UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-CV-11457-JGD

ALBERT FORD,                              )
      Plaintiff,                       )
                                       )
v.                                        )
                                       )
JAMES BENDER, ET AL.,                     )
      Defendants.                      )

## MEMORANDUM OF LAW IN SUPPORT OF DOC
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DOC defendants submit this memorandum of law in support of their Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Albert Ford, an inmate lawfully held with the Department of Correction, is currently and at all times relevant to his Amended Complaint housed in the Department Disciplinary Unit ("DDU") at the Massachusetts Correctional Institution at Cedar Junction ("MCI-Cedar Junction") located in Walpole, Massachusetts. Plaintiff alleges that his housing at MCI-Cedar Junction within the DDU as an inmate awaiting trial pursuant to M.G.L. c. 276, §52A violated his federal and state constitutional rights. In addition, plaintiff alleges that his continued confinement in the DDU at MCI-Cedar Junction violates his federal and state constitutional rights. Plaintiff names as defendants: the Massachusetts Department of Correction; Harold Clarke, Commissioner of Correction; James Bender, Deputy Commissioner of Correction and former Acting Commissioner of Correction; Peter St. Amand, Superintendent of MCI-Cedar Junction; Kenneth Nelson, Assistant Deputy Commissioner; and Michael Bellotti, Sheriff of Norfolk County.

Defendants are entitled to judgment as a matter of law on all counts of the Amended Complaint. Accordingly, defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## ARGUMENT

### I. STANDARD OF REVIEW

Summary judgment[1] is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A non-moving party cannot rest on mere allegations; the non-moving party must adduce specific, provable facts that establish that there is a triable issue. Rogers v. Fair, 902 F.2d 130, 143 (1st Cir. 1990). Summary judgment is mandated when the party who has the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., supra, at 322. The party moving for summary judgment is not required to negate the opposing party's claim by

---

[1] Of similar import is the fact that the standard for review of the adequacy of a complaint under Mass. R. Civ. P. 12(b)(6) was recently revised by first, the United States Supreme Court and subsequently, the Supreme Judicial Court in the cases of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) and Iannacchino v. Ford Motor Co., 451 Mass. 623 (2008). Both Court's adopted the following new standard: "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level." (internal citations omitted). Bell Atlantic, 550 U.S. at 545. In revising the standard of review established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), the Supreme Court stated that under Conley's "no set of facts" standard, "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Bell Atlantic, 550 U.S. at 561. The Iannacchino Court stated: "[W]e agree with the Supreme Court's analysis of the Conley language, which is quoted in our decision in Nader v. Citron, 372 Mass. 96, 98 (1977), and we follow the Court's lead in retiring its use." Iannacchino, 451 Mass. at 636. At the outset of this case, defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. At the request of the Court, defendants agreed to allow limited discovery, which turned into far more than limited discovery, prior to filing a dispositive motion; however, defendants reserved all of their rights to any basis for dismissal under Rule 12(b)(6). Thus, where, as here, plaintiff cannot point to any specific factual allegations even after discovery, his claims must be dismissed.

producing affirmative evidence disproving that essential element; the moving party must only show that there is an absence of evidence by which the non-moving party can prove its case. Celotex, supra, at 325.

In order to defeat a motion for summary judgment, therefore, a plaintiff must demonstrate a genuine issue of material fact on every element essential of his case in chief. A genuine issue is one where the party opposing summary judgment provides evidence "*such that a reasonable jury could return a verdict for the nonmoving party*." Daury v. Smith, 842 F.2d 9, 11 (1st Cir. 1988) (emphasis added). A plaintiff is not allowed to rely upon unreasonably speculative inferences, see Mesnick v. General Elec. Co., 950 F.2d 816, 826 (1st Cir. 1991), but must present concrete evidence in support of the essential elements of his or her case. Celotex, supra, at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Summary judgment is appropriately granted where the non-moving party cannot delineate specific factual evidence from specific references to affidavits, depositions, or other documentation. See Shubert, et al. v. Nisson Motor Corp., 148 F.3d 25 (1998).

Plaintiff's Amended Complaint for declaratory and injunctive relief is also not appropriate in this case because "it appears to a certainty [that plaintiff is] entitled to no relief under any set of facts which could be proved in support of [his] claim[s]." Harvard Law School Coalition for Civil Rights v. President and Fellows of Harvard College, 413 Mass. 66, 68 (1992).

As set forth more fully below, plaintiff cannot provide evidence on any of his claims sufficient for a reasonable jury to return a verdict in his favor against any of the named defendants. Accordingly, defendants are entitled to judgment as a matter of law on each claim.

II.  **FORD'S CLAIMS ARE MOOT TO THE EXTENT THEY CHALLENGE THE TIME HE WAS HELD IN THE DOC AWAITING TRIAL PURSUANT TO M.G.L. C. 276, §52A.**

Courts traditionally will not decide moot controversies. Specifically,

Courts decline to hear moot cases because (a) only factually concrete disputes are capable of resolution through the adversary process; (b) it is feared that the parties will not adequately represent the positions in which they no longer have a personal stake; (c) the adjudication of hypothetical disputes would encroach on the legislative domain; and (d) judicial economy requires that insubstantial controversies not be litigated.

Wolff v. Comm'r of Pub. Welfare, 367 Mass. 293, 298 (1975); see Weinstein v. Bradford, 423 U.S. 147, 148 (1975) (*per curiam*). The requirement of an actual, and not moot, controversy is particularly applicable to actions seeking declaratory relief. Penal Inst. Comm'r for Suffolk County v. Comm'r of Corr., 382 Mass. 527, 530-31 (1981); see also Eve Corp. v. License Comm'n for Worcester, 372 Mass. 869, 869 (1977).

A prisoner's claim for equitable relief to change prison conditions is extinguished when he is no longer subject to those conditions. Weinstein, 423 U.S. at 148; Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985); Lane v. Hutchinson, 794 F. Supp. 877, 881 (E.D. Mo. 1992). Where declaratory relief is sought, plaintiff must show that there is a substantial controversy over present rights of "sufficient immediacy and reality" requiring adjudication. Boston Teachers Union, Local 66 v. Edgar, 787 F.2d 12, 15-16 (1st Cir. 1986) (quoting Preiser v. Newkirk, 422 U.S. 395, 402 (1975)). Once the issues

presented are no longer "live" or the parties lack a legally cognizable interest in the outcome, the case for declaratory relief is moot.  Id.

> [A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them.  Its judgments must resolve a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

Preiser, 422 U.S. at 401 (inner citations and quotations omitted).  The same principles render plaintiff's claims for injunctive relief moot as well.  See Roth v. United States, 952 F.2d 611, 613-14 n.2 (1st Cir. 1991); Purvis v. Ponte, 929 F.2d 822, 824-25 (1st Cir. 1991) (prisoner's claim for equitable relief rendered moot after he no longer resides at the institution).

The only exceptions lie in circumstances where the alleged wrongdoer voluntarily ceased its unlawful conduct, thereby eliminating the live dispute between the parties, or where the events are capable of repetition yet evading review.  Edgar, 787 F.2d at 15-16. Absent a class action:

> the 'capable of repetition yet evading review' doctrine [is] the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

Weinstein, 423 U.S. at 149.  In Weinstein v. Bradford, an inmate sued members of the North Carolina Board of Parole claiming he had procedural rights under the Fourteenth Amendment in considering his eligibility for parole.  Id., at 147.  Subsequently, the inmate was temporarily paroled and that status then ripened into a complete release from supervision.  Id., at 148.  The Court held that the inmate did not fulfill the second requirement under the exception because "there [was] no demonstrated probability that

[the inmate] will again be among that number [of inmates subject to the Board of Parole's jurisdiction]." Id., at 149. Therefore, the Court ruled the inmate "no longer ha[d] any present interest affected by [the parole] policy," so the case was moot. Id., at 148.

Similarly, the First Circuit found in Arnold v. Panora, 593 F.2d 161, 164 (1st Cir. 1979), that plaintiff failed to meet the second requirement under the standard set forth above. In Arnold, plaintiff was convicted of drunk driving after a trial and had his license revoked for a year pursuant to a Massachusetts statute. Id., at 162. Subsequently, plaintiff exercised his right to a trial de novo, was found not guilty, and had his license reinstated in superior court. Id., at 163. Plaintiff simultaneously sought injunctive and declaratory relief in federal court by challenging the Massachusetts statute as unconstitutional. Id. The district court dismissed the case as moot, and the First Circuit affirmed. Id. The First Circuit reasoned that there was no "reasonable expectation that Arnold will again be subject to the alleged unconstitutional statutory procedure. Arnold would have to be again arrested for drunken driving, and he has provided no evidence that such an event is likely to happen." Id., at 164.

The identical reasoning applies to the instant case. Ford is no longer housed within the Department as a pretrial detainee pursuant to M.G.L. c. 276 §52A. Following his confinement in the DDU as a pretrial detainee, Ford subsequently pled guilty to assault and battery with a dangerous weapon, kidnapping, and the charges arising from his attempt to smuggle heroin into MCI-Cedar Junction in May of 2007. Amended Complaint, at ¶ 28; Plaintiff's Deposition 38: 11-15; 40: 4-6, 15-18, 22-23; 41:7-11, attached hereto at Exhibit A. Ford received a sentence of four to five years for this charge, and was returned to his designated housing in the DDU at MCI-Cedar Junction.

Am. Compl., at ¶28; Pl.'s Dep. 40: 13-14, 24; 41: 1-2, attached hereto at Exhibit A.  He

has not been designated as a pretrial detainee since that sentencing.  Currently, there are

no pending charges against Ford as he has been sentenced on all counts brought against

him in Norfolk County Superior Court.  Therefore, Ford's claim as to the

unconstitutionality of M.G.L. c. 276, §52A is moot.

Additionally, Ford's case does not fall within the limited exception where it is

capable of repetition yet evading review.  Taken to its logical conclusion, such an

argument would require the Court to assume that Ford is going to commit another crime,

either while incarcerated or after he is released upon completing his current sentence, and

additionally have an incomplete DDU sanction.  Ford, like the plaintiffs in Weinstein and

Arnold, has not demonstrated that there is a probability that he will again be a pretrial

detainee held in the DDU and "has provided no evidence that such an event is likely to

happen."  See Weinstein, 423 U.S. at 149; Arnold, 593 F.2d at 164.  Thus, Ford would

fail to satisfy the second requirement under Weinstein, so his claim would not fall into

the limited exception of being "capable of repetition yet evading review," and would

therefore be moot.  See 423 U.S. at 149.

III.    **EVEN IF FORD'S CLAIM IS NOT MOOT, FORD WAS PROPERLY IN DOC CUSTODY PURSUANT TO M.G.L. c. 276, §52A AND PROPERLY HOUSED IN THE DDU.**

A.    **Ford Was Properly In The Custody Of The Massachusetts Department of Correction.**

Ford first appears to challenge his housing within DOC custody as a pretrial detainee

in January 2007 and again in June 2007, arguing that as a pretrial detainee he should have

been held at the Norfolk County jail.  M.G.L. c. 276, §52A provides that:

> [p]ersons held in jail for trial may, with the approval of the district attorney, and shall, by order of a justice of the superior court, be removed by the commissioner of correction to a jail in another county, and said commissioner shall, at the request of the district attorney, cause them to be returned to the jail whence they were removed.  In addition, **such persons, if they have been previously incarcerated in a correctional institution of the commonwealth under sentence for a felony, may, with the approval of the district attorney be removed by the commissioner of correction to a correctional institution of the commonwealth**[.]

