# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALBERT FORD,<br><br>        Plaintiff,<br><br>v.<br><br>HAROLD CLARKE, Commissioner of Correction; JAMES BENDER, Deputy Commissioner of Correction; PETER ST. AMAND, Superintendent of MCI-Cedar Junction; KENNETH NELSON, Assistant Deputy Commissioner of Correction; MICHAEL BELLOTTI, Norfolk County Sheriff<br><br>        Defendants. | Civil Action No. 07-11457-JGD<br><br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Lisa J. Pirozzolo, BBO # 561922
Timothy D. Syrett, BBO # 663676
Dimple Chaudhary, BBO # 674845
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

*Attorneys for Plaintiff Albert Ford*

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS .................................................................................2

A.   Conditions in the DDU ...............................................................................2
B.   Mr. Ford's First Period of Pretrial DDU Confinement ...............................3
C.   Mr. Ford's Second Period of Pretrial DDU Confinement ...........................5
D.   Mr. Ford's Continued Confinement in the DDU as a Convicted Inmate ............................5

IV.  ARGUMENT ......................................................................................................6

A.   Legal Principles ...........................................................................................6

1.   Summary Judgment ..............................................................................6
2.   Individual and Official Capacity Claims ..............................................6

B.   The Court Should Grant Summary Against James Bender on Count One In
     His Individual Capacity For Confining Mr. Ford to the DDU as a Pretrial Detainee,
     In Violation of His Substantive Due Process Rights ...........................................7

C.   The Court Should Grant Summary Against James Bender on Count Three In
     Both His Individual and Official Capacities For Violating Mr. Ford's Procedural
     Due Process Rights ......................................................................................9

1.   Mr. Bender, In His Individual Capacity, Deprived Mr. Ford of His Rights by
     Confining Mr. Ford to the DDU as a Pretrial Detainee Without Process ........................10

     a)   Mr. Ford Has a Liberty Interest in Avoiding DDU Placement as a Pretrial
          Detainee ...............................................................................................10
     b)   Mr. Ford Was Denied Procedural Due Process ......................................13

2.   Mr. Bender, In His Individual Capacity, Deprived Mr. Ford of His Rights By
     Retaining Mr. Ford in the DDU as a Convicted Prisoner Without Process ....................15

     a)   Mr. Ford Has a Liberty Interest In Avoiding DDU Placement as a Convicted
          Prisoner .................................................................................................15

     b)   Mr. Ford Was Deprived of his Liberty Interest as a Convicted Prisoner Without
          Procedural Due Process ..........................................................................17

3.   Mr. Bender Is Liable in His Official Capacity For Violating Mr. Ford's Procedural
     Due Process Rights ..............................................................................18

D.  James Bender Subjected Mr. Ford to "Infamous Punishment" Without Trial
by Jury in Violation of Article 12 of the Massachusetts Declaration of Rights ................18

CONCLUSION.........................................................................................................................20

US1DOCS 7230901v11

**TABLE OF AUTHORITIES**

Federal Cases

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)..............................................................................................6

*Bell v. Wolfish*,
441 *U.S.* 520 (1979).........................................................................7, 8, 9, 11

*Benjamin v. Fraser*,
264 F.3d 175 (2d Cir. 2001)..............................................................................12

*Boulanger v. United States Bureau of Prisons*,
No. 06-cv-308, 2009 WL 1146430 (D.N.H. April 24, 2009) ................................10

*Burns v. State Police Assoc. of Mass.*,
230 F.3d 8 (1st Cir. 2000).................................................................................6

*Colon v. Howard*,
215 F.3d 227 (2d Cir. 2000)........................................................................15, 16

*Cordi-Allen v. Conlon*,
494 F.3d 245 (1st Cir. 2007)...............................................................................6

*Hafer v. Melo*,
502 U.S. 21 (1991)........................................................................................7, 18

*Jackson v. Russo*,
495 F. Supp. 2d 225 (D. Mass. 2007) ..............................................................12

*Kentucky v. Graham*,
473 U.S. 159 (1985).............................................................................................7

*Lee v. Coughlin*,
902 F. Supp. 424 (S.D.N.Y. 1995).....................................................................16

*McGuiness v. DuBois*,
75 F.3d 794 (1st Cir. 1996)................................................................................13

*Meachum v. Fano*,
427 U.S. 215 (1976)....................................................................................13, 17

*Mitchell v. Dupnik*,
75 F.3d 517 (9th Cir. 1996) ...............................................................9, 10, 11, 13

Federal Cases (continued)

*New Fed Mortg. Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA*,
543 F.3d 7 (1st Cir. 2008) ........................................................................................ 6

*O'Connor v. Huard*,
117 F.3d 12 (1st Cir. 1997) ...................................................................................... 7

*Palmigiano v. Baxter*,
487 F.2d 1280 (1st Cir. 1973) ........................................................................... 10, 17

*Parenti v. Ponte*,
727 F.2d 21 (1st Cir. 1984) .................................................................................... 12

*Rapier v. Harris*,
172 F.3d 999 (7th Cir. 1999) ............................................................................. 10, 11

*Sandin v. Conner*,
515 U.S. 472 (1995) ........................................................................................... 10, 15

*Silva v. Worden*,
130 F.3d 26 (1st Cir. 1997) ...................................................................................... 7

*Surprenant v. Rivas*,
424 F.3d 5 (1st Cir. 2005) ............................................................................... *passim*

*United Mine Workers of America v. Gibbs*,
383 U.S. 715 (1966) .................................................................................................. 6

*Wilkinson v. Austin*,
545 U.S. 209 (2005) ......................................................................................... *passim*

*Wolff v. McDonnell*,
418 U.S. 539 (1974) ................................................................................................ 13

State Cases

*Brown v. Commissioner of Correction*
394 Mass. 89 (Mass. 1985) ..................................................................................... 19

