# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALBERT FORD,<br><br>                Plaintiff,<br><br>v.<br><br>HAROLD CLARKE, Commissioner of Correction;<br>JAMES BENDER, Deputy Commissioner of<br>Correction; PETER ST. AMAND, Superintendent of<br>MCI-Cedar Junction; KENNETH NELSON,<br>Assistant Deputy Commissioner of Correction;<br>MICHAEL BELLOTTI, Norfolk County Sheriff<br><br>                Defendants. | Civil Action No. 07-11457-JGD<br><br><br>**PLAINTIFF ALBERT FORD'S<br>MEMORANDUM IN OPPOSITION<br>TO THE DOC DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT**<br><br><br>**REQUEST FOR ORAL ARGUMENT** |

Lisa J. Pirozzolo, BBO # 561922
Timothy D. Syrett, BBO # 663676
Dimple Chaudhary, BBO # 674845
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

*Attorneys for Plaintiff Albert Ford*

# TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................................................1

II.  ARGUMENT .................................................................................................................1

   A.   The DOC Defendants Procedural Arguments Are Without Merit........................3

      1.   Mr. Ford's Claims Regarding His Period of Pretrial Detention Are Not Moot as They Are Capable of Repetition Yet Evading Review .......................................3

      2.   The Defendants are Not Entitled to Qualified Immunity for Mr. Ford's Federal Constitutional Claims ....................................................................................8

      3.   The DOC Defendants' Contentions Regarding the Sufficiency of the Amended Complaint Are Misplaced...............................................................................10

   B.   On the Merits, the DOC Defendants Fail to Establish That They Are Entitled to Summary Judgment on Mr. Ford's Claims........................................................13

      1.   The DOC Defendants Are Not Entitled to Summary Judgment on Mr. Ford's Substantive Due Process Claim....................................................................13

         a)   The Presence of Alternative Justifications For Mr. Ford's Pretrial DDU Detention Does Not Excuse James Bender's Unlawful Intent to Punish .................13

         b)   Conduct that "Shocks the Conscience" Is Not the Operative Standard for Mr. Ford's Substantive Due Process Claim............................................................16

         c)   The DOC Defendants Have Failed To Demonstrate the Absence of Material Issues of Fact Regarding the Reasonableness of Confining Mr. Ford to the DDU as a Pretrial Detainee....................................................................18

         d)   The DOC Defendants Are Not Entitled To Qualified Immunity From Mr. Ford's Substantive Due Process Claims ...................................................25

      2.   Mr. Bender is Not Entitled to Summary Judgment on Mr. Ford's Procedural Due Process Claim .......................................................................................27

         a)   Mr. Ford's 2003 Hearing Does Not Permit His Pretrial Detention in the DDU Four Years Later, On a New Charge, Without Process ...........................27

         b)   The State Cases Relied Upon by the DOC Defendants are Distinguishable from Mr. Ford's Claims.................................................................................32

         c)   Mr. Bender's Discretion is Subject to Constitutional Limitations...........................34

d)    Mr. Bender Is Not Entitled To Qualified Immunity From Mr. Ford's
Procedural Due Process Claim ................................................................................ 36

3.    A Claim for Infamous Punishment Is Not Limited to Instances Where the Plaintiff
Has Been Sentenced But Not Indicted .......................................................................... 38

4.    Summary Judgment Is Not Appropriate on Mr. Ford's Equal Protection Claim ............ 40

## <u>TABLE OF AUTHORITIES</u>

<u>Federal Cases</u>

*Arnold v. Panora*,
    593 F.2d 161 (1st Cir. 1979) ............................................................................ 7

*Barrington Cove Ltd. P'ship v. R.I. Housing & Mortgage Fin. Corp.*,
    246 F.3d 1 (1st Cir. 2001) ........................................................................ 42, 43

*Beauchamp v. Murphy*,
    37 F.3d 700 (1st Cir. 1994) ............................................................................ 30

*Becker v. Fed. Election Comm'n*,
    230 F.3d 381 (1st Cir. 2000) ........................................................................ 5, 8

*Bell v. Wolfish*,
    441 U.S. 520 n.5 (1979) ........................................................................ *passim*

*Benjamin v. Fraser*,
    264 F.3d 175, 189-90 (2d Cir. 2001) .............................................................. 31

*Bergeron v. Cabral*,
    560 F.3d 1, 8-10 (1st Cir. 2009) ................................................................. 9, 10

*Block v. Rutherford*,
    468 U.S. 576 (1984) ........................................................................................ 18

*Boivin v. Merrill*,
    No. 97-CV-177, 1999 WL 33117053 (D. Me. Jan. 6, 1999) ............................ 27

*Both Weinstein v. Bradford*,
    423 U.S. 147 (1975) .......................................................................................... 7

*Boulanger v. U.S. Bureau of Prisons*,
    No. 06-308, 2009 WL 1146430 (D.N.H. Apr. 24, 2009) .................................. 38

*Buenrostro v. Collazo*,
    973 F.2d 39 (1st Cir. 1992) .............................................................................. 8

*C-1 v. City of Horn Lake, Miss.*,
    775 F.Supp. 940 (N.D. Miss. 1990) .................................................... 21, 28, 29

*Cleavinger v. Saxner*,
    474 U.S. 193 (1985) ........................................................................................ 35

*Collazo-Leon v. United States Bureau of Prisons*,
    51 F.3d 315 (1st Cir. 1995) ...................................................................... 16, 18

Federal Cases (continued)

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ............................................................................................. 19

*Demery v. Arpaio*,
    378 F.3d 1020 (9th Cir. 2004) ........................................................................ 6, 21

*Feeley v. Sampson*,
    570 F.2d 364 (1st Cir. 1978) ............................................................................... 43

*Gerstein v. Pugh*,
    420 U.S. 103 (1975) .............................................................................................. 4

*Green v. Baron*,
    879 F.2d 305 (8th Cir. 1989) .............................................................................. 15

*Green v. Baron*,
    925 F.2d 262 (8th Cir. 1991) .............................................................................. 27

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ......................................................................................... 8, 10

*Hatch v. Dep't for Children, Youth, & Their Families*,
    274 F.3d 12 (1st Cir. 2001) .................................................................................. 9

*Hooper v. Bernalillo County Assessor*,
    472 U.S. 612 (1985) ............................................................................................ 43

*Hutto v. Finney*,
    437 U.S. 678 (1978) ............................................................................................ 22

*Inmates of the Suffolk County Jail v. Eisenstadt*,
    360 F. Supp. 676 (D. Mass. 1973) ..................................................................... 23

*International Organization of Masters, Mates & Pilots v. Brown*,
    498 U.S. 466 (1991) .............................................................................................. 6

*Jones v. City & County of San Francisco*,
    976 F.Supp. 896 (N.D. Cal. 1997) ..................................................................... 22

*Klos v. Haskell*,
    48 F.3d 81 (2d Cir. 1995) ................................................................................... 36

*Lareau v. Manson*,
    651 F.2d 96 (2d Cir. 1981) ................................................................................. 22

*LCM Enter. v. Town of Dartmouth*,
    14 F.3d 675 (1st Cir. 1994) ................................................................................ 41

US1DOCS 7296991v6

Federal Cases (continued)

*Lock v. Jenkins*,
641 F.2d 488 (7th Cir. 1981) ............................................. 22

*Love v. Sheaha*n
156 F.Supp.2d 749 (N.D.Ill. 2001) ..................................... 38

*Lyons v. Powell*,
838 F.2d 28 (1st Cir. 1988) ........................... 18, 21, 22, 27

*Mack v. Suffolk County*,
191 F.R.D. 16 (D. Mass. 2000) ............................................ 5

*Magluta v. Samples*,
375 F.3d 1269 (11th Cir. 2004) ...................................... 15, 39

*McGuinness v. DuBois*,
No. 93-12673, 1995 WL 169500 (D. Mass. March 15, 1995) ......... 12, 13

*McMillian v. Johnson*,
88 F.3d 1554 (11th Cir. 1996) ....................................... 15, 27

*Mitchell v. Dupnik*,
75 F.3d 517 (9th Cir. 1996) ............................................... 33

*Morelli v. Webster*,
552 F.3d 12 (1st Cir. 2009) ................................................ 9

*New Hampshire Motor Trans. Assoc. v. Rowe*,
448 F.3d 66 (1st Cir. 2006) ................................................ 3

*O'Connor v. Huard*,
117 F.3d 112 (1st Cir. 1997) ............................................. 18

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) ........................................................ 6

*Oregon Advocacy Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003) ..................................... 4, 7, 8

*Pearson v. Callahan*,
129 S.Ct. 808 (2009) ...................................................... 9

*Pinto v. Nettleship*,
737 F.2d 130 (1st Cir. 1984) ............................................ 12

*Rapier v. Harris*,
172 F.3d 999 (7th Cir. 1999) ....................................... 17, 31

- iii -

<u>Federal Cases (continued)</u>

*Rochin v. California*,
    342 U.S. 165 (1952) ................................................................ 18

*Roe v. Wade*,
    410 U.S. 113 (1973) .................................................................. 5

*Romer v. Evans*,
    517 U.S. 620 (1996) ............................................................ 41, 43

*Safford Unified Sch. Dist. No. 1 v. Redding*,
    129 S.Ct. 2633 (2009) ............................................................... 9

*Sandin v. Conner*,
    515 U.S. 472 (1995) ............................................................ 16, 31

*Spadafore v. Gardner*,
    330 F.3d 849 (6th Cir. 2003) .................................................... 11

*Surprenant v. Rivas*,
    424 F.3d 5 (1st Cir. 2005) ................................................ *passim*

*Tellier v. Fields*,
    280 F.3d 69 (2d Cir. 2000) ..................................................... 38, 39

*Ukrainian-American Bar Assoc., Inc. v. Baker*,
    893 F.2d 1374 (D.C. Cir. 1990) .................................................. 8

*United States v. Basciano*,
    369 F. Supp. 2d 344 (E.D.N.Y. 2005) ..................................... 26

*United States v. Gotti*,
    755 F. Supp. 1159 (E.D.N.Y. 1991) ....................................... 36

*Vote Choice, Inc. v. DiStefano*,
    4 F.3d 26 (1st Cir. 1993) ....................................................... 4, 6

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) ............................................................ 37, 38

*William J. Kelly Co. v. Reconstruction Fin. Corp.*,
    172 F.2d 865 (1st Cir. 1949) ..................................................... 11

*Wilson v. Layne*,
    526 U.S. 603 (1999) ............................................................... 10

*Wright v. Smith*,
    21 F.3d 496 (2d Cir. 1994) ..................................................... 13

US1DOCS 7296991v6

Federal Cases (continued)

*Zobel v. Williams*,
    457 U.S. 55 (1982) ................................................................................... 43

State Cases

*Aime v. Commonwealth*,
    414 Mass. 667 (1993) .................................................................................. 8

*Brown v. Commissioner of Correction*,
    394 Mass. 89 (1985) ................................................................................... 40

*Commonwealth v. Clark*,
    697 N.E.2d 995 (Mass. 1998) ............................................................... 34, 35

*Commonwealth v. Clark*,
    No. 974079, 1998 WL 1270655 (Mass. Sup. Ct. Jan. 22, 1998) ............................. 31

*Commonwealth v. Forte*,
    671 N.E.2d 1218 (Mass. 1996) ....................................................................... 34

*Haverty v. Commissioner of Correction*,
    776 N.E.2d 973 (Mass. 2002) ........................................................................ 35

*In re Pridgett*,
    No. 01-P-259, 2003 WL 1524678 (Mass. App. March 25, 2003) ............................. 33

