UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALBERT FORD,           )
                       )
       Plaintiff,    )
   v.               )       CIVIL ACTION
                       )       NO. 07-11457-JGD
HAROLD CLARKE, et al.,   )
                       )
     Defendants.   )

## MEMORANDUM OF DECISION AND ORDER
## ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT

September 30, 2010

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Albert Ford ("Ford"), has brought this action challenging his

confinement in the Departmental Disciplinary Unit ("DDU") at MCI-Cedar Junction

while a pretrial detainee and, later, as a convicted felon serving his sentence.  The

remaining defendants (collectively, the "DOC defendants") are the Deputy Commissioner

of Correction, James Bender ("Bender"), and the Superintendent of MCI-Cedar Junction,

Peter St. Amand ("St. Amand"), in their official and individual capacities.[1]  Presently

---

[1] Ford does not oppose the dismissal of all claims against the Department of Correction, the Commissioner of Correction, Harold Clarke, and the Assistant Deputy Commissioner of Correction, Kenneth Nelson.  Nor does he oppose the dismissal of the claims raised in Counts V, VI, X and XI against all defendants, and the procedural due process claims contained in Counts III and IV against St. Amand.  Judgment on Ford's Amended Complaint (Docket No. 52) shall be entered accordingly.  Additionally, on December 1, 2009, this court allowed the motion of Norfolk County Sheriff, Michael Bellotti, for summary judgment on all of Ford's claims against him.

before the court are Ford's claims in his First Amended Complaint (Docket No. 52) that his confinement in the DDU, first as a pretrial detainee and later as a convicted prisoner, deprived him of his federal and state substantive due process (Counts I and II), procedural due process (Counts III and IV), and equal protection rights (Counts VII and VIII), and violated the prohibition against "infamous punishment" found in Article 12 of the Massachusetts Declaration of Rights (Count IX).

The matter is presently before the court on the "DOC Defendants' Motion for Summary Judgment" (Docket No. 90) and on "Plaintiff Albert Ford's Motion for Partial Summary Judgment" (Docket No. 94). For all the reasons detailed below, each of the parties' motions for summary judgment is ALLOWED IN PART and DENIED IN PART. Specifically, this court holds that Bender and St. Amand violated Ford's substantive due process rights (Counts I and II) by confining Ford in the DDU as a pretrial detainee as punishment for his 2003 conduct, and that Bender violated Ford's procedural due process rights (Counts III and IV) by confining Ford in the DDU without a hearing as a pretrial detainee and, later, as a convicted felon serving a sentence. Further, this court holds that Bender and St. Amand are not entitled to qualified immunity with respect to Ford's confinement as a pretrial detainee, but that Bender is entitled to qualified immunity with respect to Ford's subsequent confinement in the DDU as a convicted felon.

The defendants' motion for summary judgment as to the equal protection claims (Counts VII and VIII) is denied as there are material facts in dispute. Finally, the DOC

defendants are entitled to qualified immunity on Ford's claim of "infamous punishment."
(Count IX).

## II.  **STATEMENT OF FACTS**[2]

The following material facts are undisputed unless otherwise indicated.

This case arises out of Ford's confinement by the Department of Corrections
("DOC") in the DDU at MCI-Cedar Junction from January through March 2007, and
from June 2007 to the present, pursuant to a disciplinary sanction that Ford received in
2003 while incarcerated for a prior conviction.  (See Am. Compl. (Docket No. 52) ¶¶ 16-
24, 28).  MCI-Cedar Junction is a maximum security facility located in Walpole, Massa-
chusetts.  (DF ¶ 4; PR ¶ 4).  The DDU is "a restricted area or areas designated by the
Commissioner [of Correction] to which an inmate has received a recommended sentence
by a Special Hearing Officer."  103 C.M.R. § 430.06.  "Inmates can be sentenced to the

---

[2]  The facts are derived from the following materials: (1) the "DOC Defendants' Concise
Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment"
(Docket No. 91) ("DF"); (2) "Plaintiff Albert Ford's Response to DOC Defendants' Rule 56.1
Statement of Undisputed Facts" (Docket No. 105) ("PR"); (3) "Plaintiff Albert Ford's Local Rule
56.1 Statement of Undisputed Facts in Support of His Motion for Partial Summary Judgment"
(Docket No. 96) ("PF"); (4) "Defendant James Bender's Response to Plaintiff's Albert Ford's
Local Rule 56.1 Statement of Undisputed Facts in Support of His Motion for Partial Summary
Judgment" (Docket No. 98) ("DR"); (5) the exhibits attached to the Affidavit of Julie E. Daniele,
Esq. (Docket No. 93) ("Def. Ex. __"); (6) the exhibits attached to the Affidavit of Timothy D.
Syrett (Docket No. 109) ("Pl. Ex. __"); (7) the exhibits attached to the Affidavit of Dimple
Chaudhary, Esq. (Docket No. 97) ("Pl. Supp. Ex. __"); (8) the exhibits attached to "Defendant,
James Bender's Opposition to Plaintiff's Motion for Partial Summary Judgment" (Docket No. 99)
("Def. Supp. Ex. __"); and (9) the exhibits attached to the "DOC Defendants' Reply to Plaintiff's
Opposition to DOC Defendants' Motion for Summary Judgment (Docket No. 111) ("Def. 2nd
Supp. Ex. __").  This court has not considered Def. Ex. Q and Pl. Ex. G, which have been
stricken pursuant to this court's separate Memorandum of Decision and Order on Parties'
Motions to Strike issued on this date.

DDU only after a disciplinary officer finds that such a sentence may be warranted and

forwards a copy of the disciplinary report to a special hearing officer, the prisoner is

notified of the possibility of a DDU sentence, and a hearing is held." DuPont v. Comm'r

of Corr., 448 Mass. 389, 392-93, 861 N.E.2d 744, 747-48 (2007) (citing 103 C.M.R.

§§ 430.08, 430.09 & 430.11 (1995)).  Moreover, an inmate may be confined there only

after the Special Hearing Officer finds the inmate guilty of a disciplinary infraction

warranting DDU placement.  (PF ¶ 4; DR ¶ 4).

Defendant Bender is the Deputy Commissioner of the Prison Division of the DOC.

(PF ¶ 1; DR ¶ 1).  At all relevant times, his responsibilities included, but were not limited

to, overseeing day-to-day operations at the DOC's correctional facilities, including the

care and custody of convicted inmates, civilly committed inmates and pretrial detainees.

(See PF ¶ 2; DR ¶ 2).  Defendant St. Amand has been the Superintendent at MCI-Cedar

Junction since May 2007.  (Pl. Ex. C at 17).  In that capacity, St. Amand is responsible

for overseeing the entire operation of the prison, including operations in the DDU, and is

responsible for the care and custody of all inmates at the facility.  (Id. at 17-18).

**Conditions in the DDU**[3]

While in the DDU, inmates are held for approximately 23 hours a day in a cell measuring about 7 by 12 feet.  (PF ¶ 5; DR ¶ 5).  Each cell contains a cement bed, a cement desk, a cement stool, a small cement shelf, a mirror, a sink and a toilet.  (PF ¶ 5; Pl. Supp. Ex. B at 30-31).  There is a window in the cell's metal door and a window in the back of the cell that measure approximately 18 to 24 inches long and 8 to 10 inches wide.  (PF ¶ 5; Pl. Supp. Ex. B at 31).  Because the toilet is located toward the front of the cell, inmates using their toilets are visible through the window in the cell door.  (PF ¶ 5; Pl. Supp. Ex. B at 32).  Inmates are not allowed to cover the window.  (PF ¶ 5; Pl. Supp. Ex. B at 32).

---

[3] The DOC defendants argue that this court is bound by the findings of the state court in Torres v. Commissioner of Correction, 427 Mass. 611, 695 N.E.2d 200 (1998), regarding conditions of confinement in the DDU, based on a theory of "issue preclusion."  (See DF ¶ 18). This court does not agree.  "[I]ssue preclusion 'prevents relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies.'"  Kobrin v. Bd. of Registration in Med., 444 Mass. 837, 843, 832 N.E.2d 628, 634 (2005) (quoting Heacock v. Heacock, 402 Mass. 21, 23 n.2, 520 N.E.2d 151, 152 n.2 (1988)).  Thus, "[b]efore precluding a party from relitigating an issue 'a court must determine that (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication.'"  Id. (quoting Tuper v. No. Adams Ambulance Serv., Inc., 428 Mass. 132, 134, 697 N.E.2d 983, 985 (1998)).  Torres involved a challenge to conditions of confinement in the DDU by present and former prisoners who claimed that such conditions violated their Eighth Amendment right to remain free from cruel and unusual punishment, and that the administrative disciplinary process governing DDU confinement violated their procedural due process rights.  In the instant case, the DOC defendants have not shown that Ford was a party or was in privity with any of the parties in Torres.  Nor have they shown that the conditions Ford experienced in the DDU beginning in 2007 would have been the same as the conditions that the plaintiffs in Torres were subjected to approximately nine years earlier.  Accordingly, there is no basis for concluding that this court must accept the description of the DDU set forth in Torres.

