```
 1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2


 3


 4   Albert Ford,              )
                  Plaintiff,   )
 5                             )
                               )
 6   vs.                       )        Case No. 07cv11457-JGD
                               )
 7                             )
     James Bender, et al.,     )
 8            Defendants.      )


 9


10   BEFORE:  The Honorable Judith G. Dein


11


12                        Bench Trial Day 2


13


14


15                              United States District Court
                                Courtroom No. 15
16                              One Courthouse Way
                                Boston, Massachusetts
17                              July 26, 2011


18


19


20


21


22
                         Marianne Kusa-Ryll, RDR, CRR
23                          Official Court Reporter
                         United States District Court
24                        595 Main Street, Room 514A
                           Worcester, MA 01608-2093
25                    508-929-3399 justicehill@aol.com
                    Mechanical Steno - Transcript by Computer
```

```
 1   APPEARANCES:

 2   Wilmer Cutler Pickering Hale and Dorr, LLP
     Lisa J. Pirozzolo, Esquire
 3   Anant K. Saraswat, Esquire
     Dimple Chaudhary, Esquire
 4   Emily R. Schulman, Esquire
     Timothy D. Syrett, Esquire
 5   60 State Street
     Boston, Massachusetts 02109
 6   for the Plaintiff.

 7   Department of Correction
     Legal Division
 8   Julie E. Daniele, Esquire
     Kevin A. Anahory, Esquire
 9   70 Franklin Street, Suite 600
     Boston, Massachusetts 02127
10   for the Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2     Testimony of:          Direct   Cross   Redirect   Recross

 3     James R. Bender
         by Ms. Daniele         10
 4       by Ms. Pirozzolo                42
         by Ms. Daniele                            66
 5
       Peter Raymond St. Amand
 6       by Ms. Daniele         67
         by Ms. Chaudhary                93
 7       by Ms. Daniele                           111

 8     Dale Bissonette
         by Mr. Anahory        114
 9       by Ms. Pirozzolo              130
         by Mr. Anahory                          140
10       by Ms. Pirozzolo                                   142

11     Carol Ann Mici
         by Ms. Daniele        143
12       by Mr. Syrett                163

13

14

15

16

17

18

19

20

21

22

23

24

25
```

E X H I B I T S

| No. | Description | For Id. | In Evd. |
|-----|-------------|---------|---------|
| 17 | SMU Regulations, 103 CMR 423. | | 18 |
| 18 | 2002 Disciplinary report. | | 42 |
| 19 | Five photographs of Block Ten. | | 86 |
| 20 | Letter to Kathleen Dennehy, from Albert Ford. | | 92 |
| 21 | Letter to Albert Ford, from Ken Nelson, dated August 27, 2007. | | 92 |
| 22 | General population yard photo. | | 93 |
| 23 | East wing cell photo. | | 100 |
| 24 | West wing cell photo. | | 100 |
| 25 | Email to James Bender, from Carol Mici, dated January 3, 2007. | | 133 |
| 26 | DDU review slip for Albert Ford. | | 135 |
| B | Medical and mental health screening form for Albert Ford. | 139 | |
| 27 | Three photographs of segregation unit. | | 159 |

```
 1                    P R O C E E D I N G S

 2

 3            THE CLERK:  All rise.

 4            You may be seated.

 5            The United States District Court for the

 6   District of Massachusetts is now in session on July 26

 7   of the year 2011.  This is day 2 in the matter of Ford

 8   versus Bender, Civil Action No. 2007-11457.

 9            THE COURT:  Okay.  I have the defendant's

10   motion for a directed verdict.

11            Do you want to be heard?

12            MS. DANIELE:  Yes, your Honor.

13            The defendants at this point move for a

14   directed verdict.  Plaintiff has not -- has not

15   demonstrated that he's entitled to compensatory damages

16   for the remaining claims in this action.

17            As a violation of due process, he must prove

18   actual injury, and he has not demonstrated such actual

19   injury at the close of his case.  More importantly, in

20   order to recover for an emotional distress under the

21   PLRA, he must demonstrate a physical injury, and the

22   plaintiff has not demonstrated that he suffers from a

23   physical injury that he received during the requisite

24   time period, the 52A time period, and I draw your

25   attention to there -- the legal arguments are in the
```

1   memo, but I specifically draw your attention to two

2   cases:  One is the Williams case, where an inmate spent

3   13 years in segregation and testified that he, quote,

4   passed out and hit his head on a table in the cell, was

5   unable to obtain help for quite a while because of

6   placement in segregation behind a solid door.

7           Furthermore, inmates in segregation must be

8   cuffed behind their backs when they are transported, and

9   this resulted in shoulder injury for plaintiff on at

10  least two occasions.

11          Plaintiff also stated one time while he was

12  cuffed, he fell down the stairs and injured his left

13  ankle, knee, and shoulder.  That's similar to the

14  situation we have here in which the plaintiff complains

15  of injury to his ankle with regard to the cuffs.  In the

16  Williams case, it was not sufficient to demonstrate

17  physical injury.

18          Similarly, in the Todd case cited in my

19  brief, the Court found that an increase in blood

20  pressure, aggravation of hypertension, and dizziness and

21  insomnia is insufficient to demonstrate physical injury,

22  similar to Mr. Ford's complaints here with regard to his

23  diabetes being exacerbated.

24          In addition, with regard to both of

25  those -- the claims that Mr. Ford has, he has absolutely

1    no medical testimony or anything to link that physical

2    injury to the time that he was in 52A or to his being

3    held in the DDU; therefore, defendants are entitled to a

4    directed verdict on the issue of compensatory damages,

5    and Mr. Ford's recovery will be simply nominal damages.

6           With regard to injunctive relief, he has not

7    demonstrated that there's any further relief that he's

8    entitled to at the close of his case.  There isn't any

9    further appropriate relief after your order that his

10   holding is unconstitutional and process is required.

11           THE COURT:  Okay.  Counsel.

12           MR. SYRETT:  Your Honor, we -- we disagree.

13   We believe that Mr. Ford has established that he

14   suffered an actual injury.  His testimony was extensive

15   about the harm that he suffered during his period of

16   pretrial detention, including the loss of privileges,

17   the loss of opportunities.

18           He also -- to the extent that the defendants

19   argue that his prior time in the DDU somehow negates his

20   pretrial detention, he testified -- and Dr. Grassian

21   explained that this time was, in fact, different, and

22   had a much greater impact on him than the prior

23   incarceration in the DDU had.

24           We also disagree with the plaintiff's

25   characterization -- or I'm sorry -- the defendants'

1  characterization of the PLRA.  This is not solely a

2  claim for mental and emotional distress.  Certainly

3  Mr. Ford suffered emotional and mental distress, but his

4  rights were violated.  He also suffered more concrete

5  deprivations, like, the loss of the opportunities, the

6  loss of privileges, and that sort of thing.

7          So we think that the PLRA requirement is

8  inapplicable to our claim; but even assuming for the

9  sake of argument that it is applicable, we think we have

10  more than met the standard, which requires more than a

11  de minimus showing.  We think we've shown that.

12          Mr. Ford testified about his having elevated

13  blood sugar levels during his pretrial detention, in the

14  300s.  We submitted evidence showing that he had

15  received a prescription for Tegretol to treat the

16  numbness in his ankles and feet and the burning in his

17  ankles and feet that he testified worsened as a pretrial

18  detainee, a numbness that continues to plague him to

19  this day.  Mr. Ford also testified that the Tegretol was

20  not sufficient, and he needed a stronger prescription of

21  Neurontin; and the record suggests that he was diagnosed

22  with diabetic neuropathy.

23          So we think that that -- that injury is

24  sufficient to meet the de minimis threshold, and in our

25  opposition to the plaintiff's motion in limine, we cite

1   a number of cases that we think support our position

2   that his injuries are sufficient, including the fact

3   that these injuries were sustained over a period of 375

4   days.  This wasn't a short-term, temporary situation.

5   This was more than a year that he was dealing with this,

6   and we think that that -- that factor certainly lends to

7   the -- to the harm that Mr. Ford suffered.

8              In terms of injunctive relief, we think that

9   there is -- it is appropriate for the Court to order

10  injunctive relief here to remedy the period from

11  April 2008, up through the summary judgment order, when

12  Mr. Ford continued to be held in the DDU and continued

13  to suffer the harms that are characteristic of the DDU,

14  and that there needs to be -- to remedy that harm and to

15  address that harm going forward, there needs to be some

16  sort of transition plan to promote an adjustment to --

17             THE COURT:  Is the argument that since he

18  was deprived of the opportunity to engage in social

19  interaction and develop those skills or -- which Dr.

20  Grassian contends are negated by solitary, that the

21  remedy should be to sort of make up for those lost

22  opportunities; is that --

23             MR. SYRETT:  Yes.

24             THE COURT:  -- the link there?

25             MR. SYRETT:  Yes.

```
 1                     And so for those reasons, your Honor, we
 2     think that we have met our burden; we have established
 3     our case, and that the directed verdict is not
 4     warranted.
 5                     THE COURT:  Okay.  I'm going to deny the
 6     motion for a directed verdict.
 7                     Would the defendant call your first witness.
 8                     MS. DANIELE:  The defendants calls James
 9     Bender.
10                     THE CLERK:  Please raise your right hand.
11                          JAMES BENDER, SWORN
12                     THE CLERK:  Please be seated.  Please state
13     your full name, spelling your last name for the record.
14                     THE WITNESS:  James R. Bender, B-E-N-D-E-R.
15                          DIRECT EXAMINATION
16     BY MS. DANIELE:
17       Q.  Good morning, Deputy Commissioner Bender.
18           Could you please tell me your current employment?
19                     THE COURT:  Can you do me a favor though.
20     Can you move the mike towards you.
21                     Thank you.
22                     MS. DANIELE:  I'll try to speak up, too.
23     I'm sorry.
24                     THE COURT:  That's all right.
25                     MS. DANIELE:  You remember when you're
```

1   there, and you forget when you're over here.  I

2   apologize.

3                THE COURT:  And I have to confess to the

4   whole world that I can't hear.  Okay.  So now we all

5   know, and let's just deal with it.

6   BY MS. DANIELE:

7        Q.  Deputy Commissioner Bender, could you tell us how

8   you're employed presently.

9        A.  I'm retired from the Massachusetts Department of

10  Correction as of January 5th of this year.

11       Q.  And prior to your retirement, what was your

12  position?

13       A.  I was a Deputy Commissioner of the Prison

14  Division.

15       Q.  When did you become Deputy Commissioner of the

16  Prison Division?

17       A.  2008, Commissioner Clarke appointed me as the

18  Deputy Commissioner of the Prison Division.

19       Q.  Prior to 2008, what was your position?

20       A.  For seven months, I was the Acting Commissioner

21  of Corrections prior to Commissioner Clarke being

22  appointed in November of 2007.

23       Q.  And before that, what was your position?

24       A.  I was the Deputy Commissioner of the Department

25  of Corrections -- the sole Deputy Commissioner of the

1   Department of Corrections from 2003, December, until

2   2007.

3   Q.   Could you explain why your position changed in

4   2008.

5   A.   Commissioner Clarke, when he came on board,

6   decided to have three commissioners.  I was one of those

7   three.  I was in charge of the day-to-day operations of

8   the prison division.  There was a Deputy Commissioner of

9   Classification and Treatment and also a Deputy

10  Commissioner of Administration.  So he wanted to have

11  three separate deputy commissioner positions.

12  Q.   Before you were appointed deputy commissioner in

13  2003, what was your position?

14  A.   I was the Assistant Deputy Commissioner of the

15  Community Corrections Division.

16  Q.   And just briefly, can you give the Court your

17  previous employment history with the department.

18  A.   Okay.  I was -- I started in 1977 as a

19  correctional social worker.  I was in the treatment end

20  of the business.  I worked as Director of Treatment at

21  MCI-Walpole; two deputy superintendent positions at

22  MCI-Concord, the treatment and classification as well as

23  operations; and then I was superintendent of two

24  institutions:  MCI-Plymouth and North Central

25  Correctional Institution in Gardner; and then for about

1    ten years, I was Assistant Deputy Commissioner of Secure

2    Facilities.

3        Q.   As the Deputy Commissioner of the Prison

4    Division, just prior to your retirement, could you tell

5    us what your responsibilities were.

6        A.   Primary responsibility was the day-to-day

7    operations of all 18 correctional facilities, primarily

8    safety and security of those facilities.  I was also in

9    charge of several divisions within the Department of

10   Corrections, including the transportation division, the

11   inmate discipline division, as well as the investigative

12   unit.

13          In that responsibility also, the appellate

14   authority evolved on Department Disciplinary Unit

15   Appeals.  When an inmate was sentenced to a Department

16   Disciplinary Unit, and they appealed that sentence, it

17   would come to me, and I'd make the determination on

18   whether it was sustained or not.

19       Q.   And in January of 2007, were those your

20   responsibilities?

21       A.   Yes.

22       Q.   In June of 2007, you were acting commissioner; is

23   that correct?

24       A.   That's correct.

25       Q.   Did you also have some of the same

1   responsibilities that you had when you were Deputy

2   Commissioner of the Prison Division?

3       A.   We had an acting deputy commissioner at that

4   time.  I was acting commissioner, so, in essence, I was

5   still responsible for the entire operations of all

6   correctional facilities, but at the time, I was also in

7   charge of treatment and classification, as well as

8   administrative when I was acting commissioner.

9       Q.   How many inmates are there in the Department of

10  Correction custody?

11      A.   Approximately 11,000.

12      Q.   Can you briefly tell this Court what the

13  placement possibilities are for inmates in the

14  Department of Correction?

15      A.   There are four security ratings in the Department

16  of Corrections:  maximum, medium, minimum, and

17  prerelease.

18          In 2007, we had two maximum security facilities

19  at MCI-Cedar Junction and Souza-Baranowski Correctional

20  Center.  We had approximately eight or nine medium

21  security facilities; five minimum prerelease facilities;

22  so, those different ratings.

23      Q.   Could you briefly describe the types of units

24  that were in the medium security institutions.

25      A.   Primarily the medium security, as compared to a

1    maximum security, they would have -- they could have

2    single cells, double bunk cells, but in addition, they

3    would have a lot of dormitory-style units in a medium

4    security environment.

5         All medium security facilities, except Bay State

6    Correctional Center, also had what was the special

7    management unit enclosed in that facility; whereas, in

8    maximum security, they did not have any dormitory-style

9    units.  They were more secure internal housing

10   structured.

11   Q.  What type of inmates are housed in medium

12   security?

13             THE COURT:  Are you saying medium or

14   minimum?

15             MS. DANIELE:  Medium.  I apologize, your

16   Honor.

17   A.  You know, it runs in the full gamut.  We have

18   hundreds of lifers, first degree lifers, second degree

19   lifers, housed in medium security facility, all the way

20   down to inmates, who are serving two-and-a-half-year

21   sentences.

22   Q.  What are the units in maximum security

23   institutions?

24   A.  Those units are primarily single bunk; however,

25   at Souza-Baranowski Correctional Center, there is about

1  300 cells that are double bunked there, but in -- they

2  are secure units, internal housing units within that

3  facility.  They also have a secure management unit; and

4  in addition, at MCI-Cedar Junction, we have the

5  Department Disciplinary Unit.

6      Q.  At MCI-Cedar Junction, have there ever been any

7  other units?

8      A.  Yes.  We've had many different units in the past.

9  We've had protective custody units in the past.  We've

10 had secure units; restricted units, we call them, for

11 some high-profile inmates.  We've had security threat

12 group or gang blocks that we called at times in the

13 past.  We've had a variety of different units there.

14     Q.  You testified that Cedar Junction has the

15 Department Disciplinary Unit or I'm going to refer to it

16 from now on as the DDU for short; is that correct?

17     A.  That's correct.

18     Q.  What are the purposes of the DDU?

19     A.  DDU was established in 1992 by then Commissioner

20 Larry Dubois.  It was an alternative or -- to the

21 Department Segregation Unit that we had in existence

22 throughout the 1970s and '80s.

23          The DSU, as we called it, was a

24 classification unit, where inmates were classified to

25 that unit; and we found that it was really a revolving

1    door, and it didn't serve the purpose that it was first

2    intended to.

3              As a result, the commissioner at that time

4    decided to establish a Department Disciplinary Unit.

5    You know, the purposes are punishment, deterrence, or

6    primarily safety and security.  You know, it's --

7    inmates are sentenced to that unit, not classified.

8    They're sentenced based on a disciplinary infraction

9    that they have been found guilty or pled guilty to.

10   Q.   What are the possible sentences to the DDU?

11   A.   It could be a suspended sentences -- sentence,

12   all the way up to a 10-year sentence, which is the max.

13   Q.   Is a 10-year sentence common?

14   A.   No.

15   Q.   What -- you testified that there are Special

16   Management Units at the -- most of the mediums and the

17   two maximum security institutions.  Could you tell me

18   what those units are used for.

19   A.   Primarily for internal housing, you know, for the

20   superintendent to have an option of housing an inmate,

21   who may be disruptive or may be on an administrative

22   segregation status, which means awaiting some sort of

23   classification hearing, awaiting a disciplinary hearing,

24   awaiting an internal investigation, the completion of an

25   internal investigation.  So the SMUs are used by the

```
 1   facility to -- to manage their inmate population.

 2       Q.  Is there a regulation that governs the Special

 3   Management Units?

 4       A.  Yes.

 5             MS. DANIELE:  Your Honor, at this point, I'm

 6   going to seek to introduce the Special Management Unit

 7   Policy.  It's my understanding there's an objection to

 8   this, so...

 9             MS. PIROZZOLO:  Well, we object to this as

10   the inappropriate comparison in this case for the

11   purpose of calculating damages, but we don't have any

12   other objections.

13             THE COURT:  So that objection is overruled.

14             I'm leaving myself the option of deciding

15   what the appropriate comparison, if any, to be made.  So

16   we'll mark this as Exhibit 17.

17             (Exhibit No. 17 was admitted into evidence.)

18             MS. DANIELE:  I have an extra one if the

19   Court wants a copy.

20             THE CLERK:  Yeah, that would be great.

21             MS. DANIELE:  Your Honor, may I approach the

22   witness?

23             THE COURT:  Yes.

24   BY MS. DANIELE:

25       Q.  Deputy Commissioner Bender, I'm handing you
```

1    what's been marked Defendant's Exhibit No. 17.

2              Could you identify that for me, please.

3        A.   That's a 103 CMR 423 Special Management Unit for

4    the Department of Corrections.

5        Q.   And is this the regulation that governs those

6    units that you've been discussing, the Special

7    Management Units?

8        A.   It is.

9        Q.   Does this policy also govern the procedures for

10   placing an inmate in administrative segregation?

11       A.   Yes.

12       Q.   Do you know what those procedures are?

13       A.   Yes, I do.

14       Q.   Could you tell me what those are, please.

15       A.   To place an inmate in a Special Management Unit,

16   the first order of business is to clear that inmate

17   through the health services division, to be screened by

18   a health professional.

19              THE COURT:  Could you do me a favor, before

20   you go there though, are you using Administrative

21   Segregation as the same as SMU or SMU was broader?

22   What --

23              THE WITNESS:  Special Management, it --

24   yeah, it -- it's basically one of the things that you

25   use the Special Management Unit for.  Admin Seg, which

1    is a status of, as I mentioned earlier, there's like six

2    or seven different criteria that you can use it for,

3    which is --

4              THE COURT:  So this is anything that the

5    facility itself feels it needs to segregate these

6    inmates for --

7              THE WITNESS:  That's correct.

8              THE COURT:  -- basically?

9              THE WITNESS:  That's correct.

10             THE COURT:  All right.

11             THE WITNESS:  So after the health screening,

12   the superintendent or a designee must review that

13   inmate's status within 72 hours.  The status must then

14   be reviewed every seven days for 60 days, and then every

15   30 days thereafter by -- usually by the Deputy

16   Superintendent of Classification Treatment; sometimes,

17   the Director of Classification at each facility.

18   BY MS. DANIELE:

19     Q.  Is there a formal hearing associated with the

20   reviews that are done under the -- this regulation?

21     A.  No, there's not.

22     Q.  Deputy Commissioner Bender, I'm going to change

23   course here.

24             THE COURT:  Before you do that, what's the

25   purpose of the reviews?  When you have the review every

```
 1    seven days, what -- what are you checking for?
 2               THE WITNESS:  We -- we started that years
 3    ago, to just ensure that the facility kept on top of
 4    those inmates they placed in the status.
 5               Sometimes you have an inmate, who is
 6    awaiting classification, let's say, out-of-state.
 7    That's not an internal function.  That's a function of
 8    the central classification.  So, it's just an insurance
 9    policy to make sure that the facility knows the status
10    of that inmate is there, and if -- if he is there for
11    any extended period of time, for them to get on the
12    phone with central classification just to sort of prod
13    them to make sure that they know when this inmate's
14    going to be moved.  It's just a process to ensure that
15    that inmate just doesn't fall through a crack and is
16    never found again; that we know somebody's monitoring
17    their case.
18               THE COURT:  So the intention is that this is
19    a temporary assignment?
20               THE WITNESS:  That's correct.  It -- the
21    policy reads that it's a temporary assignment to these
22    units, you know, and that's what it's used for in the
23    vast majority of cases.  There are examples when it has
24    gone beyond a temporary status, based on the difficulty
25    of finding a proper placement for an inmate.
```

```
1              THE COURT:  Thank you.

2  BY MS. DANIELE:

3     Q.   Deputy Commissioner Bender, as Deputy

4  Commissioner of the Prison Division, what was your

5  responsibility with regard to pretrial detainees or

6  52As, as we colloquially have called them, in the

7  department?

8     A.   The -- clarifying, what's my responsibility as it

9  relates to them being housed?

10    Q.   Their acceptance to the department?

11    A.   Okay.  For 52As, basically we had a Court decree

12 from Suffolk County and Middlesex County that dates back

13 to the 1980s that mandated the Department of Correction

14 take in all 52As from those two counties, sort of an

15 unlimited number.  They can send whoever they wanted.

16 Beyond that, it is really the responsibility of the

17 Commissioner of Corrections to accept a 52A into our

18 facilities; and that would usually come about through a

19 request by a respective sheriff in one of the 13 counties

20 that have facilities.

21         They would make a request of the commissioner to

22 house an inmate, and obviously a 52A inmate, as the law

23 prescribes, has to have served prior time in the state

24 system.

25    Q.   How would the commissioner know about a 52A
```

1     request that was made?

2         A.   Through the director of classification, central

3     classification.   That -- that's the main screening body

4     for the department.   They receive those requests from

5     the sheriffs.

6         Q.   And does the classifica -- does anyone in the

7     classification department have authority to accept a

8     52A?

9         A.   You have the director, who is the commissioner's

10    designee that would be -- that would act on -- act for

11    the commissioner, but usually it would be in a

12    con -- they could accept him, but they usually have a

13    conversation with the deputy commissioner at least about

14    that 52A.

15        Q.   Deputy Commissioner Bender, I'm going to draw

16    your attention to Mr. Ford's placement as a 52A.

17               In January of 2007, did he come into the

18    department as a 52A?

19        A.   He was already in the department.   His sentence

20    had expired, and he had charges pending; so, he became a

21    52A at that point in January of '07.

22        Q.   At that time, were you contacted to make a

23    determination as to where he would be housed?

24        A.   I was.

25        Q.   And what was your decision?

1     A.   My decision at the time was to have him housed in

2     the Department Disciplinary Unit at MCI-Cedar Junction.

3     Q.   Why was that?

4     A.   You know, I looked at a lot of information,

5     primarily his entire incarceration record, including his

6     previous incarcerations, and Mr. Ford has a very serious

7     record, including stabbing of inmates in the 1980s,

8     1990s, 2000.

9          In 2002, he had a very serious incident in a DDU

10    that resulted in the maximum sentence in the DDU, ten

11    years for stabbing two correctional officers as well

12    as -- as well as holding a nurse hostage.

13         In addition to that, in 2005, while he was still

14    in the DDU, but housed in Block 10, due to repairs that

15    were under -- underway in DDU, we had -- we had to empty

16    the entire unit out due to some malfunctioning that was

17    occurring, he stabbed an inmate in 2005 while in Block

18    10.

19         Based on the entire history, his entire history,

20    my serious concerns about safety and security of staff

21    and inmates, I felt that the most appropriate placement

22    for him at that time was at DDU.

23    Q.   In June of 2007, Mr. Ford had been out on bail

24    and was returned to the department.

25              Were you involved in his decision -- in the

1   decision of where to house him when he was returned in

2   2007?

3       A.   I was the commissioner -- commissioner at the

4   time so that my acting deputy commissioner would have

5   been -- had day-to-day operations in that, but certainly

6   I was informed of his coming back and that his placement

7   at that time would continue to be the DDU.

8       Q.   When --

9            THE COURT:  May I ask you then, so you're

10  saying that there was a separate assessment in January

11  of '07 that he was not kept in the DDU to continue

12  his -- the 10-year sentence that he had?

13           THE WITNESS:  He certainly -- well, I mean I

14  knew that he had that still when he left in

15  January -- or when his sentence expired in January of

16  '07, he still had time remaining on his DDU sentence;

17  so, that was certainly a factor.  I knew that he could

18  still be placed in there based on that.

19           I had sought advice at that time from the

20  legal department and asked them whether -- where I could

21  house him and whether that would be an appropriate

22  placement.  I was told that I could house him there.  I

23  looked at all the options of where I could place him at

24  the time, and that was the only one I felt that was

25  reasonable, based on his serious concerns for his

1 penchant for violence that he has demonstrated over the

2 last 30 years.

3              THE COURT:  When someone's put in the DDU

4 for a disciplinary infraction, is there a -- at that

5 point, there's a process?

6              THE WITNESS:  That's correct.

7              THE COURT:  And there's an appeal process?

8              THE WITNESS:  That's correct.

9              THE COURT:  Okay.  So you didn't have any

10 new process in connection with the January '07?

11              THE WITNESS:  No, we did not.

12              THE COURT:  All right.  So you were relying

13 on the earlier sentence?

14              THE WITNESS:  That's correct.

15              THE COURT:  Okay.  Thank you.

16 BY MS. DANIELE:

17    Q.  Deputy Commissioner Bender, in June --

18              THE COURT:  I'm sorry.  You were up to June

19 '07.

20              MS. DANIELE:  Thank you, your Honor.

21 BY MS. DANIELE:

22    Q.  In June of 2007, were the same reasons used to

23 return Mr. Ford to the DDU?

24    A.  Yes, they were.

25    Q.  And in June of 2007, did you, again, make a new

1    determination that housing in the DDU was the most

2    appropriate housing?

3        A.   I did.

4        Q.   Was there anything else that you considered in

5    June of 2007?

6        A.   I looked at all the options.  I am -- you know, I

7    tour every facility, so I am -- I'm very well briefed on

8    what's available at all of our facilities, including the

9    SMUs at all the medium and maximum security facilities.

10           The department 10 -- I mean, in Block 10.  In

11   Block 10, he was able to stab another inmate, and

12   that's -- the reason is that we had grill doors in Block

13   10; whereas, in the Department Disciplinary Unit, we

14   have solid doors.  There's very limited movement in the

15   DDU.  Based on his serious threat to security, I felt

16   that the DDU was the most -- was the only placement

17   option I had at the time.

18       Q.   And you felt that way despite the fact that he

19   had been in the community for three months?

20       A.   Yes.  I didn't make that decision for him to go

21   in the community.  Someone else did, but while he was in

22   our prison setting, based on his history that he has had

23   with us and demonstrated, you know, two years prior,

24   where he had, you know, stabbed an inmate, and five

25   years prior where he had seriously stabbed two officers

1   and taken a nurse hostage, based on that and his entire

2   history -- usually you find an inmate where early on the

3   violence occurs, and as they get older, the violence

4   sort of lessens.  In this case, we've had violence

5   throughout all three decades, and I felt that that was

6   the most appropriate placement for him in order to

7   ensure staff and inmate safety.

8      Q.  Deputy Commissioner Bender, was Albert Ford the

9   only 52A or pretrial detainee that was ever housed in

10  the Department Disciplinary Unit?

11     A.  No, he was not.

12     Q.  Other inmates that were placed there, why did you

13  place them there?

14     A.  Every case is an individual case.  You've got to

15  look at the entire record of that inmate and what threat

16  he poses to the safety and security of the facility.

17  Each one is an individual decision.  There are some

18  inmates who became 52A were released from DDU because it

19  was our determination that based on their history, they

20  did not pose a threat to the safety and security of the

21  facility.

22      In Mr. Ford's case, as I mentioned, the penchant

23  for violence, even after the violence, he's had

24  disciplinary report after disciplinary report, for

25  possession of weapons; for threatening staff, including

1    nurses several times; for contraband.  He has always

2    been a disruptive force within the DDU, and that's the

3    reason that you do it in an individual basis; and in his

4    case, we felt that was the most appropriate placement

5    for him.

6       Q.  What benefits do the DDU offer for safety and

7    security purposes in housing an inmate like Mr. Ford?

8       A.  As I mentioned earlier, the solid door; whereas,

9    he does not have that in the Block 10, we have that in

10   the DDU.  It's -- the movement within that unit is very

11   restricted.  You're in handcuffs and leg irons.  Staff

12   there are better trained to deal with that type of

13   inmate, an inmate who has been very disruptive in the

14   past.  So overall, the safety and security aspects of

15   that unit is most appropriate for a serious inmate that

16   has demonstrated a penchant for violence in the past.

17            THE COURT:  If someone is given a ten-year

18   sentence to the DDU, do you review that at any time?

19   Are there situations where you can decide even though

20   the sentence was ten years that it should be shortened?

21            THE WITNESS:  Yes.  There are monthly

22   reviews within the Department Disciplinary Unit, and the

23   inmate is supposed to come out for those reviews to

24   review his -- his case.

25            There have been times in the past where the

1  superintendent has recommended a lessening of a

2  sentence.  Usually it's near the end of that sentence

3  when, you know, the last year or so, based on a

4  number -- we might have the DDU that is -- is filled up,

5  and we have more inmates, who are stationed around the

6  state in SMUs waiting to come in, and at times we have

7  reduced sentences of those inmates in there.

8           THE COURT:  So Mr. Ford was reviewed monthly

9  in the 10-year period?

10          THE WITNESS:  Yeah.  There's a monthly

11 review in the department -- in the DDU where he's

12 supposed to come out.  If he does not come out, he loses

13 credit for that month, and he does not get credited for

14 the month he's in the DDU; but if he comes out, he

15 remains free of disciplinary reports, he gets credited

16 for each month, and then obviously his sentence is

17 expiring at that time.

18          You know, that's one -- that's one of the

19 debates between the DSU and the DDU.  There's some

20 drawbacks for the DDU.  DDU is a fixed sentence.

21 There's a set amount of time; whereas, a DSU model is

22 sort of open-ended.  It could last longer than ten years

23 in some cases; but in -- for the DDU, there's a fixed

24 time that an inmate is in there, and they are -- they

25 have monthly reviews while they're in there.

1           THE COURT:  What does coming -- when you say

2    "he comes out," what does that mean?

3           THE WITNESS:  That means his sentence is

4    expired.  And so that if he's -- for instance, if he is

5    serving a two-year DDU sentence, and he serves that

6    entire two years, he complies with all the rules and

7    regulations in that unit, he attends his monthly

8    reviews, at the end of two years, he's released to

9    general population of the facility or of another

10   facility.

11          THE COURT:  Within those two years,

12   whoever's reviewing him can decide to shorten the

13   sentence?

14          THE WITNESS:  Not the -- not the people

15   within the review.  You know, those are staff that work

16   within the DDU, but the superintendent of that facility

17   could make a recommendation to the Deputy Commissioner's

18   Office to have that sentence lessened in some regard.

19   And as I said earlier that it's usually near the end of

20   the sentence.  So, I mean it would be rare a year in or

21   two years in for someone doing a ten-year sentence for

22   them to come up and say, we would like that sentence to

23   be shortened, but it usually occurs at the end of the

24   sentence.

25          THE COURT:  So when you say they come out

1    monthly, that's to meet with the review panel?

2              THE WITNESS:  That's what they're supposed

3    to do, yes.

4              THE COURT:  But they're still housed in the

5    DDU?

6              THE WITNESS:  That's correct.

7              THE COURT:  And who does the review panel

8    consist of?

9              THE WITNESS:  I'm going to let

10   the -- someone else answer that.  I think it's the

11   director of -- the administrator of the unit, who -- we

12   have an administrator of the DDU, as well as other staff

13   within that unit that meet with the inmate on a monthly

14   basis.

15             THE COURT:  Thank you.

16   BY MS. DANIELE:

17     Q.  Deputy Commissioner Bender, if you were unable to

18   house Mr. Ford in the DDU, in January of 2007, what

19   would you -- where would you have placed him?

20             MS. PIROZZOLO:  Objection, your Honor.

21             THE COURT:  Overruled.

22             THE WITNESS:  If I had no other options for

23   Mr. Ford at that time -- if I did not have the DDU, the

24   only place I could place him at that time would be Block

25   10, the west wing segregation unit of MCI-Cedar

1  Junction.

2  BY MS. DANIELE:

3     Q.   Why would you choose Block 10 rather than another

4  SMU throughout the Commonwealth?

5     A.   Because it's my opinion, even though we have the

6  drawbacks of those grill doors within Block 10, it's

7  still the most secure setting within the Department of

8  Corrections that -- that we have; and as a result of

9  that, if I did not have DDU as a possibility, that would

10  be the only option I think I could have had to use at

11  the time.

12  BY MS. DANIELE:

13     Q.   As deputy commissioner, and subsequently as

14  commissioner -- acting commissioner, would you have ever

15  approved Mr. Ford for general population at that time?

16     A.   No, I would not.

17     Q.   Deputy Commissioner Bender, could you describe to

18  this Court what a security level A is.

19     A.   Security level A is a designation we established

20  several years ago to sort of, again, keep track of those

21  inmates that pose the most serious threat of escape or

22  violence within our institutions.

23        It was just -- and prior to establishing the

24  designation, it was really up to the superintendents of

25  each facility to keep that designation.  There were

1    problems with inmates transferring from one facility to

2    the next of some of those falling through the cracks.

3    So we established a designation and basically stated

4    that those inmates -- and we had a criteria of when the

5    escape had to occur or a violence had to occur that we

6    place an inmate on as a level A; and in that status,

7    they would have to be monitored more closely.

8         If they were leaving the facility, they'd have to

9    be -- there would have to be a four-man escort with

10   that.  Under normal circumstances, we have a two-man

11   escort leaving the facility.  We wanted, in this case,

12   to ensure safety and security to the public to have four

13   officers on that individual.

14   Q.  Who makes the determination of whether -- who

15   identifies an inmate as a level A?

16   A.  It starts internally at each facility with the

17   inter perimeter security team.  They're our security arm

18   of the facility.  They monitor the inmate's record and

19   the like; makes a recommendation to the superintendent,

20   who then makes a recommendation, as I understand it, to

21   the chief of investigative services; and that's when

22   it -- a designation of level A is established.

23   Q.  So there are a number of different arms of the

24   department involved --

25   A.  Yes.

1    Q.  -- correct?

2         In 2007, was Mr. Ford a level A?

3    A.  Yes, he was.

4    Q.  Deputy Commissioner Bender, yesterday there was

5    some testimony from Dr. Stuart Grassian that inmates

6    should not be released to the streets directly from

7    segregation.

8         In your professional opinion, is it an ideal

9    situation to release inmates directly from segregation

10   or the DDU to the streets?

11   A.  No, it's not.

12   Q.  And why is that?

13   A.  The -- the last thing we want to do is release an

14   inmate from a setting like a DDU or a segregation to the

15   streets without that inmate having the benefit of going

16   through various levels of a facility, including medium

17   security, where there is a great deal of programming

18   that he can get involved with.  Minimum security where

19   he could get involved with community work crews that

20   would begin his reintegration to the street, as well as

21   prerelease, the last 18 months of his incarceration,

22   where he could actually work in a job.

23        We feel that's the most ideal process for an

24   inmate to go through; and the fact is the vast majority

25   of inmates go through that process.  They comply with

```
 1   the rules and regulations of the institution, and they

 2   find themselves at the end in a prerelease status before

 3   they're released to -- on parole or the expiration of

 4   their sentence; but, unfortunately, there are some

 5   individuals that, you know, for whatever reasons, do not

 6   comply with the rules and the regulations, and involve

 7   themselves with serious violations, including security

 8   threat group violations, which Mr. Ford has been

 9   involved with in the past, gang problems, where he has,

10   you know, threatened other inmates.

11          MS. PIROZZOLO:  Your Honor, I object to

12   this.  It's all hearsay.

13          THE COURT:  What did you decide about the

14   disciplinary reports?  I mean are we dealing -- I need

15   to deal with something concrete here.

16          MS. PIROZZOLO:  Yeah, I mean we object to

17   introduction of inadmissible hearsay, and all of this

18   testimony about what he has heard is inadmissible

19   hearsay.

20          MS. DANIELE:  It's not simply what he's

21   heard though.  It's what he bases his decisions on and

22   what he -- why Mr. Ford is not appropriate for other

23   housing or release -- direct release from -- to the

24   streets from any other housing.

25          MS. PIROZZOLO:  There has been no foundation
```

1  established that Mr. Bender knows anything about any of

2  this.

3            THE COURT:  That objection is sustained.

4            If you want to describe the process

5  generally, that's all right; but if -- I'm not going to

6  take the analysis of Mr. Ford without a foundation.

7  BY MS. DANIELE:

8    Q.  Deputy Commissioner Bender, without discussing at

9  this point Mr. Ford directly, why would you release an

10 inmate directly from segregation or the DDU to the

11 streets?

12   A.  We found that that -- again, that inmate refused

13 to comply with the rules and regulations of the

14 facility; was seriously assaultive to staff and other

15 inmates; and unfortunately, on a few occasions, inmates

16 who demonstrate that, the most appropriate release at

17 the time is from the DDU or segregation units, the only

18 place we can release them.  If we try to release them

19 back to a general population to get them prepared for

20 eventual parole or wrap-up, you know, they get involved

21 with other incidents where other inmates and staff lives

22 are in danger, and it's my job to protect other staff

23 and other inmates; and I just can't do that so...

24            THE COURT:  Well, what happens if -- what's

25 the process if someone's DDU sentence expires around the

```
1    time that their criminal sentence expires; so, you don't

2    have 18 months, unless you hold them longer?  What do

3    you do then?  Do you shorten the DDU sentence by

4    18 months?

5              THE WITNESS:  I'm sorry.  I didn't quite --

6              THE COURT:  Somebody -- somebody gets a DDU

7    sentence.  It's -- right?  They've committed an

8    infraction, and there's a sentence.  Let's say, two and

9    a half years.

10             THE WITNESS:  Okay.

11             THE COURT:  All right.  That two and a half

12   years coincides with the end of their underlying

13   criminal sentence; so, they're going to be released on

14   "X" date, which coincides with the expiration of the DDU

15   sentence and their underlying criminal sentence, so that

16   they don't have an additional 18 months or -- to go to

17   medium security, minimum security, prerelease.

18             THE WITNESS:  Okay.

19             THE COURT:  What -- what do you do?

20             THE WITNESS:  They're released right to the

21   streets.

22             THE COURT:  They are.

23             THE WITNESS:  Yes, they are.

24   BY MS. DANIELE:

25       Q.  Deputy Commissioner Bender, would any of
```

1   those -- of the inmates that the judge was just

2   referring to, would an inmate ever be released from the

3   DDU early if his DDU sanction and criminal sanction were

4   to expire at the same time?

5       A.   We have done that in the past due to -- again,

6   it's all predicated on the review of that inmate,

7   whether they are -- have refrained from D reports or are

8   not a management problem within the DDU.  We had

9   released inmates early so they can partake in some of

10  the re-entry efforts that we have in the department.  We

11  also have some re-entry efforts -- we have a whole

12  re-entry department now that actually go into the

13  facility to work with the inmates, even if they're in

14  the DDU, or they're in a segregation unit in order to

15  assist them in some re-entry planning, to get them ready

16  for release.

17      Q.   How frequently do you release inmates from the

18  DDU directly to the street?

19      A.   Not often.

20      Q.   In January of 2007, if Mr. Ford had not had

21  outstanding charges, would he have been released

22  directly from the DDU to the streets?

23      A.   Yes, he would.

24      Q.   Why would that have been?

25      A.   Because his sentence had expired.

1    Q.  His criminal sentence?

2    A.  His criminal sentence had expired, yes.

3    Q.  Would you have considered him for early release

4    from the DDU to participate in programs?

5    A.  No, I would not.

6    Q.  Why not?

7    A.  Just because of the violence that he has

8    demonstrated over his incarceration.

9              MS. PIROZZOLO:  Your Honor, I object.

10             THE COURT:  Overruled.

11   BY MS. DANIELE:

12   Q.  You can go ahead.

13   A.  I just said because of the violence that he has

14   demonstrated over his incarceration.

15   Q.  Deputy Commissioner Bender, during your testimony

16   regarding Mr. Ford's placement in the DDU in

17   January -- in both January and June of 2007, you

18   testified that he had an outstanding DDU sentence for a

19   disciplinary infraction of staff assault and hostage

20   taking; is that correct?

21   A.  That's correct.

22             MS. DANIELE:  Your Honor, at this time, I

23   want to introduce the disciplinary report into evidence.

24   It is objected to.

25             THE COURT:  Okay.  What's the objection?

```
 1                MS. PIROZZOLO:  The objection is hearsay,
 2      your Honor, and prejudice.
 3                THE COURT:  Huh?
 4                MS. PIROZZOLO:  And prejudice.
 5                THE COURT:  Can I see?
 6                MS. DANIELE:  The report?
 7                MS. PIROZZOLO:  And I would add relevance.
 8                THE COURT:  So why is this not hearsay?
 9                MS. DANIELE:  Your Honor, it's a business
10      record kept in the regular course of business by the
11      Department of Corrections.  It is the DDU hearing packet
12      that Mr. Ford received at the time in the process --
13      that he received at that time and has kept in the
14      regular course of business; and it's kept in the regular
15      course of the Department's business.
16                MS. PIROZZOLO:  Your Honor, I mean, this
17      is -- you know, you can see how thick it is, and it's
18      filled with hearsay statements, including handwritten
19      notes from correction officers, all different sorts of
20      hearsay statements, and in our motion in limine, filed
21      in the case with regard to these types of reports, we
22      cited several cases in which courts have consistently
23      declined to admit incident reports prepared by prison
24      guards in light of the self-serving nature of such
25      reports; though, I am happy to give the Court those
```

1    cites, or they're in our motion in limine.

2              THE COURT:  I think for present purposes,

3    I'm going to admit it just as a reflection of what's in

4    the records and not for the truth of the matter asserted

5    in there.

6              MS. DANIELE:  Okay.  I would ask also, your

7    Honor, that it be -- it be accepted for rebuttal of what

8    Mr. Ford testified to occurred on this incident and what

9    it --

10             THE COURT:  No, I'm not accepting this as

11   for the truth of the matters asserted in here, but I

12   will accept it as this is what is reflected in his

13   records at the prison.

14             MS. DANIELE:  Thank you, your Honor.

15             If there is -- if there's no question on

16   authenticity, and it's just going to be accepted, then I

17   have no further questions.

18             THE COURT:  Okay.  So this is Exhibit 18,

19   accepted for the limited purpose of reflecting the

20   contents of the record -- of Mr. Ford's records.

21             (Exhibit No. 18 was admitted into evidence.)

22                  CROSS-EXAMINATION

23   BY MS. PIROZZOLO:

24      Q.  Good morning, Mr. Bender.

25      A.  Good morning.

```
 1      Q.  Now, I'd like to talk with you about those points

 2   in 2007 and 2008 when you addressed Mr. Ford's

 3   situation.  Can you do that?

 4      A.  Okay.

 5      Q.  Okay.  And I want to start with January 2007.

 6   Okay?

 7      A.  Okay.

 8      Q.  Okay.  And that is the period at which Mr. Ford's

 9   time of unconstitutional confinement in the DDU began;

10   correct?

11      A.  That's your terminology, not mine.

12              THE COURT:  I don't think he thinks it was

13   unconstitutional.

14   BY MR. PIROZZOLO:

15      Q.  That's what the Court has held; right?

16      A.  Okay.

17      Q.  All right.  Now, you were the acting deputy

18   commissioner of the prison division at that time;

19   correct?

20      A.  I was the Deputy Commissioner of the Prison

21   Division.

22      Q.  And in January, you received an email from

23   Ms. Carol Mici about Mr. Ford's situation; correct?

24      A.  Yes, I did.  That's correct.

25      Q.  Okay.  And in that email, Mrs. Mici told you that
```

1    Mr. Ford was scheduled to complete his sentence on

2    January 6, 2007; correct?

3         A.   I can't remember the exact -- if you have an

4    example of that, I can take a look at that email.  I

5    don't recall it.

6                   MS. PIROZZOLO:  May I approach, your Honor?

7                   THE COURT:  Yes.

8                   (Witness handed document.)

9                   THE WITNESS:  Thank you.

10   BY MS. PIROZZOLO:

11        Q.   And she also told you -- well, let me -- let me

12   stand on my question.

13            She told you that Mr. Ford's sentence was going

14   to wrap up on Saturday, January 6, 2007; correct?

15        A.   His release date scheduled, yes, on Saturday,

16   January 6, 2007; that's correct.

17        Q.   And she also told you that she wasn't going to

18   accept Mr. Ford on 52A status; correct?

19        A.   That's correct.

20        Q.   Okay.  And as a 52A prisoner, he would remain in

21   the custody of MCI-Cedar Junction; correct?

22        A.   Her decision was to remain in custody at that

23   time in the Department of Correction, yes, and at

24   MCI-Cedar Junction, that's correct, although it doesn't

25   say MCI-Cedar Junction.

1    Q.  But you knew at that point in time that Mr. Ford

2  was in your custody and that his status was changing

3  from a convicted prisoner to a pretrial detainee;

4  correct?

5    A.  I did.  That's correct.

6    Q.  Now, let's talk about some of the things you did

7  not do when you learned of his change in status.  Okay?

8    A.  Okay.

9    Q.  Okay.  At the time you did not speak to the

10  superintendent of MCI-Cedar Junction about where

11  Mr. Ford should be housed as a pretrial detainee;

12  correct?

13    A.  I can't recall who I spoke to at that time.

14    Q.  Okay.  Sir, I put in front of you your

15  deposition.

16    A.  Okay.

17    Q.  Could you turn to page 107.  Line 18.

18    A.  107.  I'm sorry.  Okay.

19    Q.  Okay.  And Mr. Syrett asked you this question:

20  "You don't think you would have talked to the

21  superintendent of Cedar Junction?"

22       Do you see that?

23    A.  Yes, I said it's a possibility, but I don't think

24  I did.  I don't recall speaking to him, but it's a

25  possibility.

1    Q.   Now, you also did not speak to the person in

2  charge of DDU where Mr. Ford had been housed most

3  recently; correct?

4    A.   That's correct.

5    Q.   Now, both of those people, the superintendent of

6  MCI-Cedar Junction and the director of the DDU would

7  have had more information about Mr. Ford's recent

8  behavior than you; correct?

9    A.   They would have, yes.

10    Q.   Yet, you didn't have a single conversation with

11  them or anyone else about where Mr. Ford should be

12  housed?

13    A.   That's not correct.   I said there's a possibility

14  I spoke to the superintendent.   I just didn't remember.

15  I did not speak to the administrator; that's for

16  certain.   I believe might have -- I spoke to Phil Silva,

17  who is the director of discipline, who would be familiar

18  with Mr. Ford's background.   I spoke to legal, as I

19  mentioned earlier; and as I said, I'm not -- I don't

20  recall specifically who I spoke to at that time.

21    Q.   You spoke to legal.   Do you think they knew what

22  Mr. Ford's situation was?

23    A.   I had no idea.

24    Q.   Do you think they knew what Mr. Ford's situation

25  was in the DDU?   I think you said you spoke to the

1    general counsel of the DOC.

2         Do you think Ms. Ankers knew?

3    A.   I have no idea.  I had no idea what she knew.

4    Q.   Okay.  Well, she didn't tell you about Mr. Ford's

5    situation and his behavior in the DDU, did she?

6    A.   I can't recall the conversation.

7    Q.   Okay.  Now, the other thing you did not do is

8    review Mr. Ford's files in January, 2007; correct?

9    A.   I can't recall if I did or not.  I -- I could

10   have, but I'm not certain.

11   Q.   So you -- you don't have any recollection of

12   going and looking at the document that Ms. Daniele just

13   introduced?

14   A.   I have -- as I mentioned earlier, there's 11,000

15   inmates, 120 in the DDU.  I'm responsible for all of

16   them.  I can't recall what I looked at in January of

17   '07.

18   Q.   Okay.  And with 11,000 inmates, and you didn't

19   talk to anybody; you don't recall looking at records.

20   It's kind of hard to decide what the appropriate

21   placement is, isn't it?

22   A.   Not at all.  Not with Mr. Ford, because I'm well

23   aware of Mr. Ford.  I spoke to Mr. Ford in my tours at

24   MCI-Cedar Junction on several occasions.  I know what

25   his record is.  I know the records of inmates in that

```
 1   unit.  I'm well versed in what happens within DDU.  I
 2   had numerous conversations with the superintendent.
 3               MS. PIROZZOLO:  Your Honor, I move to
 4   strike.
 5               THE COURT:  I think you've answered the
 6   question.
 7               The motion to strike allowed.
 8   BY MS. PIROZZOLO:
 9     Q.  Now, the other thing you did not consider when
10   you decided Mr. Ford should stay in the DDU is whether
11   he would be able to adequately prepare to defend himself
12   against criminal charges; correct?
13     A.  I felt that he would be able to adequately
14   prepare himself.  I think I mentioned that in the
15   deposition as well.
16     Q.  You didn't consider it specifically; correct?
17     A.  No, I can't say it's correct.  I just -- I just
18   knew from his status that he had access to the law
19   library and to attorneys within that unit, as other
20   inmates, many inmates in that unit are preparing for
21   criminal trials.
22     Q.  Okay.  What's in the law library in the DDU?
23     A.  There's a room associated with each tier
24   that's --
25     Q.  What -- what kind of books are in it?
```

1    A.   You know, legal books.  I'm not familiar with the

2    exact ones.

3    Q.   Are you familiar with any of them?

4    A.   I haven't -- I haven't been in there; so, I can't

5    say I am.

6    Q.   So how would you know that it's adequate to help

7    him prepare for his criminal case?

8    A.   Because our legal division has indicated that the

9    books in there are adequate.

10   Q.   Okay.  But you don't know?

11   A.   Well, I know, you know, that they're there.  So,

12   I'm familiar with the fact that we provide those -- that

13   access for inmates who are housed in DDU.

14   Q.   Are there case books there?

15   A.   I'm not familiar exactly what is there.

16   Q.   Now -- now I want to talk about the things you

17   did consider in January 2007, when you kept Mr. Ford in

18   DDU.  Okay?

19   A.   Okay.

20   Q.   So you did consider that Mr. Ford had a DDU

21   sentence; correct?

22   A.   Yes.

23   Q.   Okay.  Now, I want to focus on that sentence.

24   That sentence involved -- the DDU sentence involved an

25   incident with prison guards; correct?

1    A.   And a nurse.

2    Q.   Okay.  And that was the incident for which

3  Mr. Ford was awaiting trial; correct?

4    A.   That's correct.

5    Q.   So basically in 2007, you had to -- you were

6  housing Mr. Ford as a pretrial detainee for the same

7  thing he was awaiting trial on; correct?

8    A.   Could you repeat that.

9    Q.   Mr. Ford's DDU sentence was directed to the same

10  conduct for which he was awaiting trial; correct?

11    A.   That's correct.

12    Q.   Okay.  So he was presumed innocent of that

13  conduct when he was in your custody; correct?

14    A.   That's correct.

15    Q.   But in January 2007, you decided he should be

16  punished for that conduct; correct?

17    A.   I decided that he still posed a serious threat to

18  the orderly running of the facility as well as safety of

19  our inmates and staff, and that's why he --

20    Q.   Punishment was an element of that?

21    A.   Absolutely.  I can't deny that there's a punitive

22  aspect to it, but it's primarily safety and security.

23    Q.   Now, after you made that decision to keep

24  Mr. Ford in the DDU, you never notified him about that,

25  did you?

1    A.  I didn't, no.

2    Q.  You didn't direct anyone to notify him about

3    that, did you?

4    A.  Not that I can recall, no.

5    Q.  Okay.  So you just left Mr. Ford in his cell

6    wondering why he was still in the DDU, even though he

7    had completed his criminal sentence?

8    A.  I'm not certain who talked to him about that.

9    Somebody obviously had to notify him that he was staying

10   there.  I didn't.

11   Q.  You don't know anything about that, do you?

12   A.  I'm not sure who spoke to him, as I said.  As I

13   sit here right now, I'm not sure.  That's four years

14   ago, so I'm not certain.

15   Q.  You don't know if anybody told him why he was in

16   the DDU, do you?

17   A.  I do not.

18   Q.  Now, in March 2007, a judge of the Superior Court

19   let Mr. Ford out into the community; correct?

20   A.  That's correct.

21   Q.  The judge obviously did not agree with your

22   assessment of Mr. Ford's dangerousness; correct?

23   A.  That's correct.

24   Q.  Now, I'd like to focus on June 2007.  Can we do

25   that?

1    A.   Okay.

2    Q.   Okay.  So, in June 2007, you had to face another

3  decision about where to house Mr. Ford; correct?

4    A.   That's correct.

5    Q.   Okay.  Now, let's talk, again, about what you did

6  not do in June 2007.  You did not speak to the

7  superintendent at MCI-Cedar Junction, correct, about

8  Mr. Ford?

9    A.   As I said earlier, I don't recall who I spoke to

10 then.

11   Q.   You did not speak with the DDU supervisor about

12 Mr. Ford; correct?

13   A.   I'm pretty certain I didn't speak to her, no.

14   Q.   And, in fact, you can't recall discussing

15 Mr. Ford's placement with anyone in June 2007; correct?

16   A.   No, I said earlier that it could have been Phil

17 Silva that I spoke to, a possibility of the

18 superintendent.  I'm just not sure who I spoke to, if

19 anybody.

20   Q.   Well, what you said at your deposition was you

21 just don't recall any conversation; isn't that what you

22 said?

23   A.   I don't recall.  That doesn't mean it didn't

24 happen.  I just can't recall if it did or not.

25   Q.   You also did not consider the fact that Mr. Ford

1   was a pretrial detainee; correct?

2       A.   I considered it since I knew that he was a

3   pretrial detainee at that time, but to me the issue was

4   safety and security again.

5       Q.   The fact that he was a pretrial detainee did not

6   impact your decision of where to house him; correct?

7       A.   It did.   I looked at Mr. Ford's past behavior,

8   and as a result, I felt that DDU was the most

9   appropriate placement.

10      Q.   And you did know about -- you did intend that

11  Mr. Ford continue to serve his DDU sanction; correct?

12      A.   Yes.

13      Q.   And you did intend Mr. Ford continue to be

14  punished for the activity that led to that sanction;

15  correct?

16      A.   You know, he's in there for safety and security

17  issues, and punitive aspect is a part of it.

18      Q.   Now, in June 2007, you didn't notify Mr. Ford of

19  the basis of his being held in the DDU; correct?

20      A.   I don't believe I did, no.

21      Q.   So at your direction, DOC employees simply placed

22  Mr. Ford in solitary confinement without any notice to

23  him whatsoever about why he was being put there?

24              MS. DANIELE:   Objection, your Honor.   It's

25  not solitary confinement.   There has been no testimony

```
 1   as to that.
 2                   THE COURT:  Rephrase.
 3                   MS. PIROZZOLO:  I'll rephrase.
 4   BY MS. PIROZZOLO:
 5       Q.  So in June 2007, at your direction, DOC employees
 6   simply placed Mr. Ford in DDU without any notice at all
 7   to him about why he was being put there?
 8       A.  I don't recall if he received any notice.  I
 9   didn't tell anybody to give him any notice, so, no.
10       Q.  Now, I'd like to talk about July of 2007.  Okay?
11       A.  Okay.
12       Q.  Now, that's when Mr. Ford was about four months
13   into his wrongful detainment in the DDU.  Okay?
14       A.  Okay.
15       Q.  In July 2007, your office received a letter that
16   Mr. Ford wrote to Katherine [sic] Dennehy; correct?
17       A.  When -- when is this?
18       Q.  July 2007.
19       A.  Commissioner Dennehy was not there in July.  She
20   left in April of 2007.
21       Q.  Did you receive a letter that Mr. Ford wrote to
22   her office?
23       A.  Again, I don't recall.
24                   (Document handed to the witness.)
25                   THE WITNESS:  Yes, I did.
```

1   BY MS. PIROZZOLO:

2       Q.   And in the letter -- well, let me back up.

3           Ms. Dennehy's office gave Mr. Ford's letter to

4   you to do something about it; correct?

5       A.   No.   Actually, I was acting commissioner at this

6   time, so what I had done -- this letter did come into

7   the office.   Obviously, Mr. Ford was mistaken thinking

8   that Ms. Dennehy was still the commissioner.   I took the

9   letter, and I referred it to Ken Nelson, who is the

10  assistant deputy commissioner of the southern sector --

11      Q.   Okay.

12      A.   -- in terms of the Walpole and DDU.

13      Q.   So you got Mr. Ford's letter at the time;

14  correct?

15      A.   Well, the office did for sure.

16      Q.   And in the letter, Mr. Ford asked the

17  commissioner -- well, let me back up.

18          He complained about his wrongful detention in

19  DDU; correct?

20      A.   Can I read it first?

21      Q.   Sure.

22              (Pause.)

23      A.   Okay.   I'm sorry.   Can you repeat that question.

24      Q.   Sure.   Mr. Ford, in the letter said he was

25  wrongfully being held in the DDU; correct?

1      A.   Yes.

2      Q.   And he asked Ms. Dennehy to correct this

3  wrongdoing; correct?

4      A.   Yes.

5      Q.   But you didn't do anything about these concerns

6  when this letter was sent to your office?

7      A.   I knew at the time that the proper placement for

8  Mr. Ford was the DDU; so, I was not going to change that

9  decision based on this letter.

10     Q.   Now, I'd like to talk about September 2010.

11 Okay?

12     A.   September 2010?

13     Q.   Yes.

14     A.   Okay.

15     Q.   Now, that's the date -- well, on September 30th,

16 the judge issued the summary judgment order in this

17 case; correct?

18     A.   Okay.

19     Q.   Did you review the Court's decision?

20     A.   I did not, no.

21     Q.   The Court found that the DOC's policy upholding a

22 pretrial detainee in DDU based on a prior sentence was

23 unconstitutional; correct?

24     A.   That's what I understand, yes.

25     Q.   And more specifically, the Court found that you

1    violated Mr. Ford's substantive due process rights and

2    procedural due process rights; correct?

3        A.   Okay.

4        Q.   Well, do you know that?

5        A.   I know it -- I do know that, yes.

6        Q.   The Court also held that Mr. Ford was entitled to

7    a hearing before being held in the DDU; correct?

8        A.   Okay.

9        Q.   Do you know that?

10       A.   I know it now.

11       Q.   Now, as of -- so as of September 30, 2010, a

12   federal court had held that Mr. Ford was entitled to a

13   hearing before he could be held in the DDU; correct?

14       A.   Okay.

15       Q.   Now, following the receipt of that order by the

16   Court, Mr. Ford nevertheless continued to be held in the

17   DDU; correct?

18       A.   Yes.

19       Q.   No hearing about his placement was ever held

20   after the Court issued its order; correct?

21       A.   I left in November of 2010, so I'm not sure what

22   happened after that.

23       Q.   Okay.

24       A.   I left on November 2nd.

25       Q.   Okay.  So between September 30, 2010, and

 1    November 2nd, while you were in charge, no hearing was

 2    ever held for Mr. Ford; correct?

 3        A.   That's correct.

 4        Q.   So, after being explicitly told that you were

 5    supposed to have a hearing, you didn't hold a hearing?

 6        A.   Obviously, that's true.

 7        Q.   And you didn't instruct anyone that reported to

 8    you to hold a hearing; correct?

 9        A.   I did not, no.

10        Q.   So Mr. Ford was not placed in administrative

11    segregation in 2010; correct?

12        A.   As I said after -- after November 2nd, I had no

13    idea what happened; so up til November 2nd, he wasn't.

14        Q.   Just to be clear, your counsel was allowed to ask

15    you kind of what you would have done if DDU wasn't

16    available.  Do you remember those questions?

17        A.   I do.

18        Q.   And I objected to those questions.

19             Now -- now, I'm asking you why didn't you put him

20    in admin -- why didn't you do whatever process you just

21    described in September or October 2010?

22             MR. DANIELE:  Your Honor, I'm going to

23    object at this point.  The Court gave us a specific

24    amount of time to determine what to do with Mr. Ford.

25             Mr. Bender has testified that he left on

 1    November 2nd of 2010 and was not involved in that.  So,

 2    at this point, he -- the -- the implication is that he

 3    continued to violate Mr. Ford's rights.

 4              THE COURT:  No.  I'm not taking it

 5    as -- well, the facts are the facts as to what happened

 6    after my order, and we have the record on that, but I

 7    think counsel is allowed to explore why changes were not

 8    made.

 9    BY MS. PIROZZOLO:

10    Q.  Now, as of the time you left, no hearing had been

11    held; correct?

12    A.  That's correct.

13    Q.  Okay.  And is it true you don't know anything

14    about what happened to Mr. Ford afterwards?

15    A.  That's correct.

16    Q.  Did you ever tell anyone as a departure memo or

17    things for my successor to keep track of, you know,

18    you've got to give Mr. Ford a hearing?

19    A.  No.

20    Q.  Okay.  Now, you talked about administrative

21    segregation.  Do you remember that?

22    A.  I do.

23    Q.  Okay.  And those regulations are marked as

24    Exhibit 17; is that right?

25    A.  That's correct.

 1     Q.   Now, administrative segregation, it says right in

 2     the definition in the regulations in Exhibit 17, and

 3     that's 423.06 that it's a temporary form of separation

 4     from general population; correct?

 5     A.   That's correct.

 6     Q.   Holding someone for 375 days without review is

 7     not a temporary placement; correct?

 8     A.   There's no set time on the temporary form, but as

 9     I said earlier, there have been examples of inmates

10     being held longer based on the fact that we can't find

11     outside -- appropriate, adequate outside placement for

12     them.  So there has been occasions where an inmate has

13     gone beyond that.

14     Q.   My question wasn't has the department always

15     complied with administrative segregation being

16     temporary.  My question was 375 days of holding someone

17     without review is not a temporary placement; correct?

18     A.   You know, um, it's not temporary.

19     Q.   Now, you were asked by the Court about -- now,

20     there's extensive review for this administrative

21     segregation; correct?

22     A.   Yes.

23     Q.   Review, health screening, review after 72 hours,

24     then periodic reviews quite frequently; correct?

25     A.   That's correct.

1    Q.   And you were asked what the purpose of that

2    review is; do you recall that?

3    A.   I do.

4    Q.   And you kind of said -- and I'm paraphrasing a

5    bit -- it's so people don't fall through cracks; right?

6    A.   That's one of the reasons, yes.

7    Q.   Okay.  There are other reasons, aren't there?

8    A.   There's a lot of reasons for it.  Just -- just

9    the process of monitoring who you have in the

10   segregation units, in the SMU units, just knowing as a

11   deputy superintendent to know what they're there for, to

12   have contact with them periodically.

13        So, there's a lot of different reasons for that.

14   I'm not sure it's specifically spelled out however.

15   Q.   Well, could you turn, sir, to the section of the

16   regs.  It is page -- the numbering starts again, but

17   it's after the regulation itself and where the standard

18   operating procedures are -- are -- begin.

19   A.   Yes.

20   Q.   Okay.  And if you turn to page 2 of Standard

21   Operating Procedure.

22   A.   Okay.

23   Q.   Okay.  And if you look at Section B, do you see

24   that?

25   A.   I do.

```
 1      Q.   Okay.  And that Section B, on page 2, of Special

 2   Operating Procedures talks about the purpose of the

 3   review.

 4           Do you see that?

 5      A.   I do.

 6      Q.   Okay.  And I would like you to look at the

 7   sentence that begins with "the," about four lines down.

 8           Do you see that?

 9      A.   I do.

10      Q.   Okay.  And -- and the things that are supposed to

11   be reviewed are the reason for the placement; correct?

12      A.   That's correct.

13      Q.   The threat to institutional security; correct?

14      A.   Yes.

15      Q.   Pending disciplinary issues; correct?

16      A.   Yes.

17      Q.   Disciplinary sanctions; correct?

18      A.   Yes.

19      Q.   Classification issues; correct?

20      A.   Correct.

21      Q.   Enemy situations; correct?

22      A.   Yes.

23      Q.   Mental health issues; correct?

24      A.   Yes.

25      Q.   Attitude towards authority; correct?
```

1    A.   Yes.

2    Q.   Willingness and ability to live with others;

3    correct?

4    A.   Yes.

5    Q.   So these reasons aren't so that people don't fall

6    through the cracks; the reasons are to be -- to

7    determine whether they are appropriately housed in

8    administrative segregation; correct?

9    A.   That's part of not falling through the cracks,

10   too, you know.  So I just want to -- you know, I used

11   that term, but it was to monitor the status of that

12   inmate that -- and those are the ones you just read, the

13   different statuses of the inmate.

14   Q.   So administrative segregation has this extensive

15   review to make sure people aren't held in administrative

16   segregation for ten years without anybody taking a

17   second look at whether they need to be segregated;

18   correct?

19   A.   That's correct.

20   Q.   And that's actually why the DDU was created;

21   right?  So you wouldn't have to review people

22   periodically like you do administrative segregation?

23   A.   We review them on a monthly basis in the -- in

24   the DDU.

25   Q.   Now, what you can agree with me on is that

1    Mr. Ford did not receive the type of review that we just

2    read about in the Special Procedures for Administrative

3    Segregation; correct?

4        A.   I'm not sure -- I'm not sure if he attended those

5    reviews, the monthly reviews that he -- that were

6    scheduled in the DDU.

7        Q.   Let's just be clear on the monthly reviews.

8    Okay?

9            The monthly reviews aren't for the purpose of

10   determining whether someone can get out of DDU?

11       A.   That's correct.

12       Q.   Okay.  The monthly reviews are is he going to get

13   credit for the month; right?

14       A.   Well, the monthly review is the opportunity of

15   staff to talk to the inmate, to monitor the inmate's

16   behavior, to counsel the inmate if there's issues

17   related to his incarceration within the DDU.  It's for a

18   variety of reasons, so it's similar in nature, but

19   you're right.  The review is not to determine whether

20   they're getting out because they have a set sentence

21   while they're in there.

22       Q.   Now, you never provided Mr. Ford with physical

23   screening when he returned to the DDU, as he would have

24   gotten if he was in administrative segregation; correct?

25       A.   In terms of the medical screening?

1      Q.   Yes.

2      A.   I'm not sure what protocols occurred when he

3   first came in.  When he came in in June, I'm not sure.

4      Q.   Well, no one reviewed his status after 72 hours,

5   according to the procedures for administrative

6   segregation; correct?

7      A.   But he wasn't in admin -- admin. segregation.  He

8   was in the DDU.  So he would have been seen --

9      Q.   So that's my point.

10     A.   Right.

11     Q.   He didn't get any of the review that is built

12  into the protections of administrative segregation;

13  correct?

14     A.   He got the monthly reviews.  That was standard

15  for DDU inmates.

16     Q.   He -- as far as you were concerned, he was going

17  to stay in DDU and serve out his sentence; correct?

18     A.   As far as I was concerned, he posed a threat to

19  the security and safety of the institution, and that was

20  an appropriate placement for him.

21     Q.   Now, DDU is the most restrictive portion of the

22  prison facility; correct?

23     A.   Yeah, but I would say -- they have, in some

24  cases, more privileges than inmates in SMU.  They have

25  TVs, access to TVs.  There's some programming in the

1   DDU, but it is our most secure setting.

2            MS. PIROZZOLO:  I have no further questions.

3            THE COURT:  Thank you.

4            MS. DANIELE:  I just have a couple, your

5   Honor.

6            THE COURT:  Redirect.

7                    REDIRECT EXAMINATION

8   BY MS. DANIELE:

9   Q.  Deputy Commissioner Bender, between September

10  30th or possibly October 1st of 2010 and November 2nd,

11  when you left for your retirement, were you aware that

12  steps were being taken to determine appropriate

13  placement for Mr. Ford?

14  A.  I don't --

15           MS. PIROZZOLO:  I'm going to object.

16           THE COURT:  Overruled.

17           THE WITNESS:  I don't recall having

18  knowledge of that at the time, to be honest with you.

19  BY MS. DANIELE:

20  Q.  Deputy Commissioner Bender, did Ford need to be

21  segregated in 2007 and 2008?

22  A.  He did.

23           MS. DANIELE:  I have no other questions.

24           THE COURT:  Do you have anything further?

25           MS. PIROZZOLO:  I have no further questions.

```
 1                    THE COURT:  You may step down.

 2                    THE WITNESS:  Thank you.

 3                    Do you want to take a ten-minute break now

 4    before the next witness or do you want to --

 5                    MS. DANIELE:  I would love to.

 6                    THE COURT:  Okay.  We'll do that then, take

 7    our morning break.

 8                    THE CLERK:  All rise.  Court is in recess.

 9                    (Recess from 11:18 a.m. until 11:37 a.m.)

10                    THE CLERK:  All rise.

11                    You may be seated.

12                    THE COURT:  Call your next witness.

13                    MS. DANIELE:  Thank you, your Honor.

14                    The defense calls Peter St. Amand.

15                    THE CLERK:  Please raise your right hand.

16                      PETER ST. AMAND, SWORN

17                    THE CLERK:  Please be seated.  Please state

18    your full name, spelling your last name for the record.

19                    THE WITNESS:  Peter Raymond St. Amand, S-T.

20    A-M-A-N-D.

21                      DIRECT EXAMINATION

22    BY MS. DANIEL:

23      Q.  Good morning, Superintendent St. Amand.

24          Could you please tell this Court how you're

25    employed currently.
```

1      A.   I'm retired from the Department of Corrections.

2      Q.   And prior to -- when did you retire?

3      A.   December of last year, 2010.

4           THE COURT:  I'm sorry.  December?

5           THE WITNESS:  December 2010.

6           THE COURT:  Okay.

7  BY MS. DANIELE:

8      Q.   And prior to your retirement, how were you

9  employed with the department?

10     A.   From -- for the year 2010, I was a captain at

11  Mass. Treatment Center.

12     Q.   When did that start?

13     A.   December 2009.

14     Q.   And in December of 2009, how were you employed?

15     A.   Superintendent, MCI-Cedar Junction.

16     Q.   When did you become superintendent of Cedar

17  Junction?

18     A.   May of 2007.

19     Q.   And in December of 2009, why did you resign your

20  position as superintendent at -- or change positions

21  from superintendent at MCI-Cedar Junction and become a

22  captain?

23     A.   Personal choices for retirement.

24     Q.   So you were not removed by anyone?

25     A.   No.

1    Q.  Prior to May of 2007, when you became

2    superintendent of Cedar Junction, what was your position

3    with the department?

4    A.  Deputy Superintendent of Operations at MCI-Cedar

5    Junction since 2005.

6    Q.  Could you briefly tell the Court from the time

7    you began working for the department up through 2005

8    what your employment history is.

9    A.  I started working for the department in November

10   of 1978.  I worked at MCI-Norfolk for the first part of

11   my career as a correctional officer, a sergeant, and

12   lieutenant.

13        I then went to Old Colony Correctional Center,

14   and I was a lieutenant and a captain.  I was the

15   Director of Security at MCI-Framingham for about two to

16   three years; Deputy of Operations at Baystate

17   Correctional Center for about two years; six years at

18   MCI-Concord as the Deputy of Operations; two years as

19   central transportation on -- as the director; and then I

20   went to MCI-Cedar Junction.

21   Q.  In January of 2007, what was your position with

22   the department?

23   A.  Deputy Superintendent of Operations at MCI-Cedar

24   Junction.

25   Q.  And what were your responsibilities?

1    A.   I overseen the security for MCI-Cedar Junction,

2    food services, the maintenance department.

3    Q.   Did you have any responsibilities with

4    the -- with regard to the Department Disciplinary

5    Unit -- or I'm going to refer to it as the DDU from now

6    on -- in January of 2007?

7    A.   On a day-to-day basis, no.  If there was an

8    emergency in the unit, I would have -- I would be

9    responsible for the team that went in to take care of

10   the emergencies, but that would be it.

11   Q.   The day-to-day operations of the Department

12   Disciplinary Unit in January of 2007, what was the title

13   of the individual that was responsible for that?

14   A.   Deputy Superintendent --

15   Q.   And --

16   A.   -- of the Special Management Units.

17   Q.   When you became superintendent in May of 2007,

18   how many deputy superintendents were there?

19   A.   It was dropped down from three to two at that

20   time.

21   Q.   Could you just briefly tell the Court how the

22   structure changed.

23   A.   There -- for the first two years I was there,

24   there was three superintendents -- three deputy

25   superintendents.  One took care of Classification and

1    Treatment; one took care of the General Operations; and

2    one took care of DDU, SMU, and the Health Service Unit.

3         And in 2007, when I became superintendent, we

4    reduced it to two deputy superintendents and a director

5    of the DDU.  The Deputy of Operations then overseeing

6    the director of DDU.

7    Q.  In January of 2007, did the Deputy Superintendent

8    of the DDU report to you?

9    A.  When in 2007?

10   Q.  In January of 2007 --

11   A.  No.

12   Q.  -- when you were the Deputy of Operations?

13   A.  The Deputy of DDU reported directly to the

14   superintendent.

15   Q.  Who was the superintendent in January of 2007?

16   A.  John Marshall.

17   Q.  In January of 2007, did you have any

18   decision-making authority with regard to anyone housed

19   in the DDU?

20   A.  No, I didn't.

21   Q.  Would it be fair to say that in January of 2007,

22   you didn't have a knowledge of the inmates housed in the

23   DDU either?

24   A.  General knowledge, but that would be it, not

25   thorough knowledge of the inmates that were in there.

 1    Q.   You became superintendent in May of 2007?

 2    A.   That's correct.

 3    Q.   What were your responsibilities as

 4  superintendent?

 5    A.   Oversee the operations of the entire -- of

 6  MCI-Cedar Junction and the DDU.

 7    Q.   What were your responsibilities for overseeing

 8  the DDU as superintendent?

 9    A.   Care and custody of the inmates in there, making

10  sure that they were get -- that mental health rounds

11  were being made, medical rounds; that the director was

12  doing her job in the unit.

13    Q.   In May of 2007, when you were superintendent, who

14  was the director of the DDU?

15    A.   Lynn Bissonette.

16    Q.   Did you play any role in placing --

17    A.   I'm sorry.  It was Dale Bissonette.

18    Q.   Thank you.

19         Did you play any role in placing inmates in the

20  DDU as superintendent of MCI-Cedar Junction?

21    A.   No, I didn't.

22    Q.   Did you have any authority to place an inmate in

23  the DDU when you were superintendent at MCI-Cedar

24  Junction?

25    A.   There is a list made up of when an inmate

1   receives a disciplinary sanction to go into DDU, and we

2   just basically went right by that list.

3       Q.   Did you have the authority to disregard that

4   list?

5       A.   No, I didn't.

6       Q.   As superintendent of MCI-Cedar Junction, what was

7   your main concern in operating the prison?

8       A.   Security of the staff and inmates.

9       Q.   In January of 2007, did you know that Albert Ford

10   was in the DDU as a pretrial detainee?

11       A.   If it was brought up at one of the morning

12   meetings we had every day, then I would; otherwise, I

13   wouldn't have known.

14       Q.   Would you have had any responsibility for that as

15   Deputy Superintendent of Operations in January of 2007?

16       A.   No, I wouldn't.

17       Q.   Moving to June of 2007, Mr. Ford returned to the

18   custody of the Department of Correction and to the DDU.

19         Did you have any part in the decision to place

20   him in the DDU --

21       A.   No, I didn't.

22       Q.   -- at that time?

23         Did you have the ability to remove him from the

24   DDU?

25       A.   No, I didn't.

1              THE COURT:  As superintendent, can you

2    reduce the sentence in the DDU?

3              THE WITNESS:  The only person who can reduce

4    the sentence is the deputy commissioner because it's all

5    done through a disciplinary process.

6              THE COURT:  And where did you fit in in the

7    disciplinary process, if at all?

8              THE WITNESS:  For inmates going to DDU, I

9    didn't.  The only thing where I fit in is if I

10   were -- once an inmate does an infraction in the

11   instit -- my institution or the institution I was

12   working at, I would have the right to refer him for a

13   disciplinary sanction -- for a disciplinary hearing for

14   DDU, and that would be the end of it.

15             THE COURT:  Thank you.

16   BY MS. DANIELE:

17     Q.  Superintendent St. Armand, if you believed

18   a -- when you were superintendent, if you believed an

19   inmate's behavior warranted reduction in his DDU

20   sanction, could you do anything about that?

21     A.  We didn't do it when I first became super, but

22   once we started getting a lot of inmates that were

23   getting set to go there because of problems in the

24   department, then I was authorized to -- I sent the

25   list -- I'm not sure if it was monthly or quarterly for

1  the reduced sentences of guys that were getting close to

2  getting out.

3      Q.   And who did you send that to?

4      A.   Mr. Bender.

5      Q.   Did you make any final decisions with regard to

6  that list?

7      A.   No.

8      Q.   When Mr. Ford was returned to the department in

9  June of 2007, what was your knowledge of him as an

10  inmate?

11     A.   The -- the day-to-day, I would have received D

12  reports, and I knew that he was in there for an incident

13  that happened in 2002.

14     Q.   Did you have any other information with regard to

15  Mr. Ford?

16     A.   I didn't go back to -- every one of the dates is

17  in there.

18     Q.   Did you have any reason to get any further

19  information on Mr. Ford?

20     A.   No.

21     Q.   Would you ever second guess Deputy Commissioner

22  Bender's decision to place Mr. Ford in the DDU in June

23  of 2007?

24     A.   No, I wouldn't.

25     Q.   If Mr. Ford had -- strike that.

```
 1          Superintendent St. Armand, are you familiar with

 2    the disciplinary infraction from 2002 that Mr. Ford had

 3    been charged with?

 4      A.  Yes.

 5      Q.  Are you familiar with the individuals involved in

 6    that report?

 7      A.  I am now, yes.

 8      Q.  Based on that knowledge, if Mr. Ford were to have

 9    been sent to Cedar Junction, but not to the DDU, as a

10    pretrial detainee, where would you have placed him?

11      A.   In the segregation unit.

12      Q.  And why is that?

13              MS. CHAUDHARY:  Objection.  Speculation.

14              THE COURT:  As far as I understand your

15    testimony, you're not the one that does the placement.

16              THE WITNESS:  I am -- if he's not going to

17    DDU, I am the one who does the placements.  It's

18    two -- the Department Disciplinary Unit is a department

19    unit compared to the institution itself.

20              THE COURT:  So the question is if he came in

21    and was not going to DDU?

22              MS. DANIELE:  Yes, your Honor, and I

23    apologize.  I will -- I will make this -- I'll make this

24    clear and lay a foundation for you.

25              THE COURT:  Thank you.
```

```
 1   BY MS. DANIELE:

 2      Q.  Superintendent St. Armand, can you describe the

 3   physical layout of MCI-Cedar Junction?

 4      A.  The Department Disciplinary Unit is attached to

 5   the facility.  It's actually built in a wall outside of

 6   the wall of the correct -- of MCI-Cedar Junction.

 7         Inside Cedar Junction, you have the orientation

 8   unit.  You have a hospital wing.  You have the Special

 9   Management Unit, which is the segregation unit.  You

10   have -- and then you have general housing units.

11            THE COURT:  When pretrial detainees are

12   generally sent, aren't they kept separate from the

13   general population?

14            THE WITNESS:  No.

15            THE COURT:  No?  In the federal system we

16   keep them separate.

17            THE WITNESS:  The only ones that we're

18   required to keep separate are the federal detainees that

19   we hold there.

20            THE COURT:  All right.  So those you do keep

21   separate?

22            THE WITNESS:  Yes.

23            THE COURT:  Okay.  Thank you.

24   BY MS. DANIELE:

25      Q.  Superintendent St. Armand, with regard to the
```

1    housing unit at MCI-Cedar Junction, what is your

2    responsibility over the general housing units and the

3    Special Management Unit or Ten Block?

4        A.   I'm not sure what you mean.

5        Q.   As superintendent of MCI-Cedar Junction, what is

6    your responsibility for the operations of the general

7    housing units and -- and Ten Block?

8        A.   To ensure that inmates who are enemies are kept

9    separated from each other.  This is all done through the

10   two deputies and the Director of Classification.

11          The inmates in the Special Management Unit are

12   reviewed on a regular basis.  We do them almost every

13   day at our morning meetings.  The inmates that go or

14   come into the facility that they're all properly

15   screened.  They go into the orientation unit where

16   they're basically equated to which housing unit they're

17   best suited for.

18          We have two restricted units that we have to

19   manage where they get classified.  I believe it's up to

20   three months for disciplinary infractions inside the

21   facility, where they're housed by themselves.  They

22   don't get to mingle with the rest of the general

23   population.

24              THE COURT:  And that's segregation?

25              THE WITNESS:  No, it's restricted units.

1    They -- they're not in restraints when they come out of

2    their room.  They come out of their room for their food,

3    instead of having it brought to them; but they get to go

4    out in their own rec. yard.  They can't go out into the

5    main yards.

6                    THE COURT:  And that's for --

7                    THE WITNESS:  It's a step down from

8    segregation.

9                    THE COURT:  And that's for disciplinary

10   infractions --

11                   THE WITNESS:  Infractions.

12                   THE COURT:  -- as well?

13                   THE WITNESS:  Yes.

14   BY MS. DANIELE:

15      Q.  Superintendent St. Armand, to the best of your

16   knowledge, do those -- the restricted units still exist

17   at MCI-Cedar Junction?

18      A.  They did when I left in 2009.  I don't know if

19   they still do.  Oh, actually, no, I think -- no, we

20   closed them up because we went into the -- as a

21   receiving building in 2009.  In July, September 2009, is

22   when they were, I believe, closed.

23      Q.  If -- could you describe to the Court the process

24   that is taken when an inmate comes to MCI-Cedar Junction

25   as either a new commitment or a transfer to MCI-Cedar

1    Junction?

2        A.   When they first come into the booking area,

3    they're IMS, Inmate Management Screens, which has all

4    the information about the inmate.  It will be reviewed

5    by whoever the booking staff are, such as enemy

6    situations, staff conflicts, to ensure that they can go

7    out into the orientation unit.

8        Q.   And then --

9        A.   They're seen by mental health; they're seen by

10   medicals.

11       Q.   And after that, they go to the orientation unit?

12       A.   As long as everything's clear.

13       Q.   What happens at that point?

14       A.   They would be placed in the orientation unit

15   on -- awaiting action status, which means they're not

16   let out with the other inmates for approximately two to

17   three days, until they get interviewed by a counselor.

18   I believe -- I'm not sure if the IPS team interviews all

19   of them or just if they have some type of problems.

20           And then they're let out into the orientation

21   unit, which runs by itself, meaning they get fed in the

22   unit.  They rec. by themselves in the back of the unit,

23   and that usually lasts for one to two months before they

24   go to a general population unit.

25       Q.   Do any of those inmates -- when those inmates are

```
 1    placed after they're -- after the orientation unit, do
 2    any of those inmates get placed in the DDU?
 3       A.   Not unless they receive the sanction before the
 4    DDU placement.
 5       Q.   Can you place any of them in the DDU?
 6       A.   No.
 7       Q.   In June of 2007, when Mr. Ford was returned as a
 8    pretrial detainee, if he had not been placed in the DDU
 9    by Deputy Commissioner Bender, where would he have been
10    housed?
11       A.   The segregation unit.
12                MS. CHAUDHARY:  Objection.
13                THE COURT:  Overruled.
14    BY MS. DANIELE:
15       Q.   Why is that?
16       A.   One of the two officers that was stabbed,
17    allegedly stabbed in 2002, still worked in the facility.
18                THE COURT:  Where did he work?
19                THE WITNESS:  On the three to eleven shift,
20    and he worked throughout the facility.  He didn't work
21    in a special spot.
22                THE COURT:  So you always move the inmate;
23    you wouldn't have modified his position?
24                THE WITNESS:  It was that, and there was two
25    other reports concerning gang activity, and we would
```

1    have to make sure that was cleared up --

2                    MS. CHAUDHARY:  Objection.

3                    THE WITNESS:  -- before we put them out in

4    the population.

5                    THE COURT:  Overruled.

6                    As I understand it though when Mr. Ford was

7    returned in June of '07 -- well, let me ask you this:

8    Did you do an evaluation as to where he should go or did

9    you --

10                   THE WITNESS:  No, he automatically went to

11   DDU because myself, along with the department, was under

12   the impression that we could have him finish his

13   sentence.

14                   THE COURT:  Otherwise you would have looked

15   at his file?

16                   THE WITNESS:  Yes.

17                   THE COURT:  And if there was a conflict with

18   a guard, the -- generally, the inmate would be moved.

19   That would affect the inmate's location, as opposed to

20   the guard's --

21                   THE WITNESS:  Correct.

22                   THE COURT:  -- duties?

23                   All right.  Thank you.

24   BY MS. DANIELE:

25      Q.  Superintendent St. Armand, the -- you testified

 1    that Mr. Ford would have been placed in the SMU on the

 2    Ten Block.

 3          Could you describe the conditions of confinement

 4    in Ten Block?

 5      A.  They get out of their cell one hour a day for

 6    activities outside of the unit.  They exercise by

 7    themselves.  They're in restraints to and from there.

 8    They -- I believe, they're allowed a phone call every

 9    day or at least four a week, if not every day.  They're

10    allowed two visits a week.  They're --

11              THE COURT:  Ten Block you're saying is --

12              THE WITNESS:  It's a Special Management

13    Unit.

14              THE COURT:  So this is segregation?

15              THE WITNESS:  West wing segregation you've

16    heard today:  Segregation, Special Management Unit, Ten

17    Block, it's all the same building.  It holds 50 inmates.

18              THE COURT:  So this is the SMU --

19              THE WITNESS:  Yes.

20              THE COURT:  -- that we've heard about before

21    this one?

22              THE WITNESS:  Correct.

23    BY MS. DANIELE:

24      Q.  How much time a week do they have out of their

25    cells?

1    A.  Five hours.

2    Q.  Do inmates in the -- in Ten Block have TVs?

3    A.  No.

4    Q.  Do they have radios?

5    A.  Some of them, I believe, have Walkmans.

6    Q.  How do inmates leave their cell in Ten Block?

7    A.  Waist chains and leg irons.

8    Q.  Always?

9    A.  Or cuffed behind their back actually and leg

10   irons.

11   Q.  Always?

12   A.  Unless they're -- there's -- always.

13      If they're special restraint status, then they're

14   left in waist chains -- they're placed in waist chains

15   because they don't get out of them while they're out in

16   the yard.

17   Q.  Is there any programming in Ten Block?

18   A.  Not that I recall in 2007.

19         MS. DANIELE:  Your Honor, I have photographs

20   of this unit that are similar to the DDU and the general

21   population ones.  Counsel has objected to these being

22   admitted.  I intend, at this point, to admit them

23   through Mr. St. Armand.  I'm assuming they have an

24   objection.

25         MS. CHAUDHARY:  Yes.  We object to the

```
 1   comparison, the relevant comparison, not to the
 2   photographs themselves.
 3               THE COURT:  All right.  So with that
 4   understanding, I'll admit them collectively as
 5   Exhibit 19.
 6               MS. DANIELE:  I apologize --
 7               THE COURT:  But I want to understand
 8   something.  Your point, I gather, is that the SMU was
 9   quite restrictive?
10               MS. DANIELE:  Yes.
11               THE WITNESS:  Yes.
12               THE COURT:  All right.  But in the SMU, you
13   get the reviews that we've talked about?
14               THE WITNESS:  Yes.
15               THE COURT:  So what's the difference between
16   the level of restriction in SMU and the DDU?  Is the
17   difference mostly the physical doors, the grills?
18               THE WITNESS:  The grills.  That's definitely
19   a difference.  I think the biggest difference of the two
20   is:  One, you're there to be reviewed, to be either
21   moved to another facility or to be released out in
22   population after an incident; and the other one is a
23   disciplinary sanction where you're placed there until a
24   certain date.
25               And in DDU, you've got to earn your
```

1   privileges.  You get them -- you have to lose them in

2   Ten Block.  That's --

3              THE COURT:  That's fundamentally the

4   difference?

5              THE WITNESS:  Yes.

6              (Exhibit No. 19 was admitted into evidence.)

7              MS. DANIELE:  May I approach the witness,

8   your Honor?

9              THE COURT:  Yes.

10  BY MS. DANIELE:

11     Q.  Superintendent St. Armand, I'm handing you a

12  packet of photos that has been identified as Defendant's

13  Exhibit No. 19.

14        Could you identify the first of the photos with

15  the exhibit sticker on it, please.

16     A.  That's one of the tiers of Ten Block.

17     Q.  And what does that photo show?

18     A.  The hallway with the windows outside of the

19  cells, the cell doors and in between each cell door is a

20  sliding steel door.

21     Q.  The photo -- I'm going to go individually each

22  photo.

23        The photo next to that, what does that

24  depict?

25     A.  That's these barred cell doors that are in the

1  units.

2      Q.  The middle photo in the top, what does that

3  depict?

4      A.  That's the solid steel door.

5      Q.  And can you describe what that solid steel door

6  is, please.

7      A.  It's utilized basically at night.  An inmate may

8  request for it to be closed because of the light that

9  comes in and the noise on the tier.  Otherwise, we only

10  close it if an inmate's being disruptive.

11      Q.  The --

12      A.  It only can be -- the inmate has to be reviewed

13  every shift by the commander.

14      Q.  If the solid door is closed?

15      A.  Yes, because of the size of that little window in

16  it.

17      Q.  The photograph in the upper right, could you tell

18  us what that shows.

19      A.  That's the furniture inside of the cells.

20      Q.  In Ten Block?

21      A.  In Ten Block.

22      Q.  And the photo to the left, could you --

23      A.  That's the recreational cages that are utilized

24  with the inmates in Ten Block.

25      Q.  Superintendent St. Armand, do you know if there

1   is a size difference in the cells between the DDU and

2   Ten Block?

3       A.   I'm almost positive that the DDU is a little bit

4   bigger.

5       Q.   The recreation cages that -- for Ten Block, are

6   they utilized in the same fashion as the recreation

7   cages for the DDU?

8       A.   Yes, they are.

9       Q.   Are they approximately the same size as the DDU?

10      A.   If anything, Ten Block's a little bit bigger.

11      Q.   How many inmates at once are in a recreation

12   cage?

13      A.   They're both the same, one inmate.

14      Q.   And do multiple inmates go out in separate cages

15   at once for Ten Block?

16      A.   Yes.

17      Q.   How about for the DDU?

18      A.   Yes.   The only difference is if you're on a

19   special status, then you go out by yourself.

20      Q.   If inmates are out there together, can they

21   talk --

22      A.   Yes.

23      Q.   -- to one another?

24           Are any of the visits for any population at Cedar

25   Junction contact visits?

1    A.   Not in 2007 and '8.

2    Q.   Superintendent St. Armand, if an inmate has to go

3    to the bathroom, to use a toilet in a cell, in Ten

4    Block, can they be seen from the tier?

5    A.   Yes.

6    Q.   Is that the case in any --

7    A.   Well, they can be seen if you're walking down the

8    tier.

9    Q.   If an inmate is using the toilet in the DDU, can

10   they be seen from the tier?

11   A.   A smaller section because you'd have to look in

12   your windows, which you're required to when you walk

13   down the tier, but not at a general glance because they

14   have the solid doors.

15   Q.   Superintendent St. Armand, do you recall whether

16   or not Mr. Ford was a level A security?  We discussed

17   level A security risk with Deputy Commissioner Bender

18   when he was here.

19        Do you recall whether or not Mr. Ford was a

20   level A security risk?

21   A.   Right now I really don't recall.

22   Q.   If he were a level A --

23   A.   Uh-huh.

24   Q.   -- does that change any of his housing at

25   MCI-Cedar Junction?

1      A.   It wouldn't because it's a maximum facility.

2      Q.   If -- would the frequency of Mr. Ford's cell

3   movement change if he was a level A?

4      A.   The -- I'm almost positive the procedure back in

5   2007 was they get moved every month to a different cell.

6      Q.   So once a month Mr. Ford would be moved?

7      A.   Correct.

8           MS. DANIELE:   Could I have one moment, your

9   Honor?

10          (Pause.)

11  BY MS. DANIELE:

12     Q.   Why is that?

13     A.   Tampering with the cells, making -- see what they

14  can see from outside their cell windows.   The majority

15  of it's tampering with the cells.

16     Q.   Superintendent St. Armand, there was testimony

17  during Deputy Commissioner Bender's testimony that

18  Mr. Ford complained to him about his housing in the DDU.

19          Were you ever made aware that Mr. Ford had

20  complained about his housing in the DDU after June of

21  2007?

22     A.   At -- I don't remember it from June of 2007.   I

23  remember it when I did my deposition; that I was told a

24  letter went through my office.

25     Q.   Is there anything that would refresh your

1    recollection of what occurred then?

2        A.   I'm not sure if I see the letter if it would help

3    or not.

4                MS. DANIELE:  Your Honor, may I approach the

5    witness?

6                THE COURT:  Yes.

7    BY MS. DANIELE:

8        Q.   Deputy -- Superintendent St. Armand, I'm handing

9    you a letter to Albert Ford, from ADC Kenneth Nelson.

10               Does that refresh your recollection as to whether

11   or not you were aware that Mr. Ford had complained about

12   his being placed in the DDU as a 52A, in the summer of

13   2007?

14       A.   Yes.

15       Q.   And did somebody in the department respond to

16   Mr. Ford with regard to his complaint?

17       A.   Yes.  Deputy Commissioner -- Assistant Deputy

18   Commissioner Ken Nelson.

19       Q.   And did he inform Mr. Ford that -- what did he

20   tell Mr. Ford?

21       A.   That he was serving the remainder of his ten-year

22   DDU sentence that was received on September 4, 2003.

23       Q.   And when was that letter dated?

24       A.   August 23rd, 2007.

25               MS. DANIELE:  I have no further questions,

1    your Honor.

2            THE COURT:  Is there a reason -- we've had

3    witnesses read from two exhibits now.  Is there a reason

4    that they're not being put into evidence?

5            MS. DANIELE:  I'm just not because the other

6    one wasn't, and I figured the testimony was sufficient.

7            MS. PIROZZOLO:  I'm happy to offer them or

8    put them in.

9            MS. DANIELE:  If there's no objection --

10           MS. PIROZZOLO:  They weren't on our exhibit

11   list, and I didn't want to have problems with that.

12           THE COURT:  Well, if I -- if there are no

13   problems, what I would like to mark as Exhibit 20 is the

14   first letter that was the notice that Mr. Bender

15   testified to, and as Exhibit 21 would be the letter that

16   this witness just testified to.  Okay.

17           (Exhibit Nos. 20 and 21 were admitted

18   into evidence.)

19           MS. PIROZZOLO:  Could I also --

20           THE COURT:  Was there more?

21           MS. PIROZZOLO:  There was an email from

22   Ms. Mici to Mr. Bender, in January of 2007.

23           THE COURT:  Is there an objection to that?

24           MS. DANIELE:  No, your Honor.

25           THE COURT:  It makes it easier if I actually

1   have the document.  So we'll mark the email as

2   Exhibit 22.

3                (Exhibit No. 22 was admitted into evidence.)

4                MS. PIROZZOLO:  May I provide that at the

5   break?

6                THE COURT:  Yes.

7                MS. PIROZZOLO:  The email.

8                Thank you, your Honor.

9                THE COURT:  Cross-examination?

10                      CROSS-EXAMINATION

11   BY MS. CHAUDHARY:

12     Q.   Good morning, Mr. St. Amand.

13     A.   Good morning.

14     Q.   You agree that Mr. Ford could be housed in the

15   general population of MCI-Cedar Junction; is that

16   correct?

17     A.   From my deposition, I wasn't aware of -- it was

18   more of a general statement for inmates that come in.  I

19   didn't realize that -- the officers' names that he had

20   assaulted and some of the inmates that were on his enemy

21   list; but at the deposition, I did say he could go to

22   general population.

23     Q.   And do you recall at your deposition being asked

24   specifically if there were any other units of Cedar

25   Junction that were capable of housing Mr. Ford?

1          Do you recall being asked that question?

2     A.   No.

3     Q.   If I could direct you to the binder right in

4     front of you.  Tab one of that binder is a copy of your

5     deposition transcript in this case.

6     A.   Okay.

7     Q.   I'd like to direct your attention to page 205,

8     the bottom of page 205, line 23.

9     A.   I don't see any page numbers.

10    Q.   They should be at the top.

11    A.   Oh, okay.  Sorry.  Where on the page?

12    Q.   Line 23, Mr. Syrett asked "And do you think there

13    are any units at Cedar Junction that are capable of

14    housing Mr. Ford?"

15         And then on the next page, line 10, you say, "He

16    would have to go to one of the orientation units, which

17    is the first step of anyone who goes to -- to/from DDU,

18    and then he would be processed."

19         Do you recall giving that answer?

20    A.   Yes, I do.

21    Q.   And do you recall Mr. Syrett asking "And where do

22    you think he," referring to Mr. Ford, "could be placed

23    after the orientation unit?"

24         And you said "He would probably remain in what

25    they call the east wing of my facility."

1        Is that correct?

2    A.   Correct.

3    Q.   And the east wing is part of the general

4    population; is that correct?

5    A.   Correct.

6    Q.   And that was your deposition testimony?

7    A.   Yes.

8    Q.   And that's not your testimony today?

9    A.   No, it's not because I didn't see those reports

10   at the deposition.  I wasn't aware of -- I was unaware

11   that he took a nurse hostage.  I hadn't read all of the

12   packages since I've been at Cedar Junction because all

13   of that had happened in 2002.

14       And when I was asked if, in fact, I would put him

15   in population, I needed to review everything that I

16   would have had that day; and in the deposition, I didn't

17   have any of this information.

18   Q.   And so you had never reviewed that information

19   after you became superintendent in May 2007 --

20   A.   No.

21   Q.   -- is that correct?

22   A.   No, I haven't.

23   Q.   And you never reviewed it when Mr. Ford returned

24   to Cedar Junction as a pretrial detainee in June 2007;

25   is that correct?

```
 1      A.  There was no need to, I was told he was going to

 2   DDU.

 3      Q.  But you were aware that Mr. Ford was challenging

 4   his confinement in the DDU as a --

 5      A.  Yes, I was.

 6      Q.  -- a pretrial detainee?  That's correct?

 7      A.  Yes.

 8      Q.  Okay.  And, in fact, someone -- you or someone

 9   under your supervision drafted a letter to Mr. Ford

10   explaining that he was properly held in DDU?

11      A.  Correct.

12              THE COURT:  I'm going to ask you to speak

13   slower.

14              MS. CHAUDHARY:  My apologies.

15   BY MS. CHAUDHARY:

16      Q.  Mr. St. Amand, as the former superintendent of

17   MCI-Cedar Junction, you're familiar with the layout of

18   the facility; correct?

19      A.  Yes.

20      Q.  Including the areas used by general population

21   inmates; correct?

22      A.  Yes.

23      Q.  I'd like to show you a photo, tab 2 in your

24   binder, and it's tab 16 in the binder that we provided

25   to the Judge yesterday.
```

1        Is this a true and accurate representation of the

2   prison yard used by the general population at MCI-Cedar

3   Junction?

4        A.  In 2007, no.

5        Q.  And how -- how would it have been different in

6   2007?

7        A.  This doesn't appear to be a fence dividing the

8   two yards.  It seems to be like they might have removed

9   it since they switched his status.  This here -- there

10  would have been two separate yards.

11       Q.  But other than a fence dividing this into two

12  separate yards, other than that, is this an accurate

13  representation of the prison yard in Cedar Junction in

14  2007?

15       A.  And there should be a softball field.

16       Q.  And there should be a softball field?

17       A.  Yes.

18            MS. CHAUDHARY:  I'd like to offer this into

19  evidence.

20            MS. DANIELE:  I would object, your Honor, on

21  the basis of relevance.  There has been no testimony

22  that -- by anyone that Mr. Ford would have been

23  appropriate for general population.

24            THE COURT:  Objection overruled.

25            We'll mark as Exhibit 22 the photograph of

1    the recreation field.

2                (Exhibit No. 22 was admitted into evidence.)

3    BY MS. CHAUDHARY:

4        Q.   Mr. St. Amand, if Mr. Ford was housed in the east

5    wing of general population, he would have had access to

6    the prison guard -- to the prison yard -- excuse

7    me -- shown here; correct?

8        A.   Once he got out of orientation.

9        Q.   And he would have had access to this yard for

10   approximately two and a half hours a day; is that

11   correct?

12       A.   Yes.

13       Q.   And I'd like to show you another photo, tab 3 in

14   the binder in front of you.  It's tab 15 in the binder

15   we provided to the Court.

16            Mr. St. Amand, is this a true and accurate

17   representation of a general population cell at MCI-Cedar

18   Junction?  I apologize it's a little dark.

19       A.   For the west wing.

20       Q.   It's for the west wing.  And are cells in the

21   east wing substantially different?

22       A.   Totally different.  It's more so.  In the west

23   wing, you have two tiers that run all the way around the

24   unit.  They have outside windows in every cell.  In the

25   east wing, it's three tiers, all solid bars, so you can

1    see anything the inmate does, and it's only skylights.

2        Q.   I'd like to show you the next tab in your binder,

3    tab 4.

4                And is this a photo of a cell in the east

5    wing at MCI-Cedar Junction?

6        A.   Yes.

7        Q.   And is it a true and accurate representation to

8    your knowledge?

9        A.   Yes.

10               MS. CHAUDHARY:   I'd like to offer this into

11   evidence.

12               THE COURT:   Which one?

13               MS. CHAUDHARY:   This photo here.  It's tab

14   14 in the binder that was provided to the Court.

15               MS. DANIELE:   Your Honor, the defendants

16   have the same objection to any testimony and any

17   evidence regarding the general population.  Just note my

18   running objection.

19               THE COURT:   Why don't I note your objection,

20   and I'm overruling it.

21               Exhibit 23 will be the photograph of

22   the -- now I'm lost though is this the east wing or the

23   west wing?

24               THE WITNESS:   The last photo with the bars?

25               THE COURT:   Yes.

1              THE WITNESS:  That's the east wing.

2              THE COURT:  East wing.

3              THE WITNESS:  The one prior to it -- it

4    actually has a solid door -- that's the west wing.

5              THE COURT:  The west wing.

6              MS. CHAUDHARY:  And I'd also like to offer

7    into evidence the photo of the west wing as well.

8              THE COURT:  Okay.  So the east wing photo

9    will be Exhibit 23; the west wing photo will be

10   Exhibit 24.

11             (Exhibit Nos. 23 and 24 were admitted into

12   evidence.)

13   BY MS. CHAUDHARY:

14      Q.  Mr. St. Amand, if an inmate was housed in the

15   photo depicted here, he would be housed in -- excuse

16   me -- housed in a cell depicted here, he would not have

17   a solid metal door on his cell; is that correct?

18      A.  Correct.

19      Q.  An inmate housed in this cell would be able to

20   speak to other inmates through the bars of the cell; is

21   that correct?

22      A.  Correct.

23      Q.  And if an inmate was housed in the photo depicted

24   in Exhibit 24 of the west wing, that inmate would have a

25   window in his cell; correct?

1     A.   Section 3?

2     Q.   Yes.

3     A.   Yes.

4     Q.   And that open window, if that's depicted in the

5  photo, would provide natural light and fresh air to the

6  inmate housed in that cell; is that correct?

7     A.   Correct.

8     Q.   And an inmate in general population would spend

9  about half his day in the cell -- in the cells depicted

10  in Exhibits 23 and 24; is that correct?

11     A.   A little over half his day, yeah.

12     Q.   And inmates in the DDU, by contrast, are locked

13  in their cell for 23 hours a day?

14     A.   Correct.

15     Q.   I'd like to talk a little bit about

16  administrative segregation.  You discussed that with

17  Ms. Daniele.

18          The DOC has regulations govering -- governing

19  Special Management Units; correct?

20     A.   Correct.

21     Q.   And you're familiar with those regulations;

22  correct?

23     A.   Yes.

24     Q.   And the DOC also has standard operating

25  procedures for Special Management Units?

1     A.  Correct.

2     Q.  And you're familiar with those as well?

3     A.  Yes.

4     Q.  I believe you testified that the Special

5 Management Unit at MCI-Cedar Junction is also known as

6 the Ten Block; correct?

7     A.  Correct.

8     Q.  And the DOC regulations require that the

9 commissioner, superintendent, or his designee approve an

10 inmate's placement in administrative segregation; is

11 that correct?

12     A.  Correct.

13     Q.  And I believe you would agree that an officer

14 just can't grab someone and walk them into the Ten

15 Block; is that correct?

16     A.  No, they can't.

17     Q.  Because there are certain procedures that are

18 required prior to placing an inmate in administrative

19 segregation; correct?

20     A.  Correct.

21     Q.  And you never approved Mr. Ford's placement in

22 administrative segregation in June 2007; correct?

23     A.  No.

24     Q.  And you never approved Mr. Ford's placement in

25 administrative segregation in April of 2008; is that

1    correct?

2       A.   Correct.

3       Q.   And no other placement, as far as you know, other

4    than the DDU was considered for Mr. Ford when he was

5    placed as a pretrial detainee in June 2007; is that

6    correct?

7       A.   Correct.

8       Q.   And no other placement was considered for

9    Mr. Ford when he was placed as a convicted inmate in

10   June 2008; correct?

11      A.   Correct.

12      Q.   The DOC regulations require a physical screening

13   of an inmate before his placement in administrative

14   segregation; correct?

15      A.   Correct.

16      Q.   They also require the review of an inmate's

17   placement within 72 hours of being placed in

18   administrative segregation?

19      A.   Correct.

20      Q.   And it's also true that inmates in administrative

21   segregation are entitled to have their status reviewed

22   every seven days for the first two months of their

23   placement; correct?

24      A.   Correct.

25      Q.   And then that status is reviewed at least every

1  30 days thereafter?

2      A.   Correct.

3      Q.   And those reviews are to be completed by the

4  superintendent's designee, and thereafter by a

5  classification committee or other authorized group?

6      A.   Correct.

7      Q.   Would the -- and that committee is required to

8  review a number of reasons that Ms. Pirozzolo went over

9  with Mr. Bender as well, including the reason for the

10  placement, the threat to institutional security, pending

11  disciplinary issues, classification issues, mental

12  health issues, and the willingness and ability to live

13  with others; correct?

14      A.   Correct.

15      Q.   And isn't it also true that to ensure proper

16  documenting of this review process that the regulations

17  require the committee must maintain a Special Management

18  Unit report that lists information about each inmate?

19      A.   Correct.

20      Q.   And have you seen such reports?

21      A.   About three to four times every week in 10 years.

22      Q.   Have you ever seen such a report about Mr. Ford?

23      A.   Mr. Ford is not in that status.

24      Q.   And Mr. Ford's status -- Mr. Ford never received

25  a review within 24 hours of his place -- 72

1    hours -- excuse me -- of his placement as a pretrial

2    detainee; correct?

3        A.   No.

4        Q.   And his class -- and the classification committee

5    was never convened to review the status, correct?

6        A.   Yes.

7        Q.   And no committee ever reviewed the reasons for

8    Mr. Ford's placement, his mental health issues, his

9    willingness or ability to live with others --

10               THE COURT:  You know, this poor stenographer

11   has to write down what you're saying.  You need to slow

12   down.

13               MS. CHAUDHARY:  My apologies.  Sorry.

14   BY MS. CHAUDHARY:

15       Q.   No committee ever reviewed the reasons for

16   Mr. Ford's placement, his mental health issues, or his

17   willingness or ability to live with others when he was

18   held as a pretrial detainee; is that correct?

19       A.   I am sure that his mental health issues were

20   always monitored; the others, no.

21       Q.   And there was no documentation of a review by

22   Mr. Ford in any Special Management Unit report; correct?

23       A.   No.

24       Q.   An inmate's placement in administrative

25   segregation is intended to be temporary; correct?

1    A.  Correct.

2    Q.  And you testified -- and you've testified, I

3  believe, that when an inmate is placed in administrative

4  segregation, it's when you're trying to find another

5  place to send him --

6    A.  Correct.

7    Q.  -- is that correct?

8        Mr. Ford was held in the DDU as a pretrial

9  detainee for over a year; is that correct?

10   A.  Correct.

11   Q.  That's not a temporary placement?

12   A.  No.

13   Q.  And he has been held in the DDU as a convicted

14  inmate since April of 2008; is that correct?

15   A.  I haven't been in the department for years; so, I

16  couldn't tell you.  Until I left in December of 2009, he

17  was in DDU.

18   Q.  He was in DDU.  And that's not a temporary

19  placement from April 2008 to 2009, when you left;

20  correct?

21   A.  It was my understanding he was doing his

22  sanction; so, it wouldn't have been considered

23  temporary.

24   Q.  I'd like to talk a little bit about the

25  conditions in administrative segregation.

```
 1            Inmates in administrative segregation are

 2   entitled to opportunities for visitors that are largely

 3   the same as those in general population; correct?

 4      A.   I think it's one less a week.

 5      Q.   But -- but more than those that are available to

 6   the inmates in the DDU; correct?

 7      A.   Yes.

 8      Q.   And inmates in administrative segregation are

 9   entitled to the same opportunities for writing and

10   receiving letters as is available to inmates at the

11   general population; correct?

12      A.   Indeed, yeah.

13            THE COURT:  I'm sorry.  And DDU, they're all

14   the same?

15            THE WITNESS:  There's no difference in mail

16   in any place in the facility.

17   BY MS. CHAUDHARY:

18      Q.   And inmates in administrative segregation are

19   entitled to the same kinds of meals that are served to

20   those in general population; is that correct?

21      A.   It's the entire facility, including DDU.

22      Q.   And you testified that the exercise cages

23   in -- for inmates in administrative segregation are

24   larger than the DDU?

25      A.   I believe they're longer than the ones in DDU.
```

1    Q.   And isn't it true that inmates would prefer to be

2   housed in the Ten Block than in administration

3   segregation, as compared to the DDU?

4    A.   It depends on the inmates.   There's some that

5   would prefer it, and others would do things just to go

6   to DDU.

7    Q.   If I could direct you to your deposition

8   testimony --

9    A.   Yeah.

10    Q.   -- in this -- in this matter, page 59.

11    A.   Yep.

12    Q.   Page 60.   Excuse me.   Line 15.   Do you recall

13   being asked by Mr. Syrett:   "So inmates would least like

14   to be in the DDU?"

15         And your answer:   "Yes."

16         And then "Least like to be in the Ten Block

17   generally?"

18         And you said:   "A normal inmate, yes."

19         So, generally, would you agree that inmates would

20   prefer to be in the Ten Block as compared to DDU?

21    A.   Yeah, for visits and phone -- yes.   Yes.

22    Q.   Mr. St. Amand, Mr. Bender testified that he may,

23   in fact, shorten a DDU sentence upon recommendation of a

24   superintendent of a facility -- or of Cedar Junction --

25    A.   Correct.

1    Q.   -- since that's the only facility with the DDU.

2         As superintendent, if you had an inmate serving a

3    10-year sentence in the DDU, and after two years, it

4    became apparent to you that the inmate had undergone a

5    genuine change and was no longer the same person who had

6    committed the misconduct that required him to be in the

7    DDU, would you recommend him being released?

8    A.   No.

9              (Counsel conferred.)

10   BY MS. CHAUDHARY:

11   Q.   Mr. St. Amand, you referred to the corrections

12   officer involved with the 2002 incident --

13   A.   Yes.

14   Q.   -- regarding Mr. Ford.  Do you know his name?

15   A.   Dugdale.

16   Q.   And does -- Officer Dugdale works in the control

17   unit at MCI-Cedar Junction; correct?

18   A.   I don't know where he works now.  When I was

19   there, he worked in several areas in the institution.

20   Q.   And you had also testified that you would move an

21   inmate if he was involved in an incident with the guard,

22   not adjust an officer's schedule; is that correct?

23   A.   Major incidents, yes.

24   Q.   Could the inmate be moved to a different facility

25   in that situation?

 1      A.   That's the only way to do it, yes.

 2      Q.   To move him to an entirely different facility?

 3      A.   Correct.

 4      Q.   And wouldn't that be better than perhaps placing

 5   the inmate in an overly restrictive condition of

 6   confinement?

 7      A.   He would have to be placed there until

 8   classification could find someplace else to put him.

 9   That's -- that is the whole purpose of the

10   administrative segregation.

11            (Counsel conferred.)

12   BY MS. CHAUDHARY:

13      Q.   Just to clarify your last answer, you stated that

14   Mr. Ford or an inmate could be placed in ad. seg. in

15   such a situation -- administrative segregation in such a

16   situation --

17      A.   Correct.

18      Q.   -- but that would be a temporary placement for

19   the purposes of classification only; correct?

20      A.   Yes, but they wouldn't actually classify him

21   because he's 52A.  They would just have to find another

22   location for him in another facility.

23      Q.   But he -- you -- he wouldn't stay in

24   admin -- excuse me -- in administrative segregation; he

25   would be moved somewhere else.  That would be the

1    intent; correct?

2        A.   Depend -- yes, and at one point he would have to

3    be moved.

4        Q.   And -- and sitting here today, you don't know

5    what Mr. Ford's placement would have been after he was

6    moved out of administrative segregation; is that

7    correct?

8        A.   No, I don't.

9        Q.   Because no analysis was ever done to consider

10   that in 2007 and 2008, to your knowledge; is that

11   correct?

12       A.   Correct.

13              MS. CHAUDHARY:   I have no further questions.

14              THE COURT:   Redirect?

15              MS. DANIELE:   Just a couple, your Honor.

16                      REDIRECT EXAMINATION

17   BY MS. DANIELE:

18       Q.   On that same train of thought, Superintendent St.

19   Amand, once you placed Mr. Ford in Ten Block, what would

20   you have done?

21       A.   I would have notified the Director of

22   Classification, the department's Director of

23   Classification.  I would have him review all of his

24   inmate enemies to see if any of them were still in the

25   facility and what institutions they were at, and I would

1    have to -- spoke to the officer to see if there was

2    still an issue between him and Mr. Ford.

3        Q.  Superintendent St. Amand, are there TVs allowed

4    in Ten Block?

5        A.  No.

6        Q.  Is there air conditioning in Ten Block?

7        A.  No.

8        Q.  Superintendent St. Amand, counsel showed you a

9    photograph of an east wing cell.

10       A.  Uh-huh.  Yes.

11       Q.  And I believe that it was your testimony that

12   inmates in the east wing have out-of-cell time on the

13   flats; is that correct?

14       A.  Yes.  Well, they didn't ask me that, but, yes.

15       Q.  I apologize.

16           Could an inmate in -- locked in an east wing

17   cell, like the one that you're looking at, grab another

18   inmate from the flats and stab him?

19       A.  Yes.

20           MS. DANIELE:  I have no further questions,

21   your Honor.

22           THE COURT:  Are you done with this witness?

23           MS. CHAUDHARY:  I have no questions.

24           THE COURT:  You may step down.  Thank you.

25           THE WITNESS:  Thank you.

```
 1                    THE COURT:  Can someone get us those
 2       exhibits.
 3                    I think it makes sense -- do you want to
 4       break or you want to start the next witness?
 5                    MS. DANIELE:  We can do a brief break, if
 6       you want.  I don't know --
 7                    THE COURT:  I don't want to do a brief
 8       break.  I either want to go to one o'clock, and we'll
 9       break for lunch then, or we can break now and come back.
10                    MS. DANIELE:  We can break now, that's fine,
11       if this is a good time for everybody.
12                    We have two more witnesses for this
13       afternoon.
14                    THE COURT:  All right.  So an hour break for
15       lunch.
16                    (Recess from 12:31 p.m, until 1:37 p.m.)
17                    THE CLERK:  All rise.
18                    You may be seated.
19                    THE COURT:  Okay.  Call your next witness,
20       please.
21                    MR. ANAHORY:  Thank you, your Honor.
22                    Your Honor, the department -- the defendants
23       call Dale Bissonette.
24                    THE CLERK:  Please raise your right hand.
25                         DALE BISSONETTE, SWORN
```

```
 1              THE CLERK:  Please be seated.  Please state
 2   your full name, spelling your last name for the record.
 3              THE WITNESS:  Dale Bissonette, B, as in boy,
 4   I-S-S, as in Sam, O-N, as in Nancy, E-T-T, as in Tom, E.
 5                     DIRECT EXAMINATION
 6   BY MR. ANAHORY:
 7      Q.  Ms. Bissonette, could you please state where
 8   you're employed.
 9      A.  Massachusetts Department of Correction at
10   MCI-Cedar Junction.
11      Q.  And how long have you been employed with the
12   Department of Correction?
13      A.  Over 25 years.
14      Q.  And can you list the -- your current position
15   with the Department of Correction?
16      A.  Department Disciplinary Unit, administrator.
17      Q.  And could you also give the Court a brief
18   background of other positions that you've held within
19   the Department of Correction?
20      A.  Prior to being the DDU administrator, I was the
21   Executive Assistant for the Associate Commissioner of
22   Administration.  I was a unit manager at MCI-Cedar
23   Junction for seven years.  Prior to that I was a
24   correction officer for approximately five and a half
25   years; and prior to that, I was a secretary to the
```

1  Deputy Superintendent of Programs, and a clerk in the

2  records office.

3      Q.   And how long have you held your current position?

4      A.   Four -- just over four years.

5      Q.   And do you know the date that you began that

6  position?

7      A.   It was April 2007.

8      Q.   And could you describe for the Court your duties

9  and responsibilities as the administrator of the DDU?

10     A.   I oversee the day-to-day operations of the

11 Department Disciplinary Unit, ensuring that the staff

12 and the inmates are following policy and procedure.

13     Q.   And can you give the Court a background of what

14 the DDU is.

15     A.   The Department Disciplinary Unit is a -- kind of

16 like a small institution of its own, and inmates come

17 into the DDU as a result of a serious disciplinary

18 infraction committed in one of the other Department of

19 Correction facilities.  There is a process where the

20 inmate receives a D report.  The superintendent

21 determines whether or not it was -- it is a DDU

22 referable offense.  It is reviewed by the central and

23 main Disciplinary Unit Director.  It -- prior to three

24 months ago, it was also reviewed by the mental health

25 director to determine if it should go forward.

1          Once it's determined that it's DDU referable,

2    again it goes forward.  It's scheduled for a hearing by

3    the special hearings officer.  The hearing is held.  The

4    recommendation for a sanction, if one is warranted, is

5    made.  The results are served to the inmate.  He has 15

6    days to appeal the results.

7          After the 15-day appeal process is up, the final

8    stage is at the deputy commissioner's level, and he

9    has -- it's usually around 30 days to make a decision on

10   whether he's -- upholds the sanction, reduces the

11   sanction, or modifies it in any such way after that.

12         Once he makes a decision, then a letter is issued

13   to the inmate, and then the inmate is transferred into

14   the DDU.

15   Q.  Can you provide for the Court information where

16   the DDU is located.

17   A.  It's located on the grounds of MCI-Cedar Junction

18   in South Walpole, Mass.

19   Q.  And is it located within the walls of Cedar

20   Junction?

21   A.  Yes, it is.

22   Q.  And is it located within the walls of the general

23   population -- is it in the same location as the general

24   population units in Cedar Junction?

25   A.  No, it is not.  It's in a separate building of

1    its own.

2                    THE COURT:  How many -- do you only take

3    inmates who have committed infractions at Cedar

4    Junction, or can people be sent from other institutions?

5                    THE WITNESS:  From any of the other male

6    facilities within Massachusetts Department of

7    Correction.

8    BY MR. ANAHORY:

9       Q.  Could you describe the physical layout of the DDU

10   for the Court, please.  By that, I mean, let's start

11   with the -- how many tiers are there in the DDU?

12      A.  There are 12 tiers in the DDU.  There's A wing, B

13   wing and C wing.  Each of the wings have four tiers.

14   Each tier comprises either 10 or 11 cells, and then

15   there's a small observation area called D wing, and that

16   has four cells to it.  So there's a total of 124 regular

17   cells and four observation cells.

18      Q.  And is there a separate area where inmates are

19   visited or receive visits?

20      A.  Yes, there's three noncontact visiting rooms for

21   social visits, and then there's two separate attorney

22   visiting rooms where the inmate can have actual contact

23   with their attorney.

24      Q.  And can you give to the Court a general

25   description of a DDU cell.

1    A.  The cell, I believe, is approximately 12 feet by

2    12 feet, 8 inches by 6 -- 6 feet.  I don't know the

3    exact dimensions.  The bed is across the back wall, and

4    it's made of concrete.  Over the bed is a side light

5    window.  Adjacent to the bed is a concrete desk, a

6    concrete stool.  Closer to the door is a concrete shelf

7    for hygiene items, and then near that is a combination.

8    It's a steel, metal sink/toilet combination.  The door

9    is a solid door, and it has a small side light window,

10   and within the door is also a food slot at the top and a

11   leg iron slot at the bottom.

12   Q.  And you said the bed was concrete.  Do inmates

13   receive a mattress?

14   A.  Yes, they do.

15   Q.  Do you know the dimensions of a DDU cell?

16   A.  Off the top of my head, no, I said.  I'm not

17   positive.

18   Q.  Once an inmate is incarcerated in -- in the DDU,

19   for instance, if an inmate comes into the DDU, what's

20   the process that takes place?

21   A.  The inmate has to -- he's in full restraints.  He

22   gets transferred into the DDU with -- by that I mean

23   he's transferred with leg restraints and then wrist

24   restraints behind the back.  Then the process is a

25   two-man hands-on escort anywhere in the DDU that this

1    inmate goes.  He is brought into the DDU, brought to the

2    strip cell where he's strip searched.  We issue him DDU

3    clothing, a T-shirt, underwear, socks, a scrub top,

4    scrub bottoms.  Depending on the footwear that he has,

5    he may keep his own sneakers or we issue him a pair of

6    state sneakers.  He is brought back into -- put back

7    into restraints, full restraints, and he's escorted to

8    his cell.

9       Q.  And is he provided with any documents concerning

10   the DDU?

11      A.  He would have been provided with that prior to

12   his actual arrival in the DDU.

13      Q.  Can you describe for the Court what those

14   documents would be.

15      A.  He would have received a letter from the Deputy

16   Commissioner authorizing his placement in the DDU.  He

17   would have had a DDU hearing, which he could have

18   requested copies of the hearing himself.

19          He would have been served with the results of the

20   recommendation from the Special Hearings Officer; and

21   within 24 hours of being placed in the DDU, unless it's

22   a weekend, the Correction Program Officer would issue

23   him an Inmate Orientation Manual to read and review.

24   He's allowed to keep that, and then the Correction

25   Program Officer will ask him if he has any questions or

1    anything that he needs to clarify.

2       Q.  Can you briefly describe for the Court what that

3    manual is.  What's in that manual?

4       A.  It explains the process of the DDU; the -- the

5    restraint process; that we utilize restraints and the

6    two-man hands-on escort; it describes recreation, how

7    often they get recreation; how to access medical; how to

8    access mental health; the 30-day review process; the DDU

9    privileges; how to utilize -- request the law library

10   usage.

11              THE COURT:  What's the 30-day review

12   process?

13              THE WITNESS:  Every inmate who comes into

14   the DDU has to be reviewed at least once every 30 days

15   to evaluate their behavior to determine what privilege

16   level they will be at.  The privilege level changes from

17   30 days to 60 days to 90 days and 120 days.  There's

18   different levels of privileges.

19   BY MR. ANAHORY:

20      Q.  So directing your attention to the privilege

21   system, an inmate who's new to the DDU comes in at what

22   privileges?

23      A.  Has no privileges.  He will be issued one

24   telephone call upon his arrival to let a family member,

25   friend, whomever he choses, let them know that they

1    won't hear from him for at least 30 days.

2       Q.   And what's the purpose behind this privilege

3    system?

4       A.   To get the inmate to improve his behavior.

5       Q.   And this is a progressive system?

6       A.   Correct.

7       Q.   And at what point does it cap off?

8       A.   After 120-day privileges, then you stay at

9    120-day privileges for the duration, as long as you

10   don't pick up any serious disciplinary reports that

11   warrant reduction in your privileges.

12      Q.   And you testified that these reviews happened

13   every 30 days?

14      A.   Correct.

15      Q.   And were these the same rules back in 2007?

16      A.   Yes.

17      Q.   Could you tell the Court how often and for what

18   reason -- what reasons DDU inmates would leave their

19   cells?

20      A.   They can leave their cells -- they have an

21   opportunity to recreate five times a week for one hour

22   at a -- recreation is for one hour at a time.  They earn

23   visits.  They can earn up to a maximum of four visits,

24   and those are one hour in duration.  They leave their

25   cells to go up to triage, whether it be for being on a

1    doctor's line or possibly the dentist line.  We have

2    some inmates that require daily insulin or daily

3    dressing changes.  They would be required to leave their

4    cells for that.  They have to go to Court.  They have to

5    go to an off-site hospital.  We also have -- they may

6    just be seeing a different medical provider, and it may

7    have to be done in the HSU; so, we would have to take

8    them out of their cells for that as well.

9        Q.   And are there certain procedures that must be

10   followed when an inmate leaves his cell?

11       A.   Absolutely.

12       Q.   Could you describe those procedures.

13       A.   Prior to leaving the cell, every time the inmate

14   leaves the cell, he has to be fully stripped searched.

15   He passes his clothing out to the correction officer,

16   who will be escorting him.  They search the clothing.

17   They search the shoes.  He may put the clothing back on.

18   He is processed into restraints, wrist restraints behind

19   the back, leg irons.

20           The correction officer will have the door open.

21   The inmate is pat searched on the tier, and then there

22   is a two-man hands-on escort, wherever they are in the

23   DDU.

24       Q.   And why are those procedures utilized?

25       A.   The inmates in the DDU are the most disruptive,

1   usually volatile inmates in the Massachusetts Department

2   of Correction, and that's how we process them through to

3   ensure that we can maintain safety.

4       Q.   Could you tell the Court how inmates in the DDU

5   receive their meals.

6       A.   They are delivered by correction officer staff.

7   They eat in their cells, and they're provided in a

8   Temp-Tech tray.  The inmate has approximately 20 to

9   25 minutes to eat, and then the staff go back and

10  collect all the trays and the utensils.

11      Q.   And can you tell the Court why the department

12  utilizes those procedures.

13      A.   Safety and security.  We wouldn't -- the inmates

14  in the DDU are in single cells, and we don't allow them

15  to be in places other than one person at a time.

16  Everything is done singularly.

17      Q.   Could you also describe for the Court the types

18  of programming or, if any, that are available to DDU

19  inmates?

20      A.   There are several types of programs available.

21  We have a DDU high risk offender program, and that is

22  limited to participation of four inmates at one

23  particular time.  That program is -- it's facilitated by

24  the Spectrum, who is contracted out to the department

25  and then tries to target cognitive behavioral skills of

1   inmates within the DDU to help them process thinking, to

2   hopefully not bring them back to the type of a situation

3   where they have to be in the DDU.

4        That is roughly a 24-session program.  The first

5   eight sessions are individual sessions, one-on-one with

6   the facilitator; and the second portion of that is

7   16 group sessions where the inmates are placed in

8   therapeutic modules individually, so that they can still

9   communicate with themselves and the facilitator.  And if

10  the inmates complete that program, they will be granted

11  up to 30 days off their DDU sanction of their release

12  date.

13       And then inmates also have via closed circuit

14  television, we have educational programming, which

15  consists of adult basic education, the GED program,

16  pre-GED program, commercial driver's license program,

17  and then there's also religious programming available on

18  the television as well.

19       If the inmate hasn't earned the privilege of

20  using a television, then they're allowed to do the

21  workbook portion of it until they -- until such time

22  that they actually earn the use of the television to

23  supplement the workbook portion of the programming.

24    Q.  Now, are there any other services available to

25  closed circuit TV?

1    A.   Other than the religious services, not that

2  I'm -- well, regular TV programming, and they show

3  movies on weekends.

4    Q.   Okay.  Are you familiar with Mr. Ford, the

5  plaintiff in this case?

6    A.   I am.

7    Q.   How do you know him?

8    A.   Through working for the Department of

9  Corrections.  He has spent a lot of time at MCI-Cedar

10  Junction, which is where the majority of my experience

11  has been.

12    Q.   So have you known him prior to working in the

13  DDU?

14    A.   Yes.

15    Q.   And you talked about programming.  Did Mr. Ford

16  participate in any programs in the DDU?

17    A.   Yes.  He completed the high risk offender

18  program, I believe, at the end of June.

19    Q.   Could you tell the Court the circumstances

20  regarding his participation in this program.

21    A.   I'm sorry.  I'm not sure.

22    Q.   Did he ask to be placed in this program?

23    A.   Yes.

24    Q.   And he was granted placement in it?

25    A.   Correct.  There's an interview process.  The

process consists of the inmate applies through the
Spectrum coordinator, and we interview him, the Spectrum
coordinator, myself; if the DDU Captain is available, he
will attend; the DDU Correction Program Officer; and on
occasion, we have a mental health clinician that will
also be part of the interview process, just to try to
get a sense of whether or not the inmate is truly
committed to the program and is going to participate in
it.

Q.  And do inmates receive mental health screening
when they come into Cedar Junction from outside -- from
an initial incarceration?

A.  Yes.

Q.  And are you aware with regard to Mr. Ford, did he
receive that in June of 2007?

A.  Yes, he did.

Q.  You're sure?

A.  Positive.

Q.  Could you describe to the Court whether or not
Mr. Ford has any special security status assigned to
him?

A.  Yes, he does.  He's a level A status according to
the Department of Corrections guidelines; and within the
Department Disciplinary Unit, he is on extra restraints.

Q.  First, with respect to level A status, what does

1    that mean?

2        A.   They have certain guidelines for the Department

3    of Correction Policies that this -- I'm not sure exactly

4    what the guidelines are.  It's all written in a policy,

5    but someone in the Internal Affairs Unit at the central

6    office, they're the ones who determine which inmates in

7    the Department of Correction are on level A status.  And

8    when they are, they have to be able -- their cell has to

9    be moved at least once every 30 days, and when they're

10   on outside transportation, extra officers are assigned

11   to the DDU.

12       Q.   So was Mr. Ford's cell moved every 30 days?

13       A.   Yes.

14       Q.   And does he -- does his cell -- is this movement

15   continued even today?

16       A.   As of today, I'm not positive.  There's

17   another -- there was another guideline in the policy

18   that allowed a superintendent to waive the 30-day

19   movement of the inmate within the facility, but keep him

20   on level A status when he transferred, when he was

21   on -- outside of our facility.

22       Q.   So in the DDU, do you move his cell every

23   30 days?

24       A.   I don't think so.

25       Q.   And can you tell the Court a little bit about

1   that other special -- the restraint status that he has

2   within the DDU?

3       A.   Extra restraint status is an internal procedure

4   that we utilize.  When some inmates are more disruptive

5   or volatile, we'll place the inmate on extra restraint

6   status, which means that when he leaves his cell, he has

7   a three-man escort; two-man hands-on, and then the third

8   person is a supervisor that monitors the movement to

9   wherever the inmate is going; and when the inmate

10  recreates in the yard, he will remain in full

11  restraints.

12      Q.   Could you let the Court know -- because you

13  mentioned earlier -- you testified earlier about the

14  privileges and how that worked.

15           Do you know what privileges Mr. Ford received in

16  January of 2007?

17      A.   I believe he was at the 90-day privileges in

18  January of 2007, and then February, he -- he was

19  advanced to the maximum privileges of four phone calls,

20  four visits, a TV, and a radio.

21      Q.   So, despite his status change, his privileges

22  didn't change?

23      A.   I'm sorry.  I don't understand the question.

24      Q.   Based on what you've just testified to, is it

25  safe to say that even though he -- he changed his status

1   from convicted to pretrial, his privileges didn't change

2   in the DDU?

3       A.   No, they did not.

4       Q.   And are you familiar with the level of privileges

5   he received when he came back into the institution in

6   June of 2007?

7       A.   Yes.

8       Q.   And what were those?

9       A.   He started back at the maximum warranted

10  privileges.

11      Q.   And why didn't he start over?

12      A.   It just seemed logical that when he left the

13  department from the DDU, he was at maximum privileges,

14  so when he returned, nothing had changed; so, we put him

15  back at maximum privileges.

16      Q.   And did Mr. Ford ever complain to you that

17  the -- that his restraints were digging into his skin?

18      A.   No.

19      Q.   And if Mr. Ford had made this complaint, would

20  you be aware of it?

21      A.   Yes.

22      Q.   How so?

23      A.   He could have voiced it to me when I make my

24  rounds on the tier.  He could have written it to me in a

25  letter, and I would have advised him to seek medical

1    attention.

2              MR. ANAHORY:  Thank you.

3              No further questions, your Honor.

4              THE COURT:  When you say that recreation is

5    in full restraints, what does that mean?

6              THE WITNESS:  He recreates with his hands in

7    wrist restraints behind the back and leg irons on his

8    ankles.

9              THE COURT:  What --

10             THE WITNESS:  And that's only for inmates

11   who are on this extra restraint status.

12             THE COURT:  And is that what his status is

13   now?

14             THE WITNESS:  Yes.

15             MR. ANAHORY:  Can I just follow-up, your

16   Honor, with that?

17             THE COURT:  Yes.

18   BY MR. ANAHORY:

19      Q.  Why is he in on extra restraint status now?

20      A.  Due to the threats that he made against staff.

21             MR. ANAHORY:  I see.  Thank you.

22                     CROSS-EXAMINATION

23   BY MS. PIROZZOLO:

24      Q.  Ms. Bissonette, when did Mr. Ford get put on

25   extra restraint status?

1        A.   I don't have the documentation in front of me.   I

2    didn't look it up yesterday.

3        Q.   It was the winter of 2009; correct?

4        A.   I just said I don't have the documentation in

5    front of me.

6        Q.   It was right as DOC officials were being deposed

7    in this case that he was put on extra restraint status;

8    correct?

9                MR. ANAHORY:   Objection, your Honor.

10               THE COURT:   Overruled.

11               THE WITNESS:   I don't know.   If I had the

12   paperwork in front of me, I'd be able to tell you that.

13   I don't have it with me, for a specific date.

14   BY MS. PIROZZOLO:

15       Q.   But you do have paperwork that would show the

16   specific date on which Mr. Ford got put on extra

17   restraint status; correct?

18       A.   Yes, I do.

19       Q.   Now, you said it was due to some incident.

20               When did that incident occur?

21       A.   It was due to some threats that he had made

22   against staff.   It wasn't -- I believe it was more than

23   one particular instance.

24       Q.   But you don't remember when that was?

25       A.   No, I don't have the paperwork in front of me.

1    Q.  Now, I want to ask about the 30-day review --

2    A.  Okay.

3    Q.  -- in the DDU.

4         A committee doesn't conduct that review;

5    correct?

6    A.  Correct.

7    Q.  Okay.  And that review is for determination of

8    phone and visitation privileges; correct?

9    A.  Correct.

10   Q.  And there's no review of the reason for placement

11   in the DDU; correct?

12   A.  No, there's not.

13   Q.  There's no review of mental health issues as part

14   of the 30-day review; correct?

15   A.  Correct.

16   Q.  And you don't review the inmate's willingness to

17   live with others or exist in a general population;

18   correct?

19   A.  Correct.

20   Q.  That's not the point of that review; correct?

21   A.  Correct.

22         MS. PIROZZOLO:  Your Honor, may I approach?

23         THE COURT:  Yes.

24   BY MS. PIROZZOLO:

25   Q.  Ms. Bissonette, I've just handed you a document.

1    Is that a 30-day DDU review slip?

2        A.  Yes, it is.

3        Q.  And when you're talking about review, you're

4    talking about the information on this type of slip;

5    correct?

6        A.  Correct.

7                MS. PIROZZOLO:  Your Honor, I'd move to

8    admit the 30-day DDU review slip as the next exhibit.

9                THE COURT:  Exhibit 25.  Any objection?

10               MR. ANAHORY:  No, your Honor.

11               THE COURT:  So marked.

12               (Exhibit No. 25 was admitted into evidence.)

13               MS. PIROZZOLO:  Did the email get in?

14               THE CLERK:  Yeah.

15               MS. PIROZZOLO:  Great.

16               So is this Exhibit 26?

17               THE COURT:  Twenty-five.

18               MS. PIROZZOLO:  What's the email?

19               THE COURT:  Twenty-five.  I have

20    twenty -- is that what you have, too?

21               MS. PIROZZOLO:  We put in the email during

22    the break.

23               THE COURT:  The email that we had left out

24    as Exhibit 21 --

25               MS. PIROZZOLO:  Okay.

1          THE COURT:  -- and then we had the photos of

2     the field, the east wing, and the west wing, so now

3     we're up to 25.

4          MS. DANIELE:  At least that's what I have.

5          MS. PIROZZOLO:  Okay.  Do you want to speak

6     up?

7          MR. SYRETT:  Your Honor, my --

8          THE COURT:  Do you have something else?

9          MR. SYRETT:  -- my records may well be

10    wrong.  I have the letter from Ken Nelson as Exhibit 21,

11    and then I think that we hadn't handed up the email, so

12    I'm not sure it got marked along the way.  So I

13    don't -- I didn't have it down as receiving a number,

14    but I may be incorrect.

15         THE COURT:  Well -- so in other words, we

16    have two Exhibit 21s?

17         THE CLERK:  Yeah.  I had that, too, as a

18    letter from Nelson to Ford, dated 8/27/07.

19         THE COURT:  Okay.  We shouldn't marked that

20    one 21.

21         THE CLERK:  All right.  I can --

22         THE COURT:  All right.  The email will then

23    be marked as Exhibit 25, and this would be Exhibit 26.

24    So Exhibit 26 will be the DDU review slip.

25         Thank you.

1              (Exhibit Nos. 25 and 26 were admitted into

2      evidence.)

3      BY MS. PIROZZOLO:

4         Q.   Now, when an inmate in DDU gets a 30-day review

5      slip, he doesn't have to come out of his cell to get

6      that slip; correct?

7         A.   No, he doesn't.

8         Q.   Okay.  The slip is just put in through a slot in

9      the door; correct?

10        A.   Well, that all depends.  If he's in his cell at

11     the time that the caseworker is bringing around those

12     reviews, he'll hand it to him; and if not, he will be

13     left in his cell.  If he's out at the yard or he's on a

14     court trip or something, we'll leave it in the cell for

15     the inmate.

16        Q.   But there's not necessarily any interaction over

17     the communication of the privilege information?

18        A.   Not necessarily unless the inmate wants to ask

19     the caseworker a question about the review itself.

20        Q.   Now, you said that Mr. Ford got mental health

21     screening; do you remember that?

22        A.   Yes, I do.

23        Q.   How do you know Mr. Ford got mental health

24     screening?

25        A.   I saw the mental health screening this morning.

1 Q. So that was a record that you saw out of court?

2 A. Correct.

3 Q. So you don't have any personal knowledge of

4 whether Mr. Ford got health screening; correct?

5 A. Well, I saw the paperwork showing that he did get

6 it; so that is personal knowledge that he got that.

7 Q. Well, it's personal knowledge of a paper that

8 said that?

9 A. Correct.

10   MS. PIROZZOLO: Your Honor, I'd move to

11 strike that testimony.

12   THE COURT: As hearsay?

13   MS. PIROZZOLO: Yes, your Honor.

14   MR. ANAHORY: Your Honor, she saw it. It's

15 certainly a business record.

16   THE COURT: You saw a business record, but

17 we don't have the business record. It is stricken.

18 BY MS. PIROZZOLO:

19 Q. Now, you don't know what effect continued

20 confinement in the DDU has on mental health inmates;

21 correct?

22 A. I have not studied that, no.

23 Q. And you're not familiar with statistics regarding

24 the incidence of mental health problems in DDU; correct?

25 A. Correct.

1    Q.  You haven't ever been given training on the

2    treatment of pretrial detainees; correct?

3    A.  Correct.

4    Q.  And you were never told you couldn't punish

5    pretrial detainees; correct?

6    A.  I don't punish pretrial detainees.

7    Q.  But you were never told you could not punish

8    pretrial detainees?

9    A.  I don't punish any inmates.

10   Q.  But my question is you weren't told you could not

11   do that?

12   A.  No.

13            MS. PIROZZOLO:  I have no further questions.

14            MR. ANAHORY:  Your Honor, at this point, I

15   would like to enter that business record in as an

16   exhibit.

17            I'll show the form to counsel.  I'm sure

18   they'll have an objection.  But I'd like to at least

19   mark it for identification.

20            THE COURT:  Was this introduced before?

21            MR. ANAHORY:  No, your Honor.  This is --

22            MS. PIROZZOLO:  No, your Honor.

23            THE COURT:  It has not been produced in this

24   case?

25            MR. ANAHORY:  It's -- it's rebuttal.  It's

1    based on --

2              THE COURT:  Has it been produced as a

3    document in this case?

4              MR. ANAHORY:  No, your Honor.  It was just

5    discovered yesterday, last night.

6              MS. DANIELE:  It would have been produced in

7    discovery though in the medical records.

8              MR. ANAHORY:  It is a medical record, so to

9    the extent that --

10              MS. PIROZZOLO:  We have not seen this

11    before.

12              THE COURT:  Would this have been covered by

13    a document request before that's been made in this case?

14              MS. SCHULMAN:  Yes.

15              MS. PIROZZOLO:  Yes.  Yes, your Honor.

16              THE COURT:  And it just wasn't found before?

17              MS. DANIELE:  No, it would be -- I -- we

18    didn't go back and look in -- we have stacks and stacks

19    of medical records that we turned over to them.  I am

20    presuming it was turned over because I turned over all

21    the medical records for that time period.

22              So I'm just presuming that it was turned

23    over.  Because we didn't know that until yesterday that

24    Mr. Ford was going to testify that he never got mental

25    health screening in June.  I then at the end of the day

1    called Walpole and said can you get this and fax it over

2    to us immediately because there's no way last night I

3    could go through the boxes and boxes of documents, and

4    they're not organized where they have them down in the

5    medical records.

6              So it's my understanding that I would have

7    turned it over.  There's no reason that I wouldn't have.

8    I just can't give you a Bates number that it was turned

9    over under, because I turned over all of the --

10             MS. PIROZZOLO:  So I just have to

11   clarify -- we -- okay.  We got documents that -- we

12   don't know if this was in those.  This copy is not Bates

13   stamped; so, there's no way for me to tell that we've

14   gotten it, and it certainly wasn't identified to us

15   before right now.

16             THE COURT:  Why don't we mark it as Exhibit

17   B for now, and then if there's no -- you can look over

18   your records and see if you're challenging it.  All

19   right?

20             MS. PIROZZOLO:  Thank you, your Honor.

21             THE COURT:  I can tell you if it has not

22   been produced, it's not coming in.  If it has been

23   produced, you can set the foundation for it being a

24   business record, unless that's disputed -- not disputed.

25             (Document was marked Exhibit B for

1   identification.)

2                   REDIRECT EXAMINATION

3   BY MR. ANAHORY:

4     Q.  Ms. Bissonette, do you recognize this exhibit?

5     A.  Yes, I do.

6     Q.  And what is it?

7     A.  It's a medical and mental health screening of

8   Mr. Ford.

9     Q.  And what is the date on this exhibit?

10    A.  June 26th of 2007.

11    Q.  And do you know if the -- the information on this

12  exhibit, would it have been entered in by a person with

13  knowledge of the facts that are contained in this

14  exhibit?

15    A.  Yes.

16              MS. PIROZZOLO:  Objection, your Honor.

17              THE COURT:  Is this a standard form that's

18  used when persons are going into the DDU?

19              THE WITNESS:  Yes, it is.  It's -- it's a

20  standard form utilized any time any inmate amongst any

21  facility in the Department of Correction that's going to

22  any segregation unit.  It's a standard operating

23  procedure to have them screened by both medical and

24  mental health.

25              THE COURT:  And this is the form that's

1    used?

2                    THE WITNESS:  Correct.

3                    THE COURT:  And who fills it out?

4                    THE WITNESS:  A medical RN or an LPN or some

5    form of medical person would fill out the medical

6    portion, and whoever are contracted out for mental

7    health services, one of those clinicians would be

8    responsible for filling out the mental health portion of

9    the form, and both have to be done prior to the inmate's

10   movement into the DDU.

11                   THE COURT:  Do you know in Mr. Ford's case

12   whether he went anywhere other than the DDU in June of

13   '07?

14                   THE WITNESS:  He would have gone to the

15   health services unit prior to coming into the DDU, and

16   that's where this form would have been conducted.

17                   THE COURT:  Okay.  You can continue.

18   BY MR. ANAHORY:

19      Q.  And this form --

20                   MR. ANAHORY:  At this time, your Honor, I'd

21   like to enter it into evidence.

22                   THE COURT:  Do you have an objection as to

23   the foundation of this as a business record?

24                   MS. PIROZZOLO:  I don't know enough about it

25   because it's entitled UMass Correctional Health

 1   Screening Form.  So we don't know anything about this

 2   form.

 3              MS. DANIELE:  Your Honor, I can tell you, I

 4   know for a fact that I turned over a lot of these forms

 5   to them.  I know -- I can visual -- I looked through

 6   them recently, that's why I know.  This particular one,

 7   I don't look at -- didn't look at the dates, but there

 8   were a number of these forms turned over.

 9              THE COURT:  All right.  I'm going to keep it

10   as Exhibit B for now.  I will allow cross-examination on

11   it if you want.

12   BY MR. ANAHORY:

13      Q.  So what does this form mean?

14      A.  That medically and mental health-wise, those

15   personnel feel that the particular inmate, and in this

16   case, Mr. Ford, is okay to enter the DDU.

17              MR. ANAHORY:  Thank you.

18              THE WITNESS:  You're welcome.

19                    RECROSS-EXAMINATION

20   BY MS. PIROZZOLO:

21      Q.  Ms. Bissonette, you weren't present at the mental

22   or the physical health screening; correct?

23      A.  Correct.

24      Q.  Do you know who performed that screening?

25      A.  I can't read the screening for the medical one;

1   however, the mental health screening is done by Theresa

2   Brasier.

3       Q.   Do you know how long the mental health screening

4   lasted?

5       A.   No, I don't.

6       Q.   Do you know anything about what was communicated

7   to Ms. Brasier during that?

8       A.   No, I do not, only what's written here and what

9   she wrote.

10              MS. PIROZZOLO:  I have no further questions.

11              THE COURT:  Well, let's bring this up

12   tomorrow.

13              Thank you.  You may step down.

14              (The Court conferred with the Clerk.)

15              THE COURT:  Please call your next witness.

16              MS. DANIELE:  The defendants call Carol

17   Mici.

18              THE CLERK:  Please raise your right hand.

19                   CAROL MICI, SWORN

20              THE CLERK:  Please be seated.  Please state

21   your full name, spelling your last name for the record.

22              THE WITNESS:  Carol Ann Mici.  Last name is

23   M-I-C-I.

24                   DIRECT EXAMINATION

25   BY MS. DANIELE:

1    Q.   Good afternoon.  Could you tell us your present

2    position with the Department of Correction.

3    A.   Assistant Deputy Commissioner of Classification.

4    Q.   When did you become Assistant Deputy Commissioner

5    of Classification?

6    A.   April of 2007, I believe.

7    Q.   Prior to becoming Assistant Deputy Commissioner

8    of Classification, what was your position?

9    A.   Director of Classification for the whole

10   Department of Correction.

11   Q.   And when were you Director of Classification?

12   A.   May of 2005 through April of 2008; so, I've been

13   Assistant Deputy Commissioner since 2008, I believe.

14   Yeah.  I'm missing a year there, I think.  Sorry.

15   Q.   That's okay.  Regardless, in January of 2007, you

16   were in charge of classification for the DDU; is that

17   correct?

18   A.   Correct.

19   Q.   Okay.  Prior to becoming Director of

20   Classification, could you just briefly tell us what

21   positions you held with the department.

22   A.   I started as a Correction Counselor.  I was a

23   Correction Counselor 1, 2 and 3, which is now called a

24   Correctional Program Officer.  I was a Supervisor of

25   Classification, a Director of Treatment, a Deputy

1    Superintendent, a Superintendent, and then the Director

2    of Classification for the whole department.

3       Q.  As Director of Classification, what were your

4    duties?

5       A.  As the director, I was responsible for the

6    decomputation and classification of all offenders

7    throughout the department.

8       Q.  How did that position change when you became

9    Assistant Deputy Commissioner of Classification?

10       A.  I absorbed more divisions when I took -- when I

11    became the Assistant Deputy Commissioner; so, I oversee

12    the sex offender unit; data collection; county, federal,

13    and state; central records; and then the two divisions I

14    already talked of.

15       Q.  When -- as Assistant Deputy Commissioner of

16    Classification, who do you report to?

17       A.  Deputy Commissioner Veronica Madden.

18       Q.  When you were Director of Classification, who did

19    you report to?

20       A.  Deputy Commissioner Veronica Madden.

21       Q.  What is classification within the Department of

22    Correction?

23             THE COURT:  Can you please keep your voice

24    up.

25             MS. DANIELE:  Sorry.

1          THE WITNESS:   It is an assessment of an

2    inmate's program needs and security level.   In real

3    basic terms, it's an assessment.

4    BY MS. DANIELE:

5       Q.   What does that assessment do?

6       A.   It -- what classification is supposed to do is

7    it's supposed to place an inmate in the most appropriate

8    security level, conducive with public safety, based on

9    research-based factors.   So it is supposed to guide you

10   as to what security level you need to place an inmate

11   in.

12      Q.   What are your options for security levels?

13      A.   There is maximum security, medium security,

14   minimum security, prerelease security, and some halfway

15   house that's residential beds as well.

16      Q.   How, in general -- general terms, how is the

17   decision of what institution level to place an inmate

18   made?

19      A.   Classification works based on a numeric system.

20   It's a series of variables that will, based on the

21   variables, it -- you come up with a score, and the score

22   drives the custody level decision, certainly taking

23   into -- other things into consideration, but it's really

24   a guide as to where -- what level of security to place

25   the inmate in.

1    Q.   What are some of the factors that you look at?

2    A.   The severity of the current crime, an escape

3    history, criminal history, past incarcerations, number

4    of D reports, severity of D reports, age, employment,

5    education.

6    Q.   Are DDU inmates classified?

7    A.   No, they are not.

8    Q.   Why not?

9    A.   They are not subject to classification based on

10   that it's a disciplinary sanction, and the

11   classification process basically stops at that point,

12   and the DDU has their own review process.

13   Q.   Are pretrial detainees, or as we call them

14   colloquially in the department, 52A classified?

15   A.   No, they're not.

16   Q.   Why not?

17   A.   52As are not currently convicted, and they

18   basically come to the Department of Correction either

19   via referral through a DA or a standing court orders

20   through a couple of our counties in Massachusetts, and

21   it is a placement based on two of the counties.  It's

22   based on overcrowding, and other counties who petition

23   for it.  It's based on a variety of factors.

24        So they come in to be held just awaiting trial,

25   and there's no -- there's no variables we can classify

1    them on because they haven't been sentenced yet at this

2    point.

3        Q.   What -- what is a 52A?

4        A.   A 52A is a -- an offender who can come into the

5    Department of Correction, because they have served prior

6    felony time in the State of Massachusetts; so, they can

7    be subject to Massachusetts' facilities as opposed to

8    being housed at the county facility.

9        Q.   When can we take a pretrial detainee?

10       A.   We can take them -- through Middlesex and

11   Suffolk, it's automatic because there's standing court

12   orders.  Any other county needs to petition.  The DA

13   needs to petition and actually request it to the

14   Department of Correction -- through the Commissioner of

15   Correction.

16       Q.   How do those -- did the 52A requests from the

17   county come to you?

18       A.   They do come to me as the commissioner designee.

19       Q.   And how does that happen?

20       A.   Generally through facsimile.  Just they're faxed

21   to the office.  Sometimes we'll get a call ahead of

22   time; sometimes we will not.

23       Q.   And what do you do when you get that kind of

24   request?

25       A.   When we get a petition, we try to get as much

1    information from the county that we can about the

2    offender they're trying to send us.

3         We may have records on him as well, based on

4    their past time with us; and we certainly call -- reach

5    out to somebody in the county to find out the reasons

6    behind why they're sending them, why they're asking us.

7    Q.   For what reasons does -- typically does a county

8    request that we take a 52A?

9    A.   It's usually a problematic inmate.  They don't

10   feel -- the counties in Massachusetts are very

11   different.  Some of them can handle assaultive or

12   difficult inmates or protective custody inmates; others

13   cannot.  So they will petition the department to take

14   the inmate.

15   Q.   Are there other reasons also?

16   A.   We've had people -- we've had counties petition

17   for medical reasons because they can't handle them

18   medically.

19   Q.   When you're -- so you're the one that accepts the

20   52As; is that correct?

21   A.   Myself, and there are two other people in my

22   office that are commissioner designees that can accept

23   them as well.

24   Q.   And the actual Commissioner of Correction, could

25   they -- could he or she, if it were a she, make that

1   decision also?

2       A.   Absolutely.

3       Q.   When you get a request to take a 52A, what do you

4   look at to determine whether or not to take that

5   individual?

6       A.   I look at housing first.  Can I safely house him

7   in the Department of Correction.  If I can't safely

8   house them, then we just look at all the variables.  We

9   have to look at enemy issues, conflicts, gang-related

10  issues, medical/mental health, past incidents, previous

11  time with us, if they've been with us before.

12  Obviously, a 52A would be.  We look at everything

13  possibly we can before we accept.

14      Q.   With regard to Mr. Ford in January of 2007 --

15      A.   Uh-huh.

16      Q.   -- why did you accept him into our custody at

17  that point?

18      A.   I believe it was Norfolk County petitioned us.

19  He had been with us for several years, and they felt

20  that it was a better placement, and they asked the

21  Commissioner of Correction to continue custody of the

22  inmate.

23      Q.   Did you make -- have any -- play any role in the

24  decision to house Mr. Ford in the DDU?

25      A.   I did not.

1    Q.  In June of 2007, Mr. Ford returned to the

2  department after being out on bail.

3          Were you part of that decision to accept him

4  into the Department of Correction?

5    A.  Most likely I was part of it.  Again, there are

6  two other people in my office that absolutely could have

7  played a role in the acceptance of it, yes.

8    Q.  Again, in June of 2007, would you have made the

9  determination to place him in the DDU?

10   A.  No.

11   Q.  In either January or June of 2007, if Mr. Ford

12  could not have been placed -- was not placed in the DDU,

13  what would your recommendation have been?

14          MR. SYRETT:  Objection, your Honor.

15          THE COURT:  That's sustained.

16          I need some background as to her involvement

17  with 52As because right now, as far as I can tell,

18  you're telling me they don't get classified.

19          THE WITNESS:  Correct.

20          THE COURT:  Right.

21          MS. DANIELE:  I apologize.

22  BY MS. DANIELE:

23   Q.  Assistant Deputy Commissioner Mici, once you get

24  all of the information on a 52A, how do you place them?

25   A.  I place them based on their behavior that they

1    have had in the past.  We house many of our 52As at

2    MCI-Concord.  Problematic ones we house in maximum

3    security.  So it depends on the nature of the incidents

4    or what -- the request.

5        Q.  In January of 2007, when you accepted Mr. Ford as

6    a pretrial detainee, where would you have placed him if

7    he hadn't been in the DDU?

8                MR. SYRETT:  Objection, your Honor.  We --

9    we continue to object to the testimony of alternatives

10   that didn't happen.

11               THE COURT:  I understand that alternatives

12   didn't happen.  I'm just trying to understand why this

13   witness will add beyond what anybody else says, what her

14   role was distinct from the others.

15               MS. DANIELE:  Yep.  It will become clear

16   based on -- because Mr. St. Amand's testimony was that

17   he would have gone to Ten Block if he couldn't be housed

18   and because he couldn't be housed in the general

19   population of Cedar Junction.  She would have taken over

20   after that.

21               THE COURT:  I'll hear the testimony.

22               Objection overruled.

23               Did you look at Mr. Ford's file?  You

24   didn't; he went straight into DDU; right?

25               THE WITNESS:  He did go straight into DDU.

```
1              THE COURT:  And you were not involved in

2    that?

3              THE WITNESS:  I was not involved in his

4    placement in DDU, correct.

5    BY MS. DANIELE:

6    Q.  In January of 2007, when you accepted Mr. Ford,

7    where would you have placed him?

8    A.  Based on what I know of the case, I would have to

9    say he would at least start out at Cedar Junction,

10   probably in Ten Block, which is the segregation unit.

11   Q.  If --

12             THE COURT:  What would your other

13   alternatives have been?

14             THE WITNESS:  We do have another maximum

15   security facility, Souza-Baranowski, that also has a

16   seg. unit, and I -- I say seg. unit because of the

17   nature of some of the behavior and his history within

18   the Department of Corrections.

19             So, when we bring somebody in from another

20   county -- and we were very familiar with Mr. Ford.  I

21   won't say per se myself I was overly familiar because he

22   had been in the DDU.  It -- we sometimes will start them

23   out in maximum security if that's the only alternative;

24   and based on the history, I would say that that would

25   have been the alternative, one of the maximum security
```

```
 1    seg. units.
 2              THE COURT:  One of the alternatives could
 3    have been.  Do you look at everybody, and you can send
 4    them to Concord if you think that's appropriate or you
 5    can send them to Souza-Baranowski?
 6              THE WITNESS:  Correct.  Correct.
 7              MR. SYRETT:  Your Honor, we --
 8              THE COURT:  Okay.  Are you objecting to
 9    my question?
10              MR. SYRETT:  No, we're objecting to this
11    line of inquiry.  There's been no foundation established
12    that she's familiar with Mr. Ford, and I believe she
13    just specifically said she was not familiar with his
14    history --
15              THE COURT:  I'm accepting this as general
16    alternatives, okay, as opposed to -- we -- we -- I think
17    the record is very clear that Mr. Ford was not evaluated
18    specifically when he came back in January or -- when his
19    status changed in January or June, he was simply placed
20    in the DDU.  I don't think that that's disputed at this
21    point.
22              MR. SYRETT:  No.  I --
23              THE COURT:  All right.  So -- and I
24    understand that you don't feel that there should be a
25    comparison to anything other than general population.
```

1  The DOC feels that there should be a comparison with

2  anything but the general population, and I've reserved

3  that for my findings.  So I understand that objection.

4          I do believe that the witness can testify as

5  to alternatives available, not necessarily for Mr. Ford.

6  Okay.

7  BY MS. DANIELE:

8    Q.  Assistant Deputy Commissioner Mici, in January of

9  2007, if -- strike that.

10         Since this time, have you reviewed Mr. Ford's

11  history at all?

12   A.  I have.

13   Q.  Okay.  And in reviewing that history, can you

14  make a determination in both January and June of 2007,

15  when Mr. Ford was accepted as a 52A where you would have

16  recommended -- recommended that he be placed?

17             MR. SYRETT:  Objection, your Honor.

18             THE COURT:  Overruled.

19             THE WITNESS:  Yes, I can.

20  BY MS. DANIELE:

21   Q.  Where would that have been?

22   A.  Maximum security.

23   Q.  And the two institutions that were available to

24  you were what?

25   A.  Souza-Baranowski Correctional Center and

1    MCI-Cedar Junction.

2        Q.  And do you know now which one you would have

3    recommended?

4        A.  Back in 2007, I would say MCI-Cedar Junction.

5        Q.  And why is that?

6        A.  In 2007, there has been a little bit of --

7    there's been some changes in the department since then,

8    and in 2007, actually, Souza-Baranowski Correctional

9    Center was more treated as a stepdown from Cedar

10   Junction; so I would think that the nature of the

11   history would have spoken to Cedar Junction at that

12   time.

13       Q.  If you had placed Mr. Ford at Cedar Junction, and

14   he would have -- he were placed in Ten Block at the SMU,

15   and you were contacted by the superintendent that he

16   couldn't be placed in the Cedar Junction's general

17   population, what would you have done?

18       A.  Well, there are probably two alternatives I could

19   have done.  I could have seen if the county would take

20   him back, which generally does not happen, and the

21   second would have been Souza-Baranowski, the other

22   maximum security facility segregation unit.

23       Q.  And the -- why the segregation unit at Souza?

24       A.  Based on the history.  His history had been in

25   DDU.  I -- I'm not sure of enemies at this point.  I

 1   need to figure all that stuff out.  Sometimes -- I think

 2   I said this earlier -- that's where they start, until we

 3   can find the appropriate placement because it certainly

 4   isn't the goal to leave him in segregation, but

 5   sometimes you have no alternatives.

 6       Q.  What -- are you familiar with the segregation

 7   unit at Souza-Baranowski?

 8       A.  Yes.

 9       Q.  Does the segregation unit at Souza-Baranowski

10   have the same privileges as Ten Block, the same

11   conditions of confinement as Ten Block?

12       A.  All segregation units in the department have the

13   same conditions of confinement, so, yes.

14       Q.  So, if there was testimony about the conditions

15   of confinement at Ten Block, those would be the same for

16   Souza-Baranowski?

17       A.  They should be, yes.

18       Q.  And in the segregation unit at Souza, are TVs

19   allowed?

20       A.  No, I do not believe so.

21           MS. DANIELE:  Your Honor, at this point, I'd

22   like to introduce photographs of the segregation unit at

23   Souza.  I believe they're objected to.  They have been

24   turned over.  It's the same exact photographs that we've

25   had of the other units.

1               THE COURT:  Is the objection a relevance

2     objection?

3               MR. SYRETT:  It's relevance, your Honor, and

4     foundation.  I think she just testified that they should

5     be the same conditions.  It's not clear to us if she has

6     firsthand knowledge sufficient to --

7               MS. DANIELE:  I'll establish that.

8               THE COURT:  You'll establish that, and then

9     the relevance objection is overruled.

10    BY MS. DANIELE:

11       Q.  Assistant Deputy Commissioner Mici, have you been

12    inside the segregation unit at Souza-Baranowski?

13       A.  Yes, I have.

14       Q.  And are you familiar with what the unit looks

15    like and the cells inside it look like?

16       A.  Yes.

17               THE CLERK:  Twenty-seven.

18               THE COURT:  I haven't admitted it yet, Tom.

19               MS. DANIELE:  Your Honor, may I approach so

20    she can identify them?

21               THE COURT:  Yes.

22    BY MS. DANIELE:

23       Q.  Assistant Deputy Commissioner, and again I'm

24    handing you an exhibit that's not yet been marked as a

25    number, but it's three photographs.

1          Could you identify the top one, please.

2     A.   It is one of the segregation units at

3   Souza-Baranowski Correctional Center.

4     Q.   And how do you know that?

5     A.   The colors.  I've been in the unit.  I'm familiar

6   with it.

7              MS. DANIELE:  Your Honor, I would move to

8   have that photo admitted.

9              THE COURT:  Are those all photographs of the

10  segregation unit at Souza-Baranowski?

11             THE WITNESS:  Yes, they are.  Yes, they are.

12             THE COURT:  And is that as of 2007?

13             THE WITNESS:  Yes.  They have not changed

14  since then, so that's correct.

15             THE COURT:  Is there an objection other than

16  relevance?

17             MR. SYRETT:  No, your Honor.

18             THE COURT:  All right.  Objection overruled.

19  I'll mark the photographs as the next exhibit, which I

20  believe is 27?

21             (Exhibit No. 27 was admitted into evidence.)

22  BY MS. DANIELE:

23    Q.   Could you turn to the second photograph and tell

24  me what that is, please.

25    A.   The inside of a cell in the seg. unit.

 1     Q.   And the last page?

 2     A.   The solid door of the same seg. unit.

 3     Q.   That inmate cell door, is that --

 4     A.   Yes, excuse me.   That inmate cell door, yes.

 5     Q.   Assistant Deputy Commissioner Mici, in September

 6  of -- September 30th of 2010, this Court issued an order

 7  in this case finding that Mr. Ford was unconstitutionally

 8  housed in the DDU during his pretrial time.

 9          Subsequent to that decision, were you involved in

10  any way in decisions of what should be done at that

11  point with Mr. Ford's housing?

12     A.   I was involved in some of the meetings subsequent

13  to that decision, yes.

14     Q.   Could you tell the Court briefly what occurred.

15     A.   I believe the meeting was with two commissioners

16  ago, Commissioner Clarke, counsel for the Department of

17  Correction, some other key staff members, and myself,

18  discussing what our placement options were for Mr. Ford.

19     Q.   And in November of 2010, do you recall having

20  similar meetings --

21     A.   Yes.

22     Q.   -- with -- did anything change in these meetings?

23     A.   Some of the players did.  I know that the

24  commissioner -- Commissioner Clarke had left, so we -- I

25  believe we had Acting Commissioner Duval at the time,

1    and we had to restrategize to make sure we could all

2    come up with a consent as to what his best placement

3    was.

4       Q.   While we were -- while you were all discussing

5    the best placement, did anything happen that you're

6    aware of?

7       A.   I believe -- yes, Mr. Ford received a D report

8    during that time frame, a disciplinary report that led

9    to his DDU referral.

10              THE COURT:   Is that still pending in the

11   Superior Court?

12              MS. DANIELE:   Yes, it is, your Honor.

13              THE COURT:   Okay.  I gather you're not

14   claiming attorney-client privilege on any of these

15   meetings?

16              MS. DANIELE:   No, your Honor.

17              THE COURT:   So why wasn't there a hearing

18   similar to any other hearing that is held before someone

19   is put in DDU?

20              THE WITNESS:   The hearing that's held prior

21   to going into DDU is generally a dis -- based on a

22   disciplinary report.  During these meetings, it wasn't

23   discussion of a disciplinary report.  It was more

24   discussion of, okay, we need to find an appropriate

25   placement for him, and it was not an easy decision at

1    all.

2              THE COURT:  But was there any discussion

3    about having a hearing where he could present his

4    version of the events?

5              THE WITNESS:  There was a discussion of

6    that, yes.

7              THE COURT:  And what happened to that?

8              THE WITNESS:  You know, it was -- it was

9    discussion, and a decision just wasn't reached.  I

10   believe we had two meetings, and then we started over

11   with a new commissioner, and it just -- people couldn't

12   come to a consensus as to a hearing or a placement, a

13   placement at that hearing.  It just -- it just wasn't an

14   easy decision at all.

15             THE COURT:  Thank you.

16   BY MS. DANIELE:

17      Q.  Assistant Deputy Commissioner Mici, in November

18   of 2010, once Mr. Ford received his DDU referred

19   disciplinary report, do you know if he received a

20   hearing with regard to that report?

21      A.  Yes.

22      Q.  Do you know whether or not Mr. Ford is currently

23   housed in the DDU?

24      A.  Yes, he is.

25      Q.  Do you know when he's scheduled to be released

1    from the DDU?

2        A.   Yes, August 4th of this year.

3            THE COURT:  Where is he going?

4            THE WITNESS:  What will happen from there is

5    he'll be transferred to Souza-Baranowski Correctional

6    Center Segregation Unit, and at that point there will be

7    a classification hearing held.  It's -- per policy, it

8    needs to be held within 30 days, and then that board

9    will come to my office for a placement decision.

10            THE COURT:  So the persons on the

11   classification board are people from Souza-Baranowski?

12            THE WITNESS:  Correct.

13            THE COURT:  But then they come to you?

14            THE WITNESS:  Correct.  Inmates can't move

15   throughout the system without coming through my office.

16   They can't transfer; so, yes, they all come to me.

17            THE COURT:  A good place to be.

18            MS. DANIELE:  Your question was my last

19   question, your Honor, so thank you.

20                   CROSS-EXAMINATION

21   BY MR. SYRETT:

22       Q.   Good afternoon, Ms. Mici.

23       A.   Good afternoon.

24       Q.   Ms. Daniele asked you some questions about your

25   review of Mr. Ford's history; correct?

1      A.  Correct.

2      Q.  And she asked you what your decision would have

3   been in 2007 based on the review of that history?

4      A.  Correct.

5      Q.  And when you use the term "history," what are you

6   referring to?

7      A.  History within the Department of Correction,

8   during his DDU time, during any time he spent in the

9   Department of Correction --

10     Q.  Okay.

11     A.  -- is the history.

12     Q.  And that's a written history, disciplinary

13  reports, that sort of thing?

14     A.  Correct.

15     Q.  And you have no firsthand knowledge of Mr. Ford

16  as an inmate, do you, apart from your review of his

17  history?

18     A.  Firsthand knowledge as far as?

19     Q.  Have you ever observed Mr. Ford's behavior as an

20  inmate?

21     A.  I have not.

22     Q.  Is it fair to say that the substance -- your

23  review of the history would have been -- form the

24  substance of your decision in 2007?

25     A.  Yes, that's how it works because I can't see all

1  inmates, correct.

2          MR. SYRETT:  Your Honor, we move to strike

3  her testimony regarding her decision in 2007.  It's

4  entirely based on, as she's just testified, her view of

5  written documents that aren't in evidence and are

6  hearsay.

7          THE COURT:  I think it goes to the weight,

8  not the admissibility.

9  BY MR. SYRETT:

10     Q.  The classification department decides to which

11  prisons pretrial detainees are sent; correct?

12     A.  Correct.

13     Q.  The classification department generally doesn't

14  determine the placement of a pretrial detainee within a

15  prison; is that right?

16     A.  There's two answers to that.  I do sometimes make

17  a decision where to put the inmate based on information

18  I have received, but for the most part, internal

19  placements do happen at the facility level.

20     Q.  And in 2007 and 2008, you had no involvement in

21  determining Mr. Ford's placement within Cedar Junction;

22  correct?

23     A.  I hadn't even made a placement decision, and, no,

24  and I did not have the decision for the DDU, if that's

25  what you're referring to.

1    Q.  And you testified that in January 2007, you were

2    not involved in Mr. Ford -- the decision to accept

3    Mr. Ford as a pretrial detainee; is that correct?

4    A.  Oh, no, I was involved in the decision to accept

5    him.  I wasn't involved in where he was placed.

6    Q.  What was your involvement?

7    A.  The facsimile was sent to my office from Norfolk

8    County; and as the Commissioner of Correction designee,

9    I accepted his placement in the Department of

10   Correction.

11   Q.  And is it fair to say you didn't consider any

12   other options for his placement apart from Cedar

13   Junction at the time?

14   A.  It -- I wasn't given the opportunity.  It --

15   certainly Cedar Junction absolutely, that's where he had

16   been, but the placement decision was decided by somebody

17   else.

18   Q.  And when you say the "placement decision," are

19   you referring to the prison or within the prison?

20   A.  Within the prison.

21   Q.  But did you make a decision that he would remain

22   at Cedar Junction?

23   A.  No, I made the decision that he would remain

24   at -- in the Department of Correction.  The decision

25   would have been Cedar Junction, had that been given to

1    me.

2              THE COURT:  So you're making an initial

3    assessment on a 52A on whether or not somebody comes

4    into the Department of Correction; that's step one?

5              THE WITNESS:  Correct.

6              THE COURT:  And then step two is where

7    within the Department of Corrections as a facility?

8              THE WITNESS:  Correct.

9              THE COURT:  And then at the facility level,

10   it's where within the facility somebody would be placed?

11             THE WITNESS:  Correct.  And I may have

12   involvement in the internal, depending on what

13   information I have; I may not have to.  So, yes, that is

14   correct.

15   BY MR. SYRETT:

16     Q.  And in June of 2007, you didn't make the decision

17   to accept Mr. Ford as a pretrial detainee; correct?

18     A.  It was somebody in my office; so, it was myself

19   or one of my two staff members that -- again, we are the

20   people who do do the accepting of the 52As.

21     Q.  But, again, your office would have had no

22   involvement in the determination of where Mr. Ford would

23   have been placed within Cedar Junction?

24     A.  Correct.

25     Q.  The Department of Correction had no policies for

1    the detention of pretrial detainees; correct?

2      A.   Correct.

3      Q.   And there are no policies that require different

4    treatment for pretrial detainees compared to convicted

5    inmates; correct?

6      A.   There are no policies within the department.  We

7    go by just the statute.

8      Q.   And when you say "the statute," you mean 52A?

9      A.   The 276, 52A, correct.

10     Q.   And I believe you testified earlier that pretrial

11   detainees are not classified; is that correct?

12     A.   Not through the objective system, they are not

13   classified, correct.

14     Q.   And inmates in the DDU are not classified?

15     A.   Correct.

16     Q.   So is it fair to say that Mr. Ford hasn't had

17   classification since 2007 at least?

18     A.   That is fair to say.

19     Q.   So, none of the factors that the department would

20   take into consideration during a classification have

21   been applied to Mr. Ford during that process?

22     A.   Correct.

23     Q.   You testified about meetings in September and

24   November; correct?

25     A.   Yes.

1      Q.  Of 2010?

2      A.  Yes.

3      Q.  And who was at the September meeting?

4      A.  I -- General Counsel Nancy White.  There might

5   have been some other people from legal as well.  The

6   current -- the commissioner at the time, which was

7   Commissioner Clarke, Assistant Deputy Commissioners for

8   the northern and southern sector.  There might have been

9   some other Deputy Commissioners.  I mean, there was a

10  pretty good roomful of people.  I couldn't remember all

11  the players.

12     Q.  Who were the Assistant Deputy Commissioners for

13  the northern and southern sectors?

14     A.  At that time -- we change so much.  Lou Spencer,

15  who is now the Commissioner of Correction, and Paul

16  DePalo.

17     Q.  And you said there were differing views on how

18  to or where to place Mr. Ford?

19     A.  Correct.

20     Q.  Some people thought he should have a hearing

21  before he was placed; right?

22     A.  Well, it was more just discussion about what to

23  do.  Do we provide a hearing?  Do we just simply place

24  him, have a hearing follow?  And nothing was ever --

25  nothing was ever finalized.

1    Q.   And do you recall what Nancy White's view was?

2    A.   No, I don't.  It really was dialogue and

3  discussion.

4    Q.   And do you recall any views that Commissioner

5  Clarke expressed at the time?

6    A.   I do not.

7    Q.   Do you recall specific views that anyone

8  expressed at the time?

9    A.   Again, there was many different views, but who

10  specifically had them, I really couldn't testify to.

11    Q.   Okay.  And did you have a view?

12    A.   Um, I -- I think we were back and forth or I went

13  back and forth with a hearing, not a hearing, a

14  placement.  You know, that's when I really needed to

15  take a very strong look at his case and --

16    Q.   Why would you think that a hearing wouldn't be

17  appropriate?

18    A.   It's not that it wouldn't be appropriate.  It's

19  just -- it was such mixed feelings in the room that, you

20  know, we were listening to both sides or all three

21  sides, whatever it may have been.

22    Q.   What would be the reason that you wouldn't have a

23  hearing?

24    A.   To get him into a placement quicker.  A hearing

25  takes time.  Where can we put him?

1          You know, there -- there's -- when there's no
2     classification hearing held for several years, there's a
3     lot of information to put together, which is how we make
4     our decisions; so, it's not as easy as something that
5     you can really decide in a meeting in an hour.
6          Q.  Was there any discussion of changing the -- the
7     DDU to accommodate Mr. Ford, changing the classification
8     of the DDU?
9          A.  I'm not sure I understand the question.
10         Q.  Was there any -- was there any discussion of
11    changing a portion of the DDU into a DSU?
12         A.  There are some ongoing discussions about that, in
13    general, in the Department of Correction.  I wouldn't
14    base it on Mr. Ford's -- I believe that has been going
15    on prior to any of this.
16         Q.  But there was at least some discussion at these
17    meetings about keeping Mr. Ford in the DDU but
18    reclassifying it as a DSU?
19         A.  I -- I honestly -- I hate to say if I'm mixing
20    the meetings up, but I'm on that committee as well, as
21    far as looking at DDU, DSU, and all different types of
22    things.  I don't recall if that was something that
23    somebody came up with during the meeting with
24    Mr. Ford -- about Mr. Ford.
25         Q.  But as you sit here today, it is possible that it

1    was discussed in the meeting?

2        A.   It is possible, absolutely, yes.

3        Q.   Now, do you recall who was at the November 2010

4    meeting?

5        A.   Most of the same people with the exception of the

6    commissioner, and the -- again, I had said the

7    commissioner at the time was Mr. Duval.  I believe he

8    was at that meeting.

9        Q.   And do you recall any of the views anyone

10   expressed about what to do with Mr. Ford?

11       A.   It was a lot of the same back and forth as

12   to -- just there was no general consensus.

13       Q.   Did you have any views -- did you express any

14   views at that meeting?

15       A.   Um, I mean, I -- I don't know if I expressed any

16   views, but I'm certain I was part of the -- the

17   dialogue.

18            Again, you know, there's only a few choices you

19   have:  a hearing, another placement; can he safely be

20   housed in the department; does he need to go out of

21   state?  I mean, there's a lot of things that I would

22   look at, but it's really hearing dependent.

23       Q.   Okay.  You mentioned a DDU sanction that Mr. Ford

24   recently received; correct?

25       A.   Yes.

1     Q.   Was the November meeting before or after Mr. Ford

2  received that sanction?

3     A.   I -- I honestly -- I don't know.

4     Q.   Mr. Ford received a DDU sanction; correct?

5     A.   Yes.

6     Q.   And that was sometime in -- he received a ticket

7  sometime in November?

8     A.   Yes.

9     Q.   And he since remained in the DDU after that

10  ticket?

11     A.   Yes.

12     Q.   Is it fair to say that Mr. Ford's receipt of that

13  ticket nullified the issue of where to place him for the

14  time being?

15     A.   Yes.

16          MR. SYRETT:  I have no further questions.

17          THE COURT:  Anything further?

18          MS. DANIELE:  I have nothing further, your

19  Honor.

20          THE COURT:  You may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  My memory is is that we're going

23  to break now for today and resume tomorrow morning with

24  the expert; is that right?

25          MS. DANIELE:  Yes.  Our expert will be here,

1    and that will be the close of our case.

2              THE COURT:  All right.  And do we expect any

3    rebuttal?

4              MS. PIROZZOLO:  Not at this time, your

5    Honor.

6              THE COURT:  All right.  So we'll resume

7    tomorrow morning then at 10:00.

8              And -- I'm sorry.

9              MS. SCHULMAN:  I thought that the parties

10   had actually agreed to commence tomorrow at 9:30.

11             THE COURT:  9:30?

12             MS. DANIELE:  Yes, we're fine with that.

13             THE COURT:  Okay.  9:30 tomorrow morning

14   then, and I want to address this Exhibit B; so, take a

15   look at whatever records you have.

16             MS. PIROZZOLO:  We'll look at what was

17   produced to us.

18             THE COURT:  All right.  I'll see you

19   tomorrow morning then.

20             MS. DANIELE:  Thank you, your Honor.

21             THE CLERK:  Court is in recess.

22

23             (At 2:55 p.m., Court was adjourned.)

24

25

1        C E R T I F I C A T E

2

3         I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript, consisting of 174

5    pages, is a true and accurate transcription of my

6    stenographic notes in Case No. 07cv11457-JGD, Albert

7    Ford versus James Bender, et al., before Judith G. Dein,

8    on July 26, 2011, to the best of my skill, knowledge,

9    and ability.

10

11

12    /s/ Marianne Kusa-Ryll                    08/04/2011

13    Marianne Kusa-Ryll, RDR, CRR              Date

14    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25