1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3

4   Albert Ford,            )
                 Plaintiff,  )
5                            )
                             )
6   vs.                      )        Case No. 07cv11457-JGD
                             )
7                            )
    James Bender, et al.,    )
8           Defendants.      )

9

10  BEFORE:  The Honorable Judith G. Dein

11

12                    Bench Trial Day 3

13

14

15                            United States District Court
                              Courtroom No. 15
16                            One Courthouse Way
                              Boston, Massachusetts
17                            July 27, 2011

18

19

20

21

22                 Marianne Kusa-Ryll, RDR, CRR
23                    Official Court Reporter
                   United States District Court
24                  595 Main Street, Room 514A
                     Worcester, MA 01608-2093
25             508-929-3399 justicehill@aol.com
             Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES:

 2    Wilmer Cutler Pickering Hale and Dorr, LLP
      Lisa J. Pirozzolo, Esquire
 3    Anant K. Saraswat, Esquire
      Dimple Chaudhary, Esquire
 4    Emily R. Schulman, Esquire
      Timothy D. Syrett, Esquire
 5    60 State Street
      Boston, Massachusetts 02109
 6    for the Plaintiff.

 7    Department of Correction
      Legal Division
 8    Julie E. Daniele, Esquire
      Kevin A. Anahory, Esquire
 9    70 Franklin Street, Suite 600
      Boston, Massachusetts 02127
10    for the Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2   Testimony of:          Direct  Cross  Redirect  Recross

 3   Bernard Katz, M.D.
       by Mr. Anahory        5
 4     by Mr. Syrett                39
       by Mr. Anahory                        64
 5     by Mr. Syrett                                   69

 6

 7   Closing Arguments:                              Page

 8   Ms. Daniele                                      79
     Mr. Syrett                                       89
 9

10

11

12

13                       E X H I B I T S

14
     No.        Description                  For Id.  In Evd.
15
     28         Medical and mental health
16              screening form for Albert
                Ford.                                   4
17
     29         Medical record entitled UMass
18              Correctional Health Sick Call
                Request Form, dated August 17,
19              2007.                                  58

20   30         Medical record entitled UMass
                Correctional Health Sick Call
21              Request Form, dated August 20,
                2007.                                  62
22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2

3          THE CLERK:  All rise.

4          You may be seated.

5          THE COURT:  Good morning.

6          Where are we on Exhibit B, the medical

7  record?

8          MR. SYRETT:  Your Honor, we -- we were able

9  to locate it in production; so, we don't object on that

10 ground.

11         THE COURT:  All right.  So we'll mark it

12 then as Exhibit 28.

13         (Exhibit No. 28 was admitted into evidence.)

14         THE COURT:  Any housekeeping matters or are

15 we starting?

16         MR. SYRETT:  Your Honor, just one

17 housekeeping matter.  On Monday, I think you

18 mentioned -- you asked about if there are other records

19 relating to diabetes, and we have two exhibits that we

20 would submit now that we sent to Ms. Daniele last night.

21         THE COURT:  And why don't we deal with it at

22 the conclusion of the defense case and the rebuttal.

23 We'll deal with it that way.

24         Anything else?

25         All right.  Call your next witness, please.

```
 1                    MR. ANAHORY:  Your Honor, the defense calls
 2     Dr. Bernard Katz.
 3                    THE CLERK:  You're going to be sitting.
 4                    Please --
 5                    THE WITNESS:  Oh, sorry.
 6                    THE CLERK:  Please raise your right hand.
 7                         BERNARD KATZ, M.D., SWORN
 8                    THE CLERK:  Please be seated.  Please state
 9     your full name, spelling your last name for the record.
10                    THE WITNESS:  It's Dr. Bernard Katz,
11     K-A-T-Z.
12                         DIRECT EXAMINATION
13     BY MR. ANAHORY:
14        Q.  Good morning, Dr. Katz.
15             Doctor, are you currently employed?
16        A.  Yes, I am.
17        Q.  And where do you work?
18        A.  I work at the Worcester County Jail and House of
19     Correction, and I also have a private practice of
20     forensic psychiatry.
21        Q.  And how long has your work situation been as it
22     is now?
23        A.  Well, I've had a forensic and general psychiatric
24     practice for 40 years.  I have been with the Worcester
25     County House of Correction since February of '09.
```

1      Q.   Can you provide the Court with a history of

2  your -- of your -- can you provide the Court with your

3  work history.

4      A.   Starting when?

5      Q.   Starting from graduating college?

6      A.   When I graduated from college, I went to the

7  University of Chicago, got a master's degree.  Then I

8  worked for a few years at Jewish Family Service in

9  Cincinnati, Ohio.  Then went to medical school,

10  graduated in 1967; did a one-year internship at the

11  University of Wisconsin at Madison; came to Boston in

12  1968, for my residency at the Massachusetts Mental

13  Health Center.

14          When I finished the Massachusetts Mental Health

15  Center, in those days, there was a military obligation.

16  I had two years with the Public Health Service.  I was

17  chief of Psychiatry at the U.S. Public Health Service

18  Hospital in Brighton, Mass.

19          I finished that obligation and began working as

20  founding medical director of Westwood Lodge Hospital, a

21  psychiatric hospital in Westwood, Mass.  I was there

22  from, I believe, January of '73, until, I think, July of

23  '83, if I remember correctly.

24          Then I went to HRI Hospital System.  It's a

25  private psychiatric hospital system in Brookline.  My

1    first position there was director of the outpatient

2    clinics.  There were six outpatient clinics, and I was

3    asked to be the psychiatrist in chief of not only the

4    outpatient clinics, but the inpatient unit as well.  I

5    was there until -- from about '83 until 1994.

6            In 1994, I assumed the position as medical

7    director of Bridgewater State Hospital and also oversaw

8    the psychiatric -- the delivery of psychiatric services

9    in the Massachusetts prison system.

10           I left there when my contract expired in 1997,

11   did private practice, private forensic work, and decided

12   to go back to work in February of '09, in Worcester.

13   Q.  Could you just specifically hone in on the

14   periods of time where you were employed where you had

15   experience working or dealing with incarcerated

16   individuals?

17   A.  Okay.  In 1984, while I was psychiatrist in chief

18   at HRI Hospital in Brookline, I was asked by then

19   Commissioner Michael Fair, Commissioner of Correction,

20   if I would be his psychiatric consultant to the

21   Department of Correction, which I did on a very, very

22   part-time basis, and I had various duties; asked to

23   chair suicide reviews.  If a patient either had a near

24   miss or a completed suicide, there would be a suicide

25   review.  I would chair that.

1          I would be sent around to various prisons in the

2     state where there were problems, having something to do

3     with mental health, advising the staff, advising the

4     custody staff as well.  So, that was from 1984, '85

5     until 1994.

6          I gave that up when I went full-time with

7     the -- it wasn't with the Department of Correction

8     because it was a privatized contract, but the group that

9     ran it was CMS out of St. Louis.  So it was with the

10    Department of Correction but via private vendor.

11    Q.   And does any of this experience include assessing

12    individuals for their appropriateness in segregated

13    confinement?

14    A.   It does now.  I wasn't asked to do that when I

15    was either a consultant for the department or -- that

16    wasn't part of my duties when I was overseeing the

17    prison system because that's hands on; but I -- if there

18    were questions, and there were major issues, that's the

19    kind of thing I might be brought in to advise on.

20    Q.   But currently that is a function of your

21    employment?

22    A.   Oh, yes.

23    Q.   Do you have any other professional experience?

24    A.   Could you be more specific.

25    Q.   Well, I mean, I -- you've related a lot of that,

1    but is there any board certifications?

2        A.   Yes.  I'm certified by the American Board of

3    Psychiatry and Neurology.  I had a ten-year board

4    certification with a subspecialty in forensic

5    psychiatry.  That expired in 1999.  I just didn't feel

6    like taking another test to get recertified.

7        Q.   Do you have any teaching experience?

8        A.   Yes.  I've been on the faculty of Harvard for

9    many, many years, probably the lowest rank conceivable,

10   but also -- and I think it was around 2001, I was asked

11   to take over as Psychiatrist in Chief at Tufts New

12   England Medical Center.  The chairman and a professor

13   resigned precipitously.  The department was in chaos.  I

14   was asked to -- to do that, to come in and stabilize the

15   department, which I did, and I recruited my own

16   replacement.  I was there half-time during that period.

17       Q.   And --

18       A.   I'm still on -- excuse me -- I'm still on the

19   Tufts faculty as well.

20       Q.   Have you testified as an expert witness in the

21   area of psychiatry before?

22       A.   Yes, I have.

23       Q.   How many times?

24       A.   Quite a few.

25       Q.   Can you just provide the Court with a list of the

1    courts that you've testified in.

2      A.   Well, I've testified in Federal District Court, I

3    would guess, maybe five or six times; I testified in

4    State Superior Court innumerable times, usually civil

5    matters.

6          In the old days I did a lot of sexually dangerous

7    persons examinations.  I did that.  And District Court,

8    as you may or may not know, if you go to commit

9    somebody, that goes through the District Court.  I've

10   had innumerable experiences doing that.

11            MR. ANAHORY:  Your Honor, at this time, I

12   would like to have Dr. Katz qualified as an expert

13   witness.

14            MR. SYRETT:  Your Honor, we don't object to

15   Dr. Katz testifying regarding the matters that are

16   set forth in his opinion, but he did not offer an

17   opinion about Mr. Ford's mental state in 2007 and 2008,

18   and so we, therefore, think he should be concluded from

19   offering an opinion about that.

20            THE COURT:  All right.  I'm not going to

21   rule on it.  He obviously has some expertise in some

22   areas, but we'll take it question-by-question to make

23   sure he has a sufficient basis.

24            MR. ANAHORY:  Thank you, your Honor.

25   BY MR. ANAHORY:

1    Q.   Doctor, are you familiar with the plaintiff in

2  this matter, Albert Ford?

3    A.   Yes, I am.

4    Q.   How do you know him?

5    A.   I evaluated Mr. Ford at MCI-Cedar Junction.  I

6  don't have the date.  My report isn't in front of me,

7  but maybe a month or a month and a half ago.

8    Q.   And how long did that meeting or that evaluation

9  last?

10    A.   The face-to-face with Mr. Ford?

11    Q.   Yes.

12    A.   Possibly an hour and a half.

13    Q.   And did you caution Mr. Ford that you might be

14  testifying against him in court today?

15    A.   I did.

16    Q.   Did you do anything else to prepare for your

17  testimony today?

18    A.   I reviewed a voluminous number of records

19  concerning Mr. Ford, and I met with attorneys.  I had a

20  deposition of a week or so ago, a couple weeks ago, and

21  I reviewed all of that material.

22    Q.   And when you say "records," what records are you

23  referring to?

24    A.   Well, everything I could get my hands on, mostly

25  the medical records, the mental health records, some

 1   custody records that I thought were -- might be

 2   relevant.

 3       Q.   Did you look at any disciplinary records?

 4       A.   Yes.

 5       Q.   Did you do anything else to -- did you review the

 6   DDU?

 7       A.   Yes, I did.

 8       Q.   And could you let the Court know what that review

 9   consisted of?

10       A.   Sure.  While I was down there, I asked for a

11   tour, and that was graciously provided by Deputy

12   Bissonette, and I toured the whole DDU.  I viewed

13   Mr. Ford's cell.  I saw where the COs were housed.  I

14   looked at some of the program area.  Mr. Ford completed

15   a Spectrum-sponsored course.  I looked at what that

16   setting was like.  I reviewed some of the procedures

17   down there and policies.

18       Q.   And based on all of the material that you looked

19   at in your interview with Mr. Ford, to a reasonable

20   degree of medical certainty, do you have an opinion with

21   regard to Mr. Ford's mental health?

22       A.   Yes, I do.

23       Q.   What is that opinion?

24       A.   I do not believe that Mr. Ford suffers from any

25   significant major psychiatric disturbance.

1    Q.  And is there any type of disturbance that you

2  feel he suffers from?

3    A.  It depends on how we define "disturbance."  As it

4  may have come out in the court earlier, I don't know,

5  but when you go to diagnose somebody, there are

6  generally five axes that a psychiatrist is directed

7  to -- to address.

8       The first two are the major ones.  Axis I on

9  which serious mental illness would be noted.  Axis II is

10  for personality disorders, character pathology, and I

11  did -- while I said that Mr. Ford does not suffer from

12  any serious major psychiatric or affective disorder,

13  referring to the diagnosis on Axis I.

14       Axis II is more of a condition, rather than an

15  illness.  It's a lifelong or near lifelong personality

16  style that if it is rigid enough or creates difficulty

17  functioning, and it rises to the level of a -- of a

18  diagnosis; and I felt that Mr. Ford did have a diagnosis

19  on Axis II.

20    Q.  What is that diagnosis, Doctor?

21    A.  Antisocial personality.

22    Q.  Why do you feel that Mr. Ford has antisocial

23  personality disorder?

24    A.  Do you mean what criteria I used?

25    Q.  Yes.

1      A.  Well, he gave me a history of -- and I can't

2  quote all of the details from the diagnostic and

3  statistical manual, but the ones I can quote, just off

4  the top of my head, he did give me a history of what I

5  considered to be a conduct disorder as a child where he

6  talked about hanging out with his friends that -- he

7  basically had a -- according to him, a bifurcated life.

8          On the one hand, he was a terrific athlete

9  in school, but then he had his friends in the

10  Project -- and with that group he hung out with the

11  athletes and so on, but he also hung out with kids in

12  the Projects where he lived, and those kids would get

13  into trouble.  They would drink beer, smoke marijuana,

14  be involved in some petty crime, and then as he got a

15  little bit older, the crimes became more serious.

16      Q.  And you've testified earlier that you've seen

17  Mr. Ford's disciplinary history?

18      A.  Yes.

19      Q.  Do those support this diagnosis of

20  anti -- antipersonality disorder?

21      A.  Well, it's like anything else.  It's on a

22  spectrum.  There are a number of people in a prison

23  system who suffer from antisocial personality disorder

24  but have made a decision for a variety of reasons to do

25  their time quietly, and they seek privileges, and they

1    go to lower security, and so forth.  So even though they

2    have this diagnosis, they don't always get into trouble

3    picking up tickets and so forth.

4         However, there is a subset in every prison that

5    I've ever seen of serious management problems, and those

6    individuals have a very, very difficult time dealing

7    with authority.  They're constantly getting into

8    difficulty with the correction officers and with the

9    rules and with other inmates and violating the rules;

10   and in that subset of difficult to manage individuals,

11   antisocial personality disorders are overrepresented to

12   an extreme degree.  Most of those people in that small

13   subset do suffer from that diagnosis.

14   Q.  I'd like to direct your attention to your meeting

15   with Mr. Ford in 2007 -- I'm sorry -- in 2011, when you

16   met him at the Mass. Correctional Institution at Cedar

17   Junction.

18        Where did that meeting take place within that

19   facility?

20   A.  Well, it took place in a -- it looked like an

21   interview room that was used, I'm assuming, for attorney

22   meetings and other examinations, in close proximity to

23   the DDU.

24   Q.  What did you talk about?

25   A.  Well, it was a psychiatric examination.  I got

1    his psychiatric history.  I got his personal history.

2                    THE COURT:  I'm sorry.  Did I miss -- what

3    was the purpose of this meeting?

4                    THE WITNESS:  Your Honor, I was asked to

5    interview Mr. Ford within the context of this particular

6    litigation to see if I had an opinion as to whether or

7    not he had a psychiatric disorder and --

8                    THE COURT:  So you didn't examine him as

9    part of the prison system itself; this was as part of

10   the litigation?

11                   THE WITNESS:  No, your Honor, I'm not with

12   the Massachusetts DOC.

13                   THE COURT:  So they didn't bring you in for

14   placement purposes or anything like that?

15                   THE WITNESS:  No.  No, your Honor.

16                   THE COURT:  You were brought in for the

17   litigation?

18                   THE WITNESS:  Now, if I may, when I was a

19   consultant or when I was overseeing the psychiatric

20   program in the DOC, which I stopped doing in '97, this

21   could very well have been the kind of case that I would

22   be asked to see.

23                   THE COURT:  But you weren't.

24                   THE WITNESS:  But I have no connection with

25   the Mass. DOC at this point.

1            THE COURT:  Thank you.

2   BY MR. ANAHORY:

3      Q.  And during your discussions with Mr. Ford, did

4   you have any discussions specifically with regard to his

5   pretrial detainee period in 2007?

6      A.  I did.

7      Q.  What information did Mr. Ford provide to you with

8   regard to this time period?

9      A.  Well, this was in the context of the overall

10  interview; so, it was not particularly highlighted

11  anywhere, but as part of the interviews, he was

12  discussing his history of incarceration and the

13  difficulties that he has gotten into in life, and the

14  rest of it.

15      He mentioned that when he was -- his probation

16  was violated in 2007, and he was reincarcerated at

17  MCI-Cedar Junction, that he felt very unjustly

18  reincarcerated.  He -- his argument to me wasn't -- and

19  he wasn't arguing.  He was extremely pleasant, a very

20  nice, intelligent, articulate man.  But that he felt

21  that that was some sort of a setup, a frame; that he

22  didn't do it.  I think this was the heroin issue, the

23  mailing in of the heroin.  He said he didn't do it.

24  They didn't have any evidence, and he thought this was a

25  setup.  He acknowledged that he pled guilty to it, but

1   he felt he didn't have any other choice, and that

2   because he felt that he was unjustly reincarcerated,

3   violated of his probation, that he said that he was blue

4   about that.  He was angry about that.  He said he had

5   some depression, some anxiety.

6        A very good example that he used -- and I didn't

7   check these particular records, but he said, for

8   example, well, now he's out using his hour a day out

9   exercising for the most part.  He didn't do very much of

10  that during this first period, and he used that as an

11  example of his having been down and blue about -- and

12  angry about having been unjustly reincarcerated.

13   Q.  And at any point, did you note that Mr. Ford

14  suffered from significant trauma or severe psychological

15  harm stemming from his incarceration as a pretrial

16  detainee?

17            MR. SYRETT:  Objection, your Honor.  This is

18  an issue that was entirely omitted from Dr. Katz'

19  report.  There's no opinion offered about 2007 or 2008,

20  and we object that under Rule 26 he shouldn't be allowed

21  to offer an opinion here today.

22            THE COURT:  Is it in his report?

23            MR. ANAHORY:  Well, his report states, your

24  Honor, that he does not suffer from any significant

25  major mental illness.

```
1              THE COURT:  Does his report address

2    the 2007 period?

3              MR. ANAHORY:  It's mentioned in there, yes,

4    your Honor.

5              THE COURT:  Let me see the report.

6              I'll see counsel at sidebar.

7              (Sidebar as follows:

8              THE COURT:  Does this report grant an

9    interview in 2007?

10             MR. ANAHORY:  No, 2011, your Honor.

11             THE COURT:  Huh?

12             MR. ANAHORY:  It deals with --

13             THE COURT:  2011, but he's testifying now to

14   what he heard from seeing him in 2007.

15             Where is that here?

16             MR. ANAHORY:  It's in here, your Honor.

17   Just bear with me.

18             MR. SYRETT:  Your Honor, I think the only

19   mention of 2007 is on the bottom of page 3, and

20   his -- and then going over to page 4, I think he gives

21   his -- his psychiatric diagnosis, which we -- which is a

22   current diagnosis.  In 2007, he just mentions a few

23   facts that Mr. Ford reported to him.

24             THE COURT:  Do I have that?

25             MR. SYRETT:  Oh, I'm sorry.  Sorry.  Page 2.
```

1    I was looking at the fax page number.  Sorry.

2             THE COURT:  Now, but he's testifying, as I

3    understand it, as to what he discussed with Mr. Ford in

4    2007.

5             MR. ANAHORY:  Right.

6             THE COURT:  Does this say he interviewed him

7    in 2007?

8             MR. ANAHORY:  No, your Honor, but he -- when

9    he interviewed him, it was concerning his whole period

10   of incarceration.  Part of what the -- the task was to

11   determine if this man was suffering from a mental

12   illness, and he took into account --

13            THE COURT:  Is -- is he testifying now as to

14   an evaluation he says he made in 2007?

15            MR. ANAHORY:  No, your Honor.  No.

16            MR. SYRETT:  No, our dispute is that the

17   only mention that he's -- he performed an evaluation in

18   2011, and he -- his report only mentions 2007 to relay a

19   couple facts about that period.  He offers no opinion

20   about Mr. Ford's mental state in 2007, and --

21            THE COURT:  And you're saying --

22            MR. ANAHORY:  Well, your Honor --

23            THE COURT:  Okay.  How could he decide in

24   2011 what his mental state was in 2007 without some

25   facts?

```
 1              MR. ANAHORY:  Well, that's actually what
 2   Dr. Grassian has done as well.  Dr. Grassian did not
 3   interview the plaintiff in this case in 2007.  He
 4   interviewed him in 2011, and the plaintiff relayed his
 5   conditions concerning the pretrial period in 2011.
 6   There's no -- there's no report or no mention of a 2007
 7   report regarding anything to do with the pretrial
 8   experience.
 9              MR. SYRETT:  Dr. Grassian had met with
10   Mr. Ford in 2007, so he had a baseline.
11              THE COURT:  Didn't he have interviews --
12              MR. ANAHORY:  Again, as I'm saying right now
13   is that Dr. Katz didn't meet with him regarding the 2007
14   period.  Dr. Katz -- Dr. Grassian when he met with him
15   in 2007 did not opine that there was an issue concerning
16   his mental health.
17              THE COURT:  He can testify not -- he can't
18   testify as to his opinions.  He can testify as to what
19   facts he had from him in 2007 about his condition in
20   2007.  Okay?
21              MR. ANAHORY:  Okay.
22              THE COURT:  But not an opinion as to an
23   opinion as to his mental health.
24              MR. ANAHORY:  I want to point out they had
25   an opportunity to depose Dr. Grassian regarding this
```

1    issue.  They spent a lot of time probing the very issue

2    regarding his impressions on his 2007 opinions regarding

3    his pretrial detention.

4              THE COURT:  Were you at his deposition?

5              MR. SYRETT:  We did ask him.  The concern is

6    that it's not anywhere in his report.  On page 3, he

7    performs a current psychiatric diagnosis, and then at

8    the bottom -- at the bottom, he says there are two

9    additional questions.

10             THE COURT:  I will sort it out.  You have

11   him testify as to whatever he wants, and I'll sort it

12   out.

13             ... end of sidebar.)

14             THE COURT:  You may proceed.

15   BY MR. ANAHORY:

16   Q.  Doctor, at any point did you note that Mr. Ford

17   suffered from significant trauma or severe psychological

18   harm stemming from his incarceration as a pretrial

19   detainee?

20   A.  I did not see any evidence of that.

21   Q.  You stated earlier that you reviewed Mr. Ford's

22   medical records?

23   A.  Correct.

24   Q.  What conclusions have you brought from those?

25   A.  Are you including the mental health records in

1     that?

2          Q.   All of -- yes.  Yes, his medical --

3          A.   Well, on the medical side, I think it has been

4     established that he has -- I'm sorry.  Go ahead.

5          Q.   I'm sorry.  I meant to say mental health records?

6          A.   You meant to say mental health records?

7          Q.   Yes.

8          A.   Okay.  Over the period of his incarceration, he

9     had some periods of time that he was on the mental

10    health caseload.  He agreed to be seen, and that

11    stretches back into the -- into the distant past, and he

12    saw the psychiatrists every now -- for certain periods,

13    and he was on some medication, and my interpretation of

14    reading the records was that he was seeking some

15    medications from time to time, not uncommon at all, in

16    an incarcerated population.

17                    THE COURT:  Do you recall what periods those

18    were?

19                    THE WITNESS:  Your Honor, I'm sorry.  I

20    didn't hear you.

21                    THE COURT:  Do you recall what periods those

22    were?

23                    THE WITNESS:  Where he saw the psychiatrist?

24                    I think if the 2007 date is the relevant

25    date here, I'm almost positive he saw the psychiatrist

```
 1    at certain times prior to 2007 and a number of times
 2    after 2007.  I think that's what -- if I may, I didn't
 3    see any major difference between the way he seemed to
 4    the mental health clinicians way before 2007 and how he
 5    seemed to the mental health clinicians during the period
 6    of pretrial detention in 2007 or subsequently,
 7    subsequent to that period of time.  He has been pretty
 8    much the same from the clinical psychiatric point of
 9    view throughout his entire incarceration.  There have
10    been some ups and downs.
11              THE COURT:  There have been ups and downs
12    during periods of personal stress or what?  What do the
13    ups and downs mean?
14              THE WITNESS:  Well, he spent almost -- you
15    know, a long time, and people do have their ups and
16    downs in the prison.  They do have an opportunity to
17    have counseling if they want it.  I did not see any
18    particular precipitance at any time in the distant past,
19    2007, or subsequent that would account for his seeking
20    out or -- it's not even seeking out, your Honor.  They
21    offer these services, and sometimes he agreed, and
22    sometimes he didn't agree, but inmates, particularly on
23    the DDU, were offered services frequently.  I think they
24    do rounds there, clinical mental health rounds three
25    times a week and see how they --
```

```
 1                    THE COURT:  You don't do those rounds;
 2     right?  You don't do those rounds?
 3                    THE WITNESS:  No.
 4                    THE COURT:  No, I don't want --
 5                    THE WITNESS:  Okay.
 6                    THE COURT:  I don't want to hear your
 7     version.
 8                    THE WITNESS:  That's fine.  All I'm trying
 9     to say, your Honor, is that he was offered, and that's
10     what most of the mental health notes indicate.  Saw Mr.
11     Ford, offered to meet with him.  Sometimes he met;
12     sometimes he refused.
13                    THE COURT:  Continue.
14     BY MR. ANAHORY:
15        Q.  Based on your review of the records, were you
16     able to determine whether Mr. Ford was mentally health
17     screened prior to him being placed in the DDU in June of
18     2007?
19        A.  That's my impression.  I do believe that I
20     recalled such records.  Mental health screen; right?
21        Q.  Yes.
22        A.  Yes.  Uh-huh.
23                    MR. ANAHORY:  Your Honor, may I show the
24     witness Exhibit 28?
25                    THE COURT:  Yes.
```

1          MR. ANAHORY:   Thank you.

2     BY MR. ANAHORY:

3        Q.   Doctor, I'm showing you what has been marked into

4     evidence as Exhibit 28.

5             Do you recognize, not the first page of it, but

6     pages 2, 3, 4, and 5 of the exhibit?

7        A.   Yes, I do.

8        Q.   And was this a record that you reviewed in this

9     matter?

10       A.   Yes, it was.

11       Q.   Can you please turn to page 3 of the exhibit.

12    It's actually on the bottom of it.  It's listed as 204.

13       A.   204, yes.

14       Q.   And what is this?  Could you read for the Court

15    what is listed on -- actually, is this a relevant

16    psychosocial history portion of this exhibit?

17       A.   Well, these are screenings; and so, like most

18    screenings, they're not in-depth evaluations, but it's a

19    screening that tries to touch all the bases, which this

20    form clearly does.

21       Q.   I'd like to direct your attention to No. 12 on

22    this screen.

23       A.   Okay.

24       Q.   And what is noted there?

25       A.   No. 12, it's anxiety, and what's checked off is

1    no history.

2              MR. SYRETT:  Your Honor, this is -- this

3    record was not specifically identified in Dr. Katz's

4    report; so we object to this line of questioning, going

5    through it specifically.

6              THE COURT:  Objection overruled.

7              Continue.

8    BY MR. ANAHORY:

9       Q.  And No. 13, Doctor.

10      A.  It says depression:  No history.

11      Q.  No. 15, Doctor.

12      A.  Appetite disturbance:  No history.

13      Q.  No. 17, Doctor.

14      A.  Suicidal ideation:  No history.

15      Q.  Could you turn to the next page of the exhibit.

16   And what is this page reporting?

17      A.  Current observation.

18      Q.  And just so we have a frame of reference, could

19   you turn to the last page of the exhibit.

20      A.  Okay.

21      Q.  And note the date there on the bottom?

22      A.  It's June 26, '07.

23      Q.  And could you direct your attention to No. 1,

24   please.

25      A.  On -- under current observation?

 1     Q.   Under current observation -- I'm sorry -- of

 2   page 3 of 4, really page 4 of 5 in the exhibit.

 3     A.   Okay.

 4     Q.   Could you note for the Court what No. 1

 5   indicates.

 6     A.   No. 1 refers to suicidal ideation and/or suicidal

 7   plan.  Both of those boxes are checked no.

 8     Q.   Could you direct your attention to No. 4, please,

 9   Doctor.

10     A.   That is mood and affect.  Affect meaning emotion.

11   The word euthymic is checked, which means normal.

12   Normal mood and emotional tone.

13     Q.   And can you direct your attention to No. 6?

14     A.   Sleep:  No complaints.

15     Q.   And No. 7?

16     A.   Concentration:  Not impaired.

17     Q.   And I just want to go back to No. 4, Doctor.  Is

18   there a box where it could have been checked that

19   Mr. Ford was depressed?

20     A.   Yes, there is.

21     Q.   Is that box checked off?

22     A.   No, it was not.

23     Q.   And based on this information and your review of

24   the records, were there any mental health

25   contraindications in placing Mr. Ford in the DDU in June

1    of 2007?

2        A.   Not that I saw.

3                  THE COURT:   Can I have the exhibit?   Can you

4    read for me what No. 17 says.

5                  THE WITNESS:   Adjustment -- adjustment to

6    incarceration, and the clinician wrote:   Concerns about

7    being a fed and not knowing why.

8                  THE COURT:   Is that a medical term?

9                  THE WITNESS:   No, ma'am.

10                 THE COURT:   All right.   Do you know what

11   that means?

12                 THE WITNESS:   I would have to speculate,

13   your Honor.

14                 THE COURT:   All right.

15   BY MR. ANAHORY:

16       Q.   Doctor, at any point in your review of those

17   records or any of the records in this matter, did you

18   note that Mr. Ford suffered from significant trauma or

19   severe psychological harm?

20       A.   I'm sorry.   Could you repeat the question.

21       Q.   At any point in your review of the records, did

22   you note that Mr. Ford suffered from significant trauma

23   or severe psychological harm?

24       A.   I didn't see any indication of it.

25       Q.   In -- in your review of the records, do those

1    records reflect in 2007 or afterwards any instances

2    where Mr. Ford complained to medical staff of anything

3    that could be considered significant trauma or severe

4    psychological harm?

5        A.   Not to my reading.

6        Q.   You testified earlier that you took a tour of the

7    DDU.

8        A.   Yes.

9        Q.   How long did that tour last?

10       A.   I would have to guess about 45 minutes,

11   thereabouts.

12       Q.   What impressions did you draw from that tour?

13       A.   Well, the first thing I noticed was that it was

14   clean, and it was quiet, not all such units are.

15   Sometimes there's a lot of turmoil in those units.  This

16   particular one, at least when I went through it, was

17   clean, and it was quiet.  I looked at the -- a little

18   bit of the programming area.  I looked at the area where

19   the COs were sitting in the middle, in the little

20   glassed-in facility there.  I looked at the medical.  In

21   fact, I even think I met one of the nurses.  I looked at

22   the medical area.  I viewed Mr. Ford's cell, and things

23   seemed to be quiet and calm.

24       Q.   And were you able to discern what opportunities

25   inmates have to interact with others?

1    A.  Well, I didn't see that much when I was there,

2  but I did query Deputy Bissonette on that, and I looked

3  at Mr. Ford's cell where I noticed the TV.  I didn't see

4  a radio, but he might have had one.  I know that radios

5  are permitted there.  I also noticed in the

6  record -- I'm sort of not answering your question

7  directly, but that at one time a mental health clinician

8  went around to try and engage him, and he was playing

9  checkers with another inmate, and I guess -- checkers or

10  chess.  I'm not sure.  And I think they were telling

11  each other the moves.  I think it was through the air

12  vent, and Deputy Bissonette indicated to me that inmates

13  would communicate with one another.  They would slide

14  notes under the door.  They'd talk through the air vent.

15  They'd shout.  And while I didn't see it, the records

16  did seem to indicate that there was a reasonable amount

17  of interaction inmate to inmate.

18      In addition, there's a fair amount of staff

19  interaction.  As we know, Mr. Ford has his blood sugars

20  checked twice a day.  There's food delivered to him.  He

21  does get an hour of day outside in recreation.

22      So it's not the same as living in the free world,

23  but it's -- he did have a fair amount of human contact

24  while in the DDU.

25    Q.  And what other opportunities do DDU inmates have

1   to engage their senses in the DDU?

2      A.   I noticed there was a window to the outside.

3   When I was down there, it was a sunny day, and the light

4   was there.  Now, the window was small.  I mean,

5   it's -- but it was definitely a window.  You could

6   definitely look outside.  There's a -- there's a -- as I

7   mentioned, a TV and, I believe, a radio, although I did

8   not -- because I didn't go into his cell.  I certainly

9   didn't rummage around.

10         So radio, TV, interaction with health personnel,

11  interaction with correction officers, visits, telephone

12  calls, that sort of thing.

13     Q.   And could you comment on the mental health

14  services available to the DDU inmates?

15     A.   Just judging from the records, they seem

16  adequate.

17             MR. SYRETT:  Objection, your Honor.  Could

18  we have a time period?

19             THE COURT:  You went in, and you interviewed

20  him --

21             THE WITNESS:  Yes, ma'am.

22             THE COURT:  -- for a period of time.  You

23  took a 45-minute tour of the DDU, but you don't work

24  there; right?  I mean, so you're just reporting to me

25  what other people are telling you about the mental

```
1    health?
2                    THE WITNESS:  Your Honor, I reviewed a vast
3    volume of material.
4                    THE COURT:  So there's a form that you've
5    seen?
6                    THE WITNESS:  Well, it's not necessarily a
7    form.  There are progress notes.  I reviewed his medical
8    record, and I reviewed his mental health record, and
9    there are forms.  There are dictated notes.  There are
10   progress notes.  All of which indicate attempts or
11   actual clinical contacts with Mr. Ford that are
12   documented.
13                   THE COURT:  Okay.  So if I have the medical
14   records, then I know the extent of those contacts.
15                   THE WITNESS:  You would see it.  Yes, you
16   would see it in there.
17   BY MR. ANAHORY:
18      Q.  How often do mental health personnel conduct
19   rounds in the DDU?
20      A.  My impression is it's three times a week.
21                   THE COURT:  And where is your impression
22   from?
23                   THE WITNESS:  I think from Deputy
24   Bissonette.
25                   THE COURT:  You know, we've heard -- I mean
```

```
 1    either you put on people on the stand who have the
 2    information.  I mean, I have no problem with this
 3    witness telling me what he has learned here, but he is
 4    not, as far as I can tell, an expert on the DDU
 5    operations or of Cedar Junction.  I mean that's not his
 6    role.  So, I don't want to get confused on where the
 7    evidence is -- where the facts are actually coming from
 8    here.
 9                MR. ANAHORY:  I believe that -- I may be
10    mistaken, but I believe that Deputy Bissonette did say
11    that there were three.  I was --
12                THE COURT:  And that's fine.  But I don't
13    want this witness to be giving me, with all due
14    respect, his impression of what other people from the
15    Department of Corrections told him as to what went on.
16    That's -- it's too far removed from the actual facts.
17                MR. ANAHORY:  Well, I apologize, your Honor.
18    I was just trying to establish his knowledge of the DDU
19    and what he looked at and just to establish that he is
20    familiar with it and -- and is not --
21                THE COURT:  Well, that's my problem,
22    frankly.  His familiarity with the DDU is a 45-minute
23    tour when everything was quiet, and then he has met with
24    Mr. Ford.  I don't have any -- and then he's reviewed
25    the records.
```

```
 1                    THE WITNESS:  Yes, your Honor.
 2                    THE COURT:  You haven't worked there.  You
 3     haven't been trained there.  It's not his job to oversee
 4     it.  So don't -- I need facts.
 5                    MR. ANAHORY:  Yes, your Honor.
 6     BY MR. ANAHORY:
 7        Q.  Doctor, are you familiar with Type 1 diabetes?
 8        A.  Somewhat.
 9        Q.  And could you describe the symptoms of the
10     disease.
11        A.  The usual symptoms are when it first presents
12     until it's diagnosed:  thirst, frequent urination,
13     weight loss, and excessive eating.
14        Q.  How is Type 1 diabetes treated?
15        A.  With insulin.  Diet, exercise, and insulin.
16        Q.  And could the disease be caused by placement in
17     the DDU?
18        A.  No.
19        Q.  Could the disease be exacerbated by placement in
20     the DDU?
21        A.  Not in my opinion.
22        Q.  Now, are you aware of how Mr. Ford's diabetes was
23     treated by the Department of Correction?
24        A.  I read them in the medical records, yes.
25        Q.  And, in your opinion, is it medically appropriate
```

1   to test him two times a day?

2       A.  Yes.

3       Q.  And if someone's diabetes or his blood sugar

4   count increased, what would -- what -- are you aware

5   that Mr. -- whether or not Mr. Ford's diabetes blood

6   sugar count increased?

7       A.  During certain periods of time over the course of

8   his incarceration, yes.

9       Q.  And in your view of the records, what were

10  the -- what was the Department's response to that?

11      A.  To adjust his insulin dose.

12      Q.  And is that an appropriate way to treat increased

13  blood sugar counts?

14      A.  Yes.

15      Q.  Are you familiar with the findings of Dr. Stuart

16  Grassian in this matter regarding the effects of

17  segregated confinement, in general, and in the DDU

18  specifically?

19      A.  I believe so.

20      Q.  And do you agree with Dr. Grassian's opinions on

21  these subjects?

22      A.  No, I do not.

23      Q.  Why not?

24      A.  Because what Dr. Grassian is describing, and I

25  would agree that with total or near total sensory

1  deprivation, it can be extremely harmful to individuals'

2  mental health and their mental condition.  I do not

3  believe those are the conditions that exist in this DDU

4  or any other DDU that I've seen over the past number of

5  years.

6      Q.  Are you familiar with the term "sensory

7  deprivation"?

8      A.  I am.

9      Q.  What does that mean?

10     A.  Again, it's on a continuum, but if you're talking

11  about total harmful deprivation, you're talking about a

12  situation in a darkened room, no sound, no light, very

13  little human contact, no discussion, no -- no contact

14  whatsoever, so all of the senses are receiving little to

15  no input.  There's no stimulation there, and prolonged,

16  profound sensory -- sensory deprivation can have serious

17  psychological effects.  I just don't think that they

18  apply here.

19     Q.  So is it your opinion that DDU inmates are

20  sensory deprived?

21     A.  It's my opinion that they are not.

22     Q.  And in your review of the material, your

23  interview with Mr. Ford and your review of the DDU, is

24  there any indication that Mr. Ford has been sensory

25  deprived?

```
 1        A.   Not in my opinion.

 2        Q.   Any indication that he suffered severe

 3   psychological harm or significant trauma in his

 4   placement in the DDU?

 5        A.   No.

 6        Q.   Any indication that he suffered severe

 7   psychological harm or significant trauma by being placed

 8   in the DDU as a pretrial detainee?

 9        A.   Not in my opinion.

10              MR. ANAHORY:  Nothing further, your Honor.

11              THE COURT:  Can you just tell me -- and he

12   cross-examined you, but you diagnosed him as an

13   antisocial personality disorder?

14              THE WITNESS:  Yes, your Honor.

15              THE COURT:  How is that affected -- is it

16   affected at all by being incarcerated in the DDU?

17              THE WITNESS:  It usually goes the other way

18   around, your Honor.  The guys with the more severe

19   antisocial personality disorders are usually the people

20   who require placement in the DDU, so --

21              THE COURT:  Because of?

22              THE WITNESS:  Well --

23              THE COURT:  Because they have problems

24   interacting with --

25              THE WITNESS:  They have problems with
```

```
 1    authority or problems interacting.
 2              THE COURT:  But that's not my question.  My
 3    question is if you have that condition, and you're
 4    housed in the DDU --
 5              THE WITNESS:  Yes.
 6              THE COURT:  -- does that affect the
 7    condition?
 8              THE WITNESS:  It's an excellent question.
 9    In my opinion, it does not, your Honor.
10              MR. ANAHORY:  Thank you, your Honor.
11                        CROSS-EXAMINATION
12    BY MR. SYRETT:
13       Q.  Good morning, Dr. Katz.
14       A.  Good morning.
15       Q.  You haven't published any articles about the
16    effects of segregated confinement; correct?
17       A.  That's correct.
18       Q.  You haven't published any articles about the
19    effects of harmful deprivation either; right?
20       A.  Correct.
21       Q.  And at your deposition, you weren't able to
22    identify any articles you reviewed about the effects of
23    segregated confinement; correct?
24       A.  I reviewed the -- Dr. Grassian's material that
25    was appended to his reports.
```

1    Q.   And apart from the material you reviewed in

2  connection with this case, you weren't able to identify

3  any other articles that you reviewed about segregated

4  confinement?

5    A.   Not specifically, but I did review, over the

6  course of my career, things related to this, but I can't

7  identify specifically what they were.

8    Q.   And you weren't able to specifically identify any

9  articles you reviewed about sensory deprivation either;

10  correct?

11    A.   Correct.

12    Q.   Now, you mentioned Dr. Grassian during your

13  direct examination.  You couldn't identify your -- at

14  your deposition any articles that criticized

15  Dr. Grassian's articles or his views; correct?

16    A.   Not that I could specifically identify, no.

17    Q.   And you've never given a presentation about the

18  effects of segregated confinement; is that right?

19    A.   Correct.

20    Q.   And you've never given a presentation about

21  sensory deprivation either; correct?

22    A.   Correct.

23    Q.   You previously had a private practice as a

24  treating psychiatrist; is that right?

25    A.   Correct.

1      Q.   And in your private practice, you've never

2   treated anyone who has been released from segregated

3   confinement; correct?

4      A.   In my private practice?  I don't believe so.

5      Q.   You've provided expert opinions in other cases?

6      A.   Yes.

7      Q.   And this is the first time that you ever provided

8   an expert opinion about the effects of segregated

9   confinement; is that right?

10      A.   To the best of my knowledge.

11      Q.   Dr. Katz, you -- you prepared a report in this

12   case; correct?

13      A.   Correct.

14      Q.   Now, I believe you mentioned on your direct

15   examination that -- that the 2007, 2008 period was not

16   particularly highlighted anywhere; is that right?

17      A.   I don't know what you mean by "highlighted."  In

18   the report?

19      Q.   Yes.

20      A.   I referenced it.

21      Q.   Well, your report didn't include an opinion about

22   whether Mr. Ford suffered any harm in 2007 and 2008;

23   right?

24      A.   Not specifically, no.

25      Q.   In fact, your report does not include any -- does

1    not include any conclusions about Mr. Ford's mental

2    health in 2007 and 2008; right?

3        A.   Well, I believe that it does.  When I put in my

4    report that I don't believe that he suffers from any

5    significant psychiatric condition and never has that

6    was -- that has to include the 2007 period as well.

7        Q.   Okay.  Dr. Katz, I've placed in front of you a

8    smaller binder, I believe, right in front of you, with a

9    copy of your deposition.

10           You recall being deposed in this case; correct?

11       A.   I do.

12       Q.   And you recall -- you recall that we had some

13   discussion about what was in and what was not in your

14   report?

15       A.   I do.

16       Q.   And if I could direct your attention to page

17   83 --

18       A.   Eighty-three?

19       Q.   -- of the transcript.

20           Yes.

21       A.   Okay.

22       Q.   And I'm looking at page -- I'm sorry -- line 3,

23   on page 83.

24       A.   Okay.

25       Q.   And I asked you:  "Did you set out any specific

1    conclusions or findings about the period of 2007?"

2         Your answer was:  "Only in my mind.  I didn't

3    include it specifically and explicitly in the report."

4         Do you see that?

5    A.   I do.

6    Q.   Did I read that correctly?

7    A.   Correct.

8    Q.   And then at line 15, I asked you "But you'd agree

9    that short of understanding what's in your mind, someone

10   reading this report cannot view or assess the

11   conclusions that you made about Mr. Ford's state in

12   2007?"

13        And your answer was:  "Specifically, that's

14   correct.  That -- that was not explicit in the report."

15        Did I read that correctly?

16   A.   That -- that is correct.  I don't think that's

17   the correct answer however.

18   Q.   But that was your testimony in the deposition?

19   A.   That was my testimony during the deposition,

20   that's right.

21   Q.   And you're uncertain why you didn't address

22   Mr. Ford's mental state in 2007 and 2008; isn't that

23   right?

24   A.   I thought that I did.  I thought that I did in

25   the totality of the report.  I did not explicitly focus

1   on that time and explicitly state that in 2007, those

2   particular months, that he specifically did not

3   demonstrate any significant, major mental illness; and

4   my report I thought included to that period of time

5   because it included all of his time.

6       Q.   Well, do you recall when I asked you at your

7   deposition whether you should have included that -- that

8   period --

9       A.   Right.  I said that I -- I just -- I didn't give

10  the proper answer there because I think I did.

11      Q.   Well, let's -- let's look at page 85 of your

12  deposition transcript.

13      A.   Okay.

14      Q.   And I'm at line 1, and I asked you:  "Is there

15  anything in your report that you have any uncertainty

16  about?"

17          And your answer was:  "I'm uncertain as to why I

18  did not address the 2007 specific questions.  I don't

19  really know why I didn't do that.  I probably should

20  have done it, but I don't see it here."

21          Did I read that correctly?

22      A.   You did.

23      Q.   And that was your testimony at the deposition?

24      A.   It was, yes.

25      Q.   And in your deposition, you also testified that

1    you think you should have included the 2007 and 2008

2    period; correct?

3        A.   Yes.

4        Q.   Now, in one of the opinions in your report is

5    that there is absolutely no indication of anything

6    remotely approaching sensory deprivation in the DDU;

7    correct?

8        A.   Correct.  I don't see it in what page you're

9    talking about, but that's my testimony, yes.

10       Q.   And that's, in fact, from your report as well;

11   correct?

12       A.   I believe so.

13       Q.   And by sensory deprivation, you mean an

14   environment that's close to total sensory deprivation;

15   correct?

16       A.   Correct.

17       Q.   And that would be a dark and empty room would

18   result in sensory deprivation, as you use the term in

19   your report; correct?

20       A.   Correct.

21       Q.   And it's your view that the conditions in the DDU

22   are not harmful; correct?

23       A.   Correct.

24       Q.   And for the conditions in the DDU to be harmful,

25   you think a number of sources of stimulation would have

1    to be removed; is that right?

2        A.   Well, I wouldn't recommend it, but that is

3    correct.

4        Q.   And, specifically, you think that they would need

5    to block the sunlight, remove the glass in the door,

6    prevent inmates from talking to anyone, have no lights,

7    no TV, no radio, no books, no visits, no phone calls,

8    and no time out of cell; correct?

9        A.   That would do it.

10       Q.   But you do agree that an inmate is at greater

11   risk of suffering mental harm from the conditions in the

12   DDU than in general population; correct?

13       A.   I haven't seen it, but I couldn't argue the

14   point.  I just have never seen it.

15       Q.   Well, do you agree with that proposition or not?

16       A.   I'm not sure I can agree.

17       Q.   Well, let's take another look at your deposition.

18   If you can turn to page 54.

19       A.   Okay.

20       Q.   And I'm at -- starting at line 24.  I asked you:

21   "Do you think that there's an increased risk of

22   deleterious effects in DDU versus the general

23   population?"

24       A.   Uh-huh.

25       Q.   And your answer was "Probably."

1    A.   Right.

2    Q.   "It's irrelevant.  We're talking about a relative

3  thing.  I don't think it's very common or very

4  infrequent, but I would have to say, yeah, probably."

5    A.   I would agree with that answer.

6    Q.   And you'd also agree that the DDU poses a

7  relatively greater risk to mental health because the

8  environment is more stringent and restrictive; correct?

9    A.   I guess, in principle, you would have to say yes,

10  but just compared to what, general population or living

11  in the free world?

12    Q.   Well, compared to general population?

13    A.   It's probably -- well, it's more stringent.  His

14  conditions are more stringent there.  Sure.

15    Q.   And that's why the DDU would pose a greater risk?

16    A.   I would have to say in principle.  It's

17  just -- I've never seen it, but in principle, I would

18  have to assume that that's probably correct.

19    Q.   And the only time you've been to the DDU is your

20  tour recently; correct?

21    A.   To that particular DDU.

22    Q.   Now, you agree that it's important for mental

23  well-being to have human contact; right?

24    A.   Yes.

25    Q.   And you'd also agree that the type of human

1  contact matters?

2     A.  In general, sure.

3     Q.  So on your tour of the DDU, you visited

4  Mr. Ford's cell; right?

5     A.  Yes.

6     Q.  And I'd like to direct you to the larger binder

7  that's in front of you, to tab 4, which is Exhibit 4.

8     A.  Okay.

9     Q.  This is a picture of Mr. Ford's cell that you

10 saw; correct?

11    A.  It looks like a picture of a DDU cell.  Whether

12 this is Mr. Ford's, I'm not sure.

13    Q.  And all of the furniture is made of cement;

14 correct?

15    A.  Correct.

16    Q.  And at your deposition, you describe Mr. Ford's

17 cell as homey; is that right?

18    A.  Correct.

19    Q.  And you also describe it as comfortable; correct?

20    A.  Well, within limits.  It's homey, and it's

21 comfortable, as one could make in this kind of

22 environment.

23    Q.  Now, you testified on direct that when you toured

24 the DDU, you thought it was calm and quiet; correct?

25    A.  When I was there, it was, yes.

1    Q.   And you've never been in the DDU during a code 99

2  or an emergency; correct?

3    A.   No.

4    Q.   So you wouldn't know if it's calm and quiet then?

5    A.   Are you talking about the particular DDU at Cedar

6  Junction?

7    Q.   Yes.

8    A.   Well, it would probably be less calm and less

9  quiet under a code 99, yes.

10    Q.   And you've never been in the DDU at Cedar

11  Junction during a cell extraction; correct?

12    A.   Correct.

13    Q.   You'd agree it's probably less calm and quiet

14  then?

15    A.   Correct.

16    Q.   You've never spent the night in a DDU?

17    A.   Fortunately, no.

18    Q.   And so you have no opinion on whether it's less

19  calm and quiet then?

20    A.   I really don't know.

21    Q.   And when you were in the DDU, you didn't close

22  Mr. Ford's cell door; correct?

23    A.   No.

24    Q.   So you didn't try to communicate with someone

25  else in an adjoining cell; correct?

1    A.   No, I didn't.

2    Q.   And, Dr. Katz, another of your opinions is that

3  Mr. Ford does not show any evidence of a major mental or

4  affective disorder; right?

5    A.   Correct.

6    Q.   And a major mental or affective disorder, in your

7  view, would include being schizophrenic, psychotically

8  paranoid or profoundly depressed?

9    A.   Correct.  Among others.

10   Q.   But it's possible to suffer psychiatric damage

11 without developing a major mental affective disorder;

12 right?

13   A.   Well, I would presume so, yes.

14   Q.   And Mr. Anahory asked you about whether Mr. Ford

15 suffered significant trauma or severe psychological

16 harm, and you'd agree it's possible to suffer trauma and

17 psychological harm without developing major mental or

18 affective disorder; correct?

19   A.   Could you repeat that, please.

20   Q.   Sure.

21       Mr. Anahory asked you about whether Mr. Ford

22 suffered significant trauma or severe psychological

23 harm; do you remember that?

24   A.   Right.

25   Q.   And your opinion is that he didn't --

1     A.   Correct.

2     Q.   -- correct?

3          But it would be possible to suffer trauma or

4     psychological harm without developing a major mental or

5     affective disorder; correct?

6     A.   Well, individuals who suffer from post-traumatic

7     stress disorder would have a diagnosis on Axis I, and

8     even though that's not schizophrenia, bipolar disorder,

9     or something like that, it is on Axis I, and it can be a

10    significant psychiatric disturbance.  I didn't see any

11    of it here.

12    Q.   But it's also possible to suffer trauma without

13    it arising to the level of post-traumatic stress

14    disorder; correct?

15    A.   Correct, yes.

16    Q.   Now, a person's belief that he's being unlawfully

17    confined could affect his mental health; correct?

18    A.   I suppose conceivably.

19    Q.   And Mr. Ford reported to you that he suffered

20    depression and anorexia as a pretrial detainee; correct?

21    A.   Yes.

22    Q.   And as part of preparing your records, you

23    examined Mr. -- or I'm sorry -- as part of preparing

24    your report, you examined Mr. Ford's medical records;

25    correct?

1     A.   Right.

2     Q.   One of those medical records indicated that

3  Mr. Ford lost 14 pounds in three months in 2008; right?

4     A.   To the best of my recollection.

5     Q.   And that weight loss would be consistent with

6  Mr. Ford suffering from depression and anorexia;

7  correct?

8     A.   That could be one of the reasons but certainly

9  not the sole reason.

10    Q.   And you don't dispute that Mr. Ford suffered

11  mental distress as a pretrial detainee; right?

12    A.   He reported to me that he was depressed and

13  anxious and angry because he felt that he was wrongfully

14  violated off of his probation.  That was his focus when

15  I met with him.

16    Q.   Now, you've mentioned that Mr. Ford was angry a

17  couple of times.

18         Is that reflected in your report?

19    A.   Well, he wasn't angry at me.

20    Q.   Let me ask a slightly different question.  You

21  reported -- you've now mentioned a couple of times that

22  Mr. Ford was angry in 2007.  My question is is that

23  reflected in your report?

24    A.   I don't recall.

25    Q.   If I showed you your report, would that help

1  refresh your recollection?

2      A.   It might.

3              MR. SYRETT:  May I approach, your Honor?

4              THE COURT:  Yes.

5  BY MR. SYRETT:

6      Q.   And, Dr. Katz, feel free to look anywhere you'd

7  like in your report, but if I could direct you to the

8  bottom of page 2.

9      A.   Okay.

10     Q.   And you -- you wrote:  "He has not made any

11 suicide attempts although does report some vague

12 suicidal ideation when he was returning from his bail

13 violation in 2007."

14     A.   Right.

15     Q.   "At that time he claimed that he had some mild

16 depressive symptoms manifested by insomnia, reported

17 anorexia, and overall dysthymia."

18     A.   Dysthymia.

19     Q.   Dysthymia.  Thank you.

20          "He reports that these symptoms lasted

21 approximately 6 months and reports that he's entirely

22 asymptomatic at this time."

23     A.   Correct.

24     Q.   You don't mention that Mr. Ford was angry at this

25 time; correct?

1    A.   I wouldn't because it doesn't go to the issue of

2    the mild depressive symptoms.  The things that I listed

3    here:  anorexia, dysthymia, insomnia are features of the

4    mild depressive symptoms that he was reporting to me.

5    The anger was a separate matter.

6    Q.   Well, you don't dispute that Mr. Ford did suffer

7    these symptoms; correct?

8    A.   He represented to me that he did.  I have no

9    reason to doubt him.

10    Q.   And separately, there's nowhere in your report,

11    is there, where you report that Mr. Ford was angry in

12    2007?

13    A.   Probably not.

14    Q.   Now, Mr. Anahory asked you about Exhibit 28;

15    correct?

16    A.   Yes.

17    Q.   Do you still have that in front of you?

18    A.   I do.

19    Q.   And do you recall the date that Exhibit 28

20    appears to be prepared?

21    A.   I think it was June 26, 2007.

22    Q.   And you understand that was the day that Mr. Ford

23    was returned to custody?

24    A.   Yes.

25    Q.   And so on -- on June 26, 2007, it reports that

1    there was no depression -- "no depression history, no

2    anxiety, and no suicidal ideation"; correct?

3        A.  Correct.

4        Q.  But after June 26, 2007, Mr. Ford did report to

5    you that he suffered depression, anxiety, and he did

6    have some suicidal ideation?

7        A.  Mild.

8        Q.  Dr. Katz, it would be better for Mr. Ford to be

9    released to society from the general population, rather

10   than the DDU; correct?

11       A.  Probably.

12       Q.  And it would be better because life in general

13   population is more similar to life outside the prison;

14   correct?

15       A.  We always -- both from psychiatric hospitals and

16   prisons and any unusual environment, if one can move to

17   a step-down unit as a transition, it's always

18   recommended.  It can't always happen, but it's always

19   recommended.

20       Q.  And it's recommended because life in general

21   population or another step down is more similar to life

22   outside prison?

23       A.  Correct.

24       Q.  And you'd also agree that Mr. Ford's

25   participation in programs offered by the DOC would be

1    beneficial?

2        A.   I would think so.

3        Q.   And as a general rule, the more programs he can

4    participate in, the better?

5        A.   I do not disagree with that.

6        Q.   Now, Dr. Katz, you testified about Mr. Ford's

7    diabetes; correct?

8        A.   Well, somewhat, yes.

9        Q.   And in your review of Mr. Ford's medical records,

10   you did see some records that related to his diabetes;

11   correct?

12       A.   Quite a few.

13       Q.   And Mr. Ford is a Type I insulin-dependent

14   diabetic?

15       A.   Correct.

16       Q.   And you observed that some of his blood sugars

17   were high during his pretrial detention?

18       A.   I did.

19       Q.   Ideal blood sugars would be under 100 in the

20   morning and around 100 to 200 -- 110 during the day; is

21   that right?

22       A.   Ideally.

23       Q.   And if Mr. Ford's blood sugars were in the 300s

24   or the 400s, those would be considered high?

25       A.   That's correct.

1      Q.   Now, Dr. Katz, you testified that diabetes can be

2    controlled by diet, exercise, and insulin; is that

3    right?

4      A.   Not always, but that's what we try and do, yes.

5      Q.   Those are the recommended treatments?

6      A.   Yes.  Yes.

7      Q.   And you'd agree that Mr. Ford's ability to

8    exercise is somewhat limited in the DDU?

9      A.   Yes.

10     Q.   And you'd also agree that, based on your review

11   of the records, Mr. Ford was only receiving insulin

12   shots twice a day?

13     A.   That's correct.

14            MR. SYRETT:  Your Honor, I mentioned at the

15   outset that we have two additional medical records, and

16   it seems appropriate to deal with them now.

17            THE COURT:  You have the witness here.  See

18   if it works.

19            MR. SYRETT:  Okay.

20            MS. DANIELE:  Your Honor, I'd like a copy.

21   I've never seen them.

22            THE COURT:  I'm sure you've seen them.

23            MS. DANIELE:  I'm sure I've seen them, but I

24   don't know what they are.

25            (Documents handed to counsel.)

```
 1              MR. SYRETT:  May I approach, your Honor?

 2              THE COURT:  Yes.

 3              MR. SYRETT:  If there's no objection, we

 4    would move this into evidence as the next exhibit.

 5              THE COURT:  Is there any objection?

 6              MR. ANAHORY:  None, your Honor.

 7              THE COURT:  It will be marked as Exhibit 29.

 8              (Exhibit No. 29 was admitted into evidence.)

 9    BY MR. SYRETT:

10    Q.  Dr. Katz, have you seen Exhibit 29 before?

11    A.  I have.

12    Q.  This is -- I think, a document that we discussed

13    at your deposition?

14    A.  I don't recall specifically, but I've seen the

15    document.

16    Q.  And if I could direct your attention to the

17    assessment portion of Exhibit 29.

18    A.  Okay.

19    Q.  Do you see where it says "DM still uncontrolled"?

20    A.  Correct.

21    Q.  And DM is -- I may mispronounce it, but diabetes

22    mellitus?

23    A.  Correct.

24    Q.  And it is still uncontrolled.  Do you know what

25    that means?
```

1    A.   It's still not where the medical staff would like

2    it to be.

3    Q.   And perhaps you can help me decipher the

4    notations underneath.

5    A.   Okay.  Well, if I may, they reference his fasting

6    blood sugars above the assessment or over in the

7    right-hand part.  F -- FSBs.  I don't know.  It should

8    be FBSs, fasting blood sugars, around 150 to 280 in the

9    morning; 200 to 400 at the second reading; and those

10   numbers are higher than what we want it to be.  So that

11   is why they said it is still not controlled to where we

12   want it to be.

13   Q.   And can you --

14   A.   Do you want me to help you with the rest?

15   Q.   Well, can I interject with one question.

16   A.   Yes.

17   Q.   Could FSBS be finger stick blood sugar?

18   A.   Yes.  Okay.

19   Q.   And, yes, now, if you could help me decipher

20   the -- I believe it says, "therefore, will."

21   A.   Correct.

22   Q.   And are they increasing the amount of insulin

23   that they're giving him?

24   A.   Correct.

25   Q.   Because the diabetes were uncontrolled at that

1   point?

2     A.   The -- the sugars were too high.  They refer to

3   it as uncontrolled, which means that it's higher than

4   they want it to be.

5             THE COURT:  If Mr. Ford was out -- not in

6   the prison situation, which I do understand has

7   restrictions, but if he was out in the general -- in the

8   world unrestricted, and he had this condition, and these

9   levels of diabetes, how often would he be testing

10  himself?  Would it be, like, all day before he eats?

11            THE WITNESS:  I don't believe so, your

12  Honor.  I mean, these are just not that dramatic; and

13  sticking oneself, you know, you do it enough times, it's

14  unpleasant.  We recommend that you do it enough to try

15  to monitor the blood sugars, but you don't want it to be

16  so onerous that it's unpleasant.  You have to draw blood

17  on yourself.

18            THE COURT:  Are there criteria?  Is there

19  set criteria in the medical world -- and I don't

20  know -- do you practice involving diabetes?

21            THE WITNESS:  I oversee it; and I have seen

22  hundreds of cases of diabetes, but what we would do is

23  we would ask the internist to make recommendations, and

24  then we oversee it; and this is what we would do.  We

25  would adjust the insulin accordingly.

1   BY MR. SYRETT:

2      Q.   Dr. Katz, if adjusting the insulin on Mr. Ford's

3   two shots per day wasn't proving effective, another

4   option would be to add a third shot of insulin; correct?

5      A.   That is possible, but you're going a little bit

6   beyond my level of expertise.

7      Q.   But it wouldn't surprise you to see that course

8   of action if two shots were proving ineffective, a third

9   might be added?

10     A.   See, the reason I can't answer that 100 percent,

11  it's possible that a third shot or longer-acting

12  insulin.  Adjustment of insulin is not a simple matter,

13  and it's something that requires a lot of trial and

14  error and a lot of effort on the part of

15  endocrinologists and general interns.  So it's not one

16  size fits all.  So I can conceivably think that a third

17  blood sugar and a third shot a day might do it, but also

18  some longer-acting insulin could also serve the purpose

19  as well.

20             MR. SYRETT:  Your Honor, may I approach

21  again?

22             THE COURT:  Yes.

23             THE WITNESS:  Okay.

24             MR. SYRETT:  Your Honor, if there's no

25  objection, we would move into evidence as Exhibit 30 the

1     document I've just handed Mr. Katz -- Dr. Katz.

2                   MR. ANAHORY:  No objection, your Honor.

3                   THE COURT:  Marked as Exhibit 30.

4                   (Exhibit No. 30 was admitted into evidence.)

5     BY MR. SYRETT:

6         Q.  Dr. Katz, is this a medical record that you've

7     seen before?

8         A.  Yes.

9         Q.  And the date is August 20, 2007; is that right?

10        A.  Correct.

11        Q.  And the -- the top line of the notes indicate

12    "FSBSs in a.m. still elevated, approximately 225 to

13    370"; correct?

14        A.  Correct.

15        Q.  And is that indicating that Mr. Ford's blood

16    sugars from the finger stick are in the 225 to 370

17    range?

18        A.  It's too high, yes.

19        Q.  And you testified that the ideal for blood sugars

20    in the morning would be around 100?

21        A.  You're not going to see that in an

22    insulin-dependent diabetic, but ideally, yes.

23        Q.  And, again, it appears that on Exhibit 30 that

24    the response of the medical staff was to increase his

25    insulin dosage; is that right?

1    A.  Correct.

2    Q.  Now, just so the record is complete in that --

3    A.  If I may, I -- I would like to point out as long

4    as we're talking about this, this one -- this more

5    recent Exhibit No. 12 was a week before Exhibit No. 11.

6    Okay?  So, it's clear that what happened here is blood

7    sugars were too high.  They increased his insulin from

8    36 to 40 units, and then they checked it the following

9    week; and the following week his levels were better but

10   still not ideal.  So then they increased the insulin

11   from whatever it was, from 40 to 44.  This is the way

12   it's done.  You check it, and you adjust accordingly.

13   That's what they did here.

14   Q.  And from your review of the DOC's medical

15   records, you understand that the DOC diagnosed Mr. Ford

16   with diabetic neuropathy; correct?

17   A.  Yes.

18   Q.  And diabetic neuropathy can involve nerve damage

19   to the feet and ankles?

20   A.  Yes, it's generally pain, neuropathy.

21   Q.  Neuropathy.  I'm sorry.  I struggle with the

22   medical terms.

23   A.  It's okay.  It's just a different accent.

24        MR. SYRETT:  I have no further questions.

25        THE COURT:  Redirect?

                    REDIRECT EXAMINATION
BY MR. ANAHORY:

    Q.   Doctor, these records prove that the department
was treating Mr. Ford's diabetes, don't they?

    A.   It looks that way to me.

    Q.   And do these records contain any indication, in
your opinion, that the diabetes were exacerbated by his
staying in DDU under pretrial confinement?

    A.   No.   These records indicate what you get into
with insulin -- Type I insulin-dependent diabetics.
They have to be readjusted.   It's not a simple matter.

    Q.   Doctor, I would like to draw your attention to
the first of the exhibits that Mr. Syrett provided to
you.

    A.   You mean these medical --

    Q.   The one that is called the UMass Correctional
Health Sick Call Request Form.

    A.   Okay.

    Q.   And under the plan --

              THE COURT:   What number exhibit are you
looking at?

              MR. ANAHORY:   I'm sorry, your Honor.   I
believe it's 29.

              Is it 29, Doctor?

              THE WITNESS:   It's Exhibit 11 marked here.

```
 1                THE COURT:  Oh, I have -- I have the
 2    originals.
 3                THE WITNESS:  Oh, okay.  Well, the exhibits
 4    were numbered differently.  Okay.
 5                MR. SYRETT:  So --
 6                THE COURT:  Just for the record, I think the
 7    11 is a deposition exhibit sticker.
 8                MR. ANAHORY:  Yes, your Honor.
 9                THE COURT:  So we know what we're talking
10    about.
11    BY MR. SYRETT:
12       Q.  Is it Exhibit 29 that is entitled UMass
13    Correctional Health Sick Call Request Form?
14       A.  Yes.
15       Q.  And I'd like to direct your attention to the plan
16    portion of that exhibit.
17       A.  All right.
18       Q.  And under number two, what is listed there?
19       A.  Hepatitis C.
20       Q.  Hepatitis C, does that indicate that Mr. Ford
21    suffers from hepatitis C?
22       A.  Yes.
23       Q.  Could hepatitis C be a reason why Mr. Ford lost
24    14 pounds?
25       A.  It's possible.
```

1    Q.  Are there any other reasons that Mr. Ford could

2  have lost weight other than his diabetes?

3    A.  Well, you have to remember that we want diabetics

4  to lose weight but not lose weight the wrong way.  So we

5  want people's weight to be down.  So we don't know if

6  Mr. Ford was trying to lose weight to help his diabetes

7  get under better control.  We don't know if the weight

8  loss was related to the diabetes.  We don't know if the

9  weight loss was related to the hepatitis C.  We just

10  don't know.

11    Q.  Was there any indication in any of the records

12  that you reviewed that his weight loss was attributed to

13  his stay in the pretrial -- his stay in the DDU as a

14  pretrial confined inmate?

15    A.  No.

16    Q.  Doctor, Mr. Syrett asked you whether or not you

17  were in the DDU during a code 99 or a cell extraction?

18    A.  Right.

19    Q.  You're employed at the Worcester County House of

20  Correction; isn't that true?

21    A.  That's correct.

22    Q.  And in your experience at Worcester --

23    A.  Yes.

24    Q.  -- in the general population of this unit, when a

25  cell is being extracted, is it loud in there?

1    A.  Are you talking about our equivalent of the DDU?

2    Q.  No, I am talking general population.

3    A.  General population.

4        It depends on how much of a fuss the inmate wants

5    to -- how much he wants to fight.  I mean, some people

6    will go willingly.  They'll cuff up, and they'll go.

7    Other guys want to make a big tussle about it.  So the

8    greater the tussle, the greater the turmoil.

9    Q.  So in your experience, there are circumstances

10   when, even in a general population unit, the code 99 or

11   a cell extraction would cause the unit to be loud and

12   disruptive?

13   A.  The code 99, definitely.  Those are always loud

14   and disruptive; and the cell extractions may or may not

15   be, but certainly they can be loud and disruptive in the

16   general population as well.

17   Q.  So in those -- in those circumstances, it doesn't

18   matter where you are in the institution.  It's going to

19   be loud and disruptive potentially?

20   A.  Correct.

21   Q.  And there was much made of the fact that

22   your -- in your deposition that you didn't include the

23   2007 period specifically.

24       Was it your understanding that when you said that

25   Mr. Ford didn't suffer any psychological harm during his

1    period -- period of incarceration, was it your

2    understanding that you were including the 2007 period?

3        A.  Of course, yes.

4        Q.  And also in your -- you testified in response to

5    Mr. Syrett that in your private practice you don't deal

6    with inmates from -- that have experienced some sort of

7    issues of segregated confinement; is that true?

8        A.  Correct.

9        Q.  Do you do so in your current practice at the

10   Worcester County House of Correction?

11       A.  Yes, quite a bit.

12       Q.  Could you explain a little bit of that to the

13   Court.

14       A.  Well, unfortunately, the recidivism rate is high,

15   and since I am the one who sees the people in our

16   equivalent of the DDU, that's one of my units.  So I see

17   these guys once a week, not all of them, but a certain

18   portion of them once a week, and a number of them, you

19   know, they wrap up, and they go out, and then they get

20   readmitted.  Sometimes, believe it or not, the same day

21   that they get released, but certainly within a few days

22   or a week, it's not at all uncommon for these guys,

23   unfortunately, to reoffend and come back to us.  So I

24   see them quite a bit.

25       Q.  Doctor, in your opinion, is sensory deprivation a

 1   subspecialty of psychiatry?

 2      A.   Not that I've ever heard of.

 3            MR. ANAHORY:  Thank you, Doctor.  No further

 4   questions.

 5            MR. SYRETT:  Very briefly, your Honor.

 6                  RECROSS-EXAMINATION

 7   BY MR. SYRETT:

 8      Q.   Dr. Katz, did you ever ask Mr. Ford why he was

 9   losing weight in 2007 and 2008?

10      A.   I don't believe so.

11            MR. SYRETT:  No further questions, your

12   Honor.

13            THE COURT:  You may step down.

14            Anything further from the defense?

15            MR. ANAHORY:  We rest, your Honor.

16            THE COURT:  Rebuttal?  Are we done?  Are we

17   done with the evidence?

18            MR. SYRETT:  Yes, your Honor.

19            THE COURT:  All right.  Are you prepared to

20   make closings?

21            All right.  Why don't we -- yes?  So why

22   don't we take a five-minute -- a ten-minute break, and

23   then we'll have closings.

24            THE CLERK:  Court is in recess.

25                  (Recess from 10:54 a.m. until 11:14 a.m.)

```
1              THE CLERK:  All rise.

2              You may be seated.

3              THE COURT:  All right.  To closings.

4              MS. DANIELE:  Good morning, your Honor.

5    Throughout this closing, I ask you to remember that

6    although this trial is only on damages, plaintiff still

7    has the burden of proving by a preponderance of the

8    evidence that he is entitled to compensatory damages or

9    injunctive relief that he seeks.

10              First and foremost in this case, under the

11   PLRA, he must demonstrate physical injuries.  He

12   presents absolutely no medical expert testimony for

13   causation regarding the 2007 and 2008 time period that

14   he was housed in the DDU with regard to either the

15   exacerbation of his diabetes or his ankle or -- and feet

16   issues.

17              Plaintiff's attempting to argue that just

18   this specific time period in the DDU exacerbated his

19   diabetes.  His initial testimony was that he first

20   realized his diabetes was not being treated properly in

21   the department when he was released on bail and tested

22   his blood sugar level; and at that time, he was testing

23   his sugar levels three times a day, and he was returned

24   to the DDU.

25              He claims he has significant issues
```

1    continuing today because the insulin testing occurred

2    only twice; however, the real fact is that plaintiff was

3    not happy with his diabetes treatment in 2004 when he

4    filed another lawsuit seeking to have additional access

5    to blood testing.  There's absolutely no evidence that

6    his diabetes, which was first diagnosed in 2006, and

7    which plaintiff states is hereditary, as 99 percent of

8    his family have it, was affected in any way during 2007

9    and 2008, the pretrial confinement period that we are

10   dealing with here.

11           Plaintiff has been housed in the DDU since

12   that 2002 time period when the diabetes was diagnosed,

13   and his concerns about testing began as early as 2004.

14           Not only is plaintiff getting appropriate

15   medical care, as the testimony of Dr. Katz demonstrated,

16   it is also not affected by his housing.

17           With regard to Mr. Ford's complaints about

18   his ankle -- ankles and feet, he testified that his feet

19   got worse while he was in the DDU, during his pretrial

20   confinement; and that argument is bolstered by the fact

21   that he was prescribed certain medications during that

22   time period.

23           First, this Court has been provided

24   absolutely no information as to what the purpose of

25   those prescribed medications are.  For all we know, the

1   medications could simply be used to combat dry, cracked

2   skin.  More importantly, there's absolutely no evidence

3   that any problems with his feet or ankles were caused by

4   his pretrial confinement period.

5            Despite Mr. Ford's initial testimony

6   regarding the problems with his feet and ankles arising

7   during this pretrial confinement period, it was clearly

8   demonstrated that the problems with his feet and ankles

9   dated back to at least 2003.

10           Moreover, the evidence is clear that Ford

11  has continuously been provided with ankle sleeves, which

12  he admitted makes the ankle restraints more comfortable.

13           He has been in the custody of the Department

14  of Corrections for over 30 years.  In that time period,

15  he has had plenty of practice walking with ankle

16  restraints, which by observation requires shorter steps.

17  Those ankle sleeves assist with any additional problems

18  he may have.

19           Finally, Mr. Ford stated he did not want to

20  have his feet amputated, and that was his big concern

21  about his feet.  While his relatives have had that

22  problem, and that's why that's a concern.  His relatives

23  were not housed in the DDU, in the Department of

24  Correction; therefore, absolutely no link between the

25  housing during his pretrial confinement period and that

1    injury.

2            THE COURT:  So is it your reading of the

3    PLRA that even if there's a found constitutional

4    violation there can be no compensatory damages without

5    physical harm?

6            MS. DANIELE:  Your Honor, without physical

7    harm, he can have no mental or emotional distress

8    claims.  Any further damages would be simply nominal

9    damages.

10            THE COURT:  There can't be any other

11    compensatory damages?  They have to be nominal?

12            MS. DANIELE:  Under the PLRA, it's just the

13    issue of --

14            THE COURT:  No, I'm saying if there's a

15    constitutional violation.

16            MS. DANIELE:  If he can prove actual injury,

17    which I will get to later; but, yes, if he can prove

18    actual injury, but with regards to any damage claims for

19    emotional distress, he cannot receive compensation

20    unless he first has a physical injury related to that.

21            Absent that physical injury, he can't be

22    compensated for his emotional injuries; but despite

23    this, Mr. Ford cannot even demonstrate any emotional or

24    mental injuries in this action.

25            First, let's talk about the first two months

1    of Ford's pretrial confinement.  From January 7, 2007 to

2    March 2nd of 2007, plaintiff testified himself that he

3    had no mental or emotional distress during that time

4    period; so, that negates any of that time period.

5            With regard to the time from June 26th of

6    2007 through April 30 of 2008, plaintiff put forward two

7    witnesses:  himself and Dr. Grassian to testify to his

8    emotional problems.  Ford's testimony, however, was that

9    he did not want to be a prisoner again after being out

10   on bail.  He could not handle the slamming doors.  He

11   could not handle being locked up.  He could not handle

12   the smell of the, quote, gas.  The reality is that

13   Mr. Ford just did not want to come back to the DOC

14   custody at all.  As he stated, I was out on the street,

15   and I realized if I could get out, I could be like

16   everybody else, but Mr. Ford is not like everybody else.

17   He cannot accept responsibility for any of his actions.

18   In Mr. Ford's mind, there was absolutely nothing wrong

19   with sending heroin into MCI-Cedar Junction when he was

20   out on bail.

21           From 1992 until January of 2007, Mr. Ford

22   was subject to every condition that he identified caused

23   him emotional distress during his pretrial confinement

24   from June 2007 to April 2008.  He never ate meals with

25   others.  He never exercised more than one hour a day,

 1   five times a week.  He never received contact visits.

 2   He never was able to hug his sister when she visited.

 3   He never had more than incidental contact with other

 4   inmates, except when he managed to get close enough to

 5   assault them.  He never left his cell without

 6   restraints.  He was always subject to pat-down and strip

 7   searches when he left his cell.  No different than the

 8   pretrial confinement time.

 9           Moreover, Mr. Ford's testimony was not

10   credible.  He admitted that he was a Baptist, but then

11   admitted that he has been self-identified as a Muslim

12   for over 30 years in the Department of Correction

13   custody so that he could, quote, "get oils" to get rid

14   of the odor from feces in the cells surrounding his.

15   Even this admission of a lie to the DOC regarding his

16   religion is not credible.  As he has not been in the DDU

17   for over 30 years, the DDU hasn't even been in existence

18   for 30 years.  In fact, despite identifying as a Muslim

19   for over 30 years in DOC custody, he told Dr. Grassian

20   that, quote, I could have become a Muslim and got easily

21   accepted.  Well, for certain, he identified as a Muslim

22   when he came into our custody.

23           In addition, he has subsequently filed a

24   lawsuit in this court to have Kingism -- as in the Latin

25   Kings, the notorious national gang -- be recognized as

1    an organized religion.  Then he states that his religion

2    is Baptist and has never changed.

3            He testified that his emotional distress

4    occurred after he returned as a pretrial detainee in

5    June of 2007; however, he received mental healthcare in

6    2005 and 2006, including medication in 2006 for anxiety

7    and panic attacks over his legal issues and 2002

8    incident.

9            What really is the cause of his emotional

10   distress?  He went to court on June 26, 2006 -- June 26,

11   2007, expecting to plead guilty to the charges arising

12   out of the 2002 incident and receive probation.

13   Instead, his bail was revoked, and he was returned to

14   the custody of the Department of Correction and faced

15   new felony charges, what really caused his emotional

16   distress at that time.

17           On the streets, Mr. Ford stated his life was

18   very difficult.  According to Mr. Ford, but contrary to

19   Dr. Grassian, he was struggling with life on the streets

20   after being in segregation for over 20 years; and the

21   struggle was not getting easier over the three-month

22   period; yet, his testimony was that he suffered grave

23   emotional harm as a result of returning to the DDU, the

24   one place where he had made himself as comfortable and

25   normal as possible and had been used to for over

15 years.

Mr. Ford further told you that he never received a medical screening when he returned to our custody on June 26th of 2007. This, again, was untruthful.

Mr. Ford's next witness was Dr. Grassian. Nathan Horton and Albert Ford, if we are to believe Dr. Grassian's testimony, these two individuals have suffered similar injuries.

In Grassian's opinion, Mr. Ford's return to the DDU was like a severe concussion. It was catastrophic to him.

Dr. Grassian testified here that after being returned to the DDU in June of 2007, he was just a broken man. Dr. Grassian attributes this to Ford's housing in the Department Disciplinary Unit; however, what makes far more sense is that his emotional distress stemmed from the fact that he was out in the community for a short period of time. He knew what he was missing, and he was returned to custody regardless of the housing.

I submit to you that Dr. Grassian's testimony is that of an advocate, rather than an expert. To him, all segregated confinement, regardless of the length or the circumstances is toxic. In his report to

1    Judge Fabricant, written in June of 2007, advocating for

2    probation for Mr. Ford, Dr. Grassian emphasizes that a

3    situation like Mr. Ford's in prison, prior to his

4    release, is not unlike that of soldiers in combat,

5    except that in prison there is never relief from the

6    front lines.

7            I am embarrassed to even quote this.  It is

8    the ultimate insult to the brave men that fight for our

9    freedom that Dr. Grassian compares Mr. Ford to them.

10   This begins the clear demonstration that Dr. Grassian is

11   not an unbiased, impartial expert evaluating Mr. Ford's

12   mental state; rather, he is an advocate for Mr. Ford and

13   the wrongs he feels that Mr. Ford has suffered as a

14   result of being placed in segregated confinement based

15   upon the, quote, inevitable multiple fights, a constant

16   need to have a shank on hand, a constant need to be

17   vigilant, and a repeated pattern of disciplinary reports

18   against him.  Apparently, to Dr. Grassian, Mr. Ford's

19   behavior is just not his fault.

20           Dr. Grassian goes on to tell Judge Fabricant,

21   that he last interviewed Mr. Ford on June 18th, and that

22   Mr. Ford had done extraordinarily well in the two months

23   between his interviews with Mr. Ford and mentions

24   nothing of the need for mental health treatment.

25           Either Dr. Grassian was acting solely as an

1   advocate or he is an extremely irresponsible

2   psychiatrist.  He is recommending that an individual,

3   who spent at least 20 years in segregated confinement in

4   prison, which he states that he believes to be extremely

5   detrimental to mental health to the extent of toxicity,

6   be sentenced to probation on a very serious criminal

7   charge with absolutely no recommendation for counseling

8   because, in his words, at that point as a professional

9   psychiatrist, it wasn't his purpose in writing the

10  letter.

11          Interestingly, it was during the two months

12  between the interviews with Dr. Grassian that Mr. Ford

13  sent the heroin into MCI-Cedar Junction.  More

14  interestingly, Mr. Ford testified that he did not

15  improve during the time that he was out on bail.  Why?

16  Because it doesn't suit his needs today.  In June of

17  2007, it suited his needs to have Dr. Grassian write a

18  report that he was improving and on track after being

19  released from prison.  Here, however, he needs five to

20  six years of intensive therapy, based solely upon 375

21  days spent in unlawful segregation, despite at least

22  5,475 days of lawful segregated confinement, after which

23  he had improved drastically in a mere three months.

24          In addition, Dr. Grassian wrote the letter

25  to Judge Fabricant after two months of pretrial

1    detainment -- pretrial confinement in the DDU.  If, in

2    fact, Ford was truly suffering from severe psychological

3    harm or significant trauma, as he reported here a couple

4    of days ago, he would -- wouldn't it have made sense

5    that he would have put this in his letter to her.

6              Then, in 2009, Dr. Grassian submits another

7    report to this Court.  In this report, he doesn't

8    mention Mr. Ford at all.  He doesn't visit Mr. Ford.  He

9    merely submits an expert report that the DDU is a

10   horrible place, condemning the DDU.

11             The DDU is not on trial here.  Any opinion

12   as to whether the DDU is an appropriate form of housing

13   is not the issue.  The DDU has been found to be

14   constitutional.  The conditions of confinement are

15   constitutional.  Thus, Dr. Grassian's 2009 report

16   further demonstrates he is not a mental health expert in

17   this case, but rather an advocate for Mr. Ford.

18             The first time that Dr. Grassian ever opines

19   that Mr. Ford has any mental harm associated with his

20   pretrial confinement associated with this case was in

21   2011, when he all of a sudden issues a report that

22   Mr. Ford has significant trauma based upon this time.

23             Dr. Grassian's testimony is also not

24   credible for an additional number of reasons:  He fails

25   to ever identify the significant trauma in 2009.  He

1    fails to provide any basis for delineating just these

2    specific 375 days that conveniently Mr. Ford is seeking

3    compensatory damages for.  He states that when he met

4    with Mr. Ford in February of 2011, he was shocked at how

5    awful he looked; the weight he had lost; his demeanor.

6                Your Honor, I ask you to look at Mr. Ford

7    today.  He looks perfectly healthy; and, frankly, he

8    looked the same way on the day of his deposition in May

9    of 2009.

10               But the telling evidence of the lack of

11   credibility on the part of Dr. Grassian was his

12   testimony around the October 18, 2011 letter to

13   Mr. Ford, and I quote, "I want you to know how strongly

14   I feel you were wronged in this recent criminal case and

15   how vigorously I would have testified in your behalf if

16   the matter had gone to trial.  In my opinion, there is a

17   quality of meanness, vindictiveness that underlay this

18   prosecution against you.  I have seen it before, and I

19   have seen it since, and I wish I had more power to

20   prevent it."

21               So after meeting Mr. Ford on these three

22   times, Dr. Grassian feels there's a meanness and

23   vindictiveness that underlay this prosecution.  Clearly,

24   as an advocate, he, quote, "wishes he had more power to

25   prevent it."

1            But Dr. Grassian's impartiality in this
2    letter is not what demonstrates his complete lack of
3    credibility; rather, it is his explanation under oath as
4    to the basis of the writing of this letter.  When asked
5    why he sent the letter, Dr. Grassian testified that he
6    received correspondences from Ford and was trying to
7    pick up his spirits.  He stated again, under oath, that
8    he had no knowledge that Mr. Ford had pled guilty and
9    thus been convicted at the time he wrote the letter;
10   however, when asked why he used the past tense in
11   referring to the fact that he would have testified on
12   his behalf, Grassian skirted around the issue,
13   maintaining he had no knowledge that Mr. Ford had pled
14   guilty.  When the Court pushed him on this issue, he
15   stated he had no knowledge of why Mr. Ford was even in
16   the Department's custody at that time.
17            So either Dr. Grassian was less than candid
18   with the Court or he was merely extremely irresponsible
19   in stating to Mr. Ford that there was a quality of
20   meanness and vindictiveness that underlay the
21   prosecution.
22            Clearly, an inmate, who is sending heroin
23   into a maximum security institution or possibly because
24   he doesn't know what he's referring to committing an
25   even more serious criminal act, cannot be taken at face

1    value.

2            Dr. Grassian was, again, entirely incredible

3    when he stated that he was referring to the 2002

4    incident as having a quality of meanness and

5    vindictiveness, rather than the subsequent heroin charge

6    as he testified in his deposition.

7            With regard to Mr. Ford's mental and

8    emotional health during this time period and during his

9    entire stay in segregation in the Department of

10   Correction, Dr. Katz has testified -- and I would

11   represent to you credibly that he may have suffered some

12   mild depressive symptoms over the course of his

13   incarceration, but he does not suffer from severe trauma

14   and does not have any major mental illness.

15           With regard to any potential actual harm

16   that Mr. Ford may attempt to elicit, any placement

17   alternatives within the Department of Correction cannot

18   be based on general population as plaintiff wants you to

19   compare.

20           Mr. Ford was not appropriate for

21   general -- excuse me -- general population housing.

22   Again, Mr. Ford has the burden of proof in this case.

23   If he wants to use the general population as the

24   appropriate comparison, he must demonstrate that he was

25   appropriate for general population housing.  He has

1  presented absolutely no testimony that he was

2  appropriate for general population housing.  In fact,

3  there was no testimony presented at all that he would be

4  appropriate for anything but segregated confinement.

5          In considering this, ask yourself why did

6  this man legally spend virtually all of his 30 years in

7  DOC custody in segregation?  Because the credible

8  testimony from both Deputy Commissioner Bender and

9  Assistant Deputy Commissioner Mici established that Ford

10  could not be housed in general population because of his

11  extensive history of violence, his history being made

12  over and over and over again while he was housed in

13  segregation.

14          Going back as early as the 1980s, Ford was

15  assaulting inmates, threatening staff, being found with

16  weapons.  When Mr. Ford began the sentence that he

17  completed on January 6, 2007, he was in segregation.

18          Mr. Ford himself admitted that he has been

19  in segregation since 1993, essentially his entire

20  sentence.  Despite the segregated confinement, Mr. Ford

21  continues to commit very serious disciplinary

22  infractions, including a number of plans to seriously

23  assault other inmates, weapons possessions, gang

24  activities, and assault on staff.

25          Just think about the seriousness of the 2002

1   incident.  The DDU houses inmates that are the most

2   difficult to manage within the Department of Correction

3   because of their level of violence and horrific behavior

4   while incarcerated.  This is where Mr. Ford was housed

5   when this incident occurred.  Place yourself in the

6   position of the nurse in the DDU, locked inside a triage

7   room with an inmate, who has already been deemed one of

8   the worst management problems in the department and has

9   already committed more than one disciplinary infraction,

10  warranting a DDU sentence.

11          Now, consider the fact that you have a shank

12  held to your neck and that you have already seen the

13  officer [sic] stab two officers and no idea how serious

14  the stab wounds are.  Unbelievably, you make it out of

15  the locked triage room with only emotional scars.

16          Now, place yourself in the position of

17  Deputy Commissioner James Bender.  It is your

18  responsibility to protect every inmate, every

19  correctional staff member, and every medical staff

20  member that steps foot into the DOC institutions.  Every

21  decision that you make could potentially put another

22  person in harm's way.  A decision such as the decision

23  of where and under what conditions to house the inmate

24  that terrorized that nurse and stabbed those two

25  officers is on your shoulders.  A wrong decision could

 1    result in devastating tragedy.

 2              Now consider the fact that even after

 3    Mr. Ford committed these acts and received a ten-year

 4    DDU sanction, which is extremely rare, he continued to

 5    receive disciplinary report after disciplinary report,

 6    including three more disciplinary reports in which he

 7    received DDU sanctions.  One of these sanctions was the

 8    result of an incident in which Mr. Ford, from outside

 9    his own cell in Ten Block, grabbed another inmate

10    through the bars and stabbed him with a weapon.

11              It is your responsibility to protect this

12    inmate, every other inmate within the department, along

13    with all staff.  Although Deputy Commissioner Bender

14    could not guarantee the absolute safety and security of

15    all staff and inmates, nothing short of DDU placement

16    could mitigate the risk posed by Mr. Ford.

17              Thus, in January 2007 when Mr. Ford became a

18    pretrial detainee, Deputy Commissioner Bender placed him

19    in the only housing unit he thought could adequately

20    house Mr. Ford.  And, again, in June 2007, Deputy

21    Commissioner Bender was tasked with the difficult

22    responsibility of placing Mr. Ford in an appropriate

23    housing unit.

24              With all of his knowledge of Mr. Ford's

25    behavior while in segregated confinement in DOC custody

1    from 1992 to 2007, Deputy Commissioner Bender was then

2    presented with another important fact.  Mr. Ford was an

3    inmate who left the custody of the Department of

4    Correction on bail with charges pending.  A mere three

5    months later his bail was revoked for sending heroin

6    into MCI-Cedar Junction only two months after being

7    released.

8              Even after he left the custody of the

9    Department of Correction, he was a threat to the

10   department.  What housing unit within the department

11   could Deputy Commissioner place Mr. Ford in and still go

12   to sleep at night without the thought of waking up to

13   another staff member feeling the fear that that nurse

14   felt when she was alone with Mr. Ford in the triage room

15   with a shank held to his neck.  DDU was that housing

16   unit.

17             Thus, although not -- not ideal, the only

18   other absolutely possible housing units within the

19   department that could safely house Mr. Ford are Ten

20   Block, the SMU at MCI-Cedar Junction or the SMU at

21   Souza-Baranowski Correctional Center.

22             It is important to note that there is no

23   process involved in the placement of Mr. Ford in either

24   of these units; rather, the process involved is provided

25   once the inmate gets there.  As such, this placement was

1    entirely appropriate and could have been used for

2    Mr. Ford's entire pretrial detention.

3            Any comparison, if it would even be

4    appropriate, to evaluate compensatory damages based on

5    a comparison would need to be made between the

6    conditions of confinement in the DDU and those in these

7    two SMUs.  Because the SMUs have some more favor --

8    favorable conditions than the DDU, while the DDU had

9    some more favorable conditions than the SMUs, the

10   plaintiffs damages are nominal.

11           The conditions in both of these units are in

12   place for the safety and security of staff and inmates,

13   and they are necessary for the safety and security.

14           Please review the photographs of Mr. Ford's

15   cell.  Unlike the visual images from the Shawshank

16   Redemption, plaintiff's DDU cell is at least minimally

17   comfortable.  He had full privilege of a television and

18   a radio.  He had use of legal materials, reading

19   materials, the ability to talk to other inmates, pass

20   things under the door, go out for recreation for one

21   hour a day, five times a week, go out for insulin.

22   His -- in the -- in the SMUs, he would not have had the

23   use of a TV.  The remaining items he would have had.

24           In addition, in the DDU, he received the

25   entire time as a pretrial detainee the maximum four

1    phone calls and four visits.  The only difference in the

2    SMUs would be that those would be less limited.

3            Please, when you are evaluating Mr. Ford's

4    damages in this action, remember who he is because

5    Deputy Commissioner Bender certainly didn't have the

6    luxury of forgetting.

7            MR. SYRETT:  Your Honor, may I just have one

8    moment?

9            THE COURT:  Yes.

10           MR. SYRETT:  Thank you.

11           (Counsel conferred.)

12           MR. SYRETT:  Your Honor, as an initial

13   matter, I would move to strike the portions of Ms.

14   Daniele's closing that are not part of the factual

15   record in this case.

16           Ms. Daniele effectively testified as to the

17   nurse's state of mind, and I think she relied on the

18   contents of the 2002 incident report, which was not

19   offered into evidence for the truth of the matters in

20   there; similarly, she relied on the 2005 incident

21   report, which I don't believe was ever introduced into

22   evidence.

23           As a matter of professional courtesy, I

24   didn't object during Ms. Daniele's closing, but I would

25   like to note my objection for the record and request

1    that that portion be stricken.

2              MS. DANIELE:  Could I just briefly

3    respond --

4              THE COURT:  Yes.

5              MS. DANIELE:  -- your Honor?

6              The -- all of the statements that I made

7    that I relied upon -- as to the nurse's state of mind,

8    this closing argument, that argument, I just asked you

9    to put yourself in the nurse's position.  I didn't say

10   what the nurse would feel like.

11             As for the factual issues of the 2002 and

12   2005 incident, I am not relying on any physical

13   documents.  Deputy Commissioner Bender testified to

14   everything that I stated.

15             THE COURT:  I accept that the arguments are

16   not evidence.  I will -- I'm not going to guess now as

17   to what came from where.  All right.  So I'm not going

18   to strike anything.  I recognize that the argument is

19   what it is, is argument, and I will be limited to the

20   testimony that actually came in.

21             And at some point after this, you'll both

22   explain to me why I didn't get the disciplinary history,

23   if you were both relying on that.  Without the

24   underlying reports, I understand had a hearsay problem.

25   I have some confusion, I think, in the record as to when

```
 1    he was serving what period for what, but I'll ask you

 2    about that after.

 3              MR. SYRETT:  Your Honor, the evidence is

 4    established that Mr. Ford is entitled to damages because

 5    he has been harmed by his unconstitutional confinement

 6    in the DDU as a pretrial detainee.

 7              Now, Ms. Daniele would have you look at this

 8    case, not with respect to Mr. Ford's pretrial detention,

 9    but we submit that the DOC did not have the right to

10    serve as a judge and a jury to treat Mr. Ford as a

11    convicted prisoner during his pretrial detention, and

12    that is the substance of the summary judgment decision

13    that has been issued.

14              The DOC's own records show that Mr. Ford

15    suffered physical harm, including his poorly controlled

16    diabetes, when he was returned to the DDU as a pretrial

17    detainee in 2007; and as Mr. Ford testified, during his

18    period of pretrial confinement, his -- his diabetic

19    neuropathy -- neuropathy -- as Dr. Katz corrected

20    me -- which the DOC itself diagnosed in its records,

21    caused numbness and burning in his feet resulting in

22    permanent injury that he continues to suffer.

23              The injuries to Mr. Ford's feet first

24    required the prescription of Tegretol; and then when he

25    went back to the doctor, as he testified, because that
```

1    wasn't working, he was prescribed Neurontin.

2            The seriousness of these injuries is further

3    evidenced by the fact that Mr. Ford cannot even feel the

4    leg -- the leg chains DDU inmates are forced to wear;

5    that they were cutting into his ankles.

6            Now, the DOC position seems to be that for a

7    physical injury to meet the PLRA test, it has to be a

8    new injury.  We dispute that.  The PLRA says a physical

9    injury.  Mr. Ford may have had diabetes before, but the

10   evidence is clear that his diabetes was exacerbated and

11   grew worse, and he suffered physical injuries during the

12   period and as a result of his pretrial detention.

13           We also, as I -- as we mentioned at the

14   outside, we dispute that the PLRA applies, and your

15   Honor asked Ms. Daniele about that.  The PLRA says that

16   it applies for claims that are for actions that are for

17   mental or emotional distress.

18           Mr. Ford certainly suffered mental and

19   emotional distress here, but he has a constitutional

20   claim that is not solely dependent on suffering mental

21   or emotional stress.  He was deprived of his due process

22   rights, and that resulted in significant deprivation.

23           We also have established that Mr. Ford did

24   suffer mental harm, which both he and Dr. Grassian

25   detailed to you, including his depression, his anxiety,

1    fear, and hypersensitivity to stimulation, and the harsh

2    conditions of the DDU.

3              And, again, this doesn't have to be a new

4    occurrence.  Mr. Ford was clear that toward the end of

5    his prior DDU period in 2006, 2005, he was starting to

6    have a harder time, but he was also clear that when he

7    was a pretrial detainee, it was a different experience

8    for him, and he suffered much more than he had because

9    he -- he realized what the DDU had previously done to

10   him.

11             As a result of his DDU confinement, Mr. Ford

12   was denied access to fresh air, recreation

13   opportunities, phone privileges, a real library and

14   human contact beyond the daily rituals of strip

15   searching and shackling.

16             Defendants contend that administrative

17   segregation is the proper baseline for assessing damages

18   in this case, not the conditions in the general

19   population, but that argument fails for three reasons:

20   first, all of the witnesses from the DOC agree, and the

21   regulations confirm that administrative segregation is a

22   temporary placement.  As such, it would not have been

23   Mr. Ford's permanent placement either as a pretrial

24   detainee or a convicted inmate.

25             Second, the DOC's witnesses agree, and,

1   again the regulations confirm, that with respect to

2   Mr. Ford, the DOC failed to secure the requisite

3   approval, assess the multiple factors, conduct the

4   ongoing monitoring, or complete the documentation

5   required to place and continue to hold Mr. Ford in

6   administrative segregation.

7           Third, the DOC witnesses are engaging in

8   nothing more than rank speculation to suggest that if

9   they had not violated Mr. Ford's constitutional rights,

10  they would have fulfilled these requirements and placed

11  him in administrative segregation.

12          Ms. Mici testified that after this Court

13  held that the DOC must give Mr. Ford the process to

14  which he is constitutionally entitled, the DOC remained

15  paralyzed, unable to agree on his proper placement.  She

16  described at least two meetings of senior officials from

17  the DOC, including the commissioners at the time, the

18  General Counsel, at which they were able to

19  make -- reach no conclusions about where to place

20  Mr. Ford.

21          And, indeed, Mr. Bender testified, I

22  believe, that he didn't even read the decision and took

23  no steps to see that the ruling was -- was honored or

24  recognized in any way.

25          So to now suggest that in 2011, it was

1    imminently clear where Mr. Ford would have been placed

2    in 2007, is self-serving at best and has no support in

3    the record.

4            Finally, it is abundantly clear that

5    releasing Mr. Ford directly from the DDU into the

6    community is irresponsible.  A transition program is

7    needed in order for Mr. Ford to have time to adjust to

8    social settings and interactions that he will encounter

9    following his release from prison.

10           In view of the evidence that has been

11   presented, we request that the Court grant Mr. Ford

12   damages for the harm he suffered on a per diem basis for

13   the 375 days he was wrongfully detained in the DDU as a

14   pretrial detainee.

15           We respectfully suggest that the Court award

16   Mr. Ford $200 per day for a total award of $75,000.  We

17   further request that the Court award Mr. Ford injunctive

18   relief to rectify the continuing harm he suffers from

19   his unlawful detention and to prepare him for his

20   upcoming release into the community.

21           THE COURT:  I would like to thank everyone

22   actually.  The case was very well tried, very

23   professionally tried.

24           Thank you, Mr. Ford --

25           MR. FORD:  Thank you.

 1              THE COURT:  -- for your attention to the

 2     matters, and for all of -- all of law enforcement, who

 3     have made this possible so professionally.  It's really

 4     much appreciated, and it's a trial that needed to be

 5     had, and I thank you.

 6              Proposed findings and rulings?  Are you

 7     going to give them to me?  How much time do you people

 8     need?

 9              MR. SYRETT:  Yes, your Honor.  We would like

10     to submit briefings.  We had discussed a schedule with

11     counsel for the DOC.  I think the -- we understand we

12     will be able to have a transcript within about two

13     weeks, so we had -- I think we discussed August 31st for

14     opening briefs, and then a response perhaps within two

15     weeks.

16              THE COURT:  So what do you need?

17              MS. DANIELE:  Your Honor, I discussed this

18     with my co-counsel, and the only issue I have is I

19     presume that means an expedited transcript of which the

20     Commonwealth could never pay for it.  I could never get

21     approval for that.  So my feeling would be we can do

22     proposed findings of fact and rulings of law without any

23     transcripts, just to set a deadline for that and have

24     that one thing completed.  That's how I've always done

25     it actually.

```
 1                THE COURT:  Well, if I do August 31st -- are
 2   you planning on ordering an unexpedited transcript or
 3   you don't know?
 4                MS. DANIELE:  I would have to go back and
 5   find out if that were -- if there were money available
 6   for it.
 7                THE COURT:  Why don't I do August 31st, and
 8   you can -- if you don't have a transcript, I will accept
 9   it without transcript cites.  If you do have a
10   transcript, I'll take transcript cites, and I
11   will -- the Court will request a transcript, but I will
12   do that for me.  I can't do that for you.  Okay?
13                So August 31st for findings and rulings, and
14   then two weeks after that -- how about September 16th
15   for replies?  All right?
16                Now, I understand that Mr. Ford's status is
17   supposed to change between now and then, right?  Did I
18   hear August 4th?
19                MS. DANIELE:  My understanding is
20   August 4th, and I believe that's a Friday.  So he'll
21   be -- he's scheduled to move there, I believe, on
22   Friday.  So it would be a day or two before, but I don't
23   think they will tell inmates when it is, but they don't
24   do moves on Friday; so, I believe it will be a day or
25   two before that.
```

```
 1                    THE COURT:  I would like the proposed
 2    findings to indicate his status.
 3                    MS. DANIELE:  Where he is?
 4                    THE COURT:  All right.  Where he is and what
 5    programs, if any, he's engaged in.
 6                    Mr. Ford, and anybody else who's listening,
 7    I'm really hoping this goes smoothly.
 8                    MR. FORD:  Yes.
 9                    THE COURT:  Okay.  Let's see if the process
10    can get started on its own without me getting motions
11    about how it happens from either side.  Okay?
12                    So I'm hoping everybody will work together
13    to make any housing transition as smooth as possible.
14    Okay?
15                    Obviously, if there are issue, I'm sure I'll
16    hear about them.
17                    Mr. Syrett.
18                    MR. SYRETT:  Your Honor, may we request oral
19    argument after the submission of briefs?
20                    THE COURT:  Only if I need it.
21                    MR. SYRETT:  Okay.
22                    THE COURT:  All right.  I appreciate the
23    offer, but I think it's important that I -- let me see
24    what you've done.  Obviously, I've been working on this
25    as it goes along; but it will be helpful for me actually
```

 1    to have an updated -- you know, a status report as to

 2    the programs or -- and the housing situation because it

 3    is in transition now.  Okay?

 4             And, also, if DOC has a plan that it

 5    anticipates Mr. Ford going into, I would like to see it,

 6    if there's no objection, because I recognize that that's

 7    new evidence after this.

 8             If there's no objection, submit it to me.

 9    If there is an objection, and there is a plan that you

10    think it would be helpful for me to know about, file a

11    motion.  At least let me know that there's an issue

12    about it, and maybe we'll have a hearing at that point.

13    I am here for the entire next couple of months.

14             MS. DANIELE:  Your Honor, if there's no

15    objection, I believe that under the regulation, there's

16    30 days for classification, which would put us a few

17    days past that August 31st deadline; so, I'd be happy to

18    file the classification report when it's completed

19    if --

20             THE COURT:  Is it -- am I understanding that

21    after August 4th, whether that's a Friday or a Monday,

22    he's going to be moved somewhere?

23             MS. DANIELE:  It's anticipated that it would

24    be the special housing unit at Souza-Baranowski for a

25    classification.  All DDU inmates virtually go from DDU

1    over to Souza segregation for classification, and
2    there's a 30-day time period to do that classification.
3              It's my understanding that some of the
4    process may have been begun already for Mr. Ford because
5    it has been so long, but -- so that they could get that
6    30 days.
7              THE COURT:  Okay.  I would like it
8    after -- yes, I would like it after the class -- I would
9    like reality.
10             MS. DANIELE:  As long as --
11             THE COURT:  I don't really want
12   hypothetically what potentially could happen.
13             MS. DANIELE:  As long as it's okay with
14   plaintiff's counsel, I'd be happy to submit the
15   classification report.
16             THE COURT:  At that time, when you have it,
17   why don't you confer --
18             MS. DANIELE:  Okay.
19             THE COURT:  -- and see if you want to
20   jointly submit it to me or if not.
21             I don't know where this goes on -- whether I
22   will need additional information about alternatives
23   available or not.  I don't know.  But let me see what
24   you're submitting on that, and then see if you can
25   coordinate it.  That would be helpful to me.

```
 1              All right.  Anything else?

 2              MR. SYRETT:  One other issue while we're

 3    here, your Honor.  You've granted us some limited

 4    discovery about the recent DDU ticket, and I think there

 5    are still some outstanding issues, so I just wanted

 6    to -- we're still working through the discovery and

 7    weighing how they're going to follow up, but I wanted to

 8    update you on that.

 9              THE COURT:  Is that -- what's happening in

10    the state court on that?  Are you representing him in

11    the state court?

12              MR. SYRETT:  Yes, we are.  I believe --

13              THE COURT:  There are a lot of courts,

14    Mr. Ford.

15              MR. SYRETT:  I believe that we are awaiting

16    the DOC's response to our filing, and I'm not sure what

17    date that's due.

18              THE COURT:  Is there discovery going on in

19    that proceeding or it's only from here?

20              MR. SYRETT:  It's only from here.

21              MR. ANAHORY:  Your Honor, there would be no

22    discovery on that.  That is a certiorari action.  They

23    filed that complaint.  The department has 90 days to

24    respond and to file the documents and filing an answer,

25    and the answer essentially, your Honor, is a certified
```

1   copy of the record down below.

2            So, it's -- it's our intention to file that

3   within that 90-day period.  Once that's done --

4            THE COURT:  I just don't know when you

5   started it.  I don't know when 90 days is.

6            MR. ANAHORY:  I believe we still have three

7   or four weeks to get that filed, your Honor.

8            THE COURT:  All right.  Well, if you have a

9   discovery issue, you better bring it to my attention if

10  you can't work it out.  All right?

11           And the case is -- you know, obviously the

12  case is still open.  We will deal with whatever I need

13  to deal with.

14           All right.  My concern about the

15  disciplinary record is I obvious -- I haven't had a

16  chance to read all of the documents that you put in as

17  exhibits that have not been discussed; so, I don't

18  really know totally what's in here.

19           I understand that the discipline -- the

20  underlying disciplinary records are hearsay.  I'm not

21  sure that the fact of a disciplinary sanction or the

22  length of that sanction would have been hearsay.

23           So I'm a little confused as -- and it could

24  be here.  I just haven't put it altogether; but if

25  there's a chronology -- the dates shift a lot as to how

1   long he's in the DDU, when the anticipated release was,

2   when the anticipated release happened; and I assume that

3   has to do with good time served kind of credits and the

4   like.

5           I don't know how important it is, but I'm

6   confused about it.  I'll just say that.  If I need

7   information, that's going to be facts and then I'll ask

8   you for it; but I don't know whether you all have

9   something easily that you want to submit jointly on that

10  or not; or if it's here already -- you know, I know that

11  to some extent some of your stipulated facts have some

12  of the convictions in it.  I just haven't put it

13  together yet.

14          MS. DANIELE:  I don't think you have it,

15  your Honor, because it's my understanding that you had

16  excluded the actual reports.

17          THE COURT:  It's the records that are

18  hearsay.

19          MS. DANIELE:  All right.

20          THE COURT:  Nobody has convinced me that

21  that's an incorrect ruling, but I'm not -- the

22  chronology --

23          MS. DANIELE:  I think --

24          THE COURT:  But I think for now I'd just go

25  with that he was in the DDU consecutively for various

 1    reasons from 199 -- whatever the date is that you gave

 2    me, since 1993.

 3                    MS. DANIELE:  I --

 4                    THE COURT:  Is that what the testimony is

 5    going to be?

 6                    MS. DANIELE:  I think the testimony was in

 7    segregation rather than the DDU.  Putting together --

 8    and I don't know if I can even do it, to be honest with

 9    you, an absolute date-by-date chronology because I was

10    having difficulty myself, but --

11                    THE COURT:  All right.  I'm not going to

12    make you do it as a difficult exercise.  If I have a

13    problem with it, if it becomes an issue, I reserve the

14    right to ask for it.  All right?

15                    All right.  Is there anything further then

16    on this matter?

17                    MR. SYRETT:  No, your Honor.

18                    THE COURT:  Again, my thanks.

19                    COUNSEL IN UNISON:  Thank you, your Honor.

20                    MR. FORD:  Thank you, your Honor.

21                    THE CLERK:  Court is in recess.

22

23                    (At 12:03 p.m., Court was adjourned.)

24

25

1                    C E R T I F I C A T E

2

3           I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript, consisting of 104

5    pages, is a true and accurate transcription of my

6    stenographic notes in Case No. 07cv11457-JGD, Albert

7    Ford versus James Bender, et al., before Judith G. Dein,

8    on July 27, 2011, to the best of my skill, knowledge,

9    and ability.

10

11

12    /s/ Marianne Kusa-Ryll                08/04/2011

13    Marianne Kusa-Ryll, RDR, CRR          Date

14    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25