<pre>
 1                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                        Civil Action
 3                                      No. 07-11457-JGD

 4   * * * * * * * * * * * *
     ALBERT FORD,             *
 5                            *
          Plaintiff,          *
 6                            *     TRANSCRIPT OF
     v.                       *     BENCH TRIAL
 7                            *       (Volume 1)
     JAMES BENDER, et al.,    *
 8                            *
          Defendants.         *
 9   * * * * * * * * * * * *

10

11

12             BEFORE:  The Honorable Judith G. Dein,
                        United States Magistrate Judge
13

14

15   APPEARANCES:

16          WILMER CUTLER PICKERING HALE and DORR LLP
         (By Lisa J. Pirozzolo, Esq., Emily R. Schulman,
17       Esq., Timothy D. Syrett, Esq., Dimple Chaudhary,
         Esq., and Anant Saraswat, Esq.), 60 State Street,
18       Boston, Massachusetts 02109, on behalf of the
         Plaintiff
19
            DEPARTMENT OF CORRECTION (By Julie E.
20       Daniele, Esq. and Kevin A. Anahory, Esq.),
         70 Franklin Street, Suite 600, Boston,
21       Massachusetts 02110-1300, on behalf of the
         Defendants
22

23
                                   1 Courthouse Way
24                                 Boston, Massachusetts 02210

25                                 July 25, 2011
</pre>

**I N D E X**

Opening Statement by Ms. Pirozzolo . . . . . . . . 5

Opening Statement by Mr. Anahory . . . . . . . . 16


**WITNESS:**          **DIRECT**   **CROSS**      **REDIRECT**   **RECROSS**


STUART GRASSIAN

   By Ms. Chaudhary 22                102

   By Mr. Anahory              67                      104

ALBERT FORD

   By Mr. Syrett     107                 169

   By Ms. Daniele             147                      174


|  |  | **FOR** | **IN** |
| **EXHIBITS:** |  | **I.D.** | **EVID.** |

   10   Curriculum Vitae of Dr. Grassian . . . .29

   11   Letter . . . . . . . . . . . . . . .68

   12   Correspondence . . . . . . . . . . .93

   13   Sick Call Request Form . . . . . . . . 135

   14   Photograph . . . . . . . . . . . . . 138

   15   Ankle Sleeve . . . . . . . . . . . . 139

   16   Sick Call Request Form . . . . . . . . 140

1          **THE CLERK:**  All rise.  You may be seated.

2          The United States District Court for the District

3     of Massachusetts is now in session on July 25th, the year

4     2011, in the matter of Ford v. Bender, Civil Action

5     No. 2007-11457.

6          Could counsel please identify themselves for the

7     record.

8          **MR. SYRETT:**  Good morning, your Honor.  Tim Syrett

9     on behalf of plaintiff, Albert Ford, along with my

10    co-counsel, Anant Saraswat, Lisa Pirozzolo, Dimple Chaudhary

11    and Emily Schulman.

12         **THE COURT:**  Thank you.

13         **MS. DANIELE:**  Julie Daniele for the Department of

14    Correction, defendant, and with me is attorney Kevin

15    Anahory.

16         **THE COURT:**  Welcome Mr. Ford.

17         Okay, I'm going to ask you all to speak loudly, all

18    right?  The acoustics in here look really impressive but it

19    takes a while for the sound to make it up here.

20         All right, is everybody ready to proceed?  Any

21    pretrial matters?

22         **MS. PIROZZOLO:**  We discussed just one matter.

23    There are nine joint exhibits.  And so, we were going to

24    request that those be moved into evidence without --

25         **THE COURT:**  I assume that there's no opposition to

1    that.  So why don't we just mark Exhibits 1 through 9 then.

2            Do you have copies for everyone?

3            **MS. PIROZZOLO:**  We do.  We have a binder of the

4    admitted exhibits as well as the other exhibits that by

5    agreement we agreed could be provided to the Court.

6            **THE COURT:**  Thank you.

7            **MS. DANIELE:**  Your Honor, the remainder of the

8    exhibits there may be objections to.

9            **MS. PIROZZOLO:**  Yes.

10           **THE COURT:**  So we'll deal with those item by item.

11   Okay?

12           **MS. PIROZZOLO:**  Yes, your Honor.

13           **THE COURT:**  All right, I think we -- anything else?

14           **MS. DANIELE:**  I just have one thing, your Honor.  I

15   would request that plaintiff's expert be sequestered for

16   openings at this time.

17           **THE COURT:**  Any problem with that?

18           **MS. PIROZZOLO:**  Well, our position is experts

19   aren't usually sequestered because he has access to all the

20   information in the case.  But we'll defer to the Court.

21           **THE COURT:**  Okay.  Then he will be sequestered.

22   Who is the plaintiff's expert?  Would you just sit outside.

23           **DR. GRASSIAN:**  Sure.

24           **THE COURT:**  Just during openings.

25           All right.  Now, are we prepared to make an

1    opening?  Thank you.

2          **MS. PIROZZOLO:**  Yes, your Honor.

3          Good morning.  My name is Lisa Pirozzolo and with

4    my colleagues, Tim Syrett, Dimple Chaudhary, Emily Schulman

5    and Anant Saraswat, we represent Mr. Albert Ford, the

6    plaintiff in this case.

7          We thank the Court for giving Mr. Ford his day in

8    court.  Mr. Ford filed this case on July 31st, 2007 from his

9    cell in the Department Disciplinary Unit, DDU, in MCI Cedar

10   Junction.  At that point in time he was less than halfway

11   through the 375 day period during which he would be

12   unlawfully held in the harshest, most punitive, solitary

13   confinement unit in the state, not as a convicted criminal

14   but as a pretrial detainee presumed innocent.

15         Now that the Court has found that Mr. Ford was

16   improperly held in the DDU as a pretrial detainee for those

17   375 days and was denied his constitutional and procedural

18   due process rights, we are here to address two remaining

19   issues in the case.  First, the extent to which Mr. Ford

20   suffered harm and is entitled to compensatory damages for

21   the unlawful detention during that 375 day period.  Number

22   two, what equitable remedies are appropriate to rectify the

23   prior violations of Mr. Ford's constitutional rights,

24   including the denial of his procedural due process rights by

25   being detained in the DDU without due process.

1            During the trial we will present evidence on both

2     of those issues and at the end of the trial we will ask you

3     to compensate Mr. Ford for the injury he suffered.  We will

4     also ask that the Department of Correction be ordered to

5     take concrete steps to assist Mr. Ford with the transition

6     from solitary confinement to society.  Remedies that are

7     particularly important given that Mr. Ford is scheduled to

8     be released from prison next April.

9            I would now like to describe the witnesses you will

10    hear from during Mr. Ford's case and also what we believe

11    that evidence will show.

12           During the trial Mr. Ford will present testimony

13    from five witnesses.  First, you will hear from Dr. Stuart

14    Grassian.  Dr. Grassian is a psychiatrist with extensive

15    expertise and experience with the impact of solitary

16    confinement on prison inmates.  Dr. Grassian is also

17    familiar with the specifics of this case.  He knows the DDU

18    at MCI Cedar Junction.  Dr. Grassian also knows Mr. Ford and

19    interviewed him for this case.

20           Dr. Grassian will describe the harsh and severe

21    conditions of confinement in the DDU and the impact of those

22    conditions on Mr. Ford's mental and emotional health.  Dr.

23    Grassian, who has helped transition many inmates from prison

24    to life outside, will also explain what types of assistance

25    Mr. Ford will need to help him transition from the DDU to

1    life in the community when he's released from prison next

2    spring.

3         Next you will hear from Mr. Ford.  Mr. Ford will

4    describe the conditions in the DDU during those 375 days he

5    was held during 2007 and 2008.  Mr. Ford will, of course,

6    describe his cell, his daily routine, the substantial

7    restrictions placed upon him, and the physical deprivation.

8    In addition, as only a person who has indured conditions

9    can, Mr. Ford will describe the harm he suffered as a result

10   of DDU confinement, including his humiliation, hopelessness,

11   and fear.

12        And finally, we will present about half an hour of

13   excerpts from the videotaped depositions of three prison

14   officials, the two defendants in this case, James Bender and

15   Peter St. Amand, as well as Dale Bissonnette.

16        Mr. Bender was the deputy or acting commissioner of

17   the Department of Correction during the 375 days at issue

18   here.  Mr. St. Amand was the superintendent of MCI Cedar

19   Junction at the relevant time period.  And Ms. Bissonnette

20   is the unit administrator of DDU.

21        Tellingly, those witnesses will not contradict Dr.

22   Grassian's and Mr. Ford's descriptions of the harsh

23   conditions of confinement in the DDU.  Indeed, the Court can

24   read about those conditions in black and white in the DDU

25   handbook, which is Joint Exhibit 1.

1        Mr. St. Amand will also describe the conditions in

2   the general population of MCI Cedar Junction.  And I know

3   that portion of Mr. St. Amand's testimony is particularly

4   important because we submit the appropriate measure of

5   damages of the harm in this case is the measure of the

6   difference between the conditions in the general population

7   of MCI Cedar Junction where Mr. Ford should have been held

8   as a pretrial detainee given the lack of any process by the

9   defendants to determine otherwise versus the punitive

10  conditions of the DDU.

11       The evidence in this case will show that Mr. Ford

12  suffered greatly as a result of being held in the DDU for

13  those 375 days instead of the general population.  As a

14  pretrial detainee, Mr. Ford was punished over and over for

15  more than a year.  He was isolated from meaningful contact

16  with other human beings.  He endured extreme physical

17  deprivation and was humiliated with strip searches and

18  shackles on a daily basis.  All of this with no effort at

19  any time to determine whether any of these punitive, harsh

20  conditions were necessary.

21       What was Mr. Ford's life like in the DDU?  For 375

22  days Mr. Ford lived in a twelve-by-seven cell that looked

23  like this.  And I put it up.  Mr. Ford's cell had only one

24  narrow window to the outside and another small window into

25  the corner into the corridor of the DDU.  Mr. Ford's cell

1   door, which I'll put up next, had a small slot in the middle

2   for food and a slot at the bottom to facilitate shackles

3   being placed upon him.  Mr. Ford spent 23 hours a day in

4   this cell, let out only twice a day to take insulin for his

5   diabetes, three times a week to shower, or five times a week

6   to exercise, and we'll show you the exercise cage which

7   looks like it belongs in a dog kennel.  He was also

8   virtually isolated from normal human contact.  He ate all

9   his meals by himself in his cell, exercised in the cage by

10  himself.  From the confines of his cell, he can't see or

11  converse in a normal manner with other inmates.

12          Indeed, during his pretrial confinement, Mr. Ford

13  noticed that his blood sugar levels were elevated when he

14  went for his second shot of insulin at the end of the day

15  and asked to be able to leave his cell at one additional

16  time to get an additional insulin shot.  He was denied

17  permission to do so.  As a result, he suffered daily spikes

18  in his blood sugar levels that worsened the loss of

19  sensation in his feet.

20          In sum, prison officials confined Mr. Ford to live

21  his life in this small cell subject to these conditions as a

22  pretrial detainee for more than a year.  In contrast,

23  inmates in the general population at MCI Cedar Junction do

24  not live their entire life in a cell.  They're confined in

25  their cells overnight from 10:00 p.m. to 7:30 a.m. and for

1    an hour or so during the day while a count of inmates is

2    conducted.  For the rest of the time they have freedom to go

3    to jobs, exercise, and interact with other inmates in the

4    prison yard or gym, eat meals with each another, visit a law

5    library, and participate in other recreational activities.

6    The damage from being unconstitutionally held in a small

7    cell for 23 hours a day for more than a year, denied the

8    ability to go outside or exercise in a meaningful way, eat

9    in a cafeteria, get a third insulin shot, to have normal

10   human contact, that is harm for which Mr. Ford is entitled

11   to damages.

12        What restrictions were placed on Mr. Ford while he

13   was in the DDU?  Mr. Ford endured degrading and dehumanizing

14   restrictions on his freedom of movement while being held in

15   the DDU that are not routinely imposed on inmates in the

16   general population.  For those 375 days, Mr. Ford was

17   shackled every time he left his cell.  Shackled to take his

18   insulin shots, shackled to go to the exercise cage, shackled

19   to go to the shower.

20        What does that mean?  Chains at his waist, chains

21   on his ankles, chains on his hands.  So think about that.

22   For 375 days, Mr. Ford was either in a small concrete cell

23   or he was in shackles.

24        Mr. Ford will also explain that due to his diabetes

25   the loss of sensation in his feet worsened significantly

1  during that 375 day period, and he still suffers from loss

2  of sensation in his feet.  As a result he could not even

3  feel the shackles as they created cuts on his ankles and

4  legs that are still there.

5       In contrast, inmates in general population are not

6  routinely shackled every time they leave their cell.

7       And that's not the worst of it.  Every single time

8  Mr. Ford left his cell in the DDU he was forced to endure a

9  strip search by prison guards, when he got his insulin, when

10  he went to exercise, when he went for a shower.  And while

11  it will be difficult for him, Mr. Ford will explain during

12  the trial what this process involves and how it made him

13  feel, multiple daily strip searches for a 375 day period

14  just simply as a matter of routine regardless of whether

15  prison officials suspected any problems or issues.  In

16  contrast, prisoners in the general population only endure

17  strip searches if prison officials suspect a problem.

18       The harm caused by being shackled and strip

19  searched approximately three times a day or more for 375

20  days, that's over 1,100 times at being humiliated with a

21  strip search and shackles.  That's harm for which Mr. Ford

22  is entitled to compensation.

23       What was the impact of the DDU on Mr. Ford's

24  health.  In addition to being denied the ability to take his

25  insulin three times a day, Mr. Ford's ability to obtain

1    meaningful exercise was severely restricted.  He was

2    permitted only five hours a week in the exercise cage.  In

3    the cage his movement remains restricted.  There is no --

4    there are no weights or equipment to use.  And even that

5    minimal exercise can be canceled such as in the winter

6    months if there's snow or ice in the cages.  In contrast,

7    inmates in the general population can exercise in the yard.

8    And I've put up a picture of the yard.  Open to the air, the

9    sun.  You can see the basketball hoops in the middle.  In

10   addition, during winter months and at other times, inmates

11   in the general population have access to a gymnasium and

12   other recreational activities such as a pool table.  The

13   damage caused by not being able to run or even walk freely

14   and instead being held in a cage, that's harm for which

15   Mr. Ford is entitled to be compensated.

16        What human contact did Mr. Ford have?  In the DDU

17   for 375 days, Mr. Ford had virtually no positive human

18   contact.  He ate all of his meals alone in his cell and

19   exercised by himself.  He could see other inmates.  He could

20   not see any other inmates from his cell.  The only way to

21   communicate with other inmates was to shout through a door

22   slot or a vent.  Mr. Ford was permitted only four phone

23   calls per month and four visits.  Indeed, his most frequent

24   human contact during that time period was with the prison

25   guards who were strip searching and shackling him.

1          In contrast, inmates in the general population eat

2     together in the cafeteria, exercise together in the yard.

3     They have jobs where they come into contact with others.

4     They have unlimited phone calls, and can have visitors from

5     outside three times a week.

6          As you will hear from Dr. Grassian during the

7     trial, the damage caused by having virtual isolation from

8     contact with human beings other than prison guards,

9     conducting strip searches and putting on shackles, is very

10    real, and that's harm for which Mr. Ford is entitled to be

11    compensated.

12         I want to talk about transition issues.  As a

13    result of his confinement in the DDU, both as a pretrial

14    detainee and subsequently without due process of the

15    convicted prisoner, Mr. Ford is likely to have a very

16    difficult time transitioning to normal daily life when he is

17    released from prison next spring.  Dr. Grassian will discuss

18    the need to transition Mr. Ford from DDU into a setting

19    where he obtains more human contact before he is released

20    from prison.  In addition, Dr. Grassian will describe the

21    specific needs Mr. Ford will have for mental health services

22    once he is released.

23         At the conclusion of the case, we will ask the

24    Court to award Mr. Ford monetary damages to compensate him

25    for these very real harms and the damage he suffered in the

1    DDU during that 375 day period.  We will also be requesting

2    equitable relief, namely, that the DOC take concrete steps

3    to prepare him for his release.

4         Before I conclude, I want to briefly address a

5    couple of points that we believe the defendants will raise

6    in responses to Mr. Ford's damages claim.  First, based on a

7    communication we received last week we understand that the

8    DOC contends that the appropriate measure of damages in this

9    case involves not a comparison between confinement in the

10   DDU and the general population, but a comparison between DDU

11   and conditions of confinement characteristic of

12   administrative segregation.  This comparison is

13   inappropriate for at least two reasons.  First, and most

14   importantly, there's no evidence that DOC ever applied any

15   process to determine where Mr. Ford should be placed while

16   on pretrial status.  They just kept him in the DDU.  The

17   defendants should not be permitted to rewrite the factual

18   record by testifying that they would have applied a process

19   that they never in fact applied and indeed have yet to apply

20   to Mr. Ford even following the Court's summary judgment

21   ruling.  Such self-serving testimony is rank speculation at

22   best.

23        Second, administrative segregation requires

24   extensive oversight by DOC officials, reports every seven

25   days for the first two months and then monthly monitoring

1    thereafter.  There is no evidence that in 2007 or 2008, DOC

2    ever exercised such oversight of Mr. Ford's confinement.

3    Indeed, the regulations applicable to administrative

4    segregation suggest that it is not an appropriate placement

5    for more than a year.

6           In addition, defendants also appear to contend that

7    Mr. Ford is not entitled to any monetary damages for the

8    constitutional violation.  Among other things, we believe

9    the defendants will claim that any harm he suffered is not

10   significantly real to support a damages claim.  We dispute

11   that contention on the grounds that the evidence will show

12   that the harm suffered from having his blood sugar spike was

13   real.  The harm suffered from the shackles was real.  The

14   harm suffered from the strip searches was real.  The harm

15   caused by isolation from human contact was real.  And those

16   very real harms damage Mr. Ford's physical and mental

17   health.

18          Defendants also appear to contend that Mr. Ford

19   cannot meet his burden of proof on damages because it's

20   impossible to separate out any harm Mr. Ford suffered as a

21   pretrial detainee from the time he spent, from the harm he

22   suffered as a result of the time spent as a convicted

23   inmate.

24          This is incorrect.  As an initial matter, the fact

25   that Mr. Ford suffered both as a pretrial detainee and a

1    convicted inmate does not mean that the damage of the 375

2    days as a pretrial detainee is inconsequential.  That was a

3    year of his life.

4           Moreover, as both Mr. Ford will testify and Dr.

5    Grassian will explain, Mr. Ford's pretrial DDU confinement

6    was different.  While Mr. Ford was out on bail from the

7    period of April 2007 to June 2007, Mr. Ford realized for the

8    first time how profoundly the DDU had affected him, how

9    difficult it was to be around people, eat a meal with his

10   family, take an elevator.  So when Mr. Ford returned to the

11   DDU and was put there as a pretrial detainee in June 2007,

12   he experienced the harshness of his conditions in a new way

13   with more understanding and more fear of its impact.

14          In conclusion, we ask only that the DOC take

15   responsibility for what they have done and compensate

16   Mr. Ford for the harm caused by their unjustified placement

17   of him in the DDU, and we also ask that the Court order DOC

18   to take steps to rectify the harm that has been done.

19          Thank you, your Honor.

20          **THE COURT:**  Thank you.

21          Defendants?

22          **MR. ANAHORY:**  Your Honor, this is a case about

23   decisions made and why they were made.  It's also a case

24   about damages, your Honor.  Mr. Ford contends that he has

25   suffered as a result of being placed in the DDU as a

1       pretrial detainee.  The evidence will show, your Honor, that

2       in fact he hasn't suffered from being placed in that unit

3       for compensatory damages, your Honor.

4              The defendants will show that plaintiff's

5       significant disciplinary history, which included assaults on

6       staff, assaults on inmates, assaults, shanks hidden in his

7       cell, 14-inch shanks hidden in general population, this,

8       this history is the decision that was, this history was

9       presented to the department defendants in determining what

10      to do with Mr. Ford at the time.  While it was deemed

11      unconstitutional by this Court that his placement in the DDU

12      was inappropriate, he would not have been appropriate for

13      the general population.  The evidence will show that because

14      of his history, which included significant history of

15      escapes and escape risks, that the defendants would not have

16      placed him in general population back in 2007, rather, he

17      would have been placed in administrative segregation, your

18      Honor.  And the evidence will show that administrative

19      segregation in the department for a maximum security inmate

20      would have been at the very least similar to the conditions

21      of confinement in the DDU, if in fact not worst, your Honor.

22             The defendants remaining in the case are James

23      Bender.  He is, he at the time, in 2007, was the

24      department's deputy commissioner of the prison division.

25      And as that, in that capacity, your Honor, it was his

1    responsibility to determine what to do with Mr. Ford in

2    2007.  At that time, he placed him in the DDU.  Had he not

3    been able to do that, your Honor, he would have taken a look

4    at, and the evidence will show, the extensive history that I

5    mentioned of violence, violence against staff, violence

6    against inmates, violence, your Honor, that was unprovoked.

7    He would have taken a look at that history, your Honor, and

8    he would have determined that the appropriate placement for

9    Mr. Ford, if the DDU was not available, would have been an

10   admin segregation unit and most likely, your Honor, that

11   would have been at the Mass. Correctional Institution at

12   Cedar Junction, a maximum security facility.  Another

13   possibility, your Honor, would have been a maximum security

14   institution at Shirley, the Susan Baranowsky Correctional

15   Facility.  The evidence will show, your Honor, that the

16   conditions of confinement in those units were either

17   substantially similar or worse than the conditions in the

18   DDU.

19        The other defendant, your Honor, is Peter St.

20   Amand.  In 2007, he was the superintendent of the Mass.

21   Correctional Institution at Cedar Junction.  At that time he

22   was responsible for the internal placement of inmates.  If

23   Mr. Ford had been incarcerated -- it was determined that he

24   was going to be incarcerated at Cedar Junction, your Honor,

25   in 2007, he would have been responsible for determining

1   where he would have been housed.  That was the maximum

2   security institution available to the Department of

3   Correction for placement in 2007 for Mr. Ford.  There will

4   be evidence that will show that that would have been the

5   appropriate placement.

6           Peter St. Amand's testimony will establish, your

7   Honor, that Mr. Ford could not have been held in the general

8   population at that unit for one very important reason, your

9   Honor.  One of the correction officers that Mr. Ford stabbed

10  violently in 2002 was employed at that facility.  So he

11  certainly would have been inappropriate for general

12  population at that facility, your Honor.

13          The department is also going to introduce as a

14  witness an expert, Dr. Bernard Katz, who will testify, your

15  Honor, to the emotional well-being of Mr. Ford.  It's our

16  contention, your Honor, that he did not suffer any emotional

17  harm either in the prior time, prior to 2007, the 30 some

18  odd years, approximately, where Mr. Ford was in the DDU

19  confinement, nor did he suffer it in 2007.  He's met with

20  Mr. Ford.  He's reviewed his records.  And that evidence

21  will be shown to your Honor.

22          He's also going to testify, your Honor, that the

23  DDU, unlike plaintiff's expert, is not inherently toxic to

24  an inmate's mental health as they will contend.

25          Your Honor, Carol Mici, who is the department's

 1    deputy commissioner for, assistant deputy commissioner for

 2    classification, a position she held back in 2007, will

 3    testify as to the appropriate placement for Mr. Ford given

 4    again his long history of violence, his escape risk, your

 5    Honor.  He's a level A security inmate, which requires that

 6    he be shackled when he's transported.

 7          The evidence will demonstrate, your Honor, through

 8    all of these defendants, through the defendants and through

 9    the witnesses that Mr. Ford is a dangerous inmate.  This is

10    the information that was available to the corrections,

11    corrections staff at that time, and these were the decisions

12    they have to make.  Because their responsibility, your

13    Honor, is not only to Mr. Ford, but the evidence will show

14    that their responsibility is to the entire institution, the

15    people employed therein, your Honor, as well as other

16    inmates.

17          Mr. Ford's own actions have placed him in the level

18    of confinement that he is in and the level of confinement

19    the evidence will show that he would have been in in 2007 if

20    the DDU was not available to him.

21          Your Honor, there's one more witness that the

22    department would like to introduce to you and that's Dale

23    Bissonnette.  She is the unit manager of the department's

24    disciplinary unit.  She in that capacity will be able to

25    testify, your Honor, to the privileges that were available

```
 1    to Mr. Ford in the DDU, privileges that he wouldn't have had
 2    in ad. seg., your Honor.  She will also testify to the
 3    differences between the two units so your Honor has an
 4    understanding of what it is that she's, what to compare it
 5    with, your Honor.  Because it's our contention that Mr. Ford
 6    never would have seen the general population and he would
 7    have been in ad. seg.
 8            In conclusion, your Honor, I just would like you to
 9    consider the evidence that's going to be put forth to you,
10    your Honor.  We will demonstrate that the appropriate
11    placement for Mr. Ford was administrative segregation, not
12    the general population.  And the reason for that, your
13    Honor, is not on any bias on the part of the defendants
14    towards Mr. Ford, but because of Mr. Ford's own actions, his
15    own disciplinary history, that will be demonstrated to you
16    and it will be clear that administrative segregation is the
17    appropriate place.  And if it is, your Honor, then the level
18    of damages would need to be compared to that unit and the
19    evidence will show, your Honor, that there are no actual
20    compensatory damages in this case, your Honor.
21            Thank you.
22            THE COURT:  Are you ready to call your first
23    witness?
24            MS. PIROZZOLO:  Yes, your Honor.  We have to go get
25    Dr. Grassian.
```

1          **THE COURT:**  Thank you.

2          (Pause in proceedings.)

3          **THE CLERK:**  Please raise your right hand.

4          Do you solemnly swear the testimony you are about

5     to give this Court is the truth, the whole truth, and

6     nothing but the truth, so help you God?

7          **THE WITNESS:**  I do.

8          **THE CLERK:**  Please be seated.  Please state your

9     full name, spelling your last name for the record.

10         **THE WITNESS:**  My name is Dr. Stuart Grassian,

11    G R A S S I A N.

12         **THE COURT:**  You may proceed.

13                      STUART GRASSIAN

14                   **DIRECT EXAMINATION**

15    BY MS. CHAUDHARY

16    **Q**    Dr. Grassian, what is your present employment?

17    A    I'm a psychiatrist.

18    **Q**    Are you board certified?

19    A    Yes, I am.

20    **Q**    And how long have you been a board certified

21    psychiatrist?

22    A    Since, I believe that would be 1979 I got my board

23    certification.

24    **Q**    And how are you currently employed?

25    A    I'm in private practice.

1    Q    And have you held any other positions other than being

2    in private practice?

3    A    Yes.

4    Q    And what are those positions?

5    A    I was on the faculty of the Harvard Medical School, the

6    teaching faculty, during my residency and subsequently.  So

7    that would be from about 1974 through approximately 2002.  I

8    also have been head of the inpatient units at two of

9    Boston's community mental health centers, and head of

10   inpatient adult adolescent psychiatry at the New England

11   Memorial Hospital.  I was also for about two years assistant

12   clinical professor at Tufts, and I've also had outpatient

13   supervision positions in addictions.  I've lectured at

14   Harvard and other situations like that.

15   Q    Dr. Grassian, could you please describe your educational

16   background?

17   A    Certainly.  I have a bachelor's degree from Harvard in

18   1967.  I obtained my medical degree from New York University

19   Medical Center in 1973.  I did a straight internship in

20   medicine there from '73 to '74, and then a psychiatry

21   residency in adult and adolescent psychiatry at Harvard

22   Medical School and Beth Israel Hospital from '74 to '77.

23   Subsequently, I completed my affiliation with Beth Israel

24   and Harvard and have been in private practice and had these

25   other administrative positions.

1    Q    Do you have any other degrees other than the ones you've

2    mentioned?

3    A    I have a master's degree in sociology and a JD degree.

4    Q    And, Dr. Grassian, do you have any experience in

5    evaluating the psychological effects of segregated

6    confinement on prison inmates?

7    A    Yes, I do.

8    Q    Have you served as an expert in court in any cases

9    addressing that issue?

10   A    Yes, I have.

11   Q    What were you asked to do in this case?

12   A    Well, there have been a variety of different cases.

13   Many concern the mental health of inmates in segregated

14   confinement.  These included individual class action

15   lawsuits.  There were also Sixth Amendment issues around

16   pretrial detention, and the impairment in the capacity to

17   assist in one's own defense.  I've been involved in cases

18   involving people who are accused of or convicted of

19   terrorist activities especially in regard to issues such as

20   their ability to cooperate with the U.S. government and

21   obtain information, the effects of solitary confinement,

22   things of that sort.

23   Q    And, Doctor --

24   A    I'm sorry, one other thing.  I've also often, not often,

25   but from time to time been asked to evaluate the impact of

1    confinement on a person's adjustment after release,

2    especially when the release was directly out of solitary

3    confinement back into the community.

4    Q    And did any of the lawsuits for which you served as an

5    expert involve segregated housing units in Massachusetts

6    state prisons?

7    A    Yes.

8    Q    And what units did you consider as part of your expert

9    work?

10   A    Well, most of it concerned the Cedar Junction/Walpole,

11   the old Block 10, and the DDU.

12   Q    And has all of your expert testimony been offered on

13   behalf of inmates?

14   A    No.

15   Q    Have you ever -- who else have you been retained by to

16   serve as an expert?

17   A    On one occasion I was retained in a class action suit by

18   the Department of Corrections of the State of Florida

19   involving conditions in solitary and mental health.  I also

20   was retained by a private firm, by attorneys for a private

21   firm that was providing detention services to presumed

22   illegal immigrants, or people who were seeking asylum.  So

23   it was an immigration detention facility.  And I also

24   consulted with a research firm that was doing, it was

25   attempting to do research on the effects of solitary

1    confinement in a DDU.

2    **Q**   Have you had any experience evaluating prisoners while

3    they've been held in solitary confinement?

4    A   Yes.

5    **Q**   And approximately how many prisons would you say you've

6    evaluated involving inmate segregation?

7    A   At this point -- I think at one point I said 200.  And I

8    think it must be more than that.

9    **Q**   And have you had any experience evaluating the effects

10   of segregated confinement in individuals after their release

11   from prison?

12   A   Yes.

13   **Q**   And do you treat any such individuals in your private

14   practice?

15   A   I have treated individuals who have been in the DDU and

16   other segregated conditions of confinement and were

17   subsequently released.

18   **Q**   And have you treated any individuals that were housed in

19   the DDU at MCI Cedar Junction?

20   A   Yes.

21   **Q**   Dr. Grassian, have you published any articles on the

22   effects of segregated confinement?

23   A   Yes.

24   **Q**   And could you list those articles?

25   A   There were two peer reviewed articles.  The first and

1    probably seminal work was entitled Psychiatric --

2    Psychopathologic Effects of Solitary Confinement and that

3    was published by the official Journal of the American

4    Psychiatric Association, the American Journal of Psychiatry.

5    Basically it described what I described as a pathognomonic

6    syndrome associated with solitary confinement.  The syndrome

7    that was really strikingly different from the usual

8    psychiatric syndromes one sees in practice.

9            A subsequent peer reviewed article concerned the

10   effects of sensory deprivation or perceptual deprivation in

11   solitary confinement and in psychiatric seclusion.  Those

12   are the two peer reviewed articles.  I have had other

13   articles published, but those were not articles I submitted,

14   they were articles that people asked me to allow them to

15   publish.

16   Q   And, Dr. Grassian, you mentioned that you published two

17   peer reviewed articles.  What does it mean for articles to

18   be peer reviewed?

19   A   A peer reviewed article is an article which is reviewed

20   by experts in the field who have sub-specialty interest in

21   the particular subject that you're writing about.

22   Q   And, Dr. Grassian, have you ever testified on the

23   effects of segregated confinement before a government or

24   legislative body?

25   A   Yes, on a number of occasions.

1  Q    And have you presented any lectures on the effects of

2  segregated confinement?

3  A    Yes, I have.

4  Q    Dr. Grassian, I'm going to hand you Plaintiff's Exhibit

5  C.

6  A    Yes.

7           **THE COURT:**  I'm sorry, which exhibit?

8           **MS. CHAUDHARY:**  Plaintiff's Exhibit C.

9           **MS. PIROZZOLO:**  It's at tab 12, your Honor.

10          **MS. CHAUDHARY:**  Tab 12.

11 Q    Dr. Grassian, what is this document?

12 A    This is a CV, my curriculum vitae updated in January of

13 this year.

14 Q    And is it accurate to your knowledge?

15 A    Yes, I would hope so.  I would certainly hope so.

16          **MS. CHAUDHARY:**  We would like to offer Plaintiff's

17 Exhibit C into evidence.

18          **THE COURT:**  Any objection?

19          **MR. ANAHORY:**  No, your Honor.

20          **THE COURT:**  All right.  It's in.  We'll mark it

21 Exhibit 12?  Or 10?

22          **MS. CHAUDHARY:**  It's Plaintiff's Exhibit C, it was

23 just in tab 12 of the binder, but I believe it was marked as

24 Exhibit C to key to our joint pretrial submission.

25          **THE COURT:**  But I think the book that you gave me

1    has 1 through 9, that's agreed upon?

2         **MS. CHAUDHARY:** Okay.

3         **THE COURT:** So why don't I make this 10 and then

4    we'll move things along that way.

5         **MS. PIROZZOLO:** That sound goods.

6         **THE COURT:** All right.

7         (Exhibit marked in evidence.)

8    Q    Dr. Grassian, what have you been asked to do in this

9    case?

10   A    In this case, I was asked to evaluate the effects of

11   Mr. Ford being placed in the DDU as a pretrial detainee in

12   June of '07 and then subsequently his continued presence in

13   the DDU since his eventual sentencing in April of '08.

14   Q    Were you asked also to provide any opinions on

15   segregated confinement other than those?

16   A    Yes, I was asked to be able to, or be willing to provide

17   general opinions about the effects of segregated

18   confinement, my experience of the DDU in relationship to

19   other conditions of segregated confinement as well, and as I

20   said the effects of that confinement on Mr. Ford, my

21   experience with people who have been released from

22   segregated confinement back into the general population, and

23   my experience with people who have been released from

24   general, from segregated confinement back directly into the

25   community without a period of transition. Also, I would

1   imagine I might be asked to comment briefly about Mr.,

2   Mr. Ford's experience during the time he was on out on bail.

3   I don't know.

4   Q   And what did you conclude regarding the issues you were

5   asked to consider in this case, briefly?

6   A   Well, my work has consistently been as I stated,

7   segregated confinement is a very harsh, psychologically

8   punitive, very difficult experience for people and causes

9   significant impairment in mental functioning.  And that,

10  while that varies, the degree of it varies from person to

11  person, there are certain features of that syndrome which

12  are very particular to the experience of solitary

13  confinement and other experiences of reduced environmental

14  stimulation, occupational stimulation, social stimulation.

15  Okay.

16  Q   And did you make any specific conclusions with regards

17  to Mr. Ford?

18  A   I did, I did as well.

19  Q   And what were those conclusions, briefly?

20  A   Basically that Mr. Ford, while he had shown a great deal

21  of resilience early on in his prison career in managing the

22  experience of solitary confinement, even before he was

23  released on bail in March of 2007 he was already starting to

24  show difficulties.  He was starting to become symptomatic.

25  That was clearly demonstrated in the record, the medical

1   record.

2           His return to DDU in June 2007 was kind of

3   catastrophic for him.  It was as though -- you know, it's,

4   the analogy I think I provided was the analogy of a person

5   who had suffered a severe concussion and was just starting

6   to recover from it.  I mean, not only was he starting to

7   deal with life outside of prison, but also there's the

8   realization that you can't predict until you've been there

9   of how hard it is, how difficult, how symptomatic he would

10  continue to be, how much he would struggle with stimulation,

11  with social stimulation, fear, et cetera.  So, when he went

12  back to the DDU it was like a person who's had a severe

13  concussion and is just starting to heal and then gets

14  another.

15  **Q**   Dr. Grassian, did you review any documents in forming

16  your opinions?

17  A   Yes.

18  **Q**   And do you recall which, any documents that you

19  reviewed?

20  A    Well, there were documents, legal documents in the case,

21  the complaint, multiple depositions, the report of Dr. Katz.

22  **Q**   Did you review Mr. Ford's medical and mental health

23  records as well?

24  A   Yes, actually in 2007 when I was initially involved in

25  this in a different matter related to Mr. Ford, I actually

1    reviewed his entire medical and Department of Corrections

2    portfolio up to that time which is pretty -- it was a lot of

3    paper.  And subsequently I looked at his mental health

4    record since his reincarceration.

5    **Q**   And did you conduct any interviews in forming that

6    opinions?

7           **THE COURT:**  I'm sorry, I didn't hear.

8    **Q**   Did you conduct any interviews in forming your opinions?

9    **A**   Yes.

10   **Q**   And who did you interview?

11   **A**   Originally in 2007, I interviewed Mr. Ford on three

12   occasions over the course of about three or four months, and

13   for about four and-a-half hours or so all together.  I

14   interviewed his sister, Leona.  And I interviewed several

15   people who had been close to him during the period of time

16   he was out on bail.  That would have included his Alcoholics

17   Anonymous sponsor.  An attorney, I think her name was Eva

18   Clark, with whom he worked with DYS, in DYS facilities

19   talking to individuals in those facilities about the horrors

20   of prison and all the losses that he had suffered as a

21   result of his activities.

22           I spoke with, I can't remember the name of the

23   individual who, he was a probation officer at MSW who, who

24   was involved in a relapse and sobriety group program.  I

25   think this was mostly for adolescents or younger people, and

1    Albert would attend those meetings but also become a kind of

2    a spokesperson.  He was older than most of the people there.

3    So, I interviewed that individual as well.  And I also

4    interviewed the bishop of the church that Albert had

5    attended when he was a child and was involved with since he

6    was released on bail.

7           In 2011, I again interviewed Mr. Ford in the DDU

8    and also again interviewed Leona Ford, his sister.

9    Q   Dr. Grassian, I would like to talk about the conditions

10   of confinement in the DDU.  Are you familiar with those

11   conditions?

12   A   Basically, yes.

13   Q   How did you become familiar with those conditions?

14   A   Well, gee, there are several ways.  I toured the DDU a

15   number of years ago.  I've had a number of people that I've

16   evaluated who were in the DDU of course who described the

17   conditions.

18          Also, one of the depositions in this matter, I

19   don't recall whose, actually described the conditions as

20   well.  But, I mean, they're all the same.  I mean, the

21   conditions don't seem to have changed at all.

22   Q   And did you speak to Mr. Ford about the conditions of

23   confinement in the DDU?

24   A   Yes.  Yes.

25   Q   And do you have some experience evaluating similar

1    solitary confinement conditions?

2    A   I have evaluated solitary confinement situations in

3    many, many locations and toured a number of solitary

4    confinement sections in prisons.

5    **Q**   And can you describe the cells in the DDU?

6    A   Yes.  The cells in the DDU, if I recall correctly, I'm

7    trying to remember exactly how many square feet they are,

8    about 85 square feet, if I remember correctly.  It's very,

9    sort of typical of the square footage in a cell.

10          The cell is very stark.  Everything in it other

11   than the toilet/sink combination is cement.  At the end of

12   the cell is a cement slab on which they place a mattress.

13   And I believe it's right above there that they have a slit,

14   one of those slit windows that I think are about seven or

15   eight inches wide or six or seven, eight inches wide, a

16   couple of feet taller.  Maybe not.  I don't really know how

17   tall they are.  But those look out on, well, either on other

18   buildings or -- some of them I believe look out onto the dog

19   run exercise cages.

20          Other than that there is a stool that's made out of

21   cement.  And there's a little cement shelf.  And then

22   there's the toilet/sink combination which is stainless

23   steel.

24          The doors are solid steel.  And they're sliding.

25   So there's a little slit on he edge of the door and that's

1    where people often try to talk to people in the cells.  And

2    there's also a food slot.

3           There's another slit window which is not as high

4    facing out towards the tier as well.  And that's basically

5    it.

6    Q   Are you permitted to exercise in the DDU?

7    A   Exercise by regulation is allowed to be for up to five

8    hours a week, one hour a day, I think just on the week days.

9    And that would be out in the so-called dog runs.  These are

10   long, narrow cages outside of the building and basically

11   barren.  Basically you can walk back and forth or run.

12   There's nothing else to do in those cages.

13   Q   And do inmates in the DDU have opportunities to interact

14   with other people?

15   A   Interaction is exceedingly limited.  I believe that's

16   almost by intent as I understand it.

17          The interactions with the correctional officers are

18   exceedingly limited.  Corrections officers do make rounds,

19   they pass by, but there's usually no speaking at all at

20   those times.  The corrections officers also have to bring

21   them their food three times a day.  But generally again no,

22   there's no conversation, it's just they bring the food and

23   leave.

24          There also are rounds by medical staff which I

25   believe are almost on a daily basis, but again usually

1   there's virtually no conversation.  And rounds by health

2   staff which are three times a week.  And they basically are,

3   you know, they're through the door.  So, you know, say how

4   are you doing and most inmates will not say much of

5   anything, fine, you know, and move on.

6        Inmate to inmate communication is very difficult.

7   It basically consists of shouting either through the slit

8   inside of the door or through the ventilation shaft.  I,

9   myself, and when I've toured it did in fact have the door

10  closed and tried to speak to people outside of the cell.

11  And it's, it's a very unpleasant experience because the cell

12  is so barren and hard, all the cement and everything,

13  everything's echoing and it's not a very pleasant

14  experience.  You can't have a normal conversation at all.

15  Q   Are inmates permitted to have contact with family and

16  friends that visit the DDU?

17  A   The contacts that are allowed, well, first, they're

18  limited in frequency and duration, but they're also

19  noncontact.  And basically the visitor and the inmate are in

20  separate rooms, separated by pretty thick Plexiglas that you

21  end up speaking to the other person through the telephone.

22  It's pretty uncomfortable and awkward.

23       The amount of social visitation that's allowed with

24  family is limited.  I think it starts at zero, I think for

25  the first 30 days, then can go to one a month, two a month,

1    as you, as you progress, and at most once a week.

2    Q    Are inmates strip searched in the DDU?

3    A    Any time there's movement from the cell an inmate is

4    strip searched and shackled.

5    Q    And how would you describe the contact between the

6    inmate and the correctional officer during this strip

7    searching and shackling process?

8    A    It's --

9         MR. ANAHORY:  Objection, your Honor.  Calls for

10   speculation.  He has no knowledge of how --

11        THE COURT:  Well, we'll ask him that.  How do you

12   know?

13        THE WITNESS:  I've spoken to inmates about it as

14   well.

15        THE COURT:  Then I'll accept it on that basis.

16   A    It's a very tense situation.  There's always -- it's

17   intrinsically tense.  It's intrinsically -- the strip search

18   is intrinsically humiliating.  Things can go wrong and there

19   could be sudden violence against, you know, if, if an inmate

20   trips, if an inmate stumbles, he's got to be very careful

21   not to let any sudden movements because of the danger that

22   would be interpreted as an assault.  So it's a very, very

23   tense, humiliating, stressful kind of thing.  A lot of

24   inmates avoid going out of their cells just to avoid that.

25   Q    Dr. Grassian, in your opinion is the DDU psychologically

1   harmful to an inmate?

2   A    The conditions in the DDU are inevitably harmful and

3   impair mental health.

4   **Q**    And can you describe that harm?

5   A    Certainly.  Basically in a situation like the DDU there

6   is a grossly inadequate level of stimulation, of

7   occupational stimulation and perceptual stimulation, and of

8   course social stimulation.  In a situation like that a

9   person has an enormously difficult time in any adequate

10  state of alertness and inevitably the person starts to

11  descend into a kind of stupor state.

12          This actually has also been documented in the

13  electroencephalogram, the brain wave pattern, after a few

14  days of solitary confinement.  Even healthy volunteers will

15  show the EEG changes associated with stupor and delirium.

16          So you're in this situation where you have a very

17  hard time maintaining any adequate level of full alertness

18  and people tend to go in one of two directions.  They either

19  tend to go into this kind of disassociative fog where they

20  can't think and kind of lose track of things.  And it's not

21  pleasant.  And in that situation the irony is that when you

22  do receive stimuli they are jarring and extremely

23  unpleasant.  The idea, for example, that, you know, you hear

24  the dripping of a water or the sudden clanging of a door and

25  it jars you, because you're not, you're not really fully

1    alert.

2           So, unfortunately, one of the very common, almost

3    universal experiences is that as people are in solitary

4    confinement they actually become intolerant of stimulation.

5    Then, again, actually this notion of hyper responsivity to

6    external stimulation with the subjectively dysaesthetic

7    painful experience of it is, I think it's pretty much

8    universal, and has actually also been documented in the

9    medical literature with electroencephalographic studies

10   showing that even the EEG will show spike wave discharges

11   from people who have been in solitary when they have

12   ordinary levels of stimulation.

13          The other thing that happens to people, and in my

14   experience this tends to be people who are more cognitively

15   strong and more emotionally, less impulsive, what happens is

16   that they succeed in focusing but then they can't switch

17   focus so they become obsessional.  They become fixated on

18   something.  And when you become fixated on something it's

19   almost, in that setting, it's almost always something

20   terribly unpleasant.  A lot of people become fixated, for

21   example -- well, of course, noise and smells, sights.  I

22   mean, I had, I had one inmate I remember who I couldn't talk

23   to him because he was so distracted by the buzzing of the

24   fluorescent light in the area I was seeing him.  And I

25   didn't even notice it.  But they just can't stop focusing on

1      something.

2            You know, if you think about the problem of the

3      tension, of alertness, think of it in terms of, for example,

4      a detention deficit hyperactivity disorder, there are two

5      associated problems.  One is the inability to focus, the

6      inability to gain attention which, you know, distractibility

7      and all of that kind of stuff, you see it in HDDD and you

8      see it in solitary.

9            And the other is the inability to switch focus.

10     The most difficult aspect of the detention is what's called

11     the executive function of detention which is the ability to

12     focus on one thing but shift away and be aware of other

13     things that are going on.  And that becomes lost.

14           So I've had people, I remember one fellow in

15     particular who spent 24 hours a day, seven days a week

16     focused on whether, because he never felt that his bladder

17     was empty.  And it was just absolute torture for him.  And

18     as soon as he left solitary he was fine.

19     **Q**   Dr. Grassian, what kind of psychiatric conditions or

20     diagnoses can result from solitary confinement?

21     A    I'm not sure I understand.

22     **Q**   So in --

23     A    Can result from --

24     **Q**   From solitary confinement, what kind of diagnoses may

25     result from a term of solitary confinement?

1    A    Okay.  Well, as I said, I mean, the most characteristic

2    is the development of some degree of stupor, delirium, the

3    whole -- which is a very broad spectrum.  I don't mean

4    full-blown delirium which can occur but doesn't usually.  It

5    can.  I have seen it, I've described it a number of times.

6    This one included the hyper responsivity, external

7    stimulation.  The major difficulty is with thinking,

8    concentration and memory.  And then you have free floating

9    anxiety and panic attacks, very, very common, and of course

10   major, severe depressive symptoms, suicidality, violence

11   directed against oneself, et cetera.

12   Q    And are all individuals held in segregated confinement

13   affected in the same way and to the same degree?

14   A    Well, the effects I've described, the type of effects

15   are pretty much universal.  I would say universal.  The

16   degree to which they're, people are affected varies quite,

17   quite a bit, quite dramatically, yes.

18   Q    And how long do the effects of segregated confinement

19   last after the individual is released?

20   A    Unfortunately, there never has been a systematic, long,

21   large scale study.  There should be.  My own experience is,

22   from the people I've seen subsequent who had been in

23   segregated confinement and left.  And I have seen people

24   who -- this intolerance of stimulation, especially the

25   difficulty with social stimulation, but other kinds of

1    stimulation as well, and the fearfulness, I've seen that

2    linger for a very long time.  I mean, I have wondered if in

3    some cases whether this was going to be a lifelong

4    impairment to get somewhat better.  But I've seen people

5    years afterwards who still, I mean, they, they struggle with

6    it every day.

7    **Q**   Dr. Grassian, do you believe that the mental health

8    services provided to inmates DDU are adequate?

9    A    From my experience from what I'm aware of, no.

10   **Q**    Why?

11   A    Well, there are a number of reasons.  First of all,

12   there's, there's a paradox, an inconsistency in the, in the

13   approach to people going into the DDU.  On the one hand, one

14   often reads depositions and such, people saying, well, no,

15   the DDU doesn't cause any psychiatric harm so it's not a

16   problem.  But then others are saying at the same time, but

17   we have enhanced evaluations, screening and monitoring.

18   Well, the two statements don't obviously go together.  I

19   know that at Bridgewater at this point there is a full

20   recognition that there are many people who can't tolerate

21   solitary confinement.

22        **MR. ANAHORY:**  Objection, your Honor.  I would ask

23   that that be stricken.  That was unresponsive and it's

24   really not an issue in this case, your Honor.

25   **Q**   Dr. Grassian --

1          **MS. CHAUDHARY:**  Can I establish a foundation to see

2     if --

3          **THE COURT:**  It's stricken for now.

4     **Q**   Dr. Grassian, what is Bridgewater?

5     **A**   Bridgewater State Hospital is a place where they send

6     people who are psychiatrically falling apart, suicidal,

7     become psychotic, severely psychotic.

8     **Q**   And have you treated any inmates who have been held at

9     Bridgewater?

10    **A**   Yes, absolutely.  And I've read a lot of Bridgewater

11    records.

12    **Q**   And do you have an opinion about the mental health

13    services, can you comment on the mental health services

14    offered at Bridgewater?

15    **A**   Well --

16         **MR. ANAHORY:**  Objection, your Honor.

17         **THE COURT:**  Overruled.

18    **A**   I wasn't actually commenting on the mental health

19    services offered there, though I have, what I have seen is a

20    number of records that state that there are inmates who

21    can't tolerate solitary confinement, and in fact this has

22    led to some administrative change in the Department of

23    Corrections where some people are contraindicated to the DDU

24    on the basis of mental illness.  Unfortunately, those people

25    are not contraindicated from other harsh conditions of

1    solitary confinement, but they are from the DDU.

2         In any event, so, you know, even though there's

3    this sort of hedging about whether DDU confinement is

4    harmful, basically there's a recognition somewhere in those

5    records.  The screening that's done --

6         **THE COURT:**  It's either -- what's the -- when you

7    say that the mental health treatment at the DDU is not

8    adequate, what is the level of mental health treatment?

9         **THE WITNESS:**  Right.  The first -- when a person

10   enters the DDU they are supposed to be mental health

11   screened.  Now, those screenings, I've seen a number, many

12   of them.  And they basically consist of nothing other than a

13   mental status examination that's very, very cursory.  So,

14   you know, if the person isn't overtly psychotic and whatever

15   then the person is not going to be contraindicated to the

16   DDU.

17        So those records are strikingly devoid of history.

18   They're strikingly devoid of history regarding mental health

19   problems, attention deficit disorder, hyperactivity

20   disorder, bipolar mood disorder, which are severe

21   vulnerability factors for decompensation in solitary.  And

22   they are also devoid of any information about the person's

23   adjustment to solitary confinement previously.  So there's

24   virtually no information in them.

25        The mental health monitoring that's done --

1          **THE COURT:**  So that's just for the purpose of

2     determining whether or not somebody is mentally capable of

3     going into the DDU?

4          **THE WITNESS:**  That's right.  Right.  And basically

5     what I'm saying is that level of analysis or evaluation is

6     grossly inadequate to see if the person is vulnerable.

7          Then the mental health monitoring that occurs is

8     basically through the door, through the slit in the solid

9     steel door.  And, A, inmates don't trust these folks, B,

10    they're not going to, you know, they report and they're not

11    going to, you know, shout, you know, that they're having

12    problems through the door.

13         And they're very, by the time they've been in the

14    DDU, along with being intolerant of social simulation, the

15    stimulation they get socially is harsh.  It's not -- it

16    doesn't encourage trust.  So very little happens during

17    those rounds.  And I have seen many cases where a person has

18    grossly decompensated into a psychotic, grossly psychotic

19    state and the mental health rounds reveal nothing.  I mean,

20    I've seen people diagnosed in mental health rounds as

21    malingerers, while they're receiving high doses of

22    antipsychotic medication that can cause permanent neurologic

23    harm.  So very severe, very serious medication, but there's

24    like, they're clueless that anything at all is going on.

25         So that's what I've seen in the DDU.  And I've seen

1    many cases where people are psychotic for long periods of

2    time and it wasn't until they did something overtly

3    bizarre --

4         **MR. ANAHORY:**  Objection, your Honor.

5    A    -- that they were sent to Bridgewater.

6         **THE COURT:**  Wait.

7         **MR. ANAHORY:**  He's rambling on about things that --

8    he's not answering your question, your Honor.  I believe the

9    answer is now, he's giving you fluff here, your Honor, of

10   stuff that --

11        **THE COURT:**  I don't think that that's a recognized

12   objection.

13        **MR. ANAHORY:**   Well, your Honor, he's not

14   responsive to your question is my objection, your Honor.

15        **THE COURT:**  All right.  What I would like to know,

16   though, are these evaluations or these observations that

17   you've made, have you used these to form a basis of any of

18   the opinions in this case?  Or any of the articles that

19   you've written?

20        **THE WITNESS:**  Oh, yes.  Certainly in articles and

21   my testimony in lawsuits.  And here the relevance is that

22   universally in my experience, and it's been fairly

23   extensive, I've never seen a mental health clinician in the

24   DDU recognize the types of problems that people get into in

25   solitary.  It is recognized at least in some places in

1    Bridgewater.  I've never seen it recognized in the DDU, even

2    though it's occurring over and over again.

3    **Q**   Dr. Grassian, do you have any knowledge of the mental

4    health services offered to inmates in the DDU in 2007?

5    A   Yes.  Yes.  2007 was a particularly bad year.  There was

6    apparently gross dissatisfaction with the provider they had,

7    there was a change in providers, there was a substantial

8    period of time when they didn't have a full-time or regular

9    psychiatrist.  They were understaffed with their mental

10   health clinicians.  This all comes from depositions of one

11   of the defendant representatives.  I can't remember which

12   one.  Oh, it was Ms. Madden, I believe.

13   **Q**   Dr. Grassian, I would like now to talk about your

14   evaluation of Mr. Ford.

15           When did you first meet Mr. Ford?

16   A   As I mentioned, the first time was in actually April, I

17   believe, of 2007.

18   **Q**   And how did you come to know him?

19   A   Well, at the time he was represented by attorney Bernard

20   Grossberg and he himself had actually contacted me prior to

21   his release from prison asking if I would be available to

22   help him.  I don't remember the exact nature of that

23   cooperation.

24   **Q**   And did you meet with Mr. Ford in 2007?

25   A   As I said, I met with him on three occasions, roughly

1   once a month.

2   **Q**   And did you perform an evaluation of Mr. Ford when you

3   met with him in 2007?

4   A   I did.

5   **Q**   What was the purpose of that evaluation?

6   A   The basic purpose of the evaluation was to assess his

7   adjustment to life outside of prison.  Obviously there had

8   been concerns raised about his, that he might be having a

9   high potential for violence, assaultive behavior.  And so, I

10  was asked to evaluate whether he would, how he adjusted to

11  community life, because there was a request or an attempt to

12  have him be placed on probation and not have to be returned

13  to prison when he went back to court.

14          **THE COURT:**  So he was out at the time that you met

15  him?

16          **THE WITNESS:**  He had been released in like March of

17  2007 and remained out until late June.  And I saw him many

18  times.

19          **THE COURT:**  And that was the period of time you saw

20  him?

21          **THE WITNESS:**  Yes.  Yes.

22  **Q**   And can you briefly describe the result of your

23  evaluation with Mr. Ford in 2007?

24  A   Yes.  I mean, of course I did a history and found out a

25  lot.  But basically, this is a man who, despite the bad, the

1   bad criminal acts that he had engaged in, robberies and

2   such, actually had a lot of strength in his premorbid

3   adjustment prior to incarceration.  Close to his mother,

4   close to his church, a lot of friends, a lot of people liked

5   him.  And actually had a great career ahead of him it

6   seemed, he was, he had scholarships to various good schools,

7   USC, Boston College, Notre Dame, because of his excellence

8   in football.

9        When he left prison in March, people who knew him

10  for, since he was a kid, were really struck by a number of

11  things.  One, how symptomatic he was, how anxious he was.

12  Two, how hard he was trying to overcome them.  Especially

13  Leona, who, I was very impressed with what Leona did to try

14  to help him desensitize himself, things like being on a

15  train or subway or bus, getting, you know, getting on an

16  elevator, just gradually desensitizing, just, just go one

17  stop, you know, then get off.  And being with him when he

18  would do it.  That was really very helpful.

19       His bishop spoke about how, he could see how

20  nervous he was when he went to church and he would sit in

21  the back.  And then gradually he was getting better and

22  getting more involved.  And he seemed to really enjoy doing

23  good things for the church.  He was working on the bishop's

24  garden.  The probation officer, I think his name was Banks,

25  said he was very impressed with Mr. Ford's sincerity, how

1    hard, how much he wanted to convince, to tell people not to

2    follow the path he had taken and wanting to talk about the

3    horrors of prison life.  And Eva Clark had said the same

4    things.

5           So I was really struck, you know, struck by how

6    symptomatic he was, how hard he was trying to get better,

7    that he was making significant progress in that regard.  And

8    that people really thought a lot of him, his compassion for

9    others, his remorse about what had happened, the sadness in

10   his life.

11   Q    And did you write down the results of your evaluation of

12   Mr. Ford in 2007?

13   A    Yes, I did.

14   Q    And how did you memorialize those?

15   A    Well, I was asked to do it in the form of a letter to

16   the judge who had determined whether he would be placed on

17   probation.  It was Judge Fabricant.

18   Q    After 2007 when was the next time you had contact with

19   Mr. Ford?

20   A    The next time I saw him.  In person do you mean or --

21   Q    The next time you saw him in person.

22   A    That would have been in February 2011.

23   Q    And when were you retained as an expert in this case?

24   A    I believe it was in 2009.

25   Q    And when you visited with Mr. Ford in February how long

1   did you spend with him?

2   A   I believe it was about two hours.

3   Q   And, Dr. Grassian, were you asked to offer an opinion

4   with regards to Mr. Ford in this case?

5   A   Yes.

6   Q   And what was that opinion you were asked to offer?

7   A   Basically, what was the impact of his having been

8   returned to the DDU in June of 2007 as a pretrial detainee,

9   and then subsequent as a convicted person in April 2008.

10  Also, my recommendations regarding what kind of treatment he

11  would need after release from prison, and the question of a

12  need for a transition from the DDU into a general, more of a

13  general population setting prior to discharge back into the

14  community.

15  Q   I would like to first focus on the time period during

16  which Mr. Ford was held in the DDU as a pretrial detainee.

17          In your opinion, did Mr. Ford experience harm from

18  his confinement in the DDU as a pretrial detainee?

19  A   Severe harm.

20  Q   And can you describe that harm?

21  A   Yes.  As I said, Mr. Ford had discovered, not

22  surprisingly, but had discovered how symptomatic he really

23  was when he left prison in March 2007.  The fear of people,

24  the inability to sit in the center of any room.  He always

25  had to be near the wall.  An inability to tolerate crowds,

 1   inability to tolerate noises, overreacting, very jumpy.  All
 2   those things that I described earlier.
 3           He was just starting to recover when, as I
 4   suggested, like a person who's had a severe concussion, he
 5   was just starting to recover there at their most vulnerable.
 6           When he returned to prison -- he had been such a,
 7   he had always tried to be such a strong person and
 8   tolerating prison.  But this time he was like a broken man.
 9   He was just broken.  He had lost his strength.  And just --
10   well, actually, you know, there were times at night when he
11   would be crying.  You know, he just, he couldn't believe he
12   was back.  He couldn't, he couldn't, he just couldn't numb
13   himself again.  Instead, everything got through.  The
14   noises, the clanging, everything got through.  A person
15   tried to hang himself within, I think the first week or so
16   that he was there.  And he just could not numb himself to
17   it.  He was frightened.  What makes people go, what makes
18   people do that.  You know, he just -- he didn't know if that
19   would happen to him.  He lost his strength, his faith in
20   himself.  Very depressed.  Very anxious and fearful.  And
21   for a significant period of time he was kind of isolated
22   himself.  Whereas before he would occupy his time very
23   actively, now he was just, often just lying in his bed doing
24   nothing, often refusing to go out for exercise, refusing to
25   see people in person.  He saw for some period of time

1    apparently his sister, and to my knowledge he still hasn't

2    allowed his bishop to visit him, and so he feels so

3    defeated, so ashamed.

4    Q    Dr. Grassian, you mentioned that Mr. Ford was depressed.

5    How did his depression manifest itself?

6    A    Well, as I said, he just, he was totally despondent.  He

7    didn't want to do anything.  He didn't want to read.  He

8    didn't want to do anything.  He just couldn't bear to be

9    where he was.  He was tearful.  He lost weight.  He avoided

10   people.  He aged terribly.

11   Q    Did Mr. Ford experience any of the hypersensitivity to

12   stimulation that you described earlier?

13   A    Well, I think I did describe that.  He no longer had the

14   ability to numb himself to clanging, to keys, to water, let

15   alone to shouts of inmates, to cell extractions, to people

16   attempting to hurt themselves in the cells.  He just had --

17   he had no -- he lost that resilience, he lost that

18   insulation.  And everything was battering him.

19   Q    You also mentioned that Mr. Ford suffered from anxiety.

20   Can you describe that anxiety as well?

21   A    He had become -- well, of course, I think I had

22   mentioned that even prior to his discharge from prison in

23   2007 he had become quite anxious and actually had developed

24   panic attacks, and finally, in 2006 had finally asked mental

25   health for help and had been started on medication,

```
1    primarily an antidepressant.  But when he came back, the
2    anxiety, the fearfulness was raw.  You know, there was no
3    longer that feeling of insulation, of numbing.  You know,
4    the constant preoccupation am I going to go crazy, am I
5    going to survive this.  Why do people go crazy here.  And
6    then this tremendous anxiety he had about losing his health,
7    especially since he had a fairly severe Type I diabetes.
8    And when he was in the DDU his blood sugars were terrible.
9             MR. ANAHORY:  Objection, your Honor.  He is not a
10   medical expert.  He should not be opining on his diabetes,
11   your Honor.
12            THE COURT:  Well, you are a medical doctor?
13            THE WITNESS:  Of course.
14            THE COURT:  But do we have his medical records?  I
15   mean, I assume that these are facts.  No?
16            MS. CHAUDHARY:  Dr. Grassian has reviewed Mr.
17   Ford's medical records which document his diabetes and his
18   blood sugar levels during the relevant time period, and is
19   testifying based on that knowledge as well as his
20   conversations with Mr. Ford.
21            MR. ANAHORY:  They don't -- I don't believe they're
22   submitting any medical records about his diabetes, your
23   Honor.
24            MS. CHAUDHARY:  We're not submitting -- regardless
25   of whether we're submitting them into evidence, they were
```

1    part of the materials Dr. Grassian reviewed in forming his

2    opinions and were cited in his report.

3              THE COURT:  I'll accept this for now, but I want to

4    revisit it at the break.

5              THE WITNESS:  When Mr. Ford had been out on bail,

6    he had managed, he was very careful of his diet and his

7    insulin and managed to maintain his blood sugars in the

8    hundred range, which is good.

9              THE COURT:  And how do you know that?

10             THE WITNESS:  Well, that was -- that information is

11   from him.  The information about the blood sugar levels

12   while he was in prison is from the medical record, as well

13   as from him.

14             Oh, actually even from -- Dr. Katz's, even Dr.

15   Katz's report notes it as well, that he was running blood

16   sugars in the three to four hundred.  And I have treated

17   patients with diabetes and patients in diabetic ketoacidosis

18   which is a potentially lethal condition.  It's well-known,

19   any doctor would know that if you don't control the blood

20   sugars meticulously, the less well controlled they are the

21   quicker you're going to develop eye disease and blindness,

22   cardiovascular disease, strokes, loss of limbs through small

23   vessel disease, renal disease, and a diabetic peripheral

24   neuropathy which he had developed apparently and worsened

25   when he was reincarcerated.  And these are all, these are

1   the complications of diabetes that result from inadequate

2   control of the blood sugars.

3   **Q**   Dr. Grassian, when Mr. Ford returned to the DDU in June

4   of 2007, to your knowledge did he keep in touch with his

5   family and friends?

6   **A**   To my knowledge, initially he only kept in touch with

7   his sister, Leona.  I don't know how much that increased.  I

8   believe it did increase subsequently.  I mentioned that he

9   still hasn't been in touch with the bishop to my knowledge.

10  But for the most part, I mean, he was clearly isolating

11  himself.

12  **Q**   And in your opinion, did that limited contact affect his

13  mental state?

14  **A**   Well, the limited social contact and limited contact in

15  other regards, of course, I mean, that's what I described as

16  causing the harm and impairment.  But obviously he became

17  much, much more socially isolated and his readjustment to

18  the community is going to be much difficult as a result.  He

19  hasn't been in touch with some of these people in the four

20  years since he's been back in prison.

21  **Q**   And when Mr. Ford returned to the DDU, did he regularly

22  leave his cell to use the exercise cages?

23  **A**   My understanding from Mr. Ford is that he hardly ever

24  did for the first several months.

25  **Q**   And in your opinion did that limited exercise affect his

1  mental state?

2  A   Yes.  I mean, he was -- as I said that when people are

3  in the DDU, unfortunately, they often start avoiding all

4  stimulation.  They start avoiding things.  And in Mr. Ford's

5  case there was a mixture of fear, severe depression, and

6  just the inability to accept that he was back there.

7          THE COURT:  Doctor, you saw him in 2007 when he was

8  out and then the next time you saw him is 2011.  So when

9  you're reciting the effects in that period, after he went

10  back in until you saw him, are you relying on written

11  records?  Are there reports of how often he went in to

12  exercise, or are you relying on Mr. Ford's description?

13          THE WITNESS:  In regard to these last questions,

14  I'm relying on two interviews, my interview with Mr. Ford

15  and my interview with his sister.  I haven't actually seen

16  records, I don't know if there are, of how often he went out

17  to exercise.  So I'm simply relying on his statement and his

18  sister.  Because his sister actually visited him, you know,

19  after he got in in 2007 and saw him.  So I spoke to her

20  about it as well.

21  Q   And what changes did Leona convey to you with regard to

22  Mr. Ford?

23  A   Well, Leona said that when she saw him she was horrified

24  that he had, looked so haggard, he had aged, he was so

25  depressed, he had sort of given up.  And she was very

1    frightened by that.

2    Q    Dr. Grassian, do you know whether Mr. Ford had ever been

3    housed in the DDU prior to 2007?

4    A    Yes.

5    Q    And how do you know then that when Mr. Ford was harmed

6    by his confinement in the DDU as a pretrial detainee that

7    harm was distinct from other times he had spent in the DDU?

8    A    Well, we know basically what his experience was like

9    when he got out of prison, so that's the cumulation of where

10   he was at.  As I said, Mr. Ford had, had a lot of strength

11   and he had tolerated his confinement better than most

12   people.  He was starting to lose it a bit.  He was becoming

13   symptomatic.  But he hadn't totally, he hadn't despaired, he

14   hadn't kind of given up.  He never had given up.  But when

15   he came back in June of 2007 it was like he gave up.  He

16   gave up.  He stopped insulating himself, he stopped numbing

17   himself, he stopped strengthening himself.  He was just, he

18   was just raw.

19   Q    Was there a difference in your opinion in Mr. Ford's

20   state of mind or mental state in 2007 when you first met

21   with him to 2011, your last meeting with him?

22   A    Yes.  When I met with him in 2011, I, too, I was kind

23   of, I was kind of shocked.  Because when I saw Mr. Ford --

24            MR. ANAHORY:  Objection, your Honor.  Again, he's

25   basing this on what he --

```
 1            THE COURT:  Well, now he's testifying as to his

 2   personal observations in 2011.  Right?

 3            MR. ANAHORY:  Well, he didn't -- he's saying that

 4   he saw him in 2007 and then again in 2011.  I mean --

 5            THE COURT:  Overruled.

 6   A   When I saw Mr. Ford in 2011 I was shocked.  He just --

 7   he had been a strong person.  He was -- when I saw him in

 8   2011 he looked so much older.  He -- just start with the

 9   slumped shoulders, soft voice, slow.  A man who was just

10   utterly defeated.  I had never seen him like that before.

11   And it was -- you know, it really had a very significant

12   impact.  It was quite obvious how much he had changed.

13   Q   Dr. Grassian, in your opinion was Mr. Ford's return to

14   the DDU as a pretrial detainee harmful to his mental state?

15   A   Yes.

16   Q   I would like to now turn to Mr. Ford's confinement in

17   the DDU as a convicted inmate.

18            Did the symptoms you've described subside after

19   Mr. Ford was sentenced in April of 2008?

20   A   No.

21   Q   Can you describe, can you describe Mr. Ford's mental

22   state after April of 2008?

23            MR. ANAHORY:  Objection, your Honor.  That's not an

24   issue here today.

25            THE COURT:  It's important to me.  Overruled.
```

1    A    I'm not aware of whether Mr. Ford's mental state

2    continued to further deteriorate after he was, after he was

3    sentenced in 2008.  My best understanding of it as best as I

4    can, as I can understand it, is that it did not appreciably

5    change, that he was, what I described, and that continued to

6    be the case pretty much up to the present.

7    Q    I would like to focus now on your opinions with regards

8    to Mr. Ford's transition.

9            THE COURT:  Before you go there.  In your

10   experience, I'm not limiting this to Mr. Ford in particular,

11   the length of time in the DDU, does that affect the impact

12   on an inmate's mental health, or do they sort of reach a

13   low point and the low point continues?

14           THE WITNESS:  That is such an excellent question.

15           THE COURT:  Thank you.

16           THE WITNESS:  No, because -- I don't mean to just

17   compliment you.  Because I really feel strongly that

18   Departments of Correction have an obligation to study that

19   over wide, in a large sample of people.

20           My sense is that the longer you're in the DDU the

21   worse it gets.  But I don't feel like I have a sufficiently

22   large sample to be, to really be clear about that.  You

23   know, I've mentioned that I actually had been consulted by

24   this firm doing research for the Department of Corrections

25   about the effects of DDU, and these are some of the

1    questions that needed absolutely to be answered.

2         **THE COURT:**  Thank you.

3    **Q**   Dr. Grassian, do you have -- you have experience

4    evaluating and treating inmates who have been released

5    directly from segregated confinement into the community?

6    A    I have.

7    **Q**   And can you describe that experience for those inmates?

8    A    Yes.  I have very, I have developed very, very strong

9    opinions about that.  You know, when you leave somebody in

10   segregated confinement and you release them back into the

11   community directly, you're not getting tough on crime,

12   you're getting tough on the community.  You've succeeded in

13   making that individual as incapable as you can of

14   functioning in the community, and then you release them

15   right back into it.  It's just -- it makes, it could make no

16   sense.  I mean, these folks do not function well when

17   they're released back in the community.  I've seen horrible

18   things happen.  Horrible and predictable.

19   **Q**   Is there a common set of problems these inmates share

20   when they're released from segregated confinement?

21   A    Yes.  They're intolerant to stimulation.  They become

22   isolated, loaners, irritable, ashamed.  They're ashamed

23   because they don't even know how to function in the real

24   world anymore.

25              I can give you examples for Mr. Ford.  One, there's

1    a two foot rule in prison.  You know, you have to stay at

2    least two feet away from another person.  Well, one time

3    he's waiting to walk into a, I think it was a Store 24, one

4    of those kind of places, and this woman wants to go.  So he

5    walks away from her instead of holding the door for her.

6    You know.  And his sister looks at him, like, what are you

7    doing.  And then he realizes there's no two foot rule here,

8    I should have held the door for her.  And he's embarrassed

9    by it.

10             There's so many things like that that happen all

11   the time.  So people, you know, it's very hard not to become

12   irritable, alone, angry, paranoid, fearful, and just

13   overwhelmed by stimulation.  You can't function.  To me it

14   makes no penologic sense whatsoever.

15   Q    And how does an inmate typically respond, or excuse me,

16   how does an individual when they're released from segregated

17   confinement directly into the community typically respond to

18   environmental stimulation?

19   A    They, they are hyperresponsive to it.  They don't know

20   how to tolerate it.  People tend to literally take to their

21   bed, get away.  They don't want to hear anything.  They

22   can't -- they don't know how to be with people.  They don't

23   know how to be with ordinary noises, with ordinary, the

24   clang and chatter of life.

25   Q    And do you think Mr. Ford will experience these

1    difficulties when he's released from the DDU?

2    A    To some extent, of course.

3    **Q**    Why?

4    A    Well, they're inevitable.  I mean, I've never seen

5    anyone who didn't describe just those kinds of symptoms.

6    **Q**    And did Mr. Ford experience these difficulties when he

7    was out in the community in 2007?

8    A    He experienced them, yes.

9    **Q**    And in your opinion, is Mr. Ford's mental state now

10   similar to his mental state when he was released into the

11   community in 2007?

12   A    I think his mental state is far more troubled and raw

13   than it was then.  You know, he really doesn't have the

14   strength, the resilience that he had back in 2007.

15   **Q**    What can be done, if anything, to assist Mr. Ford with

16   his transition into the community?

17   A    Well, the most important thing I think is for him to

18   have a period of transition.  And it's kind of in a sense

19   common sense.  You've got to put him back with people, in a

20   general population type of setting.  You have to give him

21   initially the opportunity to be alone in a cell for as much

22   of the day as he needs to be, have somebody help him,

23   somebody counsel him.  You know, how much can you do, you

24   know, help him set targets and gradually reintroduce himself

25   to stimulation, to activity, to people, but being able to

1    sort of retreat back to the cell when it's too much.  You

2    know, to start out slow and hopefully get better over time.

3    **Q**   And should Mr. Ford be immediately placed in a double

4    cell with another inmate if he's moved from the DDU?

5    A   I can't imagine a worse thing to do to someone who's

6    been in the DDU than to double cell him.  Double celling in

7    the best of circumstances is horrendously difficult for

8    people in solitary confinement, and if they've been in

9    solitary confinement.  Remember, they're having such trouble

10   tolerating stimulation, tolerating social stimulation.

11   Imagine not being able to get away from it.  It makes no

12   sense at all.

13   **Q**   And if Mr. Ford is not transitioned in some respect

14   while he's incarcerated before he's released, how will that

15   affect his ultimate release into the community?

16   A   It's going to be much, much more difficult.  He's going

17   to be much more symptomatic, have much less coping skills.

18   You're setting him up for far more severe trouble and, you

19   know, not giving him the skills that he might, that he's

20   going to desperately need when he gets out.

21   **Q**   And can you describe what Mr. Ford's psychological needs

22   will be after he's released from incarceration?

23   A   Well, his psychological needs, his needs for mental

24   health treatment, I believe are going to be far greater than

25   they would have been in 2007 because of how defeated he is,

1    how much of his strength he's lost.  What I think would make

2    sense for him would be to be with someone, not in some crazy

3    psychoanalytically oriented program to study his childhood

4    or something of that sort, but someone to help him in a

5    concrete way to cope and to set goals and to just understand

6    what he's going through.

7          I would suggest that in a situation like that twice

8    weekly sessions.  But it's my habit in situations like this

9    where people are having trouble coping on a daily basis, I

10   would like to be in touch with them every day, usually by

11   e-mail or phone.  But just to help, you know, set goals for

12   today, try to, you know, then you find out if they've

13   reached them.  It doesn't take a lot of the therapist's

14   time.  I think it's extremely important.

15   Q   Would any other programs or services be beneficial to

16   Mr. Ford's transition?

17   A   I don't know what kind of programs or services are

18   available.  And unfortunately, I think they're very limited.

19   I mean, one would be delighted to see a group program for

20   people in similar situations.  Because one of the things

21   that happens is that the person feels terminally unique.

22   You know, they feel very ashamed of themselves because of

23   the difficulties they're having.  So, it would be great if

24   there were a group program, you know, a group of people who

25   had been released from prison.  I think I had mentioned to

1   you that one of the folks who was actually wrongfully

2   convicted of murder in New Orleans, I think you've heard of

3   him, started a program to help people transition back from

4   prison and back into the community.  I thought that was

5   wonderful.

6   **Q**   And, Dr. Grassian, would some degree of financial

7   security assist Mr. Ford in his transition to the community

8   as well?

9   A   I, I think that he's going to have difficulty for some

10  period of time and being able to earn a good income,

11  because, you know, reasonable income because of the

12  impairments he has.  So, yes, I think that some economic

13  systems would be enormously helpful and important.

14  **Q**   Thank you, Dr. Grassian.

15          **MS. CHAUDHARY:**  Nothing further.

16          **THE COURT:**  I think it's best that we take the

17  morning break now and then we'll do cross-examination.

18          Okay, ten minute break.

19          **MS. PIROZZOLO:**  Thank you, your Honor.

20          **THE CLERK:**  Court is in recess.

21          (Recess.)

22          **THE CLERK:**  All rise.  You may be seated.

23          **THE COURT:**  Cross-examination?

24          **MR. ANAHORY:**  Thank you, your Honor.

25

**CROSS-EXAMINATION**

**BY MR. ANAHORY**

Q   Dr. Grassian, you testified today that you testified in a previous matter in Massachusetts regarding the Department Disciplinary Unit.  Is that true?

A   Yes.

Q   And was that matter the Torres matter?

A   That was definitely the Torres matter.  I believe, I believe I may have testified in other cases as well.

Q   But you did testify in --

A   I don't remember.  Yes.

Q   You did testify in the Torres matter.

And are you aware, Doctor, that in Torres the Supreme Judicial Court found that the conditions of confinement in the Department Disciplinary Unit was constitutional?

A   In that it didn't violate the Eighth Amendment, yes.

Q   Doctor, you're not an expert in prison security, are you?

A   No.

Q   You testified that you, you visited with Mr. Ford a total of four times; is that correct?

A   Yes.

Q   And that was three times between April 23rd and June 18th in 2007; is that correct?

1    A    That sounds about right.

2    Q    And then you met, the next time you met with him was

3    February of 2011?

4    A    That's correct.

5    Q    And after you visited with him in 2007 you wrote a

6    report or a letter to Judge Fabricant?

7    A    Yes.

8    Q    And she was presiding over his criminal case in Norfolk

9    Superior Court?

10   A    I assume so, yes.

11           MR. ANAHORY:  Your Honor, I would like to mark into

12   evidence for identification purposes, I believe Defendant's

13   Exhibit 11.

14           THE COURT:  Okay.  Is this an objected to exhibit?

15           MS. CHAUDHARY:  No, your Honor.

16           THE COURT:  No objection?  All right.  So, let's

17   just mark it as Exhibit 11.

18           MR. ANAHORY:  Thank you, your Honor.

19           THE CLERK:  Do you have an extra copy for the

20   judge?

21           THE COURT:  Is it in the book or do I have an extra

22   copy?

23           MR. ANAHORY:  I don't think it's in the book, your

24   Honor.

25           (Exhibit marked in evidence.)

1    **Q**    Doctor, if you could look at that exhibit, please.

2    A    Uh-huh.

3    **Q**    Do you recognize that?

4    A    I do.

5    **Q**    And what is it?

6    A    This is the letter you alluded to earlier that I wrote

7    to Judge Fabricant.

8    **Q**    Is that a copy of it?  Is it an accurate copy of your

9    letter?

10    A    It appears to be so, yes.

11    **Q**    And you authored this report?

12    A    I did.

13    **Q**    And do you recall stating in your deposition that this

14    letter was another basis for the opinions rendered in this

15    case?

16    A    I don't recall stating that the letter itself is the

17    basis.  But the information in the letter was --

18    **Q**    If I show you the deposition would that refresh your

19    recollection?

20    A    Again, I don't know I would have said the letter, but

21    the information that's in the letter is certainly the basis

22    of my opinion.

23         **MR. ANAHORY:**  Your Honor, may I approach the

24    witness?

25         **THE COURT:**  Yes.

1    **Q**   Looking at line 6.  The question's here.

2    A   The question is are these the three opinions you

3    rendered in your first report.  And then on line 6 it says

4    the only other Ford specific information provided prior to

5    2011 is in the Judge Fabricant letter.  And that would be

6    another basis for opinions that was rendered in this case.

7    **Q**   So you did -- it was a basis for your opinion?

8    A   Again, that was, it's --

9         **THE COURT:**  As I understand it the facts that you

10   described in the letter in 2007 you relied on in --

11        **THE WITNESS:**  Not exactly.  The same information.

12        **THE COURT:**  Okay.

13   **Q**   Isn't it true in this report you do not opine that

14   Mr. Ford suffered emotional harm based upon at what point

15   was two months' pretrial confinement in the DDU?

16   A   I make no such opinion, correct.

17   **Q**   And you didn't opine in this report that prior to

18   leaving prison he was panicky or he had anxiety attacks like

19   you testified today; isn't that true?

20   A   I don't recall.  I would trust that you're correct.

21   **Q**   And you never opined that Mr. Ford was in any -- you

22   testified earlier that there's a spectrum of harm that

23   individuals suffer from confinement in the DDU.  Isn't that

24   true?

25   A   Yes.

Q    And you don't opine in that report that Mr. Ford fell in
any of that spectrum, do you?

A    That's not correct.

Q    You opine such in that report?

A    Yes.

Q    Can you show me where?

A    Certainly.  If you look at my description of how he was
managing his anxiety, the difficulty being on the MBTA or
elevators, his nervousness around people, all of that is
stuff that he had when he was discharged from prison.

Q    But I believe, I believe my question was during the time
that he was incarcerated, you didn't opine that he suffered
from that emotional harm or that he was in that spectrum?

A    I think you're incorrect again.  I mean, I indicated, if
you look at the July 2002 incident, or even before, that he
was already becoming symptomatic.  And then his adjustments
since release from prison, at first quite typically he was
exceedingly apprehensive, easily overwhelmed by stimuli and
especially by being with other people.  I mean, I go on and
on.  So that's, all of that, I mean, clearly by implication
is a result of his confinement and his, his coping with the
symptomatology that remains.  So you're incorrect.

Q    So, you didn't opine in that report either that he
needed, he was in need of intensive therapy to mitigate the
impacts of confinement in the DDU in 2007, did you?

1  A   I made no opinion whatsoever about his treatment.  There

2  was no opinion.

3  Q   And in 2007 you reviewed the records, correct?

4  A   Yes.

5  Q   How long had Mr. Ford been in segregated confinement up

6  until that point?

7  A   A very, very long time.

8  Q   Over ten years?

9  A   I believe it's significantly more than that.

10  Q   Over 20 years he was in segregated confinement?

11  A   I don't know specifically, but something of that sort.

12  Q   And there was no opinion that he needed this therapy

13  based on those 20 years of segregated confinement, correct?

14  A   The letter didn't address that issue.  It wasn't

15  intended to address the issue of treatment.

16  Q   My question was is it in that letter?

17  A   My answer is no, and nor was it --

18  Q   Thank you.

19  A   -- relevant to the letter.

20  Q   And the purposes of -- you also didn't opine in there

21  that he needed twice weekly therapeutic appointments for

22  five to six years, did you?

23  A   I believe my last answer incorporates your next

24  question.  There's no opinion regarding treatment

25  whatsoever.

Q    And what was the purpose of this report?  I believe you

testified earlier it was to probation?

A    Correct.

Q    What criteria do you look at when you opine as to

whether someone's appropriate for probation?

A    In this letter I wrote what I thought was relevant that

the judge should consider.  I don't have any routine because

I don't do this commonly.  But I, I felt the important task

was to describe his adjustments after he got out of prison.

Q    So you had no set criteria that you were following, just

a feeling?

A    No.  I mean, how he was getting along with people, what

types of activities he was engaging in.  I mean, those

aren't feelings, those are kind of obvious things to

consider in preparing a report like this.

Q    So wouldn't a person who is on probation and who suffers

from the emotional stress that you feel that Mr. Ford

suffers from, wouldn't that person benefit from treatment

while on probation?

A    Absolutely.

Q    And wouldn't that person benefit from some sort of --

I'm going to strike that.

        Mr. Ford self-reported to you that he was having an

easier time getting on trains, he was able to ride

elevators, and he was letting his guard down around people

1   whom he didn't know well while he was, during that two

2   months that he was out on probation.  Isn't that true?

3   A   Some of the statements there are self-reported from Mr.

4   Ford, some are reports from Leona, some from the other

5   people who had been with him.  I can't recall which

6   statement came from which source.

7   Q   He also told you that he had reconnected with old

8   friends who were doing well.  Isn't that true?

9   A   Again, I cannot at this moment without reviewing the

10   document remember what the source was.  But, yes, the

11   statement itself was in the letter.

12   Q   In any event, it was either from Mr. Ford or from those

13   people?

14   A   Correct.

15   Q   He made all these improvements without the intensive

16   therapy that you recommended in the supplemental report,

17   didn't he?

18   A   Yes.

19   Q   Dr. Grassian, in this letter you also provide, provided

20   Judge Fabricant with a social history for Mr. Ford; isn't

21   that correct?

22   A   Yes.

23   Q   And in this case you provided the judge with information

24   that states Mr. Ford was leading two separate lives, didn't

25   you?

1   A    Yes.

2   Q    On the one hand he was a popular star athlete that he

3   self described as king of the school?

4   A    Yes.

5   Q    On the other hand, he was doing wild things with his

6   project friends which included robbing stores for money;

7   isn't that true?

8   A    That's almost a direct quote, I believe, from my letter.

9   Q    Didn't it trouble you that Mr. Ford in providing you

10  with this information didn't accept responsibility for any

11  of this, his actions?

12  A    That's entirely incorrect.

13  Q    Okay.  For instance, it wasn't Mr. Ford's fault that he

14  was convicted and imprisoned in Concord after he got caught

15  robbing a grocery -- jewelry store, rather it was the

16  football coach's fault for not coming to his aid as he had

17  in the past when it was, when he still had football

18  eligibility left.  Isn't that in that report?

19  A    No.

20  Q    That's not in that report?

21  A    That is, that is not correct.  That is not correct.

22  That's a misstatement of what I wrote.

23  Q    It wasn't Mr. Ford's fault that he lost his purported

24  athletic scholarship, again it was the coach's fault for not

25  coming to his aid when he was arrested for robbery?

1   A   I think at this point you're testifying, you're not --

2   Q   I'm reading what's in the report.

3   A   No, you're not reading what's in the report.  You're

4   not.  The report doesn't state that.  The report shows,

5   states how much remorse he felt and how much he wanted to

6   help other people not follow in his footsteps.  The report's

7   very clear on that.

8   Q   Doctor, why don't you just answer the question yes or

9   no, it's not in the report.  You don't need to add to it.

10          It wasn't Mr. Ford's fault that he didn't study in

11  school, it was his coach's fault for giving him B's and C's

12  even though he didn't put the effort in to studying.  Is

13  that true?

14  A   That -- my report doesn't state that.  You're stating

15  it, but the report doesn't state it.

16  Q   It doesn't state that he was given B's and C's?

17          THE COURT:  Counsel, is there something in

18  particular I should read here, or should I just take a

19  moment and read the report?

20          MR. ANAHORY:  Yes, your Honor, I would ask that you

21  read on the third page, there's an indented paragraph.

22          THE COURT:  Why doesn't the witness do that

23  himself.

24  Q   Doctor, could you read that, please.

25  A   He was very popular in school and as a star athlete he

1    was --

2              **THE COURT:**  All right, I'm sorry, you didn't need

3    to read it out loud for me.

4              **THE WITNESS:**  Oh, I'm sorry.

5              **THE COURT:**  I can read it.

6              **THE WITNESS:**  I'm sorry.

7    **Q**   Why don't you read it out loud actually.

8              **THE COURT:**  Go ahead.

9    **Q**   If you would, Doctor.

10   A   King of the school.  I didn't have to take a test,

11   didn't have to do anything.  Most of us were football

12   players.  We would hang around the teachers and the

13   basketball coach was my history teacher, track coach was my

14   math teacher, the football coach was my teacher.  I would

15   receive B's and C's and I didn't learn anything, didn't even

16   have to open a book.  So he had good relationships with

17   these coaches and friends in school.

18   **Q**   Okay.  Doctor, I'm going to ask you to read the next

19   paragraph that starts with "But."

20   A   But he also had another group of friends from the

21   projects and he joined them in doing a lot of wrong things,

22   including robbing stores for money.  Occasionally he got

23   caught but no one was even ever hurt in these episodes.  His

24   football coach knew someone in the Malden District Court and

25   the judge would always hand out the same sentence,

1    probation, probation, probation.  I thought I had a license

2    to do anything.

3    **Q**   And can you continue reading, please.

4    **A**   Sure.  Then came senior year, football season was over.

5    Albert had college scholarship offers and was getting ready

6    to choose, then he got caught again robbing a jewelry store.

7    Suddenly it was superior court, not district court.

8    Suddenly, his coach said that he could not help him this

9    time.  Suddenly, there was no one there to rescue him in

10   court.  He was convicted and imprisoned.  His football

11   scholarships and college acceptances were gone.  He was

12   stunned, betrayed.  Indeed, he still wonders whether his

13   football coach would have done something more for him if he

14   had not been graduating, if he were instead coming back to

15   play football at the high school the following year.

16   **Q**   Thank you, Doctor.

17          So, again, I ask you, it wasn't his fault that he

18   committed these crimes, rather it was the fault that people

19   didn't come to his aid.  Isn't what that reads, Doctor?

20   **A**   Only to you, sir, not to me.  The report states quite

21   clearly --

22   **Q**   Okay, Doctor, thank you.

23   **A**   -- otherwise.

24   **Q**   It wasn't Mr. Ford's fault that he committed the crimes,

25   rather it was the fault of his project friends who had a

1    negative influence on him.  Isn't that true?

2    A   That is not what the report says and I don't agree with

3    the statement.

4    Q   You also stated that you reviewed the department records

5    regarding, regarding Albert Ford up until 2007; isn't that

6    true?

7    A   Yes.

8    Q   And do you recall reading the incident regarding the

9    hostage taking and the staff assault?

10   A   Do you mean the 2002 incident?

11   Q   Yes.

12   A   Yes.

13   Q   You read about that?

14   A   I did.

15   Q   Okay.  And Mr. Ford's lack of responsibility for his

16   actions in this, in this instance is also evident; isn't

17   that true?

18   A   I'm sorry, is it evident?  What are you saying, sir?

19   Q   He, he didn't take responsibility fully for that action,

20   did he?

21   A   I'm not sure exactly what you mean.

22   Q   Well, let me ask you this.

23   A   I described what I believe happened in that incident.

24   Q   Let me ask you this.  Mr. Ford self-reported to you that

25   after he dropped his insulin needle and bent down to pick it

1   up the nurse thought he was falling and tried to hold him

2   up.

3   A   Right.

4   Q   Did you write that?

5   A   I did.

6   Q   And by doing that the nurse touched Mr. Ford?

7   A   Right.

8   Q   Which triggered a reaction in Mr. Ford that led him to

9   swing, to swing his arm, grab a shank and swing his arm?

10  A   That's correct.

11  Q   Isn't that what you say in there?

12  A   Correct.

13  Q   And then you say that in swinging the shank at a

14  correction officer he superficially stabbed him?

15  A   Right.

16  Q   He suffered a superficial wound?

17  A   Two actually in his back.

18  Q   And then he held the knife at the nurse's throat,

19  correct?

20  A   Yes.

21  Q   Well, the department records paint a different picture,

22  don't they?

23  A   Not to my knowledge.

24  Q   You don't recall reading in the department records that

25  it was two officers who were stabbed by Mr. Ford, not one?

1    A    There was one officer who suffered an abrasion and one

2    who was stabbed in the back.  Two stab wounds.

3    Q    So, is it now your testimony that there were two

4    officers that were injured in this report?  In this

5    incident?

6    A    I'm sorry, I stated that one officer suffered an

7    abrasion.

8    Q    But you neglected to tell Judge Fabricant that there

9    were two officers involved in that report; isn't that true?

10   A    I would trust that Judge Fabricant would have all those,

11   all those details.

12   Q    But you didn't put that in your report, did you?

13   A    I don't recall.  If you say so --

14   Q    Do you want to look at it and tell me if --

15   A    No, I would certainly believe you.

16   Q    Okay.  And the incident reports that the officers state

17   are a much different story than what Mr. Ford told you;

18   isn't that true?

19   A    Not to my recollection, no.

20   Q    Don't those records reflect that Mr. Ford stabbed the

21   officers after they were attempting to reposition his

22   handcuffs rather than in response to the nurse touching him?

23   A    Well, I believe those actions occurred at the same time,

24   didn't they?

25   Q    Don't they also reflect that Mr. Ford swung his knife at

1  the nurse, attempting to stab him in the head and neck area?

2  A    I don't recall that.  He held a knife to the nurse's

3  neck but did not, had the opportunity but did not actually

4  stab him.

5  Q    So you neglected, either you neglected or you didn't

6  read that information in the department's records?

7  A    I don't specifically recall that statement.

8  Q    Okay.  Is it your practice to accept self reports as

9  accurate without attempting to independently verify them?

10  A    No, it wasn't even my practice in this particular report

11  since obviously I was interviewing a whole number of people.

12  Q    Did you dismiss these records because they were authored

13  by corrections personnel?

14  A    I'm not clear that I ever stated I dismissed any

15  records.

16  Q    But none of what I told you is in your report, correct?

17  A    What's in my report is in my report.  I think it spoke

18  to his mental state at the time of this incident.  And I

19  believe it's a reasonably accurate statement of his mental

20  status at the time of the incident, and I don't believe

21  there's anything in any report by the corrections officers

22  that contradicts or goes against that being his mental state

23  at the time of the incident.

24  Q    Doctor, if I show you the department's investigation --

25          MR. ANAHORY:  Your Honor, if I could have a moment,

```
 1   please?

 2           THE COURT:  Yes.

 3   Q   Doctor, if I show you the department's investigation

 4   regarding the incident, would that refresh your

 5   recollection?

 6   A   I can't say without having seen it.

 7           MR. ANAHORY:  May I approach, your Honor?

 8           THE COURT:  Yes.

 9   Q   Could you read that report.  And for the record, this is

10   the report of the nurse who was assaulted.

11           Would you read that.

12   A   Sure.  On Monday, July 1 --

13           MS. CHAUDHARY:  Objection.

14           THE COURT:  Sustained.  Are you moving it into

15   evidence?

16           MR. ANAHORY:  No, your Honor, I was hoping that he

17   would refresh his recollection with it.

18   Q   You don't have to read it out loud, sir, just read it to

19   yourself.

20           THE COURT:  You can use it to refresh your

21   recollection but not to -- recollection of what?  What

22   doesn't he remember?

23           MR. ANAHORY:  Well, he said he reviewed the

24   reports, your Honor, and yet he failed to put in some

25   information that the nurse states in his incident report
```

1    regarding the incident and he doesn't put it in his report.

2    And when I asked him about it, he indicated that he, to the

3    best of his ability or to the best of his recollection he

4    put in what was, how the incident occurred.

5              THE COURT:  If you reviewed the report, would that

6    refresh your recollection as to whether you considered the

7    nurse's statement when you wrote your report?

8              THE WITNESS:  Yes, actually it's reasonably

9    consistent with what I wrote.

10   Q   Well, in this report doesn't the nurse state that

11   Mr. Ford lunged at him twice with a shank?

12   A   I think the -- I could read it again.  But what the

13   nurse states is that he thought that Mr. Ford had lost his

14   balance and he tried to grab him and then Mr. Ford lunged at

15   him, which is very, entirely consistent with what I wrote.

16   Q   You didn't write in your report that Mr. Ford stabbed

17   him twice or lunged at --

18             MS. CHAUDHARY:  Your Honor, I would like to move to

19   strike the comments of the, the recitation of the report

20   involving the stabbing, or the lunging.

21             THE COURT:  Sustained.

22             MR. ANAHORY:  Thank you, your Honor.

23   Q   Don't you think that the information regarding the

24   report as detailed by department staff would have been

25   information that Judge Fabricant would have needed to have

1    to place Mr. Ford in the community out on probation?

2    A    What?  I'm sorry, I --

3             THE COURT:  Could you just explain to me what you

4    were doing here?  What was the purpose of this letter to

5    Judge Fabricant?

6             THE WITNESS:  There was an attempt -- apparently

7    Mr. Grossberg had spoken with the judge, the judge was

8    leaning towards affording him probation and wants to know

9    how he --

10            THE COURT:  This is when he's charged -- I'm sorry,

11   I just don't have the chronology in my head --

12            THE WITNESS:  Okay.

13            THE COURT:  -- as you all do.

14            So he's now charged criminally with whatever

15   happened in prison in 2002?

16            THE WITNESS:  That's correct.

17            THE COURT:  And we're up to 2007 and what should

18   happen, because he's now served, his prior sentence is now

19   done.

20            MR. ANAHORY:  Yes.

21            THE COURT:  And the question is what's happening

22   pretrial for the charge --

23            THE WITNESS:  A 2002 charge.

24            THE COURT:  -- that arose out of this hostage

25   situation.

1          THE WITNESS:  Right.

2          THE COURT:  And you're hired by?

3          THE WITNESS:  Mr. Grossberg.

4          THE COURT:  Okay.  So you're hired on behalf of

5    Mr. Ford to make a presentation to the Court on probation,

6    on pretrial release or -- is that what we're talking about?

7          MR. ANAHORY:  Probation, your Honor.

8          THE WITNESS:  Whether he would be allowed to be on

9    probation.  And so, I was commenting, my report was about

10   his adjustment to life after he had been released in

11   March 2007.

12         THE COURT:  All right.  But it's what's going to

13   happen to him pending his trial on the --

14         THE WITNESS:  No, it was actually -- the

15   expectation was that in June the judge would allow him to

16   plead and be placed on probation and not serve anymore

17   prison time.

18         THE COURT:  So we're dealing now with the

19   sentencing for this event.

20         MR. ANAHORY:  Yes, your Honor.

21         THE COURT:  Okay.

22         THE WITNESS:  On a plea, a plea --

23         THE COURT:  If there is a guilty plea this is

24   what's going to happen.

25         THE WITNESS:  Yes.

1          THE COURT:  You're dealing now with the sentence.

2          THE WITNESS:  Exactly.

3          THE COURT:  Okay.  Thank you.

4    Q    So, Doctor, in opining on Mr. Ford's suitability for

5    probation you state that he was being compassionate, kind,

6    friendly and respectful and that these were not attributes

7    springing anew in Mr. Ford; isn't that correct?

8    A    Well, some of what you just cited was actually

9    quotations from people I interviewed.

10   Q    You put that in your report to the judge?

11   A    I put that in quotations, yes.

12   Q    So where were these attributes when he was stabbing two

13   correction officers and swinging the shank at the nurse's

14   head when he --

15         MS. CHAUDHARY:  Objection.

16         THE COURT:  Sustained.

17   Q    Where were these attributes when he was stabbing the

18   inmate at MCI-Norfolk's chow hall when he violated what you

19   described as the two foot rule?

20         MS. CHAUDHARY:  Objection.

21         THE COURT:  No, I'm not, I'm not understanding.

22   Can I see counsel, please.

23   SIDEBAR CONFERENCE, AS FOLLOWS:

24         THE COURT:  Are you trying to put in his

25   disciplinary records?  I mean, if they're in evidence then

```
1    he can talk about it.  If there's an objection to them

2    coming in you can object and you can give a limited basis to

3    the question in this form.

4         MR. ANAHORY:  Well, the purpose, your Honor, is to

5    show that -- I'm trying to impeach the witness by something

6    that he wrote before here closer to the time of 2007.

7         THE COURT:  So why don't you ask him if he

8    considered in forming this opinion certain events without

9    editorial comments.  If you want to get into the details of

10   the comments, of the events, then you need to give me some

11   basis for it.

12        MR. ANAHORY:  Okay.

13        THE COURT:  Not your description of it.  Okay?  And

14   then you can either object to it or not.  But at least I'll

15   know what we're talking about.

16        MR. ANAHORY:  Thank you, your Honor.

17        (Whereupon the sidebar conference concluded.)

18   BY MR. ANAHORY:

19   Q   Dr. Grassian, you submitted two expert reports in this

20   matter; isn't that correct?

21   A   Yes.

22   Q   And your first report was submitted on June 17th, 2009?

23   A   I take your word for that.  I don't remember the exact

24   date.

25   Q   And in this report you indicated that there were, of
```

1    course, substantial differences in the effects of solitary

2    confinement upon different individuals, correct?

3    A   Yes.  Yes.

4    Q   And in this report you failed to opine whether or not

5    Mr. Ford suffered from mental illness or whether he suffered

6    any emotional distress attributed to either his stay in

7    segregated confinement throughout his period of

8    incarceration up until that point; isn't that true?

9    A   There was nothing at all that was specific to Mr. Ford

10   in that report.

11   Q   And you also reported in that report that people who

12   suffer from, people who are housed in segregated confinement

13   have abnormal EEG readings; isn't that true?

14   A   Yes, that's been, that's been shown and published in the

15   American Journal of Psychiatry.

16   Q   You never tested Mr. Ford's EEG readings, did you?

17   A   Clearly not.

18   Q   And as you said you never, you never interviewed him and

19   you didn't interview him in 2008 or in 2009, did you?

20   A   No.  No, I did not.

21   Q   And in 2009, Doctor, you didn't state that Mr. Ford's

22   placement in the DDU was like he suffered a concussion which

23   you testified to today, did you?

24   A   I believe I've answered that question by stating that my

25   2009 report had absolutely no specific mention of Mr. Ford.

1    Q    So, in 2009 you didn't, you didn't put in your report

2    what you testified to today?

3    A    I actually put in nothing about Mr. Ford at all.

4    Q    You didn't write that he was depressed, despondent,

5    didn't want to read, didn't want to read, didn't want to do

6    anything?

7    A    I believe that's a subset of the question I already

8    answered, which is no, I did not write about Mr. Ford at

9    all, not specifically.

10   Q    And you wrote a second report in this matter on

11   April 22nd, 2011, correct?

12   A    Yes.

13   Q    And in 2011, despite not opining to Judge Fabricant on

14   June 22nd, 2007, or to this Court on June 17th, 2009, you

15   opined in this report, the 2011 report, the supplemental

16   report, that Mr. Ford is now suffering from significant

17   trauma and harm from his prolonged solitary confinement in

18   the DDU since January of 2007, correct?

19   A    I'm confused.  You seem to be indicating that despite my

20   not having commented about --

21   Q    I'm asking you, Doctor.  Let me ask the question.

22            THE COURT:  If you don't understand the question

23   just say you don't understand it and he'll rephrase it.

24   A    I'm not quite sure I --

25   Q    In 2007 you didn't say Mr. Ford had significant trauma

1    or, as you testified today, severe harm?

2    A    No.

3    **Q**    And in 2009 you didn't?

4    A    Exactly.

5    **Q**    And those reports were closer to the period in question,

6    2007, the pretrial hearing?

7    A    They address different issues.

8    **Q**    But those reports were closer to that period of time;

9    isn't that true, Doctor?

10    A    Yes.

11    **Q**    And in 2011 you met with Mr. Ford for about an hour

12    and-a-half in February, correct?

13    A    I'm not sure, an hour and-a-half, two hours, something

14    like that.

15    **Q**    And you reviewed the same records that you reviewed in

16    2007; isn't that correct?

17    A    No.  There was some additional records.  There was some

18    updated mental health records.  There was, of course, all

19    the deposition transcripts, Dr. Katz's report and

20    deposition, the, the interview with Leona Ford in 2011.

21    **Q**    That's not what you said in your deposition, is it?

22    A    I would hope it was.  I mean, I'm not sure what you're

23    referring to.

24    **Q**    If I show you the deposition --

25    A    I'm sorry?

1    **Q**    -- would that refresh your recollection?

2    A    What?

3    **Q**    If I show you the deposition would it refresh your

4    recollection that you testified that the only records you

5    reviewed were the ones from 2007?

6    A    No, that would have been incorrect then.

7    **Q**    You were incorrect in the deposition?

8    A    I must have been.

9              **MR. ANAHORY:**  Your Honor, I would like to have

10   another exhibit marked.

11             **THE COURT:**  Show it to counsel, see if it's

12   objected to.

13             **MS. CHAUDHARY:**  We object to this.

14             **MR. ANAHORY:**  I still would like to mark it for

15   identification purposes.

16             **THE COURT:**  It is marked as Exhibit A for

17   identification.

18             **MS. CHAUDHARY:**  We object to it based on relevance.

19   Relevance.

20             **THE COURT:**  On the basis of relevance.  Can I see

21   it.

22             Is there any authentication issues with this?

23             **MR. ANAHORY:**  I don't believe so, your Honor.

24             **MS. CHAUDHARY:**  No.

25             **MR. ANAHORY:**  We would ask that this be entered

1    into evidence.  It certainly goes to bias.  We also feel it

2    is relevant, your Honor, and it shows a bias towards, this

3    witness towards Mr. Ford and against the Department of

4    Corrections.

5              **MS. CHAUDHARY:**  Your Honor, this is a

6    correspondence between Dr. Grassian and Mr. Ford that has no

7    relationship to this case.  He did not use it in forming any

8    of his opinions, did not rely on it and cite to it in any of

9    his reports.  To the extent that there's questions about

10   bias, counsel can ask him about, ask about Dr. Grassian's

11   bias without seeking admission of this, of this --

12             **THE COURT:**  The objection is overruled.  We'll mark

13   this as Exhibit 12.

14             **MR. ANAHORY:**  Thank you, your Honor.

15             (Exhibit marked in evidence.)

16             **MR. ANAHORY:**  Your Honor, may I approach the

17   witness?

18             **THE COURT:**  Let's have it marked.

19             **MR. ANAHORY:**  Thank you.

20   **Q**   Doctor, I'm showing you Exhibit 12.  Do you recognize

21   this?

22   **A**   Yes.

23   **Q**   Would you state to the Court what it is?

24   **A**   It's a letter I wrote Mr. Ford while he was in the DDU.

25   **Q**   Can you read the second paragraph of the letter to the

1    Court, please?

2    A    Sure.  I want you to know how strongly I feel you were

3    wronged in this recent criminal case and how vigorously I

4    would have testified in your behalf if the matter had gone

5    to trial.  In my opinion there's a quality of meanness and

6    vindictiveness that underlay this prosecution against you.

7    I've seen it before and I've seen it since and I wish I had

8    more power to prevent it.

9    Q    Isn't it true that the criminal case that you're

10   referring to is Mr. Ford's conviction for sending heroin

11   into Cedar Junction when he was out on bail?

12   A    No.  I had no contact with that case.

13   Q    If I show you your deposition transcript that states

14   otherwise would that refresh your recollection?

15           THE COURT:  What's the recent criminal case that

16   you're referring to?

17           THE WITNESS:  It's the 2002 assault.  I felt that

18   his mental state was very impaired at the time of it and he

19   should have been granted probation as a result, and I feel

20   sometimes that there's prosecutorial zeal.

21           THE COURT:  But I just want to know, when you say

22   that you were wronged in this recent criminal case, you're

23   talking about the 2002 incident?

24           THE WITNESS:  Correct.  I know nothing, I know

25   nothing about the other case.

1          **THE COURT:**  Okay.  Thank you.

2          **MR. ANAHORY:**  Your Honor, if I could have a moment,

3    please.

4          **THE COURT:**  Yes.

5    **Q**   Dr. Grassian, Dr. Grassian, I would like to show you

6    your deposition again.  Read from Line 9.  Just read it to

7    yourself.

8          **MS. CHAUDHARY:**  What page are you referring to?

9          **THE WITNESS:**  Page 188, line 9.

10         **MS. CHAUDHARY:**  Objection.  Why, why did he give

11   Dr. Grassian his deposition?  What exactly is he doing?

12         **THE COURT:**  Thus far we don't have a question, he's

13   just giving him the document.

14   **A**   Yes.

15   **Q**   Does that refresh your recollection, Doctor, as to the

16   reason for the -- does that refresh your recollection as to

17   the criminal matter you were referring to in your letter?

18   **A**   No.  I misspoke at the deposition.  I had heard about

19   this business with the heroin subsequently and so it was on

20   my mind.  But what I was referring to in the letter was the

21   2002 case where I felt it was to me really obvious that his

22   mental state was very, very impaired and there was reaction

23   of one of terror and fear and it was impulsive reaction.  I

24   don't, I don't really know much about -- I don't really know

25   anything about the heroin conviction except what I've heard

1    from others.

2    **Q**    Well, you knew about --

3    A    So I make no expert opinion about it.

4    **Q**    You knew enough about it to testify in your deposition?

5    A    Again, I merely misspoke.   That's a -- I shouldn't have

6    raised that.   I don't know why it was on my mind.   But the

7    letter is about the 2002 case, the one I was actually

8    involved in.

9    **Q**    If it's about the -- actually, Doctor, could you read

10   the third paragraph of the letter.

11   A    It's doubly infuriating because you demonstrated well

12   while you were out that you are an asset to the community

13   out of jail and prison time is a burden both to you and to

14   the rest of us.

15   **Q**    And that's not in reference to the heroin possession or

16   the heroin incident?

17   A    Again, the letter to Judge Fabricant, the whole issue I

18   was involved with was that he should be given probation for

19   the 2002 incident and I felt strongly that the 2002 incident

20   was a product of mental defect or mental impairment at that

21   moment.   I still do.   I feel quite strongly about that.

22   **Q**    When you say that there was demonstrated a quality of

23   meanness and vindictiveness in its prosecution, who was mean

24   and vindictive?

25   A    I should say unjust.

1    **Q**   Well --

2    A   Wait.  You asked a question.  I want to answer it.  Who.

3    Prosecutors.  Prosecutors often prosecute cases that

4    shouldn't be prosecuted because there is significant

5    impairment.  I've seen cases, murder cases where that's

6    happened.  People who have had psychotic postpartum

7    depression, or psychotic depressions, people who were

8    clearly very severely ill and the prosecution went forward.

9    Because it's like an adversarial system and so --

10   **Q**   So it was the prosecutors who were mean and vindictive?

11   A   I think it was mean and vindictive to prosecute that

12   case and to try to get some jail time for it.

13   **Q**   I just showed you your deposition transcript and you

14   made a reference to there weren't any fingerprints.

15   A   Right.

16   **Q**   To what were you referring?

17   A   This is information I received from attorneys

18   subsequently.  I don't -- again, I've never actually

19   inquired about it.  I've seen no records of it.  I've never

20   asked Mr. Ford about it.  So that was basically stuff I had

21   learned from attorneys.  And it wasn't relevant to the two

22   thousand and --

23   **Q**   So, would it change your opinion if in fact Mr. Ford's

24   fingerprints were found on that package that was sent into

25   the institution?

1    A    My opinion about what?  It would not change my opinions

2    that are stated in the 2008 letter to Mr. Ford, no.  I mean,

3    that's a whole separate matter.

4    Q    You wrote this letter after Mr. Ford pled guilty to both

5    charges of, number one, the charges regarding the assault on

6    the nurse, and number two, the charges regarding the heroin

7    to which his bail was, his bail was revoked; isn't that

8    true?

9    A    I had no knowledge of the situation at the time I wrote

10   the letter.

11   Q    The letter was written on October 18th of 2008; isn't

12   that true?

13   A    Right.

14   Q    You had no knowledge that Mr. Ford at that point in time

15   was convicted of his crimes?

16   A    I had no knowledge of any illegal proceeding or whatever

17   from the time I wrote the letter to Judge Fabricant until I

18   was retained by these attorneys in 2009.  All I had was the

19   letter from him.

20   Q    I'm curious as to why you wrote in your letter then that

21   you would have testified if the case had already, if it was

22   your -- if you were under the understanding that, or you had

23   no knowledge of the criminal trial why would you use that

24   term I would have testified, past tense?

25   A    I actually was referring to June of '07.  You know, I

1    would have strongly testified that, about what happened in

2    2002.  See, I didn't even know that I wasn't going to be

3    testifying in that case.  I mean, I was asked to write the

4    letter.  Things kind of, you know, went where they went, and

5    I think you or one of your attorneys asked me, well, was it

6    ever sent to court, was it ever submitted.  I have no idea.

7    After 2007 when I wrote the letter, I had no further contact

8    about any of this.

9    Q   Just so I'm clear, Doctor, it's your testimony today

10   that when you wrote this October 18th, 2008 letter you were

11   not aware that Mr. Ford had been convicted?

12   A   I believe that's entirely correct.  Again, I had no

13   contact with anyone.  I had the -- I mean, this whole -- the

14   case kind of disappeared and, and then I got some letter

15   from him about Morrison, Mahoney & Miller.

16   Q   I mean, that --

17   A   But I didn't know anything about what had happened.

18   Remember, from 2007 to 2009, I was, I was out of this, out

19   of this system.  I wasn't part of anything.

20   Q   So that's your testimony, that you weren't aware that he

21   was incarcerated?

22   A   That he was incarcerated?

23   Q   That he was convicted in 2002.  He was convicted of the,

24   in 2007 of the -- not 2007.  In 2008 he pled guilty to the

25   charges for assaulting a male nurse and sending the heroin

1    into the institution.  And when you wrote this letter you

2    were not, it's your testimony today that you were not aware.

3    A    That's correct, it is my testimony.

4    Q    And again, I ask you why, why the use of the past tense

5    there?

6    A    Again, this happened in -- I'm referring to something

7    that happened in 2007 that I felt quite strongly about.  So

8    I would have testified -- I actually thought I was going to

9    testify.  I didn't think the letter was going to be the end

10   of it.

11        THE COURT:  Doctor, you sent this letter to him.

12   Was he home or in jail?

13        THE WITNESS:  No, he was in jail.  He had written

14   to me and I felt that I --

15        THE COURT:  So what did you understand he was in

16   jail for?

17        THE WITNESS:  Well, he had -- I knew that after

18   June of 2007 he was in prison and he was in the DDU.

19        THE COURT:  For what?

20        THE WITNESS:  I knew that.

21        THE COURT:  For what crime?

22        THE WITNESS:  You know, I did not at that point --

23   I knew he had been put in prison as a pretrial detainee in

24   June 2007.  But I didn't know anything about the resolution

25   of these cases.  I had no -- nobody contacted me about April

1    of 2008 when he pled and he was sentenced.  But he wrote me

2    and I felt that I really needed to offer him some support to

3    help him get through whatever.  But I didn't actually know

4    what the status was at that point.

5              THE COURT:  So as far as you knew he could have

6    been in for anything unrelated to the hostage situation, or

7    to the 2002 incident?

8              THE WITNESS:  All I knew was he was still there,

9    you know.  I mean, it didn't even, it actually didn't occur

10   to me to ask.  I mean, I just felt an obligation to respond

11   to him because he had written to me.

12   BY MR. ANAHORY:

13   Q    Doctor, let me ask you this.  You're an attorney as

14   well, you have, you have a JD; isn't that right?

15   A    I have a JD degree, right.

16   Q    And are you familiar with what a plea colloquy is?

17   A    Sort of vaguely.

18   Q    Essentially it's when somebody -- well, let me ask you

19   this.  Let me strike that, your Honor.

20              I'm going to direct your attention to that letter

21   again, Doctor.  The last sentence in the second paragraph,

22   can you read that?

23   A    The last paragraph in the second paragraph?

24   Q    The last sentence --

25   A    I have seen it before and I've seen it since and I wish

1    I had more power to prevent it.  Right.

2    Q   What did you mean by power to prevent it?

3    A   I believe that many cases, I've seen many cases where a

4    person was severely mentally impaired and they prosecuted

5    them anyway and convicted them.  And, you know, I wish I

6    could prevent that from happening.  And I still do.  I feel

7    that strongly about it.  I've seen many cases, I mean,

8    tragic cases of people who are severely mentally ill and

9    ended up being convicted of a crime.  That was wrong.

10   Unjust.  It was wrong.

11   Q   It's within your power to help Mr. Ford today, isn't it?

12   A   Well, I suppose I'm trying to do so right now, aren't I?

13   Q   Doctor, were you at all concerned that by writing this

14   letter to Mr. Ford you weren't helping him at all but you

15   were rather hindering him by fanning the flames for his

16   distrust of people of authority?

17   A   No.

18          MR. ANAHORY:  Nothing further, your Honor.

19          MS. CHAUDHARY:  Brief redirect?

20          THE COURT:  Brief.

21                    REDIRECT EXAMINATION

22   BY MS. CHAUDHARY

23   Q   Dr. Grassian, Mr. Anahory asked you whether your letter

24   in 2007 to Judge Fabricant recommended mental health

25   treatment for Mr. Ford.  You responded it did not address

1    that issue.  Why not?

2    A    It wasn't relevant to the, to what was at issue before

3    Judge Fabricant which was for the release on probation.

4    Q    And were you asked to evaluate the effects of DDU

5    confinement on Mr. Ford for the purposes of that 2007

6    letter?

7    A    Not really, no.  I mean, it comes out in the quotes and

8    stuff.

9    Q    And would Mr. Ford have benefited from mental health

10   treatment at that time?

11   A    Yes.

12   Q    And was your silence on that issue any indication that

13   Mr. Ford did not need mental health treatment at that time?

14   A    It simply was not an issue that was being addressed.

15   Q    And, Dr. Grassian, in your 2009 expert report were you

16   asked to opine on Mr. Ford's mental health in this case?

17   A    No.

18   Q    So, in your, in your -- excuse me.

19        In your supplemental report offered in this case

20   you were asked to opine on Mr. Ford's mental health; is that

21   correct?

22   A    In the 2011.

23   Q    Yes.  And you did submit an expert report in this case

24   on Mr. Ford's mental health; is that correct?

25   A    Correct.

1    Q    And, Dr. Grassian, you were asked whether your June 22nd

2    letter to Judge Fabricant, you were asked why it included

3    certain descriptions of Mr. Ford's, Mr. Ford's history and

4    his, his past.  Do you know what age Mr. Ford was when --

5    what Mr. Ford's age was when you were describing his, his

6    history in particular -- you were directed to page 3 of your

7    letter to Judge Fabricant and asked questions about

8    Mr. Ford's relationship with his football coach and stuff.

9    Do you know how old approximately Mr. Ford was?

10   A    This was during high school, sixteen, seventeen,

11   eighteen.  Fifteen.

12   Q    And what was the purpose of including those facts

13   regarding Mr. Ford's background in that 2007 letter?

14   A    The most important purpose here was to understand his

15   capacity for interpersonal relationships.  That if you look

16   throughout this letter there's a lot of very strong evidence

17   that Mr. Ford was capable of good relationships with people

18   and notions like compassion and such would apply to him.

19          **MS. CHAUDHARY:**  Nothing further.

20          **MR. ANAHORY:**  Just one question, your Honor.  Maybe

21   two, your Honor.

22                  **RECROSS-EXAMINATION**

23   BY MR. ANAHORY

24   Q    So, when you say it wasn't relevant in your writing the

25   report regarding Mr. Ford's mental issue in 2007 and in

1    2009, it wasn't relevant to the, to the reason why you wrote

2    the report, is that true, you just testified to that?

3    A   It doesn't tell you exactly that's what I said.  I'm a

4    little bit confused by your question.

5    Q   So, in 2007 and in 2009 you were aware that Mr. Ford

6    suffered significant trauma, yet you chose not to put that

7    in the report?  That information in the report?

8    A   Right.

9          MR. ANAHORY:  Thank you.

10          THE COURT:  You may step down.

11          (Whereupon the witness stepped down.)

12          THE COURT:  I suggest that we break for lunch now

13    and we'll be back in an hour.  Okay?

14          MS. CHAUDHARY:  Thank you, your Honor.

15          THE CLERK:  Court is in recess.

16          (Luncheon Recess.)

17

18          AFTERNOON PROCEEDINGS - 1:55 P.M.

19

20          THE CLERK:  All rise.  You may be seated.

21          THE COURT:  We have a --

22          MR. ANAHORY:  Your Honor, before we start with

23    Mr. Ford, I would just like to bring up the unresolved

24    ruling on the diabetes issue with Doctor --

25          THE COURT:  I'm going to let the testimony stand,

1    but I would like to understand why we're not, why we don't

2    have the medical records.

3           MS. CHAUDHARY:  Your Honor, Dr. Grassian reviewed

4    the medical records in preparing his report but we haven't

5    introduced them as exhibits because we weren't, he could not

6    authenticate the records.

7           THE COURT:  Is there an authentication issue?

8    Aren't they medical records from the DOC?

9           MS. DANIELE:  They were to put on the records

10   because I have not, I haven't seen any records.  I can't --

11   and there's no link between any of these records.

12          MR. SYRETT:  I have two records that I plan to use

13   with Mr. Ford during the direct.

14          THE COURT:  So let's see where that goes.  But I

15   don't understand why there should be an authentication issue

16   on the DOC medical records, unless I'm missing something.

17          MS. DANIELE:  If in fact they are DOC medical

18   records then I wouldn't think there would be an

19   authentication issue.  There may be other issues because I

20   don't know what records will be --

21          THE COURT:  I mean, I think the issue here was

22   simply whether or not there was evidence of sort of the

23   sugar level --

24          MS. CHAUDHARY:  Elevation.

25          THE COURT:  -- spiking which is going to be a

1    number.

2           MR. ANAHORY:  He also testified, your Honor, to

3    what could happen, he elaborated on what could happen if

4    somebody was suffering from elevated sugar levels.  It's our

5    belief, your Honor, that he is not an appropriate expert to

6    testify to that.

7           THE COURT:  I'll hear the testimony of Mr. Ford and

8    then we'll see what happens at that point.

9           MR. ANAHORY:  Thank you, your Honor.

10          THE CLERK:  Would you please raise your right hand.

11          Do you solemnly swear that the testimony you are

12   about to give this Court is the truth, the whole truth, and

13   nothing but the truth, so help you God?

14          THE WITNESS:  Yes.

15          THE CLERK:  Could you just please identify yourself

16   for the record spelling your last name.

17          THE WITNESS:  Albert Ford, F O R D.

18                       ALBERT FORD

19                  **DIRECT EXAMINATION**

20   **BY MR. SYRETT**

21   **Q**   Good afternoon, Mr. Ford.

22   **A**   Good afternoon.

23   **Q**   Mr. Ford, when did you file your complaint in this case?

24   **A**   Ah, sometime in, ah, 2007.

25   **Q**   Was it the summer of 2007?

1    A    Yes, it was the summer of 2007.

2    **Q**    And what was the reason you filed your complaint?

3    A    Because, ah, I came back as a pretrial detainee and I

4    know I shouldn't have been subject to punishment being held

5    in DDU, because over the years I've seen other people get

6    out of DDU and they wrapped up and they either went to a

7    county jail or they went home.

8    **Q**    And what did you hope you accomplished by filing your

9    complaint?

10   A    That they would let me out of DDU if I point out the

11   errors that was made.

12   **Q**    I would like to start by asking you some questions about

13   the conditions in the DDU when you were a pretrial detainee.

14          Could you describe your cell in the DDU when you

15   were a pretrial detainee?

16   A    Yes.  I lived in a seven by twelve cell.  Sink, toilet,

17   cement bed.  Stool.  The table going across.  And two

18   windows in the cell, approximately about six inches wide and

19   maybe about a couple feet long.

20          **MR. SYRETT:**  Your Honor, I've placed a binder with

21   the joint exhibits in front of Mr. Ford, if I could refer to

22   that as we --

23          **THE COURT:**  That's fine.

24   **Q**    Mr. Ford, could you turn to tab 3 in the binder in front

25   of you.

1    **THE COURT:**  Excuse me for one minute.  Do you want

2    to sit there or -- okay.

3    **Q**   Mr. Ford, what is shown in Exhibit 3?

4    A   It's a picture of a door.

5    **Q**   And where is the door?

6    A   The door's on the tier where I'm living at now.  It

7    shows a food slot, two food slots and the outside of a

8    window.

9    **Q**   Is the door depicted in Exhibit 3 basically the same as

10   the door you had as a pretrial detainee?

11   A   Yes, it was.

12   **Q**   And what could you see through the window in your door

13   as a pretrial detainee?

14   A   I would see the outside of the wall, the tier wall.

15   **Q**   And, Mr. Ford, if you could turn to tab 8 in the binder,

16   please, to Exhibit 8.

17   Do you recognize what's shown in Joint Exhibit 8?

18   A   It's the DDU tier where I'm living at right now.

19   **Q**   And is that the same type of tier where you lived as a

20   pretrial detainee?

21   A   Yes, it was.

22   **Q**   And so the view through the window in your cell door was

23   the wall on the right hand side of the picture; is that

24   right?

25   A   Yes, I would be looking at the right hand side, the wall

1    of the tier.

2    **Q**   Mr. Ford, if you could turn to tab 4 in your binder,

3    please, Joint Exhibit 4.

4             What does Exhibit 4 show?

5    A   It shows a picture of a cell where I'm living right now.

6    **Q**   And is the layout of your cell in the DDU now

7    essentially the same as the layout when you were a pretrial

8    detainee?

9    A   Yes, it is.

10   **Q**   And that's the bed in the back?

11   A   Yes, that's the bed in the back, and you have a stool in

12   the middle of the floor.  And you have a table.

13   **Q**   And what are the bed, stool and table made out of?

14   A   Made out of cement.

15   **Q**   What could you see out of the back window when you were

16   a pretrial detainee?

17   A   Well, this cell here, you would see the exercise cages

18   where we exercise.

19   **Q**   Mr. Ford, if you could please turn to tab 7 in your

20   binder.

21             What does Exhibit 7 show?

22   A   It shows the toilet and the sink, part of the table and

23   the shelf.

24   **Q**   Ad that's in your current cell?

25   A   Yes.

1    **Q**   But it's essentially the same as when you were a

2    pretrial detainee; is that right?

3    A   Yes.

4    **Q**   Where in your cell is the toilet located?

5    A   Probably about three feet in front of the front door.

6    **Q**   And are you visible from outside your cell when you're

7    using the toilet?

8    A   Yes, because you're not allowed to put nothing up in the

9    window so when the staff walk by, anybody that walk by they

10   can see you sitting on the toilet.  You have no privacy when

11   that happens.

12   **Q**   Mr. Ford, were you able to communicate with other

13   inmates from your cell in the DDU as a pretrial detainee?

14   A   From -- not a normal communication.  Like you would have

15   to lay on the floor and yell out underneath your door, or

16   you yell to the side at the crack of the door.  But, you had

17   to yell for communication because inside the cell everything

18   echos.

19   **Q**   Is it difficult to have a conversation that way?

20   A   Yes.  Yes.

21   **Q**   Now, I would like to turn to the schedule in the DDU

22   when you were a pretrial detainee.

23          Where do you eat your meals in the DDU?

24   A   Well, I eat in my cell three times a day.  I'm alone in

25   my cell, there's no cell mates or nothing.  So you eat alone

1    in the cell.

2    Q   And where in your cell do you eat your meals?

3    A   Well, I don't know about anyone else, but you're

4    supposed to sit at the stool.  But the stool's real high.  I

5    just sit at the edge of my bed with the food tray on my lap

6    balancing it.

7    Q   And how long do you have to eat your meals?

8    A   You have 20 minutes to eat.

9    Q   Now, how often were you let out of your cell as a

10   pretrial detainee?

11   A   Well, if you choose to go to exercise you're out of your

12   cell for that hour.  But in my case, I would go out twice a

13   day because I get insulin shots.

14   Q   And where did you get your exercise as a pretrial

15   detainee?

16   A   Well, they have these cages that look like dog, dog

17   kennels where you walk back and forth.  So it's in the yard

18   where, whatever wing you live at.

19   Q   Mr. Ford, if you could please turn to tab 9 in your

20   binder.  To Exhibit 9.

21        What is shown in Exhibit 9?

22   A   It shows the DDU exercise cages.

23   Q   And do you know the dimensions of the exercise cages?

24   A   I don't really know, but I would have to say at least,

25   it's like six feet wide and about ten yards long.

1   Q   So what is it that you do when you go out in the

2   exercise cages?

3   A   You just walk back and forth.  There's nothing you can

4   do.  There's no basketball court or nothing.  You just --

5   it's a daily routine, you walk back and forth, that's it.

6   Q   And what happens to your exercise period if the weather

7   is bad?

8   A   Oh, you just lose, you lose that day because they don't

9   have any makeup days.

10  Q   How many visitors were you allowed per month as a

11  pretrial detainee?

12  A   Well, in the DDU you have to earn your visits.  So you

13  could earn up to four visits a month.

14  Q   And where did you see your visitors?

15  A   In the DDU, there's a visiting area where you sit on the

16  one side of a high stool and your visitor sits on the other

17  side and Plexiglas in between us, and we talk on the phone

18  to each other.

19  Q   And these were completely noncontact visits?

20  A   Oh, yeah.  I've spent -- you never get to hug your

21  visits.  You hope that when you go down there that the

22  windows are cleaned by the workers.  But sometimes if

23  they're not cleaned you have to try to like, you know, you

24  tell your visitor clean the other side and you clean this

25  side here, you know.  And you hope that the AC is working,

1    too.  Because if it's off, if it's off it's like a hundred

2    degrees down there, it's very uncomfortable.

3    **Q**   And how many telephone calls were you allowed per month

4    as a pretrial detainee?

5    A   Again, you have to earn it, but you can earn up to four

6    calls.

7    **Q**   So generally what were the opportunities you had to talk

8    to other people when you were a pretrial detainee?

9    A   Can you clarify who?

10   **Q**   Talk to anyone.

11   A   Oh, anyone.  Well, like I said, testified earlier, if

12   you want to yell outside at the crack of your door, you can

13   have that type of conversation.  If you want to lay on your

14   floor, like a one inch space, you have that.  And then you

15   have the yard.  You can walk back and forth and just talk to

16   another inmate if you choose.

17   **Q**   What about talking to guards?

18   A   No one talks to guards.  They don't talk to us and we

19   don't talk to them.

20   **Q**   And what was it like to only have those opportunities to

21   talk?

22   A   Well, you, ah -- it's -- you get headaches from yelling.

23   You know, it's, ah, sometimes you don't even feel like

24   talking because you got to yell at the top of your lungs

25   just to have a normal conversation.  And when you go to the

1    yard it's like, if you want to hear the same old stories

2    every day, that's, that's what it is, you know.

3    Q    What was the process for being taken out of your cell

4    when you were a pretrial detainee?

5    A    I would have to take off all my clothes and submit to

6    have an officer look at all the parts of your body before

7    you can leave your cell.

8    Q    And how did it make you feel to have the strip search?

9    A    Ah, it's, you feel embarrassed, you feel uncomfortable

10   having especially another man look at all your body parts.

11   So, you know, that's what you substitute if you want to get

12   some type of exercise.  If you want to leave your cell you

13   have to submit to that type of harassment.  Well, I wouldn't

14   say harassment.  Embarrassment.  Excuse me.

15   Q    And are you ever subject to strip search before going

16   back to your cell?

17   A    Yes.  Especially with visits.  You know, you have to

18   submit to being strip searched when you go out there and

19   when you're coming back.  And sometimes in the yards they

20   take individuals, they might say that, okay, we want you in

21   the shower, skin search, we want you.  So if it's 20 degrees

22   outside you're in the shower taking your clothes off and

23   you're cold.  And you just hope you don't have that number

24   that day being skin searched coming in.

25   Q    So on the typical day in the DDU when you were a

1    pretrial detainee, how many hours would you spend in your

2    cell?

3    A    I would spend 23 hours a day.  If I didn't go to the

4    yard it would be 24.

5    Q    And when you're a pretrial detainee what did you do to

6    pass the time?

7    A    What I did was, especially when I came back, it seemed

8    like I had to learn how to do time all over again because I

9    forgot how to do time.  What I mean by that is, I couldn't

10   concentrate.  I couldn't think.  I couldn't focus.  I didn't

11   want to do nothing.

12   Q    What about reading?  Do you read?

13   A    I lost, I lost interest.  Especially, ah, it's like the

14   tier I was on there's like, you had certain individuals that

15   smashed their TV's.  And then you would hear code 99's

16   coming down the tier and they're in their cell eating pieces

17   of glass of the TV just to try and get out of DDU to some

18   outside hospital.  So, it's the first time that, that I'm

19   recognizing all these different signs as to what's

20   happening.  And years ago I never, I didn't dawn on the

21   stuff.  It was just a normal day.  But it's something that I

22   paid very close attention to, one, why are they doing these

23   things.

24   Q    What is a code 99?

25   A    It's when a person commits some type of, like a suicidal

1   approach in his cell, maybe cutting his wrists or trying to

2   hang it up and all the guys, anybody, they come running,

3   everybody come running down the tier, there's a code 99 on

4   this tier.  The inmate would bang the door, hey, come on

5   down here, someone's hanging up, someone's doing something,

6   you know.  And that's what the 99 is.

7   **Q**   Had you experienced code 99's prior to your period of

8   pretrial detention?

9   A   It was, it was a daily routine in DDU that I never, it

10  never really fades on me.

11  **Q**   Did you experience code 99's differently as a pretrial

12  detainee?

13  A   Yes.  Because, ah, this time it was like the noise

14  seemed like it got to me.  It seemed like, ah, that somebody

15  was really in trouble.  Because I've never really thought

16  about it, the next person the next door to me was trying to

17  get out of his cell for some reason, you know.

18  **Q**   Mr. Ford, I think in a prior answer you had mentioned

19  going out to the yard.  Do you recall that?

20  A   Yes.

21  **Q**   And what do you mean by the yard?

22  A   Oh, excuse me.  I meant the cages, the DDU cages.

23  There's no yard in DDU.

24  **Q**   Now, what about having visitors or making phone calls

25  when you're a pretrial detainee, did you do that?

1    A    As a pretrial detainee?  So, when I came back, I didn't

2    want to, ah, I didn't want to talk to nobody.  I didn't want

3    to have visits.  I just wanted to lay in my cell.  Right?

4    And there was a couple of nights there was tear drops,

5    right, coming.  And I just couldn't, I was so numb, I just

6    couldn't understand that, nobody was talking to me, nobody

7    was telling me that, when I was leaving.  There was no one

8    coming to me.  Because it was basically, maybe my history,

9    but it was something that I couldn't talk to no one from the

10   outside, and I just figured that I can just try to go to

11   sleep and just sleep it away.

12   Q    And Dr. Grassian testified that his understanding is

13   that to this day your bishop has not visited; is that

14   correct?

15   A    That's correct.

16   Q    And is there a reason?

17   A    I don't know what, I don't know what, the words to

18   really say to him.  And plus he's old and the way the DDU is

19   that, when you come over to the DDU you have a long walk for

20   especially somebody elderly.  Because by the time they come

21   over to the DDU they're all out of breath, you know.  And

22   he's kind of old and I wanted to try to take that burden off

23   him where he doesn't come over here all out of breath.  He

24   doesn't sit onto a stool that's hard on his body.  And I'm

25   just trying to make it like a little comfortable for him.

1    And at the same time it's like, you know, I just don't have

2    the words yet.  I can't think of the words yet, you know.

3    Q    Now, Mr. Ford, you were facing criminal charges when you

4    were being held as a pretrial detainee, correct?

5    A    Yes.

6    Q    Did being in the DDU affect your ability to work on your

7    criminal case?

8    A    Yes.  Yes.  Because, ah, you have like limited phone

9    calls.  You, you, you, you got to go through changes where

10   there's no library in 10 Block.  So you have to submit a

11   form, put cases on it, then you get it back ten days later.

12   Then you hope that your case law doesn't get lost on its way

13   because now you got to submit it again, over and over and

14   over.  So, it is complicated.  And if I was someplace else

15   it would have been a lot easier to physically go to the

16   library, look up cases, and use the phone any time I want.

17   Q    Mr. Ford, I think you may have said 10 Block.  Did you

18   mean the DDU?

19   A    DDU.  Excuse me.

20   Q    Is there a law library in the DDU?

21   A    No, there's a book cart.

22   Q    And how long did it typically take to have access to the

23   book cart when you were a pretrial detainee?

24   A    Well, they put a slip in, I would probably go within

25   like eight days to this area where they push the book carts

1   up to the doorway and they just tell you to pick four books.

2   Q   And are you able to take the books back to your cell?

3   A   No.

4   Q   We've talked about the conditions in the DDU, and now I

5   would like to turn to the chronology of events when you were

6   there and ask you some questions starting in January of

7   2007.

8          You were in the DDU in January 2007?

9   A   Yes, I was.

10  Q   And in January 2007 did you complete serving a criminal

11  sentence?

12  A   Yes, I wrapped up my sentence July 7th.  I mean, excuse

13  me, excuse me, January 7th.

14  Q   And was that 2007?

15  A   Yes.

16  Q   And what happened?

17  A   Well --

18          THE COURT:  How long had you been in the DDU as of

19  that point?

20          THE WITNESS:  Let's try, since 1993 I probably have

21  possibly six months in general population.

22          Can you repeat the question?

23  Q   Sure.  I think my question was --

24  A   Sorry.

25  Q   -- what happened when your criminal sentence expired?

1  A   Oh.  Well, when I was wrapping up June, I mean

2  January 7th, probably about a month before all that I was

3  giving away all my property.  I knew I was leaving.  And I

4  seen everybody else leave.  I knew I was going to the county

5  jail.  So I gave away all my books, my personal belongings,

6  because I'm leaving the 7th.

7        So when the 7th came that day, breakfast came, I

8  gave my breakfast to the neighbor.  I said, oh, you know,

9  that I'm leaving, so you're going to be here.  So now

10  lunchtime came around.  Nobody's saying nothing to me,

11  right?  And I asked the guard, I said listen, ain't I on the

12  discharge list to leave?  And he just started laughing.  He

13  said I'll look into it.  And I heard one of the guys, well,

14  someone is going home today, someone's not going some place

15  today.  So it was just a daily, daily routine operation.  I

16  stayed there.

17  Q   Mr. Ford, was there a reason you didn't want to take

18  your possessions with you?

19  A   Well, from over the years everyone's just, if you're

20  going home, if you're going someplace else, like you just

21  leave it behind.  So I figured that, there was all the other

22  inmates in DDU going to be there for two, three or five

23  years, so I just gave away everything.  I was, I was leaving

24  and I thought I was going to the county jail.  And I thought

25  I was going to make bail and I just wanted, I didn't want to

1    take nothing with me.

2    Q    And if you're locked in your cell how is it that you

3    give things away?

4    A    Well, the little slot, I don't know if you saw it when

5    they showed the pictures, there's like a little, like about

6    an inch space, you could open up a book and you could slide

7    it next door.  So whoever is next door to you, like he would

8    slide it next door.  And that's how we live in the

9    segregation areas, you live underneath the door, underneath

10   down on the tier.

11   Q    So was there any change in the way you were treated as

12   of January 7th when your criminal sentence expired?

13   A    It was more as, as, you know, the joke's on me.  You

14   know, I'm still here, like hearing them laughing.  And it's

15   like nobody was telling me nothing, you know.  And trying to

16   figure, trying to figure something else when you know you're

17   supposed to go somewhere because over the years I seen

18   everybody else leave and I'm not going nowhere.  It puts a

19   lot of burden on you, you know.

20   Q    And did you have any sort of hearing about whether you

21   were going to be staying in the DDU?

22   A    No, no hearing.

23   Q    Were you given any paperwork or form explaining why you

24   were staying in the DDU?

25   A    No.

1    **Q**   Were you given any explanation about why you were

2    staying in the DDU?

3    A   Not the truth, no.  No.  I got nothing.

4    **Q**   And did you have any mental health screening at that

5    time?

6    A   No.

7    **Q**   You were released on bail at some point in 2007, right?

8    A   March.  March 2007.

9    **Q**   And what did you do right when you got out on bail?

10   A   Well, the first thing I did was, you know, deal with the

11   Mass. Health.  I need to get my health taken care of, you

12   know.  I checked into a hospital, I seen a regular doctor

13   and just get everything, right, see what was going on.

14   **Q**   And after you had taken care of that initial, the health

15   issues, what were some of the things you were doing when you

16   were out on bail?

17   A   Well, I was still kind of limited because I was on house

18   arrest.  So, I got involved with, with church activities.  I

19   got involved in AA and NA meetings, right?  And I basically

20   was, was going to see my lawyer and I was trying to deal

21   with, ah, things that I didn't think I would ever have to

22   deal with with people.  I was uncomfortable having family

23   members come by.  You know, because, being in the same room

24   with them, right?  I was so used to eating alone.  I

25   couldn't eat on the table.  So it was like I was learning

1    everything all over again, right?  Sitting on the table, it

2    was a big thing for me.

3    **Q**   Were there any other activities that you experienced

4    trouble with when you were out on bail?

5    A    Yeah.  Ah, the transportation.  Especially the train.

6    Like, I would get on the train.  Then if I had to get off at

7    the eighth stop I would get off on stop three just to get

8    that breather, you know, because I was around, then I would

9    get back on and go.  So I had to coast everything.  In my

10   lawyer's office on the 18th floor, I couldn't get in the

11   elevator to go to the 18th floor.  I had to go like to the

12   third floor.  I would walk up a stairs and get back on the

13   elevator.  And coast everything like that.

14   **Q**   And when you got out on bail did you expect to have that

15   kind of trouble adjusting to being around people?

16   A    No.  Because, ah, I was one of the persons that's, you

17   know, spent a lot of time in segregation and I've never

18   caught up, I never done that.  So, I thought it was, you

19   know, it was nothing.  Until I got out there and I realized

20   it was, what I was missing was a whole completely different

21   world I would call it, because now it's like talking to

22   people, I couldn't hold conversations.  Like I would have

23   one-on-one conversations, if someone else come in, I would

24   have to move away from them, because I couldn't hold with

25   two people, with three people.  So I realized that being in

1    the cell this is what you're missing.  You know, you're not

2    holding daily conversations, you know.  Being in church and

3    want to talk and this.  And I just had to get out of certain

4    areas.

5    Q    Where were you living when you were out on bail?

6    A    I was living with my sister in Everett, Mass.

7    Q    Is your sister here today?

8    A    Yes, she's in the back of the courtroom.

9    Q    You returned to the DDU as a pretrial detainee, right?

10   A    Yes.

11   Q    Do you recall when that was?

12   A    June 26th.

13   Q    And what year?

14   A    2007.

15   Q    And what happened when you went back to the DDU in June

16   2007?

17   A    Well, they brought me to the new man section.  And I was

18   in the holding cell, so I figured I was going to population

19   as a pretrial detainee.  But then they come down and they

20   started walking me out towards the DDU.  And I said what are

21   you doing?  He says, well, you're going over to DDU.  I says

22   I'm a pretrial detainee.  They says, well, we have orders to

23   put you in DDU.

24            So they brought me in DDU.  And I noticed something

25   that it was like the same tier, the same cell, with the TV

1    and radio, like I never left, you know.  And it was like,

2    you know, it was -- it's not a coincidence, you know.

3    Q    And you mentioned the new man section.  What does that

4    mean?

5    A    It's a place where everyone when they first come to

6    Walpole, they, they go down this area and then you fill out,

7    you fill out these forms as a new person.  They give you an

8    I.D. number.  And it's just like a new man processing, you

9    know.

10   Q    And did you have any sort of a hearing before you were

11   put back in the DDU in June 2007?

12   A    They just walked me straight to the DDU.

13   Q    And were you given any sort of paperwork or form

14   explaining why you were going back to the DDU?

15   A    I got no paperwork or nothing, but I was told that I

16   still owed DDU time.

17   Q    And did you have any mental health screening before

18   being put back in the DDU in June 2007?

19   A    No.

20   Q    And was there anything different about the way you were

21   treated when you went back into the DDU?

22   A    It was like, ah, you know, hearing just small talk, you

23   know.  Well, he's back.  You know, how was your, how was

24   your stay, you know.

25   Q    Were you on any different sort of security status when

1   you returned to the DDU?

2   A    Yeah, it was strange, too, because they put me on the

3   status ready, they dressed up in full riot gear and with a

4   camera escorted me around every time I come out of my cell.

5   And I'm like, you know, I just came from the streets and I

6   didn't have none of this on the streets.  I was just under

7   house arrest.  But now you got to put these helmets on, put

8   me in handcuffs and have a camera follow me around.  I

9   didn't understand that, you know.

10  Q    And how long did it last, the camera following you

11  around?

12  A    That, that lasted about two or three weeks.

13  Q    And what was your reaction upon being put back in the

14  DDU in June of 2007?

15  A    That, ah, I knew they were wrong in doing it.  Because

16  over the years I've seen, I didn't see no one like staying

17  there as a pretrial detainee, I've seen others leave.  And I

18  know you couldn't, you couldn't punish a pretrial detainee.

19  Those are things I did know.

20  Q    And how did you deal with being put back in the DDU?

21  A    Well, it was like, since I explained to you about what I

22  know some of the, when I was on the street about being

23  around people, I finally realized my symptoms.  So when I

24  was in DDU it was like, I didn't want to become a prisoner

25  again.  I didn't want to -- I didn't know how to do time.  I

1    just laid there, right, trying to think about, all right,

2    what do I do now.  At the same time it's like guards coming

3    by and slamming doors, this and that.  The noise for the

4    first time started, it was inside of my head.  And hearing

5    that code 99 and a couple of guys with extraction teams

6    ready, the troops come out of their cell so they have to

7    suit up and spray gas to force them out of their cells.  So

8    me smelling the gas for the first time was like starting to

9    affect me.  So all these little small things that didn't

10   affect me over the years, it started to affect me now.

11   **Q**   Was it harder being a pretrial detainee in the DDU?

12   A   It was the most -- especially 375 days.  In all the

13   years I have in, it was the hardest thing.  Because I had to

14   learn it seems like to do everything all over again.

15   Because I didn't want to, I didn't want to become an

16   invalid.  I knew that if I got out in society I could be

17   like everybody else, you know.  I knew what the symptoms

18   were, what they were.  So I said I can do this, not to get

19   caught up.  So I just laid there numb and figured I can just

20   do my time like that.

21   **Q**   And before you left in 2007 how had you been coping with

22   the DDU?

23   A   Before I left?

24   **Q**   Yes.

25   A   Oh, I didn't -- you can bang all day long and it

1    wouldn't bother me.  You can -- I can hold, like I thought I

2    was holding conversations with, normal conversations, right,

3    I thought I was one of those guys with, you wouldn't see

4    them carrying me out of my cell, you know, with marks.  But,

5    I don't know if I was wrong about it, but it was like, I

6    thought I was stronger when I was doing all this, you know.

7    **Q**   Was there anything in particular you did to cope with

8    being in the DDU as a pretrial detainee?

9    A   Well, one thing, too, is my thoughts.  I would write

10   them down.  Right?  Just to get them out of my head.  So

11   certain thoughts I would have, I would write it down on a

12   piece of paper and this way would get them out of my head.

13   So it was like I need to get these thoughts out of my head,

14   right, because this is the crazy thought here.  Because I'm

15   questioning myself about why is this next man hurting

16   himself and I don't want to hurt myself.  So when the

17   clanging starts I'm writing everything on the paper, it's

18   getting it out, right.  And at the same time it's like, I'm

19   listening to anybody for the first time, but I'm not

20   talking.  Because I couldn't talk.

21   **Q**   Did you worry that you might hurt yourself?

22   A   Yes.  I didn't have an answer to that question.  And

23   that's what scared me.

24   **Q**   And had you ever had those thoughts prior to 2007?

25   A   No.

1   Q    Do you recall when Dr. Grassian mentioned that you

2   sometimes cried as a pretrial detainee?

3   A    I was surprised that he brought that up.  Because I said

4   that to him figuring that, you know, it was the first time

5   that I had tears coming out of all the years.  So when I

6   told him that, I didn't see it on my reports, so when he

7   said that it was like I thought that was me and him.  But,

8   yes, I started thinking for the first time and tear drops

9   coming down, you know.

10   Q    And how long was it that you remained a pretrial

11   detainee in the DDU in total?

12   A    For 375 days.

13   Q    And in those 375 days did you ever get to eat a meal

14   with someone else?

15   A    No.

16   Q    Did you ever get to exercise outside apart from being in

17   a cage?

18   A    Only, only the cages up on the screen.

19   Q    Did you ever get to be near a window for fresh air?

20   A    Not as you open it, no.

21   Q    And did you ever get to hug your sister when she

22   visited?

23   A    No.

24   Q    Did you think that you shouldn't be in the DDU as a

25   pretrial detainee?

1    A    Yes.

2    Q    And what was the reason?

3    A    Because over the years, like I said, everyone else was

4    leaving.  You know, they went to the county jails, they went

5    to population, they were in other, other pretrial detainee

6    blocks that they have that's going around, you know, other

7    joints.

8    Q    And do you think being confined in the DDU as a pretrial

9    detainee affected your mental health?

10   A    Yes.

11   Q    And how so?

12   A    Because I recognized it when I got out.  These things

13   that I'd never experienced before, explained for the first

14   time as now I'm a pretrial detainee and I still can't sleep.

15   I can't like eat.  I'm just like thinking about this this

16   night and trying to make the days go by fast, why I'm here

17   and all that.  And now I realized the different things that

18   happens to me, you know.

19   Q    Were you taking any medication when you were a pretrial

20   detainee?

21   A    Well, I started taking medication before I was a

22   pretrial detainee.  Because like over the years, like,

23   especially in the '80's, the mental health, all they used to

24   do is they want to give you Thorazine.  They want you to

25   sleep all day long and they don't have to put up with your

1    headaches.  So they were considered someone that you don't

2    talk to unless you're trying to get to Bridgewater, unless

3    you're trying to sleep all day.  So that's all they did.

4           So, around 2006, I believe, I started experiencing

5    certain things where I couldn't sleep.  I couldn't focus.

6    So for the first time I says let me, let me talk to them and

7    see what they're about.  And I talked to her.  She's a nice

8    lady.  She seemed like she was all right.  She didn't want

9    to give me something to sleep all day.  You know, she says

10   that, you know, maybe you have some big wish.  She said,

11   listen, I'll give you this dose here, you see the doctor,

12   he'll give you a dose.  So I seen the psych doctor.  And

13   eventually they upped it and that's the time that I was on

14   medication.

15   Q   Do you recall what medication you were taking?

16   A   Wellbutrin.

17   Q   And did you begin that in 2006?

18   A   Yes.

19   Q   And did your dosage of Wellbutrin increase during your

20   pretrial detention?

21   A   Yes.  The doctor kept increasing it.  You know, and I

22   would explain certain things and he would increase it and

23   increase it, you know.

24   Q   Did you lose any weight as a pretrial detainee?

25   A   Yeah, I lost at least, at least, I would say at least,

```
 1    at least about, ah, probably 30 pounds.  Thirty, 35 pounds,

 2    at least that, you know.

 3    Q   Mr. Ford, you're a diabetic, right?

 4    A   Yes.

 5    Q   And when were you first diagnosed with diabetes?

 6    A   2002.

 7    Q   And what type of diabetes?

 8    A   I have Type I.

 9    Q   Has anyone else in your family had diabetes?

10    A   99 percent of my family has had it.

11    Q   And what type of diabetes do they have?

12    A   Well, it ranged from Type I to Type II.  And when we

13    were all small, young in our family, our whole family

14    educates us about this is a disease that, that it's a killer

15    in our family.  Like I've lost so many aunts, uncles to

16    diabetes.  Their legs being cut off.  I lost both my parents

17    to complications.  So I knew what diabetes is all about.

18    Q   And do you do anything to treat your diabetes?

19    A   Yes.  I take insulin shots and a diabetic pill they give

20    me.

21    Q   And your insulin is by prescription?

22    A   Yes.

23    Q   And how often do you take your insulin?

24    A   I take it twice a day.

25    Q   Do you do anything else to try to treat your diabetes?
```

1    A   Well, diet, and I do a lot of exercising.

2    Q   And did being a pretrial detainee in the DDU have any

3    effect on your diabetes?

4    A   Yes, it has.  Because when I was on the house arrest it

5    was told that I'm supposed to take insulin three times a day

6    before each meal, finger sticks.  So when I was a pretrial

7    detainee, I'm trying to explain this to the doctor.  I

8    submitted a sick call slip that I need my afternoon coverage

9    because around four o'clock I'm getting in the range between

10   three or four hundred.  So, that's not good for a diabetic.

11   Q   And how does it feel when your blood sugars are in the

12   three or four hundred range?

13   A   You feel -- you get headaches.  You feel dizzy.  You,

14   ah, get, your heart, your heart starts pumping fast.  You

15   get shakes and tremors.

16   Q   And what level are your blood sugars supposed to be at?

17   A   They're supposed to be between 80 and 120.

18   Q   And how do you know what your blood sugars are?

19   A   Because when you go out, they had, there's a finger,

20   there's a finger stick machine and you pluck your finger and

21   you put blood on it and it tells you what your count number

22   is.

23   Q   So your blood sugar is tested every day?

24   A   Yes.

25   Q   Did you request to have a third shot of insulin as a

1    pretrial detainee?

2    A    Yes, I requested to have the afternoon, lunchtime, you

3    know, insulin because I eat lunch.  But then I was told that

4    there's no nurse around the lunchtime area.  So I explained

5    to them that if there's no nurse, I got to have some type of

6    insulin at lunchtime or I'm going to keep running high, and

7    that's not good for a diabetic.

8            MR. SYRETT:  Your Honor, in the binder at tab 10 we

9    have predesignated Plaintiff's Exhibit A in evidence.  I

10   believe there's an objection to it.  But I would like to

11   address it with Mr. Ford and move for its admission.

12           THE COURT:  This is the sick call request form?

13           MR. SYRETT:  Yes.

14           THE COURT:  Is there an objection?

15           MS. DANIELE:  There is, your Honor.

16           Your Honor, my objection to the sick call request

17   form is that it's being submitted in isolation.  Mr. Ford

18   has no medical record around the time that he tested his

19   diabetes, and this form is, all it is is Mr. Ford asking for

20   help and he gives the Court no other information.

21           THE COURT:  Well, you can bring in other things on

22   cross-examination.  I'm going to let this in.  Exhibit 13.

23           (Exhibit marked in evidence.)

24   Q    Mr. Ford, are you at Exhibit 13 at tab 12?  Tab 10,

25   sorry.

1    A    Yes.

2    Q    And what is Exhibit 13?

3    A    Well, this is a sick call slip.  It's what we use in DDU

4    as like, if you want to see the doctor or any type of

5    medical person, you have to submit a sick call slip and

6    you've got to explain what the situation is on the sick call

7    slip.

8    Q    And what did you write on your sick call slip?

9    A    I was requesting insulin coverage at 11:30 right before

10   the meal time because that's what a diabetic has to do with

11   his finger stick before each three meals during the day.

12   And I requested that.

13   Q    Am I reading your handwriting correctly that it says

14   because I'm always running high at the 4:00 p.m. coverage?

15   A    At approximately 11:30, the insulin person because I am

16   always running high at 4:00 p.m.  And the doctor wrote

17   review the sick call slip, check the records and see how

18   high I'm running at four o'clock.  And that's the process

19   there, you know.

20   Q    And what did you mean by running high?

21   A    It was over the, it was over 300.

22   Q    Did you ever end up getting the third shot of insulin?

23   A    No.

24   Q    And how were your blood sugar levels when you were out

25   on bail?

1    A    They were, they were in between, like 80, 110, because I

2    had afternoon coverage.

3    Q    Were there any other effects of your diabetes that you

4    experienced as a pretrial detainee?

5    A    Oh, yeah, my, my feet got worse.  I can't feel my toes.

6    And they said it was like nerve damage.  And being, being a

7    diabetic we were schooled at a young age that you have to

8    take very good care of your feet, or they can cut your legs

9    off, amputate your legs.  So I can't sleep sometime at night

10   because I'm thinking about my feet, how I get the sharp

11   pains, you know, the burning pains in my feet because of the

12   diabetes, I'm running high and it's because of my diabetes.

13   Q    And where exactly is the numbness that you described?

14   A    The bottom of the feet.  And it's mainly because I can't

15   feel, you know, I can't feel the, like these leg irons.

16   Like the leg irons are on my ankles and I can't feel them.

17   So I developed cuts on the back of my legs.  So, these cuts,

18   they get infected and all that.  So they tried giving me

19   ankle sleeves, soft restraints, you know, the medication for

20   the pain.  And it's like, dealing with my feet is like a

21   daily operation, especially like, you know, I can't feel

22   them.  I could be in the yard walking and if there's a rock

23   in my sneaker, I'll walk all day long not knowing the rock's

24   there and it would cause an infection.

25   Q    So is there numbness in your ankles?

1   A   Yes.

2   Q   And what kind of cuffs did you, did you wear on your

3   ankles as a pretrial detainee?

4   A   Regular leg irons, what I have on now.

5          MR. SYRETT:   Your Honor, we have, unfortunately,

6   just one copy of this photograph to which I think there's no

7   objection, and we would like to mark it.

8          MS. DANIELE:   No objection.

9          THE COURT:   It's a photograph of the leg irons?

10         MR. SYRETT:   Yes.

11         THE COURT:   Right.   We'll mark that as Exhibit 14.

12         (Exhibit marked in evidence.)

13         MR. SYRETT:   May I approach the witness?

14         THE COURT:   Yes.

15  Q   Mr. Ford, I've handed you Exhibit 14.   Could you

16  describe what is shown?

17  A   It's showing the leg irons that they use to put on me.

18  Q   And those are the leg irons used when you're a pretrial

19  detainee?

20  A   Yes.

21  Q   And those are the leg irons that cut into your ankles?

22  A   Yes.

23  Q   And you mentioned that you gave, you received an ankle

24  sleeve at some point?

25  A   Yeah.   The, the doctor gave me these ankle sleeves to

1  put them on to try to stop the leg irons from cutting into

2  my ankles.

3  **Q**  Can you describe the ankle sleeves?

4  **A**  They're like a, basically they're like probably two

5  pairs of socks together like, you know, it's like a cotton

6  nest that you pull it over my ankle.

7        **MR. SYRETT:**  Your Honor, another exhibit to which I

8  believe there's no objection.

9        **MS. DANIELE:**  No objection.

10        **THE COURT:**  Okay.  Exhibit 15 will be the sleeve.

11  The ankle sleeve?  Is that what that is?

12        **THE WITNESS:**  Yes, those, those are it.

13        (Exhibit marked in evidence.)

14        **MR. SYRETT:**  May I approach, your Honor?

15        **THE COURT:**  Yes.

16  **Q**  Mr. Ford, what is Exhibit 15?

17  **A**  Those are the ankle sleeves that were prescribed to me.

18  **Q**  Did you find them to be effective?

19  **A**  They, ah, they are in the sort of way, but I have to put

20  a couple more pair of socks on.  They do work.

21  **Q**  You mentioned numbness in your feet and ankles.  Has

22  that ever gone way?

23  **A**  No.  It's still there.

24  **Q**  Did it get worse as a pretrial detainee?

25  **A**  Yes.

1    **Q**    You also mentioned burning in your feet.

2    **A**    Yeah, I get these, ah, burning pain, sharp pains in my

3    feet.

4    **Q**    And do you still experience the burning?

5    **A**    Yes.

6    **Q**    Did the burning get worse as a pretrial detainee?

7    **A**    Yes.

8    **Q**    Were you ever given any medication for the problems in

9    your feet and ankles?

10   **A**    Yeah, they gave me this, this medication called

11   Neurontin.

12            **MR. SYRETT:**  Your Honor, tab 11 in the binder is

13   another exhibit.  I believe there's no objection to this.

14            **MS. DANIELE:**  No objection, your Honor.

15            **THE COURT:**  Okay.  I'm sorry, can you just show me

16   what it is.

17            **MR. SYRETT:**  It's another sick call request.  It's

18   Bates numbered JD1542.

19            **THE COURT:**  January 1st, '08?

20            **MR. SYRETT:**  Yes.

21            **THE COURT:**  Okay.  Marked as Exhibit 16.

22            (Exhibit marked in evidence.)

23   **Q**    Mr. Ford, are you looking at tab 11, Exhibit 16?

24   **A**    Yes.

25   **Q**    Okay.  What is Exhibit 16?

1    A    It's another sick call slip that I, that I submitted in

2    order to get the medical staff to see me and act on it.

3    Q    And what was the outcome of submitting this slip?

4    A    They -- the foot doctor ended up seeing me and they

5    prescribed like medication to my feet.  And ankle sleeves, I

6    don't know if they prescribed them that certain date, but I

7    ended up getting ankle sleeves, you know.

8    Q    And I believe you mentioned the name of a medication.

9    If I could direct your attention to Exhibit 16 where it

10   indicates plan.

11          Do you see the -- no, it's in the same exhibit,

12   Mr. Ford.

13   A    Okay.

14   Q    Do you see Tegretol written there?

15   A    Yes.

16   Q    Is that the medication you were prescribed?

17   A    Yes.

18   Q    And were you prescribed any other medication?

19   A    Yeah.  Excuse me.  You can correct me.  I guess the

20   Neurontin came after that.  They said this Tegretol, I

21   remember now is the first stage that they give you, then if

22   it doesn't work out, well, they'll give you something else

23   and something else, you know.

24   Q    And was the second medicine Neurontin?

25   A    Yes.

1  Q    Mr. Ford, if I can direct your attention to the top of

2  Exhibit 16.  You wrote I'm a pretrial detainee, correct?

3  A    Yes.

4  Q    Was there a reason you wrote that there?

5  A    I wrote that because I thought maybe they would, the

6  burning in my feet was getting real bad, so I thought if

7  they see pretrial detainee that they would probably see me

8  real fast instead of waiting like a week to see a doctor.

9  When you put a sick call slip in it's a matter of time, you

10 don't know when you're going to see the doctor.  So, I

11 figured they would act on it real quick if I put that.

12 Q    Now, at a certain point you were sentenced, correct?

13 A    Yes.

14 Q    And do you recall when that was?

15 A    April 2008.

16 Q    And after you were sentenced in April of 2008 what

17 happened?

18 A    Ah, I stayed in the DDU and they said I still owed DDU

19 time from a prior sentence.

20 Q    Did you have any hearing of any sort in April 2008?

21 A    No.

22 Q    Did you have any mental health screening in April 2008?

23 A    No.

24 Q    And were you given any sort of form or paperwork to

25 explain why you were staying in the DDU?

```
 1    A    No.

 2    Q    And what was it like to go back to the DDU in 2008?

 3    A    It was -- I didn't understand, again, why am I still in

 4    DDU.  It's like, you know, I have a new I.D. number.  I

 5    have, you know, a new sentence.  I was supposed to be

 6    treated like everybody else.  Like you go to Concord you see

 7    a classification board, you get classified.

 8    Q    Do you remember when Judge Dein issued her summary

 9    judgment decision in this case?

10    A    September 30th, 2008.

11    Q    Was it 2010?

12    A    2010.  Excuse me.  Excuse me.

13    Q    Were you still in the DDU then?

14    A    Yes.

15    Q    And you were in the same -- in the DDU on the same

16    sentence?

17    A    Yes.

18    Q    Mr. Ford, you meet with Dr. Bernard Katz, correct?

19    A    Yes.

20    Q    Did he ask you any questions about 2007 and 2008?

21    A    Well, he asked me a couple of questions.  It was strange

22    because, you know, you know, I thought he was going to ask

23    me questions about my cell, about the conditions in DDU, you

24    know, what you're going through.  And it was like none of

25    these questions were being put to me.
```

1          **THE COURT:**  Can I ask you, when you went back in

2    September -- April of '08, did you go back to the same cell

3    or did you go to a different cell in the DDU?

4          **THE WITNESS:**  The same cell.

5          **THE COURT:**  Same cell.  Okay.  And is there one

6    area that has the DDU in it where all of the cells are, or

7    are there several areas?

8          **THE WITNESS:**  There's three wings in the DDU, A, B

9    and C.  So you have 120 cells.

10         **THE COURT:**  And are they all the same?

11         **THE WITNESS:**  Yes.

12         **THE COURT:**  Thank you.

13   **Q**   Mr. Ford, when are you scheduled to be released from

14   prison?

15   A    April 2012.

16   **Q**   And what do you plan to do when you get out?

17   A    To live like everybody else.  To get involved with

18   especially helping youth so they don't go through what I

19   went through, 30 years in prison.  You know, work like, just

20   like a normal, a normal citizen.

21   **Q**   Do you have any intention of going back to prison?

22   A    No.  No intention.

23   **Q**   And based on your experience being out on bail in 2007,

24   what do you expect when you are released?

25   A    That, I hope I don't have to like go through what I went

1    through last time.  It's like starting from stage one,

2    dealing with the things that, like people in conversation,

3    unable to sleep in a regular bed because I'm so used to

4    something hard.  You know, I just -- those things there, I

5    want to like try to get by that, right?  And that's why I

6    think counseling at the same time would be a good help.

7    **Q**   And based on your experience in 2007, how would you like

8    to prepare in prison for your release?

9    A   I need to start my transaction period now because I'm

10   under a year.  You know, I'm still eating in the cell alone.

11   I'm still sitting on the tier.  And hearing the next person

12   telling the same stories over and over that I hear for

13   years.  It's time for me to move on.

14   **Q**   What about participating in programs that the DOC

15   offers?  Are you interested in that?

16   A   Yes.

17   **Q**   Why is that?

18   A   Because that's the thing where it's, I just completed my

19   only program since I've been in, Spectrum program.   And

20   program does help people.  I never been in programs before.

21   And I liked it because I was communicating, I was talking,

22   you know.

23           **THE COURT:**  What program was it?

24           **THE WITNESS:**  It was called the Spectrum program.

25           **THE COURT:**  What's it called?

1              THE WITNESS:  Spectrum.  It's like --

2              MR. SYRETT:  Spectrum.

3              THE COURT:  Spectrum.  What do you do?

4              THE WITNESS:  It's a behavior modification

5   transaction period that, it helps you handle situations

6   where you always look at things positive instead of in a

7   negative way.

8   Q    Are you interested in participating in more programs if

9   they're available?

10  A    Yes.

11  Q    You know that Dr. Grassian submitted two expert reports

12  in this case, correct?

13  A    Yes.

14  Q    And you're aware that Dr. Grassian indicated that you

15  would benefit from therapy when you're released?

16  A    Yes.

17  Q    Do you want to do therapy when you're released?

18  A    Yes.

19              MR. SYRETT:  I have no further questions.

20              THE COURT:  Cross-examination?

21              THE WITNESS:  Excuse me, your Honor?

22              MS. DANIELE:  Could we take a five minute break?

23              THE WITNESS:  Could I take a five minute break to

24  use the bathroom, please.

25              THE COURT:  It's unanimous, everyone wants a break.

| | |
|---|---|
| 1 | **THE CLERK:**  Court is in recess. |
| 2 | (Recess.) |
| 3 | **THE CLERK:**  All rise.  You may be seated. |
| 4 | **MS. DANIELE:**  Thank you, your Honor. |
| 5 | **CROSS-EXAMINATION** |
| 6 | **BY MS. DANIELE** |
| 7 | **Q**   Good afternoon, Mr. Ford. |
| 8 | A   Good afternoon. |
| 9 | **Q**   Mr. Ford, you testified on direct examination that you |
| 10 | have had diabetes since 2002; is that correct? |
| 11 | A   Yes. |
| 12 | **Q**   And since 2002 you've been housed in the DDU; is that |
| 13 | correct? |
| 14 | A   Yes. |
| 15 | **Q**   Prior to being released on bail you had your blood sugar |
| 16 | tested and insulin shots twice a day; is that correct? |
| 17 | A   That's correct. |
| 18 | **Q**   And that's all that was deemed necessary during that |
| 19 | time period; is that correct? |
| 20 | A   I had twice a day.  I don't know if it was necessary, |
| 21 | but it was twice a day, yes. |
| 22 | **Q**   Thank you. |
| 23 | And it was your testimony that when you were |
| 24 | released on bail you went to the doctor and they told you |
| 25 | you should be tested three times a day; is that correct? |

1    A    Yes, that's correct.

2    Q    Isn't it really true that you believed in 2004 that you

3    should be tested more than twice a day?

4    A    It could have been like 2003, 2005.  Family members are

5    saying, you know, you're supposed to be tested three times a

6    day.

7    Q    But you did believe while you were on the DDU in 2003,

8    2004, 2005 that you should been have tested more frequently;

9    is that correct?

10   A    Well, way before that because our family gets tested

11   three times a day.  So if I'm in prison, now I'm down to

12   twice a day of course.

13   Q    And you weren't treated any differently as a pretrial

14   detainee in 2007 and 2008 than you were from 2002 to 2007,

15   were you?

16   A    Referring to what?

17   Q    With regard to your insulin and blood sugar testing.

18   A    They don't have a nurse in DDU to do it.

19   Q    And in 2002 through 2007 it was the same circumstances,

20   medical, the medical staff deemed it appropriate that you be

21   tested twice a day and receive insulin twice a day; is that

22   right?

23   A    Well, they said that they don't have a nurse, I mean,

24   come during the afternoon.

25   Q    They said that in 2002?

1    A    That was their policy in the DDU, the nurses leave at

2    lunchtime.  There's not a nurse in DDU 24 hours a day.  So

3    that's their policy that as I requested it, they don't have

4    a nurse to do it.

5    Q    And you didn't think that was right, did you?

6    A    I didn't -- I wouldn't say that.  I didn't say back

7    then.  I didn't think that was -- I wasn't having

8    complications like what I was having now.

9    Q    In 2004 you filed a lawsuit about being tested and

10    having insulin only two times a day, did you not?

11    A    I filed a lawsuit with two other inmates that, ah, we

12    get diabetic meals, that we get ankle sleeves.  There was

13    all kinds of things that they didn't have in DDU.  So it was

14    three of us.

15    Q    And this was all regarding the same things that you're

16    complaining about here; isn't that correct?

17    A    Basically, yeah.

18    Q    Okay.  Mr. Ford, then in 2003 you also complained about

19    ankle problems; is that correct?

20    A    Yes.

21    Q    And you complained about foot problems; is that correct?

22    A    When you're dealing with leg irons on your ankles you

23    have to keep your feet secure.  So, yes, I don't know what

24    years, but it's been my whole thing take care of your feet

25    as I was growing up from my uncle where his legs got cut

1   off.  His arms got cut off.  So you paid very close

2   attention to your feet.  So I probably complained my whole

3   bit about that.

4   Q   Was your uncle in DDU?

5   A   Say again?

6   Q   Was your uncle in the DDU?

7   A   No.

8   Q   So your issues with your feet started at least in 2003

9   if not earlier; is that correct?

10  A   I don't remember the, I don't remember the dates.  But

11  like I said, if you have any diabetics in your family

12  they're going to complain about their feet, secure your feet

13  or it's going to get cut off.

14  Q   Mr. Ford, I'm not absolutely certain what the number is,

15  there's an ankle sleeve there, it's Exhibit 15.  Is that

16  correct?

17        **THE COURT:**  Yes.

18  A   Yes.

19  Q   The ankle sleeve that has been admitted as Exhibit 15,

20  that's been prescribed to you for use with your leg irons;

21  is that correct?

22  A   Yes.  Yes.

23  Q   And you had that prescribed to you in 2004, 2005 also;

24  is that correct?

25  A   A different, it was a different type of ankle sleeve.

1    But, they have different kinds of ankle sleeves, but I had a

2    different one in 2004.

3    **Q**   But it was similar to that?

4    **A**   It was more of a nylon than a mesh type.  A rubber, a

5    rubber type.

6    **Q**   Okay.  It served the same purpose; is that correct?

7    **A**   Yes.  Yes.  Same purpose.

8    **Q**   Mr. Ford, the leg irons that you wear, the leg irons

9    that you have on today that you wore to court today, are

10   those the same leg irons that you have on in the DDU?

11   **A**   Yes.

12   **Q**   And are those the same leg irons that you have worn for

13   31 years in the Department of Correction custody?  Same type

14   leg irons?

15   **A**   Yes.  Yes.  Yes.

16   **Q**   Mr. Ford, you testified that in January -- in March of

17   2007 you were released on bail and you're getting everything

18   together out in the community; is that correct?

19   **A**   Yes.

20   **Q**   And you violated bail in June of 2007; is that correct?

21   **A**   It was probably June 26th, I returned back to Walpole.

22   **Q**   And that was the date that the Court violated your bail;

23   is that correct?

24   **A**   Yes.

25   **Q**   And you testified that when you came back into our

1    custody you had a very difficult time with the clanging of

2    the doors; is that correct?

3    A    That's correct.

4    Q    Is DDU the only place that they have metal doors?

5    A    Well, DDU's the only place where it's, like you're more

6    isolated where the doors are -- like in population setting

7    everything is wide open like this room.  But when you're in

8    a small environment and you hear the doors it's extra loud.

9    Q    Isn't it true that if you were in any housing unit in

10   the entire Department of Correction, however, you would hear

11   clanging of doors?

12   A    It depends.  If you're living behind a bar door, they

13   don't clang.  But if you live behind a solid door, yeah,

14   they clang.

15   Q    If the bar door doesn't clang shut it's not going to be

16   loud?

17   A    More secure, more shut.

18   Q    Mr. Ford, you testified that when you returned you were

19   more depressed because you had proven to yourself that you

20   could make it out in the community; is that correct?

21   A    I was more depressed because I didn't recognize the

22   symptoms.  I didn't, I didn't, I didn't -- my testimony was

23   that I thought that, ah, I had no symptoms all these years

24   in segregation.  Until I got out in society and I realized I

25   couldn't talk to people, I couldn't do certain things.  So

1   that's when I was getting depressed.

2   Q   So you were depressed because you couldn't be out in

3   society, you were back in the custody of the Department; is

4   that correct?

5   A   No, I was depressed because I didn't realize, I never

6   thought about those things.  I thought about being in

7   segregation where it never bothered me all these years

8   until, and when I entered society I started recognizing the

9   symptoms that I had that I never thought I had.

10  Q   And you were getting over these symptoms; is that

11  correct?

12  A   No.

13  Q   No, you weren't?

14  A   No.

15  Q   Could you -- you were out for three months; is that

16  correct?

17       THE COURT:  I'm sorry, I didn't hear that.

18  Q   You were out for three months; is that correct?

19  A   Yes.

20  Q   And, Mr. Ford, it's true, isn't it, that you were

21  returned to custody because you sent heroin into Cedar

22  Junction; is that correct?

23  A   I was accused of that, yes.

24       MR. SYRETT:  Objection, your Honor.

25       THE COURT:  Overruled.

1   **Q**   Well, you pled guilty to that, did you not?

2   A   Yes, I pled guilty.

3   **Q**   And you pled guilty because you were guilty; isn't that

4   correct?

5   A   I pled guilty because it was a package deal.  It was a

6   package deal put together because I had to plead guilty to

7   all my cases together in order for me to get a certain deal.

8   **Q**   So the charges that you pled guilty to were the heroin

9   charges and the charges of assaulting two correctional staff

10   and taking a nurse hostage; is that correct?

11          **MR. SYRETT:**  Objection, your Honor.  And we would

12   like to renew our motion to exclude Mr. Ford's prior

13   criminal record.  And, I understand your prior ruling, but

14   if we could have a running objection to this line of

15   questioning.

16          **THE COURT:**  You can have the objection but it's

17   overruled.

18          **MS. DANIELE:**  Thank you, your Honor.

19   A   Could you repeat the question, please?

20   **Q**   I can, Mr. Ford.

21          You pled guilty to the heroin charges and taking a

22   nurse hostage and assaulting two correctional officers; is

23   that correct?

24   A   Yes, that's correct.

25   **Q**   When you pled guilty there was a plea colloquy, was

1    there not?

2    A    Yes.

3    Q    And in that plea colloquy the judge asked you you're

4    pleading guilty because you are guilty, did she not?

5    A    Yes.  Yes.

6    Q    And you pled guilty to all of those charges; is that

7    correct?

8    A    Yes.

9    Q    Mr. Ford, when you were housed in the DDU prior to being

10   released, prior to your completion of your sentence in 2002,

11   you testified earlier, I believe, that you started taking

12   Wellbutrin in 2006; is that correct?

13   A    I believe that's the year, yes, 2006.

14   Q    That was before your pretrial --

15   A    Yes.

16   Q    -- confinement time; is that correct?

17   A    Yes.

18   Q    Before 2006 did you have any anxiety issues or

19   depression issues at all?

20   A    I didn't recognize it if I did.

21   Q    You didn't?

22   A    No.  I didn't -- if I did, I can't recall right now.

23   Q    Okay.  Isn't it true, Mr. Ford, that in 2005 you sought

24   to see mental health because of anxiety attacks?

25   A    I'm not sure of the year.  But I did, I did call to see

1    them.

2    **Q**   Prior to being released as a pretrial detainee.

3    A   It's either 2005 or 2006.  So if you're saying 2005 then

4    it was 2005.

5    **Q**   Either one of those, it was --

6    A   Yes.

7    **Q**   -- prior to being, completing --

8    A   Prior, prior, yes.

9    **Q**   -- the prior sentence; is that correct?

10   A   Yes.

11   **Q**   And you were -- one of the reasons why you sought mental

12   health treatment was because you were anxious about your

13   pending charges; isn't that correct?

14   A   It, it, ah -- I wanted to know why, why that incident

15   happened.  So, I figured that if I would for the first time

16   talk to mental health to find out about A, Z, why do I react

17   to certain things, it was like a start.

18   **Q**   And the incident, that was committed in 2002 when you --

19   A   2002.

20   **Q**   -- assaulted two officers and took a nurse hostage; is

21   that correct?

22   A   I was charged, yes.  Yes.

23   **Q**   And you continuously had anxiety and panic attacks

24   around that incident, did you not?

25   A   I don't recall.

1    Q   Did you --

2           THE COURT:  Could I have the chronology though.

3    The incident is in 2002.  When are the charges brought?

4           MS. DANIELE:  The criminal charges?

5           THE COURT:  Yes.

6           MS. DANIELE:  2003.  January 2003.

7           THE COURT:  And when was -- and the plea was in

8    2007?

9           MS. DANIELE:  April.

10          THE WITNESS:  2008.

11          THE COURT:  2008.  Okay.

12   Q   And in 2005 you were, or in 2006, whichever, you had

13   sought mental health treatment for the panic attacks, did

14   you not?

15   A   You keep saying panic attacks.  I don't, I don't

16   remember what, exactly what I was seeing them for, right?

17   But I remember seeing them the first time that, someone from

18   the mental health department was around 2005 or 2006, and

19   I've never seen nobody again for all 27 years I have in.

20   So, if it's panic attacks then I don't recall exactly why.

21   But I explained to you that I needed someone to talk to.

22   Q   And you were able to speak with people during that time

23   period, correct?

24   A   The first, the first time I had requested.

25   Q   And so beginning in 2005 or 2006 you were able to see

1    mental health clinicians; isn't that correct?

2    A   Yes.

3    Q   And when the mental health clinicians came around at

4    times you spoke to her; isn't that correct?  To him or her.

5    A   Not at the door.

6    Q   Is that correct?

7    A   Not at the door.

8    Q   Were you able to meet with her in a noncontact visiting

9    room at all?

10   A   I was pulled out to the multi-purpose room.  And I don't

11   even know if it was a him or a her.  I just remember talking

12   to somebody, right, setting up an initial meeting with them.

13   It took about, it took about, I remember it took two, three

14   months.  Me requesting to see them is like, you know, I'm

15   getting, you know, all right, all right, and that was it.

16   Q   And this is prior to your pretrial --

17   A   Yes.

18   Q   -- detention?

19   A   Yes.

20   Q   Mr. Ford, on direct examination you said the 375 days in

21   pretrial detention was the hardest time you ever did because

22   you felt that if you could get out you could be like

23   everyone else, out on the streets you could be like everyone

24   else.  Is that what you testified to?

25   A   Yes.

Q   Did everybody else send heroin into maximum security
prisons?

A   You living in today's society.  You know, people do
crazy things out there.  And you say wow, I didn't know that
person was like that.  I didn't know this person was like
that.

Q   Mr. Ford, you testified, I believe, that you had been in
segregation with the Department of Corrections since 1993;
is that correct?  Approximately?

A   I spent longer than that.  But yeah.  You know.

Q   Leaving aside any time -- you first came into the
Department of Corrections in 1978; is that correct?

A   1980.

Q   1980?

A   Yes.

Q   And give or take a period, a couple of periods of time
out on parole, and your recent time in 2007 out on bail,
you've been in the Department of Correction custody since
that time; is that correct?

A   That's correct.

Q   And in 1992 you were in segregation when you began your
most, the sentence that you were released on in January of
2007, correct?

A   That's correct.

Q   So from around that time or shortly thereafter you've

1    been in segregation your entire, the entire remainder of

2    your incarceration?

3    A    That's correct.

4    Q    During this time period in segregation and the DDU you

5    were subject to regular pat searches; is that correct?

6    A    That's correct.

7    Q    Regular strip searches; is that correct?

8    A    That's correct.

9    Q    And regular hands-on escorts; is that correct?

10            THE COURT:  I can't hear, I'm sorry.

11   Q    And regular hands-on escorts; is that correct?

12   A    Yes.

13            MS. DANIELE:  I apologize, your Honor.

14   Q    When you returned as a pretrial detainee in June of

15   2007, the manner in which you were searched did not change,

16   did it?

17   A    Besides being put on the, them putting on riot gear,

18   following with the camera, you know, that's the only thing

19   that changed.

20   Q    And your housing in the Department Disciplinary Unit did

21   not change, did it?

22   A    No.

23   Q    Your conditions of confinement, did they change?

24   A    No.

25   Q    So since essentially 1992 or '93 you've always exercised

1  in a cage that's similar to the photograph that your

2  attorney showed you; is that correct?

3  A    That's correct.

4  Q    And since that time you've eaten in your cell; is that

5  correct?

6  A    That's correct.

7  Q    And since that time you've always had noncontact visits;

8  is that correct?

9  A    That's correct.

10  Q    Mr. Ford, you testified that when you returned as a

11  pretrial detainee you didn't want to talk to anyone and

12  didn't want visits.  You could have had visits, could you

13  not?

14  A    Yes.  Yes.

15  Q    You had earned four visits a month in the DDU; is that

16  correct?

17  A    I never lost it.  I came back like I never left.  I had

18  my four visits, TV, radio.  It's like I never left.

19  Q    So --

20          THE COURT:  How much TV and radio do you have in

21  the DDU?

22          THE WITNESS:  Huh?

23          THE COURT:  Do you have unrestricted time with the

24  television and radio, or is it restricted?

25          THE WITNESS:  You have your own TV in your cell.

1        **THE COURT:**  And you can watch it whenever you want?

2        **THE WITNESS:**  Yes.

3        **THE COURT:**  And the radio, too?

4        **THE WITNESS:**  Yes.

5    **Q**   And during the entire time you were a pretrial detainee

6    in the DDU you had your TV and your radio; isn't that

7    correct?

8    A    Yes.

9    **Q**   And you had four visits a month; is that correct?

10   A    Yes.

11   **Q**   And you had four telephone calls a month; is that

12   correct?

13   A    Yes.

14   **Q**   And occasionally you had more than four telephone calls;

15   isn't that correct?

16   A    With -- call your lawyer.  But that's counting extra.

17   **Q**   Mr. Ford, you testified that you don't want the bishop

18   to come visit you because he's old and it's uncomfortable.

19   Isn't it true that you're embarrassed that you're back

20   behind bars and you don't want the bishop to come visit you?

21   A    Not embarrassed.  I just told you why I didn't want him

22   to come.

23   **Q**   Are you worried about what the bishop would think if he

24   knew that you felt that Kingism should be a religion and not

25   the religion that you want to be?

1    A    I have that option to not see him, not see anyone.   I

2    explained to you why I didn't want to see him, because of

3    the way he walked over to DDU.   It's an uncomfortable area.

4    Q    So you think he would feel that a change in religion

5    from Christianity to Latin Kingism would be appropriate?

6    A    I've never changed my religion.   I've helped others with

7    this, but I've never changed what I believe in.

8    Q    The bishop in the community that you saw, what religion

9    was he?

10   A    Baptist.

11   Q    Excuse me?

12   A    He was a Baptist.

13   Q    And according to the Department of Correction records

14   you're a Muslim right now; isn't that correct?

15   A    For like the last 30 years.

16   Q    You've been a Muslim, correct?

17   A    What I am is, when I put down as a Muslim, because you

18   buy oil.   So you can put oil in your vent.   Because the guys

19   throw feces and stuff in segregation.   So I don't like that

20   kind of smell in my cell.   So in order to buy oil you have

21   to say that you're a Muslim.   So I put down as a Muslim

22   where I can buy oil and put the little tissue by the vent

23   and my cell smells clean.

24   Q    So you're manipulating the rules of the Department of

25   Corrections?

A    It's not manipulating the rules.   If you want to say, if

you want to smell that all day long then I think you would

do the same thing in my shoes.

Q    Is that the same reason why you're trying to make Latin

Kings a religion?

A    I'm not trying to -- someone asked me as a favor.

Because I'm leaving.   Once I leave this prison, this prison

life, it's all behind me.   I don't plan on contacting

nobody.   I don't plan on talking to nobody.   So, what I'm

doing now as a favor, ah, that's what they believe in.

Q    Similar to the favor that you did when you passed out

your property in 2007 when you thought you were going home;

is that correct?

A    Yes.

Q    And that's in violation of the Department of Correction

rules, too, is it not?

A    I'm not going to take my boxes, my socks and T-shirts

home, or my books.   I'm going to leave it to someone who's

doing 20 years.   I don't want nothing to do with prison.

Q    But the rules say that you don't, you're not supposed to

give other inmates your property; isn't that correct?

A    I've never seen the rule.

Q    Mr. Ford, you testified that sometimes when you go out

for visits the air conditioning isn't working and it's

really hot; is that correct?

1    A    Oh, yeah.

2    Q    So sometimes you don't want to go for a visit because of

3    the lack of air conditioning; is that correct?

4    A    It's not that.  It's, it's, it's when you have the AC

5    off in the DDU it's like a hundred fifty degrees.  So, why

6    do you want to put your visits through that kind of

7    treatment.

8    Q    So in the DDU there's air conditioning; is that correct?

9    A    Yes.  If it works.

10   Q    There's no air conditioning anywhere else in Cedar

11   Junction, is there?

12   A    Ah, I'm not sure.  I haven't been out in population in

13   so long, I don't know what they have out there.

14   Q    When you were in population years ago there was no air

15   conditioning, was there?

16   A    1995?  No.

17          **THE COURT:**  Is there other ventilation?  The

18   windows don't open?

19          **THE WITNESS:**  No.

20          **MS. DANIELE:**  The windows in population do open,

21   your Honor, but --

22          **THE COURT:**  I'm assuming in DDU that they're

23   fixed -- I mean, there's air conditioning, there's no open

24   windows.

25          **MS. DANIELE:**  Correct, it's climate controlled.

1   Q    Mr. Ford, your attorneys showed you some photos of your

2   cell in the DDU.  Was that similar to the cell that you were

3   housed in during your pretrial detainee time?

4   A    That's correct.

5   Q    And all the cells in the DDU look similar; is that

6   correct?

7   A    Yes.

8   Q    And all the cells in the DDU, all the cells in the DDU

9   are single cells; is that correct?

10  A    That's correct.

11  Q    In other words, you live by yourself?

12  A    Yes.

13  Q    You want to live by yourself, don't you, Mr. Ford?

14  A    Every inmate does.

15  Q    And you would prefer to be in the DDU single cell than

16  double celled in population; isn't that correct?

17  A    Population, you have, you have your freedom.  You can

18  walk around.  I'm free to be outside walking around.  If I

19  have to be in a double cell then I have, I'll go to double

20  cell.

21  Q    So standing here today you would rather be in a double

22  bunked cell?

23  A    If I'm walking around population, yes.

24  Q    It's true, isn't it, that at your deposition you told me

25  that you would prefer to remain in your cell than be double

1    bunked in population; isn't that correct?

2    A   If I told you that, I didn't mean it like that.  I need

3    to be in population.  I need to walk around.  But, you know,

4    every inmate prefers a single cell.  Yes, I prefer a single

5    cell.  But I have to go to population.

6         **MS. DANIELE:**  Your Honor, may I approach the

7    witness?

8         **THE COURT:**  Yes.

9         **MS. DANIELE:**  Page 79 of the deposition.

10   **Q**   Mr. Ford, I'm handing you the deposition that was taken

11   in May of 2009.  And if I could direct your attention to

12   lines 15 through 17.

13        I asked you:  Would you prefer to be in general

14   population if you had to have a cell mate?  And you said:

15   No.

16        Isn't that correct?

17   A   I think you tricked me here.  Yeah, I think you tricked

18   me.  Because, you know, yes, I said no.  But everybody wants

19   to go to population.

20   **Q**   I think you're giving me a little more credit than I

21   deserve.

22        Mr. Ford, you testified on direct that you had

23   difficulty as a pretrial detainee working on your legal

24   work; is that correct?

25   A   Meaning, meaning accessing.  Yes.

1    **Q**   Is that correct?  Okay.

2         You had an attorney for your criminal case, did you

3    not?

4    A   Yes.

5    **Q**   Very able attorney, correct?

6    A   Yes.  Can I give you another answer.  I had five

7    lawyers.  My case started in 2002 and went to 2008.  So, it

8    was five years that, in between that.

9    **Q**   From January of 2007 when you were released from your

10   original prior sentence --

11   A   Yes.

12   **Q**   -- you had the same attorney from that point on until

13   the conclusion of your criminal case is that correct?

14   A   Yes.  Yes, that's correct.

15   **Q**   So the entire time you were a pretrial detainee you had

16   the same attorney; is that correct?

17   A   Yes.

18   **Q**   And that was the same attorney that you had when you

19   pled guilty; is that correct?

20   A   That's correct.

21   **Q**   And you had access to your attorney; isn't that true?

22   A   Yes.

23   **Q**   You could write to your attorney, correct?

24   A   Yes.

25   **Q**   Talk to him on the phone, correct?

1    A    Yes.

2    Q    And he worked out what you felt was a pretty good deal

3    in a plea bargain; isn't that correct?

4    A    Yes.

5             MS. DANIELE:  Could I have one moment, your Honor.

6             (Pause in proceedings.)

7             MS. DANIELE:  I have no further questions, your

8    Honor.

9             THE COURT:  Any redirect?

10                    REDIRECT EXAMINATION

11   BY MR. SYRETT

12   Q    Mr. Ford, Ms. Daniele asked you some questions about the

13   effects of your diabetes.  Do you recall that?

14   A    Yes.

15   Q    Did the numbness in your legs get worse as a pretrial

16   detainee?

17   A    Yes, they got worse.

18   Q    Did the pain in your feet get worse as a pretrial

19   detainee?

20   A    Yes, it did.

21   Q    And as far as you know both of those symptoms are

22   attributed to your diabetes?

23   A    Yes.

24   Q    You were prescribed Tegretol as a pretrial detainee?

25   A    That's correct.

1    Q   And then you were prescribed Neurontin after that?

2    A   Yes.

3    Q   And what's the reason you were prescribed the Neurontin?

4    A   He said, ah -- well, the doctor gave me a stronger

5    medication because the Tegretol wasn't working.

6    Q   Mr. Ford, you still have cuts on your legs that you got

7    as a pretrial detainee, correct?

8    A   Yes.

9    Q   And those cuts are from the cuffs that you wore?

10   A   Yes.

11   Q   Now, Ms. Daniele asked you some questions as well about

12   when you started to have some problems with the DDU and when

13   you started talking to mental health at DOC.

14            Do you recall that?

15   A   Yes.

16   Q   Is it fair to say you were having some trouble with

17   staying in the DDU prior to 2007?

18   A   Sure.  Yes.

19   Q   But was the experience different as a pretrial detainee?

20   A   It was, pretrial, it seemed like everything caught up.

21   Like as a pretrial detainee before, it's like it got worse

22   and worse and worse.  So I reached out for help, you know.

23   Q   And Mr. Daniele also asked you a series of questions

24   about whether your conditions of confinement changed when

25   you were back in the DDU as a pretrial detainee, or, as

1    compared to before your release.

2             Do you recall that?

3    A    Yes.

4    Q    And did your response to those conditions change when

5    you were a pretrial detainee?

6    A    Yeah, I couldn't, ah, it was harder for me to deal with,

7    you know.

8    Q    And so were you more or less anxious as a pretrial

9    detainee than as a convicted inmate?

10   A    Can you -- I don't understand.

11   Q    In 2007 did you suffer more anxiety than you did, than

12   you had previously?

13   A    Yes.  Yes.

14   Q    And in 2007 did you suffer -- did you feel more

15   depressed than you had previously?

16   A    Yes.

17   Q    In 2007 and 2008 were you more sensitive to noises

18   around you than you had been previously?

19   A    Yes.

20   Q    And in 2007 did you have less energy than you had

21   previously?

22   A    Yes.

23   Q    Ms. Daniele asked you about your TV, I believe.

24   A    Yes.

25   Q    How many channels do you get?

1    A    4, 5, 6, 7.  56, 38.  That's it.

2    Q    Those are the channel numbers?

3    A    Yes, those are channel numbers.  That's it.

4    Q    And do you have cable?

5    A    No.

6    Q    An antenna?

7    A    No.

8    Q    But what sort of -- how do you get the signal?

9    A    Oh, we have cable channels for those channels, the

10   regular channels.  Yes.

11   Q    Now, Ms. Daniele also asked you some questions about

12   your deposition and whether you prefer to be in the general

13   population.

14           Do you recall that?

15   A    Yes.  Yes.

16   Q    And you testified I think that Ms. Daniele tricked you,

17   right?

18   A    Yeah, when I read it, I read it being in population.  So

19   that said no.  So that's why I said she must have tricked me

20   or something, you know.

21   Q    And do you recall how many times prior to answering the

22   question Ms. Daniele pointed out that you indicated you

23   would prefer to be in the general population?

24   A    I think she asked me like three, three, four times.

25   Like I explained to her that, that if I have to double,

1    yeah, I'll go to population.  At least I can walk around

2    instead of going through cages.

3    **Q**   And what's the reason that you don't want to share a

4    cell in general population?

5    A   Because I've been by myself all these years in

6    segregation, so many years.  And so, I never been in a cell

7    with anyone.  So I don't know if I can deal with another

8    inmate.  The cells are small.  And so, I don't think no one

9    will want to, you know, request a double cell.  Of course

10   I'm requesting a single cell.  You know, if I can't get a

11   single cell then it's going to be a double cell.  But, you

12   know, it's the same with programs.  I'm requesting as many

13   programs as there is.  And it's like, I go home in nine

14   months, and it's like I'm requesting this help.  You know,

15   it's so, all the years I have in, it's like I don't have to

16   request for programs, this and that.  I'm wrapping up.  I

17   could stay in any cell there is and just leave.  But I'm

18   seeking for help.

19   **Q**   Is it fair to say that you're worried that you're going

20   to have, that you would have a hard time having a cell mate

21   because of the conditions of confinement you're coming from?

22   A   Yeah, because I don't know what to, I don't know what to

23   expect, you know.

24            **MR. SYRETT:**  I have nothing further.

25            **MS. DANIELE:**  I just have a couple of questions,

1   your Honor.

2                     **RECROSS-EXAMINATION**

3   **BY MS. DANIELE**

4   **Q**   I just want to clarify, Mr. Ford.

5            You testified on redirect that you got cuts on your

6   ankles from the shackles as a pretrial detainee.  It's true,

7   isn't it, that in 2003 you got cuts from the shackles also?

8   A   Yes.  Yes.

9   **Q**   And you testified that you were more anxious when you

10  returned to the DDU in April -- in June of 2007 than you had

11  been in 2005 and 2006 housed in the DDU; is that correct?

12  A   Repeat the question, please.

13  **Q**   You testified that you were more anxious as a pretrial

14  detainee when you returned to the DDU in April -- I

15  apologize, in June of 2007 than you were in 2005 and 2006 in

16  the DDU; is that correct?

17  A   What do you mean more anxious?  I don't understand it.

18  **Q**   On redirect you testified that it was harder for you to

19  deal with the DDU and you were more anxious and depressed

20  when you returned --

21  A   Oh, yeah.

22  **Q**   -- in June of 2007; is that correct?

23  A   Yes.

24  **Q**   On June 26th of 2007 when you were returned you went to

25  court believing that you were going to plead to the charges

1   and get probation; isn't that correct?

2   A   That's correct.

3   Q   And instead you were returned to the Department of

4   Correction custody; is that correct?

5   A   Yes.

6   Q   Mr. Ford, you testified that you have never been in a

7   cell with another inmate before and you think you would have

8   a hard time with it.  Is that because you're afraid you

9   might violate the two foot rule and you'll have to stab him?

10            **MR. SYRETT:**  Objection, your Honor.

11            **THE COURT:**  Sustained.

12   A   No, it's just --

13            **THE COURT:**  No, no, you don't need to answer.

14   Q   You have a difficult time interacting with other

15   inmates, do you not, Mr. Ford?

16   A   I have a hard time with the whole family.  When I was

17   living -- I'm used to being in a cell by myself.  I spent

18   over 18 straight years in segregation.  So, anyone's going

19   to have a hard time adjusting around people.  So it's not

20   just inmates, it's anyone.

21   Q   But the entire time you've been housed with the

22   Department of Correction you've had a difficult time with

23   other inmates; isn't that true?

24   A   It's -- what do you mean difficult?  I've been locked up

25   in a cell for so many years.  From '76 and the DDU until I

1    wrap up.  So it's like I'm not around inmates in the yard.

2    Q    But the fact that you're not around other inmates,

3    you've been able to assault quite a few inmates and quite a

4    few staff members; isn't that correct?

5    A    Yes, I was charged with --

6         MR. SYRETT:  Objection, your Honor.

7         THE COURT:  Overruled.

8    Q    So you do have a difficult time with other inmates;

9    isn't that correct?

10   A    No, I'm not -- it's not difficult times.  It's just, you

11   know, I feel like I'm being on trial again.  I was punished

12   for things that I did, what you, what you mentioned.  But

13   there's always two sides of a story.  You know what I mean?

14   You're saying I'm having a difficult deal with inmates and

15   you're just making it one-sided.

16   Q    So that means you've justified in stabbing another

17   inmate?

18   A    No, I'm not saying that I'm justified.  No, I just,

19   ah -- for example, like if I'm going to another cell with

20   somebody else, right, you know, I don't want to be in a cell

21   with someone who kills some little baby or raped some

22   female.  I don't want to associate with someone like that.

23   So I would prefer my own cell.  So, that's what I'm worried

24   about.  It's not the other inmates.  Like, you know, you got

25   cases that, that makes you sick to your stomach.  I don't

1    want to be around them if I have my choice to be someplace

2    else.  So, I don't know who that person is, you know.  And

3    that's my situation.  So, if you're going to be put into a

4    cell it's like, you know, you put me into a cell with

5    someone who raped a female, somebody who killed a little

6    baby, or something like that, I don't want to be around

7    them.

8    Q    So you don't want to be around another inmate that --

9    A    In a cell.  In a cell.

10   Q    -- in a cell with another inmate that killed a baby

11   because you're afraid of what you might do to them?

12   A    No, I just don't want to be around them.  That's all.

13   I'm not going to do nothing to them.  I'm going home.  I'm

14   going home in nine months.  This prison life is all behind

15   me.  You know.  So it's my choice to, to be in a cell.  If I

16   got to be in a cell with someone, I will.  But my main

17   purpose is I'm going home in nine months and that's it.

18   This life is over for me.

19   Q    That's what you thought in March of 2007 also, didn't

20   you.

21   A    March of 2007?

22   Q    Yes.

23   A    I had a case pending.  It was a case in 2002.  I knew I

24   was -- you know what I'm saying, it was a case pending.

25   Q    And you picked up other charges while you were out;

1    isn't that correct?

2    A    I was charged with it.

3    **Q**    And you pled guilty to it, correct?

4    A    I had no choice.

5           **MR. SYRETT:**  Your Honor, I object.  We're well

6    outside the scope of my redirect.

7           **THE COURT:**  Yes.

8           **MS. DANIELE:**  I have no more questions, your Honor.

9           **THE COURT:**  I think she's done.

10          **MS. DANIELE:**  I have no more questions, your Honor,

11   thank you.

12          **THE COURT:**  All right.  Does it make sense to end

13   for today or does it make sense to do the videos?

14          **MR. SYRETT:**  Your Honor, we have, I think it's

15   approximately 30, 35 minutes of video designations that we

16   would be happy to play now if you think that would work with

17   the schedule.

18          **THE COURT:**  I don't know what an appropriate

19   schedule is for Mr. Ford.  Is half an hour a problem?

20          **THE MARSHAL:**  No, no problem, your Honor.

21          **THE COURT:**  All right.  You may step down then.

22          **THE WITNESS:**  Okay, thank you.

23          (Whereupon the witness stepped down.)

24          **THE COURT:**  Why don't I take just a few minutes

25   while you set this up.  Okay?

1          **MS. DANIELE:**  Your Honor, before you do, can we

2     deal with any objections to whatever the deposition

3     testimony is because there are some that we have objections

4     to.

5          **THE COURT:**  All right.  Well, how should we do it?

6          **MS. CHAUDHARY:**  Well, I believe that there are only

7     objections to three of the clips and they're towards the

8     bottom of Bissonnette Clip 1, Bissonnette Clip 3 and

9     Bissonnette Clip 4 are the objections.  So, I don't know if

10    we can play up until --

11         **THE COURT:**  Well, don't we have to play them anyway

12    to know what the objection is?  Or can you give me, give me

13    the transcript now.  Do you have it?

14         **MS. DANIELE:**  Yes, your Honor, that wasn't -- I

15    think now I'm confused.  Because the portions -- first off,

16    I have never seen the videos, so I have no idea what the

17    video is.  I've only seen transcripts.

18         **THE COURT:**  Well, presumably they're saying on the

19    video whatever they say in the transcript.

20         **MS. DANIELE:**  That's what I'm assuming, too.  But

21    the objections that I had were to Peter St. Amand's

22    testimony, not Dale Bissonnette's testimony.  The only thing

23    with regard to Dale Bissonnette that I objected to is

24    there's some preview portions that were, that -- when I was

25    given the transcript there were four pages on one thing --

1          **MS. CHAUDHARY:**  Excuse me, your Honor.

2          **MS. DANIELE:**  -- that I objected to before what

3     leads in to her.  That's all.  And I was assuming that that

4     was taken out if it's going to be a video.  If that's not

5     true then I have one objection to deal with.  But the rest

6     of them are Peter St. Amand's, the objections are to Peter

7     St. Amand's testimony.

8          **THE COURT:**  What types of objections are they?  Are

9     they to specific questions?

10          **MS. DANIELE:**  Well, pretty much with Peter St.

11     Amand, is everything relevant.

12          **THE COURT:**  Well, why don't -- there were no

13     objections to Bender, is that right?

14          **MS. DANIELE:**  No, your Honor.

15          **MS. CHAUDHARY:**  And I believe I misspoke.  I

16     believe there are objections to Mr. St. Amand's testimony.

17          **THE COURT:**  So let's do Bender first and then while

18     I take a break right now, can you give me the transcripts

19     for Mr. St. Amand so that I can see what the --

20          **MS. CHAUDHARY:**  You have the transcript in the

21     binder that we provided.  It's transcript -- it's tab number

22     18.  And I believe the objections are noted in the side with

23     red --

24          **THE COURT:**  I'll take a look at that while you set

25     this up and I'll be back in five minutes.

1          **MS. DANIELE:**  Thank you, your Honor.

2          **THE CLERK:**  Court is in recess.

3          (Recess.)

4          **THE CLERK:**  All rise.  You may be seated.

5          **THE COURT:**  Let me just deal with the objections

6     for a moment.

7          As I understand it, the first set of objections

8     relates to the comparison to general population and I assume

9     that's the DOC's general objection that that's not the

10    appropriate comparison.

11         **MS. DANIELE:**  That's correct, your Honor.

12         **THE COURT:**  All right.  That objection is

13    overruled.

14         The second relates to suicides.

15         **MS. DANIELE:**  Yes.

16         **THE COURT:**  Let me just hear you on that.  That's a

17    new thought for me.

18         **MS. CHAUDHARY:**  Hear me on this or --

19         **THE COURT:**  Who's objecting?

20         **MS. DANIELE:**  I'm objecting to the testimony

21    regarding suicides because it's absolutely not relevant to

22    this case at all.  There's no testimony that Mr. Ford was

23    going to commit suicide, did commit suicide.  There's no

24    expert testimony regarding any of that.  The case about

25    segregation and suicide is already going on in Judge Wolf's

1  courtroom.  That has nothing to do with what we're here for

2  today.

3          MS. CHAUDHARY:  Your Honor, the conditions of

4  confinement in the DDU and their effect on the mental health

5  generally of inmates is certainly an issue in this case.

6  Dr. Grassian testified that certainly one of the risks of

7  those kinds of conditions of confinement is suicide and more

8  to the point, Mr. St. Amand, the superintendent of Cedar

9  Junction, indicated that there was an issue with suicides in

10  the DDU and that's something that was brought out at his

11  deposition and we think it's relevant to the type of harm

12  that the DDU can cause.

13          THE COURT:  I actually don't think this is the case

14  that we're trying on whether or not the conditions of the

15  DDU establish, make someone more likely than not to commit

16  suicide.  I do, however, believe that there's been testimony

17  by Mr. Ford that he was concerned about this and heard

18  events going on in the unit of other inmates who had

19  committed suicide, and he testified about his emotional

20  response to that.  So I'm going to let it in.  I don't know

21  how significant that's actually going to be in the ruling.

22  But I'm not making a ruling in this case as to the overall

23  effect of the DDU on mental health in general on likelihood

24  of suicide.  Okay?

25          MS. CHAUDHARY:  Your Honor, you'll first hear

1    testimony of James Bender.  Mr. Bender was the acting and

2    deputy commissioner of the Department of Corrections during

3    the relevant time period.

4            (Whereupon the designated portions of the

5    deposition testimony of James Bender were played.)

6            MS. CHAUDHARY:  Next we'll hear testimony from

7    Peter St. Amand.  He was the superintendent of the DDU.

8            (Whereupon the designated portions of the

9    deposition testimony of Peter St. Amand were played.)

10           MS. CHAUDHARY:  Just one moment.

11           Your Honor, I believe that clip stopped a bit short

12   and if I could just read the remainder of the designated

13   testimony into the record.  It's in tab 18 of the binder we

14   provided, page 92 and 93.  I believe the clip stopped at

15   line 14 and we would also like to designate 15 through 24 of

16   page 92, and 1 through 15 of page 93, and I'll just read

17   that into the record, if I'm permitted.

18           THE COURT:  Go ahead.

19           MS. CHAUDHARY:  By Mr. Syrett, Question:  And in

20   2008 you said there were 35 inmates who went to the hospital

21   having injured themselves?

22           Yes.

23           And do you know of those 35 approximately how many

24   of those incidents would have occurred in the DDU or the 10

25   Block?

1    Answer:  I would have to say it's probably about

2    half and half again.

3    Question:  So half?

4    Answer:  It's not 35, it's 35 instances, not 35

5    different inmates.

6    Question:  Okay.

7    Answer:  It may have been the same inmate five

8    times, but I would say that it would, almost all of those

9    except for maybe two were either in segregation or the DDU.

10   Question:  And for those 35, you know, minus one or

11   two as you said that were not in the DDU or the 10 Block, do

12   you think there's a link between the conditions in which the

13   inmates were confined and their attempt to hurt themselves?

14   Answer:  Yes.  The --

15   Never mind.

16   And next we'll hear deposition testimony from Dale

17   Bissonnette, the administrator of the DDU.

18   (Whereupon the designated portions of deposition

19   testimony of Dale Bissonnette were played.)

20   **MS. CHAUDHARY:**  I just wanted to note on the record

21   that Exhibit 14 that was discussed in that last --

22   **THE COURT:**  I'm sorry?

23   **MS. CHAUDHARY:**  Exhibit 14 that's discussed in the

24   last clip of Ms. Bissonnette is Exhibit 1 in this, in this

25   trial which was admitted, the DDU handbook.

1          **MR. SYRETT:**  And with that, your Honor, Mr. Ford

2    rests his case.

3          And, your Honor, if I may make one -- can we leave

4    our boxes?  Or maybe that's a question for Mr. Quinn later.

5          **THE COURT:**  Yes, we can, we can leave things here.

6    The plaintiff has rested.  I'll hear from everyone tomorrow

7    and we'll continue tomorrow morning.

8          Is ten o'clock all right then for everyone?

9          **MR. SYRETT:**  Yes, your Honor.

10         **MS. DANIELE:**  Your Honor, could we just discuss a

11   couple of scheduling things.  Obviously first thing tomorrow

12   morning then we will have a motion for directed verdict.

13         The witnesses -- we have five witnesses total, one

14   of whom is our expert, who I think no matter how we worked

15   it, if we called him tomorrow, he would go over into

16   Wednesday.  So, if we could have our other four witnesses

17   tomorrow and if we finish early, we finish early, and do our

18   last witness and closings on Wednesday.

19         **THE COURT:**  That works for me.  Is that all right

20   with the plaintiff?

21         **MS. CHAUDHARY:**  Yes.

22         **MS. DANIELE:**  It would save us money, too.  We're

23   trying to save the Commonwealth money from paying our expert

24   for two days.

25         **THE COURT:**  Okay.  So, it sounds to me, though,

 1    that we should be able to finish on Wednesday.

 2              **MS. DANIELE:**  That's what I would hope for.

 3              **THE COURT:**  Okay.  Then I'll see you tomorrow.  We

 4    can -- if we start at 10:00, do you think you'll get through

 5    the four witnesses?

 6              **MS. DANIELE:**  I would think so.

 7              **THE COURT:**  You think so.  All right, we'll be

 8    adjourned.  So I'll hear motions in the morning.

 9              All right, thank you.

10              **MR. SYRETT:**  Thank you, your Honor.

11              **THE CLERK:**  Court is in recess.

12              (Adjournment.)

1                    **C E R T I F I C A T E**

2

3

4         I, Donald E. Womack, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12

13

14            /S/ DONALD E. WOMACK 10-7-2011
             _____
15               DONALD E. WOMACK
               Official Court Reporter
                 P.O. Box 51062
16         Boston, Massachusetts 02205-1062
                womack@megatran.com
17

18

19

20

21

22

23

24

25