UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALBERT FORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 07-11457-JGD |
| JAMES BENDER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT, RULINGS OF LAW
## AND ORDER OF JUDGMENT

January 27, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

The jury-waived trial of this matter took place on July 25, 26 and 27, 2011.  After an unanticipated delay in obtaining the transcripts, the parties submitted proposed findings and rulings through October 28, 2011.  After consideration of the testimony, exhibits, pleadings, and summary judgment record, the court makes the following findings of fact and rulings of law.

## II.   <u>FINDINGS OF FACT</u>[1]

### <u>The Parties</u>

1.      At all relevant times, the plaintiff Albert Ford, was an inmate in the custody of the Department of Correction, housed at Massachusetts Correctional Institution at Cedar Junction ("MCI-Cedar Junction").

2.      From 2003 to 2007, the defendant James Bender was the Deputy Commissioner of the Department of Correction ("DOC").  He was also the Acting Commissioner of Correction for seven months up until November 2007.  In 2008, Bender was appointed Deputy Commissioner of the Prison Division.  He retired from the DOC on January 5, 2011.  (PFF ¶ 2).

3.      From May 2007 to December 2009, the defendant Peter St. Amand was the Superintendent of MCI-Cedar Junction.  St. Amand retired from the DOC in January 2011.  (PFF ¶ 3).

### <u>The Issues</u>

4.      MCI-Cedar Junction is a maximum-security state prison located in Walpole, Massachusetts.  At issue in this case is Ford's incarceration in the Department Disciplinary Unit ("DDU") at MCI-Cedar Junction as a pretrial detainee, and later as a

---

[1]  Plaintiff's Proposed Findings of Fact and Rulings of Law (Docket No. 206) are cited as PFF, and Defendants' Proposed Findings of Fact and Rulings of Law (Docket No. 205) are cited as DFF.  In citing to these findings, the court has considered the opposing parties' responses, as well as the cited materials.  Exhibits from the trial are cited as "Ex." and trial testimony is cited by the witness' name followed by the day of the trial: transcript page number.

convicted inmate, without a hearing.  On September 30, 2010, this court issued a decision

on cross-motions for summary judgment.[2]  In accordance with this decision, on

November 16, 2010, this court entered a declaratory judgment in favor of Ford finding

that the defendants Bender and St. Amand, acting in both their individual and official

capacities, violated Ford's substantive due process rights under the U.S. Constitution and

the Massachusetts Declaration of Rights by confining him in the DDU as a pretrial

detainee as punishment for misconduct that occurred while Ford was serving a prior

sentence which had since been completed.  (Docket No. 140).  In addition, the court

declared, based on the same conduct, that Bender, acting in both his individual and

official capacities, had violated's Ford's federal and state constitutional rights to

procedural due process by incarcerating Ford in the DDU without affording him a new

hearing, and that Bender, in his official capacity, had violated Ford's federal and state

procedural due process rights by confining Ford in the DDU following his 2008

conviction, again without affording him a new hearing.  (Docket No. 140).

     5.     Prior to trial, Ford dropped his outstanding equal protection claims.

(Docket No. 170 at p. 1 n.1).  The trial was limited to Ford's claim for damages and

---

    [2] On September 30, 2010, this court entered a Memorandum of Decision and Order
granting in part and denying in part the DOC Defendants' Motion for Summary Judgment and
Plaintiff's Motion for Partial Summary Judgment (Docket No. 130) ("SJ Dec.").  On December 1,
2009, this court had allowed Defendant Bellotti's Motion for Summary Judgment so he was not
involved in the trial.  (Docket No. 121).

injunctive relief arising out of the violation of Ford's substantive and procedural due process rights.[3]

### Ford's Incarceration in the DDU

6.      The DDU is "a restricted area or areas designated by the Commissioner [of Correction] to which an inmate has received a recommended sentence by a Special Hearing Officer."  103 C.M.R. § 430.06.  An inmate can be confined to the DDU only after a Special Hearing Officer finds the inmate guilty of a disciplinary infraction warranting DDU placement.  See 103 C.M.R. §§ 430.08, 430.09, & 430.11; DuPont v. Comm'r of Corr., 448 Mass. 389, 392-93, 861 N.E.2d 744, 747-48 (2007).

7.      Ford was initially incarcerated at MCI-Cedar Junction in 1980.  (Ford I:159).  Beginning in or about 1992 or 1993, he was housed in the DDU.  No details concerning why he was housed in the DDU during this early period have been provided to the court.

8.      On July 1, 2002, while housed in the DDU, Ford was involved in an altercation which resulted in correction officers being stabbed, and a nurse being held

---

[3]  The plaintiff is seeking money damages for his 375 days in the DDU as a pretrial detainee, but not for any of the time that he spent in the DDU after he was convicted.  While the plaintiff was improperly confined in the DDU following his 2008 conviction, the plaintiff is not entitled to damages for that period because Bender's liability for Ford's post-conviction confinement is based only on actions that the defendant took in his official, as opposed to individual, capacity.  See Hafer v. Melo, 502 U.S. 21, 31, 112 S. C t. 358, 365, 116 L. Ed. 2d 301 (1991) (holding that state officials may be sued "in their individual capacities" for money damages under 42 U.S.C. § 1983).

hostage.  (DFF ¶ 5).  On January 17, 2003, Ford was given a ten (10) year DDU sanction for the incident.  (Id.).

9.      The sanction was imposed by a Special Hearing Officer following a DOC disciplinary hearing, which Ford did not attend, and for which he was unable to obtain counsel.  The Hearing Officer explained the reasons for her decision as follows:

> The maximum DDU sentence has been imposed by this Hearing Officer due to the violent nature of this offense.  A review of Inmate Ford's six part folder reveals that Inmate Ford has received five prior DDU sentences for offenses which include being in possession of a weapon, conspiring to introduce heroin and several for him conspiring to assault other inmates which was STG related.  In fact, Inmate Ford committed this offense while residing in DDU.  Clearly Inmate Ford is a danger to staff and his continued placement in the Department's most secure setting is warranted.  Not only did Inmate Ford violate [DOC] rules, he violated the laws of the Commonwealth as well.  His type of assaultive behavior towards staff is totally unacceptable and will be dealt with accordingly.  Serious injuries were sustained by the staff members involved in this incident.

(Ex. 18).

10.     Ford subsequently was indicted in Norfolk County for armed assault with intent to murder arising from this incident (the "assault charges").  Ford was still serving his original criminal sentence at the time of his indictment.  His sentence was to expire on January 7, 2007.

11.     On January 2, 2007, just prior to the expiration of Ford's original criminal sentence, the Norfolk County Sheriff's Office requested that the Norfolk County District Attorney's Office approve Ford's continued confinement in DOC custody as a pretrial detainee pending his trial in Norfolk Superior Court on the assault charges.  The request

5

was made pursuant to Mass. Gen. Laws ch. 276, § 52A ("Section 52A"), which provides

as follows:

> Persons held in jail for trial may, with the approval of the district attorney, and shall, by order of a justice of the superior court, be removed by the commissioner of correction to a jail in another county, and said commissioner shall, at the request of the district attorney, cause them to be returned to the jail whence they were removed.  <u>In addition, such persons, if they have been previously incarcerated in a correctional institution of the commonwealth under sentence for a felony, may, with the approval of the district attorney, be removed by the commissioner of correction to a correctional institution of the commonwealth, and said commissioner shall, at the request of the district attorney, cause them to be returned to the jail where they were awaiting trial</u>.  The proceedings for such removals shall be the same as for the removal of prisoners from one jail or house of correction to another.  The cost of support of a person so removed and of the removals shall be paid by the county whence he is originally removed.

(emphasis added).

12.    The District Attorney's Office granted the request on January 2, 2007, and

the DOC accepted Ford into its custody pursuant to Section 52A.  Bender had final

authority for the DOC's decision to accept Ford's transfer.

13.    Ford completed his original criminal sentence on January 7, 2007, and his

status therefore changed from a convicted prisoner to a pretrial detainee.  (DFF ¶ 8).

Nevertheless, Ford remained in the DDU serving his DDU sanction.  (Id.).  Ford did not

receive another hearing prior to his confinement in the DDU as a pretrial detainee, and

the conditions of his detention did not change.

14.     Ford was unaware of the request that he be held in DOC custody pending trial.  Ford thought once his sentence expired, if he was detained pending trial on the assault charges he would be sent to the county jail.  No one notified him to the contrary.

15.     This court finds that, due to the fact that Ford still had time left to serve on his 10 year DDU sanction, there was no consideration made to housing Ford anywhere other than in the DDU.  The DOC argues that Bender, who was responsible for the decision to place Ford in the DDU, made the decision with knowledge of Ford's history, and would not have housed Ford anywhere else due to his violent nature.  However, as detailed <u>infra</u>, this court rejects the argument that Ford's placement in the DDU would have been a foregone conclusion if a hearing had taken place.  Rather, as later events show, Ford's placement was a complicated issue.  Moreover, it is undisputed that Bender did not undertake an actual review of Ford's file before placing him in the DDU as a pretrial detainee.

16.     Based on the summary judgment record, this court found Ford's placement in the DDU during his pretrial detention was consistent with the DOC's ordinary practice.  Since 2003, the DOC has confined several pretrial detainees in the DDU pursuant to pre-existing DDU sanctions.  At trial St. Amand testified that Ford was immediately placed in the DDU without a review of his file because the DOC defendants were "under the impression that we could have him finish his sentence."  (St. Amand II:82).  Bender also admitted that Ford's placement in the DDU was at least in part intended as punishment.

(Bender II:50).  Based on this and other testimony this court finds that Ford was automatically placed in the DDU for the purpose of serving his 10 year DDU sanction.

### Ford's Second Period of Pretrial Detention in the DDU

17.     The state court granted Ford bail pending his trial on the assault charges.  In March 2007, Ford's sister posted bail, and Ford was released from custody.  (DFF ¶ 9).  However, on June 26, 2007, Ford's bail was revoked based on a charge that he had mailed heroin to an inmate at MCI-Cedar Junction (the "heroin charges") and Ford was returned to custody to await trial.  (DFF ¶¶ 10-11).

18.     Pursuant to Section 52A, permission was again granted by the Norfolk County District Attorney's Office to have Ford detained at MCI-Cedar Junction pending trial on the assault (and later the heroin) charges.  On June 26, 2007, Ford was returned to MCI-Cedar Junction and immediately housed in the DDU to continue serving his 10 year DDU sentence.  (DFF ¶ 12).

19.     Ford was not afforded a new hearing prior to his return to the DDU.  This court has found that Ford's detention in the DDU as a pretrial detainee without a hearing in January and June 2007 violated Ford's procedural and substantive due process rights.

20.     On July 18, 2007, Ford wrote a letter to the DOC Commissioner objecting to being housed in the DDU as a pretrial detainee.  As Ford asserted, he should either have been reclassified "as a new man" or housed in the county jail once his sentence had expired.  (Ex. 20).  Thus, Ford was clearly of the understanding that his status as a pretrial detainee entitled him to different treatment than that afforded a convicted felon.

21.     By letter dated August 23, 2007, St. Amand's office drafted a letter to Ford explaining that his placement in the DDU was proper.  (St. Amand II:90-91, 96).  The letter provided in relevant part as follows: "Please be advised that you are properly housed in the DDU serving the remainder of a ten (10) year DDU sentence that you received on or about September 4, 2003.  The fact that you are awaiting trial pursuant to M.G.L. 276, § 52A does not prohibit the Department from requiring that you complete your DDU sentence."  (Ex. 21).  Bender was aware of this communication, and did not indicate in any way that St. Amand's position was inaccurate.  This is further support for this court's finding that Ford was placed in the DDU to complete his 10-year sanction: his placement was not the result of an analysis of available housing alternatives for which Ford could qualify.

## Ford's 2008 Incarceration

22.     On April 30, 2008, Ford pled guilty to the assault charges and heroin charges.  (DFF ¶ 12).  Ford was sentenced to 4-5 years incarceration, considerably less than his 10 year DDU sanction for the assaultive behavior which formed the basis of the criminal charges.  After pleading guilty, Ford returned immediately to DOC custody and was placed in the DDU to continue serving his 10-year DDU sanction.  Ford was not afforded a new hearing in connection with his return to the DDU as a convicted prisoner.  As detailed above, this court has ruled that Bender violated Ford's constitutional rights by putting him back in the DDU following his 2008 conviction without a new hearing.

## Ford's Post-Judgment Placements

23.    On September 30, 2010, this court issued its "Memorandum of Decision and Order on Parties' Motions for Summary Judgment" holding, *inter alia*, that Ford's 375 day pretrial DDU confinement and his post-conviction confinement in the DDU without a hearing violated his due process rights.  (Docket No. 130).  On November 8, 2010, following a hearing on Ford's "Motion for Release from Unlawful Confinement" (Docket No. 132), the court gave the DOC until November 16, 2010 to determine Ford's future housing placement, and until November 24, 2010 to hold a hearing in connection with any effort to confine him in a segregated unit.  (Docket No. 138).  On November 16, 2010, the DOC requested an extension of these deadlines, which the court granted on November 17, 2010.  (See Docket Nos. 142, 143).

24.    After this court ordered the DOC to make a determination as to where to house Ford, and despite the DOC's position that the DDU was the only appropriate placement option for Ford (Bender II:25-26), the DOC did not automatically elect to have a hearing to determine if Ford's continued placement in the DDU was appropriate.  As Assistant Deputy Commissioner of Classification Carol Mici testified, since Ford had not had a classification hearing for several years, "there's a lot of information to put together, which is how we make our decisions; so, it's not as easy as something that you can really decide in a meeting in an hour."  (Mici II:170-71).  There were at least two meetings of high level officials following this court's summary judgment decision, but those present could not decide how to proceed.

25.     On or about November 14, 2010, Ford was given Disciplinary Report

#212833 for allegedly threatening a staff member and destroying state property, i.e.,

using a sheet to make a "fishing line."  This Report was dismissed by the DOC.  On

November 17, 2010, a new disciplinary report was issued, adding DDU-eligible charges

and citing additional statements allegedly made by Ford.  Ford denies making any of the

challenged statements.

26.     Ford requested that this court oversee his disciplinary hearing.  That request

was denied, although he was allowed to take discovery about the events leading to the

disciplinary charge.  (See Docket Nos. 144, 157).  A DDU hearing was conducted into

the disciplinary charges and on December 15, 2010, Ford was given a 10 month DDU

sanction for this offense.  Ford is challenging this sanction in a State Court certiorari

proceeding pursuant to Mass. Gen. Laws ch. 249, § 4.  The new 10 month DDU sanction

relieved the DOC from having to make an immediate decision as to where to house Ford,

as he was now deemed to be serving the 10 month sentence in the DDU.

27.     Ford remained in the DDU for this new offense until August 4, 2011, when

he completed his 10 month DDU sanction.  According to the DOC, he was moved to the

general population unit at the Souza-Baranowski Correctional Center ("SBCC"), a

maximum-security prison located in Shirley, Massachusetts.  As of the DOC's last

pleading, on October 14, 2011, Ford was residing in general population at SBCC.

**Conditions of Confinement in the DDU**

28.     The conditions under which Ford has been housed in the DDU are governed by regulation and have remained basically unchanged since Ford was first housed there in 1993.

29.     While in the DDU, inmates are held for approximately 23 hours a day in a cell measuring about 7 by 12 feet.  Each cell contains a cement bed, a cement desk, a cement stool, a small cement shelf, a mirror, and a combination sink and toilet.  There is a window in the cell's metal door and a window in the back of the cell that measure approximately 18 to 24 inches long and 8 to 10 inches wide.  Because the toilet is located toward the front of the cell, inmates using their toilets are visible through the window in the cell door.  Inmates are not allowed to cover the window.  (See PFF 8; Exs. 3, 4, 7, 8 (photographs)).

30.     To communicate with other prisoners in the DDU, Ford would yell through the air vents or under the door (PFF ¶ 9).  Like all DDU inmates, Ford ate alone in his cell and was permitted approximately 20 minutes to eat.  (PFF ¶ 10).

31.     Each time Ford was removed from his cell he was placed in full restraints, including being handcuffed behind his back, leg chains and, when moved outside the unit, a waist chain with cuffs.  (PFF ¶ 14).  In addition, Ford was stripped searched each time he entered or left his cell, as were all DDU inmates.  (PFF ¶ 20).

32.     DDU inmates are allowed up to four (4) personal visits per month based upon their disciplinary record: DDU inmates who remain disciplinary report free for 30

consecutive days will get one visiting period the following month, DDU inmates who remain disciplinary report free for 60 consecutive days will get two visiting periods the following month, and so on. All visits are non-contact visits. Ford was entitled to four (4) visits per month during the relevant time period. (Ex. 1 (DDU Handbook) at p. 10; DFF ¶ 19; PFF ¶ 15).

33.     DDU inmates are allowed up to four (4) telephone privileges per month based upon their disciplinary record: DDU inmates who remain disciplinary report free for 30 consecutive days will get one telephone privilege the following month, while DDU inmates who remain disciplinary report free for 60 consecutive days will get two telephone privileges the following month, and so on. Ford was entitled to four (4) personal phone calls per month during the relevant time period. (Ex. 1 at pp. 11-12; DFF ¶ 20; PFF ¶ 16).

34.     DDU inmates are issued a radio if they remain disciplinary report free for 30 consecutive days. Ford had a radio during the entire relevant time period. (Ex. 1 at p. 9; DFF ¶ 21).

35.     DDU inmates are issued a television if they remain disciplinary report free for 60 consecutive days. Inmates who have earned the television privilege may participate in General Equivalency Diploma ("GED"), Pre-GED, English as a Second Language and Adult Basic Education courses via closed circuit video. Ford had a television during the entire relevant time period. (Ex. 1 at p. 9; DFF ¶ 22).

36.     DDU inmates have access to the High Risk Offender or Spectrum Program. Ford completed this program.  (DFF ¶ 23).

37.     DDU inmates are given the opportunity to shave and shower three (3) times per week, and to have a haircut every 60 days.  (Ex. 1 at pp. 13-14; DFF ¶ 24; PFF ¶ 12).

38.     DDU inmates are offered one (1) hour of "exercise" per day outside their cell, five (5) days per week.  (Ex. 1 at p. 15; DFF ¶ 26).  Throughout the time period when Ford was confined in the DDU, such "exercise" consisted of walking back and forth in outdoor cages that are approximately six feet wide by ten yards long.  There was no exercise equipment.  In the case of inclement weather, the exercise period was cancelled and there was no make-up period provided.  (PFF ¶ 11).

39.     Because of his disciplinary history, Ford was classified as an "A" level prisoner, and took his "exercise" in full restraints.

40.     DDU inmates are permitted to leave their cells to see medical and mental healthcare providers.  Ford left his cell twice a day to see medical personnel during the relevant time period to receive insulin for his diabetes.  (DFF ¶ 27; PFF ¶ 13).  While Ford requested a third daily visit to check on his blood sugar levels (see discussion infra), this was not permitted.  According to Ford, this was because no nurses were available during lunchtime to check his sugar.  (Ford I:135).

41.     While DDU inmates have access to the DDU library book cart, they are not permitted to visit the prison's library and must sign up on a list to gain access to the cart.

14

There are restrictions as to materials that may be brought back into the cells.  (Ex. 1 at pp. 15-18; DFF ¶¶ 28-29; ; PFF ¶ 21).

42.     DDU inmates are given physical and mental health screenings before being placed in the unit originally.  (Ex. 1 at p. 4; DFF ¶ 30).  As the DOC's expert acknowledged, these screenings do not involve an in-depth analysis of the inmate's mental condition.  (Katz III:26).  It appears that Ford had a screening in 2007, but received no other screenings during the remainder of his confinement in the DDU.  (Ex. 28).  However, pursuant to DOC policy, Ford would have received routine visits from medical and mental health staff while he remained in his cell.  (Ex. 1 at p. 4).

## Alternative Housing

43.     It is the DOC's contention that if Ford was not housed in the DDU, he would have been placed in the Special Management Unit ("SMU") at either MCI-Cedar Junction or SBCC "because he presented such serious safety and security concerns to staff, other inmates and the operation of Department institutions."  (DFF ¶ 31).  As detailed infra, the court does not find persuasive the DOC's contention that there was no alternative other than segregation.  This court's conclusion is buttressed by the fact that Ford was placed in the general population at SBCC following this trial.

44.     According to 103 C.M.R. § 423.08(1), placement in an SMU "may occur in instances such as, but not limited to, when an inmate: (a) [i]s awaiting a hearing for a violation of institution rules or regulations; (b) [i]s awaiting an investigation of a serious violation of institution rules or regulations; (c) [i]s pending investigation for disciplinary

15

offenses or criminal acts that may have occurred while incarcerated; (d) [r]equests

admission to administrative segregation for his/her own protection or staff recommends

that placement in or continuation of such status is necessary for the inmate's own

protection and that no reasonable alternatives are available; (e) [i]s pending transfer;

(f) [i]s pending classification; (g) [i]s placed in administrative segregation following a

disciplinary hearing."  (Ex. 17; DFF ¶ 34).  Placement in the SMU is supposed to be

temporary, although according to the DOC "it is not uncommon for inmates to remain in

an SMU for months or even years while awaiting transfer out of state."  (DFF ¶ 33; Ex.

17 at § 423.06; PFF ¶ 69).  All the witnesses agreed that 375 days is not "temporary."

     45.    The conditions of confinement in the SMU at either MCI-Cedar Junction

(known as Ten Block) or at SBCC are severe, in that inmates are confined in their cells

for 23 hours per day, eat their meals alone in their cells and are otherwise restricted.  (See

DFF ¶¶ 39-48).  To the extent that the conditions are less restrictive in the SMU than in

the DDU, they are not significantly so.  Of some importance, however, in the SMU phone

and visitation privileges do not have to be earned as they do in the DDU.  (St. Amand

II:85-86).  Since Ford had earned and maintained the maximum number of visits and

phone calls while in the DDU as a pretrial detainee, this difference would not have

affected him to any significant extent, if at all.

     46.    On the other hand, there are a number of procedural safeguards to ensure

that the stay in segregation is only as long as necessary, as it is not intended to be a

permanent housing alternative.  (<u>See</u> Mici II:157 "it certainly isn't the goal to leave him in segregation, but sometimes you have no alternatives").

47.     Inmates in the SMU are reviewed within 72 hours of placement, then every 7 days for the first 2 months and at least every 30 days thereafter in order to determine whether their confinement in the SMU remains appropriate.  (Ex. 17 at § 423.08(2)(b)). The factors to be considered in the review include the reasons for the placement, threat to institutional security, any pending disciplinary issues, classification issues, enemy situations, mental health issues, attitude towards authority, and willingness and ability to live with others.  (PFF ¶ 74),  No such reviews are provided to inmates in the DDU. (PPF ¶ 75).  Accordingly, there was no consideration as to how Ford would have fared if all such factors had been applied to him.

48.     Ford contends that he could have been placed in the general population either at SBCC or at Cedar Junction.  There is some question as to whether Cedar Junction was an alternative as one of the guards involved in the 2002 assault incident was still employed there.  (St. Amand II:81).  In either location, however, the conditions of the general population are much less restrictive than they are in the SMU or the DDU.

49.     Inmates in the general population are only locked down overnight (from 10 p.m. to 7:30 a.m.) and from about 11:30-12:30 in the afternoon.  (St. Amand Depo: 38-40).  Inmates either work or go to the yard in the morning and afternoon, there are areas in which they can congregate, and they have an unlimited number of phone calls.  (<u>Id.</u>). Inmates in general population have exercise periods of 2½ hours per day and can shower

and shave every day.  Use of the radios and televisions do not have to be earned.

Moreover, inmates are permitted 3 visits per week, although they are no-contact visits.

Strip searches are not routinely applied, nor are the inmates shackled every time they are

out of their cells.  (Id. at 41-45).  Inmates eat together in general population and there are

many more opportunities for social interactions with others.  (Id. at 38-39, 41-46).

50.     Inmates in general population live in a cell with a barred cell door instead

of a solid door, making communication with others easier.  They also have windows in

the cell.  They have access to the law library several times a week.  (PFF ¶¶ 57-58, 60).

### Ford's Physical Condition in DDU

51.     Ford suffers from Hepatitis C and Type 1 Diabetes — conditions which

pre-existed his confinement in the DDU as a pretrial detainee.  (PFF ¶ 22; DFF ¶ 54).

Moreover, diabetes is very common in his family.

52.     There is no claim that Ford's diabetes was caused by his confinement in the

DDU.  On the other hand, Ford submitted evidence, which this court finds credible, that

his confinement in the DDU limited the options available for the treatment for his

condition.  The long-term consequences of this is unknown.  However, in the short term,

Ford suffered side effects as a result of the limited treatment options.

53.     According to Dr. Bernard Katz, the DOC's expert, the best way to control

diabetes is through diet, exercise and insulin.  (Katz III:57).  As detailed above, Ford's

access to exercise was extremely limited in the DDU.

18

54.     Also according to Dr. Katz, under ideal conditions a person's blood sugar count is under 100 in the morning, and around 110 during the day.  (Katz III:56).

55.     Ford submitted evidence that on occasion while in the DDU as a pretrial detainee, his afternoon sugar count was in the 300-400's.  (See PFF ¶ 24; Exs. 29 & 30). When his sugar is that high, Ford suffers from headaches, feels dizzy, his heart pumps fast and he gets shakes and tremors.  (Ford I:134).  While he was out on bail, Ford took insulin 3 times per day to prevent this rise in his blood sugar.  (Ford I:136-37).  That alternative was not available to Ford while in the DDU as there were not nurses available more than twice a day.  (Ford I:135; see also DFF ¶ 57; PFF ¶ 23).

56.     According to Dr. Katz, there is a great deal of trial and error in controlling diabetes, and there needs to be a lot of coordination among those prescribing the treatment.  (Katz III:61).  The treatment options were more limited by the restrictions placed on Ford's physical mobility in the DDU.

57.     Ford experienced pain and numbness in his feet and ankles from his diabetes.  He testified, and I find credible, that this condition worsened during the period of his pretrial detention in the DDU and he continues to suffer from burning and numbness to this day.  (PFF ¶ 23; Ford I:139-40).

58.     Ford also suffered cuts on his legs as a result of wearing leg irons in the DDU.  (PFF ¶ 26).  As detailed above, while in the DDU he was shackled each time he left his cell for any reason.  Because of his diabetes, Ford cannot feel the cuts, as a result of which they have become infected on occasion.  (Ford I:137).  While the DOC has

given Ford ankle sleeves to try and ameliorate the rubbing, it has not solved the problem completely.  If Ford had been housed in general population, he would not have had to wear leg irons every time he was moved out of his cell.

### Mental and Emotional Injuries

59.     When Ford was housed in the DDU after his bail was revoked in June 2007, he suffered from depression, anxiety, insomnia and anorexia.  (PFF ¶ 38).  In addition, he experienced feelings of helplessness and despair, was reluctant to leave his cell to exercise and declined visits from his family and the pastor of his church.  (PPF ¶ 40).  Ford lost 14 pounds in three months in 2008.  (PPF ¶ 41).  Ford's dosage of Wellbutrin, used to treat depression, was increased by prison medical staff during the period of his pretrial detention.  (PPF ¶ 46).

60.     The DOC contends that these emotional conditions were caused simply by the fact that Ford had been re-arrested after being out on bail, and had nothing to do with the fact that Ford was housed in the DDU.  This court disagrees.  Rather, this court finds credible Ford's and Dr. Grassian's testimony that while Ford was out on bail he realized how much being housed in the DDU had negatively impacted his ability to engage in normal social interactions.  For example, but without limitation, while out on bail he realized he had become overly sensitive to sounds, had difficulty engaging in casual conversation with others, and struggled with feelings of paranoia.  (See Ford I:123-25; Grassian II:51-52).  When he was returned to the DDU, as opposed to the general

20

population, Ford had to confront the reality that his ability to engage in normal social interactions would again be seriously impaired.  (See Ford 1:127-29).

61.     Thus, while Ford may have been unhappy at having been re-arrested and returned to jail, this court credits the testimony of Ford and Dr. Grassian that Ford's serious mental anguish was caused by the fact that he was housed in the DDU upon his return to DOC custody.

62.     The finding that Ford suffered mental anguish due to being placed in the DDU, and not just back in prison, is further supported by the fact that he wrote to the DOC Commissioner objecting to being housed in the DDU as a pretrial detainee. (Ex. 20).

63.     Dr. Stuart Grassian, a board certified psychiatrist, testified on behalf of the plaintiff.  He had extensive experience with the effects of segregated confinement.  (PFF ¶ 27).

64.     Dr. Bernard Katz, a board certified psychiatrist employed by the Worcester County Jail and House of Corrections, testified on behalf of the DOC.  (PFF ¶ 29).

65.     This court accepts Dr. Grassian's testimony, which Dr. Katz does not dispute, that Ford suffered from depression, anxiety, insomnia and anorexia in June 2007 when he was returned to DOC custody after his bail had been revoked.[4]  (PFF ¶ 38).  On

---

[4] Dr. Grassian had met with Ford several times in 2007.  He assessed Ford to determine whether he should be sentenced to probation on the assault charges, and opined at the time that Ford was suitable for probation.  (PFF ¶ 28; Ex. 11).

the other hand, this court does not find persuasive Dr. Grassian's opinion that segregated confinement in conditions such as that found in the DDU causes sensory deprivation, which leads to an impairment in mental functioning.  (PFF ¶ 32).

66.     This court finds that Dr. Grassian did not take into consideration the actual interactions Ford had on a day-to-day basis.  In particular, Ford was able to interact with healthcare providers, mental health staff, other inmates, correctional staff, visitors and counselors.  (See DFF ¶¶ 19, 23, 27, 62).  Thus, this court does not find Dr. Grassian's assessment as to the drastic affect of segregation on inmates to be relevant to the instant case since that assessment is premised on conditions which are much more severe than those Ford experienced in the DDU.  Rather, this court accepts Dr. Katz's opinion that Ford did not suffer from any major mental illness at any time throughout his incarceration.  (DFF ¶ 59).

67.     Ford is scheduled to remain in custody through April 2012.

68.     All the experts agreed that it is preferable to release an inmate to the community from general population, as opposed to the DDU.  It is recommended that inmates participate in programs offered by the DOC especially designed to assist them in transitioning into the community.  (See Katz III:55-56).

## III.  RULINGS OF LAW

1.      This action was brought under 42 U.S.C. § 1983 ("Section 1983").[5]  Section

1983 provides a cause of action against any "person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be

subjected, any citizen of the United States or other person within the jurisdiction thereof

to the deprivation of any rights, privileges, or immunities secured by the Constitution and

laws[.]"  42 U.S.C. § 1983.

### Availability of Money Damages

2.      Ford is seeking money damages which will compensate him for the harm

that he suffered during the 375 days that he was confined unconstitutionally in the DDU

as a pretrial detainee.  State officials sued in their individual capacities are subject to

liability for damages under Section 1983.  See Hafer v. Melo, 502 U.S. 21, 31, 112 S. Ct.

358, 365, 116 L. Ed. 2d 301 (1991).  Because Ford has established liability against

Bender and St. Amand in their individual capacities, he is entitled to recover money

damages.

3.      "[T]he basic purpose of § 1983 damages is to compensate persons for

injuries that are caused by the deprivation of constitutional rights."  Memphis Comty.

Sch. Dist. v. Stachura, 477 U.S. 299, 307, 106 S. Ct. 2537, 2543, 91 L. Ed. 2d 249 (1986)

(quotations, citations and emphasis omitted).

---

[5]  Although Ford also brought claims under the Massachusetts Declaration of Rights, he
has elected to pursue damages under Section 1983.

4.      Thus, Ford must prove that he was injured by the defendants' actions in confining him in the DDU for 375 days in violation of his constitutional rights.  See Crispin-Taveras v. Municipality of Carolina, 647 F.3d 1, 9 (1st Cir. 2011) (plaintiff "must prove the defendants' actions caused the damages[.]").  If proven, the plaintiff is entitled to "all damages that are the 'natural consequences of [the defendants'] actions.'"  Burke v. McDonald, 572 F.3d 51, 60 (1st Cir. 2009) (quoting Malley v. Briggs, 475 U.S. 335, 344 n.7, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

5.      The plaintiff has the burden of establishing his damages by a preponderance of the evidence.  See Crispin-Taveras, 647 F.3d at 9.

6.      The defendants contend that Ford is precluded from recovering any monetary damages because he suffered no physical injury and that, therefore, monetary damages are precluded under § 1997(e) of the Prison Litigation Reform Act ("PLRA").  Ford contends (1) that the absence of physical injury is an affirmative defense which the defendants failed to plead and, therefore, waived; (2) that no physical injury is required to recover damages where, as here, the defendants deprived him of his constitutional due process rights; and (3) that the physical harm he suffered, including but not limited to injuries to his ankles caused by the repeated use of leg irons, is sufficient to satisfy the physical harm requirement of the PLRA.  Recognizing that these arguments raise unre-solved issues of law in this jurisdiction, this court finds all of the plaintiff's arguments persuasive.  Therefore, and for the reasons detailed herein, this court finds that Ford has proven by a preponderance of the evidence that he suffered and is entitled to monetary

24

compensation for his actual injury, including, <u>inter alia</u>, the loss of privileges, deterioration in his physical health, and mental and emotional anguish, as a result of the defendants' unconstitutional conduct.

### Application of 42 U.S.C. § 1997e(e)

7.    The DOC defendants argue that under section 1997e(e) of the PLRA, Ford is precluded from recovering compensatory damages because he has not shown that he suffered a physical injury as a result of his pretrial confinement in the DDU.  Prior to 1996, actual physical injury was not required to maintain a claim under Section 1983 for compensatory damages based on mental and emotional distress.  <u>See</u>, <u>e.g.</u>, <u>Memphis Comty. Sch. Dist.</u>, 477 U.S. at 307, 106 S. Ct. at 2543 ("compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering" (quotations, citation and punctuation omitted)).  However, in 1996, Congress enacted the PLRA, which "was intended to reduce frivolous prisoner litigation about conditions of confinement and conserve scarce judicial resources."  <u>Shaheed-Muhammad v. Dipaolo</u>, 138 F. Supp. 2d 99, 108-09 (D. Mass. 2001).  Section 1997e(e) of the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  Thus, the PLRA "limit[s] access to the federal courts for certain prisoner claims, namely those for

emotional distress unaccompanied by physical harm." Shaheed-Muhammad, 138 F.

Supp. 2d at 101.

       8.     Ford asserts that the defendants have waived any defense under section

1997e(e) of the PLRA because they failed to assert it as an affirmative defense in their

Answer.  This court agrees.  While this issue has not been addressed by the First Circuit,

the only circuit court that has explicitly addressed the procedural nature of 42 U.S.C.

§ 1997e(e) has held "that the limitation of complaints by prisoners for emotional injury,

42 U.S.C. § 1997e(e), provides an affirmative defense[.]" Douglas v. Yates, 535 F.3d

1316, 1320 (11th Cir. 2008).  As the Douglas court held, the language of § 1997e(e)

parallels the language of § 1997e(a), which states that "[n]o action shall be brought with

respect to prison conditions . . . by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted."

Douglas, 535 F.3d at 1320.  The Supreme Court has expressly held that the § 1997e(a)

exhaustion requirement is an affirmative defense.  Id. (citing Jones v. Bock, 549 U.S.

199, 216, 127 S. Ct. 910, 921, 166 L. Ed. 2d 798 (2007)).  Since "normal rules of

statutory construction" require that "similar language contained within the same section

of a statute must be accorded a consistent meaning," § 1997e(e) should also be read as

creating an affirmative defense.  Douglas, 535 F.3d at 1320-21 (citation omitted).  See

also Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999) (noting that a defendant may

assert the physical injury requirement of § 1997e(e) as an affirmative defense in a suit by

a prisoner under Section 1983).  But see In re Nassau Cnty. Strip Search Cases, No. 99-

CV-2844 (DRH), 2010 WL 3781563, at *2 (E.D.N.Y. Sept. 22, 2010) (§ 1997e(e) is only a "limitation on recovery" and not an affirmative defense than can be waived).

9.      "An affirmative defense must be pleaded (as Fed. R. Civ. P. 8(c) requires) or it will be deemed waived." Alexander v. Univ. of Mass. Med. Sch., Civil Action No. 09-10776-RGS, 2009 WL 4030815, at *2 (D. Mass. Nov. 20, 2009).  Therefore, this court holds that a defense based on § 1997e(e) is "waived when not asserted in the answer." Caldwell v. District of Columbia, 201 F. Supp. 2d 27, 34 (D.D.C. 2001).

10.      In the instant case, the defendants failed to raise the physical injury require-ment of § 1997e(e) as a defense in their Answer, or at any time prior to their pretrial submissions, even though Ford specifically alleged at the pleading stage that his "confine-ment to the DDU as a pretrial detainee has caused him emotional stress, anxiety, and anguish."  (Am. Compl. (Docket No. 52) ¶ 53; see also DOC Def. Ans. (Docket No. 55) at 14-15).  This court concludes that under such circumstances, any defense that the defendants might have had under § 1997e(e) of the PLRA has been waived, and Ford's claim for compensatory damages is not subject to the physical injury limitation of § 1997e(e).  Compare Searles v. Van Bebber, 251 F.3d 869, 874 (10th Cir. 2001) (no waiver of section 1997e(e) defense where plaintiff did not plead, or include in his pretrial order, a claim for mental and emotional damages).

11.      Even if the defendants had not waived their defense under § 1997e(e) of the PLRA, the provision would not prevent Ford from recovering compensatory damages

based on the fact that he was deprived of privileges as a result of being unconstitutionally

held in the DDU as a pretrial detainee and without a hearing.

12.     To date, the First Circuit has not addressed the extent to which § 1997e(e)

precludes recovery for compensatory damages where, as here, a due process constitu-

tional violation has been established, and other courts are split on the issue.  At least two

circuit courts, the District of Columbia and the Eleventh Circuit, "have concluded that

prisoner suits alleging constitutional violations without accompanying physical injury

must be dismissed in their entirety."  Shaheed-Muhammad v. Dipaolo, 393 F. Supp. 2d

80, 107 (D. Mass. 2005), and cases cited.  "The Seventh and Ninth Circuits, on the other

hand, have concluded that suits alleging constitutional violations are outside the purview

of 1997e(e)" altogether.  Id., and cases cited.  Those courts have found that the depriva-

tion of constitutional rights "entitles a plaintiff to judicial relief wholly aside from any

physical injury he can show, or any mental or emotional injury he may have incurred."

Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir. 1998).  See also Oliver v. Keller, 289

F.3d 623, 630 (9th Cir. 2002) ("To the extent that appellant's claims for compensatory

. . . damages are premised on alleged Fourteenth Amendment violations, and not on

emotional or mental distress suffered as a result of those violations, § 1997e(e) is

inapplicable and those claims are not barred."); Rowe v. Shake, 196 F.3d 778, 781-82

(7th Cir. 1999) ("A prisoner is entitled to judicial relief for a violation of his First

Amendment rights aside from any physical, mental, or emotional injury he may have

sustained."); Robinson v. Page, 170 F.3d 747, 748 (7th Cir. 1999) ("when . . . a prisoner

alleges [a constitutional] injury that is neither mental nor emotional, the court has no occasion to consider the meaning of the statutory term 'physical injury[.]'").  "Still other courts have chosen a middle path, holding that claims for constitutional violations absent physical injury need not be dismissed outright, but that § 1997e(e) limits recovery to nominal and punitive damages (in addition to injunctive and declaratory relief)."  Shaheed-Muhammad, 393 F. Supp. 2d at 108.  Those "courts reason that allowing compensatory damages in the absence of physical injuries would amount to recovery for mental or emotional injury."  Id., and cases cited.

13.    For the reasons detailed below, this court agrees that the deprivation of constitutional rights can constitute compensable injuries regardless whether there are claims for mental and emotional harm.  See Memphis Comty. Sch. Dist., 477 U.S. at 316, 106 S. Ct. 2547-48 (Marshall, J. concurring) (deprivations of constitutional rights can in and of themselves constitute compensable injuries; to hold otherwise "would defeat the purpose of § 1983 by denying compensation for genuine injuries caused by the deprivation of constitutional rights.").  Therefore, this court holds with those courts that have found that § 1997e(e) does not preclude Ford from recovering for injuries caused by the deprivation of his due process constitutional rights, as distinct from his claims for mental and emotional harm.

14.    As an initial matter, § 1997e(e) bars prisoners "from bringing into federal court an action 'for' emotional damages suffered while in custody, unaccompanied by physical injury."  Shaheed-Muhammad, 138 F. Supp. 2d at 107.  As this wording makes

29

clear, § 1997e(e) "is applicable only to claims for mental or emotional injury.  It has no

application to a claim involving another type of injury."  <u>Robinson</u>, 170 F.3d at 748.  Due

process claims are not claims for emotional damages.  Rather, they "are claims for

violations of abstract rights."  <u>Shaheed-Muhammad</u>, 138 F. Supp. 2d at 108.  "Due

Process is offended when state actors deprive someone of constitutionally protected

liberty or property interests without adequate procedural safeguards[.]"  <u>Id.</u>  "While [the]

violation [of due process] may be accompanied by emotional or even physical injury, an

action under § 1983 is not brought to redress such harms."  <u>Id.</u>  <u>See also</u> <u>Oliver</u>, 289 F.3d

at 630 (holding that "§ 1997e(e) applies only to claims for mental and emotional injury"

and not to claims for compensatory damages that "are premised on alleged Fourteenth

Amendment violations[.]"); <u>Rowe</u>, 196 F.3d at 781 (finding that claims for deprivation of

substantive constitutional rights, as opposed to claims for mental or emotional injury, do

not implicate section 1997e(e)); <u>Canell</u>, 143 F.3d at 1213 (finding claim of violation of

inmate's First Amendment rights "entitles a plaintiff to judicial relief wholly aside from

any . . . mental or emotional injury he may have incurred.").

15.     Moreover, Congress' purpose in enacting the PLRA was "to reduce

frivolous prisoner litigation about conditions of confinement and conserve scarce judicial

resources."  <u>Shaheed-Muhammad</u>, 138 F. Supp. 2d  at 109.  "[I]t was not its purpose to

insulate from review all claims in which legitimate constitutional issues predominate

without accompanying physical harm."  <u>Id.</u>

16.     Where, as here, "the harm that is constitutionally actionable is the violation of intangible rights – regardless of actual physical or emotional injury – section 1997e(e) does not govern." Shaheed-Muhammad, 138 F. Supp. 2d at 107.  Accordingly, even if the defendants had not waived their defense under § 1997e(e), the PLRA would not limit Ford's ability to recover compensatory damages for the deprivation of privileges that he suffered as a result of the defendants' violation of his constitutional rights.  See Shaheed-Muhammad, 393 F. Supp. 2d at 108 (concluding, along with the Seventh and Ninth Circuits, "that § 1997e(e) is inapplicable to suits alleging constitutional injuries."); Gordon v. Pepe, No. Civ. A. 00-10453-RWZ, 2004 WL 1895134, at *2 (D. Mass. Aug. 24, 2004) ("the PLRA's physical injury requirement, 42 U.S.C. § 1997e(e), does not compel summary judgment where plaintiff seeks damages for First Amendment violations, not for emotional distress.").

17.     Finally, this court concludes that, in any event, § 1997e(e) does not bar Ford's claim for compensatory damages, including damages based on emotional distress, because the plaintiff has proven physical injury which is sufficient to satisfy the PLRA.

18.     "Although the First Circuit has not elaborated on what constitutes a physical injury, other courts have held that the physical injury 'must be more than *de minim[i]s*, but need not be significant.'" Skandha v. Savoie, – F. Supp. 2d –, 2011 WL 3654457, at *2 (D. Mass. Aug. 18, 2011) (quoting Oliver, 289 F.3d at 627).

19.     In the instant case, Ford has established that for the 375 days he was unlawfully in the DDU as a pretrial detainee, he had leg shackles placed on him every

31

time he was removed from his cell.  Similarly, while he was allowed to "exercise," he was in leg chains.  The leg irons caused cuts on Ford's legs.  Because Ford is diabetic, he could not always feel the cuts, and they have become inflected on occasion.  In addition Ford has established that he suffers from pain and numbness in his feet and ankles, which has worsened over time as a result of the use of leg irons.

20.    This court finds that Ford was subjected to the leg irons much more frequently in the DDU than he would have been if he was in general population.  The actual injury to his legs caused by the leg irons, including cuts and infections, is sufficient to meet the physical injury requirement of the PLRA.

21.    Ford has also established that he suffered from uncontrolled diabetes on occasion while he was in the DDU, and that his ability to have his blood sugar levels tested during the day were severely limited due to a lack of nurses available to do the testing for inmates in the DDU.  If, however, Ford had been in general population, he would have had the option of more frequent testing.

22.    While his blood sugar levels were too high, Ford suffered from headaches, felt dizzy, his heart pumped fast, and he got shakes and tremors.  This court finds that these episodes are sufficient physical injury to meet the requirements of the PLRA.

23.    Ford also contends that there may be a long term impact on his diabetes due to his limitations on exercise and fluctuating sugar count.  There was no medical evidence on this subject and the issue whether potential future physical harm is sufficient to satisfy the PLRA's physical harm requirement is an open question.  See Robinson, 170 F.3d at

32

749 ("The question we shall leave open is whether the 'physical injury' that is the
predicate for an award of damages for mental or emotional suffering must be a palpable,
current injury (such as lead poisoning) or a present condition not injurious in itself but
likely to ripen eventually into a palpable physical injury.").  This court does not rely on
any potential future harm in concluding that Ford has met any actual physical injury
requirement under the PLRA.

    24.    Finally, the defendants seem to argue that the injuries that Ford suffered in
the DDU must be different in kind between the period he was in the DDU unlawfully and
lawfully.  This court does not agree.  It does not matter if Ford also suffered leg injuries
when he was lawfully serving time in the DDU.  He is entitled to recover for the harm he
suffered when he was in the DDU in violation of his constitutional rights.

    25.    In sum, the physical injuries that the plaintiff has suffered as a result of his
unlawful confinement in the DDU, including the headaches, dizziness and tremors he
experienced as a result of his unmanaged blood sugar levels; the worsening pain and
numbness in his feet and ankles; and the cuts and infections he sustained as a result of
having to wear leg irons are more than de minimis.  See, e.g., Caldwell, 201 F. Supp. 2d
at 33-34 (finding that evidence of heat exhaustion, severe rash, bronchial irritation due to
smoke, choking and sneezing caused by frequent use of mace, and aggravation of back
pain and arthritis due to size of bunk constituted "significant physical injury which [was]
more than sufficient to satisfy the PLRA.").  Accordingly, § 1997e(e) does not limit
Ford's claim for damages regardless of the type of injury he is alleging.

**Measure of Damages**

26.     Where an inmate has been unlawfully held in segregated confinement, an appropriate measure of damages is "the difference between the harsher . . . conditions suffered in segregation and the conditions that prevailed in the general prison population." Furtado v. Bishop, 604 F.2d 80, 89 (1st Cir. 1979) (awarding up to $50/day to plaintiff inmate). See also Pino v. Dalsheim, 605 F. Supp. 1305, 1319 (S.D.N.Y. 1984) (determining compensatory damage award by comparing unfavorable conditions experienced by plaintiff while in special housing unit to conditions experienced by inmates in general prison population; awarding $25/day).

27.     As detailed supra, this court is not persuaded that the only alternative to housing Ford in the DDU would have been to place him in the SMU rather than in general population.  Ford is presently serving time in general population, apparently without incident.  To the extent that there is any uncertainty as to where Ford would have been placed if his due process rights had been satisfied and a hearing held, it is the defendants who should bear the risk of that uncertainty.  See In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 689 (2d Cir. 2009) ("the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created'" (quoting Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 66 S. Ct. 574, 90 L. Ed. 652 (1946)).  Therefore, Ford is entitled to a monetary sum that will fairly compensate him for the loss of privileges he

endured as a result of being held in the DDU rather than in the general prison population for 375 days.

28.     Given the extreme differences between the conditions and privileges between the DDU and general population, this court awards damages at a rate of $100/day, for a total of $37,500.  This amount seems generally consistent with awards in comparable situations.  See, e.g., Smith v. Rowe, 761 F.2d 360, 368 (7th Cir. 1985) (upholding jury award of approximately $119/day for unlawful confinement in punitive segregation based on evidence that plaintiff lost privileges, endured "physical dis-comforts," and "suffered substantial mental anguish, humiliation, and degradation[;]" acknowledges other per diem awards of $212 and $129/day); McClary v. Coughlin, 87 F. Supp. 2d 205, 218-19 (W.D.N.Y. 2000) (awarding damages for unconstitutional confinement in segregation based on conditions of confinement, as well as on "the resulting devastation such isolation had on [plaintiff's] mental and physical health[;]" survey reveals awards ranging from $100-150/day).

29.     In light of the physical injuries that Ford sustained, he may also recover damages for the mental and emotional distress he suffered as a result of the unconstitu-tional conduct.  "A plaintiff does not need to present expert testimony to recover damages for emotional distress caused by the violation of his civil rights."  Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 47 (1st Cir. 2009).

30.     The defendants contend that Ford is not entitled to emotional distress damages because there was no emotional distress caused by his being in the DDU as a

pre-trial detainee specifically.  In addition, the DOC defendants contend that Ford was just upset that he was back in jail, not that he was housed in the DDU in particular.  For his part, the plaintiff argues that it was harder for him to be in the DDU as a pretrial detainee, and his damages were greater, because he knew he should not have been there as a pretrial detainee.

31.     As detailed above, this court credits Ford's testimony that being housed in the DDU after his bail was revoked, as opposed to being in the general population, caused Ford mental anguish.  Since his placement in the DDU was unconstitutional, he is entitled to recover emotional distress damages.

32.     As detailed above, Ford suffered from depression, anxiety, insomnia and anorexia upon being placed in the DDU, which is a much more restrictive environment than general population.  Because Ford has proven by a preponderance of the evidence that the defendants' conduct caused him to suffer mental and emotional distress, he is entitled to damages that will fairly compensate him for those harms.  This court sets the amount of such damages at $10,000.

**Injunctive Relief**

33.     State officials sued in their official capacities may be liable for injunctive relief under Section 1983.  See Hafer, 502 U.S. at 31, 112 S.Ct. at 365.  Because Ford has established liability against Bender and St. Amand in their official capacities, he has established a right to injunctive relief.

34.     The PLRA provides in relevant part as follows:

36

> Prospective relief in any civil action with respect to prison condi-
> tions shall extend no further than necessary to correct the violation
> of the Federal right of a particular plaintiff or plaintiffs.  The court
> shall not grant or approve any prospective relief unless the court
> finds that such relief is narrowly drawn, extends no further than
> necessary to correct the violation of the Federal right, and is the least
> intrusive means necessary to correct the violation of the Federal
> right.  The court shall give substantial weight to any adverse impact
> on public safety or the operation of a criminal justice system caused
> by the relief.

18 U.S.C. § 3626(a)(1)(A).

35.    Because Ford has been released from the DDU and has been placed in the general prison population at SBCC, this court finds it unnecessary to grant his request for injunctive relief (1) enjoining the defendants from further violating his substantive and procedural due process rights through the imposition of unlawful or expired disciplinary sanctions; (2) directing the defendants to assist Ford in his transition from restrictive confinement in the DDU to prepare for his release from incarceration in April 2012; or (3) directing the defendants to provide Ford with individual counseling at least once a week for the remainder of his sentence.  However, this court finds, consistent with the PLRA's directive, that Ford is entitled to relief in the form of an order (1) instructing the DOC to ensure that Ford has, and continues to have for the remainder of his sentence, opportunities to participate in any transitional programs that are available to general population inmates; and (2) directing the DOC to deem satisfied Ford's 10-year DDU sanction that was issued in 2002.

## **JUDGMENT**

For all the reasons detailed herein, judgment shall be entered in favor of the plaintiff and against the defendants in their individual and official capacities in the amount of $47,500.

An injunction shall issue ordering (1) that the DOC shall ensure that Ford has, and continues to have for the remainder of his sentence, opportunities to participate in any transitional programs that are available to general population inmates; and (2) directing the DOC to deem satisfied Ford's 10-year DDU sanction that was issued in 2002.

   / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge