UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALBERT FORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 07-11457-JGD |
| JAMES BENDER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND BILL OF COSTS

August 17, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

This matter is presently before the court on the Plaintiff's Motion for Attorneys' Fees and Bill of Costs.  (Docket No. 213).  In May 2008, Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") was appointed to represent the plaintiff Albert Ford, who was incarcerated in the Department Disciplinary Unit ("DDU") at MCI-Cedar Junction as a pretrial detainee, and later as a convicted inmate, without a hearing.  In September 2010, summary judgment was entered in Ford's favor on his claim that his detention in the DDU without a hearing violated his constitutional rights.  Following a three day jury-waived trial on the issue of damages, in January 2012, Ford was awarded $47,500 in damages and injunctive relief to declare his DDU sanction satisfied and to help him transition into the general population prior to his release from incarceration.

By their motion, WilmerHale is seeking fees in the amount of $345,542.00 and costs in the amount of $20,456.36.  They contend that this is a significantly reduced amount from the hours actually expended in Ford's defense.  The defendants have raised numerous legal and factual objections to the motion.  For the reasons detailed herein, this court orders that the defendants pay WilmerHale attorneys' fees in the amount of $258,000.00 and costs in the amount of $20,456.36.

In so ruling, this court stresses that the quality of the work performed was excellent, and that the attorneys were well-prepared, professional and dedicated to their client and the case.  The reduction in the amount of fees awarded does not reflect a view that the work reported in the time sheets was not done, or that it was not done well.  Rather, as detailed below, in this court's view the work on certain issues is not compensable under the PLRA and, at times, the amount of work done on certain issues was excessive, and involved more meetings and re-writes than are appropriately charged to the defendants.  Nevertheless, as Judge Stearns stated in Hudson v. Dennehy, in language that is applicable here, "[t]his was an important and complex case that presented an issue of first impression in this Circuit.  The action had been pending for [a while] before [WilmerHale] agreed to serve as [Ford's] counsel pro bono.  Prisoner cases are notoriously unpopular among the private bar as pro bono candidates.  [WilmerHale's] agreement to take this case and the commensurate risk of receiving no payment at all is commendable.  . . .  Judgment was a solid result for the plaintiff[].  Although the case was not brought as a class action, it involved challenges to institutional practices that are

likely to impact future cases." Hudson v. Dennehy, 568 F. Supp. 2d 125, 133-34 (D.

Mass. 2008).  Counsel certainly earned the fees awarded here.

## II.  STATEMENT OF FACT

### Pre-trial Work

Ford commenced this action on July 31, 2007, proceeding *pro se.*  (Docket No. 1).

On May 8, 2008, WilmerHale was appointed as *pro bono* counsel.  (Docket No. 44).  On

July 11, 2008, WilmerHale filed a Second Amended Complaint, naming as defendants the

Massachusetts Department of Correction; Harold Clarke, the Commissioner of

Correction; James Bender, the Deputy Commissioner of the Prison Division of the DOC;

Peter St. Amand, the Superintendent of MCI-Cedar Junction; Kenneth Nelson, the

Assistant Deputy Commissioner, Southern Division of the DOC; and Michael Bellotti,

the Norfolk County Sheriff.  (Docket No. 52).  Therein, Ford brought claims under 42

U.S.C. § 1983 alleging that his detention in the DDU violated his substantive due process

rights under the Fourteenth Amendment (Count One) and under the Massachusetts

Declaration of Rights (Count Two), his procedural due process rights under the

Fourteenth Amendment (Count Three) and the Massachusetts Declaration of Rights

(Count Four), his right to effective assistance of counsel under the Sixth Amendment

(Count Five) as well as under the Massachusetts Declaration of Rights and state law

(Count Six), his rights to equal protection under the Fourteenth Amendment (Count

Seven) and the Massachusetts Declaration of Rights (Count Eight), his right to be free

from "infamous punishment" under the Massachusetts Declaration of Rights (Count

Nine), and various Massachusetts statutes.  (Counts Ten and Eleven).  He sought

monetary, declaratory and injunctive relief.

Defendant Bellotti moved to dismiss the complaint against him, which

WilmerHale opposed and which was denied without prejudice.  (Docket Nos. 58, 62, 75).

WilmerHale engaged in discovery on Ford's behalf, which included drafting and

responding to discovery requests, the production and review of thousands of pages of

documents, and the depositions of 10 fact witnesses.  (See WilmerHale Mem. (Docket

No. 214) at 2).   According to WilmerHale, counsel had difficulty gaining access to their

client, and were forced to file a motion "to compel DOC to comply with regulations

governing telephone access to counsel."  (Docket No. 65).  The matter was eventually

resolved by agreement.  (Docket No. 69).

## The Summary Judgment Motions

On September 14, 2009, Bellotti filed a motion for summary judgment (Docket

No. 87), as did the DOC defendants (DOC, Clarke, Bender, Nelson and St. Amand).

(Docket No. 90).  Ford filed a motion for partial summary judgment on that date as well.

(Docket No. 94).  There was extensive briefing and oral argument.

On December 1, 2009, the court granted Bellotti's motion for summary judgment.

(Docket No. 121).  On September 30, 2010, this court issued a decision on the remaining

cross-motions for summary judgment.  (Docket No. 130).  Judgment was entered in

accordance with this decision on November 16, 2010.  (Docket No. 140).  This court

ruled that the defendants Bender and St. Amand, acting in both their individual and

official capacities, violated Ford's substantive due process rights under the United States

Constitution and the Massachusetts Declaration of Rights by confining him in the DDU

as a pretrial detainee as punishment for misconduct that occurred while Ford was serving

a prior sentence, which had since been completed.  (Docket No. 140).  In addition, the

court declared, based on the same conduct, that Bender, acting in both his individual and

official capacities, had violated's Ford's federal and state constitutional rights to

procedural due process by incarcerating Ford in the DDU without affording him a new

hearing, and that Bender, in his official capacity, had violated Ford's federal and state

procedural due process rights by confining Ford in the DDU following his 2008

conviction, again without affording him a new hearing.  (Docket No. 140).  The claims

against the DOC and Clarke and Nelson were dismissed without opposition, as were

Counts Five, Six, Ten and Eleven against all defendants, and the procedural due process

claims contained in Counts Three and Four against St. Amand.  (See Docket No. 130 at

n.1).  The defendants' motion for summary judgment as to the equal protection claims

(Counts Seven and Eight) was denied as there were material facts in dispute.

### Subsequent Proceedings

Following the summary judgment decision, Ford filed a "Motion for Release from

Unlawful Confinement" (Docket No. 132) and, on November 8, 2010, the court gave the

DOC until November 16, 2010 to determine Ford's future housing placement, and until

November 24, 2010 to hold a hearing in connection with any effort to confine him in a

segregated unit.  (Docket No. 138).  On November 16, 2010, the DOC requested an

extension of these deadlines, which the court granted on November 17, 2010.  (See Docket No. 142, and Docket Entry dated 11/17/2010).

On or about November 14, 2010, Ford was given Disciplinary Report #212833 for allegedly threatening a staff member and destroying state property, i.e., using a sheet to make a "fishing line."  This Report was dismissed by the DOC.  On November 17, 2010, a new disciplinary report was issued, adding DDU-eligible charges and citing additional statements allegedly made by Ford.  Ford denied making any of the alleged statements. (See Docket No. 144).

Ford requested that this court oversee his disciplinary hearing.  That request was denied, although he was allowed to take discovery about the events leading to the disciplinary charge.  (See Docket Nos. 144, 157).  A DDU hearing was conducted into the disciplinary charges and, on December 15, 2010, Ford was given a 10 month DDU sanction for this offense.  Ford challenged this sanction in a State Court certiorari proceeding pursuant to Mass. Gen. Laws ch. 249, § 4, although the status of that case is unknown to this court at this time.  The new 10 month DDU sanction relieved the DOC from having to make an immediate decision as to where to house Ford, as he was now deemed to be serving the 10 month sentence in the DDU.

Ford remained in the DDU for this new offense until August 4, 2011, when he completed his 10 month DDU sanction.  According to the DOC, he was moved to the general population unit at the Souza-Baranowski Correctional Center ("SBCC"), a

maximum-security prison located in Shirley, Massachusetts, where, to the best of this

court's knowledge, he remained.

## The Trial

Prior to trial, Ford dropped his outstanding equal protection claims.  (Docket No.

170 at n.1).  A three day trial was held on July 25, 26 and 27, 2011.  Shortly before trial,

the parties filed eleven motions in limine, some of them raising novel questions of law.

The trial was limited to Ford's claim for damages and injunctive relief arising out of the

violation of Ford's substantive and procedural due process rights.  The plaintiff was

seeking money damages for his 375 days in the DDU as a pretrial detainee, but not for

any of the time that he spent in the DDU after he was convicted.  While the plaintiff was

improperly confined in the DDU following his 2008 conviction, the plaintiff was not

entitled to damages for that period because Bender's liability for Ford's post-conviction

confinement was based only on actions that the defendant took in his official, as opposed

to individual, capacity.  See Hafer v. Melo, 502 U.S. 21, 31, 112 S. Ct. 358, 365, 116 L.

Ed. 2d 301 (1991) (holding that state officials may be sued "in their individual capacities"

for money damages under 42 U.S.C. § 1983).

Ford presented the testimony of an expert and the plaintiff himself.  The defen-

dants called five witnesses, including an expert.  The parties submitted extensive post-

trial proposed findings and rulings, addressing a number of novel issues of law.  On

January 27, 2012, this court issued its extensive Findings of Fact, Rulings of Law and

Order of Judgment.  (Docket No. 210).  The court awarded Ford damages in the amount

of $47,500.00.  With respect to injunctive relief, the court made the following finding:

> Because Ford has been released from the DDU and has been placed
> in the general prison population at SBCC, this court finds it unneces-
> sary to grant his request for injunctive relief (1) enjoining the defen-
> dants from further violating his substantive and procedural due pro-
> cess rights through the imposition of unlawful or expired disciplinary
> sanctions; (2) directing the defendants to assist Ford in his transition
> from restrictive confinement in the DDU to prepare for his release
> from incarceration in April 2012; or (3) directing the defendants to
> provide Ford with individual counseling at least once a week for the
> remainder of his sentence.  However, this court finds, consistent with
> the PLRA's directive, that Ford is entitled to relief in the form of an
> order (1) instructing the DOC to ensure that Ford has, and continues
> to have for the remainder of his sentence, opportunities to participate
> in any transitional programs that are available to general population
> inmates; and (2) directing the DOC to deem satisfied Ford's 10-year
> DDU sanction that was issued in 2002.

(Rulings of Law ¶ 35).  Therefore, judgment entered in favor of the plaintiff and against

the defendants in their individual and official capacities in the amount of $47,500, and an

injunction issued "ordering (1) that the DOC shall ensure that Ford has, and continues to

have for the remainder of his sentence, opportunities to participate in any transitional

programs that are available to general population inmates; and (2) directing the DOC to

deem satisfied Ford's 10-year DDU sanction that was issued in 2002."  (Docket No. 212).

The defendants filed a Motion to Alter Judgment on March 7, 2012, which was

denied by the court on April 19, 2012.  (Docket Nos. 216, 223).  The defendants have

appealed the judgment and the matter is now pending in the First Circuit.

### The Fee Request

There were "numerous WilmerHale attorneys, summer associates, paralegals and staff" working on the case, totaling approximately 5,200 hours. (WilmerHale Mem. at 13). However, the firm is only seeking compensation for the hours worked by the so-called "Lead Associates," namely Timothy Syrett, Dimple Chaudhary and Michael Hoke. They are not seeking compensation for the work of Lisa Pirozzolo, a partner who oversaw the litigation and spent approximately 300 hours on the case, Emily Schulman, another partner who was part of the trial team and who dedicated approximately 170 hours to the case, and support staff. (Id.).

The Lead Associates billed 3,536 hours to the case. (Id.). In their fee petition, Wilmer Hale is seeking compensation for 2,039 hours. (Id. at 1). First, WilmerHale reduced the Lead Associates' hours to 3,136.3 by removing time entries relating to work on claims in which Mr. Ford did not prevail.[1] The time sheets submitted by WilmerHale for this court's review are limited to these 3,136.3 hours. Then the firm reduced these hours by 35% "to further reduce the possibility of seeking fees for unsuccessful claims and to reach an amount proportionate to the relief obtained in this case." (Id. at 14-15). It has applied the rate of $169.50 per hour, which WilmerHale contends (and the defendants dispute) was the rate authorized under the PLRA in 2008. It has not sought the higher rates which would be allowable in subsequent years. (Id. at 15).

---

[1] The excluded claims include Mr. Ford's equal protection claims, ineffective assistance of counsel claim, and other claims based on violations of state statutes and regulations. (WilmerHale Mem. at 13-14; Chaudhary Decl. (Docket No. 214-1) ¶ 8).

In accordance with the terms of its pro bono policy, any legal fees recovered will be applied to unreimbursed costs in this case and other pro bono matters in which the firm is involved.  The firm will also donate a portion of its fees to the Prisoners' Legal Services, which assisted in the case.  "WilmerHale will not retain any fees recovered through this petition as part of its general revenues."  (Id. at 3-4).

## III.  ANALYSIS

### A.  General Standard for Awarding Fees

In accordance with the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, a "prevailing party" in a civil rights action "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."  Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S. Ct. 1933, 1937, 76 L. Ed. 2d 40 (1983) (internal quotation and citation omitted).  Reasonable costs also are recoverable under § 1988. Palmigiano v. Garrahy, 707 F.2d 636, 637 (1st Cir. 1983).  To be a prevailing party, the plaintiff must "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  De Jesus Nazario v. Morris Rodriguez, 554 F.3d 196, 197 (1st Cir. 2009) (quoting Hensley, 461 U.S. at 433, 103 S. Ct. at 1939) (additional citation omitted).  The standard to be applied in the instant case is defined by the "lodestar calculation" normally used to award attorneys' fees, as well as by the PLRA because Mr. Ford was a prisoner.  See 42 U.S.C. § 1997e.

### The Lodestar Calculation

The De Jesus Nazario court summarized the lodestar calculation as follows:

The lodestar is determined by multiplying the number of hours productively spent by a reasonable hourly rate to calculate a base figure.  In crafting its lodestar, the trial court may adjust the hours claimed to remove time that was unreasonably, unnecessarily or inefficiently devoted to the case, and subject to principles of inter-connectedness, the trial court may disallow time spent litigating failed claims.  Finally, the trial court has the discretion to adjust the lodestar itself upwards or downwards based on several different factors, including the results obtained, and the time and labor required for the efficacious handling of the matter.

In making this adjustment, the trial court should be mindful of the complexities of defining the results obtained.  As we have already noted, in determining the quality of the plaintiff's results, we look to a combination of the plaintiff's claim-by-claim success, the relief achieved, and the societal importance of the rights vindicated.  We have further noted that the computational principles employed to evaluate a skimpy damage award or shortfall in other relief are difficult to quantify, and have described a constellation of potential outcomes, and permissible attorney's fees calculations, under each. In particular, we have emphasized that though a meager damage award may be taken into consideration, the [Supreme] Court has squarely disclaimed the proposition that fee awards under § 1988 should be proportionate to the amount of damages a civil plaintiff actually recovers.

Similarly, while a trial court can and should reduce the lodestar to disallow fees for time inefficiently, unnecessarily or unreasonably expended, it must also be mindful of the realities of modern litiga-tion.  It is of course true that each fee case generally rests on its own congeries of facts, but nevertheless, we have previously reversed decisions to substantially reduce hours allowed for pre-trial proceedings, where we have found that significant time was ex-pended and the plaintiff was not responsible for the delay.... Thus, although it is possible, and indeed likely, that the district court may discount some of the time plaintiff's counsel spent in pre-trial proceedings, the district court should take care to excise only fat, leaving sinew and bone untouched.  Beyond these general observa-tions, we leave the determination of a reasonable fee to the sound discretion of the trial court.

554 F.3d at 207-08 (internal footnotes, citations and quotations omitted).  The burden is

on the party claiming fees to prove the reasonableness of the hours claimed.  <u>Burke v.</u>

<u>McDonald.</u>, 572 F.3d 51, 63 (1st Cir. 2009).  While WilmerHale contends that the fee

request has already been reduced to consider the lodestar factors, the defendants disagree.

According to the defendants, not only are the time records insufficient to make the

detailed analysis required under the lodestar approach, but the defendants contend that

there is a significant amount of duplication and time spent on claims for which Ford did

not prevail which should be discounted.  This court's analysis under the lodestar method

will be discussed below.

## **Fees Under the PLRA**

Because Mr. Ford was confined to a correctional facility at the time he brought his

action, his award of attorneys' fees is governed by the PLRA, 42 U.S.C. § 1997e.  As a

general statement, the provisions of the PLRA which complement the lodestar method are

as follows:

>   (d)   Attorney's fees
>
>   (1)  In any action brought by a prison who is confined to any jail,
>   prison, or other correctional facility, in which attorney's fees are
>   authorized under section 1988 of this title, such fees shall not be
>   awarded, except to the extent that –
>
>   >   (A)  the fee was directly and reasonably incurred in proving
>   >   an actual violation of the plaintiff's rights protected by a
>   >   statute pursuant to which a fee may be awarded under section
>   >   1988 of this title; and

(B)(i)  the amount of the fee is proportionately related to the court ordered relief for the violation; or

(ii)  the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

This court's analysis of this general provision will be discussed below.  The PLRA also contains specific limitations on the amount of fees that can be awarded.  The applicability of virtually each one of these limitations is disputed by the parties, and they will be discussed separately in the next section.

**B.     Limitations Under the PLRA**

**Overall Cap on Fees**

The PLRA contains a provision capping fees at 150% of the monetary judgment awarded.  Thus, 42 U.S.C. § 1997e(d)(2) provides:

> Whenever a monetary judgment is awarded ..., a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant.  If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

This has been interpreted to mean that "the statute caps the defendants' liability for attorneys' fees at 150% of the judgment."  Boivin v. Black, 225 F.3d 36, 38, 40 (1st Cir. 2000) (noting that while the statute "is awkwardly phrased, its import and its essence are transparently clear").  The parties disagree as to whether this cap applies in the instant case.  This court concludes that it does not.[2]

---

[2]  It is undisputed that if the cap applies, the award of legal fees would be limited to $71,250.00.

The courts addressing the issue have all determined that this cap has no application where the court has ordered non-monetary redress in the form of an injunction, along with the monetary judgment.  Id. at 41 n.4.  "In such a 'hybrid' case,' the court [is] free to take into account all the provisions of section 1997e(d)."  Id.  See also Dannenberg v. Valadez, 338 F.3d 1070, 1074 (9th Cir. 2003), and cases cited ("In the context of prison litigation, which frequently involves constitutional challenges to prison conditions or practices for which the desired relief is primarily nonmonetary, a rule that tethered attorneys' fees solely to monetary relief would be difficult to square with the rest of section 1997e(d).").  Since Ford was awarded injunctive and monetary relief, the cap does not apply.

The defendants seek to avoid this conclusion on two grounds.  First, they argue that "the Court committed a manifest error of law by ordering injunctive relief."  (Defs. Mem. (Docket No. 221) at 7).  That issue is presently before the First Circuit and will presumably be decided finally by that court.  For the reasons detailed in this court's Findings and Rulings and denial of defendants' Motion to Vacate Judgment, this court concluded that injunctive relief was appropriate.  It is not convinced otherwise at this time.

The defendants further assert that the instant case differs from Boivin in that the injunction issued in this case was allegedly to remedy a past constitutional violation, and not to stop a current and ongoing constitution violation.  (Defs. Mem. at 8).  Consequently, the defendants argue, the cap should apply.  This argument fails for several reasons.

14

First, no such distinction is made in <u>Boivin.</u>  Relying on the language of the statute, the court found that the cap applies to the award of monetary damages only — the type of injunctive relief had no significance.  Second, the injunctive relief ordered in this case included the order that Ford's DDU sanction be deemed to have been satisfied, which would have a prospective effect if he is incarcerated in the future.  In <u>Dannenberg</u>, the trial court's injunction expunging materials related to an improper disciplinary report was sufficient to preclude the applicability of the 150% cap to the prisoner's request for fees.  <u>See</u> <u>Dannenberg</u>, 338 F.3d at 1074.  The same result should be reached here.

<b><u>Amount of Plaintiff's Contribution</u></b>

The defendants argue next that 25% of the judgment awarded to Ford should be applied to any award of attorneys' fees.  This argument is based on the language in 42 U.S.C. § 1997e(d)(2) that "a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant."  This court agrees with those courts which have found that "[t]he plain language of the 25-percent provision is unambiguous and does not support [the defendants'] reading.  The statute does not compel district courts to apply 25 percent of the judgment to pay attorney's fees when the attorney's fee award exceeds that amount."  <u>Parker v. Conway,</u> 581 F.3d 198, 204-05 (3d Cir. 2009), and cases cited.  In the instant case, based on the defendants' steadfast refusal to give Ford a hearing before putting him in the DDU, the fact that monetary damages can never fully compensate the plaintiff for the harm he suffered for being improperly housed in the DDU, and the significant  constitutional

15

rights which Ford has vindicated, this court orders that $1.00 of Ford's monetary

judgment be applied to legal fees.  See Thompson v. Torres, Civil Action No. 00-10981-

RWZ, 2010 WL 4919058, at *2 (D. Mass. Nov. 29, 2010) (holding that "the

determination as to how much of the [fee] award is paid out of the judgment is a matter of

discretion[,]" and applying "the minimum $1 of the judgment toward the award of

attorney's fees"); Siggers-El v. Barlow, 433 F. Supp. 2d 811, 822-23 (E.D. Mich. 2006)

(finding that PLRA contribution requirement "does not provide courts with guidance for

determining the percentage" of the plaintiff's contribution, and ordering plaintiff to pay

$1 of $219,000 judgment, which included $200,000 in punitive damages).

## The Appropriate Hourly Rate

The parties dispute the appropriate hourly rate of compensation fo the plaintiff's

attorneys' work.  42 U.S.C. § 1997e(d)(3) states that the attorney's fees awarded under

the PLRA cannot be "based on an hourly rate greater than 150 percent of the hourly rate"

established by statute "for payment of court-appointed counsel."  At issue is whether the

rate is based on the amount authorized by the Judicial Conference or the amount actually

paid to court-appointed counsel in the district.  Thus, the defendants argue that the

plaintiff should be limited to the rate of $150/hour, since the actual rate paid to CJA

counsel in this district in 2008 was $100 per hour.  (Defs. Mem. at 17).  Plaintiff,

however, has used the rate of $169.50 per hour, that being 150 percent of the $113/hour

authorized by the Judicial Conference for 2208.  (WilmerHale Mem. at 12).  In using that

rate, plaintiff has foregone the increased rate to which counsel would be entitled in later

years, during which higher CJA rates had been approved.[3]  Recognizing that different

courts have interpreted the statute differently, this court finds that the rate of $169.50 for

all years would be appropriate.

The issue has been fully addressed by Judge Stearns in Hudson v. Dennehy, 568 F.

Supp. 2d 125, 131-33 (D. Mass. 2008).  As detailed therein, "the statute is not written in

terms of what was actually paid[,]" but rather "caps fees at 150 percent of the hourly rate

established for payment of court-appointed counsel."  Id. at 132.  Based on the language

of the statute, like Judge Stearns, this court will follow "the Sixth and Ninth Circuits in

holding that the maximum hourly rate available to plaintiffs' counsel pursuant to the

PLRA is 150 percent of the Judicial Conference's rate of $113, or $169.50 per hour."  Id.

at 133.  The court accepts WilmerHale's offer to apply that rate to all the years at issue in

this fee petition.

### Calculation of Compensable Hours

As detailed above, the court generally applies the lodestar approach modified by

the PLRA in determining the appropriate number of compensable hours.  This matter is

made somewhat more complicated in the instant case because the court has not been

presented with all the time records.  Rather, WilmerHale only has submitted the time

records for 3,136.3 hours, which the firm contends has already been reduced for unsuc-

cessful claims.  This has made it harder for the court to evaluate the requested time

---

[3]  150% of subsequent CJA rates would have yielded $177/hour in 2009, $208.50/hour in 2010, and $211/hour in 2011.  (WilmerHale Mem. at 15-16).

charges in context, or to reconcile many of the charges with specific pleadings.  It also has made it impossible to reduce any fee award based on the percentage of claims which were unsuccessful, as defendants argue, since those hours have already been eliminated. While as a general statement this court finds the time records to be sufficiently detailed, the fact that they have been edited already makes it more difficult to follow the overall course of the litigation.  Similarly complicating this court's analysis is the fact that the defendants have not provided time charges for entries to which they object; rather, they just list entries by dates.  Moreover, some of these citations to dates are incorrect.  What follows, then, is this court's best calculation of amounts charged to specific tasks which the court has found to be non-compensable.

As detailed above, recovery is limited under the PLRA to fees that were "directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute[.]"  Moreover, under the lodestar method, this court shall disallow time spent litigating failed claims, and shall eliminate time spent inefficiently, unnecessarily or unreasonably.  After an extensive analysis of the records submitted, this court concludes that the following time is not appropriately compensated under this fee petition.

a.      In preparing for the summary judgment argument, the three counsel spent a total of approximately 124 hours.  This court finds this amount of time to be excessive, and will discount those hours by 50%, reducing the fee petition by 62 hours.

b.      Counsel devoted approximately 86 hours in connection with defending Ford against the new charges which resulted in the 10 month DDU sentence in 2010 following this court's summary judgment ruling. Since that time was not directly incurred in proving the violation of Ford's constitutional rights, it is not compensable.

c.      Counsel devoted approximately 50 hours in connection with the unsuccessful motion seeking court oversight of the disciplinary proceedings brought against Ford.  Again, this time is not compensable as the motion was not successful and was not directly related to proving the constitutional violation.

d.      Counsel devoted approximately 78 hours to mediation efforts which were not successful and which were not directly related to proving the constitutional violation.  Therefore, this time is not compensable.

e.      Approximately 42 hours were spent bringing Attorney Chaudhary up to speed after Attorney Hoke left the firm.  This time should not be charged to the defendants.

f.      Approximately 34 hours were spent in connection with a proposed motion to increase Ford's telephone access with counsel.  Since this motion was not pursued, and was not directly related to proving the constitutional violation, this time will not be compensated herein.

       g.     The defendants have identified approximately 17 hours spent in connection with issues not related to the constitutional violations and/or spent in connection with claims against other defendants.  This time includes withdrawing duplicative motions filed with the court (1.4 hours), dismissing non-DOC defendants (4.2 hours), research filing with the state court (3.4 hours), sending letters to other attorneys (.4 hours), or researching the use of plaintiff's deposition at trial (7.9 hours).

After subtracting all these hours from the original 3,136.3 hours, 2,767 hours remain.

WilmerHale has proposed reducing its hours by 35% to account for other duplication.  This court concludes that a 45% reduction is more appropriate.  A review of the time sheets shows that for every significant communication, pleading or event in the case, counsel reported to numerous other counsel and time was charged for each such internal communication.  In addition, there were numerous internal meetings for which multiple attorneys billed time.  Several attorneys reviewed and edited each pleading, so time was charged for editing and rewriting multiple times.  While this court recognizes that this *pro bono* litigation was an excellent learning opportunity, the time spent was excessive.

Reducing 2,767 hours by 45% leaves 1,521.85 hours of compensable time.  At the rate of $169.50 per hour, the amount of compensable fees is $257,953.57, which this court rounds to $258,000.00.  The costs being sought of $20,456.36 are not in dispute.  This court also finds that $258,000 in legal fees is appropriate given the scope of the

litigation, and is proportionately related to the relief afforded Ford.  Six times the amount

of the monetary award is not excessive given the significant constitutional issues involved

here.

Finally, the $258,000 in fees is commensurate with the amount of work needed to

bring this case to resolution.  The fact discovery was appropriate in scope and necessary

to all the legal claims presented.  The core issue throughout the case remained the same

— whether Ford was appropriately detained in the DDU for years without a hearing for a

disciplinary infraction.  Although a number of legal theories were proffered, they were all

premised on a common nucleus of facts.  In addition, there were several rounds of

summary judgment pleadings, a three day trial, and extensive post-trial pleadings

involving difficult and complex legal issues.  Under such circumstances, this court finds

the amount of $258,000 to be appropriate.

## **ORDER**

For all there reasons detailed here, Plaintiff's Motion for Attorneys' Fees and Bill

of Costs (Docket No. 213) is ALLOWED in part.  WilmerHale is awarded fees in the

amount of $258,000 and costs of $20,456.36.

　　　　　　　　　　　　　　   / s / Judith Gail Dein
　　　　　　　　　　　　　　Judith Gail Dein
　　　　　　　　　　　　　　U.S. Magistrate Judge