(emphasis added).  Consequently, Ford was properly transferred as a pretrial detainee from the jail to a correctional institution of the Commonwealth, where he was previously incarcerated under a felony sentence.  In this case, the Sheriff requested, once in January 2007 and again in June 2007, when Ford's bail was revoked, that Ford be transferred to the custody of the Department of Correction pending his trial.  See Correspondence, attached hereto at Exhibits B and C.  The Sheriff properly made this request through the District Attorney, who similarly approved Ford's housing with the Department.  See Correspondence, attached hereto at Exhibits D and E; see also Comm'r of Corr. v. Superior Court Dep't of the Trial Court for Worcester, 446 Mass. 123, 125 (2006).  Once transferred to the Department, the Commissioner has complete discretion as to where to house plaintiff under M.G.L. c. 127, §97.  See MacDougall v. Commonwealth, 447 Mass. 505, 508-09 (2006); Discussion, infra, at § IV(B).  Accordingly, Ford's housing at MCI-Cedar Junction is proper.

### B.     Ford's Housing In The DDU Was Proper.

Ford essentially appears to claim that he cannot be confined to the DDU at any time after completion of the criminal sentence that he was serving in 2002 when he received his present DDU sentence for assaulting two (2) correction officers with a shank and taking a nurse hostage, which occurred while he was housed in the DDU serving a

previous DDU sentence.  See DDU Hearing Packet, attached hereto at Exhibit F.  The

Appeals Court had occasion to consider this issue in the case of In re Pridgett.  57 Mass.

App. Ct. 1114, No. 01-P-259, 2003 WL 1524678, at *1 (Mar. 25, 2003) (unpublished

disposition), aff'd, 443 Mass. 1016 (2005).  See Copy of Decision, attached hereto at

Exhibit G for ease of reference.  While the Appeals Court opinion, issued under Rule

1:28, is not binding precedent, the Court's reasoning is instructive.  The Court rejected

Pridgett's claim that his DDU confinement could not extend into the consecutive

sentence that was imposed for his conviction of assault upon a corrections officer.  Id.

The Appeals Court explained its reasoning as follows:

> "[t]he imposition of prison discipline is a civil proceeding."
> Commonwealth v. Forte, 423 Mass. 672, 676 (1996). As a separate civil
> matter, the terms and conditions of a disciplinary sanction (including
> assignment to the DDU) are independent and distinct from the imposition
> of punishment reflected in sentences of incarceration imposed following
> convictions for criminal offenses. Hence, Pridgett's disciplinary term of a
> ten year DDU assignment is not limited by the duration of his original
> sentence, and may also encompass the time within which Pridgett will be
> incarcerated at the prison on the consecutive sentence imposed on the
> subsequent conviction.

Id.

The same reasoning applies here. Ford's assignment to the DDU is not limited to

the term of his original sentence that expired on January 7, 2007.  Otherwise, an inmate

could assault correctional staff on the last day of his sentence and be immune from

discipline by prison officials.  As the Appeals Court recognized, the terms and conditions

of prison discipline are "independent and distinct" from criminal sentencing. The

Supreme Judicial Court has acknowledged that DDU incarceration has both a punitive

aspect **as well as deterrent and remedial purposes**.  Clark v. Commonwealth, 428

Mass. 1011, 1012 (1998)(emphasis added); Forte, 423 Mass. at 676-77; Torres v.

Commissioner of Correction, 427 Mass. 611 (1998). See also Deposition of Deputy

Commissioner, James Bender at 35-40, attached hereto at Exhibit H; Deposition of Dale

Bissonnette, at 59-62, attached hereto at Exhibit I; Deposition of Superintendent, Peter St.

Amand, at 61-68, attached hereto at Exhibit J. DDU confinement demonstrates to all

inmates that good behavior is expected and that violation of prison rules will result in

adverse consequences. Forte, 423 Mass. at 676-77. "In the hierarchy of wrongs that

might be committed in prison, a physical assault on a prison guard ranks among the most

serious, and the discipline imposed may be concomitantly severe." Id., at 677.[2]

Ford does not deny that he assaulted two (2) officers and took a nurse hostage. He

also does not contend in this civil action that the disciplinary proceedings in issuing his

DDU sanction were flawed. The proper vehicle for such a challenge would be an action in

the nature of certiorari under M.G.L. c. 249, §4. Hill v. Superintendent, M.C.I. Walpole,

392 Mass. 198, 199 n.2 (1984), rev'd on other grounds, 472 U.S. 445 (1985); McLellan v.

Comm'r of Corr., 29 Mass. App. Ct. 933, 934 (1990).[3] Ford's pleadings do not (and at this

point, could not) include a certiorari claim. He wisely does not claim that there was

insufficient evidence to find him guilty of these very serious charges.

Additionally, both housing pretrial detainees in the DDU and the notion that a DDU

sentence is separate and distinct from an inmate's criminal sentence have been upheld in

---

[2] It should be noted that plaintiff's Amended Complaint relies upon the Superior Court's decision of Commonwealth v. Forte for the notion that the DDU serves solely a punitive purpose as referenced by the 1992 statement of the Commissioner of Correction. See No. 97548, 1995 WL 809491, at *1 (Mass. Super. Mar. 8, 1995), vacated, 423 Mass. 672 (1996); Am. Compl. ¶ 40. This Superior Court decision was subsequently vacated by the Supreme Judicial Court, who determined that the Commonwealth was not limited in its justification for DDU confinement to the Commissioner's 1992 statement. Commonwealth v. Forte, 423 Mass. 672, 677 (1996). "The effect of the confinement as well as the purposes stated in the regulations themselves are relevant considerations in guiding us to…the conclusion that [DDU] confinement…has a remedial purpose." Id.
[3] Declaratory relief under M.G.L. ch. 231A is not the appropriate remedy where an inmate is challenging the adjudication in his individual case. McLellan, 29 Mass. App. Ct. at 934; Ford v. Comm'r of Corr., 27 Mass. App. Ct. 1127, 1128 (rescript), review denied, 405 Mass. 1202 (1989).

Massachusetts courts.  See Commonwealth v. Karnes, 68 Mass. App. Ct. 1118, No. 06-P-337, 2007 WL 1217695, at *5 n.3 (Apr. 25, 2007)(unpublished table disposition); Karnes v. Nolan, SUCV2005-01854 (Ball, J.; Nov. 2, 2006), attached hereto at Exhibit K for ease of reference.  In Karnes, supra, plaintiff inmate was serving a two (2) year to two (2) years and one (1) day sentence when he received a DDU referred disciplinary report for assaulting a correction officer.  Karnes completed his criminal sentence prior to his hearing on the subject disciplinary report, and was released to the custody of Middlesex County awaiting resolution of unrelated charges.  Id.  Plaintiff Karnes was subsequently returned to MCI-Cedar Junction to await trial pursuant to M.G.L. c. 276, §52A.  Id.  At that time, he received a disciplinary hearing on the DDU referred disciplinary report he had received prior to his release from DOC custody, was found guilty and was ordered confined to the DDU for five (5) years.  Karnes challenged his DDU placement for much the same reasons as Ford does here.

> The Court in Karnes, held that:

> [c]ommitment to the DDU is a civil proceeding that is separate and independent from the criminal process according to which the plaintiff was detained.  Directly on point, and contradicting Karnes's position is Commonwealth v. Bloom, 53 Mass. App. Ct. 476 (2001), holding that the prison disciplinary proceeding itself, and the departmental disciplinary unit commitment resulting therefrom during the term of the defendant's previous sentence, were not events to which jeopardy attached, and that commitment of the defendant as pretrial detainee to the DDU after the defendant's transfer under Mass. Gen. Laws ch. 276, §52A was proper.  See also Pridgett, 57 Mass. App. Ct. 1114 (2003), (citing Commonwealth v. Forte, 423 Mass. 672, 676 (1996)).

Id., at 6-7.

In appealing his criminal conviction for assaulting this officer, Karnes argued again that his DDU confinement while he was a pretrial detainee was improper under Department

of Correction regulations.  Commonwealth v. Karnes, 68 Mass. App. Ct. 1118, 2007 WL

1217695, at *5.  While the Appeals Court opinion, issued under its Rule 1:28, is not binding

precedent, the Court's reasoning is instructive.  The Appeals Court reasoned that:

> [t]he DDU was defined at the time of the altercation and DDU sentencing as "a restricted area or areas designated by the Commissioner of Correction to which an inmate has been sentenced by a special hearing officer."[4] Department of Correction regulations then in effect defined "inmate" as "[a] person committed to the care and custody of a correctional facility."  See 103 Code Mass. Regs. § 155.06 (2004) (regulation currently in effect defines inmate as "[a]ny individual, whether in pre-trial, unsentenced, or sentenced status, who is confined in a correctional institution.").  Hence, while Karnes has suggested otherwise, **DOC regulations do not preclude confining a pretrial detainee in the DDU**.

Id., at *5 n.3 (internal citations omitted)(emphasis added).

Accordingly, in the case at hand, Ford's sanction to the DDU is not simply erased by

virtue of completing his criminal sentence.  Rather, Ford may be required to complete his

DDU sanction to maintain the safety and security of MCI-Cedar Junction.  Clearly, just as

Karnes assault of a correction officer was deemed serious enough to warrant DDU

placement upon completion of his criminal sentence, Ford's assault of two (2) correction

officers and hostage taking of a nurse are serious enough to warrant continued DDU

placement.  Moreover, it is important to note that Ford was serving a previous DDU

sentence when he committed this serious infraction.  See DDU Hearing Packet, attached

hereto at Exhibit F.  Of even more significance is the fact that Ford subsequently received

three (3) additional DDU sanctions from incidents occurring while he was housed in the

DDU between November 2004 and August 2005.  See Disciplinary Reports and Hearing

Summaries, attached hereto at Exhibit L, M, and N.  Thus, Ford is seeking to have this

---

[4] Current regulations define the DDU as "a restricted area or areas designated by the Commissioner to which an inmate has received a recommended sentence by a Special Hearing Officer."  103 CMR 430.06 (2006).

Court declare void four (4) separate DDU sanctions, which would thereby indicate to all inmates that committing such serious infractions close to release from incarceration will result in absolutely no disciplinary ramifications. This would pose a serious threat to the safety and security of the institution.

Finally, the Supreme Court has stated that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell v. Wolfish, 441 U.S. 520, 546 (1979). The Court reasoned that "**[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates**." Id., at 547 n.28 (emphasis added). In the case at hand, there was no reason for the Department to believe that Ford posed "any lesser security risk" than the convicted inmates already housed within the Department. The Department's decision to house Ford in the DDU was not only to have him complete his outstanding DDU sanction, but also to maintain institutional security. Deposition of James Bender, at 99-148, attached hereto at Exhibit H. In any such situation, the safety and security of the Department, staff and other inmates is central to the decision to return an inmate to the DDU as a pretrial detainee or even after completion of a criminal sentence and release.[5]

---

[5]  Insofar as plaintiff is attempting to argue that his placement in the DDU amounts to cruel and unusual punishment in violation of the Fourteenth Amendment, this claim is barred by *res judicata*. The doctrine of *res judicata* bars re-litigation of the same claim by the same party. A final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action." Manego v. Orleans Board of Trade, 773 F.2d. 1, 5 (1st Cir. 1985). The principle of *res judicata* requires that a valid and final personal judgment rendered by a court of competent jurisdiction over the parties and the subject matter serve as a bar to any further proceedings between the same parties on the same claim." Id. "A party cannot avoid this rule by seeking an alternative remedy or by raising the claim from a different posture in a different forum." Id. In Torres, supra, the plaintiff class is defined as "prisoners presently or formerly confined in a subunit of the Massachusetts Correctional Institution at Cedar Junction known as the department disciplinary unit (DDU)[.]" In addition, prisoner is defined as "a committed offender and such other person as is placed in custody in a correctional facility in accordance with law." M.G.L. c. 125, §1(m). Thus, pretrial detainees were also a member of the Torres class. Torres

13

Deposition of Deputy Commissioner James Bender, at 86-87, attached hereto at Exhibit H. Changing an inmate from a "W" number to an "A" number should not eradicate disciplinary sanctions for all of the serious acts he performed while he was incarcerated under a criminal sentence.[6] Otherwise inmates in the DDU who wrap up their criminal sentence, but are kept with the Department as a pretrial detainee, could start anew without any worry of completing time they received for past disciplinary infractions, including those that were serious enough to warrant a DDU sanction. The safety and the security of the Department's institutions would be compromised by such a ruling.

## C. Ford Did Not Have A Right To The Housing Of His Choice.

Correction officials have absolute discretion regarding the placement of prisoners within the correctional system. The classification and/or transfer of prisoners to institutions of different levels of security neither implicates any protected liberty interest nor triggers any due process protection under the state and federal constitutions. Meachum v. Fano, 427 U.S. 215 (1976) (rejecting the notion that reclassification and transfer of a Massachusetts inmate to higher custody infringes on a liberty interest of the due process clause.); Dominique v. Weld, 73 F.3d 1156 (1st Cir. 1996). The decision of where to place prisoners within the correctional system is simply a matter of administrative discretion invoked for varied reasons such as security, convenience or

---

challenged, among other things, the conditions of confinement in the DDU as violative of the Eighth Amendment. As a member of this class, Ford is precluded from making the same arguments here, as the constitutional standard, although brought under a different constitutional provision, is exactly the same. Accordingly, any claim that Ford's housing the DDU amounted to cruel and unusual punishment must be dismissed.

[6] In addition, plaintiff became a pretrial detainee with the DOC as a result of charges pending for a number of years. If this Court were to rule that plaintiff's DDU sanction were obliterated by virtue of the delay in his criminal proceedings, inmates incarcerated in the DDU with pending criminal charges would have absolutely no incentive to resolve those charges. Rather, there would be an incentive to delay resolution contrary to public policy and the need for judicial economy.

rehabilitation.  Meachum, 427 U.S. at 228; Jackson v. Comm'r of Corr., 388 Mass. 700, 703 (1983).

Plaintiff's housing assignment was appropriately determined by the judgment and experience of Department officials, as courts recognize that deference is due prison administrators in their attempts to secure the safety of prison staff, and to preserve discipline in the prisons.  Sires v. Berman, 834 F.2d 9, 14 (1st Cir. 1987)(citing Bell, 441 U.S. at 547-48).  Prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.  Bell, 441 U.S. at 547.  They also have broad administrative and discretionary authority for the running of the correctional facility, and inmates retain only a narrow range of protected liberty interests.  Hewitt v. Helms, 459 U.S. 460, 467 (1983), rev'd on other grounds, 712 F.2d 48 (1983).  Therefore, Ford's placement in the DDU was subject to the discretion of prison administrators.

IV.     **FORD WAS NOT DENIED DUE PROCESS BY HIS CONTINUED PLACEMENT IN THE DDU.**

In the context of a prison inmate, a state is prohibited, by the Fourteenth Amendment, from depriving a person of life, liberty or property without due process of law.  Meachum, 427 U.S. at 233.  The test for determining a due process violation is first whether plaintiff has been deprived of a liberty interest within the meaning of the due process clause, and if so, was that deprivation accomplished without due process of law.  Id.  A liberty interest, protected by the due process clause, may arise from one of two sources, (1) the due process clause itself and/or (2) state law.  Hewitt, 459 U.S. at 466.  Due process and the interests it protects "are not created by the Constitution.  Rather,

they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." <u>Parratt v. Taylor</u>, 451 U.S. 527, 529 n.1 (1981) (internal quotations omitted).

In <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), the Court criticized its former precedent under which courts examined the language in state statutes and regulations to determine whether a liberty interest was created. This doctrine "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." <u>Id.</u>, at 481. The Court expressed two policy concerns: (1) its prior approach "creates disincentives for States to codify prison management procedures in the interest of uniform treatment" and (2) "has led to the involvement of federal courts in the day-to-day management of prisons," contrary to cases affording state officials appropriate deference and flexibility in prison management. <u>Id.</u>, at 482.

The Court held that states may still create liberty interests that afford prisoners due process protections, but strictly limited these areas by explaining that:

> these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes **atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life**.

<u>Id.</u>, at 484 (internal citations omitted)(emphasis added). Applying this standard to the prisoner in <u>Sandin</u>, the Court concluded that disciplining a prisoner for thirty days in segregated confinement "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." <u>Id.</u>, at 486.

Therefore, the due process clause does not, in and of itself, restrict a prison official's discretionary authority when managing their respective institutions. The administration of a prison is "at best an extraordinarily difficult undertaking," and broad discretionary authority is necessary. Hewitt, 459 U.S. at 467. The Supreme Court has cautioned against subjecting what has traditionally been the discretionary business and actions of prison administrators to the wide spectrum of judicial review. Meachum, 427 U.S. at 225. Additionally, it has long been held that the lawfully incarcerated retain only a narrow range of protected liberty interests. Hewitt, 459 U.S. at 467. The Supreme Court has also consistently refused to recognize more than the most basic liberty interests for inmates.

### A. Ford Was Afforded Procedural Due Process At His DDU Detention Hearing.

Consideration of procedural due process requires a two-step analysis. Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989). The first question is whether there is any identifiable liberty or property interest with which the state has interfered. Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 571 (1972); see also Torres, 427 Mass. at 617-18 ("Prison inmates have the protections of procedural due process only if there is an existing liberty or property interest at stake"). As stated previously, "these interests will be generally limited to freedom from restraint which . . . imposes atypical or significant hardship on the inmate [or pretrial detainee] in relation to the ordinary incidents of prison life." Torres, 427 Mass. at 618 (quoting Sandin, 515 U.S. at 484). Ford has no such interest as discussed previously and detailed more fully below.

However, if the Court determines Ford had such an interest, the second question is whether the procedures attendant upon deprivation of the liberty or property interest

are constitutionally sufficient.  <u>Hewitt</u>, 459 U.S. at 472.  Therefore, "[p]rocedural due

process . . . 'requires that a statute or governmental action that has survived substantive

due process scrutiny be implemented in a fair manner.'"  <u>Knapp</u>, 441 Mass. at 164

(*quoting* <u>Aime</u>, 414 Mass. at 674).

Plaintiff claims the procedural process given to him should have included

classification, like all other inmates under the provisions of M.G.L. c. 127, §20 and 103

CMR 420.00.  However, as Ford was not "sentenced" to a correctional institution during

the relevant pretrial time, M.G.L. c. 127, §20 did not apply to him[7] and, at all times both

pretrial and post-conviction, 103 CMR 420.00, <u>Classification</u>, specifically states that

"[i]nmates serving DDU sentences are not subject to [its] provisions."  The purpose of

the classification regulation is to develop procedures for inmate classification, which is

defined as "[a] system by which the security and program needs of each individual in the

Department's custody is determined."  103 CMR 420.01, .06.  One of the central

purposes of this system is to determine what the most appropriate level of security and

the most appropriate institution is for housing each inmate.  <u>See</u> 103 CMR 420.07.  An

inmate with a DDU sanction for a specific period of time cannot be transferred to any

other housing location or institution until his DDU sanction has been completed.

Accordingly, classification during an individual's DDU sanction becomes a meaningless

exercise, which would simply waste the Department's time and resources.  Accordingly,

it is logical that all inmates serving DDU sanctions are not classified during the pendency

of their DDU sanction.

---

[7] M.G.L. c. 127, §20 provides in pertinent part "Any male convict who is sentenced to any correctional institution of the commonwealth…shall be delivered by the sheriff or other officer authorized to execute sentence to said [reception] center for the purpose of proper classification of the prisoner."

Moreover, the Supreme Judicial Court has already held that the process provided by the disciplinary proceedings resulting in a DDU sanction is sufficient for due process purposes. See Torres, 427 Mass. at 618. In Torres v. Commissioner of Correction, the Supreme Judicial Court determined that with procedural safeguards in place "DDU's disciplinary process comports with the requirements of the Fourteenth Amendment." Id. These procedural safeguards include the inmate receiving a disciplinary report, receiving notice of his hearing, having the ability to call witnesses and offer evidence in his defense, and requiring department to prepare a written decision following the disciplinary hearing. Ford has not challenged the due process received in each of his disciplinary proceedings and further has received due process as delineated in Torres for each and every DDU sanction he is or has to serve as provided by 103 CMR 430.00, et seq. See DDU Hearing Packet, attached hereto at Exhibit F; see also subsequent DDU Hearing Packets, attached hereto at Exhibits L, M and N; Torres, 427 Mass. at 618-19.

Finally, plaintiff claims that the "proceedings" required by M.G.L. c. 276, §52A "must include an evidentiary hearing and findings of fact made by a justice of the Massachusetts Superior Court." Am. Compl. ¶ 77. However, the law in Massachusetts has established a different conclusion regarding pretrial detainees who fall under the second part of the 52A statute. MacDougall, 447 Mass. at 509; see also Superior Court Dep't, 446 Mass. at 125. The second part of the 52A statute involves pretrial detainees transferred from jails to state correctional facilities, which is different from the first part of the statute which involves transfers from jails to other county jails. M.G.L. c. 276, §52A.

In Commissioner of Correction v. Superior Court Department of the Trial Court for the County of Worcester, the Supreme Judicial Court held that M.G.L. c. 276, §52A

does not authorize a judge in the Superior Court to order the transfer of a pretrial detainee

from a county jail to a state correctional facility, as the language "by order of a justice of

the Superior Court" is only contained in the first sentence of the statute. 446 Mass. at

123. The court reasoned that "the absence of parallel language in the second sentence of

the [52A] statute as to the authority of the Superior Court cannot be ignored." Id., at 125.

In rationalizing the absence of the parallel language, the court stated that:

> [t]he Legislature could reasonably have concluded that the commissioner is in the
> best position to know whether and which State facilities have bed space, whether
> those facilities include an appropriate level of security, and whether such facilities
> are geographically suitable to accept any particular detainee. It is not illogical in
> these circumstances to vest the commissioner with the discretionary authority to
> accept detainee transfers to the State correctional system. Nor is it illogical for
> the Legislature to have concluded that to authorize Superior Court judges sitting
> in every county to decide how many pretrial detainees will be transferred from
> county jails to State correctional institutions to await trial could wreak havoc on
> the management of that complex system.

Id., at 127.

Additionally, in MacDougall v. Commonweath, the Supreme Judicial Court

reasoned that the reference in M.G.L. c. 276, §52A

> to proceedings for "the removal of prisoners…from one jail or house of
> correction to another," is a reference to the "removal" provisions of G.L.
> c. 127, which authorize and set forth the administrative procedure for the
> commissioner's transfer of "sentenced prisoner[s] from any jail or house
> of correction to any other jail or house of correction."

447 Mass. at 509 (citing M.G.L. c. 127, §§ 97, 120, 121). The Court concluded that

"[n]o judicial proceeding or determination is statutorily required for the transfer of such

prisoners," and therefore, "none is required here [for pretrial detainees who have

previously been incarcerated in a State correctional institution for a felony]." Id. The

court ruled that "[t]he petitioner's suggestion that the term 'proceedings' in the third

sentence of G.L. c. 276, §52A, was intended as a reference to an 'order of a justice of the

superior court' in the first sentence is contrary to the statute's legislative history."  Id. at 509 n.10.

Therefore, Ford's suggestion that the "proceedings" required by §52A must include a hearing and findings of fact by a Superior Court justice are without merit.  As stated previously, the Sheriff of Norfolk County requested, once in January 2007 and again in June 2007 when Ford's bail was revoked, that Ford be transferred to the custody of the Department of Correction pending his trial.  See Correspondence, attached hereto at Exhibits B and C.  The Sheriff properly made this request through the District Attorney, who similarly approved Ford's housing with the Department.  See Correspondence, attached hereto at Exhibits D and E; see also Superior Court Dep't, 446 Mass. at 125.  Once transferred to the Department, the Commissioner has the discretion as to where to house plaintiff pursuant to M.G.L. c. 127, §97 as well as the knowledge of which facilities include an appropriate level of security for the detainee.  See MacDougall, 447 Mass. at 508-09; Superior Court Dep't, 446 Mass. at 127.  In MacDougall, the court also stated that "[w]hile [MCI-]Cedar Junction may be the 'state prison,' it is also clearly a 'correctional institution of the commonwealth'" within the meaning of §52A.  See 447 Mass. at 510.  Therefore, Ford's transfer from the Norfolk County jail to MCI-Cedar Junction was within the procedures allowed pursuant to §52A.

As a result, Ford has not suffered a procedural due process violation, and his claims fail as a matter of law.

**B.      Ford's Placement in the DDU as a Pretrail Detainee Does Not Shock the Conscience.**

In order for plaintiff's substantive due process protections to trigger, defendants must have acted arbitrarily or capriciously in a way that "shocks the conscience."  Rochin

v. California, 342 U.S. 165, 172 (1952); see County of Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998) ("conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscious-shocking level"); Commonwealth v. Knapp, 441 Mass. 157, 164 (2004) (adhering to Rochin's "shock the conscious" standard); Aime v. Commonwealth, 414 Mass. 667, 673 (1993) (citing Rochin, 342 U.S. at 172).  Here no such behavior exists.  Defendants' reasons for confining plaintiff in the DDU as a pretrial detainee were rooted upon valid penological reasons.  See Collaza-Leon v. United States Bureau of Prisons, 51 F.3d 315, 317 (1st Cir. 1995).

Whether a restriction violates a pretrial detainee's due process rights under the Fourteenth Amendment "turns on whether the conditions of confinement are 'reasonably related to a legitimate governmental objective.'"  Richardson v. Sheriff of Middlesex County, 407 Mass. 455, 461 (1990) (*quoting* Bell, 441 U.S. at 539); see Collazo-Leon, 51 F.3d at 318.  To distinguish between impermissible sanctions against pretrial detainees and permissible measures:

> [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.  See Flemming v. Nestor, [363 U.S. 603] at 613-617 [(1960)] . . . .  If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."

Bell, 441 U.S. at 538-39 (footnotes omitted).  In Bell, the Supreme Court was concerned with various general conditions to which all pretrial detainees were subjected, including double-bunking and strip-searches, rather than conditions that had a "direct or individualized disciplinary or deterrent purpose."  Collaza-Leon, 51 F.3d at 317.  However, though a restriction or condition "may be viewed as having a punitive effect on the pretrial detainee,

it is nonetheless constitutional if it also furthers some legitimate governmental objective such as addressing a specific institutional violation and is not excessive in light of the seriousness of the violation." <u>Collaza-Leon</u>, 51 F.3d at 318 (<u>citing</u> <u>Bell</u>, 441 U.S. at 538-39). "Among the legitimate objectives recognized by the Supreme Court are ensuring a detainee's presence at trial and maintaining safety, internal order, and security within the institution." <u>Id.</u> (*citing* Bell, 441 U.S. at 540). "The administrators of the prison must be free, within appropriate limits, to sanction the prison's pretrial detainees for infractions of reasonable prison regulations that address concerns of safety and security within the detention environment." <u>Id.</u>

> [D]etermining whether restrictions . . . are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

<u>Bell</u>, 441 U.S. at 540 n.23 (*quoting* <u>Pell v. Procunier</u>, 417 U.S. 817, 827 (1974)). "This recognition is a clear approval of a broad exercise of discretion by prison authorities to take reasonable and necessary action, including punishment, to enforce the prison disciplinary regime and to deter even pretrial detainees from violation of its requirements." <u>Collazo-Leon</u>, 51 F.3d at 318; <u>see</u> <u>also</u> <u>Jiles v. Dep't of Corr.</u>, 55 Mass. App. Ct. 658, 663-64 (2002). DDU confinement can thus be used to deter even pretrial detainees against specific and significant violations of reasonable prison regulations.

The facts in this case are clear that defendants were grievously concerned with the safety and security of the institutional system. <u>See</u> Deposition of Deputy Commissioner, James Bender, at 99-148, attached hereto at Exhibit H. Ford had assaulted two (2)

correctional officers and taken a nurse hostage *while he was housed in the DDU* and received a 10-year DDU sanction as a result of his actions, which he began serving in September 2003. DDU Hearing Packet, attached hereto at Exhibit F. On January 7, 2007, Ford completed his criminal sentence; however, he was still being held on bail out of Norfolk County for charges associated with the 2002 assault. See Bail Order, attached hereto at Exhibit O. Ford remained at MCI-Cedar Junction as a pretrial detainee pursuant to M.G.L. ch. 276, §52A. See Exhibits B, C, D and E. Accordingly, upon completion of his criminal sentence, Ford remained housed in the DDU serving the remainder of his DDU sanction. On March 2, 2007, Ford made bail and was released from the Department's custody. (Am. Compl. ¶18). However, as a result of his attempting to send heroin into MCI-Cedar Junction, Ford's bail was revoked, and he was returned to DOC custody on June 26, 2007, a mere three and one-half months later. Am. Compl. ¶19; see also Bail Order, attached hereto at Exhibit P and Investigation Summary, attached hereto at Exhibit Q. At that time Ford had not completed his DDU sanction, and he had further accumulated additional DDU sentences. See Exhibits L, M and N and Discussion, supra, at §III(B).

These facts are clearly distinguishable from the Supreme Court decision in Rochin. There the Court found that "[i]llegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents--this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation." Id. In stark

contrast to the police officers in <u>Rochin</u>, defendants had constitutional precedent guiding their conduct.

It was and continues to be well settled and clearly established that defendants retain broad discretion in maintaining security and order at MCI-Cedar Junction. <u>See</u> <u>Bell</u>, 441 U.S. at 540 n.23 ("in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters")(**quoting** <u>Pell</u>, 417 U.S. at 827). Here, no such exaggeration exists; in fact, there is a mountain of evidence to suggest that their actions were necessary. Prison officials also have broad administrative and discretionary authority for the running of the correctional facility, and inmates, which under M.G.L. c. 125, §1(i) include individuals "placed in custody in a correctional facility in accordance with the law," retain only a narrow range of protected liberty interests. <u>Hewitt</u>, 459 U.S. at 467. As such, the detention of a pretrial detainee in the DDU[8], who had previously received a DDU sanction for assaulting two (2) correctional officers and kidnapping a nurse, directly addresses the demonstrated threat to the safety and security of the institution was neither arbitrary nor capricious, nor does it (or the

---

[8] Torres found the conditions of confinement to be as follows: "[t]he DDU is a modern secure facility which can hold up to 124 male inmates in individual cells. The DDU inmates are allowed five hours of outdoor exercise weekly, weather permitting, and they also are allowed to leave their cells to shower and shave three times weekly. At all other times, DDU inmates remain in their cells. Each inmate's cell is approximately seven by twelve feet, and contains a toilet, sink, bed, desk with attached seat, and one window. The cell's steel door also has a window, two slots through which items can be passed, and several small holes to facilitate communication through the door. While there, DDU inmates receive hourly visits from correction officers, and daily visits from the director and captain of the DDU. The correctional program officer also makes rounds two or three times weekly. In addition, medical personnel visit the inmates four times each day, while religious and mental health staff make rounds once each week. Inmates may communicate with any of their visitors through their cell doors or by passing a note through one of the door's clots. Inmates may also speak with each other while in the exercise yard or in their cells. While in their cells, DDU inmates have access to the resources of the prison law library and the other reading material. Finally, inmates who have not committed further disciplinary violations while in the DDU may eventually have a radio and television in their cells, make four thirty-minute telephone calls monthly, and have four one-hour, non-contact visits per month." <u>Id.</u>, at 613.

conditions of confinement) shock the conscience. DDU confinement demonstrates to all inmates that good behavior is expected and that violation of prison rules will result in adverse consequences. Forte, 423 Mass. at 676-77. There is no evidence in the record to indicate that detention in the DDU is an exaggerated sanction by the Department of Correction to Ford's significant and dangerous violations of the prison's regulations. Cf. Richardson, 407 Mass. at 462-67 (failure to provide beds, inadequate toilet and shower facilities, and overcrowding of multiple-occupancy areas unconstitutional "punishment" of pretrial detainees since not reasonably related to legitimate governmental objectives). "The concern underlying Bell is that the challenged conditions are not 'imposed to sanction prior unproven criminal conduct,' but are 'imposed to enforce reasonable prison disciplinary requirements.'" Collazo-Leon, 51 F.3d at 318. Here, Ford was not being "punished" or sanctioned for "prior unproven criminal conduct," but was sanctioned and confined to the DDU to "enforce reasonable prison disciplinary requirements." Such detention, for up to ten years, has been upheld as constitutional by the Supreme Judicial Court. See Torres v. Comm'r of Corr., 427 Mass. 611, 618 (1998).

Moreover, the conditions of confinement in the DDU[9] cannot be said to implicate the plaintiffs' substantive due process rights as the Supreme Court has ruled that:

> [c]onfinement in any of the State's [Massachusetts'] institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with more severe rules.

---

[9] The legality of the conditions of confinement in the DDU has been litigated in Torres. Specifically, the SJC made specific findings as to the conditions of confinement in the DDU, which have not changed in any substantial way since Torres was litigated, and found that these conditions of confinement did not violate the Eighth Amendment or Article 26. Torres, supra, at 614-616. Accordingly, it should not be re-litigated here. Moreover, plaintiff elicits absolutely no evidence either in his Amended Complaint or in discovery, that his conditions of confinement in the Norfolk House of Correction would be any different from those he is subject to in the DDU.

Meachum, 427 U.S. at 225; see also Harris v. Comm'r of Corr., 409 Mass. 472, 477-78

(1991); Jackson, 388 Mass. at 703. The Court went on to hold that inmates in

Massachusetts can be transferred "for whatever reason or for no reason at all."

Meachum, 427 U.S. at 228. As these constitutional precedents indicate, the Defendants

were following established law in retaining Ford in the DDU as a pretrial detainee

following the completion of his criminal sentence and in transferring Ford to the same

area once his bail was revoked and the Department received custody of him under 52A.

Hence, the conduct of Deputy Commissioner Bender in retaining Ford in the

DDU does not "shock the conscious" and cannot be deemed arbitrary or capricious.

Furthermore, the circumstances, and Deputy Commissioner Bender's actions in response,

demonstrate a good faith approach to maintain the security and safety of the institution.

See Deposition of James Bender, at 99-148, attached hereto at Exhibit H. Defendants'

actions simply do not indicate malice or corruption.[10]

## V.  PLAINTIFF'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS UNDER THE FEDERAL AND STATE STANDARDS FAIL AS A MATTER OF LAW.

The Supreme Court "has recognized that the Sixth Amendment right to counsel

exists . . . in order to protect the fundamental right to a fair trial." Strickland v. Washington,

466 U.S. 668, 684 (1984). The Court has also stated that "the right to counsel is the right to

the effective assistance of counsel." Id., at 686 (internal quotations omitted). On the same

---

[10]  If Plaintiff's Amended Complaint is attempting to make a mental health claim, the Defendants would first note that the effect of segregation on the mental health of inmates is presently pending in the case of Disability Law Center, Inc. v. Massachusetts Department of Correction, 07-cv-10463 (Wolf, C.J.). Ford would be represented by the class of plaintiffs in this litigation, so his claims should not be decided here. Secondly, there is no medical evidence that Ford has developed a mental health condition from the conditions of confinement in segregation.

day the Strickland v. Washington opinion was decided, the Court also decided United States

v. Cronic, wherein it stated that:

> the right to effective assistance of counsel is recognized not for its own sake,
> but because of the effect it has on the ability of the accused to receive a fair
> trial. **Absent some effect of challenged conduct on the reliability of the
> trial process, the Sixth Amendment guarantee is generally not
> implicated.**

466 U.S. 648, 658 (1984)(emphasis added).

If the Sixth Amendment guarantee is implicated, there are "two components to any

ineffective-assistance claim: (1) deficient performance and (2) prejudice." Lockhart v.

Fretwell, 506 U.S. 364, 369 (1993)(*citing* Strickland, 466 U.S. at 687). Deficient

performance "requires showing that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," while prejudice

"requires showing that counsel's errors were so serious as to deprive the defendant of a fair

trial, a trial whose result is reliable." Strickland, 466 U.S. at 687; see also Lockhart, 506

U.S. at 372. Additionally, in Strickland, the Supreme Court stated that "[g]overnment

violates the right to effective assistance when it interferes in certain ways with the ability of

counsel to make independent decisions about how to conduct the defense." Id., at 686

(citing cases where defendant arraigned without counsel, court required defendant be first

defense witness, court barred direct examination of defendant, court denied petition for

counsel and defendant pled guilty without counsel, etc.).

Similarly, in Massachusetts state courts,

> what is required in . . . claims of ineffective assistance of counsel [under the
> Massachusetts Declaration of Rights], and what our own decisions have
> sought to afford, is a discerning examination and appraisal of the specific
> circumstances of the given case to see whether there has been serious
> incompetency, inefficiency, or inattention of counsel-behavior of counsel
> falling measurably below they [sic] which might be expected from an

ordinary fallible lawyer-and, if that is found, then, typically, **whether it has likely deprived the defendant of an otherwise available, substantial ground of defence** [*sic*] [in his criminal proceedings].

Commonwealth v. Saferian, 366 Mass. 89, 96 (1974)(emphasis added). While the state and federal standards use different language, the First Circuit has noted that "the SJC . . . has concluded that [Commonwealth v.]Saferian is at least as solicitous of Sixth Amendment rights as Strickland." Ouber v. Guarino, 293 F.3d 19, 32 (1st Cir. 2002)(determining that Saferian does not run contrary to Strickland); see also Commonwealth v. Urena, 417 Mass. 692, 696 (1994)(determining "that satisfaction of the standard for effective assistance of counsel under the Declaration of Rights [under Saferian] still necessarily satisfies the Federal standard").

Effective assistance of counsel claims are more often than not made regarding a habeas petition or a motion for a new trial in relation to criminal proceedings. See MacDougall, 447 Mass. at 512 n.12; see generally Lockhart, 506 U.S. 364; Strickland, 466 U.S. 668; Ouber, 293 F.3d 19; Saferian, 366 Mass. 89. In MacDougall, the Supreme Judicial Court reasoned that a claim of interference with assistance of counsel "implicates a constitutional right that is central to a fair trial on the criminal charges and to the adjudication of [the pretrial detainee's] guilt or innocence." 447 Mass. at 512 n.12. With such an implication, the court determined that the pretrial detainee correctly raised his claim of interference with assistance of counsel by motion in his criminal case rather than in a separate civil complaint. Id.

Based upon the above standards, Ford has not substantiated an effective assistance of counsel claim. He incorrectly brings this claim in a civil proceeding rather than previously in his criminal case, where such a claim is "central to a fair trial . . . and to the

adjudication of . . . guilt or innocence." See id.[11]  Additionally, Ford has not claimed the

Department interfered with his counsel's ability to make independent decisions about how

to conduct the defense of Ford's charges in Norfolk.  See Strickland, 466 U.S. at 686.  Ford

has also made no claim that his counsel was ineffective or that the ineffective performance

of his counsel prejudiced him in any way or deprived him of "an otherwise available,

substantial ground for defence [sic]" in his criminal proceedings.  See Saferian, 366 Mass. at

96.  In fact, Ford has agreed that he was happy with his representation between January

2007 and the close of his criminal case in 2008.  Pl.'s Dep. 39: 18-24; 40: 1-3, attached

hereto at Exhibit A.  Therefore, Ford's claim for ineffective assistance of counsel[12] is

without merit.

## VI.    M.G.L. c. 276, §52A DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE ON ITS FACE AND PLAINTIFF WAS NOT DENIED EQUAL PROTECTION.

Contrary to popular belief, the Equal Protection Clause of the Fourteenth

Amendment does not require the state to treat all persons alike.  Nordlinger v. Hahn, 505

U.S. 1, 10 (1992).  "It simply keeps governmental decision makers from treating

---

[11] Ford has pled guilty at all of his criminal proceedings and is not seeking a habeas petition or motion for new trial in relation to those proceedings.

[12]   To the extent that Ford is really attempting to raise an access to courts claim, such a claim similarly fails.  The constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers, by providing prisoners with adequate law libraries, **or** adequate assistance from persons trained in the law.  Bounds v. Smith, 430 U.S. 817, 829 (1977).  This standard is satisfied when an inmate has the ability "to prepare a petition or complaint," Carter v. Fair, 786 F.2d 433, 435 (1st Cir. 1986)(internal citations omitted), and "to participate meaningfully in the legal process."  Sowell v. Vose, 941 F.2d 32, 34 (1st Cir. 1991).  "The constitutionally-protected right of access to the courts is narrow in scope."  Boivin v. Black, 225 F.3d 36, 42 (1st Cir. 2000).  To state a claim, an inmate must plead facts to demonstrate that a non-frivolous legal claim was frustrated or impeded.  See Lewis v. Casey, 518 U.S. 343, 352 (1996); Hannon v. Allen, 241 F.Supp.2d 71, 74 (D.Mass. 2003); Matthews v. Commissioner of Correction, 449 Mass. 1021, 1023 (2007).  The right to access the courts, however, has never been extended to encompass more than an inmate's ability to prepare and file a claim with the court "challenging [his] convictions or conditions of confinement."  Lewis v. Casey, 518 U.S. 343, 355, (1996). Moreover, one bringing such a claim must allege and prove "actual injury," a prerequisite derived from the doctrine of standing.  Id., at 351-354.  Ford pled guilty in both of his criminal proceedings that were ongoing while he was detained in the DDU as a pretrial detainee, received a very lenient sentence, and was happy with his representation.  Ford Dep., at 39-40 attached hereto at Exhibit A.

differently persons who are in all relevant respects alike." Id. State officials "have

substantial latitude to establish classifications that roughly approximate the nature of the

problem perceived, that accommodate competing concerns both public and private, and

that account for limitations on the practical ability of the State to remedy every ill."

Plyler v. Doe, 457 U.S. 202, 216 (1982). Because of this latitude, officials are presumed

to have acted within their constitutional power when distinguishing between classes of

persons. Nordlinger, 505 U.S. at 10. Unless a classification warrants some heightened

review because it concerns a fundamental right (freedom of speech, religion, etc.) or

categorizes based *solely* on the basis of suspect criteria (race, gender, etc.), behavior

which discriminates must be upheld so long as it is rationally related to a legitimate

governmental interest. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440

(1985); LCM Enter., Inc. v. Town of Dartmouth, 14 F.3d 675, 679 (1st Cir. 1994). This

standard is relatively easy to meet. See W. & S. Life Ins. Co. v. State Bd. of

Equalization, 451 U.S. 648, 674 (1981)(stating that parties challenging legislation under

the Equal Protection Clause cannot prevail so long as "the question is at least debatable")

(quoting United States v. Carolene Prod. Co., 304 U.S. 144, 154 (1938)). The Equal

Protection analysis does not even require that the government official actually articulate

at any time a rationale supporting its classification. The analysis only requires that a

legitimate reason may *conceivably* have formed the basis for the classification.

> [T]he "Equal Protection Clause has long been limited to instances
> of purposeful or invidious discrimination rather than erroneous or
> even arbitrary administration of state powers . . . ." Briscoe v.
> Kusper, 435 F.2d 1046, 1052 (7th Cir. 1970). A plaintiff "must
> demonstrate intentional or purposeful discrimination" to show an
> equal protection violation. Bloomenthal v. Lavelle, 614 F.2d 1139,
> 1141 (7th Cir. 1980) (per curiam). "'Discriminatory purpose'
> however, implies more than intent as volition or intent as

> awareness of consequences." Personnel Administrator of
> Massachusetts v. Feeny, 442 U.S. 256, 279 (1979). It implies that
> the decision maker singled out a particular group for disparate
> treatment and selected his course of action at least in part for *the*
> *purpose* of causing its adverse effects on an identifiable group.

David K. v. Lane, 839 F.2d 1265, 1271-72 (7th Cir. 1988)(*quoting* Shango v. Jurich, 681

F.2d 1091, 1104 (7th Cir. 1982))(emphasis in original). In Personnel Administrator of

Massachusetts v. Feeney, the Supreme Court made clear that "discriminatory purpose"

implies more than intent as volition since it implies that the decision maker selected a

particular course of action "because of," not merely "in spite of," its adverse effects upon

an identifiable group. 442 U.S. at 278-80; see also Lindsey v. Natural Carbonic Gas Co.,

220 U.S. 61, 78 (1911)(a classification having some reasonable basis does not offend the

equal protection clause merely because in practice it results in some inequality).

　　　Plaintiff's housing in the DDU was not based on any "fundamental" or "suspect"

criteria. First, prisoners do not have any fundamental federal or state constitutional

expectation of being housed in a particular prison or in a particular part of a prison. See

Discussion, supra, at § III(C). Massachusetts law and the applicable Department

regulations do not impose any substantive standards on the Commissioner's discretion to

transfer inmates. Parenti v. Ponte, 727 F.2d 21, 24 (1st Cir. 1984); Commonwealth v.

Karnes, 68 Mass. App. Ct. 1118, 2007 WL 1217695, at *5 n.3 ("DOC regulations do not

preclude confining a pretrial detainee in the DDU"). The Commissioner is granted broad

statutory discretion and those statutes that specifically deal with issues of classification

and transfer place no limitations on the discretion of the prison officials. M.G.L. c. 127,

§§ 20 & 97. The U.S. Supreme Court, First Circuit Court of Appeals, the Massachusetts

Supreme Judicial Court and the Massachusetts Appeals Court have long held that the

decision to transfer a prisoner by the Commissioner is well-recognized as a simple exercise of administrative discretion, made numerous times, for varied reasons such as security, convenience, and rehabilitation. Meachum, 427 U.S. at 226-28 (transfer of prisoner to a maximum security facility is within the normal limits or range of custody which the conviction has authorized the state to impose); Parenti, 727 F.2d at 23; Lombardo v. Meachum, 548 F.2d 13, 14-15 (1st Cir. 1977); Hastings v. Comm'r of Corr., 424 Mass. 46, 50-52 (1997)(classification policy as to certain groups of inmates does not violate the Commissioner's broad authority under M.G.L. c. 127, §97 and does not violate any federal or state constitutional right to due process or equal protection); Harris, 409 Mass. at 476-78; Jackson, 388 Mass. at 703; Nelson v. Comm'r of Corr., 390 Mass. 379, 398 (1983); Abdullah v. Sec'y of Pub. Safety, 42 Mass. App. Ct. 387, 390-91 (1997).

As stated earlier, pretrial detainees pose no less of a security risk than convicted inmates. Bell, 441 U.S. at 546. Additionally, the Supreme Judicial Court determined that the Legislature, in enacting M.G.L. c. 276 §52A, "could reasonably have concluded that the commissioner is in the best position to know whether and which State facilities have bed space, **whether those facilities include an appropriate level of security**, and whether such facilities are geographically suitable to accept any particular [pretrial] detainee." Superior Court Dep't, 446 Mass. at 127 (emphasis added). Those pretrial detainees who have been previously convicted of a felony pose an even greater risk to the security of an institution than those pretrial detainees who do not have such a conviction. Therefore, the Department's ability to place pretrial detainees who have been previously convicted of a felony in a Massachusetts state prison under M.G.L. c. 276, §52A, while

such placement is not possible for those inmates who have not been previously convicted of a felony, is not a "fundamental" or "suspect" criteria for the purposes of the equal protection clause, and the Commissioner has discretion in placement of pretrial detainees in the Department's facilities because he "is in the best position" to do so. See id. Once Ford, who had previously been convicted of a felony, was transferred to the Department for detention as a pretrial detainee the Commissioner had broad discretion to house plaintiff in the DDU for administrative and security reasons.[13] Accordingly, plaintiffs equal protection claim fails.

## VII. PLAINTIFF'S CONFINEMENT AT MCI-CEDAR JUNCTION AS A PRE-TRIAL DETAINEE DOES NOT CONSTITUTE "INFAMOUS PUNISHMENT."[14]

### A. Ford Was Indicted Prior To Confinement In The State Prison.

Plaintiff relies upon Brown v. Commissioner of Correction for his claim that his confinement as a pretrial detainee at MCI-Cedar Junction before he was tried by a jury was "infamous punishment" in violation of Article 12 of the Massachusetts Declaration of Rights, and therefore unconstitutional. See 394 Mass. 89, 92 (1985); Am. Compl. ¶¶ 103-08. Plaintiff's reliance upon Brown for this proposition is misplaced and subsequent cases citing to Brown do not support his contention.

---

[13]   It is important to note that plaintiff is not the only pretrial detainee to have been housed in the DDU at MCI-Cedar Junction. Rather, a number of inmates, both pretrial detainees pursuant to M.G.L. c. 276, §52A and federal pretrial detainees, have been housed in the DDU are required by the safety and security needs of the DOC.

[14] To the extent that any of plaintiff's claims, including this one, intend a private right of action under the State constitution for money damages, it is well established that a claim for damages does not lie directly under the State Constitution. In Martino v. Hogan, 37 Mass.App.Ct. 710, 720-21 (1994), the Appeals Court addressed the issue of whether a claim for damages could be based directly upon the State Constitution in the absence of a statute providing for specific enforcement of the constitutional rights asserted. In affirming the dismissal of a former inmate's claim for damages under Part 1, Article 12 of the Massachusetts Declaration of Rights, the Martino Court held that there was no authority upon which to base a damages claim directly upon the Constitution's Declaration of Rights. Id., at 720. Also, the Martino Court stated that the existence of the state civil rights act would appear to preclude a claim for damages directly under the State Constitution. Id. Accordingly, Counts 2, 4, 6, 8, and 9 must be dismissed.

34

In Brown, an inmate had pled guilty, was sentenced to MCI Concord, and was subsequently transferred to MCI Walpole (currently MCI-Cedar Junction), but never was indicted for his offenses. Id., at 90-91. While the court quoted from Jones v. Robbins, 8 Gray 329, 74 Mass. 329, 349 (1857), "that punishment in the state prison is an infamous punishment, and cannot be imposed without both indictment and trial by jury," the court ultimately held that Article 12 prohibited "confinement in the state prison at Walpole of . . . a prisoner who has not been **indicted** and who has not waived **indictment**. Thus, the Commissioner of Correction could not transfer an **unindicted** prisoner to MCI Walpole, pursuant to G.L. c. 127, §97." Brown, 394 Mass. at 89-90 (emphasis added).[15] In Brown, the court "recognize[d] the legitimate penological purposes of G.L. c. 127, §97, as well as the commissioner's broader duty to 'maintain security, safety and order at all state correctional facilities.'" Id., at 93 (*quoting* M.G.L. ch. 124, §1(b)). However, the court felt that Article 12 "demands that the Commonwealth anticipate the security risks presented by the criminal defendant," and if it determines the risk to be enough for confinement in the state prison, "the Commonwealth may confront the defendant at the outset with the full gravity of his potential punishment and proceed against him by **indictment**." Id., at 93 (emphasis added).

Brown has since been cited in cases by the Massachusetts Supreme Judicial Court, the Appeals Court, and the Superior Court for the proposition that an individual cannot be sentenced or transferred to the state prison without *indictment*. See MacDougall, 447 Mass. at 512 n.11 (distinguishing Brown on its facts because involved transfer to state prison for sentence of punishment where MacDougall was transferred to state prison to await trial as a

---

[15] "State prison" is defined under M.G.L. c. 125, §1(o) as MCI-Cedar Junction.

pretrial detainee);[16] Commonwealth v. Smith, 444 Mass. 497, 499 (2005); Commonwealth v. Barbosa, 421 Mass. 547, 549-50 (1995); Charles C. v. Commonwealth, 415 Mass. 58, 65 (1993); Commonwealth v. Spencer, 53 Mass. App. Ct. 45, 48 (2001), review denied, 435 Mass. 1107 (2001); Feliciano v. Commonwealth, No. 980655A, 1998 WL 1184166, at *2 (Mass. Super. June 25, 1998). None of the above cases cite to the fact that an individual cannot be sentenced or transferred to the state prison without indictment *and* trial by jury; they all focus only on the need for indictment.

In the instant case, plaintiff was indicted prior to his confinement as a pretrial detainee in the state prison at MCI-Cedar Junction. Am. Compl. ¶ 13. The Commonwealth effectively determined that plaintiff's security risk was enough for confinement in the state prison, so they confronted Ford at the outset with the full gravity of his potential punishment and proceeded against him by indictment, as was required in Brown and subsequent cases. See MacDougall, 447 Mass. at 512 n.11; Smith, 444 Mass. at 499; Barbosa, 421 Mass. at 549-50; Charles C., 415 Mass. at 65; Brown, 394 Mass. at 93; Spencer, 53 Mass. App. Ct. at 48; Feliciano, 1998 WL 1184166, at *2. Therefore, Ford's confinement in the state prison was not "infamous punishment" as he was indicted prior to confinement in MCI-Cedar Junction.[17] See Brown, 394 Mass. at 93.

---

[16] In MacDougall the Supreme Judicial Court determined it did not need to decide whether Brown applied to a pretrial detainee transferred to MCI-Cedar Junction to await trial since the detainee had subsequently been transferred to another institution. In this case, Ford is no longer held at MCI-Cedar Junction as a pretrial detainee, and therefore this claim is moot and does not need to be decided by this Court. See Discussion, supra, at §II.

[17] It is important to note that since the filing of this action, the mission of MCI-Cedar Junction has changed. Although at this juncture, the purpose, conditions and operation of the DDU have not changed, MCI-Cedar Junction is now the Department's reception center.

**B.** **During the Relevant Time Period, Ford Was A Pretrial Detainee Detained At The State Prison, Not An Inmate Sentenced To Such Confinement.**

In <u>Brown</u>, the Supreme Judicial Court determined that "infamous punishment" under Article 12 includes "the sentencing of a criminal defendant to State prison without indictment." 394 Mass. at 92. Subsequent cases have agreed that "infamous punishment" involves the *sentencing* of an individual to a term in the State prison. <u>See</u> <u>Commonwealth v. Flynn</u>, No. 08-P-1258, 2009 WL 2195332, at *1 (Mass. App. Ct. July 24, 2009) (unpublished table disposition)(determining that "'[i]nfamous punishment' does not arise from pretrial detention in a State prison but rather only from the **serving of a sentence** in State Prison")(*citing* <u>Jones</u>, 74 Mass. at 349)(emphasis added); <u>Commonwealth v. Olaf O.</u>, 57 Mass. App. Ct. 918, 918 (2003)(stating that "infamous punishment" is "a phrase connoting capital punishment or a State prison **sentence**")(*citing* <u>Jones</u>, 74 Mass. at 347-49) (emphasis added). Contrary to these cases, as it pertains to his claims as a 52A inmate, Ford was not *sentenced* to a term at the State prison, but rather was detained there as a pretrial detainee due to his incomplete DDU sanction and the security risk he posed to inmates and staff, and therefore, Ford's housing at MCI-Cedar Junction was not "infamous punishment."

M.G.L. c. 276, §52A allows for the "removal" of pretrial detainees to state correctional institutions, it makes such detainees subject to all of the Departments regulations, including disciplinary regulations. 103 CMR 430.04 makes the disciplinary regulations applicable to "inmates housed at all correctional institutions within the Department of Correction," and under M.G.L. c. 125, §1(i) "inmate" is defined as "a committed offender or **such person as is placed in custody in a correctional facility in accordance with the law**." (emphasis added). Since Ford was subject to the Department's

disciplinary regulations, his disciplinary sanction to the DDU was not punishment, but, as stated previously, was "a separate civil matter," as "the terms and conditions of a disciplinary sanction (including assignment to the DDU) are independent and distinct from the imposition of punishment reflected in sentences of incarceration imposed following convictions for criminal offenses." In re Pridgett, 57 Mass. App. Ct. 1114, 2003 WL 1524678, at *1; see Forte, 423 Mass. at 676.

Accordingly, Ford's housing in the State prison within the DDU was not "infamous punishment" as defined by the Supreme Judicial Court and the Appeals Court and in general "'infamous punishment' does not arise from pretrial detention in a state prison." Flynn, 2009 WL 2195332, at *1; see Brown, 394 Mass. at 92; Olaf O., 57 Mass. App. Ct. at 918; In re Pridgett, 57 Mass. App. Ct. 1114, 2003 WL 1524678, at *1.

VIII.    **DEFENDANTS ARE ENTITLED TO IMMUNITY.**

    A.    **The Department of Correction is Protected From Suit Pursuant to Eleventh Amendment Immunity.**

Plaintiff's claims against the Department of Correction cannot be invoked in this forum because the Department of Correction is protected by Eleventh Amendment immunity. It is well-settled that the Eleventh Amendment precludes private litigation against the states and their agencies absent their consent. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 (1984); Cory v. White, 457 U.S. 85, 90 (1982). Essentially, "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." Board of Trustees of the University of Alabama, et al. v. Garrett, et al., 531 U.S. 356, 361 (2001). Although Congress can abrogate the States' Eleventh Amendment immunity "when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional

authority,'" Id., citing Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000), this has

not occurred with regard to plaintiff's claims.  Accordingly, the Department must be

dismissed.

> **B.**     **Plaintiff Cannot Maintain His Claims for Money Damages Against
> Defendants in their Official Capacities.**

Plaintiff appropriately plead his claims pursuant to §1983, as his constitutional

claims must be assumed to be brought under this statute, or they fail on their face.  Title 42

U.S.C. §1983 provides a method for vindicating federal rights elsewhere conferred.  It is not

itself a source of substantive rights. Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct.

1865, 1870-71, 104 L.Ed.2d 443 (1989).  42 U.S.C. §1983 affords a cause of action for

damages or equitable relief against:

> [e]very person who, under color of any statute, ordinance, regulation, custom or
> usage of any State or Territory or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or any other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party in injured in an action at law, suit
> in equity, or other proper proceeding for redress.

The Commonwealth and its agencies, however, are not "persons" within the

meaning of 42 U.S.C. §1983.  Will v. Michigan Department of State Police, 491 U.S. 58,

109 S.Ct. 2304, 2309 (1989); Pennhurst State School and Hospital v. Halderman, 465 U.S.

89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); Woodbridge v. Worcester State

Hospital, 384 Mass. 38, 44-45, n.7 (1981).  In addition, a state official acting his **official**

**capacity** cannot be sued for damages in a section 1983 action.  Wang v. New Hampshire

Board of Registration in Medicine, 55 F.3d 698, 700 (1st Cir. 1995).  Therefore, §1983 is

not available against the Department of Correction in any forum, and all claims for money

damages against defendants in their official capacities must be dismissed from this case.

### C. Plaintiff's Amended Complaint Fails to Allege any Cognizable Claims Supported by Factual Allegations Against Many of the Defendants.

Despite plaintiff's attempt to make numerous claims against all of the defendants, there are no factual allegations in the complaint to support many of the claims against many of the defendants. Where a complaint alleges no specific act or conduct on the part of defendant(s) and the complaint is silent as to a defendant except for his/her name appearing in the caption, the complaint is properly dismissed. Potter v. Clark, 497 F.2d 1206, 1207 (7th Cir. 1974); see also Mmoe, surpa. Moreover, a prerequisite to an award of monetary damages in a civil rights action is a showing of the defendant's personal involvement in the constitutional violation. See e.g., Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983")(internal quotations and citations omitted). Plaintiff must "allege a tangible connection between the acts of the defendant[s] and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)

To the extent plaintiff's theory of liability is based upon any of the defendants' supervisory status, the complaint must still be dismissed because supervisory liability may not be predicated upon a theory of *respondeat superior*. Monell v. Dept. of Social Services, 436 U.S. 658, 690-92 (1978); Gurtierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989) (citations omitted). In the absence of personal involvement, a supervisor is liable for the acts of a subordinate only if (1) the subordinate's behavior results in a constitutional violation and (2) the supervisor's action was "affirmatively linked" to the behavior only in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate

indifference.  <u>Hegarty v. Somerset County</u>, 53 F. 3d 1367, 1379-1380 (1st Cir. 1995).

Negligence is inadequate to establish supervisory liability.  <u>Febus-Rodriguez v.</u>

<u>Betancourt-Lebron</u>, 14 F. 3d 87 (1st Cir. 1994).  Plaintiff must show that the supervisor

acted with deliberate indifference, in addition to a causation requirement linking the

supervisor's conduct to the subordinates' violative conduct.  <u>Maldonado-Denis v.</u>

<u>Castillo-Rodriguez</u>, 23 F. 3d 576, 582 (1st Cir. 1994); <u>Febus-Rodriguez</u>, <u>supra</u>, at 92

(supervisor's acts or omissions must amount to the reckless or callous indifference to the

constitutional rights of others; i.e., that it would be manifest to any reasonable official

that his conduct was very likely to violate an individual's constitutional rights).  Prison

officials may not "be held personally responsible simply because [they were] in a high

position of authority in the prison system."  <u>Wright</u>, <u>supra</u>, at 501; <u>see</u> <u>also</u> <u>McKinnon v.</u>

<u>Patterson</u>, 568 F.2d 930, 934 (2d Cir. 1978) ("The fact that [supervisory defendant] was

in a high position of authority is an insufficient basis for the imposition of personal

liability").

Accordingly, the Amended Complaint must be dismissed, on its face, as against

all defendants.  In addition, the Amended Complaint must be dismissed, after discovery,

as to all defendants except for Deputy Commissioner Bender (who, it is important to

note, is not identified anywhere in the Amended Complaint except by reference that he

requested that defendant Nelson respond to correspondence from Ford, at ¶38).  First,

Harold Clarke was not even the Commissioner of Correction (or employed in any fashion

by the Massachusetts Department of Correction) until November 2007.  Moreover,

Commissioner Clarke is neither identified anywhere in the Amended Complaint, nor was

he identified in any discovery as participating in any of the actions alleged in the

Amended Complaint.  As such, he must be dismissed.  Moreover, the only allegation in

the Amended Complaint regarding Kenneth Nelson was that he responded to Ford's

complaint that he should not be housed in the DDU.  There is nothing in the Amended

Complaint to tie defendant Nelson to the determination as to plaintiff's housing.

Moreover, there are no further allegations that could, in any fashion, be interpreted by

this Court as implicating a constitutional right violated by defendant Nelson.  As such, he

must be dismissed.  Similarly, the only allegations, if they can even be called that, against

defendant St. Amand are that he reviewed two (2) grievances and decided the appeals of

these grievances.[18]  As such, defendant St. Amand must be dismissed.

> ### D.  <u>Defendants are Entitled to Qualified Immunity from Money Damages.</u>

Qualified immunity is a powerful defense, and the law in this area is well-settled.

"[G]overnment officials performing discretionary functions generally are shielded from

liability from civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  In determining whether an official is

---

[18] Inmates do not have a constitutionally protected right to a grievance procedure.  <u>See e.g.</u>, <u>Leavitt</u> v. <u>Allen</u>, 46 F.3d 1114, 1995 WL 44530 *2 (1st Cir. 1995) (unpublished) (neither due process clause nor prison regulations confer upon an inmate a constitutional right to pursue grievances); <u>Antonelli</u> v. <u>Sheahan</u>, 81 F.3d 1422, 1430 (7th Cir. 1996); <u>Adams</u> v. <u>Rice</u>, 40 F.3d 72, 75 (4th Cir. 1994), <u>cert. denied</u>, 514 U.S. 1022 (1995); <u>Flick</u> v. <u>Alba</u>, 932 F.2d 728, 729 (8th Cir. 1991); <u>Mann</u> v. <u>Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988), <u>cert. denied</u>, 488 U.S. 898; <u>Ashann-Ra</u> v. <u>Virginia</u>, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000); <u>Brookline</u> v. <u>Goldstein</u>, 388 Mass. 443, 451 (1983) ("the First Amendment does not impose any affirmative obligation on the government to listen to, and respond to, a citizen's grievances"), <u>citing</u> <u>Smith</u> v. <u>Arkansas State Highway Employees, Local 1315</u>, 441 U.S. 463, 464-465 (1979).  Similarly, denial of a grievance or grievance appeal, which is the primary basis of plaintiffs' claims against the defendants, is not conduct that violates any constitutional or statutory principles.  <u>See</u> <u>Shehee</u> v. <u>Luttrell</u>, 199 F.3d 295, 300 (6th Cir. 1999)(allegation that defendant denied an inmate grievance does not state a cause of action under Section 1983); <u>Powell</u> v. <u>Miles</u>, 2006 WL 2547359 at *9 (D.Ariz. Aug. 30, 2006)(where defendant's only involvement in allegedly unconstitutional conduct is denial of grievances, no Section 1983 claim is stated); <u>Turner</u> v. <u>Solorzano</u>, 2006 WL 2523410 at *6 (M.D. Fla., Aug. 30, 2006)(same).  The fact that plaintiff may be dissatisfied with the results is not sufficient to form the basis of a lawsuit.  <u>See</u> <u>Siano</u> v. <u>Justices of Massachusetts</u>, 698 F.2d 52, 56 (1st Cir. 1983), <u>cert. denied</u>, 464 U.S. 819 (1983)(a disappointed litigant has no right to a particular decision in any case).

entitled to qualified immunity, the Court should consider whether the unlawfulness of the official's actions is apparent. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). Specifically, "qualified immunity sweeps so broadly **that all but the plainly incompetent or those who knowingly violate the law are protected from civil rights suits for money damages**." <u>Hegarty v. Somerset County</u>, 53 F.3d 1367, 1373 (1st Cir. 1995), <u>cert. denied</u>, 516 U.S. 1029 (1995) (internal quotations omitted) (emphasis added).

The central purpose of affording government officials qualified immunity from suit is to protect them "from undue interference with their duties and from potentially disabling threats of liability." <u>Elder v. Holloway</u>, 510 U.S. 510, 514 (1994) (<u>citing</u> <u>Harlow</u>, 457 U.S. at 806). Qualified immunity plays a critical role in striking the "balance . . . between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." <u>Davis v. Sherer</u>, 468 U.S. 183, 195 (1984).

The First Circuit has identified the following two prongs to the basic qualified immunity analysis:

> First, the court must establish whether the constitutional right asserted by the plaintiff was "clearly established" at the time of the alleged violation. Second, the court must ask "whether a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right."

<u>Hegarty</u>, 53 F.3d at 1373 (*citing* <u>Burns v. Loranger</u>, 907 F.2d 233, 235-36 (1st Cir. 1990)). Whether an asserted federal right was "clearly established" at the particular time that the violation purportedly occurred is a question of law not fact. <u>St. Hilaire v. City of Laconia</u>, 71 F.3d 20, 24 (1st Cir. 1995), <u>cert. denied</u>, 518 U.S. 1017 (1996)(<u>citing</u> <u>Elder</u>, 510 U.S. at 516). "For purposes of determining qualified immunity, the officer's actions

are measured by a standard of objective legal reasonableness . . . in light of the legal rules that were clearly established at the time [they] were taken." <u>St. Hilaire</u>, 71 F.3d at 24 (<u>citing</u> <u>Anderson</u>, 483 U.S. at 639). Therefore, qualified immunity does not turn on the government official's state of mind, but rather, on the "objective reasonableness" of the official's action, in light of the legal rules that were "clearly established" at the time the action was taken. <u>Id.</u>

> In <u>Harlow v. Fitzgerald</u>, <u>supra</u>, the Supreme Court removed the subjective aspect, i.e., the actor's intent, from the qualified immunity standard it had articulated in <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975). The driving force behind this reformulation of the doctrine was the Court's desire that insubstantial claims against government officials be resolved prior to discovery and on summary judgment if possible. In short, [i]mmunity ordinarily should be decided by the court long before trial.

<u>Clancy v. McCabe</u>, 441 Mass. 311, 322-23 (2004)(internal citations and quotations omitted). Moreover, qualified immunity is properly decided early in the litigation to ensure that defendants may avoid the costly burdens of such litigation, including discovery and trial. "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation, and, as such, it must be considered early in the litigation." <u>Kauch v. Dep't for Children, Youth & Their Families</u>, 321 F.3d 1, 7 (1st Cir. 2003)(<i>citing</i> <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (1985))(internal quotations omitted). Recognizing that the use of summary judgment in qualified immunity cases could be undermined by a "passably clever plaintiff [who] would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated," the Supreme Court held that a broad articulation of the "clearly established" law at the time of the alleged violation is inappropriate, stating:

> [t]he right the official is alleged to have violated must have been "clearly established" in the more particularized, and hence more relevant, sense:

> The contours of the right must be sufficiently clear that a reasonable
> official would understand that what he is doing violates that right.

St. Hilaire, 71 F.3d at 24 (*citing* Anderson, 483 U.S. at 640 n.2).

Massachusetts has adopted the standard of qualified immunity for public officials developed under 42 U.S.C. §1983 and incorporated it for claims brought under the Massachusetts Civil Rights Act. Duarte v. Healy, 405 Mass. 43, 46 (1989); see also Santiago v. Fenton, 891 F.2d 373, 386 n.10. (1st Cir. 1989); Longval v. Comm'r of Corr., 448 Mass. 412, 419 (2007)("Analysis of the qualified immunity defense generally requires a two-part inquiry into whether, taken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right, and if so, whether the right was clearly established so that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted")(internal citations omitted). A Massachusetts public official is also entitled to common law immunity if his actions, taken in the exercise of his judgment and discretion, were made in good faith, without malice and without corruption. Gildea v. Ellershaw, 363 Mass. 800, 820 (1973).

When qualified immunity is raised as a defense, the burden is on plaintiff to show that the law is clearly established. See, e.g. Dixon v. Richer, 922 F.2d 1456, 1460 (10th Cir. 1991). If plaintiff does not meet this initial burden, "the government official is properly spared the burden and expense of proceeding any further." Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir. 1989).

In the present case, plaintiff cannot demonstrate that the law is clearly established in his favor. Rather, it has been previously clearly established that plaintiff, as a pre-trial detainee, previously charged of a felony and with an incomplete DDU sanction, can be

housed at MCI-Cedar Junction in the DDU. Similarly, it has been clearly established that disciplinary sanctions are civil in nature and separate from a criminal sentence. As such, it has been clearly established that Deputy Commissioner Bender's decision to require Ford to complete his DDU sanction during his time as a pretrial detainee and his subsequent criminal sentence was appropriate and legal.

Moreover, although it appears to be established that housing Ford as a pretrial detainee at MCI-Cedar Junction was legal, it certainly was not clearly established that he could not be housed there. Brown only established that an individual must first be indicted to be *sentenced* to the state prison. Brown, 394 Mass. at 93. Subsequent cases citing Brown only referenced that indictment was necessary before confinement in the state prison. See MacDougall, 447 Mass. at 512 n.11; Smith, 444 Mass. at 499; Barbosa, 421 Mass. at 549-50; Charles C., 415 Mass. at 65; Spencer, 53 Mass. App. Ct. at 48; Feliciano, 1998 WL 1184166, at *2. Additionally, the court in MacDougall distinguished Brown on its facts since it dealt with an inmate sentenced to the state prison, while MacDougall was a pretrial detainee transferred to the state prison to await trial. 447 Mass. at 512 n.11. The court ultimately did not reach the merits of the pretrial detainee's claim that housing him in the state prison amounted to "infamous punishment," since MacDougall had subsequently been transferred to a different institution. Id. Finally, the Appeals Court of Massachusetts only recently clarified the ruling in Brown pertaining to "infamous punishment" and they found that "'infamous punishment' does not arise from pretrial detention in a state prison." Flynn, 2009 WL 2195332, at *1. Therefore, Ford cannot prove that it was clearly established law that his housing in the DDU at MCI-Cedar Junction violated any constitutional provisions. However, with the Flynn opinion,

it is clear now that such housing does not constitute "infamous punishment." Ford has not and cannot allege any violations of law which defendants knew or should have known violated a clearly established constitutional right.

More important, as to the second prong of this test, plaintiff has not pled and cannot demonstrate that a reasonable official in defendants' circumstances would have known that a clearly established right was being violated in his housing in the DDU as a pretrial detainee. Rather, the SJC has clearly established that sanctions to the DDU are entirely legal. See Torres, 427 Mass. at 618. Additionally, the Supreme Court has reasoned that "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates," Bell, 441 U.S. at 547 n.28, and the Massachusetts Appeals Court has ruled that "DOC regulations do not preclude confining a pretrial detainee in the DDU." Commonwealth v. Karnes, 68 Mass. App. Ct. 1118, 2007 WL 1217695, at *5 n.3. Deputy Commissioner Bender made a rational decision first in January 2007 to continue to house Ford in the DDU when they were asked to retain Ford as a 52A pretrial detainee, and finally in June 2007 to transfer Ford directly to the DDU after he was again put in their custody under the 52A statute after his bail was revoked. Ford had an incomplete DDU sanction from actions he committed while housed in the DDU. It was under broad discretion of defendants to maintain Ford's housing in the DDU in the interest of maintaining institutional security and order as well as deterring misconduct by other inmates at MCI-Cedar Junction. See Bell, 441 U.S. at 540 n.23; Forte, 423 Mass. at 677.

Accordingly, defendants are entitled to qualified immunity, as they have not violated any clearly established right of plaintiff, and defendants have acted consistent

with a reasonable correctional official throughout all actions alleged in the Amended Complaint.

IX. **THERE IS NO PRIVATE RIGHT OF ACTION UNDER M.G.L. c. 276, §52A, M.G.L.c. 127, §20, M.G.L. c. 125, §14 OR 103 CMR 420.08.[19]**

In the absence of any indication that the Legislature intended a statute to create a private right of action, none should be inferred by the Court. Loffredo v. Center for Addictive Behaviors, 426 Mass. 541, 545-547 (1998). Borucki v. Ryan, 407 Mass. 1009 (1990)(In the absence of words expressly creating a private cause of action, G.L. c. 123, §36A, intended to protect the privacy of persons subjected to mental examinations by courts, does not create a private cause of action for damages). Where there is no suggestion in the language of a statute or in its legislative history of a private right of action for damages, the conclusion is clear that no private right exists. Falzarano v. United States, 607 F.2d 506, 510 (1st Cir. 1979).

Plaintiff is unable to bring a direct cause of action under M.G.L. c. 276, §52A, M.G.L. c. 127, §20, M.G.L. c. 125, §14 or 103 CMR 420.08 where no direct cause of action under these statutes have been recognized by Massachusetts courts. Loffredo, supra. See also, Layne v.Superintendent, MCI Cedar Junction, 406 Mass. 156, 159 (1989)("No statute has generally implemented art. 114. If a violation of art. 114 rights can be redressed within the ambit of an existing statute, such as the State Civil Rights Act, there is a well worn procedural path to relief for such a violation") and Dolan v. Bay Construction Group Co., 3 Mass. L. Rptr. 21, 1994 WL 879528 *2 (Mass. Super.)

___

[19] Furthermore, even if plaintiff's Complaint were to allege a state statutory claim, the Court may, in its discretion, "decline to exercise supplemental jurisdiction" over the state law claims pursuant to 28 U.S.C. §1367(c)(3), if only state law claims remain after all federal claims have been disposed of. Courts generally decline to exercise supplemental jurisdiction over state claims if the federal predicate is disposed of early in the litigation. See Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998). Accordingly, where defendants are entitled to summary judgment on plaintiff's federal claims, the Court may decline to exercise supplemental jurisdiction over any state claims.

(dismissed claim under art. 114 where there is no direct cause of action under the State Constitution and where plaintiff had an adequate remedy under existing state statute). Similarly, where there is a well-worn procedural vehicle, §1983, to address plaintiff's claims, he cannot bring a private right of action under these statutes.

## CONCLUSION

For the foregoing reasons, defendants request that this Motion for Summary Judgment be granted.

Respectfully Submitted,

NANCY A. WHITE
Special Assistant Attorney General

Dated: September 14, 2009

/s/ Julie E. Daniele
Julie E. Daniele
BBO#600093
Legal Division
Department of Correction
70 Franklin Street, Suite 600
Boston, MA 02110-1300
(617) 727-3300, ext. 115

## <u>CERTIFICATE OF SERVICE</u>

I, Julie E. Daniele, hereby certify that a true and accurate copy of the foregoing Motion, Memorandum of Law and Exhibits have been forwarded via U.S. Mail to the *pro se* plaintiff, Albert Ford, at MCI-Cedar Junction.  Copies of these documents have not been mailed to counsel of record, as they will receive such via electronic mail.

August , 2009                          <u>/s/ Julie E. Daniele</u>