*MacDougall v. Commonwealth*,
447 Mass. 505 (Mass. 2006) ................................................................................... 20

Federal Statutes

28 U.S.C. § 1367 ...................................................................................................... 6

US1DOCS 7230901v11

State Statutes

Mass. Gen. Laws Const. Pt. 1, Art. 12 ........................................................................ 19

Mass. Gen. Laws ch. 125, § 1 .................................................................................... 20

Mass. Gen Laws ch. 276 § 52A ................................................................................... 4

US1DOCS 7230901v11

## I.    INTRODUCTION

In this action, Albert Ford challenges his unlawful confinement in a maximum security segregation unit of the Massachusetts Correctional Institute Cedar Junction ("MCI-Cedar Junction").  Since 2007, Mr. Ford has been unlawfully confined in the Departmental Disciplinary Unit ("DDU"), first as a pretrial detainee and later as a convicted prisoner, in violation of his constitutionally-protected rights as well as guarantees afforded to him under Massachusetts state law.

Undisputed facts demonstrate that Defendant James Bender, currently Deputy Commissioner of the Prison Division of the Massachusetts Department of Corrections ("DOC"), and previously acting Commissioner of Corrections, twice confined Mr. Ford in the DDU at a time when he had been charged, but not convicted of, the crime for which he was being held.  It is also undisputed that Mr. Bender intended to punish Mr. Ford by confining him to the DDU as a pretrial detainee, even though the Constitution bars confinement of pretrial detainees with an intent to punish.  As a consequence, Mr. Bender violated Mr. Ford's substantive due process rights as guaranteed by the Fourteenth Amendment to the U.S. Constitution, which the Supreme Court has held prohibits punishment of pretrial detainees.  Mr. Bender's decision to confine Mr. Ford to MCI-Cedar Junction before he had been convicted of the crime for which he was being held also subjected Mr. Ford to infamous punishment without trial by jury, in violation of the Massachusetts Declaration of Rights.

It is also undisputed that on both of the occasions that Mr. Bender confined Mr. Ford to the DDU, first as a pretrial detainee and then after Mr. Ford had been convicted, Mr. Bender provided no process before doing so.  This failure to provide Mr. Ford with any process violated Mr. Ford's procedural due process rights under the Fourteenth Amendment, as both pretrial detainees and convicted inmates are entitled to at least some process before being subjected to the deprivations

- 1 -

inherent in DDU confinement.  Mr. Bender's individual and official liability is established as a matter of law; accordingly, summary judgment is appropriate on Counts One (substantive due process), Three (procedural due process), and Nine (infamous punishment under the Massachusetts Declaration of Rights) of Mr. Ford's Amended Complaint.

## II.    STATEMENT OF FACTS[1]

### A.    Conditions in the DDU

As DOC officials admit, the DDU is a restricted housing unit located at MCI-Cedar Junction that is intended to punish inmates who have committed serious disciplinary infractions.  (Bender Dep. at 35:24-36:10; 38:2-38:14 (Chaudhary Aff. Ex. A) [hereinafter "Bender Dep."]; Bissonnette Dep. at 60:4-7; 61:15-62:3 (Chaudhary Aff. Ex. B) [hereinafter "Bissonnette Dep."]; Mitchell Dep. at 84:7-13; 88:1-13 (Chaudhary Aff. Ex. E) [hereinafter "Mitchell Dep."]; *see also* 103 Mass. Code Regs. § 420.06.)   Pretrial detainees confined in the DDU are treated no differently than convicted prisoners.  (Bissonnette Dep. at 37:19-21.)

An inmate in the DDU is confined to a cell that measures approximately seven by twelve feet for at least 23 hours a day.  (Bender Dep. at 181:4-10.)  Cells in the DDU contain a cement bed, a cement desk, a cement stool, a small cement shelf, a mirror, a sink, and a toilet.  (Bissonnette Dep. at 30:5-31:23.)  Because the toilet is located near the front of the cell, an inmate is visible through the window in the door when using it but is prohibited from covering the window to afford himself privacy.  (Bissonnette Dep. at 32:5-16.)  There is a window in the metal door and a window in the back of the cell that are approximately 18 to 24 inches long and 8 to 10 inches wide.  (Bissonnette

---

[1]  Pursuant to Local Rule 56.1, Mr. Ford has separately filed a concise statement of material facts not in dispute.  *See attached*, Plaintiff Albert Ford's Local Rule 56.1 Statement of Undisputed Facts in Support of his Motion for Partial Summary Judgment

Dep. at 30:5-31:23.) All meals are eaten alone in the DDU cell with food provided through a slot; inmates have only twenty minutes to eat. (Bissonnette Dep. at 38:10-18.)

Inmates in the DDU are permitted a maximum of one hour of exercise each weekday, which they must spend locked in a chain link cage. (Bender Dep. at 179:11-12; 181:11-14.) Whenever an inmate leaves his cell in the DDU, he is subjected to a strip search and placed in full restraints, including handcuffs and leg restraints. (Bissonnette Dep. at 38:2-9; 38:19-39:1.) DDU inmates are prohibited from visiting MCI-Cedar Junction's main law library and instead are limited to using materials provided on a book cart. (Bissonnette Dep. at 45:21-46:10.)

After 120 days without receiving a disciplinary report, DDU inmates can earn the privilege of having a maximum of four one-hour visits per month from family and friends. These visits are non-contact; the DDU inmate and visitors are separated by a glass partition. (Bissonnette Dep. at 42:6-43:5.) Similarly, DDU inmates can make a maximum of four thirty-minute phone calls per month to family and friends, and those four calls are only permitted to inmates who go 120 days without a disciplinary report. (Bissonnette Dep. at 44:13-20.)

### B. Mr. Ford's First Period of Pretrial DDU Confinement

On January 17, 2003, while serving a criminal sentence at MCI-Cedar Junction, Mr. Ford received a disciplinary sanction of ten years confinement in the DDU, and was later indicted in Norfolk County for the same conduct. (Chaudhary Aff. Ex. H [Disciplinary Hearing Summary] at 4C; Mem. of Law in Support of DOC Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, Jan. 10, 2008, Docket No. 32, at 8; Ford Dep. at 39:7 (Chaudhary Aff. Ex. C) [hereinafter "Ford Dep."].) On January 2, 2007, four days before Mr. Ford was to complete serving his original criminal sentence, the office of Norfolk County Sheriff Michael Bellotti requested that Mr. Ford continue his confinement in the custody of the DOC, pursuant to Massachusetts General

Laws chapter 276, § 52A ("Section 52A").[2]  (Chaudhary Aff. Ex. J  [Jan. 2, 2007 Robert Harnais letter];  Chaudhary Aff. Ex. K [Jan. 2, 2007 Dennis Mahoney letter]; Mici Dep. at 71:13-74:10 (Chaudhary Aff. Ex. D) [hereinafter "Mici Dep."].)  Carol Mici, Assistant Deputy Commissioner of the DOC's Classification Division, accepted Mr. Ford's continued DOC custody pursuant to Section 52A and informed Mr. Bender and others that Mr. Ford would be remaining in MCI-Cedar Junction even after completion of his sentence.  (Mici Dep. at 71:13-73:16; 75:19-76:13 83:12-84:12; Bender Dep. at 98:15-19.)[3]

The DOC issued a Certificate of Discharge for Mr. Ford on January 6, 2007, upon completion of his existing criminal sentence.  (Chaudhary Aff. Ex. I , [Jan. 6, 2007 Certificate of Discharge].)  Nevertheless, Mr. Ford remained in DOC custody in the DDU, as a pretrial detainee without any process to determine whether his confinement in the DDU was lawful or necessary. (Mici Dep. at 63:5-15; Ford Dep. at 84:10-22; 86:11-18; *see also* Bender Dep. at 99:4-101:16.) (*See also* Appendix A hereto, providing a timeline of Mr. Ford's DDU confinement.)

Mr. Bender was ultimately responsible for the decision to accept Mr. Ford under Section 52A and to hold him in the DDU.  (Bender Dep. at 99:4-14; 136:17-137:4; Chaudhary Aff. Ex. L [Defendant James Bender's Answers to Plaintiff Albert Ford's First Set of Interrogatories] [hereinafter "Bender First Interrogatory Answers"], Response No. 1 at p. 2.)  Mr. Bender decided to retain Mr. Ford in the DDU pursuant to his authority as Deputy Commissioner, overseeing the

---

[2]  In relevant part, Section 52A allows pretrial detainees who "have been previously incarcerated in a correctional institution of the commonwealth under sentence for a felony" to be transferred "to a correctional institution of the commonwealth."  Mass. Gen Laws ch. 276 § 52A.

[3]  Mr. Bender is currently Deputy Commissioner of the Prison Division of the Massachusetts Department of Corrections, a position to which he was appointed in 2008.  (Bender Dep. at 21:23-22:24.) Before his appointment in 2008, he served as acting Deputy Commissioner from 2003 until April 2007, when he was appointed acting Commissioner of Corrections, a position in which he served until November 2007, when he reverted back to serving as Deputy Commissioner.  (Bender Dep. at 22:22-22:24.)  Mr. Bender's responsibilities have remained largely the same from 2003 to the present despite the changes in job titles. (Bender Dep. at 23:2-12.)

operations of DOC's correctional facilities and the Central Inmate Disciplinary Unit, which administers all disciplinary hearings for inmates in DOC custody. (Bender Dep. at 25:5-20; 26:6-9; 27:11-28:6.)

Mr. Ford was released from DOC custody and the DDU on March 2, 2007 after his family posted the bail set in connection with his indictment in Norfolk County. (DOC Defs. Answer, July 23, 2008, Docket No. 55 [hereinafter "DOC Answer"], ¶ 18; Ford Dep. at 66:24-67:2.)

### C. Mr. Ford's Second Period of Pretrial DDU Confinement

On June 26, 2007, Mr. Ford's bail was revoked and, at the request of Sheriff Bellotti's office, he was taken back into DOC custody and returned to the DDU in MCI-Cedar Junction. (DOC Answer ¶¶ 22-24; Defendant Michael Bellotti's Answer to the Plaintiff's Amended Compl., April 28, 2009, Docket No. 78, ¶ 21; Ford Dep. at 96:9-98:6.) Mr. Bender again made the decision to accept Mr. Ford at MCI-Cedar Junction under Section 52A and to confine Mr. Ford to the DDU as a pretrial detainee without providing Mr. Ford any process. (*See* Bender Dep. at 139:10-140:18; DOC Defs. Answer ¶¶ 22-24; St. Amand Dep. at 150:16-151:7; 152:17-153:24 (Chaudhary Aff. Ex. G); Ford Dep. at 96:9-98:6.)

### D. Mr. Ford's Continued Confinement in the DDU as a Convicted Inmate

On April 30, 2008, Mr. Ford pled guilty to the charges pending against him in Norfolk County Superior Court and was sentenced to four to five years incarceration with credit for 375 days served as a pretrial detainee. (*See* Chaudhary Aff. Ex. N [April 30, 2008 Norfolk Superior Court Mittimus to MCI-Cedar Junction].) Following that plea, Mr. Ford was returned directly to MCI-Cedar Junction and placed back in the DDU to continue his 2003 DDU sanction, again at Mr. Bender's direction and without any process. (*See* Bender Dep. at 172:2-173:4; *see also* Ford Dep. at 66:24-67:2.)

US1DOCS 7230901v11

As a result of Mr. Bender's actions, Mr. Ford endured over a year in the DDU as a pretrial detainee and remains confined there as a convicted inmate.

## IV.     ARGUMENT

### A.     Applicable Legal Principles

#### 1.     Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as  matter of law." FED. R. CIV. P. 56(c); *New Fed Mortg. Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA,* 543 F.3d 7, 11 (1st Cir. 2008); *Cordi-Allen v. Conlon,* 494 F.3d 245, 250 (1st Cir. 2007).  In defending against a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).  The First Circuit has noted that "even when 'elusive concepts' like motive or intent are at issue summary judgment may be appropriate." *Burns v. State Police Assoc. of Mass.*, 230 F.3d 8, 9 (1st Cir. 2000).  Under this standard, the Court should grant partial summary judgment in favor of Mr. Ford.

#### 2.     Individual and Official Capacity Claims

Mr. Ford is seeking summary judgment on Count One against Mr. Bender in his individual capacity and on Count Three against Mr. Bender in both his individual and official capacities.[4]  (*See*

---

[4]  Mr. Ford's infamous punishment claim (Count Nine) is based on Massachusetts state law and is brought against Mr. Bender in his individual capacity.  The Court has pendent jurisdiction over this claim under 28 U.S.C. § 1367(a) because it is "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).

Amended Compl. ¶ 4.)  To establish Mr. Bender's individual liability for depriving Mr. Ford of his substantive and procedural due process rights, Mr. Ford must show that Mr. Bender caused the deprivation while acting under color of state law.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  To sustain a claim against Mr. Bender for violation of Mr. Ford's procedural due process rights in his official capacity, which amounts to a suit against the state, Mr. Ford needs to demonstrate that a DOC "'policy or custom' . . . played a part in the violation of federal law."  *Id*. at 25 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)); *see also Silva v. Worden*, 130 F.3d 26, 31 (1st Cir. 1997) (the policy or custom must be the "moving force behind the deprivation of constitutional rights").

> **B.** **The Court Should Grant Summary Against James Bender on Count One In His Individual Capacity For Confining Mr. Ford to the DDU as a Pretrial Detainee, In Violation of His Substantive Due Process Rights**

Mr. Ford is entitled to summary judgment on Count One alleging punishment as a pretrial detainee in violation of the Due Process Clause of the Fourteenth Amendment because it is undisputed that Mr. Bender intended to punish Mr. Ford by holding him in the DDU before he had been convicted of the crime for which he was being held.

In *Bell v. Wolfish*, the Supreme Court established a bright-line constitutional prohibition on punishing pretrial detainees: "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  441 U.S. 520, 536 (1979)[5]; *see also Surprenant v. Rivas*, 424 F.3d 5, 13 (1st Cir. 2005) ("A pretrial detainee has a Fourteenth Amendment right to be free from punishment prior to conviction."); *O'Connor v. Huard*, 117 F.3d 12, 16 (1st Cir. 1997) (same).  Punishment can be proven in one of two ways:  (1) "a showing of an

---

[5]  The punishment of pretrial detainees proscribed by the Due Process Clause includes retribution and deterrence, both of which "are not legitimate non-punitive governmental objectives."  *Bell*, 441 U.S. at 539 n.20.

expressed intent to punish on the part of detention facility officials" or (2) demonstrating that a "restriction or condition [imposed on a pretrial detainee] is not reasonably related to a legitimate goal," allowing the court to "infer that the purpose of the governmental action is punishment." *Bell*, 441 U.S. at 539-39. Here, the Court need only address the first test because Mr. Bender has admitted that he intended to punish Mr. Ford.[6]

During his deposition, Mr. Bender acknowledged that his decisions in January and June 2007 to confine Mr. Ford in the DDU as a pretrial detainee were motivated by an intent to punish and deter Mr. Ford for the conduct for which he was being held awaiting trial. (*See* Bender Dep. at 44:14-18; 100:10-101:4; 102:13-17; 142:2-143:3; 147:10-148:3.) For instance, Mr. Bender conceded that Mr. Ford's confinement in the DDU in January 2007 was intended to continue Mr. Ford's punishment:

> Q. And is it fair to say that your decision to leave Mr. Ford in the DDU in January of 2007 was intended in part to continue his punishment?
>
> A. I guess in part you could say that . . .

(*Id.* at 100:10-14.) Mr. Bender also acknowledged that Mr. Ford's January 2007 DDU confinement was intended to punish the same conduct for which Mr. Ford was being held as a pretrial detainee:

> Q. And in January 2007, did it concern you at all that Mr. Ford was being punished in the DDU for the same conduct for which he was being held as a pretrial detainee?
>
> A. No.

(*Id.* at 102:13-17.) Mr. Bender made similar acknowledgements regarding Mr. Ford's June 2007 pretrial detention in the DDU: "I had the intent to keep him in the DDU. So in relation to that

---

[6] While the issue of Mr. Bender's intent to punish Mr. Ford is undisputed and thus capable of resolution on a motion for summary judgment, the second test under *Bell v. Wolfish* -- whether the restrictions imposed were reasonably related to a legitimate goal -- involves disputed issues of fact that would require determination at trial if Mr. Ford is not granted summary judgment.

being punishment for him, I'm sure it was . . . ." (Bender Dep. at 142:2-7; *see also id.* 142:10-143:3.) Mr. Bender's testimony is consistent with the DOC defendants' admission that "Ford's DDU sentences are punishment and deterrence[.]" (Mem. of Law in Support of DOC Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, Jan. 10, 2008, Docket No. 32, at 8.)

Faced with these undisputed facts about his intent to punish Mr. Ford, Mr. Bender cannot avoid summary judgment merely by pointing to what he claims are legitimate justifications for his conduct, such as concerns about Mr. Ford's security. The Supreme Court made clear in *Bell v. Wolfish* that alternative purposes for restrictions imposed on a pretrial detainee are appropriately considered *only* "[a]bsent a showing of an expressed intent to punish." 441 U.S. at 538. Further, the Supreme Court explicitly foreclosed the possibility that prison officials could justify punishing a pretrial detainee: "This is not to say that the officials of a detention facility can justify punishment. They cannot." *Id.* at 539 n.20.

**C.** **The Court Should Grant Summary Against James Bender on Count Three In Both His Individual and Official Capacities For Violating Mr. Ford's Procedural Due Process Rights**

Mr. Bender deprived Mr. Ford of his rights to procedural due process by (1) confining Mr. Ford to the DDU as a pretrial detainee without any process and (2) retaining Mr. Ford in the DDU after his conviction without any process. *See, e.g., Wilkinson v. Austin*, 545 U.S. 209, 223-25 (2005); *Mitchell v. Dupnik*, 75 F.3d 517, 524-25 (9th Cir. 1996). The lack of process afforded is not disputed; Mr. Ford, therefore, is entitled to summary judgment on Count Three alleging violations of his procedural due process rights.

1.  **Mr. Bender, In His Individual Capacity, Deprived Mr. Ford of His Rights by Confining Mr. Ford to the DDU as a Pretrial Detainee Without Process**

In determining whether a prisoner has been deprived of procedural due process under the Fourteenth Amendment, a court must first assess whether there is a protected liberty interest at issue. If such an interest is found, the court then evaluates whether deprivation of that liberty interest occurred without constitutionally adequate procedure. *See, e.g., Wilkinson*, 545 U.S. at 221, 224 (citing *Matthews v. Eldridge*, 424 U.S. 319 (1976)); *Palmigiano v. Baxter*, 487 F.2d 1280, 1284 (1st Cir. 1973) (*vacated*, 418 U.S. 908 (1974)).

a)  **Mr. Ford Has a Liberty Interest In Avoiding DDU Placement as a Pretrial Detainee**

Pretrial detainees, like Mr. Ford, have a protected liberty interest in avoiding punitive, disciplinary segregation. This liberty interest is derived from the Due Process Clause of the U.S. Constitution. "A pretrial detainee's claim that he has been subjected to unconstitutional conditions of confinement implicates Fourteenth Amendment liberty interests." *Surprenant*, 424 F.3d at 18; *see also Mitchell v. Dupnik*, 75 F.3d at 524-25 (finding that pretrial detainees have liberty interest under Due Process Clause and "may be subjected to disciplinary segregation only with a due process hearing") (citation omitted); *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999) (holding that a pretrial detainee may only be punished for misconduct committed while held in jail "after affording the detainee some sort of procedural protection"); *Benjamin*, 264 F.3d at 189-90 (concluding that pre-trial detainee had a liberty interest in being free from "restraint status" such that his procedural due process rights were implicated); *Boulanger v. United States Bureau of Prisons*, No. 06-cv-308, 2009 WL 1146430, at *12 (D.N.H. April 24, 2009) (holding that a pretrial detainee's confinement in segregation "without a hearing, under the conditions he alleges establishes a constitutional

violation"). *See also Sandin v. Conner*, 515 U.S. at 484 (noting that a punitive state action may encroach on a pretrial detainee's liberty interest under the Due Process Clause).[7] Pretrial detainees, therefore, "have a liberty interest in avoiding punishment – an interest that derives from the Constitution itself." *Surprenant*, 424 F.3d at 17.

The undisputed conditions of Mr. Ford's confinement as a pretrial detainee in the DDU constituted punitive, disciplinary segregation. *See supra* Part II. Confinement in conditions considerably less extreme than the DDU has been found to implicate a pretrial detainee's liberty interests. For example, in *Mitchell*, the Ninth Circuit concluded that a pretrial detainee had a liberty interest in avoiding placement in an administrative segregation wing of a county jail. 75 F.3d at 524-25. Similarly, in *Benjamin*, the Second Circuit held that a detainee had a liberty interest in being free from restraint status, which required a prisoner being moved within the jail to wear waist chains, security mitts, and leg irons. 264 F.3d at 181, 188-89. The extremely severe and restrictive segregation Mr. Ford endured in the DDU implicated a liberty interest and therefore triggered his right to procedural process, as protected by the Due Process Clause.[8]

In addition to his constitutionally-protected right, Mr. Ford also has a state-created liberty interest in avoiding DDU placement because DOC regulations create a protected interest in

---

[7] In *Sandin*, the Supreme Court articulated a standard to assess the liberty interests of sentenced prisoners, requiring a showing of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483-84. This Circuit has recognized that the standard set forth in *Sandin* does not apply to pretrial detainees: "[T]he *Sandin* Court's rationale applies only to those convicted of crimes – not to pretrial detainees." *Surprenant*, 424 F.3d at 17 (citing *Benjamin*, 264 F.3d at 189); *see also Rapier*, 172 F.3d 999, 1004-05; *Mitchell*, 75 F.3d at 523-25.

[8] Mr. Ford's liberty interest, as a pretrial detainee, is more robust than that of convicted prisoners. Pretrial detainees are not incarcerated pursuant to a sentence of confinement; therefore "it cannot be said that they ought to expect whatever deprivation can be considered incident to serving a sentence." *Rapier*, 172 F.3d at 1003-04 (holding that pretrial detainees are not similarly situated to convicted prisoners in assessing a detainees' liberty interests). Additionally, the Supreme Court has recognized that "pretrial detainees, who have not been convicted of any crimes, retain *at least* those constitutional rights that [the Court] ha[s] held are enjoyed by convicted prisoners." *Bell*, 441 U.S. at 545 (emphasis added).

avoiding transfer to a segregated unit.[9] *Parenti v. Ponte*, 727 F.2d 21, 25 (1st Cir. 1984)

(concluding that DOC regulations detailing procedures "creates a liberty interest" and "due process

requires that the regulations be followed in transferring an inmate from the general prison

population to a DSU [departmental segregation unit]"). This is evident in DOC regulations, which

require extensive procedures prior to a prisoner's placement in the DDU. *See* 103 Mass. Code

Regs. § 430 (2006). First, a DDU hearing is only held when a Disciplinary Officer determines that

an alleged infraction is sufficiently severe to warrant DDU placement, a determination that must be

confirmed by the Director of Discipline. 103 Mass. Code Regs. § 430.08(1) (2006). Second, the

Commissioner appoints a Special Hearing Officer to conduct a disciplinary hearing. *Id.*

§ 430.08(2). Once the determination has been made to conduct a DDU hearing, the procedures

required by the disciplinary hearing process include service of the disciplinary report on the inmate,

a hearing before a Special Hearing Officer, an opportunity for the inmate to present witnesses and

be represented by counsel, and delivery of a written decision to the inmate. *Id.* §§ 430.09-430.18.

Third, after a DDU hearing has been conducted, a prisoner is entitled to an appeal to the Deputy

Commissioner or a designee pursuant to § 430.08(5). In addition to the appellate process, the

Deputy Commissioner must also designate a staff person to conduct a documented "disposition

procedural review of all DDU hearings within ten business days of the conclusion of the appeal

process, to ensure that all procedural guidelines established in accordance with 103 CMR § 430

have been complied with." *Id.* § 430.08(6). The state has created a right to be free from

_____

[9] Both the U.S. Constitution and state regulations may create a liberty interest "in avoiding particular conditions of confinement." *Wilkinson*, 545 U.S. at 221; *see also Surprenant*, 424 F.3d at 17; *Benjamin v. Fraser*, 264 F.3d 175, 188-89 (2d Cir. 2001). When a liberty interest is created by state law, "whether that interest is tangible enough to merit the status of an entitlement protected by the Due Process Clause is a question of federal constitutional law." *Jackson v. Russo*, 495 F. Supp. 2d 225, 228 (D. Mass. 2007) (*citing Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)).

US1DOCS 7230901v11

disciplinary segregation through the language of its regulations and statutes; accordingly, "the prisoner's interest has real substance." *Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974) ("We think a person's liberty is equally protected, event when the liberty itself is a statutory creation of the State.").

Thus, under both the U.S. Constitution and Massachusetts state law, Mr. Ford has a protected liberty interest in avoiding DDU detention as a pretrial detainee. This liberty interest implicates Mr. Ford's procedural due process rights.

### b) Mr. Ford Was Denied Procedural Due Process

Where a prisoner has a liberty interest, procedural due process is required to ensure that the right is not "arbitrarily abrogated." *Meachum v. Fano*, 427 U.S. 215, 226 (1976) (internal citation omitted); *see also, Mitchell*, 75 F.3d at 524 ("Pretrial detainees may be subjected to disciplinary segregation only with a due process hearing to determine whether they have in fact violated any rule."). In *Wolff v. McDonnell*, the Supreme Court detailed the due process requirements necessary for prison disciplinary hearings. 418 U.S. at 539. These requirements include written notice of the charges against the prisoner at least twenty-four hours in advance of a hearing as well as a qualified right to call witnesses and present documentary evidence in his defense. *Id.* at 563-65; *see also Surprenant*, 424 F.3d at 18 (holding the right to procedures in *Wolff* is clearly established for qualified immunity purposes) (citing *Benjamin*, 264 F.3d at 189-90); *McGuiness v. DuBois*, 75 F.3d 794, 797 (1st Cir. 1996) (describing the *Wolff* requirements for minimum procedure). A prisoner must also be provided with a written explanation as to the factfinder's conclusion. *Wolff* at 564-65.

In sharp contrast, Mr. Bender followed no procedures in retaining Mr. Ford in the DDU after the discharge of his existing criminal sentence. Mr. Bender does not recall speaking with anyone at the DOC regarding the placement of Mr. Ford in the DDU. (Bender Dep. at 98:23-99:3.) Nor can Mr. Bender recall reviewing Mr. Ford's file before making the decision to place him in the DDU as

a pretrial detainee. (Bender Dep. at 101:5-9.)[10] Mr. Bender did not discuss his decision with either the superintendent of MCI-Cedar Junction or the head of the DDU, both of whom would have had more knowledge about Mr. Ford than Mr. Bender, based on their day-to-day interactions with Mr. Ford. (Bender Dep. at 107:13-109:1.) Further, Mr. Ford received no hearing regarding his continued placement in the DDU as a pretrial detainee following the expiration of his criminal sentence. (Ford Dep. at 84:10-22; 86:11-18; *see also* Bender Dep. at 99:4-101:16.)

Notwithstanding the absence of any process, Mr. Ford was held in the DDU as a pretrial detainee for two months, from January 2007 until March 2, 2007, when he was released on bail pending trial on his outstanding criminal charges. (DOC Defendants' Answer, July 23, 2008, Docket No. 55, ¶ 18; Ford Dep. at 66:24-67-2; *see also* Appendix A.)

In June 2007, Mr. Ford was again subjected to pre-trial confinement in the DDU without any process. After Mr. Ford's bail was revoked on June 26, Mr. Bender made the decision to return Mr. Ford to the DDU as a pretrial detainee, informing the Norfolk County Sheriff's Office that the DOC would be willing to accept Mr. Ford into its custody for a second time. (St. Amand Dep. at 150:16-151:7; 152:17-153:24; Bender Dep. at 139:10-140:18.)[11] Mr. Ford was taken back into DOC custody on June 26, 2007 and returned to MCI-Cedar Junction, where Mr. Bender placed him back

---

[10] Indeed, Mr. Bender did not even consider whether Mr. Ford's status as a pretrial detainee meant that he should be treated differently than convicted inmates. (Bender Dep. at 104:11-15.) Mr. Bender also gave no consideration to whether the conditions in the DDU would allow Mr. Ford to prepare adequately to defend himself against his pending criminal charges, including making no effort to ascertain how much access the DDU would provide Mr. Ford to his counsel or to the prison's law library. (Bender Dep. at 104:19-23, 106:8-20.)

[11] Once again, Mr. Ford's status as a pretrial detainee had no impact on Mr. Bender's decision on where to confine Mr. Ford in June 2007. (Bender Dep. at 143:4-16.) Mr. Bender also undertook no inquiry to determine whether, given the restrictive conditions in the DDU, Mr. Ford would be able to prepare adequately for his criminal case. (Bender Dep. at 144:8-21.) Nor does Mr. Bender recall speaking about Mr. Ford's placement with either the Superintendent of MCI-Cedar Junction or the head of the DDU, even though both of those individuals would have had more information about Mr. Ford than Mr. Bender possessed. (Bender Dep. at 144:22-145:19.)

in the DDU without any process, such as a hearing. (*See* Bender Dep. at 139:16-140:23; Ford Dep. at 96:9-98:6; DOC Defs. Answer ¶¶ 22-24.)

In total, Mr. Ford endured over a year in the DDU as a pretrial detainee, without any process to determine whether his confinement in the DDU was lawful, appropriate, or necessary. (*See* Appendix A.)

> **2. Mr. Bender, In His Individual Capacity, Deprived Mr. Ford of His Rights By Retaining Mr. Ford in the DDU as a Convicted Prisoner Without Process**

Mr. Ford's procedural due process rights continued to be violated even after he was convicted, and was no longer a pretrial detainee. Convicted prisoners, as well as pretrial detainees, may have a protected liberty interest in avoiding punitive conditions of confinement. *Wilkinson*, 545 U.S. at 221-22. In assessing whether a protected, state-created liberty interest exists, a court must evaluate the conditions of confinement imposed on a prisoner. *Sandin*, 515 U.S. 472, 483-84 (1995). If those conditions constitute "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," the convicted prisoner has a liberty interest in freedom from restraint. *Id.* Where "atypical and significant hardship" is evident, procedural due process protections are required. *Id.* at 483-84; *see also Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000). Here, Mr. Ford's continued detention in the DDU after his sentence, constitutes "a dramatic departure from the basic conditions of [his] . . . sentence," entitling him to a hearing prior to his segregated confinement. *Sandin*, 515 at 485.

> **a) Mr. Ford Has a Liberty Interest in Avoiding DDU Placement as a Convicted Prisoner**

The conditions of Mr. Ford's confinement and its duration are an "atypical and significant hardship" in relation to the ordinary incidents of prison life, and therefore give rise to a protected liberty interest. As discussed above, DDU inmates are confined in highly restrictive conditions. *See supra*, Part I. In *Wilkinson,* the Supreme Court relied on entirely comparable conditions to

- 15 -

conclude that prisoners had a liberty interest in avoiding "supermax" confinement.  545 U.S. at 224

("OSP's harsh conditions may well be necessary and appropriate in light of the danger that high-risk

inmates pose both to prison officials and to other prisoners.  That necessity, however, does not

diminish our conclusion that the conditions give rise to a liberty interest in their avoidance.").  The

conditions in *Wilkinson* were similar to those endured by Mr. Ford in the DDU -- confinement to a

seven by fourteen foot cell for 23 hours a day, exercise for only one hour a day, in-cell meal

consumption, and a lengthy period of confinement.  *Id* at 214; *see also, Colon v. Howard*, 215 F.3d

at 231 (holding that confinement in special housing unit for 305 days -- where inmates were in

solitary confinement for 23 hours per day, with one hour of exercise per day, and denied various

privileges available to general population prisoners -- was a sufficient departure from the ordinary

incidents of prison life).

      Moreover, the duration of Mr. Ford's confinement is sufficient to give rise to a protected

liberty interest.  *See Lee v. Coughlin*, 902 F. Supp. 424, 431 (S.D.N.Y. 1995) (finding that

plaintiff's "confinement for 376 days in [Special Housing Unit] imposed an atypical and significant

hardship on plaintiff"); *Harden-Bey v. Rutter*, 524 F.3d at 792-93 (holding that district court erred

in concluding that a prisoner's three year confinement to administrative segregation did not bear on

liberty interest inquiry).  Absent a change in position by the DOC, Mr. Ford will remain confined in

the DDU for the entire duration of his four to five year sentence because his 10-year DDU sanction

will not be discharged before 2013.

      There can be do dispute that the duration and nature of Mr. Ford's confinement, following

his sentencing, give rise to a protected liberty interest in avoiding DDU detention.

### b) Mr. Ford Was Deprived of his Liberty Interest as a Convicted Prisoner Without Procedural Due Process

Given Mr. Ford's liberty interest, Mr. Bender was required to provide Mr. Ford with procedural protections prior to his confinement in the DDU as a newly-convicted prisoner. *Wilkinson*, 545 U.S. at 224-25; *Meachum v. Fano*, 427 U.S. at 226; *see also Palmigiano v. Baxter*, 487 F.2d at 1285 ("[T]here is no question that some due process was required before appellant could be sentenced to punitive segregation and recommended for a downgraded classification."). In *Wilkinson*, the Supreme Court elaborated upon the nature of the required process. *See Wilkinson* at 224-25 ("The framework . . . requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest. . . .; and finally, the Government's interest.").

Once again, although the DOC's published policy on disciplinary hearings appears to comport with the requirements articulated in *Wilkinson*, it is undisputed that Mr. Bender did not follow these procedures when he retained Mr. Ford in the DDU on a new sentence of incarceration. Mr. Ford, therefore, was returned to the DDU with no assessment as to the appropriateness of his confinement therein, even though his initial sanction had been issued five and a half years earlier and, in the interim, his underlying sentence had expired and he had been released back into his community.

Mr. Ford has been confined to the DDU during a new criminal sentence, without a hearing, for over 15 months and counting. By these actions, acting under the color of state law, Mr. Bender deprived Mr. Ford of his protected liberty interest in avoiding disciplinary segregation, without due process of law.

- 17 -

### 3. Mr. Bender is Liable in His Official Capacity for Violating Mr. Ford's Procedural Due Process Rights

To sustain a claim against Mr. Bender in his official capacity, Mr. Ford must demonstrate that a DOC "'policy or custom' . . . played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. at 25 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Mr. Bender's testimony also establishes an unconstitutional DOC custom of holding pretrial detainees and convicted prisoners in the DDU, without any process, following the expiration of their underlying criminal sentences.

When a pretrial detainee held under Section 52A has time remaining on a DDU sanction, DOC practice permits that the pretrial detainee be confined in the DDU. (Bender Dep. at 50:10-51:6.) Mr. Bender's testimony also establishes the DOC's custom of requiring newly-convicted prisoners to return to the DDU, without a hearing, to complete sanctions issued during prior sentences of incarceration. (Bender Dep. at 64:16-65:8; 65:22-66:20; *see also* Silva Dep. at 37:2-38:1) (Chaudhary Aff. Ex. F).) Since 2003, there have been several pretrial detainees the DOC has confined to the DDU based on pre-existing DDU sanctions without hearings or additional process. (Bender Second Interrogatory Answers, Response No. 1 at pp. 3-5.)

This customary DOC practice of holding pretrial detainees and newly-convicted inmates in the DDU, without process, resulted in a deprivation of Mr. Ford's due process rights. Mr. Ford seeks that the DOC abolish this practice and conduct a hearing to determine his appropriate housing.

### D. James Bender Subjected Mr. Ford to "Infamous Punishment" Without Trial by Jury in Violation of Article 12 of the Massachusetts Declaration of Rights

Finally, Mr. Ford is entitled to summary judgment against Mr. Bender in his individual capacity on Count Nine because it is undisputed that he subjected Mr. Ford to "infamous punishment . . . without trial by jury," in violation of Article 12 of the Massachusetts Declaration of

Rights, by twice confining Mr. Ford to MCI-Cedar Junction as a pretrial detainee pursuant to Section 52A.  *See* Mass. Gen. Laws Const. Pt. 1, Art. 12.[12]

In *Brown v. Commissioner of Correction*, the Massachusetts Supreme Judicial Court held that confinement in the state prison "'is an infamous punishment, and cannot be imposed without both indictment and trial by jury.'"  394 Mass. 89 (Mass. 1985) (quoting *Jones v. Robbins*, 74 Mass. (8 Gray) 329 (1857)).  The issue in *Brown* was whether the transfer to MCI-Cedar Junction (then called the Massachusetts Correctional Institute at Walpole) of a prisoner serving a sentence for which he had not been indicted subjected him to "infamous punishment" under Article 12. Affirming the vitality of the rule announced in *Jones v. Robbins* that confinement in the state prison has the "character of infamy" sufficient to constitute "infamous punishment," the Supreme Judicial Court held that such a transfer of an unindicted prisoner to MCI-Cedar Junction, which is defined by statute as the "state prison," Mass. Gen. Laws ch. 125, § 1(o),  amounted to "infamous punishment."  394 Mass. at 89-90, 94.  The Supreme Judicial Court also rejected the argument that the inmate's transfer, which was conducted pursuant to a statute allowing the transfer of convicted inmates, Mass. Gen. Laws ch. 127, § 97, could be justified by the Commissioner of Correction's responsibility for maintaining safety and security at correctional facilities, concluding that such a determination "would seriously undermine the protection afforded by art. 12."  394 Mass. at 92-93.

The rationale of the *Brown* and Jones cases applies equally here.[13]  Mr. Bender twice approved Mr. Ford's transfer to MCI-Cedar Junction as a pretrial detainee pursuant to Section 52A.

---

[12] Article 12 reads in pertinent part that "the legislature shall not make any law, that shall subject any person to a capital or infamous punishment, excepting for the government of the army and navy, without trial by jury."

[13] Indeed, in *Brown*, the Commissioner of Correction argued that the *Jones* rule regarding infamous punishment should be applicable only to pretrial detainees:  "The commissioner contends that the *Jones* rule should be confined 'to the rights and protections of an accused criminal defendant.'"  394 Mass. at 92.

(Bender Dep. at 99:4-14; St. Amand Dep. at 150:16-151:7; 152:17-153:24.) As a pretrial detainee, Mr. Ford had not yet been tried by a jury or waived his right to trial by jury. Mr. Ford's confinement in the DDU at MCI-Cedar Junction -- the maximum security segregation unit of the state prison -- thus subjected him to "infamous punishment" in violation of the requirement in Article 12 that no such punishment can be imposed "without trial by jury."[14]

## CONCLUSION

For the foregoing reasons, plaintiff Albert Ford respectfully requests that the Court grant his Motion for Partial Summary Judgment.

ALBERT FORD
By his attorneys,

/s/ Dimple Chaudhary
Lisa J. Pirozzolo, BBO # 561922
Timothy D. Syrett, BBO # 663676
Dimple Chaudhary, BBO # 674845
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Dated:      September 14, 2009

---

[14] In *MacDougall v. Commonwealth*, 447 Mass. 505, 511 n.11 (Mass. 2006), the Supreme Judicial Court declined to decide this issue because it was raised in a criminal appeal but observed that it "is not insignificant" and could properly be pursued in a civil action.

US1DOCS 7230901v11

# Appendix A



**Timeline of Albert Ford's DDU Confinement**

Sentenced inmate in DDU

Pretrial detention in DDU

On bail

Pretrial detention in DDU

Newly-sentenced inmate in DDU

January 6, 2007: Certificate of Discharge issued

March 2, 2007: released on bail

June 26, 2007: bail revoked; returned to DDU

April 30, 2008: guilty plea

## <u>CERTIFICATE OF SERVICE</u>

I, Dimple Chaudhary, hereby certify that a true copy of the above document was
served upon the attorney of record for each other party through the Court's electronic court
filing (ECF) system, this 14th day of September, 2009.


<u>/s/ Dimple Chaudhary</u>
Dimple Chaudhary, BBO # 674845