*Jackson v. Verdini*,
    No. 03-4431, 2005 WL 1457748 (Mass. Super. June 9, 2005) ............................... 41

*Jones v. Robbins*,
    8 Gray 329 (1857) ..................................................................................... 40

*MacDougall v. Commonwealth*,
    447 Mass. 505 (2006) ................................................................................. 40

*Martino v. Hogan*,
    643 N.E.2d 53 (Mass. App. Ct. 1994) ............................................................. 41

*Moore v. McManus*,
    No. 94-6780, 1998 WL 77904 (Mass. Super. Feb. 17, 1998).............................. 41

*Torres v. Commissioner of Correction*,
    427 Mass. 611 (1998) ............................................................................. 20, 21

## State Statutes

Mass. Gen. Law ch. 276 § 52A........................................................................................... 42

Mass. Gen. Laws ch. 276 § 58A........................................................................................ 23

## Federal Rules

Fed. R. Evid. 801 ............................................................................................................. 16

US1DOCS 7296991v6

## I.     INTRODUCTION

Although the United States Constitution and well-established Supreme Court case law unequivocally prohibit punishment of individuals who have been charged with but not convicted of committing crimes, the Massachusetts Department of Correction Defendants ("DOC Defendants"[1]) now defend their practice of placing pretrial detainees in the harsh conditions of the Departmental Disciplinary Unit ("DDU") at MCI-Cedar Junction.  The DOC Defendants further claim entitlement, contrary to Supreme Court case law, to place pretrial detainees and convicted prisoners in solitary confinement without any due process to the individuals affected.  The DOC's Motion for Summary Judgment ("DOC Mem.") thus demonstrates that absent a ruling on the important issues raised in Plaintiff Albert Ford's complaint, the DOC will continue to place pretrial detainees like Mr. Ford in the DDU in violation of their constitutional rights.

As an initial matter, the DOC Defendants' various arguments that the Court need not reach the merits of Mr. Ford's complaint should be rejected.  First, Mr. Ford's claims are not moot.  Indeed, the DOC Defendants' position -- that holding pretrial detainees in the DDU is a permissible practice -- demonstrates that the circumstances faced by Mr. Ford are capable of repetition yet evading review, not only for him but for other pretrial detainees.  This issue is therefore properly before the Court.  Second, the DOC Defendants' claim of entitlement to qualified immunity should be rejected because the conduct complained of here violated well-established constitutional principles barring punishment of pretrial detainees, and the placement of pretrial detainees and convicted prisoners in the DDU without procedural due process.  The DOC Defendants' persistent refusal to acknowledge controlling case law does not render that

---

[1] The DOC Defendants include James Bender, Peter St. Amand, Kenneth Nelson, Harold Clarke, and the Department of Correction.

law in any way unclear, making a finding of qualified immunity inappropriate in this case.

Finally, the DOC Defendants' argument that the allegations in the Amended Complaint are

insufficient is irrelevant on a motion for summary judgment when the question is not what facts

have been pled but what facts have been established in the record.

On the merits of the case, although the parties do not agree on the outcome, Mr. Ford and

the DOC Defendants do agree that Mr. Ford's claims for violation of substantive due process

(Count One), procedural due process (Count Three), and infamous punishment (Count Nine) are

all capable of resolution by summary judgment.[2]  First, with regard to Mr. Ford's substantive due

process claim (Count One), Mr. Bender's admitted intent to punish Mr. Ford by confining him to

the DDU as a pretrial detainee -- a fact that goes unmentioned by the DOC Defendants -- makes

clear Mr. Ford is entitled to summary judgment under *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)

("under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt

in accordance with due process of law").[3]  Second, with regard to Mr. Ford's procedural due

process claim (Count Three), it is undisputed that Mr. Ford received *no process* before being

confined to the DDU as both a pretrial detainee and later as convicted inmate.  None of the

authority cited by the DOC Defendants justifies such a departure from clearly established

standards entitling inmates -- both pretrial and convicted -- to at least some process before being

---

[2] Mr.Ford disputes the DOC Defendants' claim of entitlement to summary judgment on his Equal Protection Claim (Count Seven), as set forth more fully herein. (*See infra* pp. 40-42.)  Mr. Ford does not oppose dismissal of Harold Clarke, Kenneth Nelson, and the Department of Correction as defendants. Nor does he oppose dismissal of his ineffective assistance of counsel claims (Counts Five and Six) and Counts Ten and Eleven against all defendants, along with his procedural due process claims (Counts Three and Four) against Peter St. Amand.

[3] As set forth more fully below, given the admitted intent to punish, the DOC Defendants' argument that detention of Mr. Ford in the DDU as a pretrial detainee was reasonable is irrelevant and, in any event, is not an issue capable of being resolved on summary judgment. (*See infra* at pp. 18-25.)

subjected to punitive, harsh conditions of maximum-security, segregated confinement.  Third, with regard to Mr. Ford's claim under Article 10 of the Massachusetts Declaration of Rights (Count Nine), the prohibition against infamous punishment is not (as the DOC Defendants incorrectly suggest) limited to prisoners who have been both indicted and sentenced to MCI-Cedar Junction, as is clear from the language of Article 10, controlling precedent of the Massachusetts Supreme Judicial Court, and the DOC's position in prior litigation on the same issue.

Mr. Ford is therefore entitled, as is set forth more fully herein, to summary judgment in his favor on Counts One, Three, and Nine of his complaint and denial of the DOC Defendants' Motion for summary judgment on Count Seven of his complaint.

## II.     ARGUMENT

### A.     The DOC Defendants Procedural Arguments Are Without Merit

As set forth below, the DOC Defendants' procedural arguments are insufficient to prevent the Court from reaching the merits of Mr. Ford's claims.

#### 1.     Mr. Ford's Claims Regarding His Period of Pretrial Detention Are Not Moot as They Are Capable of Repetition Yet Evading Review

The burden of demonstrating that a case is moot is a "heavy one," requiring the party raising it to show that "the court cannot grant any effectual relief whatever to its opponent." *New Hampshire Motor Trans. Assoc. v. Rowe*, 448 F.3d 66, 73 (1st Cir. 2006) (internal quotation marks omitted).  The DOC Defendants have not met that standard here.  Contrary to the DOC Defendants' assertions, Mr. Ford's claims regarding his treatment as a pretrial detainee are not moot because they are capable of repetition yet evading review.  To fall within that exception, a case must involve two elements: (1) the challenged action was of too short a duration to be fully litigated prior to its cessation and (2) there is a reasonable expectation that plaintiff will face the

same challenged action.  *See Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 37 n.12 (1st Cir. 1993).

Mr. Ford's claims regarding his pretrial detention meet both of those requirements.

First, as the Supreme Court has held, "[p]retrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted."  *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975); *see also Bell v. Wolfish*, 441 U.S. 520, 527 n.5 (1979) ("because of the temporary nature of confinement at the MCC, the issues presented are . . . capable of repetition yet evading review") (internal quotation marks omitted); *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1117-18 (9th Cir. 2003) ("the length of detention in the county jail is short enough that any individual detainee's claim would probably become moot before trial"); *Roe v. Wade*,  410 U.S. 113, 125 (1973) (finding the normal 266-day human gestation period "so short" as to support conclusion that pregnancy "provides a classic justification for a conclusion of nonmootness"); *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 389 (1st Cir. 2000) (finding "short length" of presidential campaign season "will make a timely resolution difficult").  Mr. Ford's claims regarding his treatment as a pretrial detainee thus meet the first test.  Indeed, the pace of this litigation demonstrates that even a lengthy pretrial detention provides an insufficient period to resolve constitutional claims.  Mr. Ford filed his initial complaint in this matter on July 31, 2007 but it was not until January 10, 2008 -- over five months later -- that the DOC Defendants even responded to that complaint.  (*See* Docket Entry Nos. 1 & 31.)

Second, Mr. Ford faces a reasonable possibility that his unlawful confinement in the DDU as a pretrial detainee will be repeated.  The DOC Defendants reach too far in claiming that for Mr. Ford's claims to be capable of repetition the Court must assume that Mr. Ford will commit another crime.  (DOC Mem. at 7.)  To the contrary, Mr. Ford only need show a

reasonable possibility that he could be *arrested* again. Because he has a criminal record, Mr.

Ford is among the class of persons who do face a reasonable probability of re-arrest, as Judge

Gertner concluded in *Mack v. Suffolk County*, 191 F.R.D. 16 (D. Mass. 2000). There Judge

Gertner held that plaintiffs challenging a strip search procedure to which they were subjected as

arrestees could pursue claims for injunctive relief based on her conclusion that "[u]nder the

circumstances, it is not unreasonable to conclude that future arrests are likely." *Id.* at 20. This

determination was based on the commonsense observation that "some groups of people are more

vulnerable than others" and that "[p]laintiffs with a criminal record, for example, are more likely

to be arrested and detained than those with no criminal history." *Id.* (collecting cases).

The risk of future arrest is heightened for Mr. Ford because as a prisoner in MCI-Cedar

Junction he is in a volatile environment and faces a reasonable possibility he could be swept into

a confrontation or conflict that would lead to his arrest -- whether justified or not. Further, the

DOC Defendants have already twice subjected Mr. Ford to pretrial detention in the DDU.[4]

These facts are sufficient to show that Mr. Ford is at risk of the conduct repeating and he need

demonstrate no more. For instance, in *International Organization of Masters, Mates & Pilots v.

Brown*, 498 U.S. 466, 473 (1991), the Supreme Court held that a challenge to union election

practices was not moot based on the simple observation that the "Respondent has run for office

before and may well do so again." *See also, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581,

---

[4] Mr. Ford would find himself in the same situation that is at issue in this litigation if he were to be charged with another crime because the length of his current DDU sanction exceeds the length of his criminal sentence. (*See* Morin Dep. 30:21-36:20 (as of October 16, 2006, Mr. Ford's DDU sanction was not set to expire until at least October 2014, but in accordance with DOC policy, that expiration date can continue to increase if Mr. Ford is found to have committed disciplinary infractions), Affidavit of Timothy Syrett, filed concurrently with this memorandum ("Syrett Aff.") Ex. B; Affidavit of Dimple Chaudhary, offered in support of Mr. Ford's summary judgment motion, Docket No. 97 ("Chaudhary Aff."), Ex. N [April 30, 2008 Norfolk Superior Court Mittimus to MCI-Cedar Junction] (Mr. Ford was sentenced on April 30, 2008 to a sentence of 4-5 years with credit for 375 days served.)

594 n.6 (1999) ("in view of the multiple institutional placements [plaintiffs] L.C. and E.W. have experienced, the controversy they brought to court is 'capable of repetition, yet evading review'"); *Vote Choice, Inc.*, 4 F.3d at 37 n.12 ("there is a reasonable expectation that Leonard will encounter the same barrier again – after all, she has not renounced possible future candidacies, and politicians, as a rule, are not easily discouraged in the pursuit of high elective office"); *Demery v. Arpaio*, 378 F.3d 1020, 1026-27 (9th Cir. 2004) (case "falls squarely within the capable-of-repetition-yet-evading-review" exception where plaintiffs challenging conditions at county jail had been confined there at least once before).[5]

Mr. Ford's claims are not moot for the additional reason that his suit affects interests broader than his own because he is challenging an ongoing government policy applied to other pretrial detainees. The DOC Defendants have stressed that it is their established policy to confine pretrial detainees to the DDU: "It is important to note that plaintiff is not the only pretrial detainee to have been housed in the DDU at MCI-Cedar Junction." (*See* DOC Mot. at 34 n.13.) In such circumstances, courts regularly find that a case is not moot. For instance, in *Oregon Advocacy Center*, 322 F.3d 1101, a challenge to delays in accepting mentally incapacitated criminal defendants for evaluation and treatment at the state mental hospital was found not to be moot even though the criminal defendants who had prompted the civil suit had been admitted to the mental hospital by the time of the civil trial. While not a class action,

---

[5] Both *Weinstein v. Bradford*, 423 U.S. 147 (1975), and *Arnold v. Panora*, 593 F.2d 161 (1st Cir. 1979), on which the DOC Defendants rely to argue that Mr. Ford's claims are moot are distinguishable. In each of those cases the court's decision that the challenge was moot was based on the fact that the plaintiff provided "no evidence" that the conduct complained of was likely to recur. *See Arnold*, 593 F.2d at 164; *Weinstein*, 423 U.S. at 149 ("there is no demonstrated probability that respondent will again be" on parole). Here, by contrast the facts that Mr. Ford was twice confined to the DDU as pretrial detainee and is presently confined in MCI-Cedar demonstrate that the DOC Defendants' unlawful conduct may occur again.

because the case addressed an "ongoing, pervasive and systemic problem," the court found it was "analogous to . . . class action cases where, because of the inherently transitory nature of the claims, the trial court does not have enough time to rule on a motion for class certification before the proposed representative's individual interest expires" but may nonetheless reach the merits of the case. *Id*. at 1117. In addition, the court held that the "continued and uncontested existence of the policy that gave rise to [the] legal challenge forecloses [the defendant's] mootness argument." *Id*. at 1118; *see also Becker*, 230 F.3d at 389 (addressing Ralph Nader's challenge to exclusion from presidential debate after debate occurred because "corporate sponsorship of the debates is sure to be challenged again in future elections yet, as here, the short length of the campaign season will make a timely resolution difficult"); *Ukrainian-American Bar Assoc., Inc. v. Baker*, 893 F.2d 1374, 1377 (D.C. Cir. 1990). Even one of the cases that the DOC Defendants rely on supports addressing the merits here. In *Aime v. Commonwealth*, 414 Mass. 667 (1993), the Massachusetts Supreme Judicial Court addressed a criminal defendant's challenge to the state bail statute even after the defendant made bail because it presented "an issue of public importance, capable of repetition, yet evading review" and because the court would "not hesitate to reach the merits of cases that no longer involve a live dispute so as to further the public interest." *Id*. at 670 (quotations and citation omitted). The same goes here. A declaration that Mr. Ford's pretrial confinement in the DDU was unlawful would address an issue of public interest and effectively preclude the DOC from treating other pretrial detainees in the same manner.[6]

---

[6] The DOC Defendants do not appear to assert that Mr. Ford's procedural due process claim challenging the lack of process afforded him in his current placement in the DDU as a convicted inmate is moot. Insofar as that challenge implicates Mr. Ford's current status, there would be no basis for the DOC Defendants to do so.

## 2. The Defendants are Not Entitled to Qualified Immunity for Mr. Ford's Federal Constitutional Claims

A defense of qualified immunity is available to state officials "insofar as their conduct does not transgress clearly established constitutional or federal statutory rights of which a reasonably prudent official should have been aware." *Buenrostro v. Collazo*, 973 F.2d 39, 42 (1st Cir. 1992); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The DOC Defendants improperly make the blanket assertion that all of their actions related to Mr. Ford's detention are protected by qualified immunity. (DOC Mem. at 42-47.) However, it is clear that the actions taken by the DOC Defendants against Mr. Ford are not protected by qualified immunity as Mr. Bender and Mr. St. Amand violated Mr. Ford's clearly-established rights -- rights that any reasonable state official should have readily recognized.

The First Circuit has articulated a three part analysis to determine whether qualified immunity will shield a government official from liability. *Morelli v. Webster*, 552 F.3d 12, 18 (1st Cir. 2009); *Bergeron v. Cabral*, 560 F.3d 1, 8-10 (1st Cir. 2009). First, a court must consider whether the plaintiff's allegations, if true, state a violation of a constitutionally-protected right. *Morelli*, 552 F.3d at 18; *see also Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009).

Second, the court must consider whether the plaintiff's protected right was clearly established at the time of the violation. *Morelli*, 552 F.3d at 18. In making this inquiry, the court must evaluate whether the right at issue was "sufficiently well-defined that a reasonable official would have understood that his actions violated that right." *Hatch v. Dep't for Children, Youth, & Their Families*, 274 F.3d 12, 22 (1st Cir. 2001). "[A] plaintiff need not show that the conduct of which he complains is an exact replica of conduct that previously has been held unlawful." *Bergeron*, 560 F.3d at 12 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also*

*Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S.Ct. 2633, 2643 (2009) ("The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason . . . that '[t]he easiest cases don't even arise.' But even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law . . . in novel factual circumstances.'") (internal citation omitted). Qualified immunity "does not furnish public officials with an absolute license to subject citizens to deprivations of constitutional rights simply because the underlying fact pattern is new." *Bergeron*, 560 F.3d at 11. Rather, the legal right must simply be apparent enough that a reasonable official could conclude that their conduct would violate the law. *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

Third, the court must examine whether a reasonable public official should have understood the challenged act or omission to violate plaintiff's clearly-established right. *Bergeron*, 560 F.3d at 12. "In many cases, the fact that the relevant law is clearly established is dispositive at step three 'since a reasonably competent public official should know the law governing his conduct.'" *Id.* at 12-13 (citing *Harlow*, 457 U.S. at 819).

The DOC defendants are not entitled to qualified immunity for Mr. Ford's substantive due process, procedural due process, or equal protection claims. Mr. Ford has stated the violation of a constitutionally-protected right for each of those claims. (*See infra* §§ B.1.d, B.2.d, B.4; *see also* Ford Mem. at 7-18.) Moreover, as described below, Mr. Ford's rights were clearly established when violated by the DOC Defendants: Mr. Ford possessed a well-defined constitutional right to be free from punishment as a pretrial detainee when he was unlawfully detained in the severe conditions of the DDU; Mr. Ford had a clear right to process prior to his detention as a pretrial detainee and sentenced inmate in maximum-security, segregated confinement; and he enjoyed an established right under the Equal Protection Clause to be free

from irrational classification pursuant to Section 52A.  (*See infra*, §§ B.1.d, B.2.d, B.4)  The

DOC Defendants unsupported assertions to the contrary are untenable.  *See, e.g.*, *Bell v. Wolfish*,

441 U.S. at 535-36 (clearly establishing that "under the Due Process Clause, a detainee may not

be punished prior to an adjudication of guilt"); *Surprenant v. Rivas*, 424 F.3d 5, 17-18 (1st Cir.

2005) (holding that "[p]retrial detainees. . . have a liberty interest in avoiding punishment – an

interest that derives from the Constitution itself" and further noting that the due process required

before a pretrial detainee may be deprived of a liberty interest is well-established).  The failure of

the DOC Defendants to recognize Mr. Ford's clearly established constitutional rights was

objectively unreasonable, rendering the qualified immunity doctrine inapplicable.

     **3.**     **The DOC Defendants' Contentions Regarding the Sufficiency of the Amended Complaint Are Misplaced**

Similarly unavailing is the DOC Defendants' attempt to attack the sufficiency of the

Amended Complaint for purportedly failing to include factual allegations regarding the

individual defendants.  (*See* DOC Mem. at 40-42.)  As has long been established in this Circuit,

"[t]he sufficiency of the allegations of a complaint do not determine the motion for summary

judgment.  Rather, it must be determined whether there is a genuine issue as to any material

fact."  *William J. Kelly Co. v. Reconstruction Fin. Corp.*, 172 F.2d 865, 866 (1st Cir. 1949)

(quotations and citation omitted); *see also* Fed. R. Civ. P. 56(c) (determination of summary

judgment turns whether there is "no genuine issue as to any material fact"); *Spadafore v.*

*Gardner*, 330 F.3d 849, 852-53 (6th Cir. 2003) (where party does not file motion to dismiss and

raises challenge to sufficiency of pleading on motion for summary judgment, the court is not

limited to the "formal issues framed by the pleadings" and the "question of whether the

pleadings were fatally insufficient is thus no longer the correct inquiry").  Thus, the proper

inquiry is whether, following discovery, there is an absence of material fact regarding Mr. St.

- 10 -

Amand's involvement in the deprivation of Mr. Ford's rights.[7]  There is not -- a point made clear by the fact that the DOC Defendants do not even assert such an absence of fact.  (*See* DOC Mem. at 42.)

In order to be held liable in a § 1983 suit, an official must be shown to have had "personal involvement" in the deprivation of constitutional rights, which in the case of a "prison official may be established by showing that the official knew of" the violation of the prisoner's rights but failed to intervene.  *See Pinto v. Nettleship*, 737 F.2d 130, 132 (1st Cir. 1984).  Specifically, "a prison superintendent may be held liable on the basis of that official's own acts or omissions."  *McGuinness v. DuBois*, No. 93-12673, 1995 WL 169500, at *7 (D. Mass. March 15, 1995).

Here, there are sufficient facts in the record to raise triable issues of fact as to Mr. St. Amand's liability for Mr. Ford's substantive due process, equal protection, and infamous punishment claims.  As Superintendent of MCI-Cedar Junction, Mr. St. Amand was responsible for the "[c]are and custody for all the inmates" at the prison and also charged with overseeing the operations of the DDU.  (St. Amand Dep. at 17:15-18:10 (Syrett Aff. Ex. C).)

In June 2007, Mr. St. Amand contacted a Norfolk County official to indicate that the DOC would be willing to accept Mr. Ford back into custody at MCI-Cedar Junction pursuant to Section 52A after his bail was revoked.  (St. Amand Dep. at 150:16-153:16 (Chaudhary Aff. Ex. G).)  Then, throughout Mr. Ford's second period of pretrial detention in the DDU, Mr. St. Amand was aware that he was being held there as a pretrial detainee for conduct that occurred in a previous criminal sentence.  (St. Amand Dep. at 175:13-20 (Syrett Aff. Ex. C).)  Indeed, in

---

[7]  The DOC Defendants apparently concede that there are disputed issues of fact regarding Mr. Bender: "the Amended Complaint must be dismissed, after discovery, as to all defendants except for Deputy Commissioner Bender."  (DOC Mem. at 41.)

August 2007, Mr. St. Amand was forwarded a letter from Assistant Deputy Commissioner

Kenneth Nelson that Mr. Ford wrote asserting that he was being held unlawfully in the DDU as a

pretrial detainee.  (St. Amand Dep. at 170:16-175:20 (Syrett Aff. Ex. C); Syrett Aff. Ex. D

[August 7, 2007 referral to Mr. St. Amand].)  Mr. St. Amand or someone working under his

supervision drafted a response to Mr. Ford for Mr. Nelson's signature dismissing Mr. Ford's

concerns and stating that he was "properly housed in the DDU serving the remainder of a ten

(10) year DDU sentence."  (Syrett Aff. Ex. E [August 23, 2007 Letter from Kenneth Nelson]; St.

Amand Dep. at 171:4-172:6, 176:23-177:15 (Syrett Aff. Ex. C).)

It is therefore clear that Mr. St. Amand played an active part in both initiating and

continuing Mr. Ford's second period of pretrial detention.  Moreover, the fact that Mr. St.

Amand was made aware of the constitutional deprivation that Mr. Ford was suffering through his

placement in the DDU and failed to take steps any to remedy it is sufficient for Mr. St. Amand to

be held liable.  *See McGuinness*, 1995 WL 169500, at *8; *Wright v. Smith*, 21 F.3d 496, 501 (2d

Cir. 1994) (personal involvement sufficient for § 1983 liability may be established where a

"supervisory official, after learning of the violation through a report or appeal, may have failed

to remedy the wrong") (citation omitted).[8]

---

[8]  Even if the Court accepts the DOC Defendants' invitation to address the sufficiency of the
allegations against Messrs. St. Amand and Bender in the Amended Complaint at this late stage, they are
plainly adequate when evaluated against the standard for personal involvement set forth above.  (*See, e.g.*,
Amended Compl. ¶¶ 37-38 (alleging Mr. St. Amand's and Mr. Bender's knowledge of and acquiescence
to Mr. Ford's unlawful pretrial placement in the DDU); ¶ 58 ("each of the DOC Defendants had direct
knowledge that Mr. Ford was a pretrial detainee ant that he was nonetheless being improperly subjected
to punitive conditions in MCI-Cedar Junction and in the DDU under a DDU sanction from a previous
criminal sentence, and/or as a supervisor within the DOC, encouraged, condoned, acquiesced, or was
deliberately indifferent to Mr. Ford's detention in MCI-Cedar Junction and confinement in the DDU");
¶ 80 ("By confining Mr. Ford to the DDU without regard for the appropriateness of such confinement and
without affording him the opportunity for any type of review of the appropriateness of this confinement,
the DOC Defendants violated Mr. Ford's procedural due process rights").)

**B.    On the Merits, the DOC Defendants Fail to Establish That They Are Entitled to Summary Judgment on Mr. Ford's Claims**

Putting to the side the DOC Defendants' unavailing procedural arguments, it is also clear on the merits that the DOC Defendants are not entitled to summary judgment on Mr. Ford's four remaining claims:  (1) substantive due process; (2) procedural due process; (3) infamous punishment under Article 10 of the Massachusetts Declaration of Rights; and (4) equal protection.

**1.    The DOC Defendants Are Not Entitled to Summary Judgment on Mr. Ford's Substantive Due Process Claim**

As set forth in Mr. Ford's motion for partial summary judgment (Ford Mem. at 7-8), there are two means by which the Court may determine whether Mr. Ford suffered punishment as a pretrial detainee in violation of the Due Process Clause:  (1) finding "a showing of an expressed intent to punish on the part of detention facility officials" or (2) determining that a "restriction or condition [imposed on a pretrial detainee] is not reasonably related to a legitimate goal," allowing the Court to "infer that the purpose of the governmental action is punishment." *Bell*, 441 U.S. at 538-39.  Significantly, the DOC Defendants ignore the first test in their motion. But that is the standard that should govern in this case where Mr. Bender has admitted an intent to punish Mr. Ford.  Further, the question of intent is the only means by which this claim can be resolved on summary judgment because, as set forth below, assessing the second test -- the reasonableness of Mr. Bender's and Mr. St. Amand's conduct -- raises numerous material issues that preclude entry of summary judgment.

**a)    The Presence of Alternative Justifications For Mr. Ford's Pretrial DDU Detention Does Not Excuse James Bender's Unlawful Intent to Punish**

The DOC Defendants argue that Mr. Ford's pretrial detention is permissible because it was motivated by safety concerns and was intended only to address violations of DOC

regulations. Neither of these justifications are sufficient to excuse Mr. Bender's conduct where he has already admitted an intent to punish Mr. Ford. (*See* Ford Mem. at 7-9.)

Even if Mr. Bender's decision to confine Mr. Ford to the DDU was motivated in part by institutional safety concerns, it cannot justify his intent to punish Mr. Ford. As the Supreme Court held in *Bell v. Wolfish*, alternative purposes for restrictions imposed on a pretrial detainee are appropriately considered *only* "[a]bsent a showing of an expressed intent to punish." 441 U.S. at 538. Applying this principle, the Eleventh Circuit has concluded that an "express intent to punish" is sufficient to establish liability by prison officials, rejecting the argument that punitive intent can be excused by the presence of an alternative reason for the detainee's treatment:

> To the extent that [the defendants] argue that a pretrial detainee may be subjected to adverse conditions of confinement for the purpose of punishment so long as there is a legitimate alternative reason for the confinement, regardless of whether the legitimate reason in fact motivated the defendants' actions, they are simply wrong. An express purpose to punish establishes unconstitutional pretrial punishment.

*McMillian v. Johnson*, 88 F.3d 1554, 1565 (11th Cir. 1996) (footnote omitted); *see also Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) ("An intent to punish on the part of detention facility officials is sufficient to show unconstitutional pretrial punishment."); *Green v. Baron*, 879 F.2d 305, 309 (8th Cir. 1989) ("If the defendants punished [plaintiff], they violated his due process rights."). The same goes here.

Similarly, Mr. Bender cannot escape liability by arguing that he was merely enforcing DOC regulations through Mr. Ford's DDU sanction. First, the DOC Defendants' argument that Mr. Ford "was not being 'punished' or sanctioned for 'prior unproven conduct'" (DOC Mem. at 26) is directly contradicted by the record. In issuing Mr. Ford's DDU sanction, the Hearing Officer noted that she imposed the maximum DDU sanction based in part on her conclusion that

"[n]ot only did Inmate Ford violate Department of Corrections rules, *he violated the laws of the Commonwealth as well*." (Chaudhary Ex. H at Ford.JD 219 [Disciplinary Hearing Summary] (emphasis added).)[9] Imposing a DDU sanction to address Mr. Ford's unproven criminal conduct necessarily means that his pretrial DDU detention for the same sanction was not strictly limited to addressing the violation of DOC regulations.

Second, in the circumstances of this case, where Mr. Ford's pretrial confinement and his DDU sanction arose from the same conduct, the continued imposition of that sanction during Mr. Ford's pretrial detention exceeded the scope of the DOC Defendants' authority. Although prison officials may discipline pretrial detainees for violations of prison regulations, the First Circuit has limited that authority to addressing transgressions during the period of pretrial detention: "While a pretrial detainee may be disciplined for a specific institutional infraction committed *during the period of his detention*, the discipline imposed must be roughly proportionate to the gravity of the infraction." *Surprenant*, 424 F.3d at 13 (emphasis added). Here, though, Mr. Ford was being punished for conduct that occurred during a previous criminal sentence and was the very same conduct for which he was being held awaiting trial. This represents an unconstitutional exercise of authority. "What the Constitution prohibits is the undue expansion of the exercise" of the authority to hold pretrial detainees "for the purpose, or with the unintended effect, of punishing the pretrial detainee for the acts that are the basis for his prosecution and his consequent pretrial detention." *Collazo-Leon v. United States Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir. 1995); *see also Sandin v. Conner*, 515 U.S. 472, 484 (1995) (cautioning that punishing a pretrial detainee for the conduct for which he is being held "would

---

[9] While Mr. Ford has moved to strike similar documents from the DOC Defendants' summary judgment motion as inadmissible hearsay, for Mr. Ford's purposes, the Disciplinary Hearing Summary is not hearsay as it is the admission of a party opponent. *See* Fed. R. Evid. 801(d)(2).

improperly extend the legitimate reasons for which such persons are detained—to ensure their presence at trial").  As another court explained the boundaries for the punishment of pretrial detainees:

> a pretrial detainee can be punished for misconduct that occurs while he is awaiting trial in a pretrial confinement status.  Notably, the basis for this punishment is not the underlying crime of which he stands accused; rather, this punishment is based upon the detainee's actions while in pretrial confinement.

*Rapier v. Harris*, 172 F.3d 999, 1003 (7th Cir. 1999).  Here, Mr. Ford suffered punishment at the hands of the DOC Defendants as a pretrial detainee for the conduct that gave rise to his pretrial detention -- precisely what is prohibited by the Due Process Clause.

In the event that the Court does not grant Mr. Ford summary judgment based on Mr. Bender's stated intent to punish him, as set forth below, the DOC Defendants fall substantially short of demonstrating that there are no triable questions of fact when it comes to the second test.

### b)      Conduct that "Shocks the Conscience" Is Not the Operative Standard for Mr. Ford's Substantive Due Process Claim

The DOC Defendants erroneously try to excuse their conduct by suggesting that it is not unlawful because it does not "shock the conscience."  First, the "shocks the conscience" test does not apply.  Second, the cases cited by the DOC Defendants involve split-second decision making -- such as recovery of evidence swallowed by a suspect and a high-speed pursuit -- that are plainly inapposite here.

Significantly, the "shocks the conscience" standard advocated by the DOC Defendants is found nowhere in controlling precedent regarding substantive due process claims by pretrial detainees.  As noted, in *Bell v. Wolfish*, the Supreme Court laid out two alternative tests for a court to assess whether punishment has been imposed -- neither of which mentions assessing whether the conduct at issue shocks the conscience.  Indeed, that phrase appears nowhere in the

Court's opinion.[10]  Similarly, in *Block v. Rutherford*, 468 U.S. 576 (1984), the Supreme Court reiterated that "where it is alleged that a pretrial detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment, '[f]or under the Due Process Clause, a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law.'" *Id*. at 583 (quoting *Bell*, 540 U.S. at 535).  Again, consideration of whether that punishment must also shock the conscience is never mentioned.  The same goes for the First Circuit.  In *Surprenant v. Rivas*, 424 F.3d 5 (1st Cir. 2005), the First Circuit's most recent treatment of the *Bell v. Wolfish* standard, there is simply no indication that a court evaluating whether prison administrators have unlawfully punished a pretrial detainee must additionally consider whether the administrators' conduct shocks the conscience.  *See also O'Connor v. Huard*, 117 F.3d 112 (1st Cir. 1997) (same); *Collazo-Leon*, 51 F.3d 315 (same); *Lyons v. Powell*, 838 F.2d 28 (1st Cir. 1988) (same).

Moreover, the cases that the DOC Defendants rely on to attempt to excuse their conduct are plainly inapplicable to claims that Mr. Ford was deliberately subjected to unlawful punishment over an extended period of time.  In *Rochin v. California*, 342 U.S. 165 (1952), the Supreme held that it violated due process, and shocked the conscience, for police to pump the stomach of a suspect in search of drugs he swallowed while being arrested.  This factual situation, where police officers have a limited period to make a determination as to the appropriate course of action, is plainly distinguishable from Mr. Ford's case where the DOC Defendants had abundant time to reflect and deliberate about how he should be treated.  Thus, the DOC Defendants' contention that their conduct should be excused because it does not rise to

---

[10]  Justice Marshall invoked the phrase in dissent when addressing body cavity searches of pretrial detainees, conduct that is governed by the Fourth Amendment.  441 U.S. at 578, 558.

the level of subjecting a suspect to a forced stomach pumping is plainly wide of the mark. This point was made clear in another of the cases on which the DOC Defendants rely, *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). There the Supreme Court held that the family of a teenager struck and killed by a police officer who was in pursuit of the motorcycle on which the teenager was a passenger at speeds reaching 100 miles per hour in a residential area failed to state a due process claim. In reaching that conclusion, the Court discussed at length the differences between the split-second decision at issue and the vastly different situation of pretrial custody. As the Court explained, "in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory" and "liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by competing obligations." *Id*. at 851, 853.

> c) **The DOC Defendants Have Failed To Demonstrate the Absence of Material Issues of Fact Regarding the Reasonableness of Confining Mr. Ford to the DDU as a Pretrial Detainee**

While there is no dispute of fact that James Bender intended to punish Mr. Ford as a pretrial detainee by confining him to the DDU -- making summary judgment for Mr. Ford appropriate on that basis -- there is dispute about the material fact of whether such confinement was reasonable. This dispute precludes entry of summary judgment for the DOC Defendants on Mr. Ford's substantive due process claim.

The question of whether confinement is reasonable "turn[s] on whether the conditions or restrictions could have been used for a legitimate purpose and whether they are excessive in relation to that legitimate purpose." *O'Connor*, 117 F.3d at 15-16; *see also Surprenant*, 424 F.3d at 13 ("An arbitrary, or disproportionate sanction . . . constitutes punishment"). Mr. Ford does

not deny that the DOC Defendants had a legitimate interest in ensuring his presence at trial and in maintaining institutional order, but he disputes that his detention for a year in the DDU was appropriate. Moreover, the DOC Defendants' assertion that "[t]here is no evidence in the record to indicate that detention in the DDU is an exaggerated sanction by the Department of Correct" (DOC Mem. at 26) is incorrect or, at the least, a disputed issue.

> **(i)  Whether the Harsh Conditions of Confinement that Mr. Ford Suffered for a Year Were Reasonable Raises a Triable Issue of Fact**

In *Bell v. Wolfish*, the Supreme Court observed that "endur[ing] genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment[.]" 441 U.S. at 542. This case raises those questions and the DOC Defendants have failed to demonstrate that the answers to them do not involve disputed issues of fact.

As explained at greater length in Mr. Ford's motion for partial summary judgment, Mr. Ford was subjected to over a year of extremely restrictive conditions as a pretrial detainee in the DDU. Among other deprivations, he was confined to a cell measuring seven by twelve feet for at least 23 hours a day. His human contact was also sharply limited, as he was allowed each month, at most, four one-hour non-contact visits from his family or friends and four 30-minute phone calls to family or friends, both of which he had to earn as privileges. (*See* Ford Mem. at 2-3.)

The DOC Defendants have pointed to no case in which a court sanctioned the imposition of such harsh conditions on a pretrial detainee for so long a period. Rather, the DOC Defendants inappropriately rely on a case addressing the treatment of *convicted* prisoners -- *Torres v. Commissioner of Correction*, 427 Mass. 611 (1998) -- to contend that detention in the DDU for up ten years is constitutional. (DOC Mem. at 26.) But the legal standards applicable to pretrial

- 19 -

detainees and convicted inmates are different, reflecting the fact that a pretrial detainee has not been found guilty of any crime: "Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although the punishment may not be 'cruel and unusual' under the Eighth Amendment." *Bell*, 441 U.S. at 536 n.16. That distinction renders irrelevant the Eighth Amendment standard that prison administrators need refrain from acting with deliberate indifference to the fact that a prison's conditions "present a substantial risk of serious harm" to inmates. *Torres*, 427 Mass. at 613-14 (internal quotation marks omitted). Thus, the DOC Defendants' reliance on an Eighth Amendment case to excuse Mr. Ford's pretrial DDU detention is plainly unavailing. And apart from their improper reliance upon *Torres*, the DOC Defendants make no effort to even address the reasonableness of the conditions in the DDU for a pretrial detainee.

When courts examine substantive due process rights of *pretrial* detainees, there is far less latitude permitted. The concern expressed by the First Circuit in *Lyons v. Powell*, 838 F.2d at 31, provides a telling indication of the scope of protection to which pretrial detainees are entitled: "subjecting pretrial detainees to the use of a floor mattress for anything other than brief emergency circumstances may constitute an impermissible imposition of punishment, thereby violating the due process rights of such detainees." *See also Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004) (use of webcam to film pretrial detainees constituted unlawful punishment); *C-1 v. City of Horn Lake, Miss.*, 775 F.Supp. 940, 947 (N.D. Miss. 1990) (requiring pretrial detainees to wash cars amounted to unlawful punishment).

Also weighing heavily in favor of a determination that Mr. Ford's treatment was not reasonable is the prolonged duration of his pretrial detention, which takes it far outside the normal realm. Indeed, the *Lyons* court noted that the fact that the pretrial detainee had been

subjected to adverse conditions for just *27 days* raised constitutional concerns: "we are most troubled by his contention that he was confined to a cell for 27 days with another inmate, during which time he was forced to sleep on a mattress on the floor of his cell." *Lyons*, 838 F.2d at 30. Similarly, in *Bell v. Wolfish*, the Supreme Court concluded that the fact that "[n]early all of the pretrial detainees are released within 60 days" supported a finding that no substantive due process violation had occurred. 441 U.S. at 543[11]; *see also Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."). Other courts, too, have found periods of pretrial detention far shorter than the yearlong period the DOC Defendants seek to have the court ratify here to be impermissibly long. *See, e.g.*, *Lock v. Jenkins*, 641 F.2d 488, 494 (7th Cir. 1981) (concluding where pretrial detainees were held for an average of 60 days that the "conditions of confinement amount to punishment . . . because of the great length of time"); *Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir. 1981) (imposing 15-day limit for confining pretrial detainees in overcrowded conditions after which such conditions "would become unacceptable punishment in violation of the Fourteenth Amendment"); *Jones v. City & County of San Francisco*, 976 F.Supp. 896, 907 (N.D. Cal. 1997) (finding conditions of confinement to constitute punishment based in part on the pretrial detainees' "lengthy tenure in the jail – an average of 103 days per inmate").

Evidence in the record also suggests that confinement to the DDU was not necessary during Mr. Ford's pretrial detention. Lisa Mitchell, who supervised the DDU during Mr. Ford's first period of pretrial detention, testified that Mr. Ford "was respectful" and that there "were very few issues that were brought to me from him directly, or even indirectly." (Mitchell Dep. at

---

[11] Specifically, more than half of the pretrial detainees at issue in *Bell* spent only 10 days or less at the jail, three-quarters spent less than 30 days, and more than 85% were released within 60 says. 441 U.S. at 524 n.3

35:1-36:6 (Syrett Aff. Ex. F).)  Similarly, Mr. St. Amand, who was the Superintendent during

Mr. Ford's second period of pretrial detention and remains in that position, testified that the east

wing of MCI-Cedar Junction would be capable of housing Mr. Ford and an appropriate unit in

which to do so.  (*See* St. Amand Dep. at 205:23-207:10 (Syrett Aff. Ex. C).)[12]

Further, it is worth noting that the conditions of confinement that Mr. Ford suffered are

far more restrictive than the conditions to which most *convicted* inmates at MCI-Cedar Junction

are subjected.  For instance, inmates in the general population at MCI-Cedar Junction are only

confined to their cells for a total of 12 to 13 hours a day, may have up to three visitors per week,

and are allowed unlimited phone calls.  (St. Amand Dep. at 38:2-46:4 (Syrett Aff. Ex. C).)  "If a

pretrial detainee is incarcerated in worse circumstances than the convict who is being 'punished,'

it is difficult to say that the detainee is not also being punished." *Inmates of the Suffolk County

Jail v. Eisenstadt*, 360 F. Supp. 676, 686 (D. Mass. 1973).

Finally, another fact that cuts strongly against a finding that Mr. Ford's pretrial DDU

confinement was reasonable is that he was released on bail during that same period.  (*See, e.g.*,

DOC Defendants Concise Stmnt. of Material Fact, Docket No. 91, ¶ 9.)  If Mr. Ford was deemed

capable of being released into the community, it plainly raises the question why he could not be

placed in a less restrictive unit of MCI-Cedar Junction.  *See* Mass. Gen. Laws ch. 276 § 58A(1)

(allowing the Commonwealth to move for an order of pretrial detention "based on

dangerousness").

---

[12] And while the DOC Defendants claim to have a "mountain of evidence" to suggest that Mr. Bender was justified in placing Mr. Ford in the DDU as a pretrial detainee (DOC Mem. at 25), as set forth in Mr. Ford's motion to strike, which is being filed concurrently, many of these DOC reports are not only inadmissible hearsay but frequently deemed inherently unreliable by courts.

**(ii)    The DDU Inflicts Psychological Pain on Inmates and Damages Their Mental Health**

There is also a dispute of material fact whether confining Mr. Ford to the DDU for a year as a pretrial detainee was reasonable in light of the risk that such confinement posed to his mental health.  As Dr. Stuart Grassian, a psychiatrist with extensive experience in evaluating the psychiatric effects of solitary confinement in the DDU as well as similar segregation units, explains in his expert report, solitary confinement is "intrinsically toxic to the mental functioning and can cause severe psychiatric harm" and the DDU "presents a particularly harsh and psychologically punishing condition of solitary confinement."  (Expert Report of Dr. Stuart Grassian ("Grassian Report"), Syrett Aff. Ex. A, ¶ 10(a)-(b).)[13]  The danger posed by the DDU is a result of the sensory deprivation caused by being locked in isolation for up to 23 hours a day with virtually no human contact.  (*See* Grassian Report ¶¶ 11-12.)  This deprivation of sensory experience means that all prisoners in the DDU, even those who enter with stable personalities, will "experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability and difficulty tolerating external stimuli (especially noxious stimuli)."  (Grassian Report, ¶ 23.)  Further, the effects of such confinement can manifest within a matter of days: "even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern towards an abnormal pattern characteristic of stupor and delirium."  (Grassian Report ¶ 19.)  While the DOC defendants may contend that DDU confinement is not psychologically harmful, in Dr. Grassian's expert view, that "is a proposition

---

[13]  Dr. Grassian, who was on the teaching staff of the Harvard Medical School from 1972 until 2002, has published four articles concerning the psychiatric effects of solitary confinement, presented numerous lectures and seminars on this topic, and served as an expert witness in a number of cases related to this issue.  In 2005, Dr. Grassian was named an "Exemplary Psychiatrist" by the National Association for the Mentally Ill for his work regarding the effects of solitary confinement.  (Grassian Report ¶¶ 1-7.)

which has no evidentiary basis at all and is at odds with commonly-accepted medical knowledge."  (Grassian Report ¶ 29.)[14]

The DOC Defendants themselves conceded the harm that conditions of confinement such as those found in the DDU can have on inmates.  Peter St. Amand testified that one of the effects of segregated housing is that it causes inmates to injure themselves in order to have the opportunity to leave and go to a hospital for treatment.  (St. Amand Dep. at 83:16-84:11 (Syrett Aff. Ex. C).)  Thus, of the 103 instances of MCI-Cedar Junction inmates trying to injure themselves in 2007 and of the 35 instances in 2008, Mr. St. Amand estimated that over 90 percent occurred in the DDU or in another segregation unit.  Further, it is Mr. St. Amand's view that there was a link between the high incidence of self-injurious behavior in segregation units and the conditions of confinement in those units.  (St. Amand Dep. at 91:13-93:15 (Syrett Aff. Ex. C).)

While the DDU poses a risk of psychological harm to all inmates confined there, it is particularly pernicious for a pretrial detainee because of his need for mental acuity to assist in the defense in his ongoing criminal proceedings.  In Dr. Grassian's experience, pretrial detainees "will often become severely impaired in regard to his capacity to cooperate with his counsel in his own defense, increasingly so as the length of such confinement increases from weeks to many months."  (Grassian Report ¶ 28.)  Based on this concern, one court refused to allow the government to impose pretrial segregation on an organized crime boss even where he was accused of continuing while in general population to direct his crime family and also of plotting

---

[14]  To the extent that the DOC Defendants contend that the DOC's mental health program is sufficient to address the potential harms caused by the DDU, that would also raise a disputed question of fact.  In Dr. Grassian's view, the mental health services provided to DDU inmates "are in no way adequate to prevent psychological harm."  (*See* Grassian Report ¶¶ 29-34.)

to kill a federal prosecutor. *See United States v. Basciano*, 369 F. Supp. 2d 344, 352-53

(E.D.N.Y. 2005). The court held that segregated confinement, which it termed the "nuclear

option," was not warranted because it is "well documented that long periods of solitary

confinement can have devastating effects on the mental well-being of a detainee" and the

defendant needed to work with his counsel to prepare his defense. *Id.* (citing Craig Haney &

Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and

Solitary Confinement,* 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997) ("[t]here is not a single

study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10

days failed to result in negative psychological effects," including "hypertension, uncontrollable

anger, hallucinations, psychosis, chronic depression, and suicidal thoughts and behavior").[15]

In light of this evidence about the severe risks posed by DDU confinement -- particularly

for a pretrial detainee -- there is a triable issue of fact regarding whether Mr. Ford's pretrial DDU

detention was reasonable to achieve the DOC's goals of pretrial detention and institutional order.

> **d)      The DOC Defendants Are Not Entitled To Qualified Immunity From Mr. Ford's Substantive Due Process Claims**

The DOC Defendants are not entitled to qualified immunity here because their conduct

violated a clearly-established constitutional right. Since the Supreme Court's 1978 decision in

*Bell v. Wolfish*, it has been clearly established that "under the Due Process Clause, a detainee

may not be punished prior to an adjudication of guilt in accordance with due process of law" and

also that imposing excessive or unreasonable conditions of confinement on a pretrial detainee

---

[15]   Based on such conclusions, there is a growing discourse about whether solitary confinement amounts to torture. For instance, a recent article in The New Yorker questioned whether the use of solitary confinement in American prisons, including the DDU, constitutes torture given the proven damage it causes to mental health. Atul Gawande, *Hellhole – The United States holds tens of thousands of inmates in long-term solitary confinement. Is this torture?*, The New Yorker, March 30, 2009 (attached as Ex. G to the Syrett Aff.).

amounts to punishment.  441 U.S. at 535-36, 538.  The First Circuit has also repeatedly set forth

this standard.  *See, e.g.*, *Surprenant*, 424 F.3d at 13; *Lyons*, 838 F.2d at 29-30.

Based on this clearly-established standard, there is simply no room for Mr. Bender to

contend that he should not have reasonably understood that it was unlawful to place Mr. Ford in

the DDU to punish him.  In a similar situation, the Eleventh Circuit has held that "*Bell*'s

prohibition on *any* pretrial punishment, defined to include conditions imposed with an intent to

punish, should have made it obvious to all reasonable officials . . . that holding [plaintiff] on

death row to punish him before he was tried violated [plaintiff's] due process rights."

*McMillian  v. Johnson*, 88 F.3d 1554, 1565 (11th Cir. 1996).  The same goes here.  Even if he

had alternative reasons for holding Mr. Ford in the DDU, Mr. Bender has admitted that one of

his purposes was to punish Mr. Ford and that intent clearly runs afoul of the standard established

long ago in *Bell*.

Nor can Mr. Bender and Mr. St. Amand be heard to argue that it was not well established

under existing substantive due process precedent that Mr. Ford's prolonged pretrial confinement

in the DDU was unreasonable.  Indeed, as the First Circuit held in 2005, when concluding that a

correctional officer was not entitled to qualified immunity, "the right to be free from arbitrary

and intentional punishment at the hands of correctional officers was clearly established"

following the First Circuit's 1988 *O'Connor* decision.  *Surprenant*, 424 F.3d at 15; *see also*

*Green v. Baron*, 925 F.2d 262, 263 (8th Cir. 1991) (denying summary judgment on qualified

immunity where plaintiff submitted evidence "including expert medical testimony, supporting

his contention that the [pretrial] deprivations were purposeless, excessive, and punitive in

nature"); *Boivin v. Merrill*, No. 97-CV-177, 1999 WL 33117053, at *2 (D. Me. Jan. 6, 1999) ("it

is evident that [defendant] is not entitled to qualified immunity.  A pretrial detainee's due process

right to be free from punishment is clearly established."); *C-1*, 775 F. Supp. at 951 (denying

qualified immunity because prohibition on punishing pretrial detainees clearly established after

*Bell v. Wolfish*).  The DOC Defendants have not cited a single case to support their contention

that a pretrial detainee may be held in punitive conditions, such as the extraordinarily harsh

environment of the DDU.  It is indeed astounding that the DOC Defendants have persisted in this

litigation to justify their plainly unlawful conduct.[16]

### 2. Mr. Bender is Not Entitled to Summary Judgment on Mr. Ford's Procedural Due Process Claim

Mr. Bender argues that Mr. Ford's 2003 disciplinary hearing may be used as the basis of

his confinement in the DDU as a pretrial detainee, on a new criminal charge.  To support this

contention, Mr. Bender relies on a series of inapposite state cases that fail to address the

constitutional issue before this Court.

### a) Mr. Ford's 2003 Hearing Does Not Permit His Pretrial Detention in the DDU Four Years Later, On a New Charge, Without Process

As explained more fully in Mr. Ford's memorandum in support of his motion for partial

summary judgment, Mr. Ford was incarcerated at MCI-Cedar Junction in 2002 when he was

charged with a disciplinary offense.  (Ford Mem. at 3-4.)  A disciplinary hearing was held on

January 7, 2003 and, that same month, Mr. Ford was given a sanction of 10 years in the DDU.

---

[16]  The cases on which the DOC Defendants apparently rely in arguing that they are entitled to
qualified immunity are plainly inapposite.  As noted, the *Torres* case only addresses an Eighth
Amendment challenge to conditions in the DDU and therefore does not speak to the constitutionality of
confining pretrial detainees there.  Further, as addressed in more detail below, the other state court
decisions on which the DOC Defendants seem to rely in attempting to excuse their conduct do not even
address the substantive due process protections to which pretrial detainees are entitled under *Bell v.
Wolfish*, *see infra* § B.2.d.

(*Id.*, Chaudhary Aff. Ex. H [Disciplinary Hearing Summary].)[17]  Mr. Ford was later indicted in

Norfolk County for the same conduct.

On January 6, 2007, Mr. Ford completed serving his criminal sentence and was issued a

Certificate of Discharge from the DOC indicating that he was "hereby discharged from further

imprisonment."  (Chaudhary Aff. Ex. I [Jan. 6, 2007 Certificate of Discharge].)  Nevertheless,

Mr. Ford remained in DOC custody in DDU as a pretrial detainee until March 2, 2007 when he

was released on bail.  (Mici Dep. at 63:5-15 (Chaudhary Aff. Ex. D); Ford Dep. at 84:10-22;

86:11-18 (Chaudhary Aff. Ex. C); *see also* Bender Dep. at 99:4-101:16 (Chaudhary Aff. Ex. A).)

During this period of pretrial detention, Mr. Ford was not provided with any process to

determine whether his confinement in the severe conditions of the DDU was lawful or necessary.

(*Id.*)

After being released from prison on March 2, 2007, Mr. Ford remained out on bail in the

community until June 26, 2007, when his bail was revoked and he was returned to the DDU as a

pretrial detainee.  (DOC Answer ¶¶ 22-24 (Docket No. 55); Ford Dep. at 96:9-98:6 (Chaudhary

Aff. Ex. C).)  Again, Mr. Ford was not provided with any process to assess whether his

confinement in the DDU was reasonable or appropriate.  (*See* Bender Dep. at 139:10-140:18;

DOC Defs. Answer ¶¶ 22-24 (Docket No. 55); St. Amand Dep. at 150:16-151:7; 152:17-153:24

(Chaudhary Aff. Ex. G); Ford Dep. at 96:9-98:6 (Chaudhary Aff. Ex. C).)  Mr. Ford remained in

the DDU through his second period of pretrial detention.  (*See* Chaudhary Aff. Ex. N [April 30,

2008 Norfolk Superior Court Mittimus to MCI-Cedar Junction].)  Mr. Ford returned to the DDU

---

[17] As noted in the Disciplinary Hearing Summary, Mr. Ford did not attend his disciplinary hearing
Moreover, Mr. Ford requested representation at this hearing but was unable to secure legal counsel.
(Chaudhary Aff. Ex. H [Disciplinary Hearing Summary] at Ford.JD 208.)

after he was sentenced and remains there to this day.  At no point since 2003 has Mr. Ford received any process to assess the adequacy of his DDU placement.

Mr. Bender argues that Mr. Ford may be held in the DDU as a pretrial detainee on a disciplinary sanction issued during a prior sentence of incarceration.  (DOC Mem. at 9, 12.) However, the scant process provided to Mr. Ford in his 2003 disciplinary hearing does not satisfy the procedural due process required by the Constitution prior to the detention of a pretrial detainee in the DDU.  When Mr. Ford was discharged by the DOC on January 6, 2007, he became a pretrial detainee entitled to all of the constitutional protections that are afforded to those who have been accused but not convicted of a crime.  *See, e.g.*, *Bell*, 441 at 536 ("A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has only a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest.") (internal quotation marks and citation omitted); *Beauchamp v. Murphy,* 37 F.3d 700, 707 (1st Cir. 1994) ("[P]retrial detainees . . . are presumptively innocent individuals held primarily to assure their presence at trial.").

Mr. Bender did not have the authority to strip Mr. Ford of his procedural due process rights when Mr. Ford was newly arrested and held in the DDU as a pretrial detainee on a new

US1DOCS 7296991v6

criminal charge, four years after his initial hearing.[18]  To the extent the Constitution permits

prison officials to punish pretrial detainees for disciplinary infractions, that punishment must be

based on actions by the detainee *during* pretrial confinement.  *See Rapier v. Harris*, 172 F.3d

999, 1003 (7th Cir. 1999) ("[A] pretrial detainee can be punished for misconduct that occurs

while he is awaiting trial in a pretrial confinement status. . . . [T]his punishment is based upon

the detainee's actions *while in pretrial confinement*.") (emphasis added).  The First Circuit has

recognized the limitations inherent in disciplining a pretrial detainee, noting that "a pretrial

detainee may be disciplined for a specific institutional infraction committed *during the period of

his detention . . . ." Surprenant*, 424 F.3d at 13 (emphasis added).  *See also Sandin*, 515 U.S. at

485 ("Discipline by prison officials in response to . . . misconduct falls within the expected

perimeters of the *sentence imposed by a court of law*.") (emphasis added).  Moreover, at least

one court has explicitly held that a DDU sanction cannot extend beyond the period of

incarceration for which the inmate was originally sentenced.  *Commonwealth v. Clark*, No.

974079, 1998 WL 1270655, at *4 (Mass. Sup. Ct. Jan. 22, 1998) ("I also note that while an

inmate may be sentenced for as long as ten years in the DDU, the DDU sentence cannot exceed

the period for which that inmate was originally incarcerated.").

---

[18] The DOC Defendants misstate the constitutional inquiry to determine whether a pretrial
detainee has a protected liberty interest in avoiding disciplinary segregation.  (DOC Mem. at 18.)  They
suggest that the *Sandin* standard, inquiring whether confinement is an "atypical or significant hardship"
on the inmate, is the operative test.  (*Id.*).  However, as this Circuit has recognized, "the *Sandin* Court's
rationale applies only to those convicted of crimes – not to pretrial detainees." *Suprenant*, 424 F.3d at 17;
(*see also* Ford Mem. at 11 n.7.)  Rather, as numerous courts have held, a pretrial detainee has an
established liberty interest in avoiding disciplinary segregation, implicating due process considerations.
*See, e.g.*, *Rapier*, 172 F.3d at 1005 (holding that a pretrial detainee may only be disciplined for
misconduct committed while held in jail "after affording the detainee some sort of procedural
protection"); *Benjamin v. Fraser*, 264 F.3d 175, 189-90 (2d Cir. 2001) (concluding that pre-trial detainee
had a liberty interest in being free from "restraint status" such that his procedural due process rights were
implicated).

Mr. Bender suggests that a DDU sanction is a stand-alone, civil sentence that may be resurrected and imposed on a pretrial detainee or sentenced inmate any time in the future, at his discretion. (DOC Mem. 9-10.) Surely, constitutional due process requires more. Were this Court to accept Mr. Bender's position, Mr. Ford could be arrested 15 years after he completes his sentence -- on *any* charge, no matter how trivial -- and once again be subjected to the extreme conditions of DDU solitary confinement without process.[19] Mr. Ford could remain in the DDU indefinitely, as a pre-trial detainee or as a sentenced inmate, with no consideration of whether the circumstances of his confinement are appropriate. Indeed, when asked whether an inmate released from custody, owing DDU time, would be returned to the DDU if he were to be arrested 15 years after satisfying his sentence, Mr. Bender did not foreclose the possibility of returning the inmate to the DDU without process noting, "I would want to look at all the facts pertaining to that case before I made that decision." (Bender Dep. at 87:8-87:23.) Mr. Bender's unilateral, unreviewed determination, more than 15 years after Mr. Ford's initial hearing, would be the sole basis upon which Mr. Ford would be retained in the DDU.

Even if this Court concludes that Mr. Ford's DDU sanction may extend beyond the term of his original sentence of incarceration, additional process is required before Mr. Bender may impose the drastic measure of retaining Mr. Ford in the DDU. As discussed above, *Bell v. Wolfish* prohibits the punishment of a detainee, prior to an adjudication of guilt, for the same conduct for which he is awaiting trial. 441 U.S. at 535-36. In view of this prohibition, "a due

---

[19] Although DDU sentences may be a maximum length of ten years, there no limitation as to the length of time an inmate can spend in the DDU because an inmate only receives credit for disciplinary-free time served. (Morin Dep. at 32:17-35:10; (Syrett Aff. Ex. B).) Clearly, when an inmate is not incarcerated, he cannot earn that credit. Accordingly, under the rationale provided by the DOC Defendants, an inmate who serves 1 year of a 10 year sanction may be held in the DDU for 9 more years if he arrested, *regardless of how far into the future he or she is arrested on a new charge.*

process hearing helps to ensure that disciplinary punishment is what it purports to be, rather than punishment in advance of conviction for the crime that led to detention – the evil condemned by *Bell*." *Mitchell v. Dupnik*, 75 F.3d 517, 525 n.4 (9th Cir. 1996). In Mr. Ford's case, a hearing was required prior to his pretrial confinement in the DDU for the precise reason articulated by the *Mitchell* court: to avoid the impermissible punishment of Mr. Ford on the same actions for which he was awaiting trial.

> **b)** **The State Cases Relied Upon by the DOC Defendants are Distinguishable from Mr. Ford's Claims**

The DOC Defendants rely upon case law that is distinguishable from the instant case to argue that Mr. Ford was not entitled to procedural due process prior to his pretrial detention in the DDU. (*See* DOC Mem. at 8-11.) These cases fail to address the federal constitutional question of whether a pretrial detainee or sentenced inmate is protected by the Due Process Clause when he is held in disciplinary segregation expressly as punishment and without process.

To support their contention that Mr. Ford was not entitled to process when he was retained in the DDU as a pretrial detainee, the DOC Defendants rely heavily on a discussion by a Massachusetts appellate court in *In re Pridgett.* (DOC Mem. at 9.) Their reliance, however, is misplaced. The court in *Pridgett* was not presented with a federal due process claim and therefore did not consider the constitutional question of whether a pretrial detainee or sentenced inmate may be held in the DDU without procedural safeguards. No. 01-P-259, 2003 WL 1524678, at *1 (Mass. App. March 25, 2003). Most significantly, the *Pridgett* court dismissed the case on procedural grounds, without reaching its merits. *Id.* ("The petition for habeas corpus was properly denied without reaching the merits of Pridgett's claims because such a writ is not an appropriate form of action where a prisoner does not show any right to immediate release from confinement."). Therefore, even if the court's reasoning in *Pridgett* were relevant, the

portion of the opinion on which the DOC Defendants rely is merely dicta from an unpublished, summary disposition.

The DOC Defendants' reliance on *Karnes v. Nolan* similarly is also misplaced. (DOC Mem. at 11.) The *Karnes* court did not consider whether pretrial detention in the DDU -- intended by prison officials as punishment -- violates a prisoner's substantive due process rights within the framework established by *Bell v. Wolfish*. *Karnes*, SUCV2005-01854 (Ball, J.; November 2, 2006) (attached as Ex. G to DOC Mem.) In addition, the factual circumstances in *Karnes* differ greatly from those here, as the plaintiff in *Karnes* received a prison disciplinary hearing with a Special Hearing Officer *after* the discharge of his original sentence, *during* his pretrial confinement on new charges. *Id.* at 2. Mr. Ford, in contrast, was retained in the DDU as a pretrial detainee based on scant process from four years earlier.[20]

The DOC Defendants also suggest that the double jeopardy challenges to DDU confinement set forth in *Commonwealth v. Clark*, 697 N.E.2d 995 (Mass. 1998) and *Commonwealth v. Forte*, 671 N.E.2d 1218 (Mass. 1996) are somehow relevant to this Court's consideration of Mr. Ford's claims. (DOC Mem. at 9.) These cases do nothing more than characterize a DDU sentence as a civil sanction and have no bearing on a due process inquiry. *See Forte,* 671 N.E. 2d at 1219 ("We are concerned here with double jeopardy only as a Federal constitutional right."); *Clark*, 697 N.E. 2d at 996 ("We also expressed in *Forte* our doubt concerning whether the Federal double jeopardy clause applies to prison discipline . . . .").

The cases relied upon by the DOC Defendants, therefore, are entirely inapposite, and do

---

[20] Moreover, the *Karnes* Court focused on commitment to the DDU as a civil, rather than criminal proceeding based on a claim of double jeopardy, and thus is inapplicable to the instant case. *Id.* at *7.

not support their claim that Mr. Bender is entitled to place a pretrial detainee or newly sentenced inmate in the DDU based on prison "process" provided during a prior criminal sentence.

### c) Mr. Bender's Discretion is Subject to Constitutional Limitations

The DOC Defendants attempt to avoid the constitutional infirmities of Mr. Bender's decision to retain Mr. Ford in the DDU as a pre-trial detainee by portraying it as a non-disciplinary action.  (*See* DOC Defs. Statement of Undisputed Material Facts ¶ 12.) Alternatively, the DOC Defendants try to justify Mr. Ford's pretrial DDU detention by calling it a discretionary "housing choice" by prison officials.  (DOC Mem. at 14.)  These arguments both fail.

First, the DOC Defendants suggest that Mr. Bender's decision in June 2007 was driven by a concern for institutional safety, rather than a disciplinary action from four years earlier. (*Id.*)  However, the DOC Defendants effort to recast Mr. Bender's decision-making is unavailing, as Mr. Bender is not permitted to segregate a pre-trial detainee for non-disciplinary reasons without adequate procedural due process.  In *Haverty v. Commissioner of Correction*, the court held that the superintendent of MCI-Cedar Junction "may not place prisoners in segregation for non-disciplinary reasons with conditions as severe as those of a [departmental segregation unit] without the procedural protections afforded by" Massachusetts regulations. 776 N.E. 2d 973, 986 (Mass. 2002).  Thus, the DOC Defendants' efforts to characterize Mr. Bender's decision as a non-disciplinary determination does not relieve him of his due process obligations to Mr. Ford.

Moreover, whatever discretion Mr. Bender may have regarding the housing of prisoners is confined by the requirements of the Constitution.  *Cleavinger v. Saxner*, 474 U.S. 193, 207 (1985) ("It is the business of prison officials, of course, to maintain order within their

institutions. But this fact does not support a claim that every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security. Routine and automatic arguments to this effect have been made before and have been rejected by this Court."); *see also Klos v. Haskell*, 48 F.3d 81, 86 (2d Cir. 1995) ("Defendants respond that where, as here, the governing statutes and regulations confer absolute discretion on prison officials to transfer an inmate, no practices by prison officials can confer a liberty interest in avoiding such transfer. We find defendants' characterization of the law too sweeping.").

Here, where the record suggests the absence of a reasonable and thorough decision-making process in the determination to house Mr. Ford in the DDU as a pretrial detainee, the Court should not defer to Mr. Bender's discretion. Mr. Bender's decisions to impose the drastic measure of confining Mr. Ford to the DDU were made in an arbitrary fashion, without reasonable deliberation, and in violation of Mr. Ford's constitutional rights. While prison administrators are entitled to due deference from courts for their decision-making, "due deference does not mean blind deference." *United States v. Gotti*, 755 F. Supp. 1159, 1164 (E.D.N.Y. 1991) (cautioning that a court accepting "any statement of reason offered by a correction official, whether well-founded or not" would leave a detainee "completely vulnerable to arbitrary governmental action").

Mr. Bender testified that he does not recall speaking with anyone or even reviewing Mr. Ford's file before making the decision to place him in the DDU in January 2007. (Bender Dep. at 98:23-99:3, 101:5-9 (Chaudhary Aff. Ex. A).) Significantly, Mr. Bender did not even consider whether Mr. Ford's status as a pretrial detainee meant that he should be treated differently than

convicted inmates. (Bender Dep. at 104:11-15 (Chaudhary Aff. Ex. A).)[21] The same lack of care plagued Mr. Bender's decision to place Mr. Ford in the DDU in June 2007. Again, Mr. Bender neither considered whether DDU confinement would impair Mr. Ford's ability to prepare for his criminal case, nor could he recall speaking about Mr. Ford's placement with either the superintendent of MCI-Cedar Junction or the head of the DDU, even though both of those individuals would have had more information about Mr. Ford than Mr. Bender possessed. (Bender Dep. at 143:4-16, 144:8-145:19 (Chaudhary Aff. Ex. A).))

        **d)**     **Mr. Bender Is Not Entitled To Qualified Immunity From Mr. Ford's Procedural Due Process Claim**

Mr. Bender is not entitled to qualified immunity from Mr. Ford's procedural due process claim because Mr. Bender's conduct violated Mr. Ford's clearly-established constitutional rights as a pretrial detainee and a sentenced inmate. The Supreme Court has held that a sentenced prisoner has a liberty interest in avoiding solitary confinement in maximum security conditions and must be afforded due process prior to his placement in those conditions. *Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005). Moreover, the First Circuit has plainly stated that pretrial detainees placed in segregated confinement must be provided with due process. *Surprenant*, 424 F.3d at 17-18.

The right of a sentenced prisoner to procedural process prior to placement in maximum security segregation was clearly defined in 2007, when Mr. Ford was retained in the DDU. In 2005, the Supreme Court concluded that a sentenced inmate has a liberty interest in avoiding severe conditions of solitary confinement, implicating the inmate's procedural due process

---

[21] Mr. Bender also gave no consideration to whether the conditions in the DDU would allow Mr. Ford to prepare adequately to defend himself against his pending criminal charges, including making no effort to ascertain how much access the DDU would provide Mr. Ford to his counsel or to the prison's law library. (Bender Dep. at 104:19-23, 106:8-20 (Chaudhary Aff. Ex. A).)

rights. *Wilkinson*, 545 U.S. at 224-225 ("[The segregated unit's] conditions give rise to a liberty interest in their avoidance . . . we turn to the question of what process is due . . . ."). Other courts have similarly held that sentenced inmates are entitled to procedural due process prior to segregated or disciplinary detention. *See, e.g.*, *Tellier v. Fields*, 280 F.3d 69, 84-84 (2d Cir. 2000) (holding that sentenced prisoner had clearly-established procedural due process rights in state officials' adhering to regulation providing procedure prior to segregation). Moreover, DOC regulations give prison officials clear notice that DDU confinement must be preceded by procedural protections. *See* 103 Mass. Code Regs. § 430 *et seq.* (2006).

Similarly well-established in 2007 was the constitutional right of pretrial detainees to procedural due process prior to segregation. The Supreme Court has noted that "pretrial detainees, who have not been convicted of any crimes, retain *at least* those constitutional rights that [the Court] ha[s] held are enjoyed by convicted prisoners." *Bell*, 441 U.S. at 545 (emphasis added); *see also Love v. Sheahan* 156 F.Supp.2d 749, 760 (N.D.Ill. 2001) (defendant prison officials were not immune from suit by pretrial detainee alleging because "it was clearly established during the time that [plaintiff] was held in segregation that [she] was entitled to certain procedural protections"); *Boulanger v. U.S. Bureau of Prisons*, No. 06-308, 2009 WL 1146430, at *12-13 (D.N.H. Apr. 24, 2009) ("[A] pretrial detainee's right to a disciplinary hearing before being punished was clearly established."). Moreover, in *Surprenant v. Rivas*, the First Circuit held that "[p]retrial detainees. . . have a liberty interest in avoiding punishment – an interest that derives from the Constitution itself," and further noted that Supreme Court jurisprudence had long established the due process required before a pretrial detainee may be deprived of a liberty interest. 424 F.3d at 17-18 ("[T]he procedural due process rights asserted by the plaintiff were clearly established in 2002."). Mr. Bender, therefore, cannot sustain an

argument that he was unaware Mr. Ford's detention in the DDU violated clearly-established rights.

In view of these well-defined rights, Mr. Bender's actions in depriving Mr. Ford of procedural due process were objectively unreasonable. As a prison official, Mr. Bender should have known that Mr. Ford was entitled to procedural due process when he was retained in the DDU on a new criminal charge and should have provided that process to Mr. Ford, a pretrial detainee. Moreover, when Mr. Ford was retained in the DDU as a sentenced inmate, Mr. Bender reasonably should have been aware of Mr. Ford's due process right to some procedure. *See, e.g.*, *Magluta v. Samples*, 375 F.3d 1269, 1283 (11th Cir. 2004) (finding that "ample federal law existed at the time of the challenged conduct to give fair warning to the defendants that it was unconstitutional to hold [plaintiff] in solitary confinement for 500 days . . . with virtually no procedural protection"); *Tellier*, 280 F.3d at 85-86 (concluding that prison officials' segregation of inmate for 514 days without a required hearing was unreasonable in view of the inmate's clearly-established due process rights).

Accordingly, Mr. Bender is not protected from Mr. Ford's procedural due process claims by the qualified immunity doctrine.

### 3. A Claim for Infamous Punishment Is Not Limited to Instances Where the Plaintiff Has Been Sentenced But Not Indicted

The DOC Defendants' strained attempt to limit the prohibition on "infamous punishment . . . without trial by jury" in Article 10 of the Massachusetts Declaration of Rights to instances in which a prisoner has not been indicted or sentenced does not withstand scrutiny. This argument runs counter to the language of Article 10, a prior ruling by the Supreme Judicial Court on this issue, and the DOC's prior position on this very issue in another litigation.

Article 10 establishes that no person shall be "subject . . . to a capital or infamous punishment . . . without trial by jury."  Notably, there is nothing in this language suggesting that infamous punishment can only occur in the absence of an indictment or where a prison sentence has been imposed.  To the contrary, the plain language of Article 10 refers to "trial by jury" and whether a person has been "subject" to -- not sentenced to -- infamous punishment.

Further, in *MacDougall v. Commonwealth*, 447 Mass. 505 (2006), the Massachusetts Supreme Judicial Court clearly endorsed the viability of challenging pretrial detention at MCI-Cedar Junction as infamous punishment.  While the court distinguished such a claim from the one brought in *Brown v. Commissioner of Correction*, 394 Mass. 89 (1985), challenging confinement at MCI-Cedar Junction without indictment, it noted that "[t]he petitioner is free to pursue this claim" -- for pretrial detention as infamous punishment -- "in any civil action he may bring against the commissioner."  447 Mass. at 511 n.11.  If Massachusetts law limits infamous punishment to instances in which a criminal defendant has not been indicted as the DOC Defendants claim, surely the Supreme Judicial Court would not have suggested that the petitioner could pursue a pretrial detention claim.

The DOC Defendants' position is also contrary to the one that the Commissioner of Correction took in *Brown*, where he argued that the rule from *Jones v. Robbins*, 8 Gray 329 (1857), that confinement to the state prison constitutes infamous punishment should be applicable *only* to pretrial detainees:  "The commissioner contends that the *Jones* rule should be confined 'to the rights and protections of an accused criminal defendant.'"  394 Mass. at 92.  Just as the *Brown* court refused to accept the Commissioner's attempt to limit the scope of infamous punishment, so too should this Court deny the DOC Defendants' newfound stand on this question.

Any lower court decisions suggesting that infamous punishment arises only from serving a sentence without indictment are plainly contradicted by both Article 10 and the Supreme Judicial Court's decision in *MacDougall*.[22]

### 4. Summary Judgment Is Not Appropriate on Mr. Ford's Equal Protection Claim

The DOC Defendants fail to appreciate the relevant classification made by Section 52A for equal protection purposes and offer no rational basis supporting that distinction. Accordingly, the DOC Defendants are not entitled to summary judgment on Mr. Ford's equal protection claim.

A legislative classification will withstand constitutional challenge under the Equal Protection Clause if it is "rationally related to a legitimate state interest and is neither arbitrary, unreasonable nor irrational." *LCM Enter. v. Town of Dartmouth*, 14 F.3d 675, 679 (1st Cir. 1994). "[E]ven in the most ordinary equal protection case [a court] insist[s] on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The DOC Defendants misstate the irrational classification made by Section 52A that warrants its scrutiny under the Equal Protection Clause. The relevant inquiry is not whether pretrial detainees pose more of a security risk than convicted inmates as the DOC Defendants erroneously suggest. (DOC Mem. at 33.) Rather, Section 52A irrationally differentiates

---

[22] The DOC Defendants' contention in footnote 14 of their brief that *Martino v. Hogan*, 643 N.E.2d 53 (Mass. App. Ct. 1994), forecloses Mr. Ford's ability to seek damages for this claim is incorrect. The "law is unsettled as to whether a direct claim can be brought under the Declaration of Rights for money damages[.]" *Moore v. McManus*, No. 94-6780, 1998 WL 77904, at *10-11 (Mass. Super. Feb. 17, 1998) (*Martino* did not provide a "definitive resolution of the question"); *see also Jackson v. Verdini*, No. 03-4431, 2005 WL 1457748, at *8 n.3 (Mass. Super. June 9, 2005) (noting that issue of whether damages can be sought directly under the Massachusetts Declaration of Rights is unresolved).

US1DOCS 7296991v6

between similarly-situated pretrial detainees based on the happenstance of whether "they have been previously incarcerated in a correctional institution of the commonwealth under sentence for a felony."  The statute states:

> Persons held in jail for trial may, with the approval of the district attorney, and shall, by order of a justice of the superior court, be removed by the commissioner of correction to a jail in another county, and said commissioner shall, at the request of the district attorney, cause them to be returned to the jail whence they were removed. <u>In addition, such persons, if they have been previously incarcerated in a correctional institution of the commonwealth under sentence for a felony, may, with the approval of the district attorney, be removed by the commissioner of correction to a correctional institution of the commonwealth,</u> and said commissioner shall, at the request of the district attorney, cause them to be returned to the jail where they were awaiting trial.

Mass. Gen. Law ch. 276 § 52A (emphasis added).  Pursuant to Section 52A, therefore, a pretrial detainee who has served a felony sentence in a correctional institution of a state other than Massachusetts may not be held in a Massachusetts state prison, while a pretrial detainee who has served a felony sentence in Massachusetts for a similar or less serious offense may be held in a Massachusetts state prison.

It is clear that the two groups of pretrial detainees delineated by Section 52A are similarly situated for the purposes of equal protection analysis.  *See Barrington Cove Ltd. P'ship v. R.I. Housing & Mortgage Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001).  Pretrial detainees who were previously incarcerated in a Massachusetts correctional institution and those who were previously incarcerated in another state both have prior criminal histories, having served time previously in a state correctional institution.  Both have convictions for prior felony conduct.  And both have been held in a Massachusetts county jail pursuant to an in-state arrest.

The DOC Defendants, however, offer no rationale for drawing a distinction between these two similarly situated classes of pretrial detainees.  The statute's purpose is not furthered

by the exclusion from transfer consideration of detainees who have served their felony sentences in non-Massachusetts prisons, as these detainees may be similarly or even more dangerous than their in-state counterparts. *See Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 623 (1985) (discrimination between classes of veterans on basis of residence that was not supported by any identifiable state interest violates Equal Protection Clause); *Zobel v. Williams*, 457 U.S. 55, 60-62 (1982) (state law that distributed benefits unequally to residents was not rationally related to a legitimate state purpose). Section 52A, moreover, includes within its sweep all detainees who have served felony sentences in Massachusetts, regardless of the severity of their previous crimes, while excluding all detainees who have served out-of-state sentences. This creates a nonsensical system whereby a violent crime offender who served an out-of-state sentence remains in a county jail, while a detainee who has served a Massachusetts sentence for a non-violent felony may be transferred to state prison. "Restrictions upon detainees that serve no proper purpose, but merely reflect the lack of imagination or energy of local officials, are properly subject to judicial correction." *Feeley v. Sampson*, 570 F.2d 364, 371 (1st Cir. 1978). Accordingly, Section 52A is invalid on its face and as applied to Mr. Ford.

To the extent the DOC Defendants contend they are qualifiedly immune from Mr. Ford's equal protection claim, they are mistaken. It is well-established that a statutory scheme cannot irrationally distinguish between classes of similarly situated individuals, as discussed above. *Romer*, 517 U.S. at 632; *Barrington Cove Ltd. P'ship*, 246 F.3d at 8.

US1DOCS 7296991v6

## CONCLUSION

For the foregoing reasons, and except as to the dismissals agreed to in footnote 1, the

Court should deny the DOC Defendants' motion for summary judgment.

ALBERT FORD
By his attorneys,

/s/ Timothy Syrett
Lisa J. Pirozzolo, BBO # 561922
Timothy D. Syrett, BBO # 663676
Dimple Chaudhary, BBO # 674845
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
Tel:  (617) 526-6000
Fax:  (617) 526-5000

Dated:      October 5, 2009

US1DOCS 7296991v6

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiff Albert Ford respectfully requests oral

argument on the DOC Defendants' Motion for Summary Judgment.


 /s/ Timothy D. Syrett
Timothy D. Syrett, BBO # 663676

## CERTIFICATE OF SERVICE

I, Timothy Syrett, hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic court filing (ECF) system, this 5th day of October, 2009.

/s/ Timothy D. Syrett
Timothy D. Syrett, BBO # 663676