Inmates in the DDU must eat alone in their cells, after receiving food through a slot, and are given 20 minutes to finish their meals.  (PF ¶ 7).  In addition, they are allowed no more than 5 hours of exercise each week, which takes place outside their cells in a metal cage.  (Pl. Supp. Ex. A at 179, 181; Pl. Supp. Ex. C at 27).  Anytime a DDU inmate leaves his cell, he must submit to a strip search.  (PF ¶ 9).  He must also be placed in full restraints, including handcuffs and leg restraints.  (Id.).

Visits to the main law library at MCI-Cedar Junction are not available to DDU inmates, although they do have access to books, which are kept on a book cart located in the satellite library of the unit.  (PF ¶ 10; Pl. Supp. Ex. B at 46-47).  The book cart contains certain legal materials that are required to be made available by the State.  (Pl. Supp. Ex. B at 46-47).  DDU inmates also may request that additional legal materials be brought to the DDU from the main law library.  (Id.).

Individuals confined in the DDU begin to earn privileges after 30 days without a disciplinary report.  (See id. at 41).  For example, after 30 days of good behavior, an inmate is eligible to receive a radio and also earns a one-hour visit and one thirty-minute telephone call for the upcoming month.  (Id. at 41-44).  Inmates can earn up to four telephone calls and four visits per month if they continue to remain on good behavior. (Id.).  However, any visits with family and friends are non-contact, meaning that the inmate and the visitor must remain separated by a glass partition.  (Id. at 42).

Confinement in the DDU serves a number of purposes, including punishment for the commission of serious disciplinary infractions, deterrence from committing future

disciplinary infractions, and maintenance of safety and security within the institution, including the safety and security of staff and the remaining inmate population.  (See PF ¶ 4; DR ¶ 4; Pl. Supp. Ex. A at 43-45).  Pretrial detainees who are held in the DDU are treated no differently than convicted prisoners who are housed there.  (PF ¶ 11).

### Ford's Initial Period of Pretrial Confinement in the DDU

On January 17, 2003, while Ford was serving a criminal sentence at MCI-Cedar Junction, Ford received a sanction of 10 years confinement in the DDU.  (PF ¶ 12; DR ¶ 12).  The sanction, which constituted the maximum DDU sentence available, arose out of an incident where Ford allegedly committed an assault against prison staff.  (See Pl. Supp. Ex. H).  The sanction was imposed by a Special Hearing Officer following a DOC disciplinary hearing, which Ford did not attend, and for which he was unable to obtain counsel.  (Id.).  The Hearing Officer explained the reasons for her decision as follows:

> The maximum DDU sentence has been imposed by this Hearing Officer due to the violent nature of this offense.  A review of Inmate Ford's six part folder reveals that Inmate Ford has received five prior DDU sentences for offenses which include being in possession of a weapon, conspiring to introduce heroin and several for him conspiring to assault other inmates which was STG related.  In fact, Inmate Ford committed this offense while residing in DDU.  Clearly, Inmate Ford is a danger to staff and his continued placement in the Department's most secure setting is warranted.  Not only did Inmate Ford violate [DOC] rules, he violated the laws of the Commonwealth as well.  His type of assaultive behavior towards staff is totally unacceptable and will be dealt with accordingly.  Serious injuries were sustained by the staff members involved in this incident.

(Id.).  Subsequently, Ford was indicted in Norfolk County for armed assault with intent to murder arising from the same incident for which he had received the 10-year DDU

sanction (the "Assault Charges").  (PF ¶ 13; DR ¶ 13; Docket No. 32 at Ex. K).  Ford was

still serving his original criminal sentence at the time of his indictment.  (See PF ¶ 14).

On January 2, 2007, four days prior to the expiration of Ford's original criminal

sentence, the Norfolk County Sheriff's Office requested that the Norfolk County District

Attorney's Office approve Ford's continued confinement in DOC custody pending his

trial in Norfolk Superior Court on the Assault Charges.  (Id.).  The request was made

pursuant to Mass. Gen. Laws ch. 276, § 52A ("Section 52A"), which provides as follows:

> Persons held in jail for trial may, with the approval of the district
> attorney, and shall, by order of a justice of the superior court, be
> removed by the commissioner of correction to a jail in another
> county, and said commissioner shall, at the request of the district
> attorney, cause them to be returned to the jail whence they were
> removed.  In addition, such persons, if they have been previously
> incarcerated in a correctional institution of the commonwealth under
> sentence for a felony, may, with the approval of the district attorney,
> be removed by the commissioner of correction to a correctional
> institution of the commonwealth, and said commissioner shall, at the
> request of the district attorney, cause them to be returned to the jail
> where they were awaiting trial.  The proceedings for such removals
> shall be the same as for the removal of prisoners from one jail or
> house of correction to another.  The cost of support of a person so
> removed and of the removals shall be paid by the county whence he
> is originally removed.

(emphasis added).  The District Attorney's Office granted the request on January 2, 2007,

and the DOC accepted Ford into its custody pursuant to Section 52A.  (PF ¶¶ 15-16).

Bender had final authority for the DOC's decision to accept Ford's transfer.  (DR ¶ 17).

Ford completed his original criminal sentence on January 6, 2007, and his status

therefore changed from a convicted prisoner to a pretrial detainee.  (PF ¶ 23).

-8-

Nevertheless, Ford remained in the DDU serving his DDU sanction.  (DF ¶ 8; PR ¶ 8).  It is undisputed that Ford did not receive another hearing prior to his confinement in the DDU as a pretrial detainee.  (PF ¶ 24; DR ¶ 24).  It is also undisputed that Bender made the decision to house the plaintiff in the DDU pursuant to his disciplinary sanction even though Ford was no longer serving a criminal sentence.  (PF ¶ 18-19; DR ¶¶ 18-19).

The record establishes that, according to Bender, the plaintiff was placed in the DDU as a pretrial detainee in order to punish him for the conduct that led to his DDU sanction, and for which Ford was facing criminal charges, as well as for purposes of deterrence and to maintain the safety and security of the institution, DOC staff and other inmates.  (See PF ¶ 20; DR ¶ 20).  In particular, Bender testified that while his decision to leave Ford in the DDU in January 2007 was intended in part to continue the plaintiff's punishment for the conduct that had occurred while Ford was serving his sentence, he was also concerned about the threat that Ford posed to the safety of others at the facility.  (See DR ¶ 20; Pl. Supp. Ex. A at 44, 100-03, 147).

Bender agreed that his decision to continue Ford's confinement in the DDU was based on his general knowledge of the plaintiff.  (PF ¶ 21; DR ¶ 21; Pl. Supp. Ex. A at 101).  Bender did not recall whether he reviewed Ford's files or other documents before making his decision, and he did not believe that he spoke to the Superintendent of MCI-Cedar Junction or the DDU Administrator, even though they may have had more knowledge about the plaintiff than Bender.  (PF ¶ 21; DR ¶ 21; Pl. Supp. Ex. A at 101, 107-08).  Furthermore, although Bender considered the fact that Ford was no longer

serving a criminal sentence, the plaintiff's status as a pretrial detainee did not have an impact on his final decision regarding Ford's housing.  (Pl. Supp. Ex. A at 104).

Ford's placement in the DDU during his pretrial detention was consistent with the DOC's ordinary practice.  Thus, when a pretrial detainee held by the DOC under Section 52A has time remaining on a previously imposed DDU sanction, the detainee may be confined in the DDU.  (PF ¶ 25).  Since 2003, the DOC has confined several pretrial detainees in the DDU pursuant to pre-existing DDU sanctions.  (Id.).

### Ford's Second Period of Pretrial Detention in the DDU

Although he was assigned to the DDU due at least in part to his dangerousness, Ford was granted bail pending his trial on the Assault Charges.  In March 2007, Ford's sister posted bail, and the plaintiff was released from custody.  (DF ¶ 9).  However, on June 26, 2007, Ford's bail was revoked and the plaintiff was returned to custody to await trial.  (DF ¶ 11).  Following the bail revocation, St. Amand contacted an official at the Norfolk County Sheriff's Office to inform him that the DOC again would be willing to accept Ford into its custody as a pretrial detainee.  (PF ¶ 26).  The Norfolk County Sheriff's Office then sought approval from the Norfolk County District Attorney's Office to transfer Ford to DOC custody pursuant to Section 52A.  (PF ¶¶ 26-27; DR ¶¶ 26-27; DF ¶ 11).  The District Attorney's Office approved the request on June 26, 2007, and Ford was returned to MCI-Cedar Junction and placed in the DDU pursuant to his prior DDU sentence.  (PF ¶¶ 28-29; DR ¶¶ 28-30).  It is undisputed that Ford was not afforded a hearing prior to his return to the DDU.  (See PF ¶ 29; DR ¶ 29).

Bender was responsible for the decision to place Ford in the DDU upon his return to DOC custody in June 2007.  (PF ¶ 30, DR ¶ 29).  Although Bender considered the fact that Ford was a pretrial detainee, the plaintiff's status did not have an impact on Bender's decision regarding the plaintiff's placement.  (Pl. Supp. Ex. A at 143).  According to Bender, his decision was based primarily upon a determination that Ford posed a threat to the security of the facility, the safety of staff and other inmates, and to the orderly operation of the institution.  (<u>Id.</u> at 140-42).  It also was intended as a sanction to punish Ford for the conduct that had led to his DDU sanction and for which Ford was facing criminal charges.  (<u>See</u> <u>id.</u> at 142-43).   Bender did not recall whether he consulted with the Superintendent or the DDU Administrator before making his decision.  (<u>Id.</u> at 144-45).

During the summer of 2007, St. Amand was aware that Ford was being held in the DDU as a pretrial detainee due to misconduct that had occurred while Ford was serving a prior sentence.  (Pl. Ex. C at 175).  Moreover, after Ford challenged his confinement in the DDU in August 2007, St. Amand or someone under his supervision drafted a letter to the plaintiff explaining that his placement in that unit was proper.  (<u>See</u> <u>id.</u> at 176-77).  The letter provided in relevant part as follows: "Please be advised that you are properly housed in the DDU serving the remainder of a ten (10) year DDU sentence that you received on or about September 4, 2003.  The fact that you are awaiting trial pursuant to M.G.L. 276, § 52 A does not prohibit the Department from requiring that you complete

your DDU sentence."  (Pl. Ex. E; <u>see</u> <u>also</u> Pl. Ex. C at 177 (describing that St. Amand

drafted the letter set forth in Pl. Ex. E)).

<u>**Ford's 2008 Incarceration**</u>

On April 30, 2008, Ford pled guilty to the Assault Charges in Norfolk County

Superior Court.  ( PF ¶ 31).  The plaintiff was sentenced to 4-5 years incarceration, but

was given credit for having served 375 days as a pretrial detainee.  (PF ¶¶ 31-32).  After

pleading guilty, Ford returned immediately to DOC custody and was placed in the DDU

at MCI-Cedar Junction to continue serving his 10-year DDU sanction.  (PF ¶ 33; DR

¶ 33; DF ¶ 15).  Ford was not afforded a new hearing in connection with his return to the

DDU as a convicted prisoner.  (<u>See</u> PF ¶ 33; DR ¶ 33).

Again, Bender was responsible for the decision to confine Ford in the DDU, and

had no recollection of communicating with anyone else regarding Ford's placement.  (PF

¶¶ 34, 36; DR ¶¶ 34, 36).  Moreover, Ford's placement in the DDU as a convicted

prisoner was consistent with the DOC's ordinary practice of confining inmates to the

DDU to complete DDU sanctions imposed during a prior period of incarceration.  (PF

¶ 35).  Among the factors that Bender considers in determining whether an inmate will be

required to continue a DDU sanction during a new criminal sentence are the seriousness

of the underlying offense, the length of time remaining on the DDU sanction, and the

inmate's behavior during the DDU sentence.  (PF ¶ 37; DR ¶ 37).  According to Bender,

each of these factors relates to issues of safety and security.  (Pl. Supp. Ex. A at 65).

Currently, Ford remains confined in the DDU serving his 10-year DDU sentence. (DF ¶ 15). Due to the way in which the DOC calculates time served in that unit, Ford has not received credit for all of the months he has already spent in the DDU. (See Pl. Ex. B at 30-36). As of October 17, 2006, Ford's DDU sentence was not set to expire until October 2014. (Id. at 34). Furthermore, the evidence shows that during his prior criminal commitment at MCI-Cedar Junction, Ford received three additional DDU sanctions beyond his 10 year sanction. (See Def. Exs. L, M and N). Therefore, the record indicates that the time remaining on Ford's DDU sentence well-exceeds the length of his current criminal sentence.

Additional factual details relevant to this court's analysis are described below.

### III.   ANALYSIS

#### A.      Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the

claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (internal citations and quotations omitted), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994). However, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (quotations and citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991).

## B.   Mootness

The DOC defendants argue as an initial matter that Ford's claims arising from the time he spent in pretrial detention are moot. Specifically, they contend that because Ford is no longer a pretrial detainee, but is instead a convicted prisoner, his claims for declaratory and injunctive relief relating to his period of pretrial detention are no longer "live" and he has no legally cognizable interest in the outcome of those claims.[4] (Def.

---

[4] The DOC defendants do not contend that Ford's claims for money damages arising from his period of pretrial detention are moot.

Mem. (Docket No. 92) at 4-5).  Because Ford has shown that his challenge to his

placement in the DDU during pretrial detention is "capable of repetition, yet evading

review," this court finds that his claims are not moot.

"The Constitution confines the federal courts' jurisdiction to those claims which

embody actual 'cases' or 'controversies.'"  Cruz v. Farquharson, 252 F.3d 530, 533 (1st

Cir. 2001) (quoting U.S. Const. art. III, § 2, cl. 1).  "This requirement must be satisfied at

each and every stage of the litigation."  Id.   Accordingly, "[w]hen a case is moot – that

is, when the issues presented are no longer live or when the parties lack a legally

cognizable interest in the outcome – a case or controversy ceases to exist, and dismissal

of the action is compulsory."  Id.

Ford argues that his claims arising from the period in which he was in pretrial

detention fall within an exception to general principles of mootness for actions that "are

'capable of repetition, yet evading review.'"  Id. at 534 (citation omitted).  Where, as

here, the matter does not involve a class action, the exception applies only where "(1) the

challenged action [is] in its duration too short to be fully litigated prior to its cessation or

expiration, and (2) there [is] some reasonable expectation that the same complaining

party [will] be subjected to the same action again."  Weinstein v. Bradford, 423 U.S. 147,

149, 96 S. Ct. 347, 349, 46 L. Ed. 2d 350 (1975).  The first prong of this test is easily

fulfilled in the plaintiff's favor.  "As the Supreme Court has explained, '[p]retrial deten-

tion is by nature temporary, and it is most unlikely that any given individual could have

his constitutional claim decided on appeal before he is either released or convicted.'"

Demery v. Arpaio, 378 F.3d 1020, 1027 (9th Cir. 2004) (quoting Gerstein v. Pugh,

420 U.S. 103, 111 n.11, 95 S. Ct. 854, 861, 43 L. Ed. 2d 54 (1975)).  Therefore, Ford's

claims evade review.

 The question of mootness thus hinges on whether there is some "reasonable

expectation" that Ford will be subject to DDU confinement as a pretrial detainee in the

future.  See Weinstein, 423 U.S. at 149, 96 S. Ct. at 349.  This "standard is not 'mathe-

matically precise' and requires only a 'reasonable likelihood' of repetition."  Oliver v.

Scott, 276 F.3d 736, 741 (5th Cir. 2002) (quoting Honig v. Doe, 484 U.S. 305, 318-19,

108 S. Ct. 592, 601-02, 98 L. Ed. 2d 686 (1988)).  In the instant case, Ford has presented

evidence showing that such a reasonable likelihood exists.  In particular, the record shows

that Ford has a prior criminal record, and that he was incarcerated at MCI-Cedar Junction

on at least one previous occasion, from 2003 to 2007.  While the record is devoid of any

details of this incarceration, the length of the sentence indicates that it was a serious

charge.  "Plaintiffs with a criminal record . . . are more likely to be arrested and detained

than those with no criminal history."  Mack v. Suffolk County, 191 F.R.D. 16, 20 (D.

Mass. 2000).

 Moreover, the record indicates that if Ford is arrested for any reason, he is likely

to be returned to the DDU for his pretrial detention under Section 52A so long as any

portion of his 10 year DDU sentence remains unfulfilled.  Not only does the record

establish that the DOC has a practice of confining detainees held under Section 52A in

the DDU when, like in Ford's case, there is time remaining on a prior DDU sanction, but

the evidence also shows that the DOC defendants, and Bender in particular, consider

Ford to continue to pose a sufficient threat to safety and security to have warranted

placement in the DDU in 2008 based on his conduct in 2003, the passage of time

apparently not being deemed significant enough to have reduced the threat that Ford

posed.  (See PF ¶ 25; Pl. Supp. Ex. A at 44, 100, 146-47).  Since time will remain on

Ford's DDU sanction when he completes his sentence on the Assault Charges, Ford has

shown that it is reasonably likely that he will be arrested and subjected to pretrial deten-

tion in the future.  See Demery, 378 F.3d at 1027 (finding "compelling evidence that the

plaintiffs likely will be reincarcerated" where one plaintiff had been detained on 20 prior

occasions and 11 others had been detained "on more than one occasion").[5]  His claims are

capable of repetition and, therefore, not moot.

### C.    Sufficiency of Ford's Allegations Against St. Amand

The DOC defendants also argue that the plaintiff has failed to state a claim against

St. Amand under any theory because he has not alleged any facts in his complaint show-

ing that St. Amand participated in the challenged conduct or could be held liable in his

---

[5]  Because Ford has presented evidence showing a reasonable likelihood that he will be
arrested and detained in the DDU in the future, his case is distinguishable from Weinstein v.
Bradford, 423 U.S. 147, 96 S. Ct. 347, 46 L. Ed. 2d 350 (1975), and Arnold v. Panora, 593 F.2d
161 (1st Cir. 1979), on which the DOC defendants rely.  In Weinstein, the court determined that
"there [was] no demonstrated probability" that the respondent would be subject to North
Carolina's parole system.  423 U.S. at 149, 96 S. Ct. at 349.  In Arnold, the plaintiff "provided no
evidence" that he was likely to be arrested again for drunk driving and subjected to the revocation
of his license.  593 F.2d at 164.  Here, in contrast, Ford has presented sufficient evidence to
overcome the defendants' mootness arguments.

supervisory capacity.[6]  In connection with these motions for summary judgment, the court

must determine whether the evidence presented establishes that there are genuine issues

of material fact that require trial or "whether either of the parties deserves judgment as a

matter of law on facts that are not disputed."  Adria Int'l Group, Inc., 241 F.3d at 107.

Here, there is evidence which, if believed, is sufficient to hold St. Amand liable.

A supervisor may be liable for a constitutional violation if (1) he or she partici-

pated in the challenged conduct or (2) the supervisor's action or inaction was

affirmatively linked to a subordinate's unconstitutional behavior "in the sense that it

could be characterized as supervisory encouragement, condonation or acquiescence or

gross negligence of the supervisor amounting to deliberate indifference."  Hegarty v.

Somerset County, 53 F.3d 1367, 1379-80 (1st Cir. 1995) (quotations, punctuation and

citations omitted).  Here, there is evidence that in June 2007, St. Amand was involved in

Ford's transfer from Norfolk County to DOC custody pursuant to Section 52A.  (See PF ¶

26).  In addition, there is sufficient evidence to establish that St. Amand knew of Ford's

subsequent confinement in the DDU as a pretrial detainee based on conduct that had

occurred while the plaintiff was serving a prior sentence, and that St. Amand or someone

under his supervision drafted a letter to Ford stating that such confinement was proper.

(See Pl. Ex. C at 175-77; Pl. Ex. E).  Based on this evidence, a jury could find that St.

---

[6]  The defendants filed a motion to dismiss which was eventually withdrawn.  (See Docket
Nos. 31 & 51).  Presumably, however, any deficiency in the pleading would have been addressed
in an amended complaint.  Therefore, it is appropriate to address this issue at the summary
judgment stage.

Amand was personally involved in carrying out Ford's pretrial detention in the DDU, or at the very least, that he condoned or acquiesced in the plaintiff's continued confinement in that unit.  Accordingly, the claims against St. Amand will not be dismissed on this basis.

### D.    Limitation on Liability for Official Capacity Claims

In this action, Ford is seeking declaratory and injunctive relief, as well as an award of money damages against Bender and St. Amand that will compensate the plaintiff for the alleged violation of his rights under the United States Constitution.  (See Am. Compl. at Prayer for Relief).  The DOC defendants have moved for summary judgment with respect to Ford's claims for money damages against the defendants in their official capacities.  Ford has not opposed the defendants' position.  Moreover, the DOC defendants are correct that money damages are unavailable against individual defendants sued in their official capacities under 42 U.S.C. § 1983.  See Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003) (money damages unavailable against individual defendants in their official capacities because "officers in their representative capacities are [not] 'persons' within the meaning of 42 U.S.C. § 1983 with respect to actions for damages").  Therefore, to the extent Ford is pursuing such claims against the DOC defendants in their official capacities, the defendants' motion for summary judgment on those claims for money damages is allowed.

### E.    Substantive Due Process Claims

Each of the parties has moved for summary judgment on Ford's claim that his confinement in the DDU as a pretrial detainee violated his constitutional right to substantive due process.[7]  For the reasons detailed herein, this court finds that the DOC defendants violated Ford's substantive due process rights by confining him to the DDU as a pretrial detainee.

## **Substantive Due Process Generally**

"A pretrial detainee has a Fourteenth Amendment right to be free from punishment prior to conviction."  Surprenant v. Rivas, 424 F.3d 5, 13 (1st Cir. 2005).  However, in defining punishment, the Supreme Court has noted that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense . . . Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention."  Bell v. Wolfish, 441 U.S. 520, 537, 99 S. Ct. 1861, 1873, 60 L. Ed. 2d 447 (1979).[8]

---

[7]  Specifically, Ford is seeking summary judgment on his claim, set forth in Count One of the Amended Complaint, that Bender violated his Fourteenth Amendment right to substantive due process.  The DOC defendants are seeking summary judgment on that claim on behalf of both Bender and St. Amand, as well as on Count Two of the Amended Complaint in which Ford claims that the defendants' conduct in confining him to the DDU as a pretrial detainee violated his substantive due process rights under Articles 1, 10 and 12 of the Massachusetts Declaration of Rights.  The parties agree that the standards governing the federal and Massachusetts substantive due process claims are the same.  (See Def. Mem. (Docket No. 92) at 21-27; Pl. Opp. Mem. (Docket No. 108) at 13-27).

[8]  In their memorandum in support of their motion for summary judgment, the DOC defendants argue that the standard to be applied in evaluating Ford's substantive due process claims is whether the defendants "acted arbitrarily or capriciously in a way that 'shocks the conscience.'" (Def. Mem. (Docket No. 92) at 21-22, 27).  However, the DOC defendants have since agreed that Bell provides the proper analysis.  (Def. Opp. Mem. (Docket No. 99) at 7

Thus, the Supreme Court "has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." Id.

To determine "whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of the word[,]" the "court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Id. at 538, 99 S. Ct. at 1873. As the Supreme Court has stated:

> [a]bsent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it.

Id. at 538-39, 99 S. Ct. at 1873-74 (internal quotations and punctuation omitted). Accordingly, "[i]f a restriction appears to be unrelated to a legitimate governmental objective, and is, for example, arbitrary or purposeless, then a court may infer that it is intended to be punishment." Lyons v. Powell, 838 F.2d 28, 29 (1st Cir. 1988). On the other hand, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" Bell, 441 U.S. at 539, 99 S. Ct. at 1874. "Legitimate governmental

_____

("plaintiff properly cites Bell v. Wolfish, 441 U.S. 520 (1979) as the appropriate law" regarding his substantive due process claims). Therefore, this court will not address further the defendants' argument that their conduct did not violate Ford's substantive due process rights because it did not "shock the conscience."

interests include ensuring the detainee's appearance at trial, as well as maintaining security and order at the prison facility."  Lyons, 838 F.2d at 30-31.

### Ford's Detention in the DDU

The DOC defendants argue that Bender was not primarily motivated by an intent to punish, and that this court must "find that the legitimate governmental purpose of safety and security of MCI-Cedar Junction, the Department, staff and inmates supports plaintiff's housing within the DDU."  (Def. Opp. (Docket No. 99) at 8).  However, Bender's testimony is clear that when he placed Ford in the DDU as a pretrial detainee, after his criminal sentence had been completed, it was meant as "punishment and deterrence," as well as for the "safety and security of the institution, staff and other inmates."  (Pl. Supp. Ex. A at 44).  Moreover, St. Amand's letter to Ford expressly stated that his detention in the DDU as a pretrial detainee was for the purpose of "serving the remainder of a ten (10) year sentence that you received on or about September 4, 2003."  (Pl. Ex. E).  Ordinarily, "[a]n express purpose to punish establishes unconstitutional pretrial punishment" even if the government also has a "legitimate alternative reason for the confinement[.]"  McMillian v. W.E. Johnson, 88 F.3d 1554, 1565 (11th Cir. 1996), amended on other grounds by 101 F.3d 1363 (11th Cir. 1996).  In light of the defendants' express statements, this court must find that Ford's incarceration in the DDU was unconstitutional punishment.

Other facts in the record point to the same conclusion.  For example, but without limitation, as noted above it is undisputed that Ford's confinement in the DDU as a

pretrial detainee was imposed as part of the 10-year disciplinary sanction that Ford had

received while serving his prior criminal sentence.  (PF ¶¶ 19, 29-30; DR ¶¶ 19, 29-30).

Bender never reassessed Ford's threat to the institution or others but instead relied on

conduct which had occurred years earlier.  This further supports the conclusion that

Bender was continuing to punish Ford for his prior conduct, not acting out of a safety

concern.  Similarly, the fact that Ford was granted bail while awaiting trial is evidence

that Ford may not have been as dangerous as the defendants claim and that his placement

in the DDU may have been unnecessary to insure the safety of the institution, staff or

inmates, or for the orderly operation of the prison.  (See Pl. Supp. Ex. A at 44, 102-03,

140-42, 146-47).  This court also notes that the record establishes that, by the time of his

detention as a pretrial detainee, Ford was found to be generally respectful and well-

behaved.  (Pl. Ex. F at 34-35).  Finally, the 10 year DDU sentence imposed as discipline

was double the sentence Ford received after pleading guilty to the conduct for which he

was being disciplined, further supporting the conclusion that the DDU sanction was

primarily intended as punishment for an institutional violation and was not motivated by a

concern for prison safety.[9]  Since Ford's incarceration in the DDU as a pretrial detainee

was intended as punishment, it violated his substantive due process rights.

The DOC defendants appear simply to assume that a DDU sanction continues

indefinitely until all time is served, and applies whenever a defendant is incarcerated for

any purpose.  Such a conclusion makes a mockery of the different rights afforded to

pretrial detainees who are innocent until proven guilty.  Under the DOC defendants'

theory, an ex-offender who had time remaining on a disciplinary sanction could be placed

in the most restrictive conditions without any new consideration of his status even if

arrested years later for charges which ultimately proved unfounded.  The distinction

between the rights of pretrial detainees and persons serving a sentence cannot be so

blithely ignored.

The "continuation" of the DDU sanction into a period of pretrial detention also

ignores the well-established fact that a DDU sanction is not a criminal sentence of

punishment, but is instead a civil sanction.  See Garrity v. Fiedler, 41 F.3d 1150, 1152

(7th Cir. 1994) (distinguishing prison discipline from criminal prosecution in double

jeopardy context and noting that every circuit that has addressed the issue has found "that

---

[9]  In support of his argument that the defendants intended to punish him for the conduct which formed the basis of his criminal charges, Ford also relies on language in the Special Hearing Officer's decision that "[n]ot only did Inmate Ford violate [DOC] rules, he violated the laws of the Commonwealth as well." (Pl. Supp. Ex. H).  Ford argues that this statement establishes that his "pretrial DDU detention for the same sanction was not strictly limited to addressing the violation of DOC regulations" but also was intended as punishment for his unproven criminal conduct. (Pl. Opp. Mem. (Docket No. 108) at 14-15).  This argument reads too much into the statement.  There is no evidence that the Hearing Officer intended to exceed her authority to enforce prison regulations.  See 103 C.M.R. § 430.00 et seq.

prison discipline does not preclude a subsequent criminal prosecution or punishment for the same acts"); Commonwealth v. Bloom, 53 Mass. App. Ct. 476, 478, 760 N.E.2d 297, 299 (2001) ("As a general matter, the imposition of prison discipline is civil in nature and does not bar criminal prosecution for the same wrongful conduct . . . ."). If the DDU sanction does not end when an inmate completes his criminal sentence, the sanction, in effect, becomes an additional criminal sentence to be served.

The continuation of a DDU sanction following the completion of a criminal sentence also is inconsistent with how all other prisoners are treated. It is undisputed that at the time the DDU sanction was imposed it was expected that it would expire upon Ford's release from Cedar Junction. The DOC could not have kept him incarcerated to finish out his "civil" discipline. Thus, despite its "10 year" term, by definition, the DDU sanction could have lasted only a day if Ford had been scheduled for release at that time.[10] The fact that a prisoner is subsequently detained on unproven criminal charges should not serve as grounds to extend an otherwise completed sanction. Since the DOC was not entitled to continue its punishment of Ford beyond his criminal sentence, it is clear that by relying on old information without a new review of the facts, the defendants'

---

[10] For this reason, the defendants' argument that a ruling that the DOC is not allowed to continue to impose its disciplinary sanction while prisoners are awaiting trial on new charges "would simply encourage and condone serious disciplinary infractions close to an inmate's release date, as any sanction would be moot upon release from one sentence" makes no sense. (Bender's Opp. (Docket No. 99) at 14). The fact that an inmate is under a disciplinary sanction would not prevent the inmate's release. On the other hand, if the inmate's behavior while a pretrial detainee establishes that he must be kept in DDU as a pretrial detainee, the DOC can so order based on an appropriate hearing and factual findings.

incarceration of Ford in the DDU was an impermissible punishment of a pretrial detainee for conduct which was charged, but not yet proven.  See Collazo-Leon v. United States Bureau of Prisons, 51 F.3d 315, 318 (1st Cir. 1995) ("reasonable punishment may be imposed to enforce reasonable prison disciplinary requirements but may not be imposed to sanction prior unproven criminal conduct") (emphasis omitted).

Finally, the DOC defendants suggest that they had unfettered discretion to place Ford in any type of confinement they deemed appropriate.  (See Def. Mem. (Docket No. 92) at 15).  However, "prisoners do not shed all constitutional rights at the prison gate[.]" Sandin v. Conner, 515 U.S. 472, 485, 115 S. Ct. 2293, 2301, 132 L. Ed. 2d 418 (1995). While "the Government concededly may detain [a person] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility[,]" it may only do so as "long as those conditions and restrictions do not amount to punishment or otherwise violate the Constitution."  Bell, 441 U.S. at 536-37, 99 S. Ct. at 1872-73.  See also MacDougall v. Commonwealth, 447 Mass. 505, 511, 852 N.E.2d 1080, 1084 (2006) ("Having undertaken the petitioner's custody [pursuant to Section 52A], the commissioner is required to afford him every constitutional and statutory right and convenience guaranteed to persons held for trial and presumed innocent.").  Ford's rights as a pretrial detainee differed significantly from those of a prisoner serving a sentence.  Absent evidence that Ford engaged in sanctionable behavior while in detention or otherwise posed a serious risk requiring pretrial confinement in the DDU, his placement there violated his constitutional rights.

## F.        Procedural Due Process

The parties have also moved for summary judgment on Ford's claims that Bender violated his right to procedural due process by confining him in the DDU as a pretrial detainee without a hearing and by retaining him in the DDU without any process following his April 2008 conviction.[11]   For the reasons detailed below, this court finds that Bender's failure to provide Ford with any procedural protections in 2007, at the time he was returned to the DDU as a pretrial detainee, or in 2008, at the time he was placed in the DDU as a convicted prisoner, violated the plaintiff's constitutional rights.

### Existence of a Protected Interest

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake."  Wilkinson v. Austin, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393, 162 L. Ed. 2d 174 (2005).  The DOC defendants contend that Ford is not entitled to due process protection because he has not established that he had a liberty interest in avoiding confinement in the DDU.  (Def. Mem. (Docket No. 92) at 17).  This argument is without merit.  As an initial matter, "[p]retrial detainees, unlike convicts, have a liberty interest in avoiding punishment – an interest that derives

---

[11]   Specifically, both parties are seeking summary judgment on Ford's claim that Bender, acting in both his individual and official capacities, deprived him of his right to procedural due process under the Fourteenth Amendment.  (Count III).  The DOC defendants also are seeking summary judgment on Ford's claim that Bender violated his right to procedural due process under Articles 1, 10 and 12 of the Massachusetts Declaration of Rights.  (Count IV).  The parties agree that the same standards govern the federal and state constitutional claims.

from the Constitution itself." Surprenant, 424 F.3d 13 (noting that Sandin court's holding that 30-day period of punitive segregation imposed on a convict could be levied without due process "applies only to those convicted of crimes – not to pretrial detainees"). Therefore, Ford "as a pretrial detainee retained a liberty interest in freedom from disciplinary confinement without due process[.]" Mitchell v. Dupnik, 75 F.3d 517, 525 (9th Cir. 1996). See also Rapier v. Harris, 172 F.3d 999, 1005 (7th Cir. 1999) ("although it is permissible to punish a pretrial detainee for misconduct while in pretrial custody, that punishment can be imposed only after affording the detainee some sort of procedural protection").

Additionally, this court finds that Ford has shown that he had a constitutionally protected liberty interest in avoiding DDU confinement even after he pled guilty and was sentenced in 2008. In the case of convicted prisoners, "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Wilkinson, 545 U.S. at 221, 125 S. Ct. at 2393. Nevertheless, "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations" where the challenged conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 222-23, 125 S. Ct. at 2393-94 (quoting Sandin, 515 U.S. at 484, 115 S. Ct. at 2300). There can be no serious challenge to the conclusion that confinement in the DDU at Cedar Junction for the lengthy period involved in this case constituted an atypical or significant hardship as

compared to the ordinary incidents of prison life.[12]  See Wilkinson, 545 U.S. at 223-24,

125 S. Ct. at 2394-95 (finding that placement in maximum security prison with highly

restrictive conditions imposed atypical and significant hardship "under any plausible

baseline" where duration of placement was indefinite and assignment to facility

disqualified inmates from parole consideration); Colon v. Howard, 215 F.3d 227, 231 (2d

Cir. 2000) (holding that 305 days in solitary confinement cell of segregated housing unit

was "a sufficient departure from the ordinary incidents of prison life to require procedural

due process protections under *Sandin*"); Magluta v. Samples, 375 F.3d 1269, 1282 (11th

Cir. 2004) (allegations that plaintiff was confined in solitary confinement under

extremely harsh conditions with minimal human contact for more than 500 days

supported a liberty interest under Sandin).  This conclusion is consistent with the DOC's

own regulations, which provide that inmates be afforded notice and a hearing by a

Special Hearing Officer before they may be sentenced to the DDU as a sanction for

misconduct.  See DuPont v. Comm'r of Corr., 448 Mass. 389, 392-93, 861 N.E.2d 744,

747-48 (2007), and regulations cited.  In sum, Ford had a liberty interest in avoiding

confinement in the DDU which entitled him to procedural due process.

---

[12]  This conclusion is even more compelling in light of the opinion of the plaintiff's expert
that "[t]he DDU at Cedar Junction presents a particularly harsh and psychologically punishing
condition of solitary confinement."  (Pl. Ex. A ¶ 10.b).

**Adequacy of Process**

Having determined that Ford had a liberty interest in avoiding confinement in the

DDU, the issue becomes whether the plaintiff was provided with all the process that was

constitutionally due.  See Wilkinson, 545 U.S. at 224, 125 S. Ct. at 2395 (once a liberty

interest has been established, court turns to question of what process is due).  In Wolff v.

McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), the Supreme Court

set forth the minimum procedural safeguards required to satisfy due process in the

context of prison disciplinary proceedings.  See Surprenant, 424 F.3d at 18 ("*Wolff* has

long established the level of due process required before a pretrial detainee can be

deprived of a liberty interest in a disciplinary hearing"); Mitchell, 75 F.3d at 525 ("The

elements of due process in a prison disciplinary hearing have long been established by

*Wolff*").  Those safeguards include

> 1) advance written notice of the charges at least 24 hours before the
> hearing; 2) the opportunity to appear at the hearing, to call witnesses
> and to present rebuttal evidence; and 3) a written statement by the
> factfinders as to the evidence relied on for their decision and the
> reasons for the prison committee's action.

Orwat v. Maloney, 360 F. Supp. 2d 146, 162 (D. Mass. 2005) (citing Wolff, 418 U.S. at

564-66, 94 S. Ct. at 2978-80).  In the instant case, Ford is not challenging his 2003 DDU

hearing for which he had received notice, even though he did not attend the hearing and

was not represented, despite having requested counsel.[13]  It is undisputed that no further

---

[13] The DOC defendants, relying on Torres, argue that "the Supreme Judicial Court has
already held that the process provided by the disciplinary proceedings resulting in a DDU sanction

proceedings occurred before Ford was placed in the DDU as a pretrial detainee in January and again in March 2007, or before he was placed in the DDU following his 2008 conviction.  (See PF ¶¶ 12, 24, 29, 33; DR ¶¶ 12, 24, 29, 33; Def. Ex. F; Pl. Supp. Ex. H). Therefore, the issue is whether the 2003 DDU hearing was sufficient to provide Ford with all of the process that was due.[14]  This court finds that based on the undisputed facts presented in this case, reliance on the 2003 hearing was insufficient.

As detailed above, Ford cannot be held in the DDU as a pretrial detainee as punishment for an infraction of disciplinary rules which occurred while he was serving a sentence that had since been concluded.  Under the facts presented here, this would constitute punishment for a crime which had not yet been proven, in violation of his substantive due process rights.  It follows, then, that if the DOC was holding Ford in the DDU for the safety and security of the institution, he was entitled to a hearing to assess his current threat level.  The threat he had posed in 2003 did not necessarily still exist in 2007, especially since he had spent the intervening years in isolation.  The failure of the DOC defendants to provide Ford with any hearing before he was placed in the DDU as a pretrial detainee violated his rights to procedural due process.  See Boulanger v. Dir. U.S.

_____

is sufficient for due process purposes." (Def. Mem. (Docket No. 92) at 19).  However, Ford is not challenging the adequacy of the available administrative procedures.  Rather, Ford's argument is "that he was never afforded the protection of those procedures ... prior to his detention in the DDU first as a pretrial detainee and later as a sentenced inmate." (Pl. Reply Mem. (Docket No. 114) at 9).

[14]  Since Ford is no longer challenging his transfer to DOC custody under Section 52A, or the related administrative procedures, this court will not address the DOC defendants' arguments on these points.

Bureau of Prisons, Civil No. 06-cv-308-JD, 2006 WL 3694548, at *5 (D.N.H. Dec. 12, 2006) (unpub. op.) ("It goes without saying that a pretrial prisoner who is denied any hearing at all prior to the imposition of punishment was denied the due process guaranteed by *Wolff*").

Even assuming, arguendo, that the record was unclear as to whether Ford was being held as punishment for the 2003 events or for security reasons, a hearing should have been held. "Because the same conduct may be the basis for either nonpunitive, regulatory restrictions or punitive sanctions, it is often important to distinguish between nonpunitive measures and the punitive measures that are subject to due process restrictions." Rapier, 172 F.3d at 1005. "[A] due process hearing helps to ensure that disciplinary punishment is what it purports to be, rather than punishment in advance of conviction for the crime that led to detention . . . ." Mitchell, 75 F.3d at 524 n.4. Again, the absence of a hearing before Ford was kept in the DDU as a pretrial detainee violated his procedural due process rights.

Ford was also entitled to a hearing at the time he began serving a sentence in 2008. As detailed above, the sanctions imposed on Ford in 2003 ended when his status changed to a pretrial detainee. Therefore, his incarceration in the DDU in 2008, after his conviction on the Assault Charges, was, in effect, a disciplinary sanction imposed on a new prisoner. The length of time the DOC sought to keep Ford in the DDU – the entire length of his sentence – implicated a liberty interest as it is "beyond the normally expected incidents of prison life." Rapier, 172 F.3d at 1004 (with respect to convicted

prisoners, "[t]he Due Process Clause simply guarantees [them] the right to be free of punishment that is beyond the normally expected incidents of prison life."). Therefore, Ford was entitled to a hearing.[15]

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965)). The DOC defendants' reliance on a hearing that took place more than five years earlier, while Ford was serving a prior sentence, to justify the plaintiff's continuing confinement in the DDU is not sufficient to meet this standard. Compare Shoats v. Horn, 213 F.3d 140, 147 (3d Cir. 2000) (holding that monthly reviews of inmate's confinement in administrative custody, during which inmate had opportunity to present his views, satisfied minimal constitutional standards for due process). Taken to its logical extreme, the defendants' position that the remainder of a DDU sanction may be imposed at any time in the future, unchecked by further procedural review, would mean that an inmate could return to DOC custody a decade or more after the completion of his original sentence, and be subjected to DDU confinement without an opportunity to challenge the appropriateness of his placement. This is entirely inconsistent with the requirement to provide an "opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333, 96 S. Ct. at 902 (quota-

---

[15]   There is nothing in the record to indicate when, if ever, Ford's 10 year disciplinary sanction was reviewed.

tions and citation omitted).  As detailed more fully above, it also negates the distinction between the "civil" disciplinary sanction and the criminal sentence for the crime charged. Accordingly, this court concludes that Ford was deprived of procedural due process when he was placed in the DDU in 2008 without any meaningful opportunity to be heard.

The defendants' reliance on unpublished opinions of the Massachusetts Appeals Court does not compel a different conclusion.  In the case of <u>In re Pridgett</u>, 57 Mass. App. Ct. 1114, 785 N.E.2d 427, 2003 WL 1524678 (Mass. App. Ct. Mar. 25, 2003) (unpub. op.), a prisoner's 10 year DDU sentence of disciplinary confinement exceeded his original criminal sentence and continued into a consecutive sentence for a subsequent conviction.  The court stated that the continuation of a DDU sanction was permissible because prison discipline is a civil proceeding, and "the terms and conditions of a disciplinary sanction (including assignment to the DDU) are independent and distinct from the imposition of punishment reflected in sentences of incarceration imposed following convictions for criminal offenses."  <u>In re Pridgett</u>, 2003 WL 1524678, at *1. Significantly, however, in <u>Pridgett</u>, there was no break in the inmate's status as a convicted inmate and the disciplinary sanction ran coterminously with the inmate's criminal sentence.  Consequently, even if <u>Pridgett</u> had any precedential value, it does not address the issues raised in connection with Ford's due process claim.

In <u>Commonwealth v. Karnes</u>, 68 Mass. App. Ct. 1118, 864 N.E.2d 1259, 2007 WL 1217695 (Mass. App. Ct. Apr. 25, 2007) (unpub. op.), a pretrial detainee moved to dismiss criminal charges pending against him on the grounds that his trial on charges

stemming from the same conduct for which he had been sentenced to the DDU for five years would subject him to double jeopardy.  <u>Karnes</u>, 2007 WL 1217695, at *1. Although Karnes' alleged misconduct occurred during his prior conviction, his DDU hearing took place during the time he was in pretrial detention.  <u>Id.</u>  The court, noting that "double jeopardy . . . does not generally forbid both prison discipline and criminal punishment for the same inmate misconduct" and that "prison disciplinary proceedings are civil in nature and do not bar subsequent criminal prosecution for the same wrongful conduct[,]" determined that Karnes had not established a violation of the double jeopardy clause.  <u>Id.</u> at *5-6 (quotations and citations omitted).  Significantly, however, the court expressly did not reach the issue whether incarceration in the DDU as a pretrial detainee as a result of a prior disciplinary sentence violated the inmate's constitutional rights.  <u>Id.</u> at *6 ("To the extent Karnes contends that the conditions of his detention do not meet constitutional standards for pretrial detainees, his remedy is to bring a civil action against the commissioner of correction, where an appropriate factual record can be developed for judicial review.") (internal quotation and punctuation omitted).  Therefore, nothing in these cases alters this court's conclusion that Bender violated Ford's constitutional right to procedural due process.

## **Official Capacity Claim Against Bender**

Ford also claims that Bender should be held liable in his official capacity for depriving the plaintiff of procedural due process.  "A suit against a public official in his official capacity is a suit against the governmental entity itself."  <u>Surprenant</u>, 424 F.3d at

19.  Therefore, Ford's claim against Bender in his official capacity constitutes a claim against the DOC.  In order to hold the DOC liable, Ford must show that "the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law."  Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985) (quotations and citations omitted).

In the instant case, it is undisputed that Ford's placement in the DDU as a pretrial detainee without adequate process occurred pursuant to a DOC custom.  In particular, the record shows that when a pretrial detainee held by the DOC under Section 52A has time remaining on a DDU sanction imposed during the term of a prior criminal sentence, it is the DOC's practice to confine the detainee in the DDU based on the pre-existing sanction.  (PF ¶ 25).  It is also undisputed that Ford's placement in the DDU as a convicted prisoner in 2008, without a hearing, was consistent with the DOC's ordinary practice of confining inmates to the DDU to complete DDU sentences imposed during a prior period of incarceration.  (PF ¶ 35).  Therefore, Ford is entitled to summary judgment with respect to his official capacity claim against Bender.

### G.   Qualified Immunity

The defendants contend that Bender and St. Amand have qualified immunity for their violation of Ford's substantive due process rights and that Bender has qualified immunity for his violation of Ford's procedural due process rights.  This court finds that the defendants are not entitled to qualified immunity with respect to their placement of

Ford in the DDU as a pretrial detainee, but Bender is entitled to qualified immunity with respect to Ford's placement in the DDU following his conviction on the Assault Charges.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)).  "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (quotations and citations omitted).

The determination whether an official is entitled to qualified immunity requires an assessment as to whether the facts alleged or shown by the plaintiff "make out a violation of a constitutional right" and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. at 815-16 (quotations and citations omitted).  "[T]he second, 'clearly established,' step of the qualified immunity analysis . . . in turn, has two aspects." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  As the First Circuit has described:

> One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation.  To overcome qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.  Indeed, it is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

Id. (quotations, citations and alterations omitted).  Thus, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. (quotations, citations and alterations omitted).

In support of their qualified immunity defense, the DOC defendants argue that Ford cannot satisfy either aspect of the "clearly established" step of the analysis.  This court disagrees.  In order to establish that the law was clearly established at the time the conduct in question occurred, "a plaintiff need not show that the conduct of which he complains is an exact replica of conduct that previously has been held unlawful." Bergeron v. Cabral, 560 F.3d 1, 12 (1st Cir. 2009).  Rather, a plaintiff need only show "that the relevant legal principles were both specific enough and sufficiently well-established that the unlawfulness of the defendant's conduct ought to have been apparent."  Id.  Ford's pretrial detention took place in 2007.  By then, it was firmly established that pretrial detainees, unlike convicted prisoners, have a constitutionally-protected liberty interest in avoiding punishment.  In addition, it was clearly established

-38-

that, as a result of their status, pretrial detainees are entitled to a hearing or some form of

procedural protection before they can be housed in disciplinary confinement.  See

Surprenant, 424 F.3d at 13, 17.  See also Bell, 441 U.S. at 535, 538-39, 99 S. Ct. at 1872-

74; Lyons, 838 F.2d at 29.  As detailed more fully above, since the defendants arranged

for Ford to be kept in the DDU without any assessment of any threat he may pose, but

simply as a continuation of his 10 year disciplinary sanction, it was clearly punishment

and, therefore, unconstitutional.  It is undisputed that Ford was not given any new hearing

in 2007.  The defendants' actions in maintaining Ford in the DDU were deliberate and

considered.  Ford has established both that the "contours of the right [is] sufficiently clear

so that a reasonable official would understand that what he is doing violates that right"

and that under the facts of this case "a reasonable defendant would have understood that

his conduct violated the [plaintiff's] constitutional rights."  Maldonado, 568 F.3d at 269.

The continuation of the DDU sanction after Ford's conviction on the Assault

Charges without a new hearing, however, poses a different issue.  No cases on point have

been cited by the parties.  At the time of the challenged conduct, it was recognized that a

disciplinary sanction was not duplicative of a criminal sentence, and that the two could

run concurrently.  See, e.g., Sandin, 515 U.S. at 485, 115 S. Ct. at 2301 ("Discipline by

prison officials in response to a wide range of misconduct falls within the expected

perimeters of the sentence imposed by a court of law.").  The Massachusetts Appeals

Court had also ruled that a disciplinary sanction could extend beyond the original

sentence and continue through a consecutive sentence.  See In re Pridgett, 2003 WL

1524678, at *1.  While these cases do not address the instant situation, where the inmate's detention is interrupted and his status is changed to that of a pretrial detainee for an extended period of time, it cannot be said that the facts of Ford's case were so clearly different than these cases so that Bender should have known that he was violating Ford's rights when he continued the DDU sanction into the plaintiff's subsequent term of incarceration without a new hearing.  Therefore, Bender is entitled to qualified immunity regarding Ford's period of incarceration in the DDU.

### G.  Equal Protection

The DOC defendants have moved for summary judgment on Ford's claims that Mass. Gen. Laws ch. 276, § 52A, both on its face and applied to him, violates the Equal Protection Clause of the Fourteenth Amendment and Articles 1 and 12 of the Massachusetts Declaration of Rights because it allows pretrial detainees who have served a felony sentence in Massachusetts state prison to be transferred to DOC custody to await trial, but does not authorize such transfers of detainees who have served a felony sentence in a state or federal correctional institution outside of Massachusetts.  (See Am. Compl., Counts Seven and Eight).[16]  Because there is a question of fact as to whether the two

---

[16]  The relevant language of Section 52A provides that persons held in jail for trial "if they have been previously incarcerated in a correctional institution of the commonwealth under sentence for a felony, may, with the approval of the district attorney, be removed by the commissioner of correction to a correctional institution of the commonwealth ...."  The statute contains no such provision for pretrial detainees who have been previously held under sentence for a felony in a state or federal correctional institution outside the Commonwealth of Massachusetts.

-40-

classes of persons identified by the plaintiff are similarly situated for purposes of equal protection, the defendants' motion for summary judgment is denied with respect to these claims.

"The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike." Restucci v. Clarke, 669 F. Supp. 2d 150, 158 (D. Mass. 2009). See also Dupont, 448 Mass. at 399, 861 N.E.2d at 752.[17]  If a law challenged on equal protection grounds "neither burdens a fundamental right nor targets a suspect class, [the court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627, 134 L. Ed. 2d 855 (1996).  Thus, "[w]hen a non-suspect classification is involved, a plaintiff may establish an equal protection claim by showing that similarly situated individuals were intentionally treated differently without a rational relationship to a state purpose." Restucci, 669 F. Supp. 2d at 158.  In the instant case, Ford contends that "Section 52A irrationally differentiates between similarly-situated pretrial detainees based on the happenstance of whether 'they have been previously incarcerated in a correctional institution of the commonwealth under sentence for a felony.'"  (Pl. Opp. Mem. (Docket No. 108) at 40-41(quoting Section 52A)).

---

[17]  Because the legal standards applicable to Ford's state law equal protection claims are the same as the legal standards that are applicable to his Fourteenth Amendment claim for purposes of the defendants' motion for summary judgment, this court has not distinguished between the two.

The DOC defendants have not attempted to articulate a rational basis for the legislation's disparate treatment of former felons who have been incarcerated in Massachusetts correctional institutions and those who have been incarcerated elsewhere. Instead, they argue that equal protection does not apply because the classes of pretrial detainees identified by the plaintiff are not similarly situated.  (Def. Reply Mem. (Docket No. 111) at 2-3).  Specifically, the DOC defendants contend that the two categories of pretrial detainees are distinguishable because, in contrast to individuals who have served felony sentences in Massachusetts, the DOC's lack of prior experience with inmates who have previously served prison time in another state, and its lack of knowledge regarding the housing needs, behaviors and dangers posed by such individuals, would render it unprepared to house them.  (Id.).  Accordingly, the DOC defendants argue that Ford has not satisfied a necessary prerequisite to the equal protection analysis.

"The dissimilar treatment of dissimilarly situated persons does not violate equal protection."  DuPont, 448 Mass. at 400, 861 N.E.2d at 752 (quotations and citations omitted).  However, the defendants have not established dissimilarity as a matter of law.

As the First Circuit has explained,

> The formula for determining whether individuals or entities are "similarly situated" for equal protection purposes is not always susceptible to precise demarcation. ... As we have explained, however, the test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.  Much as in the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result.  Exact correlation is neither likely nor necessary, but the

cases must be fair congeners.  In other words, apples should be
compared to apples.

Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir.

2001) (internal quotations, citations and punctuation omitted).  Given the imprecise

nature of the relevant test, it is hardly surprising that "[a]s a general rule, whether

individuals are similarly situated is a factual question for the jury."  McDonald v. Vill. of

Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004).  Here, a reasonable jury could conclude

that individuals such as Ford, who have previously been incarcerated for a felony in a

Massachusetts correctional institution are "roughly equivalent" to individuals who have

previously been incarcerated for a felony in another jurisdiction, and that the DOC's

experience or lack of experience with such classes of individuals does not render them

dissimilar for purposes of equal protection.  Moreover, there may be information about

prisoners from other jurisdictions which can be obtained to provide the DOC with similar

information to that which it has about prisoners previously incarcerated in Massachusetts.

Therefore, this court concludes that a question of fact precludes summary judgment for

the defendants on Ford's equal protection claims.

To the extent the DOC defendants are seeking qualified immunity with respect to

Ford's equal protection claims, their motion is also denied.  Because there is a question of

fact as to whether the relevant classes of individuals were similarly situated, this court

cannot determine, as a matter of law, whether "it would [have been] clear to a reasonable

officer that his conduct was unlawful in the situation he confronted."  Maldonado, 568

F.3d at 269 (quotations and citations omitted).  Accordingly, the question of qualified

immunity cannot be resolved on summary judgment at this time.

### H.    Infamous Punishment

Finally, both Ford and the DOC defendants are seeking summary judgment on

Ford's claim that his confinement at MCI-Cedar Junction as a pretrial detainee subjected

him to "infamous punishment" in violation of Article 12 of the Massachusetts Declaration

of Rights since he had not been tried by a jury at the time of his return to Cedar Juntion.[18]

(See Am. Compl., Count Nine).  This court finds that even if there was such a

constitutional violation, the DOC defendants would be entitled to qualified immunity.

Article 12 of the Massachusetts Declaration of Rights provides in relevant part that

"the legislature shall not make any law, that shall subject any person to a capital or

infamous punishment . . . without trial by jury."  Mass. Constitution, Pt. 1, Art. XII.  It is

undisputed that incarceration in the state prison is considered an "infamous punishment,"

and that MCI-Cedar Junction is the Massachusetts state prison.  (See Def. Mem. (Docket

No. 92) at 35; Pl. Mem. (Docket No. 95) at 19).  See also Brown v. Comm'r of Corr., 394

Mass. 89, 94, 474 N.E.2d 1059, 1062 (1985) (confirming that "the State prison retains the

'character of infamy'" for purposes of infamous punishment under Article 12) (citation

omitted); Mass. Gen. Laws ch. 125, § 1(o) (defining "state prison" as MCI-Cedar

---

[18]   Ford's motion seeks summary judgment on his individual capacity claim against
Bender, while the DOC defendants' motion seeks summary judgment on behalf of both Bender
and St. Amand.

Junction).  Thus, the dispositive issue for purposes of the parties' motions for summary

judgment is whether Ford's pretrial detention at MCI-Cedar Junction following

indictment but "without trial by jury" is sufficient to constitute "punishment" within the

meaning of Article 12.  As detailed briefly below, this issue has not been decided by the

Massachusetts courts.

### Cases Addressing Infamous Punishment

Ford relies on Brown to support his claim that his confinement at MCI-Cedar

Junction before he had the opportunity to be tried by a jury or to waive his right to a jury

subjected him to infamous punishment.  That case involved the transfer of an inmate from

MCI-Concord to MCI-Cedar Junction (which was known at the time as MCI-Walpole)

even though he had never been indicted for the offenses for which he was incarcerated,

but instead had been convicted on the basis of a criminal complaint.  Brown, 394 Mass. at

90, 474 N.E.2d at 1060.  The SJC, relying on Jones v. Robbins, 8 Gray 329, 74 Mass.

329 (1857), ruled that "Article 12 prohibits the sentencing of a criminal defendant to

State prison without indictment," and precludes the Commissioner of Correction from

transferring such a defendant to the state prison even for the purpose of "maintain[ing]

security, safety and order[.]"  Id. at 92-93, 474 N.E.2d at 1061 (quotations and citation

omitted).  It also reaffirmed the rule announced in Jones that "the State prison retains the

'character of infamy'" which makes punishment there infamous punishment.  Id. at 94,

474 N.E.2d at 1062 (quoting Jones, 74 Mass. at 349).  Significantly, the Brown court

stated that "the *Jones* court's explication of art. 12 of the Declaration of Rights led it 'to a

strong conclusion of the general understanding of the legislators and jurists of
Massachusetts, that punishment in the state prison is an infamous punishment, and cannot
be imposed without both indictment <u>and trial by jury</u>.'" <u>Id.</u> at 92, 474 N.E.2d at 1061
(quoting <u>Jones</u>, 8 Gray at 349) (emphasis added).  However, the <u>Brown</u> decision did not
further address the significance of the jury trial, and did not address the situation of a
detainee who had been indicted but not yet tried.

Subsequent cases either do not address or leave the relevant issues open.  <u>See</u>, <u>e.g.</u>,
<u>Commonwealth v. Smith</u>, 444 Mass. 497, 499, 829 N.E.2d 1090, 1092 (2005) (noting that
"a person may not be sentenced to State prison unless 'afforded the right to indictment or
presentment by a grand jury'") (quoting <u>Brown</u>, 394 Mass. at 91-92, 474 N.E.2d at
1061; <u>Commonwealth v. Barbosa</u>, 421 Mass. 547, 549, 658 N.E.2d 966, 968 (1995)
("Article 12 requires that no one may be convicted of a crime punishable by a term in the
State prison without first being indicted for that crime by a grand jury") (footnote
omitted).  In <u>MacDougall v. Commonwealth</u>, 447 Mass. 505, 508-10, 852 N.E.2d 1080,
1083-84 (2006), the SJC held that a pretrial detainee's transfer to Cedar Junction's
disciplinary area without judicial authorization was consistent with Mass. Gen. Laws
ch. 276, § 52A.  However, the court left open the question whether "the conditions of [the
plaintiff's] detention (at Cedar Junction or at any other State correctional facility) do not
meet constitutional standards for pretrial detainees," noting that "the petitioner's
argument is not insignificant." <u>Id.</u> at 511 & n.11, 852 N.E.2d at 1085 & n.11.  Thus, the

SJC acknowledged the existence of an issue with respect to detaining pretrial detainees at Cedar Junction but gave no indication as to its resolution.

Of final relevance, in the unpublished opinion of the Massachusetts Appeals Court in Commonwealth v. Flynn, 74 Mass. App. Ct. 1126, 909 N.E.2d 1194, 2009 WL 2195332 (July 24, 2009), the Court addressed the issue whether "the principle of double jeopardy bars [the defendant's] trial because he spent approximately one hundred days in pretrial detention . . . based on a misapprehension of law." Id. at *1.  In rejecting the defendant's argument, the court stated, "'[i]nfamous punishment' does not arise from pretrial detention in State prison but rather only from the serving of a sentence in State prison." Id. (citing Jones v. Robbins, 74 Mass. 329, 8 Gray 329, 349 (1857)).  However, Jones did not address the status of a pretrial detainee versus a convicted prisoner; it only addressed confinement as a result of trial by a police court instead of a jury. See Jones, 8 Gray at 349 ("Now, it seems to us that, whether we consider the words 'infamous punishment' in their popular meaning, or as they are understood by the Constitution and laws, a sentence to the state prison, for any term of time, must be considered as falling within them.").  Therefore, it cannot be said that the unpublished Appeals Court decision in Flynn finally resolves the issue whether an indicted pretrial detainee can be housed at Cedar Junction prior to his trial.

The uncertainty of the state of the law on this issue mandates the conclusion that the DOC defendants are entitled to qualified immunity.[19] See Longval v. Comm'r of Corr., 448 Mass. 412, 418-19, 861 N.E.2d 760, 765-66 (2007) (describing qualified immunity analysis under Massachusetts law).   Thus, the question whether the defendants are entitled to qualified immunity on Ford's infamous punishment claims depends upon whether Ford's rights under Article 12 were sufficiently established in 2007, when he was detained at MCI-Cedar Junction, that it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   Id. at 419, 861 N.E.2d at 766 (quotations and citations omitted).   Because the law remains unclear to this day, Ford has failed to establish that a reasonable official in the defendants' position would have known that confinement in MCI-Cedar Junction could not be imposed on a pretrial detainee who had not been afforded the opportunity for a trial by jury.

## IV.   CONCLUSION

For all the reasons detailed above, both the "DOC Defendants' Motion for Summary Judgment" (Docket No. 90) and "Plaintiff Albert Ford's Motion for Partial

---

[19]   Ford does not contend that the defendants are liable in their official capacities. Moreover, this court notes that the DOC defendants argue, in a footnote, that Ford's claim for infamous punishment, as well as his other claims for violations of his state constitutional rights, should be dismissed because there is no private right of action for money damages under the Massachusetts Constitution.   As the First Circuit has repeatedly held, "arguments raised only in a footnote or in a perfunctory manner are waived."   Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999).   Therefore, this court declines to address this argument further.

Summary Judgment" (Docket No. 94) are ALLOWED IN PART and DENIED IN PART as follows:

1.      Without objection, all claims against the Department of Correction, Harold Clarke and Kenneth Nelson are dismissed.

2.      Without objection, Counts V, VI, X and XI are dismissed.

3.      Without objection, Counts III and IV are dismissed as to defendant Peter St. Amand only.

4.      In accordance with this Memorandum of Decision, this court holds that James Bender and Peter St. Amand violated Ford's substantive due process rights (Counts I and II) by confining Ford in the DDU as a pretrial detainee as punishment for his 2003 conduct.  The defendants' liability is in an individual and official capacity.

5.      In accordance with this Memorandum of Decision, this court holds that James Bender violated Ford's procedural due process rights (Counts III and IV) by confining Ford in the DDU without a hearing as a pretrial detainee and, later, as a convicted felon serving a sentence.  The defendant's liability is in an individual and official capacity.

6.      In accordance with this Memorandum of Decision, this court holds that James Bender and Peter St. Amand are not entitled to qualified immunity with respect to Ford's confinement as a pretrial detainee, but that James Bender is entitled to qualified immunity with respect to Ford's subsequent confinement in the DDU as a convicted felon.

7.     In accordance with this Memorandum of Decision, this court holds that defendants' motion for summary judgment as to the equal protection claims (Counts VII and VIII) is denied as there are material facts in dispute.

8.     In accordance with this Memorandum of Decision, this court holds that the defendants' motion for summary judgment as to the "infamous punishment" claim (Count IX) is allowed as the defendants are entitled to qualified immunity.

9.     In accordance with this Memorandum of Decision, this court holds that the defendants' motion for summary judgment as to Ford's claims for money damages against the defendants in their official capacities is allowed.

      / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge